## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09- _10235_ (___) |
| Debtors. | Joint Administration Requested |

### AFFIDAVIT OF CHARLES A. HINRICHS IN SUPPORT OF FIRST DAY MOTIONS

STATE OF ILLINOIS      )
                       )  ss:
COUNTY OF COOK         )

CHARLES A. HINRICHS being duly sworn, deposes and states:

1.      I am the Chief Financial Officer and a Senior Vice President of Smurfit-Stone Container Corporation ("SSCC"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").[2] SSCC is a holding company that conducts its business operations through its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc. ("SSCE").  SSCE is the direct or indirect parent company of all of the other Debtors herein and their respective non-debtor affiliates.  In addition, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (TBD), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 150 North Michigan Avenue, Chicago, Illinois 60601.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

2.     On the date hereof ("Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") (collectively, the "Chapter 11 Cases").

3.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

4.     In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain "First Day" motions (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other goals, (a) preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management systems and other business operations; (d) securing the post-petition financing necessary to continue the Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into Chapter 11.  The achievement of the aforementioned goals will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

5.     I submit this affidavit ("Affidavit") in support of the First Day Motions.  I am familiar with the contents of each First Day Motion (including the exhibits attached thereto) and believe that the relief sought (i) is necessary to preserve the value and productivity of Debtors' operations, (ii) is integral to the successful reorganization of the Debtors, and (iii) serves the best interests of the Debtors, and the Debtors' estates and creditors.

2

6.    Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, materials provided by members of the Debtors' management team, information provided by professionals the Debtors retained, or information obtained from my review of relevant documents.  Additionally, the opinions asserted in this affidavit are based upon my experience and knowledge of the Debtors' operations, financial condition and liquidity. If called upon to testify, I would competently testify to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of each of the Debtors.

7.    Part I of this Affidavit describes the Debtors' business operations and corporate history, along with the circumstances surrounding the commencement of these Chapter 11 Cases.  Part II explains the Debtors' prepetition capital structure and indebtedness.  Finally, Part III sets forth the relevant facts in support of each of the First Day Motions.

**PART I**

**Overview of the Debtors' Business Operations**

8.    SSCC is a holding company that conducts its business operations through its wholly-owned subsidiary SSCE.  SSCE is the direct or indirect parent company of all of the other Debtors and their respective non-debtor affiliates (collectively with SSCC and SSCE, the "Company").  The Company is one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers.  The Company sells a broad range of paper-based packaging products, including containerboard, corrugated containers, kraft paper and point of purchase displays, to a broad range of manufacturers of industrial and consumer products.

9.    The Company operates 162 manufacturing facilities that are primarily located in the United States and Canada, including 14 paper mills (12 in the United States and 2 in Canada), 122 container plants (102 in the United States (including 1 in Puerto Rico), 16 in

3

000000.0

Canada, 3 in Mexico, and 1 in China), and 26 reclamation plants (all in the United States).  The

Company also owns approximately one million acres of timberland in Canada and operates wood

harvesting facilities in Canada and the United States.  The Company employs approximately

21,250 employees, of whom approximately 17,400 are based in the United States.  For the fiscal

year ended December 31, 2007, the Company recorded revenues of approximately $7.420

billion, resulting in a net loss of approximately $115 million for fiscal year 2007.  For the

quarterly period ended September 30, 2008, the Company reported approximately $7.450 billion

in total assets and $5.582 billion in total liabilities on a consolidated basis.

**Products and Materials**

      **Paper Products**

      10.    SSCC produces a full range of high-quality, corrugated containers designed

to protect, ship, store and display products.  The containers are made to SSCC's customers'

merchandising and distribution specifications and are sold to a broad range of consumer goods

manufacturers.  SSCC also manufactures and sells a variety of retail ready, point-of-purchase

displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the

food industry, Cordeck® recyclable pallets, and custom die-cut boxes to display merchandise on

the sales floor.  In 2008, the corrugated containers operations generated approximately 64% of

the Company's net sales

      11.    In addition to the corrugated container products, Company mills also

produce a full line of containerboard, which is used primarily in the production of corrugated

packaging.  In 2008, the Company's containerboard mills produced 6.9 million tons of

containerboard.  The Company produces approximately 4.5 million tons of linerboard and 2.4

million tons of medium, with 69% of such production consumed internally.  In 2008, the

containerboard operations generated approximately 19% of the Company's net sales.

12.    The Company also has the ability to produce market pulp, kraft paper, and other specialty products, including southern hardwood pulp, bleached southern softwood pulp, and fluff pulp.  These materials are sold to manufacturers of paper products as well as those within the printing and writing sectors.  The Company's kraft paper is used in consumer and industrial bags, grocery and other types of shopping bags, counter rolls, handle stock, and refuse bags.

### Paper and Corrugated Container Manufacturing Process

13.    Several steps are necessary to create paper suitable for paper-based packaging.  This process begins when trees are cut, debarked and sent through a chipper.  The resulting chips are then placed into a pressure cooker that separates chemical compounds from the wood fiber.  This fiber is washed to remove additional chemicals.  Black liquor, bark, sawdust and wastewater treatment solids are put into power and recovery boilers to create steam.  The pulp is then moved to a decker, a machine used to thicken fibers, while a disc refiner brushes and cuts the fibers to increase strength.  This mixture then travels to a machine tank, where it is diluted with water.  Chemicals may also be added, depending on the requirements of the finished paper.  The pulp then moves to the paper machine headbox, which distributes the material on a wire mesh conveyor to remove excess water.  The paper then moves through a dryer section.  Finally, the paper is rolled, cut and shipped to corrugating plants, where it can then be transformed into paper-based packaging.

14.    Producing corrugated containers is also a multi-step process.  Production begins when roll stock medium is inserted into a machine, where it is heated, moistened and formed into a fluted pattern and bonded to the inside or single-face liner.  Single-face board is then fed into a machine where the outside paper, or double-face liner, is affixed to the fluted

5

medium to form single-wall corrugated board. Hot plates remove excess moisture and help set

starch-based glue. The board is then fed into a device that trims the board to appropriate widths

and adds lines for later folding. Knives cut the board to the required length. These cut-to-size

sheets are stacked in preparation for finishing. Finishing then cuts, folds, glues and prints the

sheets into the finished product. Finally, flat boxes are bundled, stacked into units and banded

for shipment.

### Reclamation Facilities

15.    The Company is one of the world's largest paper recyclers, handling

approximately 6.6 million tons of recovered paper annually through its 26 reclamation facilities.

The recycling operations collect or broker wastepaper, aluminum, and plastics for sale to

Company-owned and third-party mills. The recycling business has the capacity and flexibility to

process recovered paper generated by industrial, commercial and residential sources. The

process includes collecting, sorting, grading, and baling recycled paper. In 2008, the Company's

paper mills consumed 2.6 million tons of the waste paper reclaimed and brokered by reclamation

operations, representing an integration level of approximately 39%. The remaining sales of

waste paper were to other domestic paper companies and export markets.

### Raw Materials

16.    The products that the Company produces require, among other things,

wood fiber and reclaimed fiber as the principal raw materials. The Company satisfies the

majority of its demand for wood fiber through purchases on the open market or under supply

agreements with certain providers. Approximately 90% of the Company's wood fiber needs are

met on the open market. The remaining 10% comes directly from individual landowners. The

Company satisfies essentially all of its need for reclaimed fiber primarily through its reclamation

facilities and nationwide brokerage system.

6

17.     The Company is also party to several different exchange agreements with certain paper manufacturers.  These agreements create a reciprocal relationship in which the Company requires a quantity of containerboard from certain suppliers.  In consideration, the Company exchanges its internally produced containerboard with these suppliers.  The exchanges under these agreements reduce costs, maximize paper machine efficiencies, and allow the Company to obtain grades of paper which it does not produce.

**Employees**

18.     The Debtors currently employ approximately 20,000 active employees, of whom approximately 14,200 are hourly Employees and 5,800 are salaried Employees. Approximately 11,640, or over sixty-five percent (65%), of these Employees are represented by unions and covered under one of approximately 125 collective bargaining agreements.  The collective bargaining agreements in place at the nine U.S. facilities expire at various times between 2009 and 2012.[3]  While the terms of the collective bargaining agreements may vary, the material terms of such agreements are customary for the industry, the type of facility, the classification of the employees, and the geographic location covered thereby.

19.     The Company sponsors defined benefit pension plans for its U.S. and Canadian employees, including substantially all hourly employees as well as salaried employees hired prior to January 1, 2006.  In 2007, the Company announced the freeze of its defined benefit pension plans for salaried employees effective January 1, 2009.  As of December 31, 2007, the Company's net unfunded defined benefit pension obligation totaled $407 million.  Although the Company's 2008 financial results are not finalized, this obligation is expected to increase substantially.  Additionally, the Company maintains 401(k) plans for its U.S. salaried work force and a number of hourly employees.

7

20.     The Company recognizes the value of providing employees with a safe and accident-free workplace and has therefore made efforts to be the industry leader in safety. In accordance with the Smurfit-Stone Accident-Free Environment ("SAFE") process that was established in 1994, the Company offers safety training for key managers, an in-house SAFE leadership training program for line supervisors, and a host of additional data analysis and employee development processes. As a result of these efforts and the diligence of its employees, the Company has consistently achieved a Recordable Case Rate ("RCR") of 1.05, significantly lower than the rest of the paper industry. Consequently, the number of lost days to injuries has reduced dramatically over the past four years.

**Customers**

21.     The Company obtains new customers and maintains long-term customer relationships through various sales, marketing, and distribution channels. The Company's marketing strategy is based on selling a broad range of paper-based packaging products to manufacturers of industrial and consumer products. This strategy has created a broad customer base which consists of sales directly to end-users and converters as well as to resellers. To serve their customer base, the Company has centralized its marketing and sale of containerboard and pulp to third-parties in the Company's board sales group located in Chicago, Illinois, and West Point, Virginia. Corrugated container plants, however, remain responsible for generating their own sales with the assistance of regional, divisional, or corporate sales staff, depending on the type of customer. The Company also offers many of its customers volume rebate incentives. The Company negotiates these rebates directly with the customer at the plant level and generally pays the rebates annually.

---

[3] The union contract at Panama City, Florida was scheduled to expire in March 2008, but the contract remains open.

DB02:7750749.1                                                                    000000.0

22.   The Company greatly values its diversified and high-quality customer base. The Company produces paper products and containerboard for some of the world's largest producers. The Company's top customers include Kellogg Company, PepsiCo Inc., Unilever, and Smithfield Foods Inc. In addition to these high-volume customers, the Company is also able to efficiently and economically serve local regional customers. No single customer accounted for more than 3% of the Company's sales during the twelve months ending in June 2008. In fact, during that time period, the Company's top fifteen customers represented less than 20% of the Company's total sales.

**Corporate History and Structure**

23.   Jefferson Smurfit Group plc, an Ireland-based packaging conglomerate, created Jefferson Smurfit Corporation ("JSC") in 1983 as a holding company for its U.S. interests. In the years following its creation, JSC acquired several container companies and operations, including Container Corporation of America and Alton Boxboard Company. By 1997, JSC had achieved sales of more than $4 billion.

24.   Stone Container Corporation ("SCC") was founded in 1926 as J.H. Stone and Company in Chicago, Illinois, and incorporated in 1945 under the name Stone Container Corporation. Following this formation, SCC expanded throughout the Midwest, building and buying corrugated container plants. SCC continued this expansion by purchasing mills throughout the U.S. and establishing an international presence in Latin America, Asia and Europe.

25.   On May 10, 1998, JSC, now known as SSCC, entered into an agreement and plan of merger ("Merger Agreement") with JSC Acquisition Corporation ("JSC Acquisition"), a wholly-owned subsidiary of the Company, and SCC. Pursuant to the terms of the Merger Agreement, JSC Acquisition was merged with and into SCC (the "Merger") on

9

November 18, 1998.  As a result of the Merger, each issued and outstanding share of common

stock of SCC was converted into the right to receive .99 shares of SSCC common stock, and

SCC became a wholly-owned subsidiary of SSCC.  SSCC continues to own 100% of the equity

interest of SSCE, which resulted from a December 1, 2004 merger of JSCE, Inc. ("JSCE") and

Jefferson Smurfit Corporation (U.S.) ("JSCUS") and a further merger with SCC that survived the

merger and was renamed SSCE.

26.    This newly-formed Company then focused on strategic expansion,

elimination of unnecessary facilities and operations, and cost reduction. The Company's strategy

for expansion entailed acquiring corporations that would enable it to improve efficiency levels,

broaden its high-quality containerboard offerings, and meet the growing demand for value-added

packaging.  As part of this strategy, in May 2000, the Company acquired Montreal-based St.

Laurent Paperboard, Inc., a major manufacturer, supplier, and converter of high-quality, value-

added paper board products.  Additionally, in September 2002, the Company acquired

MeadWestvaco's corrugated medium mill facility and related assets located in Stevenson,

Alabama.  Finally, in March 2003, the Company completed a transaction with Jefferson Smurfit

Group involving (1) the sale of the Company's European operations to the Jefferson Smurfit

Group plc and (2) the Company's purchase of the Jefferson Smurfit Group's 50% ownership in

Smurfit-MBI – a Canadian packaging business.  This transaction gave the Company 100%

ownership of Smurfit-MBI but effectively ended its manufacturing presence in Europe.

27.    These transactions were followed by the decision to close various facilities

and operations.  Since 2005, the Company has closed 36 box plants.  Furthermore, in June 2006

the Company completed the sale of its consumer packaging division for $1.04 billion, and in

September 2007, the Company completed the sale of its Brewton, Alabama, mill assets for $355

million. The Company has also completed the closure of its higher cost Snowflake, Arizona, medium machine and exited the hardwood pulp business with the permanent closure of its pulp mill in Portage du Fort, Québec in October 2008. Moreover, in the first half of 2009, the Company plans to close an additional six higher cost converting plants.

## Circumstances Leading to the Commencement of These Chapter 11 Cases

28.    The Company's financial performance depends primarily upon the market demand for its products and the prices that it receives for such products. The recent downturn in the global economy has resulted in an unprecedented decline in demand for the Company's products, leading to increased inventory levels and downward pressure on the Company's operating income. At the same time, substantial price competition and volatility in the pulp and paper industry has resulted in decreased prices for the Company's products which, coupled with the Company's leveraged financial position and the recent volatility in energy prices and the cost of raw materials, have adversely impacted the Company's financial performance. In addition, recent and dramatic changes in the capital markets have adversely impacted the Company's prospects for refinancing its revolving credit and securitization facilities. Because of these factors, the Debtors have found it necessary to commence these chapter 11 cases.

## Commencement of Concurrent Proceedings Under the CCAA

29.    On the Petition Date, following the commencement of these chapter 11 proceedings, certain of the Debtors – including Smurfit-Stone Container Canada Inc., a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Cross-Border Debtors")[4] – will apply for protection from their creditors in Canada pursuant to the Companies'

---

[4] The Cross-Border Debtors are Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. Smurfit-MBI and SLP Finance General Partnership will not apply for protection under the CCAA

11

Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA) or other insolvency laws in the

Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"). The Cross-Border

Debtors will seek, inter alia, an order from the Canadian Court imposing a stay of all proceedings

(the "CCAA Stay") against the Cross-Border Debtors and their property in Canada.

**Current Equity-Ownership Structure**

       30.    SSCC currently has two classes of interests – Common Stock and a 7%

Series A Preferred Stock. SSCC is the sole shareholder of SSCE, and SSCE is either the direct

or indirect parent company of the remaining Debtors and their respective non-debtor affiliates.

## PART II

**Summary of Prepetition Indebtedness**

       31.    Prior to the Petition Date, the Debtors funded their operations with four

different types of debt financing. First, the Debtors arranged senior secured bank financing

comprised of term loans and revolving credit facilities (the "Pre-Petition Secured Debt"). The

aggregate amount of Pre-Petition Secured Debt outstanding as of the Petition Date was

approximately $1.2 billion. Second, the Debtors issued long-term debt comprised of five series

of unsecured notes, which have an aggregate principal amount outstanding of $2.275 billion (the

"Senior Note Debt") as of the Petition Date. Third, the Debtors established two accounts

receivable securitization facilities (the "Securitization Facilities") – one in the United States (the

"U.S. Securitization Facility") and one in Canada (the "Canadian Securitization Facility"). As of

the Petition Date, receivables sold by the Debtors (in which the Debtors have a residual interest)

secure approximately $350 million and $38 million in obligations related to the U.S.

Securitization Facility and the Canadian Securitization Facility, respectively. Finally, as of the

---

but will instead seek recognition of their respective Chapter 11 Cases in the Canadian Court and an order granting
charges over the assets of each of Smurfit-MBI and SLP Finance General Partnership to secure their respective DIP

Petition Date, the Debtors were obligated on approximately $284 million of tax-exempt utility

systems bonds, industrial revenue bonds and similar bonds. Each of the Debtors' four primary

types of pre-petition financing is described in greater detail below.

### Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement

32.    SSCE and its wholly-owned subsidiary, Smurfit-Stone Container Canada,

Inc. ("SSC Canada"), are borrowers under that certain Credit Agreement, dated as of November

1, 2004, with JPMorgan Chase Bank and several other financial institutions (as amended,

restated or modified from time to time, the "Pre-Petition Credit Agreement"). The Pre-Petition

Credit Agreement provided for, among other things:

> (i) a U.S. revolving credit facility of $600 million – approximately $468 million of loans and $131 million of letters of credit were outstanding as of the Petition Date;
>
> (ii) a Canadian revolving credit facility of $200 million (also available to SSCE, as borrower) – approximately $171 million of loans and $27 million of letters of credit were outstanding as of the Petition Date;
>
> (iii) a U.S. Tranche B term loan of $975 million – approximately $137 million was outstanding as of the Petition Date;
>
> (iv) a Canadian Tranche C term loan of $300 million – approximately $258 million was outstanding as of the Petition Date;
>
> (v) a Canadian Tranche C-1 term loan of $90 million – approximately $78 million was outstanding as of the Petition Date; and
>
> (vi) a deposit-funded letter of credit facility with approximately $122 million of letters of credit outstanding as of the Petition Date.

Both of the revolving credit facilities were scheduled to mature on November 1, 2009, and the

term loans were payable in quarterly installments, ending on November 1, 2011.

---

Obligations, under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.

000000.0

33.    SSCC guaranteed all of the obligations of SSCE (the "Pre-Petition U.S. Obligations") under the Pre-Petition Credit Agreement.[5] Certain material subsidiaries of SSC Canada (the "Pre-Petition Canadian Guarantors"), as well as SSCC and SSCE, guaranteed the obligations of SSC Canada (the "Pre-Petition Canadian Obligations") under the Pre-Petition Credit Agreement.

34.    The Pre-Petition U.S. Obligations are secured by liens on substantially all of the assets of SSCC and SSCE, as well as by the capital stock of SSCE and 65% of the capital stock of SSC Canada.  The Pre-Petition Canadian Obligations are secured by liens on substantially all of the assets of SSC Canada and the Pre-Petition Canadian Guarantors, pledges of all of the capital stock of the Pre-Petition Canadian Guarantors, and the liens and stock pledges securing the Pre-Petition U.S. Obligations.[6]

**Senior Note Debt**

35.    SSCE is obligated under five separate series of unsecured notes with an aggregate principal amount of $2.275 billion:

(i) 8.375% unsecured notes in the aggregate principal amount of $400 million, due on 7/1/12;

(ii) 8.25% unsecured notes in the aggregate principal amount of $700 million, due on 10/1/12;

(iii) 7.50% unsecured notes in the aggregate principal amount of $300 million, due on 6/1/13;

(iv) 8.00% unsecured notes in the aggregate principal amount of $675 million, due on 3/15/17; and

---

[5] The Pre-Petition Credit Agreement also required SSCE's material domestic subsidiaries to guarantee SSCE's obligations under the agreement.  However, as of the Petition Date, none of SSCE's domestic subsidiaries are deemed material for purposes of the agreement and none are obligated on a guaranty of SSCE's obligations under the agreement.

[6] The Debtors' material assets that do not constitute collateral under the Pre-Petition Credit Agreement consist primarily of three mills and approximately thirty corrugated container facilities.

(v) 7.375% unsecured notes in the aggregate principal amount of $200 million, due on 7/15/14.

The 7.375% unsecured notes were issued by Stone Container Finance Company of Canada II and were guaranteed by SSCE. Each of the other four series of unsecured notes was issued directly by SSCE or by a predecessor of SSCE.

### Securitization Facilities

36.    SSCE participates in the $475 million U.S. Securitization Facility, pursuant to which it sells, on an ongoing basis and without recourse, certain of its accounts receivable to Stone Receivables, LLC ("SRC"), a wholly-owned non-consolidated subsidiary of SSCE. SRC then transfers the receivables to a non-consolidated subsidiary, SSCE Funding, LLC (the "Securitization Issuer"). The Securitization Issuer in turn issues notes to third-party investors, pursuant to (a) that certain Master Indenture, dated as of November 23, 2004 (the "Indenture"), between the Securitization Issuer and Deutsche Bank Trust Company Americas, as Indenture Trustee (in such capacity, the "Securitization Trustee"), (b) that certain Series 2004-1 Indenture Supplement to Master Indenture, dated as of November 23, 2004 (the "Indenture Supplement"), between the Securitization Issuer and the Securitization Trustee, and (c) that certain Series 2004-2 Indenture Supplement to Master Indenture, dated as of November 23, 2004, between the Securitization Issuer and the Securitization Trustee, in each case, as amended, restated, modified or waived from time to time. The notes issued pursuant to the Series 2004-2 Indenture Supplement have since been defeased. Copies of the Indenture and Indenture Supplement are attached as Exhibit B to the DIP Financing Motion discussed below in Part III. The U.S. Securitization Facility is scheduled to mature on November 15, 2009.

37.    As of the Petition Date, over $485 million of receivables sold by SSCE into the U.S. Securitization Facility secure approximately $350 million in outstanding notes issued by

the Securitization Issuer under the Indenture. As discussed in Part III below, the Debtors are

seeking to use proceeds from the DIP Facility to defease the outstanding notes under the U.S.

Securitization Facility in order to regain ownership of their receivables. The Debtors will then

have immediate access going forward to the proceeds realized from collections on the

receivables, and the receivables will constitute a key component of the borrowing base under the

DIP Facility.

38.    SSCE, through its wholly-owned subsidiary Smurfit-MBI, also participates

in the $70 million Canadian Securitization Facility, pursuant to which it sells, on an ongoing

basis and without recourse, certain of its Canadian accounts receivable to an asset-backed

commercial paper conduit (the "Canadian CP Conduit").[7] The Canadian Securitization Facility

is scheduled to mature on March 31, 2009. As of the Petition Date, over $52 million of

receivables sold by SSCE into the Canadian Securitization Facility secure approximately $30.4

million in indebtedness and other obligations outstanding under the Canadian Securitization

Facility. For the same reasons as discussed above with respect to the U.S. Securitization Facility

and as explained further below in Part III, proceeds from the DIP Facility will be used to

refinance this outstanding indebtedness under the Canadian Securitization Facility.

**Utility and Industrial Revenue Bonds and Other Debt Obligations**

39.    SSCE is an obligor on approximately $284 million in aggregate principal

amount of tax-exempt utility bonds, environmental improvement bonds, industrial revenue bonds

and similar bonds issued by local government entities. Approximately $122 million of these

variable rate industrial revenue bonds are secured by letters of credit issued under the deposit

---

[7] The sale occurred pursuant to that certain Receivables Purchase Agreement, dates as of March 30, 2004, among MBI/Limited.Limitee, as the general partner of Smurfit-MBI, and certain other parties.

16

funded letter of credit facility provided under the Pre-Petition Credit Agreement.[8]  These (and

any other) outstanding letters of credit under the Pre-Petition Credit Agreement will not be

replaced or rolled into the DIP Facility.

## PART III

40.    Concurrently with the filing of these Chapter 11 Cases, the Debtors have

filed a number of First Day Motions, consisting of administrative motions and motions relating

to the Debtors' business operations.  The Debtors believe, and I agree, that approval of each First

Day Motion is an important element of their reorganization efforts and is necessary to ensure a

smooth transition into chapter 11 with minimal disruption to their operations.  I have reviewed

each of the First Day Motions, including the exhibits thereto, and believe that the relief requested

therein is critical to the Debtors' ability to achieve a successful reorganization.  Factual

information with respect to each First Day Motion is provided below and in each First Day

Motion.  Capitalized terms, to the extent not defined herein, have the meaning as defined in the

respective First Day Motions.

### Administrative Motions

#### Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (The "Joint Administration Motion")

41.    These chapter 11 cases involve 25 affiliated Debtors.  Many, if not most, of

the motions, applications, and other pleadings that will be filed in these chapter 11 cases will

relate to relief jointly sought by all of the Debtors.  Joint administration of these chapter 11 cases

will therefore promote efficiency and ease the administrative burden on the Court and all parties

in interest.  It will permit the Clerk of the Court to utilize a single docket for all of the cases,

---

[8] In conjunction with its July 29, 2008 acquisition of Calpine Corrugated, LLC ("Calpine") – an independent corrugated container producer in Fresno, California, for which SSCC is the primary containerboard supplier – SSCE agreed to guarantee Calpine's outstanding funded bank debt.  As of the Petition Date, Calpine's aggregate amount of debt guaranteed by SSCE was approximately $46 million.

creating a centralized location for the numerous documents that are likely to be filed and served

in these cases and for all notices and orders entered by the Court. Joint administration will also

enable parties-in-interest in each of the chapter 11 cases to stay apprised of all the various

matters before the Court.

42.    Because these chapter 11 cases involve 25 individual Debtors, joint

administration will also significantly reduce the volume of paper that otherwise would be filed

with the Clerk of this Court, will render the completion of various administrative tasks less

costly, and will minimize the number of unnecessary delays. Moreover, the relief requested by

this Joint Administration Motion will simplify supervision of the administrative aspects of these

cases by the Office of the United States Trustee.

43.    For these reasons, the Debtors believe, and I agree, that the relief requested

the Joint Administration Motion is in the best interests of the Debtors and their estates, will

reduce the administrative burdens on the Court and all parties in interest, and therefore should be

granted.

### Motion for an Order Granting the Debtors Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (The "Schedules Motion")

44.    Debtors seek an extension of thirty (30) days to file their Schedules and

Statements, without prejudice to the Debtors' ability to request additional time if necessary. The

extension requested herein is in addition to the automatic fifteen (15) day extension that I

understand is provided pursuant to the Local Rules and would give the Debtors a total of sixty

(60) days from the Petition Date to file their Schedules and Statements.

45.    The total number of creditors in these jointly administered cases greatly

exceeds 200 creditors. The Debtors' management and employees, together with their outside

legal and financial advisors, have been working diligently to compile the information necessary

DB02:7750749.1                                                                              000000.0

for the Schedules and Statements. Given the size and complexity of the Debtors' business (including issues of Debtors in two different countries), completing the Schedules and Statements is a massive and time-consuming undertaking, particularly when taken together with the considerable stresses of preparing for the filing of these chapter 11 cases, the anticipated burdens of preparing the Debtors' transition into chapter 11, and the ongoing burdens of operating the Debtors' businesses day-to-day.

46.    For the foregoing reasons, the Debtors believe, and I agree, that the extension requested will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of these chapter 11 cases. The Debtors therefore believe, and I agree, that an it is in the best interest of the Debtors that an interim order be entered extending the deadline to file the Schedules and Statements by an additional thirty (30) days, for a total of sixty (60) days from the Petition Date, without prejudice for the Debtors to seek to the Debtors' ability to request additional time if necessary.

### Application For An Order Authorizing The Debtors And Debtors In Possession To Retain And Employ Epiq Bankruptcy Solutions, LLC As Claims, Noticing, And Balloting Agent Pursuant To 28 U.S.C. § 156(c), Rule 2002(f) Of The Federal Rules Of Bankruptcy Procedure And Local Rule 2002-1(f) As Of The Petition Date (The "Claims Agent Motion")

47.    In connection with the Claims Agent Motion, the Debtors have evaluated several potential candidates to serve as Claims Agent. Following that review, and in consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtors' businesses, and the scope of the tasks for which the Debtors will require the assistance of a claims, noticing, and balloting agent, the Debtors believe, and I agree, that the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") is in the best interests of the Debtors'

estates, their creditors, parties-in-interest, and this Court. Based on Epiq's considerable

experience in providing similar services in large chapter 11 cases, the Debtors believe, and I

concur, that Epiq is eminently qualified to serve as Claims Agent in these chapter 11 cases. A

detailed description of the services that Epiq has agreed to render and the compensation and

other terms of the engagement are described in the engagement letter and affidavit of Epiq

Executive Director Daniel C. McElhinney, attached as exhibits to the Claims Agent Motion.

Based upon these terms and representations, the Debtors believe, and I agree, that the Debtors'

estates, creditors, parties-in-interest, and this Court will benefit as a result of Epiq's experience

and cost-effective methods.

**Motions Relating to Business Operations**

> **Motion Of Debtors For An Order (i) Authorizing Debtors To Obtain Post-Petition
> Financing; (ii) Granting Liens, Including Priming Liens, And Superpriority Claims
> Pursuant To 11 U.S.C. § 364; (iii) Authorizing Use Of Proceeds To Effectuate
> Payout of Securitization Facilities; (iv) Authorizing Use Of Cash Collateral
> Pursuant To 11 U.S.C. § 363; (v) Granting Adequate Protection Pursuant To
> 11 U.S.C. §§ 363 And 364; And (vi) Scheduling A Final Hearing (the "DIP
> Financing Motion")**

48.     The Debtors require additional working capital financing in order to

preserve and maintain their business. The level of necessary additional borrowings, however, is

not limited to the Debtors' need for incremental working capital. The Debtors also are

requesting authority to replace the Securitization Facilities because both facilities will

automatically "unwind" as a result of the Debtors' bankruptcy filings. Accordingly, because of

the structure of these Securitization Facilities, the Debtors would be denied access to the

proceeds of approximately $537 million in accounts receivable unless and until the obligations

under the Securitization Facilities have been satisfied. For this reason, the Debtors are seeking to

advance funds from the DIP Facility to the appropriate parties under the Securitization Facilities

so that those parties may retire the outstanding obligations under the Securitization Facilities and

the Debtors, in turn, may regain access to the receivables that are currently subject to the Securitization Facilities.

49.    Prior to initiating their pursuit of debtor-in-possession (DIP) financing, the Debtors, with the assistance of their advisors, had pursued out-of-court financing. Toward the end of 2008, the Debtors' advisors initially contacted approximately twenty-five (25) potential lenders regarding possible out-of-court financing. But it soon became apparent that the Debtors would not be able to secure out-of-court financing in the current lending market in the time period available to the Debtors, particularly in light of their liquidity position and their significant leverage. The Debtors therefore decided to adjust their course and pursue DIP financing. Through their advisors, the Debtors pursued negotiations with selected parties, based in part upon the feedback provided by potential lenders who had been contacted for out-of-court financing. Moreover, the Debtors recognized that the universe of lenders who could meet their DIP financing requirements likely would be limited for several reasons. For example, the requested DIP facility was quite large and quite complex, particularly given the cross-border and securitization components, and accordingly required sophisticated syndication capabilities. In addition, because any DIP facility likely would require the priming of the Pre-Petition Secured Debt, the Debtors required that any DIP agent have the ability to work with the Pre-Petition Lenders. In light of these requirements, among other reasons, the Debtors' financial advisors' discussions with potential lending sources yielded only one potential lender (in addition to the lenders under the DIP Facility) that provided preliminary indicative financing terms, and those terms were ultimately unacceptable to the Debtors.

50.    Consequently, the Debtors determined that the DIP Facility offered the best option – and indeed the only available, viable option – for DIP financing with terms comparable

to those offered by the DIP Facility. The DIP Facility will be provided pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement"), substantially in the form attached as an exhibit to the proposed Interim Order, by and between SSCE and SSC Canada (collectively, the "Borrowers"), SSCC, the other Loan Parties party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "U.S. DIP Agent"), JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent and Canadian collateral agent ("Canadian DIP Agent", collectively with the U.S. DIP Agent, the "DIP Agents"), and the Lenders party thereto (the "DIP Lenders", collectively with the DIP Agents, the "DIP Secured Parties"). The DIP Facility will provide the Debtors with much needed liquidity to fund their operating, working capital and capital expenditure needs during the course of these chapter 11 cases, as well as the retirement of obligations owing in connection with the Securitization Facilities. Moreover, the DIP Facility constitutes a new money financing arrangement and does not involve any roll-up of the Debtors' pre-petition obligations under the Pre-Petition Financing Agreements.

51.    While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors also attempted to identify other sources of post-petition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital markets conditions and discussions with potential lenders, the Debtors determined that post-petition financing on an unsecured basis or on a junior priority basis to pre-petition secured parties would be unobtainable.

52.    The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. In both the Debtors' business judgment and my own, the proposed terms of the DIP Facility are fair, reasonable and adequate given the severe credit

crisis that exists in today's market. Likewise, the various fees and charges and other terms required by the DIP Lenders under the DIP Facility were necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets. The terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length. Given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, it is the Debtors' judgment and my own that the terms of the DIP Facility are fair, reasonable and adequate.

53.    On a pre-petition basis under the U.S. Securitization Facility, SSCE sold a significant portion of its newly-arising trade accounts receivable on a daily basis to SRC, a limited purpose subsidiary of SSCE that has been structured to be bankruptcy-remote from SSCE. SRC, in turn, transferred the trade receivables to the U.S. Securitization Issuer, which issued notes secured by those receivables to third-party investors pursuant to the Indenture and the Indenture Supplement. Thus, pursuant to these arrangements, SRC provided working capital to the Debtors by purchasing, for cash and on a daily basis, a significant portion of the accounts receivable generated by SSCE in the ordinary course of its business. SRC, in turn, funded its purchase of receivables through proceeds it received from the U.S. Securitization Issuer, which proceeds the U.S. Securitization Issuer received from third-party investors by issuing notes, including a variable funded note (which has since been paid off), pursuant to the Indenture and the Indenture Supplement. As of the Petition Date, the U.S. Securitization Issuer owned receivables with an aggregate face amount of approximately $485 million (the "Sold U.S. Receivables"), and the U.S. Securitization Issuer was, in turn, obligated on approximately $350 million in outstanding notes issued under the Indenture or Indenture Supplement.

000000.0

54.     Similarly, on a pre-petition basis under the Canadian Securitization Facility, Smurfit-MBI sold a significant portion of its newly-arising Canadian trade accounts receivable on a daily basis to the Canadian CP Conduit. As of the Petition Date, the Canadian CP Conduit owned former Smurfit-MBI receivables with an aggregate face value of over $52 million (the "Sold Canadian Receivables," together with the Sold U.S. Receivables, the "Sold Receivables")). Under the relevant documents, Smurfit-MBI is entitled to repurchase the Sold Canadian Receivables from the Canadian CP Conduit for approximately $30.4 million.

55.     The Debtors' short-term liquidity will be significantly enhanced if the Debtors are permitted to refinance or defease the outstanding obligations under the Securitization Facilities and regain ownership of the Sold Receivables. First, the Debtors would get immediate access to the proceeds from the Sold Receivables as those receivables are turned into cash collections. Without the immediate defeasance of the Securitization Facilities, the Debtors will not have access to collections from the Sold Receivables, which will remain "trapped" in the Securitization Facilities until the outstanding obligations under those facilities have been paid in full. Instead, the Debtors would have to build up their accounts receivable over time, resulting in little cash flow from receivables in the weeks following the Petition Date. Second, under the terms of the DIP Credit Agreement, the Debtors will be required to draw the entire U.S. and Canadian term loans upon closing. If the Debtors are not permitted to use the proceeds of the term loans to refinance or defease the Securitization Facilities, a large portion of the term loans will be required to be held in Collateral Accounts with the DIP Agent pursuant to the DIP Credit Agreement due to a lack of borrowing base support or budgeted need. During this period, the Debtors would be paying interest on both the Securitization Facilities and the Term Loans. Therefore, the refinancing and/or defeasance of the Securitization Facilities upon the closing of

24

the DIP Facility would result in significant savings to the Debtors.  Third, the Debtors'

borrowing capacity under the DIP Facility would increase if the requested relief is granted.  The

Debtors' borrowing capacity is governed, in certain respects, by reference to a borrowing base

consisting of, inter alia, accounts receivable owned by the Debtors.  With respect to their interim

borrowing needs, the Debtors will have greater availability under the borrowing base formula if

the Debtors are permitted to pledge to the DIP Lenders the $537 million in Sold Receivables.[9]

However, the Debtors cannot pledge any of the Sold Receivables (or the proceeds thereof) so

long as obligations remain outstanding under the Securitization Facilities.

56.    The obligations owing to the Canadian CP Conduit and the noteholders

under the U.S. Securitization Facility – which will be paid in full in the event the requested relief

is granted – would have been paid in full in any event.  As noted above, the value of the Sold

U.S. Receivables and the Sold Canadian Receivables greatly exceeds the outstanding obligations

under the U.S. Securitization Facility and Canadian Securitization Facility, respectively.

Consequently, the proceeds from the applicable receivables will be sufficient to repay those

obligations in full under virtually any circumstance.  The net result is that the relief requested in

the DIP Financing Motion (i) benefits the Debtors for the reasons set forth above and (ii) ensures

that the rights of the Canadian CP Conduit and the noteholders under the U.S. Securitization

Facility will not be impacted in any material way.

57.    The Indenture and the Indenture Supplement do not specifically provide for

the defeasance of the notes issued thereunder prior to March 14, 2009.  Therefore, SSCE and the

---

[9] The Debtors believe, and I agree, that they will have sufficient liquidity to operate in the ordinary course in the event that they are not permitted to use to use the proceeds of the DIP Facility to take out the Securitization Facilities upon the entry of the Interim Order.  However, the Debtors believe, and I agree, that their liquidity will be materially improved over the Interim Period if they are permitted to take out the Securitization Facilities upon the entry of the Interim Order.  Therefore, the Debtors believe, and I agree, that it is in the estate's best interest to be granted the relief requested.

other parties involved in the U.S. Securitization Facility will have to take several steps in order to effectuate the defeasance of those notes.

58.    What is proposed is that SSCE will use proceeds of the DIP Facility and Cash Collateral to make a capital contribution to SRC. SRC will use those proceeds to make a simultaneous capital contribution to the Securitization Issuer for redemption of its outstanding notes in accordance with Section 4.10(b) of the Indenture Supplement and of the terms of the Interim Order.

59.    Because certain interest rates cannot yet be determined in connection with the price at which the outstanding notes must be redeemed (the "Redemption Price"), the parties have agreed to (i) estimate such interest rate at 10.00% per annum for the period from February 15, 2009 to March 14, 2009 (when defeasance occurs), (ii) enter into a redemption side letter, substantially in the form attached to the DIP Financing Motion as Exhibit C (the "Redemption Letter"), and (iii) use proceeds of the DIP Facility and Cash Collateral or any other funds available to SSCE to purchase a "AAA" rated derivative (the "Derivative") to pay any shortfall with respect to the Redemption Price to be determined in accordance with the Redemption Letter. Any such shortfall amount would be paid by the Derivative counterparty to the Trustee. The Securitization Issuer will simultaneously deposit the Redemption Price into the Collection Account for the benefit of the applicable noteholders, and the Indenture Trustee will subsequently make payments to the noteholders in accordance with the Indenture.

60.    After the conditions precedent described above and in the Redemption Letter have been satisfied, the remaining Sold U.S. Receivables and all liens, claims, and encumbrances against the remaining Sold U.S. Receivables (including, without limitation, any liens and/or security interests granted in respect of the U.S. Securitization Issuer's receivables)

will be released in all respects from the Indenture.  In addition, the U.S. Securitization Issuer will

merge with and into SRC, with SRC being the survivor of such merger, and immediately

thereafter, SRC will merge with and into SSCE, with SSCE being the survivor of such merger.

The result of the foregoing transactions is that the Sold U.S. Receivables will become part of

SSCE's estate, free and clear of all liens, claims and encumbrances other than the DIP Liens and

the Pre-Petition Adequate Protection Liens.

61.    With respect to the Canadian Securitization Facility, SSC Canada will use

proceeds of the DIP Facility to make a capital contribution to Smurfit-MBI, which will then use

those proceeds to repurchase the Sold Canadian Receivables from the Canadian CP Conduit.

Those receivables will become part of the Debtors' estates, free and clear of all liens, claims and

encumbrances other than the DIP Liens and the Pre-Petition Adequate Protection Liens.

62.    It is vital to the success of the Debtors' reorganization efforts that they

immediately obtain access to sufficient post-petition financing and access to cash collateral.  The

preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend

heavily on the expeditious approval of the DIP Financing Motion.  Absent the Court's approval

of the interim relief sought through the DIP Financing Motion, the Debtors face a substantial risk

of severe disruption to their business operations and irreparable damage to their relationships

with their vendors and customers.

63.    A denial of the Debtors' requested relief will cause immediate and

irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the

collateral.  Absent access to the DIP Facility and the use of the cash collateral, the Debtors would

have no ability to meet their ongoing obligations to suppliers, vendors, employees and other

creditors.  If the Debtors are unable to pay their ongoing obligations, they will not be able to

operate.  In other words, without post-petition financing, the Debtors would be unable to operate

their business as a going concern, which would significantly impair the value of the Debtors'

assets and limit their ability to repay their debts and liabilities.  In contrast, the Debtors' access to

the DIP Facility and continued use of cash collateral will ensure that the "going concern" value

of their assets are preserved, a value substantially greater than the value which would be realized

from a piecemeal liquidation of those assets if the Debtors were forced to cease operations

immediately.

   64. Fore the foregoing reasons, the Debtors believe, and I agree, that the relief

sought through the DIP Financing Motion is in the best interest of the Debtors and their estates.

> **Motion Of The Debtors For An Order (i) Authorizing Continued Use Of Existing Cash Management System, (ii) Authorizing Continued Use Of Existing Bank Accounts And Business Forms, (iii) Authorizing The Continuation Of Certain Intercompany Transactions, (iv) Waiving The Requirements Of 11 U.S.C. § 345(B) On An Interim Basis, And (v) Granting Administrative Expense Status To Post-Petition Intercompany Transactions ("Cash Management Motion")**
>
>> **Request for Authority to Continue Using the Debtors' Existing Cash Management System and to Provide Protection to the Cash Management Banks**

### Description of the Centralized Cash Management System

   65. In the ordinary course of business, the Debtors use a centralized cash

management system to collect funds from their operations and to pay operating and

administrative expenses (such centralized cash management system, collectively with the

Calpine Cash Management System and the SSPRI Cash Management System (each term as

defined below), the ("Centralized Cash Management System").  It is my understanding that the

Centralized Cash Management System is similar to the centralized cash management systems

used by other large, diversified companies to collect, transfer, and disburse funds generated by

numerous operating units in a cost-effective and efficient manner.  Although certain of the

Debtors' non-debtor affiliates have separate bank accounts that are connected to the Centralized

Cash Management System, and which do not constitute property of the Debtors' estates, the

Debtors are not seeking authority pursuant to this Motion to transfer any funds to such non-

debtor affiliates.  If the non-debtor affiliates need any funding from the Debtors following the

commencement of these chapter 11 cases, the Debtors will seek authority from this Court before

providing such funding.

      66.    The Centralized Cash Management System is carefully managed through

oversight procedures and controls implemented by the Debtors' treasury department.  Through

their control over the Centralized Cash Management System, the Debtors are able to facilitate

cash forecasting and reporting, monitor collection and disbursement of funds, and maintain

control over the administration of various bank accounts required to effect the collection,

disbursement, and movement of cash.  The bank accounts used in connection with the

Centralized Cash Management System (the "Bank Accounts") are listed in an exhibit to the Cash

Management Motion.[10]

      67.    The Centralized Cash Management System primarily operates through the

U.S. and Canadian bank accounts certain of the Debtors maintain at JPMorgan Chase Bank

("JPMC"), Bank of America ("BofA"), Deutsche Bank ("DB"), Scotia Bank ("Scotia"), and

Wachovia Bank ("Wachovia"), with one primary concentration account at JPMC (the "JPMC

Concentration Account") acting as the central concentration account for the entire system.

Revenues typically reach the JPMC Concentration Account through transfers from (i) the SSCCI

Concentration Account, the SSPRI Concentration Account, and the SCM Concentration Account

---

[10] The Centralized Cash Management System operates entirely between affiliated entities.  Each Debtor is a direct or
indirect subsidiary of Debtors SSCC and SSCE.

DB02:7750749.1

000000.0

(each term as defined below), (ii) the Receivables Collection Account (as defined below), and

(iii) the various receivables accounts and lockboxes at BofA, JPMC, DB and Scotia.

### Summary of the Centralized Cash Management System – United States[11]

68.    SSCE uses four BofA lockboxes located in Chicago, Atlanta, St. Louis and

Dallas to receive checks from customers, with all lockbox deposits transferred nightly to a BofA

lockbox account (the "BofA Lockbox Account"). The majority of payments received by

electronic funds transfer are collected in the BofA Lockbox Account, but some are received in an

EFT account at JPMC (the "EFT Account"). The receivables collected in the BofA Lockbox

Account and the EFT Account are swept on a nightly basis into a collection account established

at Deutsche Bank for purposes of the U.S. Securitization Facility (the "Receivables Collection

Account"). Another JPMC lockbox in Chicago (the "JPMC Exchange Account") collects

accounts receivable from so-called "exchange customers," whose receivables are not sold into

the U.S. Securitization Facility, and accounts receivable from certain other customers. All cash

in the JPMC Exchange Account, and all cash released from the Receivables Collection Account

in accordance with the terms of the U.S. Securitization Facility, is swept daily into the JPMC

Concentration Account. Upon repayment of the U.S. Securitization Facility, as contemplated by

the terms of the debtor-in-possession financing facility the Debtors are seeking to have approved

contemporaneously with this Motion (the "DIP Facility"), all receivables collected in the BofA

Lockbox Account and the EFT Account will be swept on a nightly basis directly into the JPMC

Concentration Account (or such other collection account as the Debtors may establish following

the Petition Date in accordance with the terms of the DIP Facility). As discussed in greater detail

below, the JPMC Concentration Account also occasionally receives transfers of excess cash from

000000.0

certain non-debtor accounts. As a result, as of the Petition Date, substantially all of the Debtors'

incoming receivables are concentrated in the JPMC Concentration Account.

      69.    The U.S. Debtors process and disburse substantially all of their accounts

payable and payroll obligations through SSCE accounts. Indeed, the overwhelming majority of

the U.S. Debtors' accounts payable and payroll obligations are funded through the JPMC

Concentration Account. The JPMC Concentration Account funds various accounts used by the

Debtors for disbursements, including: (i) a JPMC funding account that distributes funds to an

accounts payable account at JPMC that runs checks every Tuesday and Friday and funds ACH

payments on a daily basis; (ii) an imprest account at JPMC that, in turn, distributes funds to

approximately eighteen (18) local accounts maintained by the Debtors' reclamation facilities

(such local accounts are identified in Exhibit A to the Cash Management Motion); (iii) a funding

account at Wachovia that funds an hourly payroll account and a salaried payroll account (both

also at Wachovia); (iv) a separate BofA account for hourly payroll in the State of California, in

accordance with state law requirements; and (v) a JPMC account used to wire certain fees and

other payments relating to the Debtors' employee benefit programs. In addition, SSCE has

historically transferred funds from the JPMC Concentration Account to fund the operations of

certain of its non-debtor foreign subsidiaries. Pursuant to this Motion, the Debtors are not

seeking the authority to transfer funds to any domestic or foreign non-debtor entities. To the

extent the Debtors determine that a transfer of funds to any non-debtor entities is necessary and

is in the best interests of their estates, they will seek authority to provide such a transfer of funds

pursuant to a separate motion.

---

[11] Attached as Exhibit B to the Cash Management Motion is a diagram describing the general flow of funds within the Centralized Cash Management System in the United States.

DB02:7750749.1                                    000000.0

70.    **Accounts Payable Accounts**.  The Debtors' primary accounts for non-payroll disbursements are maintained at JPMC.  Most accounts payable for the Debtors and their non-debtor affiliates are processed through the funding account at JPMC, which is funded through the JPMC Concentration Account and, in turn, funds the accounts payable account at JPMC.  SSCE transmits ACH debit instructions daily to JPMC and a check file to JPMC on Tuesdays and Fridays of each week.  Based on the instructions it receives from SSCE, JPMC initiates ACH credits and clears checks that have been verified against the check file.  The JPMC disbursement accounts clear checks presented by mid-morning; checks presented after that time typically clear the following day.  By enforcing a cutoff time and prohibiting debits against their accounts after that time, the Debtors are able to monitor their cash position on a daily basis.

71.    **Payroll and Benefits Accounts.**  The Debtors and certain of their non-debtor affiliates primarily use the same hourly and salaried payroll accounts maintained at Wachovia (the "Wachovia Payroll Accounts").  Each payroll period, the Debtors generate a direct deposit file and transmit ACH debit instructions to Wachovia at least two business days before the scheduled pay date.  The Debtors also send a check issuance file to Wachovia before the scheduled pay date.  The Debtors fund the Wachovia Payroll Accounts from the JPMC Concentration Account for the amount of payroll paid via direct deposit to employees before JPMC processes the ACH file.  For employees that are paid by check, debits are made against the Wachovia Payroll Accounts when checks are presented and verified.  The Debtors also maintain a separate payroll account at BofA for hourly employees in California that is funded from the JPMC Concentration Account.  The JPMC Concentration Account also funds an employee benefits account at JPMC that the Debtors use for funding certain claims and fees that are payable under various employee benefit programs.

000000.0

72.    **Calpine Corrugated Accounts**. Calpine Corrugated, LLC ("Calpine Corrugated"), one of the Debtors herein, uses a separate cash management system (the "Calpine Cash Management System")[12] that is not directly connected to the rest of the Centralized Cash Management System. The Calpine Cash Management System consists of a concentration account (the "Union Bank Concentration Account") and a deposit account (the "Union Bank Deposit Account") at Union Bank of California ("Union Bank"), an accounts payable account at JPMC, and a payroll account at Wachovia. Calpine Corrugated's customers deliver checks directly to Calpine Corrugated, which manually deposits them in the Union Bank Concentration Account. Prior to the Petition Date, funds remaining in the Union Bank Concentration Account were automatically swept into the Union Bank Deposit Account and applied to Calpine Corrugated's revolving line of credit with Union Bank, but the sweep mechanism was disabled on the Petition Date due to the imposition of the automatic stay. Funds in the Union Bank Concentration Account are disbursed by Calpine Corrugated through the accounts payable account at JPMC and the payroll account at Wachovia.

73.    **Smurfit-Stone Puerto Rico Accounts**. Smurfit-Stone Puerto Rico, Inc. ("SSPRI"), another one of the Debtors herein, also uses a separate cash management system (the "SSPRI Cash Management System")[13] that is not directly connected to the rest of the Centralized Cash Management System. SSPRI's receivables are collected in a receivables account at Banco Bilbao Vizcaya ("BBVA"), which sweeps on a daily basis into a concentration account at BBVA (the "SSPRI Concentration Account"). SSPRI transfers funds from the SSPRI Concentration Account into a zero-balance accounts payable account and a zero-balance payroll account, both

---

[12] Attached to the Cash Management Motion as Exhibit C is a diagram describing the general flow of funds within the Calpine Cash Management System.
[13] Attached to the Cash Management Motion as Exhibit D is a diagram describing the general flow of funds within the SSPRI Cash Management System.

DB02:7750749.1                                                                                            000000.0

at BBVA.  Funds from the SSPRI Concentration Account are also used to make payments to

SSCE for the containerboard that SSPRI purchases from SSCE.  Prior to the Petition Date, cash

from the SSPRI Concentration Account was occasionally transferred into the JPMC

Concentration Account in the form of a dividend.  To date, the Debtors have not transferred any

funds from the JPMC Concentration Account into the SSPRI Concentration Account.

### Summary of the Centralized Cash Management System – Canada[14]

74.    Smurfit-Stone Container Canada Inc. ("SSC Canada") and Smurfit-MBI

("SMBI"), a wholly-owned subsidiary of SSC Canada, maintain separate Canadian bank

accounts at Scotia that are part of the Centralized Cash Management System.  SSC Canada

maintains two lockboxes in Toronto for the collection of receivables, one for USD receivables

and another for CAD receivables.  All funds received in the lockboxes are deposited on a daily

basis into two separate collection accounts at Scotia, one for USD funds and another for CAD

funds.  The collection accounts at Scotia are swept on a daily basis into two separate

concentration accounts, one for USD funds (the "SSCCI Concentration Account") and another

for CAD funds (the "SSCCI Concentration Account - CAD").  SSC Canada transfers funds

between the SSCCI Concentration Account and the SSCCI Concentration Account – CAD

through currency exchange trades depending on its daily needs.  SSCE occasionally transfers

funds into the SSCCI Concentration Account from the JPMC Concentration Account.

75.    SSC Canada transfers funds from the SSCCI Concentration Account into

(i) a USD accounts payable account at Scotia for U.S. vendors and (ii) a USD accounts payable

account at Scotia for Canadian vendors who are paid in USD.  Funds from the SSCCI

Concentration Account are also regularly transferred to and from the SMBI Concentration

---

[14] Attached to the Cash Management Motion as Exhibit E is a diagram describing the general flow of funds within
the Centralized Cash Management System in Canada.

Account (as defined below). SSC Canada transfers funds from the SSCCI Concentration Account – CAD into the following disbursement accounts: (x) a CAD accounts payable account at Scotia and (y) a CAD payroll account at Scotia, which is used to fund the hourly and salaried payroll for all of the Debtors' employees in Canada. SSC Canada and SMBI occasionally transfer CAD funds between the SSCCI Concentration Account – CAD and the SMBI Concentration Account – CAD (as defined below).

76.     SMBI maintains four lockboxes of its own, two in Toronto and two in Calgary (with a USD and a CAD lockbox in each city). All funds received in the lockboxes are deposited on a daily basis into two separate zero-balance collection accounts at Scotia, one for USD funds and another for CAD funds. SMBI's collection accounts at Scotia are swept on a daily basis into two separate concentration accounts, one for USD funds (the "SMBI Concentration Account") and another for CAD funds (the "SMBI Concentration Account - CAD"). SMBI transfers funds from the SMBI Concentration Account into (i) a USD accounts payable account at Scotia for Canadian vendors who are paid in USD and (ii) a CAD accounts payable account at Scotia. In addition, SMBI transfers funds from the SMBI Concentration Account – CAD into a CAD accounts payable account at Scotia.

77.     **Non-Debtor Affiliate Accounts**. Certain of the Debtors' non-debtor affiliates who have their own cash management capabilities use the Centralized Cash Management System from time to time by pre-funding expenses that are then paid by SSCE. For example, the Debtors manage and control the bank accounts of Stone Container de Mexico S. de R.L. de C.V. ("Stone Container Mexico"), a wholly-owned non-debtor subsidiary of SSCE, without transferring any Debtor funds into such accounts. In addition, Dalton Paper Products, Inc. ("DPP"), a joint venture that was 50% owned by SSCE until shortly before the Petition Date

(and which uses a separate cash management system and does not receive any transfers of funds from the Debtors) funds its payroll through the Wachovia Payroll Accounts by wiring the full amount of the payroll cost to SSCE before it is funded through the Wachovia Payroll Accounts. The Debtors receive a fixed fee from DPP for such payroll services. The Debtors hereby request authority to continue providing such cash management services to Stone Container Mexico and DPP. Pursuant to this Motion, as discussed in Part IV below, the Debtors also seek authority to continue ordinary course intercompany transactions by and among the Debtors and their non-debtor affiliates in order to avoid significant disruption in the Debtors' operations, preserve the value of the Debtors' estates, and serve the best interests of the Debtors' estates.

### Continued Use of the Centralized Cash Management System Is in the Best Interests of the Debtors' Estates and Creditors

78.    The Debtors seek authority to continue using the Centralized Cash Management System on a post-petition basis as described above. The Debtors believe, and I agree, that it is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations. Disrupting the Debtors' current cash management procedures would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully reorganize during these chapter 11 cases.

79.    The Centralized Cash Management System utilizes the Bank Accounts to effectively and efficiently collect, transfer, and disburse funds as needed in the Debtors' general business operations. The Centralized Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of near-continuous status reports on the location and amount of all such funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the

36

movement of funds and the development of timely and accurate account balance and

presentment information. Indeed, the Debtors believe, and I concur, that any disruption in the

Centralized Cash Management System would likely cause delays in the collection and

disbursement of funds, thus impeding the Debtors' ability to carry out their normal business

operations to the detriment of the Debtors' employees, customers and suppliers.

80.    The Centralized Cash Management System allows the Debtors to centrally

manage all of their cash flow needs and includes the necessary accounting controls to enable the

Debtors, as well as their creditors and this Court, to trace funds through the system and ensure

that all transactions are adequately documented and readily ascertainable. The Debtors will

continue to maintain detailed records reflecting all post-petition transfers of funds. Furthermore,

the Debtors manage the Centralized Cash Management System in an automated environment

using treasury management software and bank account structures to guard against fraud and to

protect the integrity of the overall system. Over many years, the Debtors developed their

treasury systems to automate reporting and to calculate their cash position, and they continue to

invest in such systems. Fraud protection remains a high priority through use of "positive pay"

programs, debit blocks, and limited use of direct check issuance and wire transfers by the

Debtors' subsidiaries and affiliates. Any changes to the Debtors' bank accounts or their treasury

systems that report on account activity and generate wire transfers would be disruptive to the

Debtors' business operations and could undermine the effectiveness of such systems.

81.    Therefore, the Debtors believe, and I agree, that it is both essential and in

the best interests of the Debtors' respective estates and creditors that the Centralized Cash

Management System be maintained. Furthermore, the Debtors' reorganization efforts will be

facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that

would be associated with disruptions in the Centralized Cash Management System. Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Centralized Cash Management System.

82.    The Debtors also request that no bank participating in the Cash Management System (the "Cash Management Banks") that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition. The Debtors believe, and I agree, that such protections are necessary in order to induce the Cash Management Banks to continue providing cash management services to the Debtors without additional credit exposure.

### Request for Authority to Use Existing Bank Accounts and Business Forms

83.    The Debtors further believe, and I concur, that requiring the Debtors to comply with the U.S. Trustee Guidelines, including the requirement that chapter 11 debtors close all existing bank accounts upon filing of their petitions and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee, would create significant and undue hardship for the Debtors.

### Request for Authority to Maintain Existing Bank Accounts

84.    The Debtors therefore seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new post-petition bank accounts be opened. If enforced in these cases, the Debtors believe, and I agree, that such requirements would cause enormous disruption in the Debtors' businesses and would likely impair the Debtors' efforts to successfully reorganize. As described in detail above, the Bank Accounts comprise an established

38

Centralized Cash Management System that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of their business operations. Otherwise, the Debtors believe, and I agree, that transferring the bank accounts will be disruptive, time consuming, and expensive.

85.    Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors open new bank accounts. The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

86.    The Debtors intend to implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those that are specifically authorized by this Court. For example, concurrently with the filing of this Motion, the debtors are filing motions requesting authority to pay certain prepetition obligations to employees, taxing authorities, vendors, customers and other key constituencies in the ordinary course of business. To prevent any inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will immediately advise the Cash Management Banks not to honor prepetition checks. The Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

## Request for Authority to Continue Using Existing Checks and Forms

87.     The Debtors request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks without reference to the Debtors' status as debtors in possession.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the size and publicity surrounding these chapter 11 cases.  If the Debtors were required to change their correspondence, business forms and checks, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar.  The Debtors believe, and I agree, that such a change in operations could potentially create a sense of disruption and confusion within the Debtors' organization and could result in confusion for the Debtors' customers and vendors.  The Debtors further submit, and I concur, that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, business forms and checks.  The Debtors respectfully submit that to do so would be unnecessary and that the Debtors can take appropriate care to ensure the proper use of the existing business forms.

88.     The Debtors should therefore be authorized to use their existing checks and business forms.  The Debtors use a significant number of checks and a wide variety of business forms in the ordinary course of their business operations.  The Debtors believe, and I agree, that to require the Debtors to replace all of their existing checks and business forms would be unduly burdensome and costly, particularly when appropriate care can be taken to ensure the proper usage of the existing forms.

## Request for an Interim Waiver of the Requirements of 11 U.S.C. § 345(b)

89.     Prior to the Petition Date, the Debtors established a bank account at U.S. Bank to hold the proceeds of recent borrowings under the Prepetition Credit Agreement. The Debtors invest the balances in the U.S. Bank account on an overnight basis in highly-rated commercial paper issued by U.S. Bank. The Debtors do not invest any other funds, including any of the funds on deposit in the JPMC Concentration Account. The Debtors request that the Court waive the requirements of section 345(b) on an interim basis and permit them to continue investing funds in the U.S. Bank account in accordance with their prepetition practices.

90.     As the Cash Management Motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors collectively have in excess of 200 creditors, and given the complexity of the Debtors' existing Centralized Cash Management System and the relative security of the Centralized Cash Management System, the Debtors request that the Court enter an order waiving, on an interim basis, the requirements of section 345(b) for forty-five (45) days, without prejudice to the Debtors' ability to seek a further interim or final waiver of the requirements of section 345(b).

## Request for Authority to Continue Certain Intercompany Transactions and for Administrative Expense Status for All Post-Petition Intercompany Transactions

91.     In the normal course of their business operations, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions. As a result, on any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payments made in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to:

41

Accounts Receivable, Accounts Payable and Payroll. In the ordinary course of business, the Debtors contribute cash and process disbursements through the Centralized Cash Management System. The system is so integrated that substantially all receipts are swept into and substantially all disbursements are paid from the parent-level accounts maintained by SSCE, resulting in a corresponding Intercompany Claim between SSCE and the applicable Debtor entity. Also, in the ordinary course of business, SSCE collects cash and disburses funds on behalf of the other Debtors. The Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Debtor. These types of Intercompany Transactions only occur between and among the Debtors.

Centrally Billed Expenses. In the ordinary course of business, the Debtors and Stone Container Mexico incur centrally billed expenses, such as employee medical costs, insurance premiums, accounts payable processing, certain taxes (including real estate, franchise, sales taxes, etc.) and leased equipment. These charges are allocated among the Debtors and Stone Container Mexico and are reflected in the intercompany accounts.

Corporate Expense Allocation. Charges for corporate expenses provided by SSCE to the other Debtors and Stone Container Mexico are allocated among the Debtors and Stone Container Mexico based upon the cost of service provided, directly identifiable costs, and other allocation methods, in addition to a services fee payable to SSCE.

Containerboard Purchases. In the ordinary course of business, SSCE sells containerboard to certain of its Debtor and non-debtor affiliates, with such sales resulting in a corresponding Intercompany Claim. For example, SSCE regularly sells containerboard to SSPRI, Stone Container Mexico, and SSC Canada. SSC Canada, in turn, sells containerboard to SMBI. The prices for such containerboard are determined by SSCE based on the prices applicable to certain third parties that purchase containerboard from SSCE on an arm's-length basis. Prior to the Petition Date, such intercompany purchases were either settled in cash resulted in a corresponding Intercompany Claim. From and after the Petition Date, the Debtors intend to settle all such intercompany purchases in cash.

92.     The Debtors maintain records of all Intercompany Transactions and can

ascertain, trace and account for all Intercompany Transactions between and among the Debtors

and between and among the Debtors and their non-debtor affiliates. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that all Intercompany Claims against a Debtor by another Debtor or a non-debtor affiliate arising after the Petition Date as a result of an Intercompany Transaction be accorded administrative priority expense status. If all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions.

### Motion Of The Debtors For An Order Authorizing The Payment Of Prepetition Sales, Use, Property, And Other Taxes And Governmental Charges (The "Tax Motion")

93.     In the ordinary course of business, the Debtors incur certain sales, use, property, and other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various state, local and foreign taxing authorities (collectively, the "Taxing Authorities") as such payments become due. The Debtors have facilities and operations located throughout the United States and Canada; accordingly, they are obligated to pay Taxes to numerous Taxing Authorities located throughout the United States and Canada.

94.     Although the Debtors believe that they are current on all of their Taxes that have become due as of the Petition Date, many of such Taxes are paid on a periodic basis (and in arrears). As a result, in many instances there is a lag between the time when the Debtors incur an obligation to pay the Taxes and the date such Taxes become due and payable under applicable laws or regulations. Various Taxing Authorities may therefore have claims against the Debtors for Taxes that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes that will come due during the pendency of these cases.

95.     Through the Tax Motion, the Debtors seek authority, in their discretion, to pay to the relevant Taxing Authorities (i) any prepetition Taxes that have accrued, but were not

yet due and owing or were not paid in full, as of the Petition Date and (ii) any prepetition Taxes

that arose prior to the Petition Date that become due and owing during the pendency of these

cases in the ordinary course of business, including any Taxes that the Cross-Border Debtors are

required to pay under Canadian law. The Debtors estimate that as of the Petition Date, their

accrued and unpaid liabilities for Taxes were approximately $23,100,000.

96.    In addition, the Debtors are subject to certain audit investigations and may

be subject to further audit investigations (collectively, the "Audits") during the pendency of these

cases that may result in additional prepetition Taxes being assessed against the Debtors (such

additional taxes, the "Audit Amounts"). The Debtors have included such real and potential

Audit Amounts in their estimates in this Motion and hereby seek the authority, in their

discretion, to pay any such Audit Amounts in the ordinary course of business. As noted in the

Tax Motion, however, nothing should be construed as an admission of liability by the Debtors

with respect to any Audit or Audit Amount, and the Debtors expressly reserve all rights with

respect to any Audit and reserve the right to contest the Audit Amounts, if any, claimed to be due

as a result of the Audits.

97.    Payment of the taxes as requested by the Tax Motion will prevent

disruption of the Debtors' operations as they enter these Chapter 11 cases. In certain cases, some

Taxing Authorities may audit the Debtors if such Taxes are not timely paid. I believe that such

audits would needlessly divert the Debtors' attention from their reorganization efforts. In

addition, like unpaid property taxes, some Taxing Authorities may also seek to impose liens on

the Debtors' assets on account of unpaid "trust fund" Taxes, which liens would require time,

effort and expense for the Debtors to challenge and remove. An improper lien or the failure to

pay certain Taxes might also affect the Debtors' good standing in a particular state, potentially

affecting the Debtors' ability to continue operating in the ordinary course. The Debtors believe, and I concur, that timely payment of the Taxes is necessary to avoid such distractions and is thus in the best interests of the Debtors and their estates.

98.    I have been advised that some states hold responsible officers personally liable in various circumstances for unpaid sales and use taxes. To the extent that any such "trust fund" taxes remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases. The Debtors believe, and I agree, that the possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their effort to implement a successful reorganization strategy to the detriment of all parties-in-interest.

99.    Debtors believe, and I agree, that their successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these cases. Given that the Debtors operate in numerous states and Canada, often with more than one facility in each jurisdiction, and have sales in most, if not all states and Canada, there are a vast number of Taxing Authorities with which the Debtors interact. If any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful reorganization. For these reasons, if the relief requested herein is not granted, the tax obligations described above would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, their reorganization efforts.

000000.0

### Motion Of The Debtors For An Order Authorizing The Payment Of Prepetition Claims Of Shippers, Warehousemen And Other Lien Claimants ("Shippers/Warehousemen Motion")

100.    Through the Shippers/Warehousemen Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers and Warehousemen in amounts the Debtors determine necessary or appropriate to (i) obtain releases of critical or valuable goods or equipment that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and (iii) induce critical Shippers and Warehousemen and other lien claimants to continue to carry goods and equipment and make timely deliveries thereof.  The Debtors propose to pay such claims when, in the Debtors' discretion and business judgment, a creditor's exercise of its rights under applicable state law would unduly disrupt the Debtors' business operations, and hereby seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the Shipping and Warehousing Claims, as of the Petition Date, in an amount not to exceed $33,000,000.

### Description Of Shippers And Warehousemen And Their Claims

101.    The Debtors' supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carries, less-than-truckload ("LTL") carriers, freight-forwarders, ocean carriers, parcel carriers, and non-asset based carriers (brokers) (collectively, the "Shippers"), as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen").  In addition, the Debtors utilize the services of customs agents to facilitate the shipment of goods across into and out of the United States.

102.    In many instances, the Debtors, as well as several of their customers, operate a "just-in-time" inventory system, which means that their ability to produce goods depends on the frequent, and often daily, delivery of materials and components that are required for their manufacturing operations.  The Debtors employ nearly 700 third parties, including

46

Shippers and Warehousemen, to ensure that their delivery network runs smoothly. The Debtors engage Shippers to transport, store and deliver raw materials, goods and components to the Debtors, as well as finished products to the Debtors' customers. The Debtors contract with Warehousemen to store raw materials and finished goods which are in inventory.

103.    As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of raw materials and supplies, as well as finished goods produced by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtor and Debtors' customers prior to the Petition Date.

104.    I am informed that under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods. Additionally, I am informed that pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien. As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

105.    The Debtors' businesses are necessarily shipping intensive and are dependent upon timely delivery and receipt of raw materials and finished goods. The Debtors receive daily shipments of the raw materials and supplies that are required to operate their facilities and produce products for their customers. Additionally, the Debtors routinely ship

DB02:7750749.1                                                                                    000000.0

finished goods from mills to their numerous plants and to warehouses prior to shipping such goods to their customers. Finally, the Debtors ship finished goods from various locations to their customers.

106. The Debtors believe, and I agree, that the value of the goods and materials in the possession of the Shippers and Warehousemen, and the potential injury to the Debtors if they are not timely released, is likely to substantially exceed the amount of Shipping and Warehousing Claims asserted by such parties. Indeed, even if the Shippers and Warehousemen did not have valid liens under applicable state law, their possession (and retention) of the Debtors' finished products would severely disrupt, and potentially cripple, several of the Debtors' customers' operations because of certain of their customers' "just-in-time" inventory policies. For these reasons, the Debtors therefore believe, and I agree, that it is necessary and essential to their reorganization efforts and the enhancement and preservation of the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims.

107. The Debtors believe, and I agree, that the total amount to be paid to the Shippers and Warehousemen on account of their prepetition claims is necessary and appropriate in light of the importance and necessity of the Shippers and Warehousemen to the Debtors' and their customers' business operations, and the direct and indirect losses that the Debtors would suffer as a consequence of a Shipper's refusal to deliver goods to the Debtors or their customers. Moreover, the Debtors do not believe that there are viable and timely alternatives to the Shippers and Warehousemen that the Debtors have used prior to the Petition Date.

108. The Debtors have a reputation for reliability and dependability among their customers. Indeed, many of the Debtors' pricing policies and marketing strategies revolve

around that reliability and dependability.  This reputation depends in substantial part on the timely delivery of product to the Debtors' customers.  In fact, in certain cases the Debtors' relationships with their customers require timely delivery of product in order to prevent a shutdown of a customer's manufacturing facility or loss of product by the customer.  The Debtors' ability to make such timely deliveries depends on a successful and efficient system for the delivery and receipt of raw materials, supplies and other components used in the Debtors' operations, as well as finished goods.

109.   It is essential for the Debtors' business operations and reorganization efforts that the Debtors maintain a reliable and efficient supply and distribution network. Because the Debtors are in many cases dependent on third parties for the delivery of finished goods to their customers, it is essential that their bankruptcy cases not be a reason or excuse for any such party to cease timely performing services or to retain goods in their possession on account of unpaid prepetition claims.  If the customers are unable to receive deliveries on a timely and uninterrupted basis, the Debtors' mill, container plant, and recycling plant operations will be impeded with devastating consequences.  In turn, the Debtors will likely suffer, at a minimum, a significant loss of credibility and customer goodwill as well as revenue, thereby causing substantial and potentially irreparable harm to their businesses and reorganization efforts.

### Description Of Lien Claimants

110.   In addition to the Shippers and Warehousemen, the Debtors also routinely transact business with a number of other third parties (collectively, the "Lien Claimants") who, under applicable state law, have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date

000000.0

("Statutory Liens").  The Lien Claimants provide equipment and perform various services for

the Debtors, including (i) manufacturing tooling and other capital and non-capital equipment and

parts necessary for the Debtors' operations and (ii) rendering essential services related to the

Debtors' manufacturing facilities, such as machine repair and maintenance.

111.    Although the Debtors have generally made timely payments to the Lien

Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for

certain prepetition goods, equipment and services, which may result in such Lien Claimants

asserting, and perfecting, Statutory Liens against the Debtors' relevant plant locations or the

Debtors' goods or equipment.  Furthermore, certain Lien Claimants may refuse to perform their

ongoing obligations to the Debtors, including manufacturing, installation, and servicing

obligations, unless their claims are paid in full.

112.    The Debtors operate over 160 production facilities.  At any given time,

certain third party Lien Claimants may be providing services at certain of these facilities, and

may therefore have the right to perfect statutory liens related to the Debtors' or their customers'

property, including liens on account of a Lien Claimant's possession of the Debtors' property.  In

such cases, if the Debtors are unable to immediately pay the Lien Claimants on account of their

prepetition claims, the Debtors' will be unable to regain possession of their property (in many

cases, equipment crucial to the Debtors' manufacturing process that had been sent out for repair),

or, in certain instances, the Debtors' customers may have to satisfy the prepetition claims of the

Lien Claimant likely resulting in cost to the Debtors above the face amount of the Lien

Claimant's claim on account of the likely strain on customer relations.  Additionally, the

existence and perfection of the Statutory Liens could potentially cause the Debtors to violate the

terms of certain of their leases.

000000.0

113.    In order to avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the maintenance of their facilities and plants, and the completion of the Debtors' goods, capital equipment and tooling, the Debtors seek, by the Shippers/Warehousemen Motion, immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants that have given or could give rise to a Statutory Lien against the Debtors' property, equipment or other assets, or property of the Debtors' customers (the "Lien Claimant Claims"), regardless of whether such Lien Claimants have already perfected their interests under applicable law, in a total amount not to exceed $13,000,000; provided, however, that with respect to each Lien Claimant Claim, the Debtors will not be authorized to pay a Lien Claimant Claim unless the Lien Claimant has perfected or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting in the future, one or more Statutory Liens in respect of such claim.  Nor shall such payment be deemed to be a waiver of any rights regarding the extent, validity, perfection or possible avoidance of such Statutory Liens.

114.    As described above, the Debtors strongly believe, and I agree, that (i) continuation of their positive relationships with the Shippers, Warehousemen, and Lien Claimants is imperative to their continued business operations and reorganization efforts, and (ii) the payment of the Shipping and Warehousing Claims and the Lien Claimant Claims is essential to preserve and enhance the value of the Debtors' estates.  Put simply, the Debtors believe, and I agree, that maintaining the production and timely delivery of the Debtors' products is necessary in order for their businesses to survive in the preliminary stages of these cases.

DB02:7750749.1                                                                                                                          000000.0

**Motion Of The Debtors For An Order Authorizing The Debtors To Honor Certain Prepetition Obligations To Customers And Brokers And To Otherwise Continue Prepetition Customer And Broker Programs And Practices In The Ordinary Course Of Business ("The Customers and Brokers Motion")**

115.    Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation with their customers and in the marketplace for their products (collectively, the "Customer Programs"). The Customer Programs, many of which are customary in the Debtors' industries, include, among others, rebates, prebates, pre-payments, adjustments, performance/volume discounts and early payment discounts. Each of these Customer Programs is described in greater detail below. The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing the Debtors' revenue and profitability.

116.    Through the Customers and Brokers Motion, the Debtors request the entry of an order granting the Debtors authority to operate in the ordinary course of business and to (i) perform their prepetition obligations related to the Customer Programs (as defined below) as they determine advisable, (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business and without further application to this Court, (iii) maintain their relationships with the Brokers (as defined below), and (iv) perform and pay certain prepetition obligations the Debtors owe to the Brokers. Accordingly, the Debtors desire to continue during the post-petition period those Customer Programs that they believe are beneficial to their businesses. The Debtors believe, and I agree, that such relief is necessary to preserve critical customer relationships. Indeed, the Debtors believe, and I agree, that the total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant when compared to the revenue that

52

the Debtors generate from their customers.  Accordingly, the Debtors hereby seek the authority

to continue the Customer Programs on a post-petition basis in the ordinary course of business.

117.  In addition, in light of the fact that some of the Customer Programs, as they

relate to prepetition agreements between the Debtors and their customers, may represent

unperformed prepetition obligations, the Debtors seek this Court's authorization to perform all

prepetition obligations under the Customer Programs.[15]  Because the industry in which the

Debtors operate is highly competitive, some of the Debtors' customers may cease to purchase the

Debtors' products and may turn to other sources if the Debtors fail to timely perform their

prepetition obligations under the Customer Programs.  Therefore, unless the Debtors are able to

assure their customer base that they will honor the Customer Programs during these chapter 11

cases, the Customers may seek alternative suppliers, which would result is an immediate loss of

revenue and cash flow for the Debtors.

118.  Further, prior to the Petition Date, and in the ordinary course of business,

the Debtors utilized the services of several independent brokers or broker groups (collectively,

the "Brokers") in order to obtain new customers and maintain long-term customer relationships

for certain of their products through various sale and distribution channels.  The Debtors hereby

seek the authority to maintain their relationships with the Brokers and to perform certain

prepetition obligations the Debtors owe to the Brokers.  The Debtors believe, and I agree, that

the relief requested herein is crucial to their reorganization efforts because the Brokers are

essential to the Debtors' overall business.  Indeed, the Debtors believe, and I agree, that a failure

---

[15] In the Customers and Brokers Motion the Debtors make clear that nothing in the Customers and Brokers Motion shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract with respect to any Customer or Broker.  The Debtors also expressly reserve all rights with respect to the continuation or cessation of any contract with any Customer or Broker and the assumption, adoption, modification or rejection of any executory contract with any Customer and Broker.  Furthermore, the Debtors reserve the right to contest the amounts claimed to be due, if any, by any Customer or Broker in the ordinary course of business.

000000.0

to immediately pay the prepetition amounts owing to the Brokers would have an immediate material and adverse effect on the Debtors' business resulting from, *inter alia*, (i) loss of sales revenue if the Brokers reduced or ceased their efforts to sell the Debtors' products and (ii) potential damage to customer relationships supported by the Brokers. For these reasons, and those discussed below, maintaining relationships with the Brokers is necessary in order for the Debtors to stay competitive, maintain their presence in the marketplace, and preserve their customer base during the course of these chapter 11 cases.

### Customer Programs

119. The Debtors seek to continue the Customer Programs because they have produced positive results in the past and are responsible for generating valuable goodwill, repeat business, and increased revenue. The Debtors believe, and I concur, that continuing the Customer Programs in the ordinary course of business during these chapter 11 cases is essential to maximizing the value of their estates for the benefit of all stakeholders. The following are general descriptions of the Customer Programs and the prepetition obligations relating thereto.

### Customer Rebates and Allowances

120. The Debtors offer rebates and allowances to certain customers to incentivize such customers to buy the Debtors' products. A customer's rebate or allowance is calculated based upon various factors related to the sale of product to such customer. Each rebate or allowance program is unique and custom-negotiated by the Debtors and the respective customer to fit the specific demands of the customer. Under each such customer rebate or allowance program, customers accrue rebates or allowances either monthly, quarterly or annually. The accrued rebates or allowances are then either paid by the application of certain credits to the customer's account or through periodic cash payments to the customer. Depending on the specific terms of each customer's rebates or allowance program, the rebates or allowances

54

000000.0

are generally paid or credited to the customer either monthly, quarterly or annually. In certain

limited circumstances the Debtors will advance a customer funds (a "pre-bate") based on specific

annual volume commitments in order to secure future business. Further, under certain

circumstances, in order to incentivize customers to purchase product from the Debtors, the

Debtors agree that they will identify and guarantee packaging and supply chain savings for their

customers over a certain period of time. To the extent the Debtors do not meet the targeted

savings, the Debtors typically issue the customer a cash rebate to make up the difference.

121.    The Debtors accrued approximately $60 million in cash rebates and

allowances due to their customers on account of sales made during fiscal year 2008. As of the

Petition Date, the Debtors estimate that $24.5 million of outstanding but unpaid customer rebates

and allowances are due, approximately $20 million of which represent cash rebates owed to

customers. The Debtors believe, and I agree, that any failure to honor their obligations to pay

prepetition rebates and allowances to their customers would significantly undermine the Debtors'

relationship with their customers and would impair the Debtors' ability to successfully attract

new customers. Further, current customers may seek alternative suppliers, thereby adversely

impacting the Debtors' ability to generate revenue. Moreover, in the event that the Debtors do

not honor such rebate and allowance claims, the affected customers may attempt to offset their

rebates or allowances against the amount they owe the Debtors, which would further negatively

impact the Debtors' cash flows and revenues.

122.    By the Customers and Brokers Motion, the Debtors are requesting authority

to honor their customer rebates and allowances. Because the potential harm to the Debtors'

businesses from not honoring the rebates and allowances outweighs the cost to their estates, the

Debtors believe, and I agree, that such relief is warranted and necessary to promote their

reorganization efforts and maximize the value of their estates for the benefit of all creditors in these cases.

### Customer Adjustments

123.   Despite the Debtors' continuous focus on and dedication to quality, it is inevitable that certain unexpected situations will arise in which the products supplied to the Debtors' customers do not conform to such customers' specifications (the "Nonconforming Goods"). In certain circumstances, the Debtors have warranted that their products, upon delivery, will meet certain specifications required by the customers. Similarly, despite the Debtors' efforts to manage their supply chain, it is inevitable that certain products will occasionally be misdelivered, delivered in an inaccurate quantity, or damaged in transit (the "Misdelivered Goods," and together with the Nonconforming Goods, the "Adjusted Goods").

124.   Additionally, from time to time, the Debtors correct billing errors after an invoice has been sent to the customer. Such errors include duplicative invoicing (when two invoices are created for the same shipment), improper invoicing (when the invoice created does not properly reflect the goods shipped or is otherwise incorrect), duplicative payment (when a customer makes two payments on account of the same shipment), mispricing (when a customer is charged or pays an incorrect price – either too high or too low – for the Debtors' products), and various other billing and payment errors (collectively, the "Invoicing Errors"). The Debtors routinely issue credits or refunds for reimbursement of Invoicing Errors to customers.

125.   In the event of delivery of Adjusted Goods or an Invoicing Error, the Debtors and the affected customer will generally agree to adjust the amount owed by such customer in connection with the affected shipment (the "Invoice Adjustments") or will agree to correct the products previously shipped. The correct goods or adjustment will be in such

quantity or amount as is allocable to the Adjusted Goods or sufficient to correct the Invoicing Error, as appropriate.

126.    The Debtors may also incur, directly or indirectly, additional shipping charges in connection with expediting delivery in order to ensure timely delivery of corrected goods. Alternatively, the Debtors may directly or indirectly incur charges in connection with the sorting or repair of the Adjusted Goods if such activities are practicable.

127.    The Debtors believe, and I agree, that their practices related to remedying Invoicing Errors and Adjusted Goods (collectively, the "Customer Adjustments") are standard in the Debtors' industry and are done in the ordinary course of their business, such that court authority is unnecessary. However, out of an abundance of caution, the Debtors seek authority to continue the Customer Adjustments and to pay any prepetition obligations relating thereto.

128.    Honoring the Customer Adjustments is undoubtedly in the best interests of the Debtors and their estates. The Debtors' failure to remedy Invoicing Errors and deliver corrected goods would significantly harm customers' confidence in the Debtors and their products. Moreover, in the event that the Debtors do not credit customers' accounts in connection with Invoicing Errors, those customers with claims related to Invoicing Errors may attempt to offset those claims against the amount they owe the Debtors. A failure to honor the Customer Adjustments would have a long-term negative impact on the Debtors' reputation and would hurt the Debtors' industry position. Accordingly, when compared to the harm that could arise should the Debtors fail to honor the Customer Adjustments, the Debtors submit, and I concur, that payments on account of Customer Adjustments will have minimal impact on their estates. As of the Petition Date, it is difficult for the Debtors to track the number of Adjusted Goods or the cost associated with other Customer Adjustments including Invoicing Errors

because such amounts are generally netted against outstanding invoices and not separately settled. However, as of the Petition Date, the Debtors believe, and I agree, that they have minimal amounts, if any, outstanding on account of prepetition Customer Adjustments. Accordingly, through the Customers and Brokers Motion, the Debtors request authority to honor any prepetition Customer Adjustments that may arise.

**Pre-Payments**

129.    There are certain instances when the Debtors will receive payment from their customers in advance of providing goods and services (the "Pre-Payments"). These instances include: (i) pre-payments from the Debtors' produce customers and (ii) situations where products are billed and manufactured by the Debtors in advance of actual delivery to their customers. In each of these instances, the Debtors have no actual cash liability to their customers as the Debtors are simply honoring obligations that the customers have paid for in advance.

130.    Certain of the Debtors' customers, specifically produce farmers, will often be billed in advance of the Debtors' delivery of goods to such customers. More specifically, these customers will pay in advance for an entire season's worth of packaging products in order to either obtain a pricing discount or fix the price at which they buy product from the Debtors. Then, throughout the year and at times specified by the customer, the Debtors will manufacture, deliver and invoice product to such customers. Through the Customers and Brokers Motion, the Debtors are requesting authority to continue providing these customers with their products in the ordinary course of the Debtors' business and to honor their obligations to customers who have made Pre-Payments.

131.    Similarly, from time to time, the Debtors hold certain goods previously invoiced to the customer and manufactured by the Debtors to be shipped from the Debtors'

58

warehouses at a later date specified by the customer (collectively, the "Bill and Hold Products"). Pursuant to customer agreements affecting the Bill and Hold Products, the Debtors no longer hold title to these goods, and instead collect a fee to store such goods until delivery is effected. Through the Customers and Brokers Motion, the Debtors are requesting authority to continue to provide these customers with delivery of their Bill and Hold Products in the ordinary course of the Debtors' business and to honor their obligations to customers who have prepaid for such Bill and Hold Products.

### Pass Through Costs

132.    The Debtors also perform certain "middle-man" functions on behalf of some of their customers related to the purchasing of tooling equipment and the coordination of waste management services.  In many cases, the Debtors need to acquire specialized tooling equipment (e.g., printing plates and cutting dies) in order to produce the end products ordered by their customers.  In such situations, the customer will often intend to own such specialized tooling equipment and will use the Debtors to sub-contract the tool production and to perform quality control assessments.  The tooling would, in many instances, be used by the Debtors at the Debtors' location, although the customers would retain title to the tooling.  The Debtors technically buy the tooling from third-party suppliers but, in the instances where such tooling will be owned by a customer, the customer will either advance funds to the Debtors prior to payment of the third-party tool-maker or will reimburse the Debtors for funds the Debtors paid to the third-party tool-maker for the specialized tooling (collectively, the "Tooling Payments").  In such instances, the Debtors have no equitable interest in either the tooling or the funds advanced by the customers.  Therefore, the Debtors, out of an abundance of caution, request the authority

to continue to serve as a "middle-man" with respect to the Tooling Payments, regardless of whether such payments involve prepetition or post-petition transactions or transfers.

133.    The Debtors also act as a "middle-man" with respect to the coordination of certain of their customer's waste management services.  In such instances, the Debtors are paid a fee to reduce a customer's costs for waste disposal by coordinating the customer's waste management services.  In many instances, a third party servicer receives and audits the customer's waste removal invoices (the "Waste Management Auditor").  The customers, in turn, pay to the Debtors the invoice amount and the Debtors forward such payment to the Waste Management Auditor or directly to the waste hauler.  There is no profit in the payment the Debtors receive from their customers and the Debtors merely act as an intermediary between their customer and the Waste Management Auditor or waste hauler to facilitate the payment of the waste removal invoices.  If the Debtors do not remit payment to the Waste Management Auditor, the customers' waste management invoices will not be paid, which would likely result in the termination of the customer's waste removal service and the customer being directly liable to the waste management vendors for amounts already paid to the Debtors.  Through the Customers and Brokers Motion, the Debtors are requesting authority to pay all amounts owing to Waste Management Auditors or waste haulers regardless of whether such amounts are on account of monies received by the Debtors from their customers prior to or after the Petition Date.

### Exchange Customers/Customer Setoffs

134.    In the ordinary course of business, the Debtors purchase goods from certain of their customers (the "Exchange Customers"), thus creating both a payable and receivable with such customers.  As a result, Exchange Customers will have a right to setoff monies they owe to

the Debtors against payables the Debtors owe to them.  Through the Customers and Brokers

Motion, the Debtors request that the Court modify the automatic stay, solely to the limited extent

necessary to permit the Debtor to effect setoffs of undisputed claims with the Exchange

Customers without further order of this Court.  The Debtors believe, and I agree, that such a

procedure is appropriate in order to reduce the administrative burdens on the Exchange

Customers to seek and this Court to adjudicate approval of setoffs, and to ensure that the

Debtors' cash flow is not impaired by Exchange Customers exercising self help remedies by

refusing to pay for the Debtors' goods in excess of the amounts owed to them by the Debtors.

As of the Petition Date, the Debtors believe, in the aggregate, the Exchange Customers owe the

Debtors more than the Debtors owe the Exchange Customers on account of goods delivered prior

to the Petition Date.

    135.   In certain other instances, the Debtors trade product with their Exchange

Customers.  In such instances, no money changes hands; rather, the Debtors "pay" for the

Exchange Customers' product by trading the equivalent value of the Debtors' product.

Typically, at the time the product is ordered, the Debtors and the Exchange Customer agree on

the quantity (usually in tons) of product to be traded.  Because the exchanges of product are not

instantaneous, it is possible that the Debtors will not have completed their obligations to deliver

product under certain "trades" as of the Petition Date.  If the Debtors fail to honor these

obligations, it is likely that certain of these Exchange Customers will no longer desire to trade

product and thus require the Debtors to use their cash to purchase products from the Exchange

Customers, or simply cease buying from and/or selling to the Debtors altogether.  Therefore,

through the Customers and Brokers Motion, the Debtors request authority to perform all

prepetition obligations to deliver product under such arrangements with their Exchange Customers.

136.   The success and viability of the Debtors' businesses are dependent upon the development and maintenance of customer loyalty.  The commencement of these chapter 11 cases will no doubt create apprehension on the part of customers or potential customers regarding their willingness to continue or to commence doing business with the Debtors.  The Debtors believe, and I concur, that without the requested relief, the stability of the Debtors' business will be significantly undermined, and otherwise loyal customers may explore alternative sources for their packaging products.  To preserve the value of the Debtors' businesses, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all Customer Programs without interruption or modification.  In addition, to provide necessary assurances to customers on a going-forward basis, the Debtors request authority to continue honoring or paying all obligations to Customers that arise in the ordinary course of the Debtors' businesses from and after the Petition Date.

**Brokers**

137.   As mentioned above, the Debtors utilize Brokers to obtain new customers and to maintain long-term customer relationships for certain of their products.  In general, the Brokers are responsible for the promotion, sale, solicitation and confirmation of orders from customers for the Debtors' products.  In addition, the Brokers are generally responsible for communications with Customers relating to the sale and marketing of the Debtors' products.  Among other things, the Brokers generally provide the Debtors with information as to changes in requirements, nature, quality or quantity of products, any complaints or other problems with the

DB02:7750749.1

000000.0

products, delivery or other matters, credit worthiness of the customers, and changes in the market, including matters that relate to competition of the Debtors.

138.   The Brokers for which the relief is sought through the Customers and Brokers Motion are not employees of the Debtors.  The vast majority of Brokers are, however, under contract with the Debtors.  Typically, the Brokers accrue commissions calculated based on the amount of the Debtors' product sold by the Brokers to customers located in certain areas of the United States and Canada (the "Customers").  The commissions are thereafter generally paid to the Brokers at the time the price of any products sold by the Brokers becomes part of the Debtors' net revenues or upon actual receipt by the Debtors of payments from Customers for the products sold by the Brokers.  The Brokers' compensation is designed to ensure that the Brokers maximize their efforts in enlisting new Customers and maintaining existing quality Customers.

139.   The Debtors therefore seek the authority to maintain their relationships with the Brokers and to perform certain prepetition obligations the Debtors owe to the Brokers. The Debtors believe, and I agree, that the relief requested herein is necessary to their reorganization efforts because the Brokers are essential to the Debtors' overall business. Furthermore, the Debtors believe, and I agree, that a failure to pay the prepetition amounts owing to the Brokers would have a material, adverse effect on the Debtors' business.  First, for the majority of the Brokers, the sole source of revenue from the sale of product for the Debtors is from the commissions earned on account of the sale of the Debtors' products.  The majority of Brokers do not receive any profit margin on the products they sell.  In addition, for the vast majority of Brokers, there are no specific performance goals or quotas placed obligating the Debtors to sell a pre-defined amount of product or to aggressively solicit new Customers.  In other words, the Brokers' incentive to expend the effort to sell the Debtors' products (as opposed

to a competitor's product) is tied directly to the Brokers' commission package. Accordingly, the Debtors believe, and I concur, that if the Brokers are not paid on account of the prepetition obligations, the Brokers can and will substantially reduce their sales efforts on behalf of the Debtors as their only incentive to sell the Debtors' products is the ongoing payment of commissions.

140.    Moreover, with respect to certain Brokers, the Debtors' ability to sell to Customers serviced by those Brokers is curtailed on account of the terms of the agreements between the Debtors and those Brokers. Some Broker contracts contain exclusivity provisions, which prohibit the Debtors from hiring new brokers or directly marketing their items to certain Customers. Accordingly, any substandard performance by these Brokers would, in essence, substantially limit the Debtors' ability to sell their products to such Customers. Additionally, other Broker contracts allow the Broker to sell other companies' non-competing products to the Customers. Accordingly, the Debtors are concerned that without payment of commissions due to such Brokers, their sale and promotion of the Debtors' products might decrease as compared to the sale and promotion of other companies' products.

141.    With respect to all Brokers, the uninterrupted payment of the Brokers is critical to maintaining the Brokers' loyalty to the Debtors.[16] One factor contributing to the Brokers' loyalty to the Debtors during the prepetition period was the Debtors' ability to make timely payments to the Brokers. In the event the Brokers go unpaid, the Debtors believe, and I agree, that the Brokers may not put forth the same effort previously expended on account of the Debtors' products or may cease to represent the Debtors at all. As these Brokers are essentially representatives of the Debtors with respect to the Customers, the Brokers' happiness and

000000.0

willingness to successfully market the Debtors' products to the Customers are of utmost import to the reorganization of the Debtors' businesses.

142.    The Debtors believe, and I concur, that if certain Brokers' quality of performance were to deteriorate or certain Brokers were forced to cease operations, the effect of this failure to serve the Customers would be very damaging to the Debtors' business and their ability to reorganize.  The Debtors' goodwill, presence, and recognition within the various industries described above, which are enhanced by these Brokers, would be substantially harmed by a loss of Brokers and the resulting erosion of the Debtors' customer base and revenue streams.

143.    As explained above, the Debtors compensate their Brokers in arrears by commissions that are calculated based on the amount of the Debtors' products sold to Customers. As of the Petition Date, the Debtors' estimate that the aggregate cost of performing all of their prepetition obligations owed to their Brokers will be approximately $3 million.

144.    Authorizing, but not requiring, the Debtors to perform their prepetition obligations owed to the Brokers in order to maintain the Debtors' business relationships with the Brokers will enable the Debtors to maintain their current Customer base and continue to attract new business through their Brokers.  If the Brokers are not timely paid, it is likely that they will no longer be willing to provide the same quality of service to the Debtors.  Moreover, the Debtors believe, and I agree, that any burden to the estate to pay such obligations is significantly outweighed by the resulting loss of business that would be caused by a failure to pay such obligations and the deleterious effects on the Brokers and Customers.  Because of the importance of the Brokers to the Debtors' overall industry presence and operations, the Debtors believe, and

---

[16] Furthermore, because some of the Brokers are individuals or small companies, any disruption in the payments to such Brokers could materially harm their livelihood or business operations.  If these companies are forced to close

000000.0

I agree, that paying such prepetition claims to the Brokers is integral to the Debtors' business going forward and their ability to maintain their enterprise value and to serve their Customers.

145.   As described above, the Customer Programs and Broker relationships are vital to the Debtors' operations and are necessary to maintain the amiable relations and goodwill of the Debtors' customers.  The Debtors believe, and I agree, that failure to satisfy the Customer Programs and maintain Broker relationships in the ordinary course of business during the first 20 days of the chapter 11 cases and thereafter would cause irreparable damage to the Debtors' reorganization efforts.

**Motion Of The Debtors For An Order Authorizing The Payment Of Prepetition Claims Of Certain Critical Vendors ("Critical Vendors Motion")**

146.   Through the Critical Vendors Motion, the Debtors seek entry of an order (i) authorizing the Debtors, in their discretion, to pay the prepetition claims of critical vendors that delivered goods or provided services to the Debtors prior to the Petition Date and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under this Order whether presented prior to or after the Petition Date.

147.   Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims").  Through the Critical Vendors Motion, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay the prepetition claims of such Critical Vendors in an aggregate amount not to exceed $60 million (the "Critical Vendor

their doors, the Debtors may not have as much or any presence in the industries serviced by such Brokers.

Cap").[17]  Given the paramount importance of the goods and services provided by the Critical

Vendors, and in order to ensure that the Debtors continue to receive such goods and services, the

Debtors believe, and I agree, that it is imperative that the Debtors be authorized to pay the

Critical Vendor Claims on an emergency basis.[18]

148.    The Debtors have examined whether the payment of Critical Vendor

Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade

credit on a post-petition basis.  Specifically, the Debtors have reviewed their accounts payable

and have undertaken a process to identify those vendors who are essential to the Debtors'

operations.  The Debtors have further developed certain procedures (for which they seek this

Court's approval) that, when implemented, will ensure that vendors receiving payment of

Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations

on a post-petition basis and in accordance with the terms of the parties' prepetition dealings.

149.    The Debtors consulted with appropriate members of their management

team to identify those vendors that are most likely essential to the Debtors' operations using the

following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether

certain customizations prevent the Debtors from obtaining a vendor's goods or services from

alternative sources within a reasonable timeframe, (c) if a vendor is not a sole source provider,

whether the Debtors have sufficient goods in inventory to continue operations while a

replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is

---

[17] Debtors reserve the right to seek to increase the Critical Vendor Cap at a later date if necessary, subject to this Court's approval.

[18] Through the Critical Vendors Motion the Debtors also seek the authority, where applicable and consistent with the relief sought in this Motion, to "pay" certain Critical Vendor Claims by cancelling out certain post-petition amounts that may be owed to the Debtors (a "Cancellation").  Such Cancellation would merely serve to avoid the administrative burden of keeping track of payments flowing both to and from the Debtors.  To be clear, however, all Critical Vendors receiving "payment" by Cancellation would be subject to the terms and conditions for payment of Critical Vendor Claims set forth in the Critical Vendors Motion.

000000.0

likely to refuse to continue providing goods or services to the Debtors post-petition if its prepetition outstanding balances are not paid. After carefully assessing the universe of vendors under the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors following the Petition Date in calculating the Critical Vendor Cap.

150.   The Debtors believe, and I agree, that authority to pay the Critical Vendor Claims is vital to their reorganization efforts. If this Motion is not granted, the Debtors believe that their access to trade credit on a postpetition basis will be severely limited and that many of the Critical Vendors will stop doing business with the Debtors altogether. Such results would cause immediate and irreparable damage to the Debtors and their estates.

151.   The continued availability of trade credit in amounts and on terms consistent with the Debtors' prepetition trade terms is also advantageous to the Debtors because it allows the Debtors to preserve working capital while maintaining optimal production levels. The retention or reinstatement of Customary Trade Terms will therefore enable the Debtors to maximize the value of their businesses as a going concern. Conversely, a deterioration in postpetition trade credit available to the Debtors and a disruption or cancellation of deliveries of goods – many of which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition, and ultimately impede the Debtors' ability to service their customers, thereby placing their customer base, as well as their successful reorganization, at risk.

152.   The goods and services that the Critical Vendors provide to the Debtors can generally be divided into the following categories: (i) Raw Materials and Chemicals, (ii) Plant

000000.0

Maintenance and Repair, (iii) Directed Sourcing and (iv) Customers, each of which is described in further detail below.[19]

###   i.     Raw Materials and Chemicals

####     a.     Wood and Reclaimed Fiber

153.   Wood fiber is essential to the paper manufacturing process.  The Debtors operate several paper mills throughout the United States and Canada covering a widespread geographic area, all of which require wood fiber for use in the paper making process.  In each case, the Debtors derive such fiber from wood, or wood chips (and saw dust) purchased from wood suppliers.  Due to the nature of the commodity (wood), the Debtors are required to use local suppliers, in part, because of the high costs of shipping wood between or among regions of the United States or Canada.  These high shipping costs make it practically impossible to purchase wood from wood suppliers from other regions.  As such, in many regions, the Debtors have very limited (if any) choices as to their supplier of wood.

154.   Typically, the wood suppliers cut wood from their forests on a weekly basis based on the Debtors requirements for that week.  As a result, the wood suppliers typically do not carry excess capacity/product that can otherwise be sold to other customers.  If the Debtors do not pay the prepetition claims of their wood suppliers, I believe that it is highly likely they will refuse to make product available for the Debtors, and in light of the Debtors limited options, the Debtors' mills may not be able to obtain wood chips to process into fiber that is the essential component to the paper making process.

155.   The Debtors also use reclaimed or recycled fibers in their manufacturing process.  While the process by which the Debtors obtain reclaimed fibers is different from wood

---

[19] The categories of vendors contained herein is not intended to be exclusive.  Due to the extensive nature of the Debtors' operations, it is possible that vendors that provide goods and services not described herein will qualify as a

fibers, the vendors are similarly critical. The Debtors' primary source of reclaimed fibers comes from arrangements the Debtors have with large generators of recyclable materials – often stores like Wal-Mart, Kroger, and similar stores. Under these arrangements, the Debtors purchase recyclable materials, and transfer certain of the materials to the Debtors' reclamation facilities and sell other materials to outside customers for a profit.

156. Maintaining these arrangements is crucial to the Debtors' reclamation business because they not only provide the Debtors with reclaimed fibers for their recycled paper manufacturing process, but they also provide the Debtors with an additional source of revenue by allowing the Debtors to sell certain materials to outside customers at a profit. The market for purchasing recyclable materials is extremely competitive and if the Debtors do not have the ability to pay some or all of the prepetition amounts owed under these relationships, the Debtors may lose the ability to purchase these materials directly from the recyclable generators. In such a case the Debtors (a) will lose the ability to generate revenue from the sale of certain recyclable materials to outside customers, and (b) be required to purchase recyclable materials for reclaimed fibers from third parties at a higher price.

### b.    Chemicals

157. The paper making process requires the use of several types of chemicals at various stages – the absence of any of these chemicals could curtail the paper making process. For instance, the Debtors use caustic chemicals during the pulping process – a process by which the wood chips are turned into usable bundles of fiber. Processed chemicals, on the other hand, are used after the pulping process and directly impact the end product by inputting characteristics to the sheet of paper and improving the efficiency of the paper making process. Some processed chemicals give the paper color, while others give the paper a smooth or grainy texture depending

---

critical vendor based on the criteria set forth above.

DB02:7750749.1

000000.0

on the type of chemical.  Other chemicals are used to treat the inflow of fresh water from the boiler and steam systems.

158.    In many cases, the chemicals used by the Debtors are only available through a limited number of suppliers, making it difficult for the Debtors to find an alternative source without experiencing manufacturing disruptions.  In addition, the Debtors' current manufacturing processes have proven successful through the use of its current chemical supply base, and while, in certain circumstances, the Debtors may be able to find the same generic chemical from another supplier, the integration of such replacement chemical into the current manufacturing process may or may not be successful.  If unsuccessful, the costs to the Debtors' estates associated with production interruptions and general manufacturing inefficiencies likely would greatly exceed any payment the Debtors would be required to make under the Critical Vendors Motion to induce the current critical chemical suppliers to continue supplying product to the Debtors post-petition.

159.    Further, in certain cases, the Debtors have negotiated extremely favorable pricing terms with their chemical suppliers as compared to the current market.  While technically such chemicals could be purchased through another supplier, the costs to the Debtors' estates associated with such alternative sourcing in many cases would vastly exceed any payment the Debtors would be required to make under the Critical Vendors Motion to induce such suppliers to continue supplying product to the Debtors post-petition.

c.    **Inks**

160.    Inks are used in the container process to put graphics and wording on packaging and displays.  In general, the Debtors carefully choose their ink suppliers in order to produce the highest quality products for their customers.  While the Debtors ink suppliers are not

technically considered "customer directed," the Debtors' customers (and their customers, including the general marketplace) have become accustom to the quality of the inks and color spectrums used on their packaging and displays. Further, in certain instances, the Debtors' customers must approve color spectrums (matches) for their packaging and displays. Once the color spectrums are approved, if the Debtors were to use a different ink in their production process, the Debtors would be required to seek customer approval which would likely result in a disruption of product to the Debtors' customer while such approval is sought.

ii.  **Plant Maintenance and Repair**

161.  To ensure that a wide range of specialized equipment required for the Debtors' manufacturing process, including corrugators, boilers, converting machines, and other tooling and material handling equipment operate in an effective, safe and efficient manner, the Debtors rely on specialized maintenance and repair services provided by certain Critical Vendors (collectively, the "Maintenance and Parts Vendors"). Due to the specialized and often hazardous nature of some of the services involved, certain of the services can only be obtained by the Debtors from Maintenance and Parts Vendors with permits or licenses required by state or federal laws and regulations. For example, daily maintenance and repair services can only be performed by certain Maintenance and Parts Vendors possessing specialized skills and/or licenses when the services involve specialized, proprietary or dangerous elements. Specialized or dangerous elements may include, among other things, high speed rotation motors, toxic substances, high voltage electricity, high pressure boilers, steam systems and dangerous chemicals. Additionally, certain Maintenance and Parts Vendors are the only vendors with the capacity to provide the Debtors with spare parts necessary to maintain and/or repair the Debtors' equipment.

72

162.    The Debtors' plant staffing model places a great deal of importance on the services provided by the Maintenance and Parts Vendors.  In certain instances, the Debtors' plants are operated with minimal in-house staffing capable of performing routine maintenance, which is supplemented by the specialized maintenance and repair services provided by the Maintenance and Parts Vendors on a regular or as-needed basis.  For example, the Debtors' main unitizing/strapping systems require specialized monthly maintenance from outside vendors.

163.    Further, the Debtors require parts to run their equipment on a regular basis.  Due to the frequency with which the Debtors require spare parts and the specialized nature of their equipment, the Debtors typically have few options as to the spare parts vendor.  Additionally, many of the Debtors' Maintenance and Parts Vendors carry the appropriate number of spare parts in their inventories such that they can support the Debtors' equipment in the event of a part failure.  In many cases, such arrangements are crucial to maintain going forward to ensure that the Debtors can quickly replace broken parts and avoid a shut down of their manufacturing equipment.

164.    In addition, there are a limited number of vendors able to provide the Debtors with the specialized maintenance and repair services and parts the Debtors require.  The Debtors believe, and I agree, that some of the Maintenance and Parts Vendors will refuse to provide postpetition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied.  Although the Debtors will make every effort to obtain continued performance from the Maintenance and Parts Vendors, it is vitally important that the equipment required for the Debtors' manufacturing process be maintained in an appropriate manner to reduce the risk of disruption to the Debtors' operations.  I believe that it is, therefore, crucial that the Debtors have the authority to satisfy the prepetition claims of the Maintenance and Parts

DB02:7750749.1

000000.0

Vendors. Equipment downtime could result in the Debtors' inability to service their clients, causing significant harm to the Debtors' ability to generate revenue and cash flow.

### iii. Directed Sourcing

165.   In certain cases the Debtors' customers require the Debtors to buy product from a specific source ("Directed Suppliers"). For example, certain of the Debtors' customers require the Debtors use a product from a specific supplier in their corrugating process. In such cases, the Debtors cannot purchase that product from another supplier. If the directed supplier refuses to supply its product to the Debtors unless the supplier's prepetition claim is satisfied in part, or in full, the Debtors will not be able to manufacture its customer's product and will likely lose the customer's business. Thus, I believe that it is crucial that the Debtors have the ability to satisfy prepetition claims of Directed Suppliers in order to prevent harm to (or loss of) customer relationships and loss of revenue.

### iv. Customers

166.   In many instances, the Debtors purchase goods from their customers ("Trading Partners"). In such cases, to the extent the Debtors are unable to pay all or a portion of the prepetition claims of the Trading Partners, the Trading Partners will likely cease purchasing product from the Debtors resulting in a loss of revenue.[20] Further, because of the integrated relationship between the Trading Partners and the Debtors, the Debtors often receive favorable pricing terms on the products they purchase from the Trading Partners. Thus, in the event a Trading Partner ceased to do business with the Debtors altogether, in certain instances, not only

---

[20] In their Customers and Brokers Motion, the Debtors request authority to lift the automatic stay for the limited purpose of effecting set-offs of pre-petition amounts owing to and from certain customers. The relief requested herein is intended to apply to those customers that do not have a right to set-off against amounts owed to them by the Debtors, and to customers who are owed amounts in excess of amounts setoff under the Customers and Brokers Motion.

000000.0

will the Debtors lose revenue from the loss of the Trading Partner's customer account, but they may be required to purchase replacement product on less favorable pricing terms.

167.    As discussed above, maintaining the goods and services provided by the Critical Vendors is vital to the Debtors' continuing business operations. In addition, and as also detailed above, the Debtors have conducted an extensive analysis and review of the Debtors immediate trade needs and supplier base and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid. Should any Critical Vendor stop supplying the Debtors, or choose to significantly downgrade the Debtors' trade terms, the Debtors believe, and I agree, that their businesses would be significantly and perhaps irreparably disrupted because their manufacturing facilities would lack the requisite materials and services needed to supply products to customers. This, in turn, would affect the Debtors' customers', supply chain and operations. Such a scenario would drastically affect the Debtors' revenues, cash flows and profitability and could lead to large customer damage claims against the Debtors. As such, the Debtors believe, and I agree, that the amount of the Critical Vendor Cap is small relative to the likely damage to the Debtors' businesses and estates should the relief requested herein not be granted. Accordingly, the Debtors believe, and I agree, that payment of the Critical Vendor Claims is plainly in the best interests of their estates and creditors.

**Motion For An Order (i) Authorizing: (a) Payment Of Prepetition Employee Wages, Salaries, Commissions And Other Compensation; (b) Payment Of Prepetition Compensation Owed To Independent Contractors And Temporary Workers; (c) Reimbursement Of Prepetition Employee Business Expenses; (d) Payments For Which Prepetition Payroll Deductions Were Made; (e) Contributions To Prepetition Employee Benefit Programs And Continuation Of Such Programs In The Ordinary Course; (f) Payment Of Workers' Compensation Obligations; And (g) Payment To Third Parties Of All Costs And Expenses Incident To The Foregoing Payments And Contributions; And (ii) Authorizing And Directing Applicable Banks And Other Financial Institutions To Honor And Pay All Checks And Transfers Drawn On The Debtors' Payroll Accounts To Make The Foregoing Payments ("Wages Motion")**

168.    The Debtors currently employ approximately 20,000 active employees (the "Employees"), of whom approximately 14,200 are hourly Employees and 5,800 are salaried Employees.[21]  In addition, the Debtors normally utilize the services of approximately 425 independent contractors (the "Independent Contractors") and approximately 600 temporary, full-time equivalent hourly workers (the "Temporary Workers").

169.    Approximately 11,640, or over sixty-five percent (65%), of these Employees (the "Union Employees") are represented by unions and covered under one of approximately 125 collective bargaining agreements (the "CBAs").[22]

170.    The Debtors believe, and I agree, that the Employees' skills, knowledge, and understanding of the Debtors' businesses are the Debtors' most valuable asset.  Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible.  In addition, the Debtors utilize Independent Contractors to perform a wide spectrum of services, including logging and manufacturing functions.  The Debtors believe, and I agree, that the services they provide are critical to the smooth functioning of the Debtors' businesses.

---

[21] The Debtors also employ approximately 250 Employees who are currently inactive due to either a leave of absence, short or long-term disability leave, or maternity leave and are receiving pay and benefits.

[22] For purposes of the Wages Motion only, the Employees other than the Union Employees shall be collectively referred to as the "Non-Union Employees".  The contractual terms of Union Employees' hours worked, overtime, vacation, and other benefits vary slightly depending upon the particular CBA.

Further, the Temporary Workers are hourly workers who perform various jobs and include systems analysts, accounting clerks and laborers. The same individual Temporary Workers are regularly used by the Debtors and thus have developed expertise and experience that are necessary to the smooth functioning of the Debtors' operations.

171.    To minimize the personal hardship that the Employees, Independent Contractors, and Temporary Workers will suffer if prepetition employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, through the Wages Motion, seek authority, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtors' Employees; (b) pay all prepetition compensation owed to individuals who work regularly as the Debtors' Independent Contractors and Temporary Workers; (c) reimburse all prepetition business expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments (collectively, and as more fully described below, the "Employee Wages and Benefits").

## I.    Prepetition Employee Obligations

### a.    Wages, Salaries, and other Compensation

172.    The Debtors' average gross monthly compensation for their Employees, including wages, salaries, commissions and other compensation is approximately $106 million ("Wages"). More than 80% of payroll payments to salaried employees and 35% of payroll

77

payments to hourly employees are made by direct deposit through electronic transfer of funds directly to the Employees, while the remaining payments are made via check. The Debtors' hourly Employees in the United States are paid on Thursday or Friday, on either a weekly or bi-weekly schedule, four to five days in arrears. Hourly Employees in Canada are paid on a weekly schedule five days in arrears. Salaried Employees in the United States and Canada are paid twice a month, with direct deposits made or checks issued on the day before or on pay periods ending on the 15th and 30th of each month. Wages are handled on a centralized basis and without a third party payroll processor.

173.    Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition Wages. Furthermore, salaried Employees are paid on the 15th and 30th of the month, and have thus accrued some prepetition wages as of the Petition Date that are not scheduled to be paid until January 30. Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

174.    As of the Petition Date, the aggregate amount of accrued Wages (excluding the Payroll Taxes and Deductions (each as defined below)) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $27.7 million (the "Unpaid Wages"). Through the Wages Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business, including, without limitation, to the Union Employees in the ordinary course of business and in accordance with the terms and conditions of the CBAs. The Debtors have made careful inquiries and have taken diligent steps

to ensure that their Employees are not owed more than $10,950 for Unpaid Wages as of the Petition Date. Accordingly, if the Wages Motion is granted, the Debtors believe, and I concur, that no Employee should be paid more than $10,950 for such Unpaid Wages.

175. The number of Independent Contractors engaged by the Debtors varies from month to month. The Debtors typically spend an average of $14.6 million per year on Independent Contractors. Depending on the type of service rendered, Independent Contractors are paid on a weekly, monthly or per assignment basis. As of the Petition Date, the Debtors estimate, and I concur, that they owe approximately $600,000 for the unpaid and accrued services of the Independent Contractors. The Debtors believe, and I agree, that no Independent Contractor is owed more than $10,950 as of the Petition Date. Through the Wages Motion, the Debtors request authority to pay any and all prepetition amounts owing for the services of their Independent Contractors.

176. The number of Temporary Workers engaged by the Debtors varies from month to month, and is highest during months in which the Debtors' manufacturing capacity is greatest. Payment for the services of the Temporary Workers is generally made on a weekly or bi-weekly basis. The Debtors spend approximately $1.9 million per month for the services of the Temporary Workers, and as of the Petition Date, the Debtors estimate, and I concur, that they owe approximately $1.45 million for the unpaid and accrued services of approximately 600 Temporary Workers. The Debtors believe, and I agree, that no Temporary Worker is owed more than $10,950 as of the Petition Date. Through the Wages Motion, the Debtors request authority to pay any and all prepetition amounts owing for the services of their Temporary Workers.

**b.    Reimbursement of Prepetition Employee Business Expenses**

177. Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of

79

the Debtors in the scope of their employment (the "Reimbursable Expenses").  The

Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, and

other business-related expenses.

178.   The Debtors have existing arrangements with American Express Travel

Related Services Company ("American Express") that provide approximately 2,500 Employees

who incur the greatest amount of Reimbursable Expenses with corporate credit cards that are to

be used solely for incurring Reimbursable Expenses on behalf of the Debtors.  The Debtors remit

payment for these Reimbursable Expenses directly to American Express on a weekly basis after

the Employees have submitted the appropriate receipts and expense reports.

179.   While most of the Reimbursable Expenses are paid through the use of the

American Express cards, a portion of the Reimbursable Expenses are incurred by Employees on

behalf of the Debtors through use of personal funds or credit cards.  After submission and

approval of expense reports, such Employees are reimbursed through the regular payroll process.

180.   The Debtors spend an average of approximately $3.2 million per month on

Reimbursable Expenses incurred by Employees either through the use of the American Express

corporate cards or through the use of personal funds or credit cards.

181.   Because Employees do not always submit expense reports with perfect

regularity, it is difficult to determine with precision the aggregate amount of outstanding

Reimbursable Expenses.  However, the Debtors estimate, and I concur, that as of the Petition

Date, approximately $1.8 million in Reimbursable Expenses have been incurred but remain

unpaid.

182.   The Reimbursable Expenses were all incurred on the Debtors' behalf and

with the understanding that they would be reimbursed.  To avoid harming the individual

DB02:7750749.1

000000.0

Employees who incurred the Reimbursable Expenses, the Debtors request authority to reimburse the Employees for Reimbursable Expenses that were incurred prepetition, including, as applicable, (a) making all payments to American Express and (b) paying all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period.

**c.    Prepetition Withholdings and Deductions**

183.    The Debtors' Payroll Taxes, including both the employee and employer portion, for 2008 were approximately $270 million.  The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.  As of the Petition Date, the Debtors estimate, and I agree, that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $6.7 million.  The Debtors seek authority, but not direction, to honor and process the prepetition obligations with respect to the Payroll Taxes, including forwarding the Withheld Amounts to the appropriate taxing authorities.

184.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) credit union payments, (c) garnishments, child support, and similar deductions, and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of pension payments, health care benefits, insurance premiums, 401(k) contributions, Canadian savings and defined contribution plans, legally ordered deductions and other miscellaneous deductions) (collectively, the "Deductions") and forward those amounts (with the exception of any amounts owing on account of self-insured programs) to various third party recipients.  On average, the Debtors have historically deducted approximately $13 million in Deductions from the Employees' paychecks per month.  As of the Petition Date, approximately $3.8 million was previously deducted from

81

Employees' earnings and had not yet been forwarded to the appropriate third party recipients. Accordingly, the Debtors seek authority to forward these prepetition Deductions to the applicable third party recipients.[23]

## II.    Prepetition Employee Benefits

185.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) a broad range of medical and health care programs, (b) vacation, sick, holiday and leave benefits, (c) savings and certain pension plans, and (d) certain other specific employee benefits, described in greater detail below (collectively, (a), (b), (c) and (d) make up the "Specified Employee Benefits"). The Debtors also provide various other benefits to their Employees such as non-qualified pension plans and management incentive bonus plans, which are not the subject of the Wages Motion for first-day relief and thus not included in the Specified Employee Benefits. As set forth in greater detail below, I estimate that as of the Petition Date the total amount owed or accrued prepetition in connection with the Specified Employee Benefits is approximately $36.6 million.

### a.    Health Care Programs

186.    The Debtors offer several programs to eligible full-time Employees[24] for health, prescription drug, dental, and vision care coverage, whether through third party insurers or otherwise (the "Health Care Programs"). A majority of the Debtors' Health Care Programs are provided through (i) a self-insured preferred provider organization medical plan administered by Blue Cross Blue Shield of Alabama ("BCBS"); (ii) a self-insured prescription drug plan

---

[23] The Withheld Amounts are paid out of the payroll accounts within a day of funding, while the Deductions are held for 3-4 days before they are directed to the appropriate vendor/account.
[24] Active, regular, full-time Employees are generally eligible to participate in the Health Care Programs after 30 days of employment.

administered by Express Scripts, Inc.; (iii) a self-insured dental plan administered by Delta

Dental of Missouri; and (iv) a vision plan insured by Vision Service Plan with premiums paid

entirely by participating Employees (the "Self-Insured Health Programs"). The Debtors also

maintain insured medical policies for approximately fifteen percent (15%) of their Employees

with a variety of other health care insurers, including HMOs and multi-employer plans (the

"Insured Health Programs"). The Health Care Programs are funded through contributions by the

Debtors and participating Employees. The Debtors contribute a majority of the costs for both the

Self-Insured Health Programs and the Insured Health Programs, and the percentage contributed

by the Employee varies depending on whether the Employee's family members or partners and

any dependent is covered, and may be governed by CBAs. Employee contributions are deducted

from Employees' paychecks.

187.   On average, the Debtors pay approximately $12.8 million per month for

both the Self-Insured Health Programs and the Insured Health Programs. In addition, the

Debtors' average monthly administrative fees currently paid for Self-Insured Health Programs

total approximately $580,000. As of the Petition Date, the Debtors estimate, and I concur, that

the amount of accrued and outstanding prepetition obligations with respect to the Health Care

Programs to be approximately $15.8 million.

188.   Through the Wages Motion, the Debtors seek authority to (a) continue to

provide the Health Care Programs for their Employees in the ordinary course of business, (b)

continue to honor obligations under such benefit programs, including any premiums and

administrative fees, and (c) pay all such amounts owed under the Health Care Programs to the

extent that they remain unpaid on the Petition Date.

### b.    Vacation, Sick, Holiday, and Leave Benefits

189.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The duration of vacation benefits varies based on the Employee's location, position, amount of time employed by the Debtors and may be governed by CBAs (where applicable). When used, Employees are generally paid for Vacation Time at their regular hourly or salaried rates. Other than where mandated by state law or CBA, I understand that accrued but unused Vacation Time does not generally carry over to the following calendar year and pay cannot be requested in lieu of earned vacation time.

190.    In the ordinary course of business, the Debtors provide sick leave ("Sick Leave") to certain of their Employees. Under the Debtors general sick leave policy, Employees are not entitled to a specific number of sick days. Instead, they receive pay for occasional sick days, provided that their absences are not excessive. Sick Leave does not carry over to the following calendar year. Sick leave for Union Employees may vary from the Debtors' general Sick Leave policy and is governed by the applicable CBAs.

191.    The Debtors also generally provide twelve (12) paid holidays for eligible full-time Non-Union Employees and offer additional compensation ("Holiday Pay") to certain Employees who work on holidays. With respect to certain Union Employees, the number of paid holidays and the provisions governing Holiday Pay are governed by applicable CBA and may vary based on, among other things, length of service and shift worked.

192.    In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain subsets of their Employees (the "Additional Leave Policies;" and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay"). Because the benefit programs sometimes differ for Union and Non-Union Employees, or for Canadian

and U.S. Employees, and because the benefit provisions in the CBAs are not always the same, the Debtors' Additional Leave Policies differ for each subset of the Debtors' Employees.[25]

193.    Costs of Leave Pay that accrued prepetition will be honored through the payroll process by the continuation of pay during the affected Employees applicable leave. Thus, with the exception of earned Vacation Time pursuant to the CBAs, the cost of Leave Pay is included in the "Unpaid Wages" total.  Generally, the Debtors' policy is that all unused Vacation Time must be utilized before the end of the calendar year.  Through the Wages Motion, the Debtors request authority to continue to honor their Leave Pay policies in the ordinary course of business and to honor all prepetition obligations related thereto.

c.      **Savings and Employee Pension Plans**

194.    Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained a number of savings plans for the benefit of their domestic Employees, including the Smurfit-Stone Container Corporation Hourly Savings Plan, the St. Laurent Paperboard Hourly Savings Plan; the Smurfit-Stone Container Corporation Savings Plan; the Jefferson-Smurfit Corporation Hourly Savings Plan; the Smurfit-Stone Puerto Rico, Inc. Savings Plan for Salaried Puerto Rican Employees; the Smurfit-Stone Puerto Rico, Inc. Hourly Savings Plan for Puerto Rican Employees and the Calpine Corrugated, LLC 401(k) Plan,[26] (collectively, the "401(k) Plans").  The Debtors also maintained, prior to the Petition Date, and in the ordinary course of business, savings plans – the Group Retirement Savings Plan for Smurfit-Stone Container Canada Inc. and Smurfit-MBI and the Deferred Profit Sharing Plan for Smurfit-Stone Container Canada Inc. and Smurfit-MBI – and a defined contribution plan – the Pension Plan for

---

[25] For example, Non-Union Employees in the United States are entitled to take paid time off on account of (i) jury duty service; and (ii) bereavement or funeral leave and may be eligible for "make-up" pay for military service. The Additional Leave Policies may vary, however, for Union Employees based on the terms of their CBAs.

[26] This plan will be absorbed by the Smurfit-Stone Container Corporation Savings Plan on March 31, 2009.

Employees of B.C. Shipper Supplies Ltd. – for the benefit of their Canadian Employees (collectively, the "Canadian Savings Plans" and together with the 401(k) Plans, the "Employee Savings Plans"). The Employee Savings Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. Approximately 18,400 Employees currently participate in the Employee Savings Plans, and they contributed approximately $48 million of their own funds into the Employee Savings Plans during 2008. The Debtors also make varying contributions, which are indexed to Employee contributions to the Employee Savings Plans for certain participating Employees. During 2008, the Debtors paid their contributions to these Employee Savings Plans in the amount of approximately $17 million. As of the Petition Date, the Debtors owed approximately $6.0 million dollars to third parties in connection with the Employees Savings Plans. Through the Wages Motion, the Debtors seek authority to pay all amounts owed under the Employee Savings Plans and continue to perform their obligations under the Employee Savings Plans.

195.    In addition to the 401(k) Plans, prior to the Petition Date, the Debtors made contributions to ten (10) multi-employer pension plans pursuant to the CBAs governing approximately thirty (30) of their facilities in the United States and Canada (the "Multi-Employer Plans"). The Debtors' Multi-Employer Plan contribution requirements vary by CBA and generally are based on a percentage of earnings as calculated on a shift, hourly, or weekly basis. The Multi-Employer Plan contributions are paid on a monthly basis, and the Debtors paid approximately $4 million in total contributions to such plans in 2008. The Debtors estimate, and I agree, that the aggregate amount of contributions that remained unpaid to the Multi-Employer Plans as of the Petition Date was approximately $500,000 (the "Unpaid Pension Contributions").

86

Through the Wages Motion, the Debtors seek authority to pay the Unpaid Pension Contributions and continue to perform their obligations under the Multi-Employer Plans.

196.    Prior to the Petition Date, in the ordinary course of business, the Debtors maintained two (2) defined benefit pension plans for domestic Employees and former employees (the "DB Plans"). On December 31, 2008, one of the DB Plans (for salaried Employees and former employees) was frozen. The Debtors also maintain four (4) non-qualified pension plans for domestic Employees and former employees (the "NQ Plans" and together with the DB Plans, the "U.S. Pension Plans"). In Canada, the Debtors maintained, prior to the Petition Date, in the ordinary course of business, six (6) registered pension plans (the "Registered Plans") and four (4) non-registered pension plans (the "Non-Registered Plans" and together with the Registered Plans, the "Canadian Pension Plans" and collectively, with the U.S. Pension Plans, the "Pension Plans") for the benefit of their Canadian Employees and former employees. Through the Wages Motion, the Debtors are not seeking authorization to make prepetition contributions to the Pension Plans, but do reserve their rights to seek further relief with respect to the Pension Plans.

   **d.     Specified Employee Benefits**

   (i)     Disability

197.    The Debtors provide self-funded short-term disability benefits (the "Short-Term Disability Benefits") to approximately 11,000 hourly Employees and approximately 5,100 salaried Employees. Eligible Non-Union Employees are entitled to, among other things, certain continuations of salary in the event of a short-term medical disability due to a non-work related illness or injury.[27]  Short-Term Disability Benefits begin after a Non-Union Employee is

---

[27] An Employee that has completed between six (6) months and four (4) years of service is eligible to receive 100% of his or her base salary for four (4) weeks and 60% of base salary thereafter, while an Employee with more than four (4) years of service is eligible to receive 100% of his or her weekly base salary for each year or partial year of service and 60% of weekly base salary thereafter up to the 26 week maximum.

DB02:7750749.1                                                                                          000000.0

diagnosed with an occupational or non-occupational illness and may be continued for a maximum of 26 weeks. The amount of Short-Term Disability Benefits that an eligible Non-Union Employee is entitled to receive is based on number of years of service. For Union Employees, Short-Term Disability Benefits, if any, are typically governed by the CBA at issue and accordingly, the terms and conditions of such policies may vary. Short-Term Disability Benefits for hourly Employees are administered by Aetna, and Short-Term Disability Benefits for salaried Employees are self-administered by the Debtors. The Debtors currently pay approximately $220,000 per month with respect to Short-Term Disability Benefits. As of the Petition Date, the Debtors owed approximately $150,000 to Aetna on account of the Short-Term Disability Benefits, and any prepetition amounts stemming from the self-administered portion of the Short-Term Disability Benefits are included in the "Unpaid Wages" total.

198.    The Debtors currently provide approximately 5,100 Non-Union Employees and Union Employees with company-sponsored long-term disability benefits (the "Long-Term Disability Benefits"). Generally, eligible full-time Employees become entitled to receive Long-Term Disability Benefits after six (6) months of employment with the Debtors. In most instances, Long-Term Disability Benefits commence after the eligible Employee has received Short Term Disability Benefits for six (6) months. The Long-Term Disability Benefits are generally paid at a rate of sixty percent (60%) of a participating Employee's base salary, with a maximum monthly benefit of $15,000. The Long-Term Disability Benefits are self-insured and are administered by Aetna in the United States. In Canada, the Debtors maintain long term disability insurance coverage for eligible Canadian Employees through a third party insurer, Great West Life ("Great West").

DB02:7750749.1                                                                      000000.0

199.    The approximate monthly cost for the Long-Term Disability Benefits is $270,000 per month. As of the Petition Date, the Debtors owed a total of approximately $340,000 in connection with the Short-Term and Long-Term Disability Benefits. The Debtors request authority to pay all prepetition amounts outstanding in connection with the Short-Term and Long-Term Disability Benefits, including amounts owed to third party insurers and to otherwise continue to provide Short-Term and Long-Term Disability Benefits in the ordinary course of their businesses postpetition.

(ii)    Life Insurance

200.    The Debtors provide life insurance coverage ("Life Insurance") for eligible Union and Non-Union Employees through either (i) Standard Life (for United States Employees) or (ii) Great-West (for Canadian Employees). Benefit amounts and other terms and conditions of the Life Insurance differ depending on whether an Employee is in the United States or Canada, and whether they are a Union or Non-Union Employee. Even among Union Employees in the same country, benefit amounts and other terms and conditions vary depending on the applicable CBA under which such Employees are covered. Approximately 20,000 Employees participate in the Life Insurance program, which costs the Debtors approximately $440,000 in premiums per month. As of the Petition Date, the Debtors estimate, and I agree, that approximately $440,000 is owed to Standard Life and Great-West in connection with the Life Insurance program.

(iii)    Voluntary Insurance Programs

201.    In addition, eligible Employees may enroll for and purchase supplemental long-term disability, supplemental life insurance, and accidental death and dismemberment coverage (the "Voluntary Insurance Programs"). As participating Employees pay all premiums in connection with the Voluntary Insurance Programs, the Debtors anticipate that all amounts

outstanding with respect to the Voluntary Insurance Programs will be handled through payroll deductions. Through the Wages Motion, the Debtors seek authority to continue their prepetition practices with respect to the Voluntary Insurance Programs.

      (iv)    Severance Programs

202. Prior to the Petition Date and in the ordinary course of business, the Debtors maintained severance plans in the United States and allocated severance in Canada in accordance with Canadian law (the "Severance Programs") for all active, full-time Non-Union salaried Employees and certain active, full-time hourly Employees.[28] Pursuant to the Severance Programs, Employees become eligible for severance payments and benefits ("Severance") if (i) their employment was terminated without cause; and (ii) the Employee has worked for the Debtors for at least 30 days prior to termination. In the U.S., Employees entitled to Severance generally receive one week of salary for each year of service with the Debtors, plus four additional weeks. In Canada, Severance varies depending on the Employee's location, years of service and job responsibilities. The amount and duration of the Employee's Severance depends on whether the Employee signs a company-provided agreement containing, among other things, a waiver and release of claims (the "Waiver and Release Agreement").

203. As of the Petition Date, there are no former employees receiving Severance payments under the Severance Programs. Through the Wages Motion, the Debtors request authority to continue the Severance Programs in the ordinary course of business, following notice and a subsequent hearing. A hearing with respect to the relief requested in connection with the Severance Plans shall be held on the date and at the time set forth in the proposed order attached to the Wages Motion as Exhibit A (the "Proposed Wage Order"), and parties shall be

---

[28] Certain salaried Employees are party to executive severance plans, individual employment contracts, or like agreements and are not eligible for the Severance Programs.

given an opportunity to object as set forth in the Proposed Wage Order. A proposed order with respect to the relief requested in connection with the Severance Programs is attached to the Wages Motion as Exhibit B (the "Severance Order").

204.    Although there are no former employees receiving Severance payments pursuant to the Debtors' Severance Programs, I understand that approximately 120 former employees of the Debtors (the "Severed Employees") continue to receive Severance healthcare benefits. Through the Wages Motion, the Debtors request authority to pay prepetition and postpetition healthcare benefits ("Continued Healthcare Benefits") to all such Severed Employees (i) through entry of the Severance Order, and after entry of the Severance Order, until each Severed Employee's Continued Healthcare Benefits expire, or (ii) if the Severance Order is not entered by the Court, up to three (3) months after denial or withdrawal of the Severance Order (including the interim period before denial or withdrawal of the Severance Order, the "Notice Period"). The Debtors believe, and I agree, that providing the Continued Healthcare Benefits through the balance of the Notice Period, if the Severance Order is not entered, will provide the Debtors with sufficient time to identify Severed Employees who have retired and will prevent interruption of healthcare benefits to retired Employees that may be subject to other protections. As of the Petition Date, the outstanding Continued Healthcare Benefits for all Severed Employees to be provided by the Debtors total approximately $215,000.

205.    In addition to the Employees included in the Debtors' Severance Programs, the Debtors' Union Employees typically obtain severance payments and/or payments during specified notice periods prior to termination and health care benefits (the "CBA Severance") pursuant to agreements (the "CBA Severance Agreements") negotiated between the Debtors and the unions in accordance with the governing CBAs. Currently the Debtors are providing CBA

91

Severance pursuant to six (6) CBA Severance Agreements. As of the Petition Date, the Debtors

estimate, and I agree, that approximately $8.8 million in CBA Severance benefits are

outstanding. Through the Wages Motion, the Debtors seek the authority to continue to pay all

CBA Severance amounts arising pursuant to the CBAs, and to continue negotiating CBA

Severance Agreements in the ordinary course, as required in the CBAs and applicable provisions

of the National Labor Relations Act.

(iv)    Flexible Spending

206.    The Debtors offer their Employees the ability to contribute a portion of

their pre-tax compensation, which amounts are generally deducted automatically from each

participating Employee's paycheck, into flexible spending accounts for health and dependent

care through BCBS, which operates as a third party administrator to the plans (the "Flexible

Spending Program"). Approximately 1,760 Employees participate in the Flexible Spending

Program, for which the Debtors deduct approximately $230,000 per month from the Employees.

Through the Wages Motion, the Debtors seek authority to continue their prepetition practices

with respect to the Flexible Spending Program.

(iv)    Employee Relocation Program

207.    The Debtors also pay relocation expenses, including traditional market-

based costs, incurred by certain of their Employees in connection with their employment (the

"Employee Relocation Program"). During 2008, the Debtors have expended approximately $8.0

million on account of the Employee Relocation Program. As of the Petition Date, the Debtors

estimate, and I concur, that approximately $3.8 million is owed in connection with the Employee

Relocation Program. Through the Wages Motion, the Debtors seek authority, but not direction,

to continue to maintain the Employee Relocation Program in the ordinary course of business and

to pay for any and all outstanding amounts owed on account of the Employee Relocation Program.

   (v) Retiree Medical Programs

  208. The Debtors maintain a self-insured plan that provides different levels of medical, dental, and prescription drug programs to approximately 6,800 retired Non-Union Union former employees and approximately 60 retired former employees that receive such benefits through HMOs (collectively, the "Retiree Medical Benefits"). The Retiree Medical Benefits are administered through BCBS. The Debtors also maintain a retiree life insurance plan that is provided by a third party insurer (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits"). The Retiree Life Insurance program provides benefits to approximately 13,900 retired Non-Union Union former employees. The Debtors spend an average of $1.6 million on Retiree Medical Benefits per month and pay a monthly premium of $215,000 for the Retiree Life Insurance. Through the Wages Motion, the Debtors seek authority to pay all obligations related to the Retiree Benefits that accrued as of the Petition Date, and to continue honoring their commitment to pay Retiree Benefits.

   (vi) Accidental Death and Dismemberment Coverage

  209. The Debtors also provide accidental death and dismemberment insurance coverage ("AD&D") for certain full-time Employees through two third party insurers, Standard Life ("Standard") in the United States and American Home Assurance ("American Home") in Canada. The Debtors' pay premiums to Standard and American Home of approximately $35,000 per month in the aggregate. As of the Petition Date, the Debtors believe, and I agree, that $35,000 is owed in connection with the AD&D program. Through the Wages Motion, the Debtors request authority to pay any and all outstanding amounts owed for AD&D coverage and to continue the AD&D program in the ordinary course of business.

                              

(vii)    Car Allowances

210.    To assist certain Employees in commission of their duties (most commonly sales) in support of the Debtors' businesses, the Debtors pay for automobile expenses, including car allowances and the fixed and variable rate program (collectively the "Car Allowance Programs") for approximately 210 Employees, as well as a company car program, which provides leased cars for employee use at the Debtors' facilities (the "Company Car Program"). During 2008, the Debtors spent approximately $7.25 million on the Car Allowance Programs and the Company Car Program.  At the Petition Date, the Debtors believe, and I concur, that they were current on account of such programs, and seek authority, but not direction, to continue to maintain the Car Allowance Programs and the Company Car Program in the ordinary course of business.

(viii)    Club Memberships

211.    The Debtors pay for club memberships for approximately 60 Employees (the "Club Memberships"), for use fostering relationships with vendors, customers and trade partners of the Debtors.  Primarily, the Club memberships are used by the Debtors' salespeople. The Debtors spent approximately $540,000 on the Club Memberships in 2008, and as of the Petition Date, the Debtors believe that they owed $50,000 on account of the Club Memberships. Through the Wages Motion, the Debtors seek authority, but not direction, to continue to maintain the Club Memberships for the benefit of certain Employees in the ordinary course of business and to pay for any and all outstanding amounts owed on account of the Club Memberships.

(ix)    Employee Welfare

212.    The Debtors also maintain other Employee programs, including the (i) tuition reimbursement program (the "Tuition Program"), which includes various educational and

service programs; (ii) Employee assistance program (the "Assistance Program"), which provides

counseling and other personal services; and (iii) adoption assistance program (the "Adoption

Program," together with the Tuition Program and the Assistance Program, the "Employee

Welfare Programs"). In 2008, the Debtors spent approximately $270,000 reimbursing

Employees for tuition and related expenses, approximately $325,000 providing services through

the Assistance Program, and approximately $10,000 on account of the Adoption Program. At

the Petition Date, the Debtors believe, and I agree, that they owed a *de minimus* amount on

account of the of the Employee Welfare Programs, and seek authority, but not direction, to

continue to maintain the Employee Welfare Programs in the ordinary course of business and to

pay for any and all outstanding amounts owed on account of the Employee Welfare Programs.

### III.    Workers' Compensation Program

213.    In the United States, the Debtors are self-insured in nineteen (19) states (all

of the states in which they operate, except for the State of North Dakota, which, I understand,

requires coverage through the workers' compensation State Fund (the "North Dakota Fund")[29])

in which they operate (the "Workers Compensation Policies"). In addition, the Debtors maintain

excess "stop-loss" insurance above their self-insured retentions through Zurich American

Insurance. The Debtors pay approximately $490,000 in premiums to Zurich American Insurance

on an annual basis on account of such excess coverage.

214.    As of the Petition Date, there were approximately 559 workers'

compensation claims (the "United States Workers' Compensation Claims") pending against the

Debtors arising out of alleged injuries incurred by United States Employees during the course of

their employment with the Debtors, which the Debtors expect to continue to resolve in the

---

[29] The Debtors pay annual premiums of approximately $6,800 on account of the North Dakota Fund, and were current on such payments as of the Petition Date.

ordinary course of business. The Debtors paid approximately $20.4 million to settle Workers'

Compensation Programs claims in 2008. I understand that the Debtors expect to continue to

resolve the Workers' Compensation Claims in the ordinary course of business in accordance

with applicable state law.

215. As the Canadian workers' compensation system is government

administered, the Debtors fund the workers' compensation coverage for their Canadian

Employees via workers' compensation premiums paid to the government (the "Canadian

Workers' Compensation"). The approximate monthly cost to the Debtors of the Canadian

Workers' Compensation is $270,000. As of the Petition Date, and due to the varying schedules

upon which the Canadian Workers' Compensation becomes due, approximately $120,000 in

Canadian Workers' Compensation had accrued but not yet been paid by the Debtors as of the

Petition Date.

216. Because the Debtors believe, and I agree, that the Workers' Compensation

Programs are essential to the continued operation of the Debtors' businesses under the laws of

the various states and provinces in which they operate, the Debtors request authority to pay any

and all prepetition amounts due or that may become due with respect to the Workers'

Compensation Programs. The Debtors further seek authority to maintain and continue their

prepetition practices with respect to the Workers' Compensation Programs, including, among

other things, allowing workers' compensation claimants, to the extent they hold valid claims, to

proceed with their claims under the applicable Workers Compensation Programs.

217. The Debtors seek the relief requested herein because they believe, and I

agree, that any delay in paying any of the Employee-related wages, deductions, reimbursements

and benefits described herein, (including, without limitation, the wages owed to Independent

Contractors and Temporary Workers) could severely disrupt the Debtors' relationship with their

Employees and dedicated non-Employee personnel and irreparably impair the Employees'

morale at the very time that their dedication, confidence and cooperation are most critical. The

Debtors face the risk that their operations may be severely impaired if the Debtors are not

immediately granted authority to pay the Employee Wages and Benefits. At this critical stage, I

believe that the Debtors simply cannot risk the substantial disruption of their business operations

that would attend any decline in workforce morale attributable to the Debtors' failure to pay the

Employee Wages and Benefits in the ordinary course of their businesses.

> ### Motion Of The Debtors For An Order Authorizing The Debtors To (i) Make Installment Payments Under Prepetition Insurance Premium Financing Arrangements, (ii) Continue Prepetition Insurance Programs In The Ordinary Course Of Business, And (iii) Pay All Prepetition Obligations In Respect Thereof ("Insurance Motion")

218.    In connection with the operation of their business, the Debtors maintain

multiple insurance policies (each an "Insurance Policy" and, collectively, the "Insurance

Policies"). The Debtors maintain the Insurance Policies in amounts and types of coverage in

accordance with the state and local laws governing the multiple jurisdictions in which the

Debtors do business, as well as in accordance with their numerous contractual obligations. The

Insurance Policies provide coverage for, among other things, real property, directors and officers,

general liability, automobile liability, crime insurance, fiduciary liability, flood insurance, vessel

pollution, umbrella/excess liability, and employment practices liability. For the policy period of

2008-2009, the total annual premiums under the Insurance Policies equaled approximately

$11,983,384. The Insurance Policies are listed in Exhibit B to the Insurance Motion, along with

the corresponding insurance carriers (the "Insurance Carriers") and individual annual premiums.[30]

## A.    Policies with Financed Premiums

219.    The majority of the Debtors' insurance policies, including, but not limited to, the Debtors' pollution, fiduciary, and umbrella policies (collectively, the "Financed Insurance Policies") are financed through 8 separate commercial premium financing agreements (each a "Premium Financing Agreement") with Cananwill, Inc. ("Cananwill"), AICCO, Inc. ("AICCO"), AFCO Credit Corporation ("AFCO"), and CAFO Inc. ("CAFO" and collectively, the "Premium Financiers"). Under the Premium Finance Agreements, the Debtors pay an initial down payment and monthly installments thereafter to the Premium Financiers, in exchange for the Premium Financiers' agreement to pay the full annual insurance premiums, in advance, to the Insurance Carriers. Pursuant to the Premium Finance Agreements, the Debtors have financed insurance premiums in the aggregate amount of approximately $7,436,500. The financed amount is payable in monthly installments of approximately $767,900 in the aggregate, and the remaining balance due for the policy period as of the Petition Date is approximately $3,556,565.

(i)    Pollution Insurance

220.    On January 7, 2009, the Debtors executed a Premium Financing Agreement with Cananwill with respect to pollution insurance policies with Indian Harbor Insurance Company ("Indian Harbor") and XL Environmental, Inc. ("XL"). The financed policy is effective from August 1, 2009 through July 31, 2011. Under the Premium Financing Agreement, Cananwill paid $370,156.50 in insurance premiums to Indian Harbor and XL. In return, the

---

[30] In addition to the Insurance Policies listed in Exhibit A to the Insurance Motion, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, dental, disability and life insurance benefits. These policies are addressed in a separate motion relating to the Debtors' employee wage policies and benefits programs.

Debtors are obligated to pay twenty-four (24) monthly installments of $21,889.48 to Cananwill, with the unpaid installments accruing interest at the rate of 7.99% per annum.

      (ii)    <u>Property Insurance</u>

      221.   On July 29, 2008, the Debtors executed Premium Financing Agreements with CAFO and AFCO with respect to property insurance policies with Factory Mutual Insurance Company ("Factory Mutual"). The financed policies are effective from August 1, 2008 through July 31, 2009. Under the Premium Financing Agreement with CAFO, CAFO paid $845,154 in upfront insurance premiums to Factory Mutual. In exchange, the Debtors are obligated to pay nine (9) monthly installments of $95,274.09 to CAFO, with the unpaid installments accruing interest at the rate of 3.483% per annum. Under the Premium Financing Agreement with AFCO, AFCO paid $3,510,067 in upfront insurance premiums to Factory Mutual, and the Debtors are obligated to pay nine (9) monthly installments of $394,742.13 to AFCO, with the unpaid installments accruing interest at the rate of 2.904% per annum.

      (iii)   <u>Crime Insurance</u>

      222.   On September 19, 2008, the Debtors executed a Premium Financing Agreement with Cananwill with respect to the Debtors' crime insurance policy with National Union Fire Insurance Company ("National Union"). The financed policy is effective from September 1, 2008 through August 31, 2009. Under the Premium Financing Agreement, Cananwill paid $58,702.43 in upfront crime insurance premiums to National Union. In return, the Debtors are obligated to pay eleven (11) monthly installments of $5,469.57 to Cananwill, with the unpaid installments accruing interest at the rate of 4.95% per annum.

DB02:7750749.1

000000.0

(iv)   <u>Fiduciary Insurance</u>

223.   On September 19, 2008, the Debtors executed a Premium Financing

Agreement with Cananwill with respect to the Debtors' fiduciary insurance policies with Axis

Reinsurance Company, Federal Insurance Company, and Navigators Insurance Company

(collectively, the "Fiduciary Insurers"). The financed policies are effective from September 1,

2008 through August 31, 2009. Under the Premium Financing Agreement, Cananwill paid

$199,131.97 in upfront pollution insurance premiums to the Fiduciary Insurers. In return, the

Debtors are obligated to pay eleven (11) monthly installments of $18,554.03 to Cananwill, with

the unpaid installments accruing interest at the rate of 4.95% per annum.

(v)   <u>Directors and Officers Insurance</u>

224.   On September 22, 2008, the Debtors executed a Premium Financing

Agreement with Cananwill with respect to the Debtors' directors and officers insurance policies

with Federal Insurance Company, National Union, Twin City Fire Insurance Company, U.S.

Specialty Insurance Company, and Allied World National (collectively, the "D&O Insurers").

The financed policies are effective from September 1, 2008 through August 31, 2009. Under the

Premium Financing Agreement, Cananwill paid $1,260,459.30 in upfront directors and officers

insurance premiums to the D&O Insurers. In return, the Debtors are obligated to pay eleven (11)

monthly installments of $117,442.70 to Cananwill, with the unpaid installments accruing interest

at the rate of 4.95% per annum.

(vi)   <u>Umbrella Insurance</u>

225.   On April 14, 2008, the Debtors executed a Premium Financing Agreement

with Cananwill with respect to the Debtors' umbrella insurance policies with American

Guarantee & Liability, XL Insurance American, Inc., Ace American Insurance Company,

Federal Insurance Company, and St. Paul Fire & Marine Insurance Company (collectively, the "Umbrella Insurers"). The financed policies are effective from April 1, 2008 through March 31, 2009. Under the Premium Financing Agreement, Cananwill paid $790,402.57 in upfront umbrella insurance premiums to the Umbrella Insurers. In return, the Debtors are obligated to pay eleven (11) monthly installments of $73,517.93 to Cananwill, with the unpaid installments accruing interest at the rate of 4.60% per annum.

      (vii)   <u>Employment Practices Liability Insurance</u>

      226.   On September 19, 2008, the Debtors executed a Premium Financing Agreement with Cananwill with respect to the Debtors' employment practices liability insurance policies with Lexington Insurance Company, Midwestern Risk Specialists, AIG Excess Liability Insurance Company, and Aon Bermuda Ltd. (collectively, the "Employment Practices Insurers"). The financed policies are effective from September 1, 2008 through August 31, 2009. Under the Premium Financing Agreement, Cananwill paid $194,450.19 in upfront pollution insurance premiums to the Employment Practices Insurers. In return, the Debtors are obligated to pay eleven (11) monthly installments of $18,117.81 to Cananwill, with the unpaid installments accruing interest at the rate of 4.95% per annum.

      227.   The Debtors' obligations under the Premium Financing Agreements are secured by all unearned premiums or dividends payable to the Debtors under each of the Insurance Policies that are covered by the Premium Financing Agreements. Under the Premium Financing Agreements, in the event of non-payment, the Premium Financiers are appointed as attorney in fact for all named insureds under the Insurance Policies and are granted the authority to, among other things, cancel the Insurance Policies.

228.   It is my understanding that the Debtors have made all installment payments that came due under the Premium Financing Agreements prior to the Petition Date.  The Debtors are required to pay the next monthly installment for each of the Premium Financing Agreements on February 1, 2009.  Through the Insurance Motion, the Debtors seek authority to pay (i) the February 1, 2009 installments, in the aggregate amount of approximately $745,000, and (ii) all remaining monthly installments under the Premium Financing Agreements, which total approximately $3,537,700.

**B.    Policies without Premium Financing Agreements**

229.   Certain of the Insurance Policies are not financed.  For these Insurance Policies, the Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurance Carrier.  Annual insurance premiums (the "Insurance Premiums") are paid by the Debtors either in advance in a lump sum payment or in periodic installments in arrears.  The Insurance Premiums total approximately $1.80 million in the aggregate on an annual basis.  As of the Petition Date, no amounts were owing on account of the Insurance Premiums.

230.   The Debtors accordingly believe, and I agree, that they have satisfied their financial obligations under those Insurance Policies.  However, out of an abundance of caution, and in order to prevent any disruption of the Debtors' Insurance Policies and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek authorization to make, in their discretion, any necessary prepetition premium payments and to perform any other prepetition obligations that may be necessary to maintain the Insurance Policies.

231.   In light of the importance of maintaining the insurance coverage with respect to their business activities, the Debtors believe, and I concur, that it is in the best interests of their estates and creditors for this Court to authorize the Debtors to honor their obligations

under the Insurance Policies and the Premium Financing Agreements. Any other alternative would likely require considerable cash expenditures, could result in the Debtors obtaining insurance coverage on less desirable terms than their existing coverage, and could be detrimental to the Debtors' restructuring efforts.

232.    The Debtors believe, and I agree, that they have compelling business reasons for seeking to keep their Insurance Policies in effect. The insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. Indeed, it is my understanding that maintenance of insurance policies, the coverage provided by the Insurance Policies, is required by the operating guidelines established by the Office of the United States Trustee.

233.    If the Debtors did not continue to perform their obligations under the Insurance Policies and the Premium Financing Agreements, their coverage under the Insurance Policies could be voided. Disruption of the Debtors' insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed

policies or obtaining new insurance coverage.[31] I believe that any or all of these consequences could be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and an increased risk of loss. To avoid those potential consequences, the Debtors believe, and I agree, that the relief requested in the Insurance Motion should be granted.

234.    The Debtors believe, and I agree, that any interruption in insurance coverage caused by the Debtors' inability to pay prepetition claim amounts or to generally satisfy their obligations as they come due under the Insurance Policies and the Premium Financing Agreements would cause immediate and irreparable harm to the Debtors' estates. The Debtors therefore believe, and I concur, that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Policies and the Premium Financing Agreements is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors hereby seek authority to make all remaining payments under the Premium Financing Arrangement and the Insurance Policies as they come due.

**Motion For An Interim Order And A Final Order Pursuant To Sections 105(a) And 366 Of The Bankruptcy Code (i) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured Of Future Performance, And (iii) Establishing Procedures For Determining Adequate Assurance Of Payment ("Utilities Motion")**

235.    In connection with the operation of their businesses and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services (the "Utility Services"). On a monthly basis, the Debtors spend approximately $30 million for various Utility Services.

---

[31] Nothing contained herein is intended or should be construed as either: (i) an admission by the Debtors as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim; or (iii) a request

These Utility Services are provided by more than 300 Utility Providers in the United States and

Canada, with which the Debtors may have multiple accounts. A non-exhaustive list of these

Utility Providers is attached as Exhibit C to the Utilities Motion.[32]

236.   Uninterrupted Utility Services are essential to the Debtors' ongoing

operations and the success of the Debtors' reorganization efforts. A disruption of the Utility

Services at any of the Debtors' facilities would likely be costly to the Debtors and harmful to

their businesses, as the Debtors would be forced from the outset of these chapter 11 cases to

focus on finding replacement Utility Providers and services, rather than focusing on the

operation and restructuring of their businesses. Moreover, the business disruption that would

likely result from interruption of the Utility Services would damage customer relationships,

revenues, and profits and would adversely affect the Debtors' restructuring efforts, to the

detriment of their estates, creditors, and employees. The debtors believe, and I agree, that it is

therefore critical that Utility Services to the Debtors continue uninterrupted.

237.   The Debtors intend to pay all postpetition obligations owed to the Utility

Providers in a timely manner, consistent with the ordinary course of operating their businesses

postpetition. The Debtors' approximate monthly spending on Utility Services is $27.1 million,

and the Debtors propose to make the Adequate Assurance Deposit of approximately $13.55, as

described in the Utility Motion.

---

to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

[32] While the Debtors have exercised their best efforts to list all of their Utility Providers and account numbers in Exhibit A to the Utilities Motion, it is possible that certain Utility Providers and/or account numbers may have been omitted from this list. In the Utilities Motion, the Debtors reserve the right to amend Exhibit A to add any Utility Providers and/or account numbers that were omitted therefrom and to request that the relief requested herein apply equally to all such entities and accounts. Furthermore, the relief requested in the Utilities Motion is intended to apply to all of the Debtors' accounts with every Utility Provider listed in Exhibit A regardless of whether or not such accounts are contained in Exhibit A. In addition, the Debtors have reserved the right to argue that any of the entities now or hereafter listed in Exhibit A are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

238.   The Debtors believe, and I concur, that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtors' chapter 11 cases constitutes sufficient adequate assurance to the Utility Providers.  Specifically, the Debtors are seeking approval of $750 million Debtor-in-possession financing which the Debtors believe, and I agree, is more than adequate to meet their cash needs during these cases.  As a result, the Debtors are objectively very likely to continue paying their obligations to the Utility Providers post-petition.

**Motion Of Debtors For An Order (i) Authorizing Use Of Cash Collateral By Calpine Corrugated, LLC Pursuant To 11 U.S.C. § 363; (ii) Granting Adequate Protection To Certain Prepetition Lenders Pursuant To 11 U.S.C. §§ 361 And 363; And (iii) Scheduling A Final Hearing (the "Calpine Motion")**

239.   Prior to the Petition Date, Calpine Corrugated funded its operations through (i) the Prepetition Revolving Loan and (ii) the Prepetition Term Loan (each as defined below, and together the "Prepetition Credit Facilities").  First, pursuant to that certain Loan and Security Agreement dated as of March 30, 2006 (as amended, supplemented or restated from time to time, the "Union Bank Credit Agreement"), Union Bank agreed to make available to Calpine Corrugated a revolving line of credit in the maximum amount of $12,000,000 for working capital purposes (the "Prepetition Revolving Loan").  Second, pursuant to that certain Amended and Restated Credit Agreement dated as of July 28, 2008 (as amended, supplemented or restated from time to time, the "CIT Credit Agreement"), CIT advanced $40,350,000 in term loans (the "Prepetition Term Loan") to Calpine Corrugated to finance the purchase and installation of certain machinery and equipment.

240.   As of the Petition Date, the outstanding principal amount of the revolving debt under the Prepetition Revolving Loan was approximately $9.2 million (the "Union Bank Prepetition Obligations"), and the outstanding principal amount of the term loans under the

Prepetition Term Loan was approximately $36.8 million (the "CIT Prepetition Obligations," and collectively with the Union Bank Prepetition Obligations, the "Prepetition Obligations").

241.    The CIT Prepetition Obligations are secured by liens and security interests on substantially all assets and property of Calpine Corrugated (including, without limitation, the Cash Collateral) and all proceeds thereof (collectively, the "CIT Collateral"). The Union Bank Prepetition Obligations are secured by liens and security interests on all accounts, inventory, and certain general intangibles of Calpine Corrugated (including, without limitation, the Cash Collateral) and all proceeds thereof (collectively, the "Union Bank Collateral" and, collectively with the CIT Collateral, the "Prepetition Collateral").

242.    Pursuant to that certain Intercreditor Agreement dated as of March 30, 2006 (as amended, supplemented or restated from time to time, the "Intercreditor Agreement"), Union Bank and CIT expressly acknowledged and agreed, among other things, that (i) the liens and security interests of CIT in the Union Bank Collateral shall be subject to and subordinate to the liens and security interests of Union Bank in the Union Bank Collateral, but only to the extent that all obligations of Calpine Corrugated under the Union Bank Credit Agreement are not in excess of $12,000,000; and (ii) Union Bank shall not have or claim any liens or security interests in any assets of Calpine Corrugated other than the Union Bank Collateral.

243.    On July 29, 2008, SSCE acquired a 90% equity interest in Calpine Corrugated, an independent corrugated container producer in Fresno, California, for which SSCC is the primary containerboard supplier. As part of the acquisition, SSCE agreed to guarantee the Prepetition Obligations, which totaled approximately $46 million as of the Petition Date, on an unsecured basis.

DB02:7750749.1

000000.0

244.   Calpine Corrugated has an immediate and critical need to use Cash Collateral in order to preserve and protect the value of its assets. Calpine Corrugated will require use of the Cash Collateral over the next five weeks in order to conduct its day-to-day operations including, but not limited to, the payment of salaries, wages and benefits to, or on behalf of, Calpine Corrugated's employees, the purchase of supplies, the payment of various overhead expenses, the provision of services necessary for their business and ongoing administrative expenses in the Chapter 11 Cases. Calpine Corrugated's cash needs through February 28, 2009 are set forth in the 5-week interim budget attached to the Calpine Motion as Exhibit A (the "Budget"). Without the continued use of Cash Collateral in accordance with the terms of this Interim Order, Calpine Corrugated's estate and creditors would suffer immediate and irreparable harm.

245.   The relief requested in this Motion is essential for the operation of Calpine Corrugated's business and the management and preservation of its property. The Prepetition Lenders and Debtors have negotiated at arms' length and in good faith regarding Calpine Corrugated's use of Cash Collateral to fund its operations during the five-week budget period (the "Budget Period"). As a result of these negotiations, the Debtors are hopeful that the Prepetition Lenders will consent to Calpine Corrugated's use of its Cash Collateral during the Budget Period in accordance with the Budget and the terms of the Interim Order.

246.   A denial of the Debtors' requested relief will cause immediate and irreparable harm to Calpine Corrugated and its estate, and will also have a detrimental effect on the Prepetition Collateral. Absent the continuing use of the Cash Collateral, Calpine Corrugated would have no ability to meet its ongoing obligations to suppliers, vendors, employees and other creditors. If Calpine Corrugated is unable to pay its ongoing obligations, it will not be able to

operate.  In contrast, Calpine Corrugated's continued use of Cash Collateral will ensure that the "going concern" value of its assets is preserved, a value substantially greater than the value which would be realized from a piece-meal liquidation of those assets if the Debtors were forced to cease Calpine Corrugated's operations immediately.

DB02:7750749.1

000000.0

Charles A. Hinrichs
Chief Financial Officer
Smurfit-Stone Container Corporation

Sworn to and subscribed
before me this 21st day
of JANUARY, 2009.

Notary Public

"OFFICIAL SEAL"
Lisa L. Mezyk
Notary Public, State of Illinois
My Commission Expires August 7, 2010