## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
In re:                                              :    Chapter 11
                                                    :
                                                    :    Case No. 09-10235 (BLS)
Smurfit-Stone Container Corporation, *et al.*,      :    (Jointly Administered)
                                                    :
                                                    :
---------------------------------------------------------x

## STATEMENT OF SMITH MANAGEMENT LLC IN SUPPORT OF MOTION FOR APPOINTMENT OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

TO THE HONORABLE BRENDAN L. SHANNON,
UNITED STATES BANKRUPTCY JUDGE:

Smith Management LLC, acting as investment advisor to certain collective investment funds ("Smith"), by its attorneys Cooley Godward Kronish LLP and Morris, Nichols, Arsht & Tunnell LLP, submits this statement (the "Statement") in support of the motion (the "Motion") of Caspian Capital Advisors ("Caspian") for an order appointing an official committee of equity security holders of Smurfit-Stone Container Corporation ("Smurfit-Stone" and, collectively with its affiliated debtors and debtors-in-possession, the "Debtors") pursuant to Section 1102(a)(2) of the Bankruptcy Code, and respectfully represent:

### BACKGROUND

1. On January 26, 2009 (the "Petition Date") the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. In accordance therewith, the Debtors remain in possession of their businesses and continue to operate their properties.

2. The Debtors are one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers. Accordingly, the demand for the products manufactured by the Debtors is very closely linked to the performance of the national and world economies.

1573810 v4/NY

3. According to the Debtors' most recent 10-K report, as of February 27, 2009, there were 256,178,274 outstanding shares of Smurfit-Stone common stock outstanding held by approximately 18,227 holders of record.

4. Smith owns approximately 11,000,000 shares of Smurfit-Stone common stock, constituting approximately 4.3% of the outstanding shares, and 100,000 shares of Smurfit-Stone Preferred Stock, constituting 2.2% of the outstanding preferred shares.[1] On August 26, 2009, Cooley Godward Kronish LLP wrote a letter on behalf of Smith to the Office of the United States Trustee, seeking the appointment of an Official Committee of Equity Security Holders pursuant to Section 1102(a)(1) of the Bankruptcy Code. That request was denied.

5. On August 20, 2009, Caspian filed the Motion seeking the appointment of an official committee of equity security holders pursuant to Section 1102(a)(2) of the Bankruptcy Code. Such section authorizes the appointment of an equity committee "if necessary to assure adequate representation" of equity security holders. [Docket No. 1661].

6. A joinder in support of the Motion was filed by Fiduciary Counselors Inc. ("FCI"), a holder of approximately 4% of the common stock of Smurfit-Stone. [Docket No. 1986]. Objections (the "Objections") to the Motion have been filed by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors Committee") and the Office of the United States Trustee. [Docket Nos. 1983, 1982 and 2001, respectively].

7. Accordingly, Smith submits this statement to provide an explanation of its support of the Motion and to respond to the Objections. Further, Smith shares FCI's respectful request that if an equity committee is appointed, the committee should include holders of common stock.

---

[1] On February 4, 2009, Smurfit-Stone's common stock and its 7% Series A Preferred Stock (the "Preferred Stock") were delisted from the NASDAQ Global Select Market and the trading of securities was suspended on such market. The Smurfit-Stone common stock and Preferred Stock are now quoted on the Pink Sheets Electronic Quotation under the symbols "SSCCQ.PK" and "SSCJQ.PK," respectively.

8. The factors to be utilized by the Court in determining whether an equity committee should be appointed are not in dispute. Those factors are: (a) whether the interests of shareholders are otherwise already adequately represented; (b) whether the debtor appears to be hopelessly insolvent; (c) the complexity of the case; (d) whether the stock is widely held and actively traded; (e) the timing of the request; and (f) whether the cost of the additional committee significantly outweighs the concerns for adequate representation. *See, e.g., In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Exide Technologies,* Case No. 02-11125 (Bankr. D. Del. 2002); *In re Northwestern Corp.*, 2004 WL 1077913 at p. 2 (Bankr. D. Del. May 13, 2004).

### A. Stockholders Will Not Be Adequately Represented Absent Appointment of an Official Committee

9. Notwithstanding the protestations of the Creditors Committee, the equity holders cannot count on the Creditors' Committee, which is a fiduciary to general unsecured creditors, a different and senior class, to represent the equity interests. Indeed, the Creditors Committee may seek to obtain equity in the reorganized Debtors, whose financial condition is on the upswing as discussed below, as a significant piece of the recovery for unsecured creditors in this proceeding. Accordingly, the Creditors Committee, under the absolute priority rule, has an interest in assigning the lowest possible value to that equity so that unsecured creditors can obtain all of the capital stock and lock the current shareholders out of any distribution in this proceeding. For that reason, the notion that the Creditors Committee is capable of adequately representing the interests of shareholders is akin to having the fox guard the chicken coop.

10. As a corollary, an official committee enjoys access to documents and information, which can be made available on a confidential basis which is not afforded to private parties. An official equity committee is much better suited to adequately represent shareholders than a

disparate band of a few individual shareholders who would each have to bear the extensive, individual and repetitive costs of litigating with an estate which has been up and running for over eight months without benefit of the knowledge which comes from being an official participant in a bankruptcy proceeding. Moreover, other than a few institutional holders, many of the shareholders are individual long-term holders of the Smurfit-Stone common stock.

### B. The Debtors are *Not* Hopelessly Insolvent

11. These Debtors are not hopelessly insolvent at this juncture of the economic cycle. While the Debtors' financial condition may have appeared dire as of the Petition Date, it has substantially improved along with conditions in their industry, specifically, and the economy, generally, as will be demonstrated below.

#### i. Historical Financial Results

12. First, the Debtors averaged $7.4 billion of annual revenue and $782 million of annual earnings before interest, taxes, depreciation and amortization ("EBITDA") for the ten year period from 1999 to 2008. The EBITDA margin for this period was approximately 10.6%. As recently as fiscal year 2007, the year before the global recession and credit crisis firmly took hold, the Debtors generated $7.4 billion in revenues and $745 million in EBITDA, a 10% EBITDA margin. During the last twelve months ("LTM") ended June 30, 2009, while the global recession and credit crisis were in full swing, revenues, EBITDA, and EBITDA margin declined to $6.1 billion, $397 million and 6.4%, respectively. Therefore, the recent financial performance is not remotely reflective of the historical EBITDA generating ability of the Debtors.

13. Moreover, there have been many positive developments for the Debtors. Most notably, the Debtors have built and continue to build a tremendous amount of cash during the Chapter 11 proceeding. As of July 31, 2009, the Debtors had $673 million in cash and cash equivalents. This cash has been generated from operations as well as the receipt of cash refunds

relating to an excise tax credit for alternative fuel mixtures. The Debtors have filed refund claims of approximately $353 million for the periods January 1, 2009 through July 31, 2009. According to their filings, the Debtors received $294 million as of July 31, 2009, with the balance of $59 million received in August 2009.

14. The Debtors have been able to build so much cash that they announced, on September 9, 2009, that they had made a voluntary $250 million pre-payment on their US $400 million debtor-in-possession term loan. After such pre-payment, the Debtors had liquidity of approximately $800 million, including cash estimated to be over $500 million. Moreover, the Debtors expect to receive a substantial amount of additional alternative fuel tax credits this year. According to the Debtors' 10-Q report for the second quarter of 2009, the Debtors will file claims for an additional $55 million per month of such tax credits through December 31, 2009, for a total of $275 million for the period from August 1, 2009 through December 31, 2009.

15. Based upon historically normalized valuations of the Debtors, significant opportunity exists for equity holders to capture value. The Debtors' revenues, EBITDA and growth have been disappointing in the last six quarters. However, the business has stabilized and the Debtors' operations are poised for a rebound. Accordingly, a modest upswing in demand would easily return the Debtors to historical levels of profitability, and would ensure value for current equity. As demonstrated below, that upswing is well within the Debtors' reach.

### ii. Positive Industry Trends

16. Due to the global recession, which led to an unprecedented decline in demand for the Debtors' goods in the fourth quarter of 2008, the entire containerboard industry has been operating under trough conditions. However, since the fourth quarter of 2008, the industry has not only stabilized, but has improved markedly. This is demonstrated by the improved operating rates, which measure the rate at which mills operate or utilize their capacity. In December 2008,

the industry operating rate was just 71%. However, by June 2009 industry operating rates increased to 91%, and held steady at approximately 89% in July and August 2009. For reference, the average five year industry operating rate from 2004 to 2008 was 95%. As recently as August 2008, the industry operating rate was 97%.

17. The combination of declines in the cost of key raw materials used in the Debtors' manufacturing process, along with the recent stable prices in the Debtors' end markets, should lead to improved margins. Since 2008, the price of key components in the Debtors' manufacturing process, including fiber (both virgin and recycled), chemicals (caustic soda and starch), natural gas and fuel oil have dropped precipitously. Notably, as has been widely reported, the prices of natural gas and fuel oil have fallen approximately two-thirds and 50% on their record highs in the past year.

18. Furthermore, box demand has also remained steady over the past few months and is poised to rebound in the near future. Industry analysts note that there is a high correlation between box shipments and the ISM Manufacturing Index, which index has increased every month this year from 35.6 in January 2009 to 52.9 in August 2009. Bloomberg consensus estimates for the September 2009 ISM Manufacturing Index are 54.0, reflecting the expectation for an increase in manufacturing activity. A reading of over 50 indicates manufacturing expansion.

19. Moreover, the inevitable increase in box demand should drive containerboard production and pricing higher. Total inventories of containerboard at the end of August 2009 were 2.3 million tons, which represented the lowest such August level in fifteen years. Because inventories are lean, an increase in demand will spur restocking, which will lead to an increase in production. Such an increase in production can lead to an increase in operating rates from the

89% operating rate in August 2009. Industry analysts believe that once operating rates reach 92% or higher, price increases may be achieved. Potential price increases and higher volumes of production will result in higher revenue and EBITDA for the Debtors.

20. Accordingly, industry analysts expect a rebound in containerboard production, box shipments, and financial performance because (a) economic indicators that have a high correlation to box shipments have improved, (b) industry inventories are extremely low, and (c) supplier discipline has been strong and has supported strong market prices.

### iii. Improving Conditions in the Broader Economy

21. Conditions in the broader economy are expected to significantly improve as well. On September 23, 2009, the statement issued by the Federal Open Market Committee of the Federal Reserve Board began with the comment that "[i]nformation received since the Federal Open Market Committee met in August suggests that economic activity has picked up following its severe downturn." Further, Federal Reserve Bank Chairman Bernanke stated in a question and answer session at The Brookings Institution on September 15, 2009 that the "recession is very likely over at this point." "U.S. Stocks Hit New '09 Highs as Bernanke Says Recession Is Over," The Wall Street Journal at www.WSJ.com, September 15, 2009.

22. As a further example of the improvement in the general economy, Federal Express Company ("FedEx"), the leading transportation company which delivers boxes worldwide, issued guidance on September 11, 2009 that it expected earnings to be 58 cents per share for the quarter ended August 31, 2009. The previous guidance had called for earnings to be between 30 cents and 45 cents per share. The anticipated improvement resulted from lower expectations for fuel prices and "continued modest recovery in the global economy." "FedEx Guidance Gives Transport Stock a Fillip," The Wall Street Journal at www.WSJ.com., September 11, 2009. In fact, FedEx's quarterly earnings for that quarter were subsequently

reported at $181 million or 58 cents per share in line with the improved guidance. "FedEx 1Q Profit Falls, Sees Improving Economy", by Samantha Bomkamp, Associated Press, at www.forbes.com, September 17, 2009. As FedEx is a closely watched barometer of the global economy, its 2009 performance is indicative of the improved economic conditions and the projected increase in demand for boxes.

23. Returning to the case at bar, the Debtors have taken substantial steps in this Chapter 11 proceeding to reorganize their operations, including the closing of unneeded plants, reductions in headcount, and rejection of burdensome leases and executory contracts. Accordingly, they are poised to benefit from the positive trends, which are widely expected in their industry, specifically, as well as the national and international economy, generally.

### iv. Improved Prices of Smurfit-Stone Securities

24. While Smurfit-Stone's senior notes and common stock experienced severe price deterioration in the past year, they have rebounded significantly, reflecting optimism related to the Debtors' operating performance and liquidity position. Specifically, Smurfit-Stone's 8.375% Notes due 2012 fell to a 52-week low of 6.8% of par in late February 2009. That price has rebounded to 64.5% as of September 23, 2009. Similarly, Smurfit-Stone's 8.250% Notes due 2012 hit a 52-week low at the end of February 2009 of 6.8% of par and have improved to 65.0% as of September 23, 2009. Finally, Smurfit-Stone's 7.50% Notes due 2013 hit a 52-week low at 6.5% of par in late February 2008 and have risen to 64.5% as of September 23, 2009.

25. The common stock of Smurfit-Stone has enjoyed a renaissance as well. In early January 2009, it hit a 52-week low of $0.02. As of the close on September 23, 2009, the price jumped to $0.515, giving Smurfit-Stone a market capitalization of approximately $132,070,000. Accordingly, the public markets have taken note of the improvement in the Debtors' prospects, and in particular, the value of the common stock.

### v. The Court Should Be Wary of Low Current Valuations By the Debtors

26. The very first case cited by the Debtors in support of their Objection to the Motion is *In re Northwestern Corporation,* Case No. 03-18272 (CGC). There, Bankruptcy Judge Case, who was sitting in Delaware, denied a motion for the appointment of an equity committee. Subsequently, the Debtor proposed a plan which provided for payment to unsecured creditors with 100 percent of the company's publicly traded equity, while the equity interests of shareholders were extinguished. Notwithstanding a challenge to the plan by individual shareholders, the Court confirmed the plan based upon its determination that shareholders were out of the money and, therefore, not entitled to any distribution under Section 1129(b)(2)(C) of the Bankruptcy Code. The projections prepared by the debtors in connection with the plan valued the reorganized Northwestern in a range between $1.415 billion and $1.585 billion, with a midpoint of $1.5 billion. See Second Amended and Restated Disclosure Statement at page 94, based upon the valuation prepared by the debtors' financial advisor Lazard Freres [Docket Nos. 2021 and 2022]. As in these proceedings, the debtors and creditors in Northwestern were motivated to value the enterprise conservatively and preserve any increased value for creditors. The case was confirmed by the Court on October 20, 2004 over shareholders' objections [Docket No. 2237].

27. Approximately one year later, on November 23, 2005, Northwestern announced in a press release that it had received a request from Black Hills Corporation to enter into merger negotiations and that Black Hills' request contemplated that Northwestern's stockholders would receive between $33 and $35 per share in common stock of the combined company. Northwestern Corp., 8-K Report, Exhibit 99.1 (Nov. 23, 2005). The value of equity was estimated to be $20.00 per share on the effective date of the plan, according to the Disclosure Statement at p. 94. Despite the fact that Black Hills' offer presented a substantial return on the

new equity issued just a year before, it was rejected by Northwestern's board of directors. Associated Press, "Previous Black Hills Offer Spurned by Northwestern", Helena Independent Record, December 10, 2005.

28. However, on April 25, 2006 Northwestern entered into a merger agreement with Babcock & Brown Infrastructure Limited ("BBI"), pursuant to which BBI would pay Northwestern shareholders $37 in cash for each share. Northwestern Corp., 8-K Report, Item 1.01 (Apr. 25, 2006). The total consideration payable to Northwestern under the BBI merger agreement was $2.3 billion in addition to which BBI was to assume $736 million in existing Northwestern debt. See Announcement issued by BBI dated April 26, 2006, at www.bbinfrastracture.com. BBI's offer, equivalent to over $3 billion, *doubled* the valuation presented in Northwestern's disclosure statement – an estimated $1.5 billion dollars. The $3 billion offer from BBI that was accepted by Northwestern in 2006, would have provided a substantial return to equity.[2]

29. In addition, Cooley Godward Kronish LLP previously represented two official equity committees in this Court, Peregrine Systems, Inc. (Case No. 02-12740-JKF) and Seitel, Inc. (Case No. 03-10227-PJW), whose formation was objected to by the debtor or the unsecured creditors committee. In both cases, the equity committee defeated cramdown attempts, resulting in substantial returns for shareholders that did not appear to be readily available at the time those committees were appointed.

30. Accordingly, Smith advances these cautionary tales so that the Court does not fall for the shell game proposed by the Debtors and the Committee. In these fluid economic times, the Court must be particularly vigilant against making prejudgments regarding the value of the

---

[2] The transaction was not successfully consummated because BBI withdrew its offer when it became clear regulatory approval was not forthcoming by the Montana Public Service Commission. "Northwestern Corporation Announces Termination of Acquisition Agreement with Babcock & Brown Infrastruct", Reuters, July 24, 2007.

Debtors' business, especially judgments which are not tested by evidence presented at a valuation hearing. The Debtors are not hopelessly insolvent and, therefore, in order to assure adequate representation of shareholders, an official committee represented by professionals should be appointed to present the evidence to the Court.

### vi. Current Market Valuations Show Substantial Equity

31. The closing price of the Smurfit-Stone common stock on September 23, 2009 was $0.515. Accordingly, the Smurfit-Stone market capitalization was approximately $132,070,000. While admittedly market valuations are not the last word in whether there is equity in a company, the market participants clearly believe that there is value in Smurfit-Stone's equity. Accordingly, these Debtors should not be presumed to be hopelessly insolvent. Current trading in the Smurfit-Stone shares indicates that equity is solidly in the money.

## C. These Cases Are Extremely Complex

32. There could be no doubt that these cases are extraordinarily complex. As noted in the Motion, there are 25 affiliated debtors and concurrent insolvency proceedings pending in Canada. The Debtors' bankruptcy petition states that as of September 30, 2008, the Debtors had total assets of approximately $7.45 billion and total liabilities of $5.582 billion on a consolidated basis. The Debtors own manufacturing facilities in the United States, Canada, Mexico and China and employ over 20,000 employees. Accordingly, this factor weighs in favor of granting the Motion.

## D. The Stock Is Widely Held And Actively Traded

33. Most importantly, there are approximately **18,227** holders of record holding the 256,178,274 outstanding shares of Smurfit-Stone common stock. In addition, the Smurfit-Stone common stock is very actively traded. Although Smurfit-Stone's common stock was delisted, it continues to trade on the Pink Sheets and as of September 23, 2009 the average daily trading

volume for the last three months was 3,755,920 shares. Accordingly, the broad holding of common stock by the investing public, whose interests are in danger of being extinguished in this bankruptcy proceeding, also weighs heavily in favor of the appointment of an equity committee in this case.

E. **The Timing of the Request**

34. The timing of the Motion could not be better. The Plan of Reorganization has not yet been filed in these cases. However, over eight months have passed since the Petition Date so the initial costs of having an equity committee in the early stages of the case while the Debtors were stabilizing their operations has been avoided. Rather, an official equity committee appointed at this stage and its professionals would now focus their efforts on valuation issues in connection with negotiating a plan. Shareholders are entitled to adequate representation in the critical plan process.

F. **The Cost of the Committee Does Not Outweigh the Concerns for Adequate Representation of Shareholders**

35. This is one of the largest bankruptcy proceedings pending in this Court, which has seen its share of large and complex cases. The cost of a committee, which is anticipated to be relatively modest in the overall scheme of these proceedings, does not significantly outweigh the concerns for adequate representation here as there is a significant likelihood that equity is in the money. Moreover, the common stock is held by over 18,000 investors and there is a significant market capitalization of over $130 million. Even if it had appeared earlier in these cases that equity were out of the money, circumstances have changed for both the Debtors and the broader economy, as demonstrated by the dramatically higher value of the Smurfit-Stone notes and common stock. Accordingly, given the likelihood that there is value for equity now, shareholders must be adequately represented and are entitled to a meaningful voice in this

proceeding. When the large investor interest is balanced against the modest cost of an official committee for the remainder of this proceeding, it is not a close call.

## CONCLUSION

36. As in many other cases, the Debtors and the Creditors Committee would like nothing better than to have their contemplated cramdown of equity become a *fait accompli*. However, as demonstrated above, these Debtors are not hopelessly insolvent. Indeed, the timing of their filing for Chapter 11 was ideal in that they have enjoyed the benefits of protection from their creditors at the same time that the building blocks for a positive turnaround in both their industry and the general economy were put in place. Tens of thousands of Smurfit-Stone shareholders are entitled to adequate representation by an official committee with access to professionals who would advocate on their behalf to ensure that a plan, which wipes out their equity, is not crammed down their throats without a valuation hearing before this Court. The Court should not be seduced by tired clichés alleging that these cases are hopelessly insolvent and that the cost of adequate representation is too great. Based upon current market conditions and the Debtors' improved prospects, shareholders are entitled to a seat at the table of this bankruptcy proceeding in the form of an official equity security holders committee.

**WHEREFORE**, Smith Management Company LLC respectfully requests that this Court enter an Order granting the Motion of Caspian Capital Advisors and appoint an official equity security holders committee comprised of common and preferred shareholders of Smurfit-Stone Container Corporation and providing for such other and further relief as this Court deems just and proper.

Dated: Wilmington, Delaware
September 28, 2009

        Attorneys for Smith Management LLC

        COOLEY GODWARD KRONISH LLP
        1114 Avenue of the Americas
        New York, NY 10036
        Telephone (212) 479-6000

        Lawrence C. Gottlieb
        Eric J. Haber

        MORRIS, NICHOLS, ARSHT &
        TUNNELL LLP
        1201 North Market Street, 28th Floor
        P.O. Box 1347
        Wilmington, DE 19899-1347
        Telephone (302) 658-9200

        By: _____
            Robert J. Dehney (No. 3578)
            Curtis Miller (No. 4583)