UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SMURFIT-STONE CONTAINER CORPORATION, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10235 (BLS)<br><br>Jointly Administered<br><br>Ref. Docket No. 1661 |

## SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION OF CASPIAN CAPITAL ADVISORS FOR AN ORDER APPOINTING AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

The above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), respectfully submit this supplemental brief in opposition to the Motion of Caspian Capital Advisors for an Order Appointing an Official Committee of Equity Security Holders, dated August 20, 2009 [Docket No. 1661] (the "Motion"), and in further support of the Objection of Debtors to Motion of Caspian Capital Advisors For an Order Appointing an Official Committee of Equity Security Holders, dated September 21, 2009 [Docket No. 1983] (the "Objection").[2] For the reasons set forth herein, the Debtors respectfully request that the Motion be denied.

## PRELIMINARY STATEMENT

Mariner Investment Management, LLC ("Mariner") bears a heavy burden to demonstrate that this case should be the "rare exception" in which an official equity committee is appointed.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

*See, e.g., In re Northwestern Corp.*, 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004); *In re Williams Comm'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002); *see also In re Oneida, Ltd.*, 351 B.R. 79, 83 (Bankr. S.D.N.Y. 2006) (describing "necessary" as a "high standard"). That this standard is appropriately high is illustrated by the state of the instant cases where, after eleven months, the parties with economic "skin in the game" negotiated a plan of reorganization based on Smurfit-Stone Container Corporation's ("SSCC") projections—which were extensively vetted by the Official Committee of Unsecured Creditors (the "Creditors' Committee") — that clearly demonstrate that there is no value for equity security holders (the "Shareholders"). (*See* Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors, filed December 1, 2009 [Docket No. 2914] ("the Plan") at 38) (attached hereto as Exhibit A). In this context, the only function an equity committee could possibly serve is to object to confirmation and litigate valuation at the confirmation hearing. Clearly, as demonstrated by this proceeding, Mariner is more than capable of taking on that task. And where that task is the only purpose of an equity committee, its costs simply do not justify its formation. *See In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996).

Additionally, if, as the Mariner passionately argues, equity is "in the money", it has had eleven months to bring someone to the table who is prepared to offer value demonstrating just that. Mariner has brought no one. However, the Plan does not foreclose that possibility, as it explicitly provides for what is always the right of an equity holder. The Plan permits a party to come in as late as ten days prior to the Disclosure Statement hearing and offer to pay the Full Payment Amount. (Plan at 2.) If a party demonstrates its ability and desire to pay full value to

---

[2] The Debtors hereby incorporate by reference the arguments set forth in the Objection.

all creditors of the Debtors, including interest as allowable under applicable law, the Debtors reserve the right to modify the Plan as necessary. This is the very essence of an equity holder's rights in a bankruptcy proceeding, and such rights are appropriately recognized in the Plan.

The Debtors submit that, in the context of the instant cases, the Court need not look further into what Mariner has put forward in an attempt to satisfy its heavy burden because, at the end of the day, it simply comes down to valuation which can be litigated at confirmation. On this basis alone the Motion should be denied. However, should the Court examine the underlying assertions of Mariner, the Motion must still be denied.

To satisfy its heavy burden, Mariner must establish by a preponderance of the evidence that there is a substantial likelihood that the Shareholders will receive a meaningful distribution, and that their interests are not adequately represented in the absence of an official equity committee, particularly in light of the active role of the Creditors' Committee. Following the hearing on the Motion held on September 30, 2009 (the "September Hearing"), the Court held that Mariner failed to satisfy its burden, but adjourned the proceedings to afford Mariner a second opportunity to develop an appropriate record to support the Motion.

Despite being afforded nine weeks to do so (in addition to several months prior to filing the Motion), Mariner has produced no credible evidence to show a substantial likelihood that the Shareholders will receive a meaningful distribution. At most, Mariner's expert, Mark Hootnick ("Hootnick"), speculates that there is a "potential for distributable value to exist beyond the claims of the general unsecured pool." (Report Submitted in Support of Motion for Formation of Official Committee of Equity Holders ("Hootnick Report") at 4 (emphasis added).) Mr. Hootnick bases this statement on an unrecognized methodology that relies on hyper-aggressive estimates derived from a single equity analyst at Credit Suisse and illusory sources of value, and

neglects to account for the impact of certain other costs. As Debtors' expert, Joseph Miller of Lazard Freres & Co., LLC ("Lazard") explains, Mr. Hootnick's methodology and valuation metrics are flawed. (*See* Miller Rebuttal Report ("Miller Report") (attached as Exhibit B).) Properly applying comparable company multiples with relevant financial projections results in ranges of value well below the estimated claims pool. As such, the Motion should be denied.

## PROCEDURAL BACKGROUND

On January 26, 2009, the Debtors each filed a voluntary petition for relief under the United States Bankruptcy Code (the "Bankruptcy Code"). The Debtors are operating their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On February 5, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee"), pursuant to section 1102 of the Bankruptcy Code, appointed the Creditors' Committee to represent the interests of all unsecured creditors in these cases.

On August 7, 2009, Mariner requested that the U.S. Trustee appoint an official committee of equity interest holders. Before the U.S. Trustee had an opportunity to respond, on August 20, 2009, Mariner filed the Motion seeking appointment of an official committee of equity shareholders pursuant to Section 1102(a)(2) of the Bankruptcy Code.[3] The Motion utilized publicly available sources, such as SSCC's historical financial results, industry trends, broader economic reports, and the trading prices of the Debtors' bonds to support assertions that the Debtors were not hopelessly insolvent. The Motion was opposed by the Debtors, the Creditors' Committee and the U.S. Trustee.

On September 17, 2009, the U.S. Trustee declined to appoint the requested committee because Mariner failed to establish "by any measure" a substantial likelihood that equity will

---

[3] Fiduciary Counselors, Inc. and Smith Management, LLC also submitted a Joinder and Statement in Support on September 21, 2009 and September 28, 2009, respectively.

receive a distribution and equity is unable to represent its interests unless an official committee is formed. *See* Acting United States Trustee's Objection to the Motion of Caspian Capital Advisors for an Order Appointing an Official Committee of Equity Security Holders, at 2.

On September 30, 2009, the Court determined that Mariner failed to carry its burden under Section 1102(a)(1) of the Bankruptcy Code, and adjourned proceedings to enable Mariner to explore whether it could develop the record with credible evidence supporting its position. (*See* September Hearing Tr. at 98:19-99:99:2, 105:2-106:2.) More than two weeks after the September Hearing, Mariner sought discovery from the Debtors on a broad variety of topics, including SSCC's projections, business plans and draft term sheets in order to permit its expert witness to "analyze the company's own information." (November 2, 2009 Hearing Tr. at 11:21-12:4.) The Debtors produced all of this material, which amounted to over 9000 pages of documents. After completing this extensive discovery, Mariner submitted the Hootnick Report, and the Debtors submitted the rebuttal Miller Report.

On December 1, 2009, the Debtors filed the Plan. The Plan unambiguously states that all SSCC Common Interests, meaning the interests held by holders of SSCC equity securities, "shall be extinguished, cancelled and discharged," and all holders of such interests "shall not be entitled to receive or retain any monetary distributions or other property on account of such [i]nterests under the Plan." (Plan at 24, 38.) The Plan also provides a mechanism that explicitly allows the Debtors to modify the Plan as necessary if a credible offer for the Full Payment Amount is received at least 10 days prior to the hearing to approve the Disclosure Statement. (the "Full Payment Mechanism") (*id.* at 2.)

## LEGAL ARGUMENT

Section 1102 of the Bankruptcy Code provides that a bankruptcy court has discretion to appoint "additional committees of creditors or of equity security holders <u>if necessary to assure</u>

adequate representation of creditors or of equity security holders. 11 U.S.C. § 1102(a)(2) (emphasis added). Whether equity security holders have "adequate representation" must be determined by the facts of each case. *See, e.g., In re Edison Bros. Stores, Inc.*, 1996 WL 534853, at *3 (D. Del. Sept. 17, 1996) (citing *In re Johns-Manville Corp.*, 68 B.R. 155, 159 (Bankr. S.D.N.Y. 1986)). Equity is not entitled to exclusive representation by a committee, only adequate representation. *In re Edison Bros.*, 1996 WL 534853, at *4. Thus, if equity is adequately represented by another group, *e.g.* the Creditors' Committee or management (as was the case in *Edison Bros.*), then it should not be entitled to its own committee. *See id.*

Courts have considered a variety of factors in determining whether an equity committee should be appointed, including: (i) whether a debtor is solvent; (ii) whether the interests of shareholders are not otherwise adequately represented; (iii) the size and complexity of the case; (iv) whether the stock is widely held and actively traded; (v) whether the request for formation of an equity committee is timely; and (vi) whether the costs of such appointment outweigh the benefits. *See, e.g., In re Kalvar*, 195 B.R at 600; *In re Emons Indus. Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985). "No one factor is dispositive, and the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case." *In re Kalvar,* 195 B.R. at 600-601. Nevertheless, courts emphasize two of these factors above all others:

> [equity] committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.

*In re Williams,* 281 B.R. at 223 (emphasis added); *see also In re Northwestern Corp.,* 2004 WL 1077913, at *2. None of these factors are satisfied in these cases.

## ARGUMENT

### A. No Purpose is Served by the Appointment of an Equity Committee.

As an initial matter, given the mature stage of the proceedings, no purpose is served by the appointment of an equity committee. The Debtors have filed a fulsome Plan and Disclosure Statement that provide for an internal reorganization of the Debtors by converting the unsecured bonds of the Debtors into equity of the reorganized company. This debt conversion is necessitated by the value of the Debtors, as set forth in the projections which accompany the Disclosure Statement, and is consistent with the restructuring strategy that the Debtors have maintained publicly since the cases were filed. Although Mariner disagrees that there is no value for equity, and therefore this conversion is not appropriate, valuation is uniquely an issue for confirmation, and none of Mariner's, or any other Shareholder's, rights with respect to confirmation, including valuation, are prejudiced in any manner by not appointing an equity committee at this mature stage of the proceedings. Additionally, the Plan contains the Full Payment Mechanism, which provides the Debtors with the flexibility to modify the Plan as necessary if a credible offer comes forward which satisfies all of the claims against the Debtors, with interest as applicable, in full in cash. The Full Payment Mechanism does not render the Plan illusory or half-baked. In fact, a "full payment mechanism" is implicit in virtually every plan of reorganization as it embodies a fundamental principal of the Bankruptcy Code—unless and until every creditor receives full value for its claim, including interest as applicable, holders of equity are not entitled to any distribution on account of their equity interests in a debtor. The Full Payment Provision simply makes this explicit and goes a step further by making clear that the Debtors can modify the Plan as may be necessary to pursue such offer. The Shareholders

have no statutory right to an equity committee and no right to receive any value until all the claims have been satisfied in full. The Plan expressly recognizes this right and none of the rights of Mariner, or any other Shareholder, to object at confirmation, including with respect to valuation, have been prejudiced. Under these circumstances, there is simply no purpose to be served by the appointment of an equity committee, let alone a purpose which would justify the costs of such committee. *See In re Kalvar,* 195 B.R. at 600. For these reasons alone, the Motion should be denied. However, should the Court determine it is necessary to continue the inquiry, the Debtors address Mariner's failure to meet its heavy burden below.

**B.    Mariner Has Not Satisfied Its Heavy Burden to Establish A Substantial Likelihood of a Meaningful Distribution to the Shareholders.**

FILED UNDER SEAL PURSUANT TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 107(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9018 FOR AUTHORIZATION TO FILE UNDER SEAL CERTAIN PORTIONS OF THEIR SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION OF CASPIAN CAPITAL ADVISORS FOR AN ORDER APPOINTING AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS AND EXHIBIT B THERETO

**C.    Equity Has Adequate Representation.**

Mariner must prove a present and identifiable need for representation that cannot otherwise be addressed by individual representation. *See In re Williams,* 281 B.R. at 223. The question is not whether the equity holders are "'exclusively' represented, but whether they are 'adequately' represented." *In re Edison Bros.,* 1996 WL 534853, at*4 (affirming bankruptcy court's finding that the interests of the debtor's shareholders were adequately represented by the debtor). While Mariner claims the Shareholders "are likely to be the fulcrum class in these cases, especially if there is someone at the negotiation table to represent their interests" (Motion at 1), there is nothing in the record to support this contention.

First, the Shareholders are being represented, to the extent necessary, by the Creditors' Committee and its team of legal and financial advisors. The interests of the Creditors' Committee and the Shareholders are aligned in seeking to maximize value to the Debtors' estates. Courts have recognized that alignment of interests is relevant in determining whether equity holders' interests are adequately represented. *See, e.g., In re Williams*, 281 B.R. at 222 (finding that "the Creditors' Committee has sufficiently aligned or parallel interests with Shareholders to preclude the need for an additional committee"). The Creditors' Committee is comprised of diverse unsecured creditors including trade creditors, the United States Steelworkers, the Pension Benefit Guaranty Corporation and several indenture trustees. Each of the members of the Creditors' Committee, as a fiduciary, has a parallel interest with that of the Shareholders in maximizing recoveries to the Debtors' unsecured creditors in an efficient and effective manner.[4]

The Creditors' Committee has already undertaken significant steps in an attempt to achieve the highest realistic value for the Debtors. For example, the Creditors' Committee's advisors routinely scrutinize and comment on all of the Debtors' substantive pleadings. The Debtors' advisors are in constant contact with the Creditors' Committee's advisors regarding myriad matters in these cases. The Creditors' Committee is actively, and with an objective eye, involved in review of the Debtors' business operations, cash flow, intercompany transactions, restructuring efforts and generally the direction of these chapter 11 cases to ensure that the highest values are obtained for unsecured creditors. To that end, unless and until the general unsecured creditors receive full value for their claims, the Shareholders will not receive distributions on account of old equity.

Finally, as the vigorous prosecution of the Motion demonstrates, Mariner is a sophisticated institutional investor capable of adequately representing the interests of the Shareholders. Mariner represents the holders of approximately 665,000 preferred shares of SSCC, which is in excess of 14% of the issued preferred shares of SSCC. Mariner has selected competent counsel in Wilkie Farr & Gallagher LLP to protect its interests in these cases, and engaged Mr. Hootnick to provide expert services. There can be no doubt that Mariner is capable of adequately representing itself and the interests of the Shareholders, and indeed has even taken the extra step of hiring competent counsel, without the need for an official equity committee. Courts have held that the appointment of an additional committee is not necessary when a creditor or equity holder is otherwise capable of adequately representing its own interests, which appears to be the case here. *See, e.g., In re Garden Ridge Corp.*, 2005 WL 523129, at *2 (Bankr. D. Del. 2005).

### D. None of the Other Factors Support The Formation of An Equity Committee.

Even if Mariner could demonstrate that the Debtors were not insolvent, it cannot satisfy any of the remaining factors courts consider in determining whether equity holders are adequately represented. *See In re Exide*, 2002 WL 32332000, at *2.

#### 1. The Shareholders' Request Is Not Timely.

Eleven months after these cases began, and once a Plan has been filed, is not the time to form an equity committee.[5] As the *Kalvar* court recognized: "The late timing of the motion ties in to the only remaining purpose of an equity committee in this case, which would be to object to confirmation, and litigate the valuation issue. The aforementioned costs associated with the

---

[4] The Creditors' Committee's fiduciary duties in this regard run solely to the Debtors' unsecured creditors, and not specifically to equity holders, but equity holders may reap the benefits of any value realized in excess of that required to satisfy in full the claims of all unsecured creditors.

formation of an equity committee <u>cannot be justified in light of this purpose</u>. This observation holds even more true as to common shareholders, as their interests are below those of preferred shareholders." *In re Kalvar,* 195 B.R. at 600 (emphasis added). Here, Mariner simply asserts that because the Shareholders are likely to be an "in the money" constituency, it is imperative that they are provided adequate representation as soon as possible to be able to participate in the process. As discussed above, Mariner has provided no credible evidence that the Shareholders will receive *any* distribution, let alone a *meaningful* distribution. Moreover, it is clear that the Creditors' Committee and its team of sophisticated advisors has been focused on seeking to maximize the value of the Debtors' estates, which will be to the benefit of creditors and Shareholders alike.

Finally, if Mariner wants to object to the Plan, it can do so without an equity committee. In this context, the only function an equity committee could possibly serve is to object to confirmation and litigate valuation at the confirmation hearing. As Mr. Hootnick testified, if an equity committee were to be formed in this case, it would simply function to keep the company in bankruptcy for a *longer* period of time. Clearly, as demonstrated by this proceeding, Mariner is more than capable of taking on that task.

2. **The Size and Complexity of the Case Do Not Require An Equity Committee.**

Mariner emphasizes the size and complexity of the Debtors' cases. The Debtors have made significant strides since the petition date to begin their restructuring process and have begun to decrease the number of moving parts in these cases. The Motion mentions the number of the Debtors' mills, plants and employees, and also the ownership of 1,000,000 acres of Canadian timberland. Since the petition date in these cases, the Debtors have actually closed

---

[5] The delay from the filing of Mariner's Motion to now is the result of their failure to satisfy their burden at the initial hearing, and their own delay in requesting discovery.

numerous plants and mills, rejected unfavorable executory contracts and leases, sold numerous de minimis and large scale assets, including the recent sale of the nearly 1,000,000 acres of Canadian timberland, and decreased the overall size of their workforce.

Moreover, the fact that the cases are large and complex, however, does not lead to the conclusion that the appointment of an equity committee is warranted. Although Mariner points to a handful of large and complex cases in which an equity committee was appointed, it ignores the scores of large and complex cases where the appointment of an equity committee has been denied. *See In re Owens Corning,* Case No. 00-3837 (JKF) (Bankr. D. Del. Feb. 17, 2006) (appointment of an official equity committee denied by both the U.S. Trustee and the Court); *In re Johns-Manville,* 68 B.R. at 164 ("adequate representation" of shareholders can occur without appointment of a special committee despite the extreme complexity of a case); *In re Williams,* 281 B.R. at 233 (appointment of equity committee denied despite the complexity of the case). The existence of a large and complex case therefore does not automatically merit the appointment of an equity committee. Instead the Court should focus on issues such as adequate representation, the lack of any showing of the potential for any recovery by the Shareholders (let alone a meaningful recovery) and the high costs which would ultimately be borne by the estate.

3. **The Nature of the Equity Securities Does Not Require An Equity Committee.**

Even though there are a large number of Shareholders, "not every case with ... a large number [of shareholders] will require an official equity committee... Indeed, if Congress' intent was otherwise, it would have mandated the appointment of equity committees instead of leaving it within the discretion of the [United States Trustee] and the Court." *In re Williams,* 281 B.R. at 223 (citing *In re Johns-Manville,* 68 B.R. at 160). On February 4, 2009, SSCC's common and preferred stock were delisted from the NASDAQ Global Select Market and have since been

traded on the Pink Sheets Electronic Quotation Service. Mariner makes the blanket statement that the Debtors' preferred stock is actively traded, but the only fact to support such statement is that the average daily trading of the preferred shares over the thirty days prior to August 6, 2009 was 43,000 shares. It is not necessarily clear whether this is "active" or substantial trading, but it is clear, however, that SSCC was delisted from the NASDAQ, which significantly reduced the market for trading SSCC shares.

### 4. The Cost of an Equity Committee Weighs Against Appointment.

The Debtors' estates would be required to bear significant additional duplicative and unnecessary costs if an equity committee were appointed in these cases. Indeed, the costs to the estate of an additional committee must be taken into account in determining whether to appoint an equity committee, in particular at this mature stage where a Plan has been filed. *See, e.g., In re Kalvar*, 195 B.R. at 601 (court determined that the appointment of an equity committee was not warranted due to, among other reasons, the "delay and additional costs" associated with appointing an equity committee); *see also In re Exide Tech.*, 2002 WL 32332000, at *1 (balancing the costs of an equity committee against the need for adequate representation and equity's ability to recoup a substantial distribution).

Additionally, as set forth in the Objection, the Debtors' stakeholders already have several sets of reputable financial, legal and other advisors that are actively involved in these cases. Given the multiple layers of legal, financial and other advisors that the prominent creditor and other groups have already retained in these cases, whose fees and expenses will likely be borne by the Debtors' estates, the Debtors submit that the costs and attendant delay of adding yet another layer of outside experts overseeing the Debtors at the expense of their estates is

unreasonable and unnecessary, in particular given that there is no demonstrable evidence that there will be any distribution to the Shareholders.

Most official committees retain counsel to assist them in discharging their fiduciary responsibilities. Usually, in large cases such as these, official committees also retain, among other professionals, financial advisors, tax advisors and accountants. Given the economics of these cases, the cost of an official equity committee's involvement would essentially be borne entirely by unsecured creditors, as any potential creditor recovery would only be reduced by further administrative expenses. Viewed in this light, and in light of the mature stage of the proceedings, it is impossible to identify any benefit to be derived from the appointment of an official equity committee. Besides burdening the Debtors' estates with additional fees and expenses, the appointment of an official equity committee would unnecessarily complicate these cases, with no corresponding benefit to any party with a cognizable economic interest.

Mariner contends that concerns of cost are outweighed by the need for adequate representation and, as previously mentioned, may be constrained by Bankruptcy Code safeguards governing compensation. In making this argument, Mariner disregards case law that has emphasized the "cost" factor in evaluating these types of requests. *See In re Sharon Steel Corp.*, 100 B.R. 767, 778 (Bankr. W.D. Pa. 1989) (separate committees impose additional administrative expenses on the debtor's estate which adversely affect the debtor's ability to reorganize – request for separate committee denied); *In re Public Service Co. of N.H.*, 89 B.R. 1014, 1020 (Bankr. D. N.H. 1988) (court must consider cost in determining whether to appoint a separate committee – request for separate committee denied); *In re Baldwin-United Corp.*, 45 B.R. 375, 376 (Bankr S.D. Ohio 1983) (appointment of separate committee denied due to

astronomical cost to bankruptcy estate). The additional costs that would result from the appointment of an official equity committee far outweigh the benefits to be derived.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court deny the relief requested in the Motion, and grant such other and further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
December 3, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION