# **EXHIBIT A**

Plan

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al., | Case No. 09-10235 (BLS) |
| Debtors. | Jointly Administered |

**JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE**
**CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND**
**PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE**
**CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS**

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone: (416) 869-5261
Facsimile: (416) 947-0866

Counsel for the Debtors and Debtors in Possession

Dated: December 1, 2009

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................2

**ARTICLE I : DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS** ..................................................3
    1.1    Definitions. ........................................................................................................................3
    1.2    Rules of Interpretation. ....................................................................................................27
    1.3    Currency Denomination. ..................................................................................................27
    1.4    Exhibits and Plan Supplement. ........................................................................................27
    1.5    Deemed Acts. ...................................................................................................................28

**ARTICLE II : TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS IN THE CHAPTER 11 CASES** ...........................................................28
    2.1    Administrative Expense Claims. ......................................................................................28
    2.2    No Double Payment of Administrative Expense Claims. ..................................................29
    2.3    DIP Facility Claims. ........................................................................................................29
    2.4    Priority Tax Claims. .........................................................................................................29

**ARTICLE III : CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS IN THE CHAPTER 11 CASES** ...............................................................................30
    3.1    Summary of Classification and Treatment of Classified Claims and Interests ..................30
    3.2    Classification and Treatment of Claims Against and Interests in SSCC (Debtor 1)...............35
    3.3    Classification and Treatment of Claims Against and Interests in SSCE (Debtor 2)...............38
    3.4    Classification and Treatment of Claims Against and Interests in Cameo Container (Debtor 3). ............42
    3.5    Classification and Treatment of Claims Against and Interests in Calpine Corrugated (Debtor 4) ...........45
    3.6    Classification and Treatment of Claims Against and Interests in SSPRI (Debtor 5)...............48
    3.7    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14). ....................................................................50
    3.8    Classification and Treatment of Claims Against and Interests in SSC Canada (Debtor 15). .................52
    3.9    Classification and Treatment of Claims Against and Interests in Smurfit-MBI (Debtor 16). .................56
    3.10    Classification and Treatment of Claims Against and Interests in MBI Limited (Debtor 17) ..................59
    3.11    Classification and Treatment of Claims Against and Interests in Stone FinCo II (Debtor 18)...............61
    3.12    Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd. (Debtor 19). ......................................................................................................64
    3.13    Classification and Treatment of Claims Against and Interests in Francobec Company (Debtor 20). .....67
    3.14    Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company (Debtor 21) ................................................................................................69
    3.15    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25)...........................................................................72
    3.16    Acceptance or Rejection of the Plan by Classes of Claims and Interests. ..........................75

**ARTICLE IV : CLASSIFICATION AND TREATMENT OF AFFECTED CLAIMS AGAINST THE CANADIAN DEBTORS IN THE CCAA PROCEEDINGS** ...........................................................75
    4.1    Purpose and Effect of the CCAA Plan................................................................................75
    4.2    Classification of Creditors. ..............................................................................................76
    4.3    Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims. ...............78
    4.4    Option to Place the Canadian Debtors into Bankruptcy Proceedings..................................78
    4.5    Treatment of Affected Unsecured Claims. .......................................................................79
    4.6    Conditions Precedent to Implementation of CCAA Plan ...................................................80
    4.7    CCAA Creditors' Meeting ................................................................................................80
    4.8    General. ............................................................................................................................82

**ARTICLE V : CANADIAN ASSET SALE** ......................................................................................84
    5.1    Sale of the Canadian Assets to Canadian Newco. .............................................................84

**ARTICLE VI : MEANS FOR IMPLEMENTATION OF THE PLAN**..................................................86

6.1     Procedural Consolidation. ...................................................................................................87
6.2     Corporate Governance and Corporate Actions. ..................................................................87
6.3     Issuance and Distribution of New Securities and Related Matters. .....................................89
6.4     Listing on the New York Stock Exchange or the NASDAQ Stock Market. .......................90
6.5     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors. ..............90
6.6     Dissolution of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II. ..........90
6.7     Vesting of the Canadian Assets in Canadian Newco. .........................................................91
6.8     Cancellation of Credit Documents, Debt Instruments, and Interests. ..................................91
6.9     Cancellation of Liens. ........................................................................................................92
6.10    Employee Compensation and Benefit Programs. ...............................................................92
6.11    Canadian Pension Plans. ...................................................................................................93
6.12    Management Incentive Plans. .............................................................................................93
6.13    Restructuring Transactions. ...............................................................................................94
6.14    Additional Transactions Authorized Under the Plan. .........................................................95

**ARTICLE VII : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN THE CHAPTER 11 CASES AND THE CCAA PROCEEDINGS**..................................................95

7.1     Assumption/Ratification of Executory Contracts and Unexpired Leases. ...........................95
7.2     Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases. .......95
7.3     Assumption of Collective Bargaining Agreements. ............................................................96
7.4     Insurance Policies and Agreements. ..................................................................................96
7.5     Rejection Damages Bar Date. ............................................................................................96
7.6     Post-Petition Contracts and Leases. ...................................................................................96

**ARTICLE VIII : PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN**...............97

8.1     General Provisions on Distributions under the Plan. ...........................................................97
8.2     No Interest on Claims Unless Otherwise Provided in the Plan............................................97
8.3     Distributions by Disbursing Agents. ..................................................................................97
8.4     Delivery of Distributions – Chapter 11 Cases. ..................................................................98
8.5     Delivery of Distributions – CCAA Proceedings. ...............................................................99
8.6     Undeliverable and Unclaimed Distributions. .....................................................................99
8.7     Record Date for Distributions...........................................................................................100
8.8     Assignment of Claims. .....................................................................................................100
8.9     Means of Cash Payment. ..................................................................................................100
8.10    Withholding and Reporting Requirements. .......................................................................101
8.11    Allocation of Plan Distributions Between Principal and Interest........................................101
8.12    Setoff and Recoupment. ...................................................................................................101
8.13    Fractional Shares. ............................................................................................................101
8.14    Compromises and Settlements. .........................................................................................101
8.15    Claims Administration Responsibility – Chapter 11 Cases. ..............................................102
8.16    Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases. ..................102
8.17    Distribution Reserve – CCAA Proceedings......................................................................104

**ARTICLE IX : CONFIRMATION AND CONSUMMATION OF THE PLAN** ...........................105

9.1     Conditions to Confirmation. .............................................................................................105
9.2     Conditions to Occurrence of the Effective Date. ..............................................................105
9.3     Waiver of Conditions. ......................................................................................................106
9.4     Consequences of Non-Occurrence of Effective Date. .......................................................106
9.5     Notice of Effective Date ...................................................................................................106

**ARTICLE X : INJUNCTIONS, RELEASES AND DISCHARGE** .................................................106

10.1    Discharge..........................................................................................................................106
10.2    Releases. ...........................................................................................................................108
10.3    Supplemental Injunction. ..................................................................................................110
10.4    Disallowed Claims...........................................................................................................112

| 10.5 | Exculpation. | 112 |
| 10.6 | Revesting of Assets. | 113 |
| 10.7 | Preservation of Litigation Claims. | 113 |
| 10.8 | Survival of Indemnification Obligations. | 113 |

**ARTICLE XI : RETENTION OF JURISDICTION** .............................................................. **114**

| 11.1 | Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court. | 114 |

**ARTICLE XII : MISCELLANEOUS** .................................................................................. **116**

| 12.1 | Surrender of Instruments. | 116 |
| 12.2 | Dissolution of the Committee. | 117 |
| 12.3 | Pre-Effective Date Injunctions or Stays. | 117 |
| 12.4 | Post-Confirmation Date Retention of Professionals. | 118 |
| 12.5 | Bar Date for Certain Administrative Expense Claims. | 118 |
| 12.6 | Effectuating Documents and Further Transactions. | 118 |
| 12.7 | Exemption from Transfer Taxes. | 118 |
| 12.8 | Payment of Statutory Fees. | 119 |
| 12.9 | Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees. | 119 |
| 12.10 | Proofs of Claim Filed by Prepetition Notes Indenture Trustees. | 119 |
| 12.11 | Creditor Representative Duties and Payment of Fees. | 119 |
| 12.12 | Amendment or Modification of the Plan. | 119 |
| 12.13 | Severability of Plan Provisions. | 119 |
| 12.14 | Binding Effect; Successors and Assigns. | 120 |
| 12.15 | Revocation, Withdrawal or Non-Consummation. | 120 |
| 12.16 | Notice. | 120 |
| 12.17 | Governing Law. | 121 |
| 12.18 | Reservation of Rights. | 121 |

# EXHIBITS

Exhibit 1     Amended and Restated By-Laws of Reorganized SSCC

Exhibit 2     Amended and Restated Certificate of Incorporation of Reorganized SSCC

Exhibit 3     Management Incentive Plans

Exhibit 4     Directors and Officers of Reorganized SSCC

Exhibit 5     Directors and Officers of Reorganized Debtors Other than Reorganized SSCC

Exhibit 6     Asset Purchase Agreement (Canadian Asset Sale)

Exhibit 7     Canadian Newco Certificate of Incorporation

Exhibit 8     Canadian Newco By-Laws

Exhibit 9     List of Previously Assumed Unexpired Leases to be Assigned to Canadian Newco in Connection with the Canadian Asset Sale

Exhibit 10     List of Executory Contracts and Unexpired Leases to be Assumed and Assigned to Canadian Newco in Connection with the Canadian Asset Sale

Exhibit 11     Employee Benefit Plans

Exhibit 12     Employment and Retirement Benefit Agreements

Exhibit 13     Restructuring Transactions

# INTRODUCTION

Smurfit-Stone Container Corporation ("SSCC") and its affiliated Debtors in the above-referenced Chapter 11 Cases, and the Canadian Debtors in their capacities as debtors in or parties to the CCAA Proceedings, hereby propose the following Plan for the resolution of outstanding Claims against and Interests in each of the Debtors. Article IV of this Plan shall also serve as the plan of compromise and arrangement (the "CCAA Plan") to be proposed in the CCAA Proceedings to each Class of Affected Claims against the Canadian Debtors. Capitalized terms not defined in this Plan shall have the meanings assigned to such terms in Article I hereof.

The Plan provides for a coordinated restructuring and compromise of all Claims against and Interests in the Debtors, including the Canadian Debtors, in both the Chapter 11 Cases and the CCAA Proceedings. The classification and treatment of Claims against and Interests in the Debtors for purposes of the Chapter 11 Cases is set forth in Article II and Article III of this Plan. The classification and treatment of Affected Claims against the Canadian Debtors for purposes of the CCAA proceedings is set forth in Article IV of this Plan. Under this Plan, the treatment of Claims against the Canadian Debtors in the Chapter 11 Cases is intended to be consistent with the treatment of Affected Claims against the Canadian Debtors in the CCAA Proceedings, with the Holders of Claims or Affected Claims against any particular Canadian Debtor receiving a single recovery on account of such Claims in the Chapter 11 Cases and the CCAA Proceedings. If the CCAA Plan is not accepted by any Class of Affected Claims, the Holders of such Claims shall not be Affected Creditors under the CCAA Plan and shall not be entitled to receive any distributions thereunder; provided, however, that the Debtors reserve the right to seek confirmation of this Plan in the Chapter 11 Cases pursuant to Section 1129(b) of the Bankruptcy Code with respect to any Class of Claims (including any Class of Affected Claims against the Canadian Debtors) that has failed to accept the Plan, in which case the Holders of such Claims shall receive the treatment set forth in Article III and shall be subject to all applicable provisions of this Plan for purposes of the Chapter 11 Cases. The effectiveness of the Plan in the Chapter 11 Cases is conditioned upon the effectiveness and implementation of the CCAA Plan in the CCAA Proceedings, and vice versa, unless otherwise determined by the Debtors. The Debtors will seek the entry of the Confirmation Order by the Bankruptcy Court and the entry of one or more CCAA Sanction Order(s) by the Canadian Bankruptcy Court. Unless otherwise noted herein and subject to the terms of Article IV hereof, all provisions of this Plan shall be equally applicable to both the Chapter 11 Cases and the CCAA Proceedings.

The Plan constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases and the CCAA Plan constitutes a separate plan of compromise and arrangement for each Canadian Debtor in the CCAA Proceedings. The Debtors reserve the right to withdraw the Plan or the CCAA Plan with respect to one or more Debtors or Canadian Debtors, as applicable, while seeking confirmation or approval of the Plan or the CCAA Plan with respect to all other Debtors or Canadian Debtors, as applicable.

Notwithstanding the fact that the Plan provides for an internal reorganization of the Debtors which equitizes the Prepetition Noteholder Claims and certain other Claims, if not later than ten (10) days prior to the hearing on approval of the Disclosure Statement a third party purchaser determined to be credible by the Debtors expresses an interest, and demonstrates the wherewithal, to (i) purchase all or a substantial portion of the New SSCC Common Stock for the Full Payment Amount or (ii) purchase all of the assets of the Debtors for the Full Payment

Amount and satisfy all other obligations provided for in the Plan, the Debtors, in consultation with the Committee, reserve the right to modify the Plan and the Disclosure Statement, including by seeking approval of appropriate sale or other procedures, in a manner necessary to allow such a transaction to be pursued.

The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed by the Debtors in connection with the solicitation of votes to accept this Plan, for a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, the securities to be issued under the Plan. Subject to certain restrictions and requirements set forth herein, in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and any applicable provisions of the CCAA, the Debtors reserve the right to alter, amend, modify, supplement, revoke or withdraw the Plan prior to its substantial consummation in accordance with the terms of this Plan, the Confirmation Order, the CCAA Sanction Order(s), the Bankruptcy Code, and the CCAA.

## ARTICLE I: DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS

1.1     Definitions.

For purposes of the Plan, capitalized terms not otherwise defined herein shall have the meanings set forth below. Any capitalized term not otherwise defined herein that is used in the Bankruptcy Code shall have the meaning given to that term in the Bankruptcy Code.

1.1.1     7.375% Notes Due 2014 means the 7.375% senior unsecured notes due on July 15, 2014, issued by Stone FinCo II in the aggregate principal amount of $200,000,000 pursuant to an indenture dated as of July 20, 2004, by and among Stone FinCo II as the issuer, SSCE (as a successor in interest to Stone Container Corporation) as a guarantor, and Manufacturers and Traders Trust Company (as a successor in interest to BNY Midwest Trust Company) as the indenture trustee.

1.1.2     7.50% Notes Due 2013 means the 7.50% senior unsecured notes due on June 1, 2013, issued by SSCE in the aggregate principal amount of $300,000,000 pursuant to an indenture dated as of May 23, 2003, by and among SSCE (as a successor in interest to Jefferson Smurfit Corporation) as the issuer and Wilmington Trust Company (as a successor in interest to The Bank of New York) as the indenture trustee.

1.1.3     8.00% Notes Due 2017 means the 8.00% senior unsecured notes due on March 15, 2017, issued by SSCE in the aggregate principal amount of $675,000,000 pursuant to an indenture dated as of March 26, 2007, by and among SSCE as the issuer and Wilmington Trust Company (as a successor in interest to The Bank of New York Trust Company, N.A.) as the indenture trustee.

1.1.4     8.25% Notes Due 2012 means the 8.25% senior unsecured notes due on October 1, 2012, issued by SSCE in the aggregate principal amount of $700,000,000 pursuant to an indenture dated as of September 26, 2002, by and among SSCE (as a successor in interest

to Jefferson Smurfit Corporation) as the issuer and Wilmington Trust Company (as a successor in interest to The Bank of New York) as the indenture trustee.

1.1.5    <u>8.375% Notes Due 2012</u> means the 8.375% senior unsecured notes due on July 1, 2012, issued in the aggregate principal amount of $400,000,000 pursuant to an indenture dated as of June 26, 2002, by and among SSCE (as a successor in interest to Stone Container Corporation) as the issuer and Wilmington Trust Company (as a successor in interest to The Bank of New York) as the indenture trustee.

1.1.6    <u>Administration Charge</u> has the meaning assigned to such term in the CCAA Initial Order.

1.1.7    <u>Administrative Expense Claim</u> means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date under Sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors arising from and after the Petition Date (such as wages, salaries and commissions for services to the Debtors and payments for inventory and leased equipment and premises) and Claims of governmental units for taxes (including tax audits) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for actual and necessary legal, financial, advisory, accounting and other services provided by the Professionals and the reimbursement of actual and necessary expenses incurred by the Professionals pursuant to Sections 328 or 330 of the Bankruptcy Code; (c) any payment to be made pursuant to the Plan or otherwise to cure a default under an executory contract or unexpired lease that has been or will be assumed by the Debtors; (d) any fees and charges assessed against the Estates under Section 1930, Chapter 123, of Title 28 of the United States Code; (e) the actual and necessary fees and expenses incurred by the Claims and Noticing Agent; (f) the actual and necessary fees and expenses incurred by the CCAA Monitor and its counsel (<u>provided</u>, <u>however</u>, that no approval of the Bankruptcy Court shall be required for the payment of such fees and expenses); (g) Claims arising under Section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors (including the Canadian Debtors) during the twenty (20) day period immediately preceding the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business operations; and (h) all Intercompany Claims arising from and after the Petition Date but prior to the Effective Date.

1.1.8    <u>Affected Claims</u> means, for purposes of the CCAA Plan, the Affected Secured Claims and the Affected Unsecured Claims.

1.1.9    <u>Affected Creditor</u> means, for purposes of the CCAA Plan, any Person or Entity that is a Holder of an Affected Claim and may, if the context requires, mean an assignee of an Affected Claim or a trustee, interim receiver, receiver manager, or other Person acting on behalf of such Person, if such assignee or other Person has been recognized by the CCAA Monitor, the Canadian Debtors, or the applicable Disbursing Agent, as the case may be.

1.1.10    <u>Affected Secured Claims</u> means, for purposes of the CCAA Plan, the Prepetition Canadian Lender Claims and all Other Secured Claims against each of SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, and 3083527 Nova Scotia.

1.1.11      **Affected Secured Creditor** means, for purposes of the CCAA Plan, any Holder of an Affected Secured Claim.

1.1.12      **Affected Unsecured Claims** means, for purposes of the CCAA Plan, the General Unsecured Claims against each of SSC Canada, Smurfit-MBI, or Stone FinCo II.

1.1.13      **Affected Unsecured Creditor** means, for purposes of the CCAA Plan, any Holder of an Affected Unsecured Claim.

1.1.14      **Affiliate** has the meaning assigned to such term in Section 101(2) of the Bankruptcy Code and when used in this Plan with reference to any Debtor shall include, but not be limited to, each of the other Debtors.

1.1.15      **Allowed** means, with respect to a Claim or Interest in the Chapter 11 Cases, or any portion of such Claim or Interest in any Class or category specified herein, a Claim or Interest that either (a) is listed in the Schedules as neither disputed, contingent nor unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed; (b) is evidenced by a Proof of Claim filed on or before the applicable Claims Bar Date and is not listed as disputed, contingent or unliquidated in the Schedules, and as to which no objection or request for estimation has been filed on or before any applicable deadline; (c) is not the subject of an objection to allowance that (i) was filed on or before the Claims Objection Deadline and (ii) has not been settled, waived, withdrawn or denied pursuant to a Final Order; or (d) is expressly allowed (i) pursuant to a Final Order, (ii) pursuant to an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, as applicable, or (iii) pursuant to the terms of this Plan; provided, however, that proofs of interest need not be filed with respect to any Interests, including, without limitation, any SSCC Interests.

1.1.16      **Allowed      Claim** means a Claim in a particular Class or of a particular type that is also an Allowed Claim. For example, an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim.

1.1.17      **Amended and Restated By-Laws** means the amended and restated by-laws of Reorganized SSCC, in substantially the form of Exhibit 1 to this Plan.

1.1.18      **Amended and Restated Certificate of Incorporation** means the amended and restated certificate of incorporation of Reorganized SSCC, in substantially the form of Exhibit 2 to this Plan.

1.1.19      **Asset Purchase Agreement** means that certain Asset Purchase Agreement, in substantially the form of Exhibit 6 to this Plan (to be filed with the Plan Supplement), pursuant to which the Canadian Assets shall be transferred to Canadian Newco on the Effective Date in accordance with the terms of the CCAA Vesting Order, this Plan, the Confirmation Order, and the CCAA Sanction Order.

1.1.20      **Assumption/Rejection Motion** means a motion to be filed by the Debtors no later than fifteen (15) days prior to the Confirmation Hearing, seeking the Bankruptcy Court's approval for the assumption or rejection by the Debtors of any executory contract or unexpired lease (a) to which any Debtor is a party and (b) which had not previously been assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.21    Avoidance Actions means, collectively, (i) causes of action arising under Sections 542, 543, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including fraudulent transfer laws, and (ii) causes of action arising under the BIA or under similar or related provincial laws, including fraudulent preference and reviewable transaction laws, in each case whether or not litigation to prosecute such causes of action was commenced prior to the Effective Date.

1.1.22    Ballot means the ballot form for accepting or rejecting this Plan, either (i) in the form approved by the Bankruptcy Court pursuant to the Voting Procedures Order and distributed with the Disclosure Statement to the Holders of Claims in the Chapter 11 Cases that are Impaired under the Plan and entitled to vote to accept or reject the Plan under Article III hereof or (ii) the Form of Proxy distributed to Affected Creditors in the CCAA Proceedings pursuant to the terms of the CCAA Creditors' Meeting Order.

1.1.23    Bankruptcy Code means Title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as in effect on the Petition Date, together with any amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.24    Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware or any other United States court with jurisdiction over the Chapter 11 Cases.

1.1.25    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure promulgated under Section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.26    Bar Date Order means the order entered by the Bankruptcy Court on or about June 22, 2009, establishing August 28, 2009 at 4 p.m. (prevailing Eastern Time) as the deadline (subject to certain exceptions set forth therein) for all Persons and Entities asserting Claims (including, without limitation, Administrative Expense Claims arising under Section 503(b)(9) of the Bankruptcy Code) against the Debtors in the Chapter 11 Cases to file their Proofs of Claim with respect to such Claims with either the Claims and Noticing Agent or the CCAA Monitor.

1.1.27    BIA means the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3, as amended.

1.1.28    Business Day means (i) with respect to the Chapter 11 Cases, any day other than a Saturday, a Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)) and (ii) with respect to the CCAA Proceedings, any day other than a Saturday, a Sunday, or a non-juridical day (as defined in Article 6 of the Code of Civil Procedure, R.S.Q., c. C-25, as amended) on which commercial banks are generally open for business in Canada.

1.1.29    Calpine Corrugated means Calpine Corrugated LLC, a 90%-owned subsidiary of SSCE and one of the Debtors in the Chapter 11 Cases.

1.1.30    Calpine Corrugated Credit Agreements means, collectively, the Union Bank Credit Agreement and the CIT Credit Agreement.

1.1.31    Cameo Container means Cameo Container Corporation, a wholly-owned subsidiary of SSCE and one of the Debtors in the Chapter 11 Cases.

1.1.32    Canadian Assets means those assets of SSC Canada, Smurfit-MBI and Francobec Company that are identified as "Acquired Assets" in the Asset Purchase Agreement, including, without limitation, (i) the Interests in certain other Canadian Debtors that are held by SSC Canada or Smurfit-MBI either prior to the Effective Date or on the Effective Date in accordance with the terms of this Plan, (ii) the Interests in certain non-Debtor Affiliates of the Debtors that are held by SSC Canada or Smurfit-MBI on the Effective Date, and (iii) all Intercompany Claims held by SSC Canada, Smurfit-MBI and Francobec Company.

1.1.33    Canadian Asset Sale means the sale of the Canadian Assets to Canadian Newco pursuant to the Asset Purchase Agreement, in accordance with the terms of the CCAA Vesting Order, this Plan, the Confirmation Order, and the CCAA Sanction Order, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco pursuant to the terms of the Asset Purchase Agreement.

1.1.34    Canadian Bankruptcy Court means the Ontario Superior Court of Justice (Commercial List) or any Canadian court with appellate jurisdiction over the CCAA Proceedings.

1.1.35    Canadian Collective Bargaining Agreements means, collectively, all Collective Bargaining Agreements to which any Canadian Debtor is a party.

1.1.36    Canadian Debtor(s) means, individually or collectively, SSC Canada, Stone FinCo II, 3083527 Nova Scotia Company, MBI Limited/ Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc.

1.1.37    Canadian Employee Benefit Plans means any employment, compensation, pension, welfare, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, dependent care, retirement, savings, deferred compensation, supplemental pension, retention, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other compensation or benefit plan, agreement or arrangement for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of SSC Canada, Smurfit-MBI, or any other Canadian Debtor, but excluding (i) all Canadian Pension Plans and (ii) all Non-Qualified Employee Benefit Plans.

1.1.38    Canadian Newco means one or more newly-formed, wholly-owned subsidiaries of SSCE that are organized under the laws of _____ and formed for the purpose of purchasing the Canadian Assets from SSC Canada, Smurfit-MBI and Francobec Company pursuant to the Plan, including any intermediate holding companies that are wholly-owned, direct or indirect, subsidiaries of SSCE and formed for the purpose of holding SSCE's equity interests in Canadian Newco.

1.1.39    Canadian Newco By-Laws means the by-laws for Canadian Newco, in substantially the form of Exhibit 8  to this Plan (to be filed with the Plan Supplement).

7

1.1.40    Canadian Newco Certificate of Incorporation means the certificate of incorporation for Canadian Newco, in substantially the form of Exhibit 7 to this Plan (to be filed with the Plan Supplement).

1.1.41    Canadian Pension Plans means, collectively, the following single-employer defined benefit plans: (i) the Retirement Plan for Unionized Employees of Smurfit-Stone Container Canada Inc. – La Tuque, Matane, Pointe-aux-Trembles and Burlington Divisions, (ii) the Pension Plan for Unionized Employees of Smurfit-MBI, (iii) the Pension Plan for Forest & Sawmill Employees of Smurfit-Stone Container Canada Inc., (iv) the Retirement Plan for Employees of Smurfit-Stone Container Canada Inc., (v) the Pension Plan for Non-Unionized Employees of Smurfit-MBI, (vi) the Pension Plan for Designated Executive Employees of Smurfit-MBI, and (vii) any other retirement or pension plan that is considered to be a qualified pension plan for purposes of the Income Tax Act (Canada) or any applicable pension benefits standards statute and/or regulation in Canada and that is established, maintained or contributed to by SSC Canada, Smurfit-MBI, or any other Canadian Debtor.

1.1.42    Causes of Action means, collectively, (i) any and all causes of action that could be asserted either by the Debtors or the Estates, including, without limitation, all Avoidance Actions, suits, accounts, promises, controversies, rights to legal remedies, rights to equitable remedies, and rights to payment and (ii) any and all Claims held by the Debtors, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, directly or derivatively, in law, equity or otherwise.

1.1.43    CCAA means the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as in effect on the Petition Date.

1.1.44    CCAA Bar Date Order means the order entered by the Canadian Bankruptcy Court on or about June 25, 2009, establishing August 28, 2009 at 4 p.m. (prevailing Eastern Time) as the deadline (subject to certain exceptions set forth therein) for all Persons and Entities asserting Claims against the Canadian Debtors in the CCAA Proceedings to file their Proofs of Claim with respect to such Claims with either the CCAA Monitor or the Claims and Noticing Agent.

1.1.45    CCAA Charges means, collectively, the Administration Charge, the Directors' Charge, and the DIP Lenders' Charge.

1.1.46    CCAA Circular means the information circular relating to the CCAA Plan, including the notice of the CCAA Creditors' Meeting and the exhibits attached thereto, which information circular shall include the Disclosure Statement.

1.1.47    CCAA Claims Determination Order means the order of the Canadian Bankruptcy Court dated November 6, 2009, establishing, among other things, certain procedures for the classification, modification, allowance, disallowance or consensual resolution of Claims against the Canadian Debtors in the CCAA Proceedings.

1.1.48    CCAA Creditors' Meeting means, collectively, the meeting of the Affected Secured Creditors and the meeting of the Affected Unsecured Creditors, in each case convened pursuant to the CCAA Creditors' Meeting Order for the purpose of, among other

things, considering and, if deemed appropriate, passing the CCAA Resolution(s), and includes any adjournment, postponement or other rescheduling of such meeting.

1.1.49    CCAA Creditors' Meeting Chair means the Person designated by the CCAA Monitor to preside as chairperson at the CCAA Creditors' Meeting.

1.1.50    CCAA Creditors' Meeting Date means the date fixed for the CCAA Creditors' Meeting pursuant to the CCAA Creditors' Meeting Order.

1.1.51    CCAA Creditors' Meeting Order means an order to be entered by the Canadian Bankruptcy Court in the CCAA Proceedings, accepting this Plan for filing in the CCAA Proceedings, directing that a meeting of Affected Secured Creditors and Affected Unsecured Creditors be held for purposes of voting to accept or reject this Plan as it pertains to the Canadian Debtors, and setting the CCAA Creditors' Meeting Date.

1.1.52    CCAA Initial Order means the Initial Order entered by the Canadian Bankruptcy Court on the Petition Date, as amended and restated, pursuant to which, among other things, the Canadian Bankruptcy Court provided certain relief under the CCAA to each of the Canadian Debtors and authorized each of the Canadian Debtors to enter into the DIP Facility Credit Agreement.

1.1.53    CCAA Monitor means Deloitte & Touche Inc. or any successor thereto appointed by the Canadian Bankruptcy Court as the monitor in the CCAA Proceedings.

1.1.54    CCAA Proceedings means the proceedings in respect of the Canadian Debtors that were commenced under the CCAA on the Petition Date and are currently pending before the Canadian Bankruptcy Court.

1.1.55    CCAA Released Parties has the meaning assigned to such term in Section 4.8.1 of this Plan.

1.1.56    CCAA Resolution(s) means, with respect to the CCAA Proceedings, one or more resolutions providing for the approval of the CCAA Plan by the Classes of Affected Creditors.

1.1.57    CCAA Sanction Order(s) means one or more orders of the Canadian Bankruptcy Court sanctioning the CCAA Plan.

1.1.58    CCAA Vesting Order means the order of the Canadian Bankruptcy Court approving and sanctioning the transfer of the Canadian Assets to Canadian Newco.

1.1.59    Chapter 11 Cases means the voluntary cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

1.1.60    CIT Group means The CIT Group/Equipment Financing, Inc.

1.1.61    CIT Group Claims means all Claims against Calpine Corrugated that are held by CIT Group pursuant to the terms of the CIT Group Credit Agreement.

1.1.62    CIT Group Credit Agreement means that certain Amended and Restated Credit Agreement dated as of July 28, 2008, by and among Calpine Corrugated as borrower, SSCE as guarantor, and the CIT Group as administrative agent and sole lender, as amended, modified, or supplemented from time to time.

1.1.63    Claim means (i) with respect to the Chapter 11 Cases, a "claim" as such term is defined in Section 101(5) of the Bankruptcy Code and (ii) with respect to the CCAA Proceedings, any right or claim of any Person against one or more of the Canadian Debtors in connection with any indebtedness, liability or obligation of any kind whatsoever of one or more of the Canadian Debtors, whether reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including, without limitation, any claim arising from or caused by the repudiation by a Canadian Debtor of any contract, lease or other agreement, whether written or oral, the commission of a tort (intentional or unintentional), any breach of duty (legal, statutory, equitable, fiduciary or otherwise), any right of ownership or title to property, employment, contract, a trust or deemed trust, howsoever created, any claim made or asserted against any one or more of the Canadian Debtors through any affiliate (as defined in the Nova Scotia Companies Act, R.S.N.S., 1989, c. 81, as amended), or any right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any grievance, matter, action, cause or chose in action, whether existing at present or commenced in the future, based in whole or in part on facts which existed on the Petition Date, together with any other claims of any kind that, if unsecured, would constitute a debt provable in bankruptcy within the meaning of the BIA.

1.1.64    Claims and Noticing Agent means Epiq Services LLC, employed by the Debtors as the official claims, noticing, and balloting agent in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court entered on or about January 27, 2009.

1.1.65    Claims Bar Date means, as applicable, either (i) August 28, 2009, the final date for all Persons or Entities asserting certain Claims against any of the Debtors or the Canadian Debtors to file Proofs of Claim on account of such Claims in accordance with the Bar Date Order or the CCAA Bar Date Order or (ii) such other date as the Bankruptcy Court or the Canadian Bankruptcy Court may fix with respect to any Claim.

1.1.66    Claims Objection Deadline means, solely with respect to the Chapter 11 Cases, the later of (a) ninety (90) days after the Confirmation Date or (b) thirty (30) days after the filing of any Claim, including any Claim for damages arising from the Debtors' rejection of an executory contract or unexpired lease; provided, however, that the Claims Objection Deadline shall not apply to any Claim filed after the applicable Claims Bar Date.

1.1.67    Class means (i) a category of substantially similar Claims or Interests that are designated in a single category of Claims or Interests for purposes of the Chapter 11 Cases in accordance with Section 1122 of the Bankruptcy Code, as described in Article III of this Plan, and (ii) a category of Affected Claims for purposes of the CCAA Proceedings in accordance with applicable provisions of the CCAA, as described in Article IV of this Plan.

1.1.68    Collective Bargaining Agreements means all collective bargaining agreements to which any of the Debtors (including, without limitation, any of the Canadian Debtors) is a party on the Confirmation Date.

1.1.69    Committee means the Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the Office of the United States Trustee on or about February 5, 2009, pursuant to Section 1102 of the Bankruptcy Code, as reconstituted from time to time.

1.1.70    Competing Bid means any bid for the Canadian Assets that may be submitted by any Person or Entity other than Canadian Newco pursuant to Section 5.1.6 of this Plan; provided, however, that any bid for the Canadian Assets that does not comply with the requirements of Section 5.1.6 of this Plan shall not be deemed to constitute a Competing Bid.

1.1.71    Competing Bid Deadline shall have the meaning assigned to such term in Section 5.1.6 of this Plan.

1.1.72    Confirmation means, as applicable, the Bankruptcy Court's entry of the Confirmation Order with respect to the Chapter 11 Cases and the Canadian Bankruptcy Court's entry of a CCAA Sanction Order with respect to the CCAA Proceedings.

1.1.73    Confirmation Date means the later of (i) the date on which the Bankruptcy Court enters the Confirmation Order with respect to the Chapter 11 Cases and (ii) the date on which the Canadian Bankruptcy Court enters a CCAA Sanction Order with respect to the CCAA Proceedings.

1.1.74    Confirmation Hearing means, as applicable, the hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and the hearing held by the Canadian Bankruptcy Court to consider entry of the CCAA Sanction Order, as such hearings may be adjourned or continued from time to time.

1.1.75    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

1.1.76    Convenience Claim means a Claim against SSCE that would otherwise be classified as a General Unsecured Claim against SSCE but either (i) is in an amount that is equal to or less than [$10,000] or (ii) pursuant to a Ballot submitted on or before the Voting Deadline has been reduced to [$10,000] by election of the Holder of such Claim; provided, however, that if any portion of any Claim held by such Holder has been transferred to a transferee, the Convenience Claim Election shall not be recognized with respect to such Claim unless such Holder and all transferees of the Claim make the Convenience Claim Election with respect to the Claim on their respective Ballots that are submitted prior to the Voting Deadline.

1.1.77    Convenience Claim Election means the election available pursuant to Section 3.3.4 of this Plan to the Holder of any Claim against SSCE that (i) is in an amount greater than [$10,000] and (ii) would otherwise be classified as a General Unsecured Claim against SSCE.  All Convenience Claim Elections shall be final and irrevocable.

1.1.78　　Creditor Representative means a representative selected by the Committee (in consultation with the Debtors) prior to the Effective Date, whose identity shall be disclosed in the Plan Supplement, to perform the duties set forth in Article XII of the Plan.

1.1.79　　Creditor Representative Threshold Amount means $[1,000,000].

1.1.80　　Cross-Border Insolvency Protocol means the cross-border insolvency protocol that was approved by the Bankruptcy Court and the Canadian Bankruptcy Court on or about March 12, 2009, as amended, modified, or supplemented from time to time.

1.1.81　　Debtor(s) means, individually or collectively, SSCC, SSCE, Calpine Corrugated, Cameo Container, Lot 24D Redevelopment Corporation, Atlanta & Saint Andrews Bay Railway Company, Stone International Services Corporation, Stone Global, Inc., Stone Connecticut Paperboard Properties, Inc., SSPRI, Smurfit Newsprint Corporation, SLP Finance I, Inc., SLP Finance II, Inc., SMBI Inc., SSC Canada, Stone FinCo II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc.

1.1.82　　Debt Instruments means any debt instruments, the terms of which shall be developed by the Debtors in consultation with the Committee, that may be issued by the Reorganized Debtors to certain of the Prepetition Lenders on or after the Effective Date pursuant to the terms of this Plan.

1.1.83　　DIP Facility means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Credit Agreement, as authorized by the Bankruptcy Court pursuant to the DIP Facility Order and the Canadian Bankruptcy Court pursuant to the CCAA Initial Order.

1.1.84　　DIP Facility Agent means, collectively, J.P. Morgan Chase Bank, N.A. in its capacities as administrative agent and collateral agent under the DIP Credit Agreement and J.P. Morgan Chase Bank, N.A., Toronto Branch, in its capacities as Canadian administrative agent and Canadian collateral agent under the DIP Credit Agreement.

1.1.85　　DIP Facility Claims means, collectively, all Claims against the Debtors that are held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the terms of the DIP Facility Credit Agreement and the DIP Facility Order.

1.1.86　　DIP Facility Credit Agreement means that certain Amended and Restated Credit Agreement dated as of February 25, 2009, by and among SSCE and SSC Canada as borrowers, SSCC and certain other Debtors as guarantors, the DIP Facility Agent, and the DIP Facility Lenders, as amended, modified, or supplemented from time to time.

1.1.87　　DIP Facility Lenders means, collectively, the lenders party from time to time to the DIP Facility Credit Agreement.

1.1.88　　DIP Facility Order means, collectively, (i) that certain Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral

Pursuant to 11 U.S.C. § 363, (II) Authorizing Use of Proceeds to Effectuate Payout of Securitization Facilities, (III) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), entered by the Bankruptcy Court on or about January 27, 2009 [Docket No. 58] and (ii) that certain Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, entered by the Bankruptcy Court on or about February 23, 2009 [Docket No. 383].

1.1.89    DIP Lenders' Charge has the meaning assigned to such term in the CCAA Initial Order.

1.1.90    Directors' Charge has the meaning assigned to such term in the CCAA Initial Order.

1.1.91    Disallowed Claim means any Claim, including any portion thereof, that has been disallowed, denied, dismissed, or overruled pursuant to a Final Order of the Bankruptcy Court, the Canadian Bankruptcy Court, or any other court of competent jurisdiction.

1.1.92    Disbursing Agent means any Person or Entity in its capacity as a disbursing agent under Article VIII of this Plan, including, without limitation, the DIP Facility Agent, the Prepetition Agent, each Prepetition Notes Indenture Trustee, and each Industrial Revenue Bond Indenture Trustee in their capacities as disbursing agents.

1.1.93    Discharge Injunction means the injunction described in Section 1141 of the Bankruptcy Code and contained in Section 10.1.2 of this Plan.

1.1.94    Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all Exhibits and schedules thereto, as such disclosure statement may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

1.1.95    Disputed Claim means any Claim, including any portion thereof, (i) that is neither an Allowed Claim nor a Disallowed Claim or (ii) for which a Proof of Claim has been timely filed or a written request for payment has been made, to the extent that any party in interest has interposed a timely objection to or request for estimation of such Claim, which objection or request for estimation has not been withdrawn or determined pursuant to a Final Order. With respect to the CCAA Proceedings, the term "Disputed Claim" means an Affected Claim or any portion thereof that is subject to a Notice of Revision or Disallowance, or a Notice of Dispute, and that has not yet become either a Proven Claim or a Disallowed Claim.

1.1.96    Distribution Date means any of the Initial Distribution Date, any Quarterly Distribution Date, and the Final Distribution Date.

1.1.97    Distribution Record Date means the Confirmation Date or such other applicable date as may be designated in the Confirmation Order or the CCAA Sanction Order.

1.1.98    DTC means The Depository Trust Company.

1.1.99    Effective Date means the first Business Day this Plan becomes effective and is implemented in accordance with Article IX hereof.

1.1.100    Employee Benefit Plans means any employment, compensation, pension, welfare, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, dependent care, retirement, savings, deferred compensation, supplemental pension, retention, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other compensation or benefit plan, agreement or arrangement for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor, including, without limitation, the Jefferson Smurfit Corporation (U.S.) Deferred Compensation Plan, but expressly excluding (i) any equity-based compensation awards granted by any of the Debtors prior to the Petition Date, (ii) all Canadian Pension Plans, and (iii) all Non-Qualified Employee Benefit Plans.

1.1.101    Employment and Retirement Benefit Agreements means, collectively, each of the employment contracts, compensation agreements and retirement benefit programs listed in Exhibit 12 to this Plan (to be filed with the Plan Supplement), which the Debtors shall either (i) assume (as amended and restated, if applicable) and assign to the Reorganized Debtors on the Effective Date pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, (ii) enter into on or prior to the Effective Date and assign to the Reorganized Debtors on the Effective Date pursuant to the terms of this Plan, or (iii) with respect to any such contracts, agreements and programs that the Debtors entered into after the Petition Date but before the Effective Date, assign to the Reorganized Debtors on the Effective Date pursuant to the terms of this Plan.

1.1.102    Entity means any Person, estate, trust, governmental unit, and United States trustee.

1.1.103    ERISA means the Employee Retirement Income Security Act of 1974.

1.1.104    Estate(s) means, individually or collectively, the estate or estates of the Debtors created in the Chapter 11 Cases under Section 541 of the Bankruptcy Code and, with respect to the CCAA Proceedings, includes all assets of the Canadian Debtors that are subject to the protections granted by the Canadian Bankruptcy Court pursuant to the CCAA Initial Order.

1.1.105    Excluded Claims has the meaning assigned to such term in Section 4.2.2 of this Plan.

1.1.106    Exhibit means an exhibit to this Plan or to the Disclosure Statement.

1.1.107    Final Cash Management Order means that certain Final Order (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing the Continuation of Certain Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (V) Granting Administrative Expense Priority to Post-Petition Intercompany Transactions, entered by the Bankruptcy Court on or about February 23, 2009 [Docket No. 366].

1.1.108    Final Distribution Date means a date selected by the Reorganized Debtors that is not later than thirty (30) days after the date on which (i) all Disputed Claims in

the Chapter 11 Cases shall have been Allowed or Disallowed pursuant to a Final Order of the Bankruptcy Court or any other court with competent jurisdiction over such Disputed Claims and (ii) the CCAA Monitor has certified to the Canadian Bankruptcy Court that the last Disputed Claim in the CCAA Proceedings shall have been finally resolved.

1.1.109    Final Order means (i) with respect to the Chapter 11 Cases, an order or judgment of the Bankruptcy Court (or any other United States court of competent jurisdiction) as entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other United States court of competent jurisdiction) which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing under the Bankruptcy Rules has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order; and (ii) with respect to the CCAA Proceedings, an order or judgment of the Canadian Bankruptcy Court with respect to which the period for seeking leave to appeal has expired without leave having been sought or, if obtained, the appeal shall have been denied.

1.1.110    Form of Proxy means the form of proxy and election notice and voting instructions to Affected Creditors in the CCAA Proceedings, in substantially the form attached as an exhibit to the CCAA Creditors' Meeting Order.

1.1.111    Full Payment Amount means an amount of cash sufficient to satisfy all Allowed Claims against the Debtors (including, without limitation, all Allowed Administrative Expense Claims and all Allowed General Unsecured Claims) in full, plus all post-petition interest, fees and costs that are Allowed against any Debtor under applicable law.

1.1.112    General Unsecured Claim means a Claim against any Debtor (including any Canadian Debtor) that is not an Administrative Expense Claim, a CCAA Charge, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Convenience Claim, a Prepetition Lender Claim, a DIP Facility Claim, or an Intercompany Claim.  For the avoidance of doubt, all Prepetition Noteholder Claims, Industrial Revenue Bond Claims, Rejection Damages Claims, and Non-Qualified Employee Benefit Claims against any Debtor (including any Canadian Debtor) shall constitute General Unsecured Claims for purposes of this Plan.

1.1.113    Holder means a Person or Entity holding a Claim against, or Interest in, any Debtor.  With respect to the CCAA Proceedings, the term "Holder" includes any Person or Entity that has taken valid assignment of a Claim against the Canadian Debtors, provided that the CCAA Monitor has recognized such Person or Entity as the rightful holder of such Claim.

1.1.114    Impaired means "impaired" within the meaning of Section 1124 of the Bankruptcy Code.

1.1.115    Industrial Revenue Bonds means, collectively, (i) the 7.40% Industrial Development Revenue Bonds Series 1996 due April 1, 2026, issued by the Industrial Development Authority of the County of Navajo, Arizona on April 1, 1996 in the original principal amount of $20,000,000; (ii) the 7.20% Industrial Development Revenue Bonds Series 1997 due June 1, 2027, issued by the Industrial Development Authority of the County of Navajo, Arizona on June 1, 1997 in the original principal amount of $14,500,000; (iii) the 5.125% Environmental Improvement Revenue Refunding Bonds, Series 2005 due August 1, 2013, issued by the County of Coshocton, Ohio on May 1, 2005 in the original principal amount of $30,000,000; (iv) the 5.25% Environmental Improvement Revenue Refunding Bonds, Series 2005 due June 1, 2015, issued by the Industrial Development Authority of the City of Hopewell, Virginia on May 1, 2005 in the original principal amount of $41,340,000; and (v) the 7.45% Combined Utility System Revenue Refunding Bonds Series 2003 due March 1, 2024, issued by the Village of Hodge, Louisiana on December 18, 2003 in the original principal amount of $58,085,000.

1.1.116    Industrial Revenue Bond Claims means all Claims against SSCE arising under or in connection with the Industrial Revenue Bonds and related documents.

1.1.117    Industrial Revenue Bond Indentures means, collectively, the indentures for each series of the Industrial Revenue Bonds.

1.1.118    Industrial Revenue Bond Indenture Trustees means, collectively, U.S. Bank Trust National Association and UMB Bank, N.A. in their respective capacities as indenture trustees under the Industrial Revenue Bond Indentures.

1.1.119    Industrial Revenue Bond Indenture Trustee Fees means the reasonable compensation owed to any Industrial Revenue Bond Indenture Trustee (including in connection with the administration of distributions to the Holders of Allowed Industrial Revenue Bond Claims pursuant to Article VIII of the Plan), as determined by the Debtors and the applicable Industrial Revenue Bond Indenture Trustee prior to the Confirmation Date, and reasonable disbursements, indemnity claims, expenses and advances incurred or made by any Industrial Revenue Bond Indenture Trustee (including the reasonable fees, disbursements and expenses of agents for or external counsel to any Industrial Revenue Bond Indenture Trustee) payable in accordance with the Plan and pursuant to the relevant Industrial Revenue Bond Indenture; provided, however, that any such indemnity claims, disbursements, expenses and advances shall be reimbursable under the terms of the relevant Industrial Revenue Bond Indenture.

1.1.120    Initial Distribution Date means a date selected by the Reorganized Debtors that is not later than thirty (30) days after the Effective Date.

1.1.121    Intercompany Claim means any Claim against a Debtor that is held by another Debtor.

1.1.122    Interest means the interest of any Holder of equity securities in any Debtor that is represented by any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in such Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common interests,

unvested preferred interests or any other agreements of any character related to the common or preferred interests of any such Debtor, obligating any such Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any such Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common stock, preferred stock or other equity securities (or any right, claim, or interest in and to any common stock, preferred stock or other equity securities) of any such Debtor, any Claims for the payment of any distributions with respect to any common stock, preferred stock, or other equity interests in or securities of such Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any such Debtor's outstanding common stock, preferred stock, or other equity interests or securities.

   1.1.123 <u>Lien</u> means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement, or other encumbrance of any kind whatsoever, under United States, Canadian, or other applicable law, with respect to such interest in property.

   1.1.124 <u>Litigation Claims</u> means all Causes of Action that any Debtor or Estate may hold against any Person or Entity as of the Effective Date, except any Causes of Action that (i) have been settled by the Debtors on or prior to the Effective Date or (ii) shall be released by the Debtors pursuant to <u>Article X</u> of this Plan.

   1.1.125 <u>Management Incentive Plans</u> means, collectively, the compensation, incentive, and benefit plans (including any associated award and option agreements) applicable to certain officers, directors and/or employees of the Debtors and/or Reorganized Debtors, as described in <u>Exhibit 3</u> to the Plan and in substantially the forms included therein, which compensation, incentive and benefit plans shall include, without limitation, the Debtors' 2010 Management Incentive Plan, 2009 Long-Term Incentive Plan, Management Sale Incentive Plan, and an equity-based incentive plan that provides for or otherwise permits, among other things (i) a reservation of not less than [___] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of the New SSCC Common Stock) and (ii) an allocation of individual equity-based awards to certain officers and other employees of the Reorganized Debtors that the Reorganized Debtors shall grant on, and as of, the Effective Date.

   1.1.126 <u>MBI Limited</u> means MBI Limited/ Limitée, a wholly-owned subsidiary of SSC Canada and one of the Debtors and Canadian Debtors herein.

   1.1.127 <u>New Calpine Corrugated Interests</u> means the new limited liability company interests in Calpine Corrugated that shall be issued to Reorganized SSCC on the Effective Date.

   1.1.128 <u>New SSCC Common Stock</u> means the new common stock of Reorganized SSCC, par value $0.001 per share, that shall be issued on the Effective Date or authorized to be issued by Reorganized SSCC at any time from and after the Effective Date.

   1.1.129 <u>New SSCC Common Stock Pool</u> means all shares of the New SSCC Common Stock to be issued by the Reorganized Debtors on the Effective Date and to be

distributed pursuant to this Plan, but excluding all shares of the New SSCC Common Stock that shall be reserved for issuance pursuant to the Management Incentive Plans.

1.1.130    New SSCC Preferred Stock means the new preferred stock of Reorganized SSCC, par value $0.001 per share, that shall be authorized to be issued by Reorganized SSCC at any time from and after the Effective Date.

1.1.131    Non-Operating Debtors (Canada) means, collectively, 639647 British Columbia Ltd., Specialty Containers Inc., SLP Finance General Partnership, and 605681 N.B. Inc.

1.1.132    Non-Operating Debtors (United States) means, collectively, Lot 24D Redevelopment Corporation, Atlanta & Saint Andrews Bay Railway Company, Stone International Services Corporation, Stone Global, Inc., Stone Connecticut Paperboard Properties, Inc., Smurfit Newsprint Corporation, SLP Finance I, Inc., SLP Finance II, Inc., and SMBI Inc.

1.1.133    Non-Qualified Employee Benefit Claim means any Claim against the Debtors arising under or in connection with a Non-Qualified Employee Benefit Plan

1.1.134    Non-Qualified Employee Benefit Plan means, with respect to any of the Debtors, any of the prepetition non-tax qualified pension plans, individual prepetition agreements providing for retirement compensation, or prepetition deferred compensation arrangements with respect to individuals who served as employees, officers or directors of any Debtor either prior to or as of the Petition Date, but excluding the Jefferson Smurfit Corporation (U.S.) Deferred Compensation Plan.

1.1.135    Notice of Dispute has the meaning assigned to such term in the CCAA Claims Determination Order.

1.1.136    Notice of Revision or Disallowance has the meaning assigned to such term in the CCAA Claims Determination Order.

1.1.137    Other Secured Claim means any Secured Claim other than a DIP Facility Claim, a Prepetition Lender Claim, a Union Bank Claim, or a CIT Group Claim.

1.1.138    Person means any individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any domestic or foreign government, governmental agency, or any subdivision, department or other instrumentality thereof.

1.1.139    Petition Date means January 26, 2009, the date on which (i) the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court and (ii) the Canadian Debtors commenced the CCAA Proceedings in the Canadian Bankruptcy Court.

1.1.140    Plan means this joint plan of reorganization, including all Exhibits, supplements, appendices and schedules thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and the terms of the CCAA Creditors' Meeting Order and includes, for purposes of the CCAA Proceedings, the CCAA Plan that is incorporated into this joint plan of reorganization.

1.1.141    Plan Supplement means a supplement to this Plan that the Debtors shall file with the Bankruptcy Court and the Canadian Bankruptcy Court not later than ten (10) days prior to the Voting Deadline.

1.1.142    Post-Filing Claims means, for purposes of the CCAA Plan, any right of any Person or Entity against the Canadian Debtors in connection with any indebtedness, liability, or obligation of any kind which arose in respect of obligations first incurred by the Canadian Debtors on or after the Petition Date (other than the Restructuring Claims) and interest thereon, including any obligations of the Canadian Debtors toward Persons or Entities who supplied services, utilities, goods or materials or who have or shall have advanced funds to the Canadian Debtors on or after the Petition Date, but only to the extent of their Claims in respect of the supply of such services, utilities, goods, materials or funds on or after the Petition Date, or in respect of any executory contract or unexpired lease which has been deemed ratified by the Canadian Debtors pursuant to Article VII of this Plan or otherwise.

1.1.143    Post-Petition Intercompany Claims means all Claims against any Debtor that are held by another Debtor and arise on or after the Petition Date but prior to the Effective Date and which, pursuant to the Final Cash Management Order, are granted administrative priority status pursuant to Section 507(a)(2) of the Bankruptcy Code.

1.1.144    Prepetition Agent means, collectively, Deutsche Bank Trust Company Americas in its capacities as administrative agent and collateral agent and Deutsche Bank AG in its capacity as Canadian administrative agent under the Prepetition Credit Agreement.

1.1.145    Prepetition Canadian Lender Claims means the principal amount of the Prepetition Canadian Revolving Loans, the Prepetition Canadian Revolving Facility Letters of Credit, and the Prepetition Canadian Term Loans, plus any accrued but unpaid interest thereon (accruing at the non-default interest rate payable under the Prepetition Credit Agreement).

1.1.146    Prepetition Canadian Revolving Facility Letters of Credit means, collectively, (i) the letters of credit issued by the Prepetition Facing Agent for the account of SSC Canada pursuant to the terms and conditions of Article III of the Prepetition Credit Agreement and (ii) the Existing SSC Canada Letters of Credit (as defined in the Prepetition Credit Agreement).

1.1.147    Prepetition Canadian Revolving Loans means the $57.2 million in aggregate principal amount of Revolving (Canadian) Loans (as defined in the Prepetition Credit Agreement) made by the Prepetition Lenders to SSC Canada prior to the Petition Date pursuant to Section 2.01(b)(ii) of the Prepetition Credit Agreement.

1.1.148    Prepetition Canadian Term Loans means the $335.7 million in aggregate principal amount of term loans made by the Prepetition Lenders to SSC Canada prior to the Petition Date pursuant to Section 2.01(a) of the Prepetition Credit Agreement.

1.1.149    Prepetition Credit Agreement means that certain Credit Agreement dated as of November 1, 2004, by and among SSCE and SSC Canada as borrowers, the Prepetition Agent, and the Prepetition Lenders, as amended, modified, or supplemented from time to time.

1.1.150    Prepetition Credit Documents means, collectively, the Prepetition Credit Agreement and all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, including, without limitation, the Prepetition Guarantee and Collateral Agreement and all other collateral and security documents executed by the Debtors in favor of the Prepetition Agent and the Prepetition Lenders.

1.1.151    Prepetition Facing Agent means, collectively, Deutsche Bank Trust Company Americas in its capacity as Revolving Facility Facing Agent under (and as defined in) the Prepetition Credit Agreement and Deutsche Bank AG in its capacity as Revolving (Canadian) Facility Facing Agent under (and as defined in) the Prepetition Credit Agreement.

1.1.152    Prepetition Guarantee and Collateral Agreement means that certain Guarantee and Collateral Agreement (U.S.) dated as of November 1, 2004, by and among SSCC, SSCE, and the Prepetition Agent, as amended, modified or supplemented from time to time.

1.1.153    Prepetition Lenders means, collectively, the lenders party from time to time to the Prepetition Credit Agreement.

1.1.154    Prepetition Lender Claims means all Claims of the Prepetition Agent, the Prepetition Facing Agent, and the Prepetition Lenders arising under the Prepetition Credit Documents against Debtors that are not Canadian Debtors, including, without limitation, the principal amount of and accrued but unpaid interest on the Prepetition Revolving Loans, the Prepetition Revolving Facility Letters of Credit, the Prepetition Term Loans, and the Prepetition Swap Termination Payments.

1.1.155    Prepetition Noteholders means, collectively, the Holders of Prepetition Noteholder Claims.

1.1.156    Prepetition Noteholder Claims means all Claims arising under or evidenced by the Prepetition Notes, the Prepetition Notes Indentures, and any related documents.

1.1.157    Prepetition Notes means, collectively, (i) the 7.375% Notes Due 2014, (ii) the 7.50% Notes Due 2013, (iii) the 8.00% Notes Due 2017, (iv) the 8.25% Notes Due 2012, and (v) the 8.375% Notes Due 2012.

1.1.158    Prepetition Notes Indentures means, collectively, the indentures for each series of the Prepetition Notes.

1.1.159    Prepetition Notes Indenture Trustees means, collectively, Wilmington Trust Company and Manufacturers and Traders Trust Company in their respective capacities as indenture trustees under the Prepetition Notes Indentures.

1.1.160    Prepetition Notes Indenture Trustee Charging Lien means any Lien or other priority in payment arising prior to the Effective Date which a Prepetition Notes Indenture Trustee is entitled to assert pursuant to the relevant Prepetition Notes Indenture against any distributions that would otherwise be made under this Plan to the Prepetition Noteholders.

1.1.161    Prepetition Notes Indenture Trustee Fees means the reasonable compensation owed to any Prepetition Notes Indenture Trustee (including in connection with the

administration of distributions to the Holders of Allowed Prepetition Noteholder Claims pursuant to <u>Article VIII</u> of the Plan) ), as determined by the Debtors and the applicable Prepetition Notes Indenture Trustee prior to the Confirmation Date, and reasonable disbursements, indemnity claims, expenses and advances incurred or made by any Prepetition Notes Indenture Trustee (including the reasonable fees, disbursements and expenses of agents for or external counsel to any Prepetition Notes Indenture Trustee) payable in accordance with the Plan and pursuant to the relevant Prepetition Notes Indenture; <u>provided</u>, <u>however</u>, that any such indemnity claims, disbursements, expenses and advances shall be reimbursable under the terms of the relevant Prepetition Notes Indenture.

    1.1.162 <u>Prepetition Revolving Facility Letters of Credit</u> means, collectively, (i) the letters of credit issued by the Prepetition Facing Agent for the account of SSCE pursuant to the terms and conditions of Article III of the Prepetition Credit Agreement and (ii) the Existing SSCE Letters of Credit (as such term is defined in the Prepetition Credit Agreement).

    1.1.163 <u>Prepetition Revolving Loans</u> means the $652.7 million in principal amount of Revolving Loans (as defined in the Prepetition Credit Agreement) made to SSCE prior to the Petition Date pursuant to Section 2.01(b)(i) of the Prepetition Credit Agreement.

    1.1.164 <u>Prepetition Swap Agreements</u> means the Swap Agreements (as defined in the Prepetition Credit Agreement) to which SSCE is a party that were (i) in effect on the Closing Date (as defined in the Prepetition Credit Agreement) with a counterparty that was a Prepetition Lender or an Affiliate (as defined in the Prepetition Credit Agreement) of a Prepetition Lender as of such date or (ii) entered into after such date with a counterparty that was a Prepetition Lender or an Affiliate (as defined in the Prepetition Credit Agreement) of a Prepetition Lender at the time such agreement was entered into.

    1.1.165 <u>Prepetition Swap Providers</u> means those Prepetition Lenders or their Affiliates that are parties to Prepetition Swap Agreements with SSCE.

    1.1.166 <u>Prepetition Swap Termination Payments</u> means the net termination payments owing by the Debtors under the Prepetition Swap Agreements.

    1.1.167 <u>Prepetition Term Loans</u> means the $136.8 million in principal amount of term loans made by certain of the Prepetition Lenders to SSCE prior to the Petition Date pursuant to Section 2.01(b) of the Prepetition Credit Agreement.

    1.1.168 <u>Priority Non-Tax Claim</u> means any Claim entitled to priority in payment pursuant to Section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

    1.1.169 <u>Priority Tax Claim</u> means (i) with respect to the Chapter 11 Cases, any Claim of a governmental unit of the kind entitled to priority in payment pursuant to Sections 502(i) and 507(a)(8) of the Bankruptcy Code or (ii) with respect to the CCAA Proceedings, any Claim of a governmental unit of the kind entitled to priority in payment under the CCAA.

    1.1.170 <u>Professional</u> means any Person retained by the Debtors, the Committee, or the CCAA Monitor, either (i) in the Chapter 11 Cases pursuant to a Final Order of

the Bankruptcy Court entered pursuant to Sections 327 or 1103 of the Bankruptcy Code or (ii) in the CCAA Proceedings.

1.1.171    Proof of Claim means the proof of claim that must be filed by a Holder of a Claim against any Debtor on or before the applicable Claims Bar Date and, for purposes of the CCAA Proceedings, has the meaning set forth in the CCAA Bar Date Order.

1.1.172    Pro Rata Share means the proportion that the amount of any Allowed Claim or Proven Claim, as applicable, in a particular Class bears to the aggregate amount of all Allowed Claims or Proven Claims in such Class, except in cases where Pro Rata Share is used in reference to multiple Classes of Claims, in which case Pro Rata Share means the proportion that an Allowed Claim or Proven Claim, as applicable, in a particular Class bears to the aggregate amount of all Allowed Claims or Proven Claims in such multiple Classes.

1.1.173    Proven Claim means, with respect to any Affected Claim in the CCAA Proceedings, the amount or any portion of the amount of the Affected Claim as finally determined for distribution purposes in accordance with the provisions of this Plan, the CCAA Bar Date Order, the CCAA Claims Determination Order, and any other applicable orders of the Canadian Bankruptcy Court.

1.1.174    Quarterly Distribution Date means each date that is not later than thirty (30) calendar days after the conclusion of each calendar quarter ending in March, June, September and December between the Initial Distribution Date and the Final Distribution Date.

1.1.175    Record Date has the meaning set forth in the Voting Procedures Order or the CCAA Creditors' Meeting Order, as applicable.

1.1.176    Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation under a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim for any pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder thereof.

1.1.177    Rejection Damages Claim means a Claim against any Debtor arising from such Debtor's rejection (in the Chapter 11 Cases) or repudiation (in the CCAA Proceedings) of an executory contract or unexpired lease, including any Claim of a lessor for damages resulting from such Debtor's rejection or repudiation of a lease of real property.

1.1.178    Related Persons means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and its and their respective present and former Affiliates and each of their respective current and former

members, partners, equityholders, officers, directors, employees, managers, shareholders, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members, financial advisors, attorneys, and other professionals).

1.1.179    Released Parties means, collectively, each of the Debtors (including the Canadian Debtors), the Reorganized Debtors, Canadian Newco, the Committee, the Prepetition Agent, the Prepetition Facing Agent, the Prepetition Lenders, the DIP Facility Agent, the DIP Facility Lenders, the Prepetition Notes Indenture Trustees, the Industrial Revenue Bonds Indenture Trustees, the CCAA Monitor, and each of their respective Related Persons.

1.1.180    Reorganized means, with respect to any Debtor (including any Canadian Debtor), such Debtor or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Plan, including, without limitation, each Restructuring Transaction that occurs on or prior to the Effective Date.

1.1.181    Reorganized Debtors means, collectively, each of the reorganized Debtors (including the Canadian Debtors) or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Plan, including, without limitation, each Restructuring Transaction that occurs on or prior to the Effective Date; provided, however, that the term Reorganized Debtors shall not include SSC Canada, Smurfit-MBI, Stone FinCo II, or any other Debtors that are being dissolved pursuant to the terms of this Plan.

1.1.182    Reorganized SSCC means reorganized SSCC or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on the Effective Date in accordance with the Plan, including each Restructuring Transaction that occurs on or prior to the Effective Date (including, without limitation, the planned merger of SSCC into SSCE on or prior to the Effective Date).

1.1.183    Required Majority means a majority in number of Affected Creditors holding at least two-thirds in value of the Claims in a Class of Affected Creditors, voting either in person or by proxy at the CCAA Creditors' Meeting for such Class.

1.1.184    Restructuring Transactions means those transactions or other corporate actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake on, prior to, or after the Effective Date in accordance with Section 6.13 of this Plan and as set forth in Exhibit 13 to this Plan (to be filed with the Plan Supplement), including, without limitation, the planned merger of SSCC into SSCE on or prior to the Effective Date.

1.1.185    Sale Procedures shall have the meaning assigned to such term in Section 5.1.6 of this Plan.

1.1.186    Schedules means, with respect to each Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by such Debtor with the Bankruptcy

Court on or about April 6, 2009 pursuant to Sections 521(1) and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statement have been or may be amended or supplemented by such Debtor at any point prior to the Confirmation Date.

1.1.187    Secured Claim means any Claim secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in the Plan, (ii) as agreed to by the Holder of such Claim and the Debtors or (iii) as determined pursuant to a Final Order in accordance with Section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.  For the avoidance of doubt, the term "Secured Claim" shall include the DIP Facility Claims, the Prepetition Lender Claims, the Union Bank Claims, and the CIT Group Claims.

1.1.188    Smurfit-MBI Distribution Pool means cash and/or shares of New SSCC Common Stock in the amount equal in value to $_____, which shall be available for distribution to the Holders of Affected Unsecured Claims against Smurfit-MBI pursuant to Articles III and IV of this Plan.

1.1.189    Smurfit-MBI Distribution Reserve means a reserve funded with cash and/or shares of New SSCC Common Stock, established pursuant to Section 8.17.2 of this Plan and held by the CCAA Monitor for distribution to the Holders of certain Proven Claims against Smurfit-MBI upon the resolution of all Disputed Claims.

1.1.190    SSCC Common Interest means the Interest of any Holder of equity securities of SSCC represented by any issued and outstanding shares of SSCC's common stock, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating SSCC to issue, transfer, purchase, redeem, or sell any shares of common stock, any rights under any stock option plans, stockholder rights agreements (including, without limitation, the Stockholder Rights Plan) voting agreements and registration rights agreements regarding common stock of SSCC, any Claims arising from the rescission of a purchase, sale or other acquisition of common stock (or any right, claim, or interest in and to any common stock) of SSCC, any claims for the payment of dividends on any shares of common stock of SSCC, and any Claims for damages or any other relief arising from the purchase, sale, or other acquisition of SSCC's common stock.  For the avoidance of doubt, the term SSCC Interests shall include the existing common stock of SSCC, of which 400,000,000 shares were authorized and approximately 256,658,958 shares were outstanding as of November 4, 2009.

1.1.191    SSCC Interests means, collectively, the SSCC Common Interests and the SSCC Preferred Interests.

1.1.192    SSCC Preferred Interest means the Interest of any Holder of equity securities of SSCC represented by any issued and outstanding shares of SSCC's preferred or convertible preferred stock, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating SSCC to issue, transfer, purchase, redeem, or sell any shares of preferred or convertible preferred stock, any rights under any stock option plans, stockholder rights agreements (including, without limitation, the Stockholder Rights Plan), voting agreements and registration rights agreements regarding preferred or convertible preferred stock of SSCC, any Claims arising from the rescission of a purchase, sale or other acquisition of preferred or convertible preferred stock (or any right, claim, or interest in and to any preferred or convertible preferred stock) of SSCC, any claims for the payment of dividends on any shares of

preferred or convertible preferred stock of SSCC, and any Claims for damages or any other relief arising from the purchase, sale, or other acquisition of SSCC's preferred or convertible preferred stock.

1.1.193    SSC Canada means Smurfit-Stone Container Canada, Inc., a wholly-owned subsidiary of SSCE and one of the Debtors and Canadian Debtors herein.

1.1.194    SSC Canada Distribution Pool means cash and/or shares of New SSCC Common Stock in the amount equal in value to $_____, which shall be available for distribution to the Holders of Affected Unsecured Claims against SSC Canada pursuant to Articles III and IV of this Plan.

1.1.195    SSC Canada Distribution Reserve means a reserve funded with cash and/or shares of New SSCC Common Stock, established pursuant to Section 8.17.1 of this Plan and held by the CCAA Monitor for distribution to the Holders of certain Proven Claims against SSC Canada upon the resolution of all Disputed Claims.

1.1.196    SSCE means Smurfit-Stone Container Enterprises, Inc., a wholly-owned subsidiary of SSCC and one of the Debtors in the Chapter 11 Cases.

1.1.197    SSCE Distribution Reserve means a reserve consisting of shares of New SSCC Common Stock issued on the Effective Date, to be held by the Reorganized Debtors in accordance with Section 8.16.2 of this Plan for distribution to the Holders of certain Allowed Claims against SSCE upon the resolution of all Disputed Claims.

1.1.198    SSPRI means Smurfit-Stone Puerto Rico, Inc., a wholly-owned subsidiary of SSCE and one of the Debtors in the Chapter 11 Cases.

1.1.199    Stockholder Rights Plan means that certain Rights Agreement by and between SSCC and Mellon Investor Services, LLC, in its capacity as rights agent, dated as September 9, 2002,

1.1.200    Stone FinCo II means Stone Container Finance Company of Canada II, a wholly-owned subsidiary of SSCE and one of the Debtors and Canadian Debtors herein.

1.1.201    Stone FinCo II Contribution Claim means the contingent contribution claim that certain Holders of the 7.375% Notes due 2014 have asserted Stone FinCo II may hold against SSCE pursuant to Section 135 of the Nova Scotia Companies Act, R.S.N.S., 1989, c. 81, as amended, based on Stone FinCo II's status as an unlimited liability company under Nova Scotia law.  If the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, such Claim shall be classified and treated as an Allowed Intercompany Claim against SSCE for purposes of this Plan.

1.1.202    Stone FinCo II Intercompany Claim means the Intercompany Claim held by Stone FinCo II against SSC Canada arising under that certain Loan Agreement dated as of July 20, 2004, by and among Stone FinCo II as a lender and SSC Canada as a borrower, pursuant to which Stone FinCo II advanced loans in the aggregate principal amount of $200 million to SSC Canada prior to the Petition Date.  For purposes of this Plan, the Stone FinCo II Intercompany Claim shall be classified as a Subordinated Securities Claim against SSC Canada

25

and shall be subordinated to all other Claims against SSC Canada, including, without limitation, all General Unsecured Claims and other Intercompany Claims against SSC Canada.

1.1.203    Stone FinCo II Settlement Distribution means cash and/or shares of New SSCC Common Stock in the amount equal in value to $_____, which shall be available for distribution to the Holders of Allowed General Unsecured Claims against Stone FinCo II pursuant to Sections 3.11.3 and 4.5.3 of this Plan

1.1.204    Subordinated Securities Claim means any Claim that is subject to subordination under Section 510(b) of the Bankruptcy Code, including without limitation, any Claim that arises from the rescission of a purchase or sale of an SSCC Interest, or for damages arising from the purchase or sale of an SSCC Interest, or for reimbursement, indemnification, or contribution on account of such Claim pursuant to Section 502 of the Bankruptcy Code.

1.1.205    Superior Competing Bid means, in the event the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, a Competing Bid that the Canadian Bankruptcy Court determines would provide cash recoveries to the Holders of Allowed General Unsecured Claims against SSC Canada and/or Smurfit-MBI.

1.1.206    Superior Competing Bid Distribution means the cash component of the Superior Competing Bid, if any, that would be available for distribution to the Holders of Allowed General Unsecured Claims against SSC Canada and Smurfit-MBI.

1.1.207    Unaffected Creditor has the meaning assigned to such term in Section 4.2.2 of this Plan.

1.1.208    Unimpaired means with respect to a Claim, Class or Interest, a Claim, Class or Interest that is not Impaired.

1.1.209    Union Bank means Union Bank of California, N.A.

1.1.210    Union Bank Claims means all Claims against Calpine Corrugated that are held by Union Bank pursuant to the terms of the Union Bank Credit Agreement.

1.1.211    Union Bank Credit Agreement means that certain Loan and Security Agreement dated as of March 30, 2006, by and among Produce Container, LLC (as a predecessor in interest to Calpine Corrugated) as borrower, SSCE as guarantor, and Union Bank as the administrative agent and sole lender, as amended, modified, or supplemented from time to time.

1.1.212    U.S. Pension Plans means the following single-employer defined benefit plans: (i) the Smurfit-Stone Container Corporation Pension Plan for Hourly Employees and (ii) the Smurfit-Stone Container Corporation Pension Plan for Salaried Employees.

1.1.213    Voting Claim means, with respect to any Affected Claim in the CCAA Proceedings, the Canadian dollar amount of such Affected Claim that is accepted for purposes of voting at the CCAA Creditors' Meeting in accordance with the provisions of the CCAA Creditors' Meeting Order and Article IV of this Plan.

1.1.214    Voting Deadline means the date by which all Holders of Claims who are entitled to vote on the Plan (i) must submit their Ballots to the Claims and Noticing Agent or (ii) submit their Form of Proxy to the CCAA Monitor, as applicable, in accordance with the terms of the Voting Procedures Order or the CCAA Creditors' Meeting Order, as applicable.

1.1.215    Voting Procedures Order means an order to be entered by the Bankruptcy Court (i) approving the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code and (ii) setting forth the deadlines, procedures and instructions for submitting votes to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots.

1.2    Rules of Interpretation.

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (d) any reference to a Person or Entity as the Holder of a Claim or Interest includes that Person or Entity's successors in interest and assigns; (e) all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, subsection or clause contained in the Plan; (g) captions and headings to Articles and Sections of this Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, organizational or governing documents, instruments, releases, or other agreements or documents entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law of the United States, including the Bankruptcy Code and Bankruptcy Rules, with respect to the Chapter 11 Cases, and federal law of Canada, including the CCAA, with respect to the CCAA Proceedings; (i) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules will apply; and (j) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

1.3    Currency Denomination.

All references in this Plan to monetary figures shall refer to currency of the United States of America unless otherwise indicated.

1.4    Exhibits and Plan Supplement.

All Exhibits to this Plan, as well as the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits and Plan Supplement shall be timely filed with the Clerk of the Bankruptcy Court on or before the Plan Supplement Filing Date.  Holders of Claims and Interests may obtain a copy of

the filed Exhibits and Plan Supplement upon written request to the Debtors. Upon their filing, the Exhibits and Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or at the Bankruptcy Court's website at http://www.deb.uscourts.gov/, or at the Claims and Noticing Agent's website at http://chapter11.epiqsystems.com/Smurfit. The documents contained in the Exhibits and the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and sanctioned by the Canadian Bankruptcy Court pursuant to the CCAA Sanction Order. The Debtors explicitly reserve the right to modify or make additions to or subtractions from any Exhibit to the Plan or the Plan Supplement and to amend, modify or supplement any Exhibit to the Plan prior to the Confirmation Date.

1.5     Deemed Acts.

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party pursuant to the terms of the Plan and the Confirmation Order.

**ARTICLE II: TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS IN THE CHAPTER 11 CASES**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims have not been classified for purposes of the Chapter 11 Cases and therefore are excluded from the Classes of Claims and Interests set forth in Article III of this Plan. The treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases is set forth below.

2.1     Administrative Expense Claims.

Subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, on either: (i) the latest to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Distribution Date after such Administrative Expense Claim becomes an Allowed Claim, and (c) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, (x) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (y) such other treatment as the Debtors and the Holder of such Administrative Expense Claim shall have agreed; provided, however, that (aa) Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of the Reorganized Debtors' business operations and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations; and (bb) Allowed Administrative Expense Claims against SSC Canada or Smurfit-MBI that are not yet due on the Effective Date, or that represent obligations incurred by SSC Canada or Smurfit-MBI in the ordinary course of their business operations after the Petition Date, shall be assumed by Canadian Newco pursuant to the Asset Purchase Agreement and shall be paid or performed by Canadian Newco when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations.

If all Classes of Impaired Claims against a particular Debtor vote to accept the Plan, such Debtor may agree to waive, and may not receive any distributions under the Plan on account of, any Post-Petition Intercompany Claims held by such Debtor. On the other hand, if any Class of Impaired Claims against a particular Debtor votes to reject the Plan, any Post-Petition Intercompany Claims held by such Debtor shall be paid in full in cash on the latest to occur of (i) the Effective Date and (ii) the date on which such Post-Petition Intercompany Claim becomes payable in the ordinary course of the Debtors' business operations; provided, however, that any Post-Petition Intercompany Claim may be cancelled, waived, subordinated or reinstated, in full or in part, in the Debtors' sole discretion, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liability, or for any other reason.

2.2     No Double Payment of Administrative Expense Claims.

To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Administrative Expense Claim. In addition, to the extent any obligation that would otherwise constitute an Administrative Expense Claim is paid as a CCAA Charge in the CCAA Proceedings, the payment of such CCAA Charge in the CCAA Proceedings shall be the only payment on account of such Administrative Expense Claim under this Plan.

2.3     DIP Facility Claims.

The DIP Facility Claims shall be Allowed on the Effective Date pursuant to this Plan. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall pay all Allowed DIP Facility Claims (if any) in full in cash on the Effective Date. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall either be (i) returned to the issuer undrawn and marked canceled or (ii) cash collateralized with cash in an amount equal to 105% of the face amount of such outstanding letter of credit.

2.4     Priority Tax Claims.

Except to the extent that the Debtors and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and the first Distribution Date after such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, or (ii) pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

**ARTICLE III: CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS IN THE CHAPTER 11 CASES**

    3.1    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>

        3.1.1    <u>General</u>

        (a)    Pursuant to Sections 1122 and 1123 of the Bankruptcy Code, Claims against and Interests in the Debtors are classified for all purposes, including, without express or implied limitation, voting, confirmation and distributions pursuant to the Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for any purposes under the Plan.

        (b)    The Plan does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes hereof. Unless otherwise provided in the Plan or the Confirmation Order, Allowed Claims against a particular Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor by any of the other Debtors solely for purposes of consummating this Plan. Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is liable for any Claims against any other Debtor. Claims that are asserted against multiple Debtors shall be treated as separate Claims against each applicable Debtor for all purposes (including, but not limited to, voting and distributions), provided that (i) there shall only be a single recovery on account of such Claims and the aggregate distributions to the Holders of such Claims shall not exceed the largest Allowed amount of any such Claim against any particular Debtor, (ii) any distributions from a particular Estate on account of such Claims shall take into account the distributions to be made on account of such Claims by the other Estates, and (iii) such Claims shall be administered and treated in the manner set forth below.

        (c)    All Claims against SSCE that are held by a single Holder as of the Record Date shall be deemed to be aggregated and shall be treated as a single Claim for purposes of classification and treatment as a Convenience Claim under this Plan, regardless of whether or not any such Claim is subsequently assigned, in whole or in part, to any other Person or Entity.

        (d)    For purposes of brevity and convenience, but with the same legal force and effect as if set forth at length in this Plan, the classification and treatment of Claims against and Interests in the Debtors under this Plan has been set forth in the following groups: (i) SSCC (Debtor 1), (ii) SSCE (Debtor 2), (iii) Cameo Container (Debtor 3), (iv) Calpine Corrugated (Debtor 4), (v) SSPRI (Debtor 5), (vi) the Non-Operating Debtors (United States) (Debtors 6 through 14), (vii) SSC Canada (Debtor 15); (viii) Smurfit-MBI (Debtor 16), (ix) MBI Limited (Debtor 17), (x) Stone FinCo II (Debtor 18), (xi) B.C. Shipper Supplies Ltd. (Debtor 19), (xii) Francobec Company (Debtor 20), (xiii) 3083527 Nova Scotia Company (Debtor 21), and (xiv) the Non-Operating Debtors (Canada) (Debtors 22 through 25).

### 3.1.2 Identification of Classes of Claims Against and Interests in the Debtors.

(a)     The following chart assigns a letter to each Class of Claims against or Interests in SSCC (Debtor 1) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | SSCC Preferred Interests[1] |
| G | SSCC Common Interests |

(b)     The following chart assigns a letter to each Class of Claims against or Interests in SSCE (Debtor 2) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | Convenience Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

3.1.3     The following chart assigns a letter to each Class of Claims against or Interests in Cameo Container (Debtor 3) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|

---

[1]  The Debtors reserve the right, if and as appropriate, to classify any potential Subordinated Securities Claim against SSCC as either an SSCC Preferred Interest or an SSCC Common Interest, depending on the SSCC Interest on which such Subordinated Securities Claim is based, or in a separate Class of Subordinated Securities Claims.

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.1.4      The following chart assigns a letter to each Class of Claims against or Interests in Calpine Corrugated (Debtor 4) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Union Bank Claims |
| D | CIT Group Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

3.1.5      The following chart assigns a letter to each Class of Claims against or Interests in SSPRI (Debtor 5) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.1.6      The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.1.7    The following chart assigns a letter to each Class of Claims against or Interests in SSC Canada (Debtor 15) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Stone FinCo II Intercompany Claim |
| G | Interests |

3.1.8    The following chart assigns a letter to each Class of Claims against or Interests in Smurfit-MBI (Debtor 16) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

3.1.9    The following chart assigns a letter to each Class of Claims against or Interests in MBI Limited (Debtor 17) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

3.1.10      The following chart assigns a letter to each Class of Claims against or Interests in Stone FinCo II (Debtor 18) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.1.11      The following chart assigns a letter to each Class of Claims against or Interests in B.C. Shipper Supplies Ltd. (Debtor 19) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.1.12      The following chart assigns a letter to each Class of Claims against or Interests in Francobec Company (Debtor 20) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |

| | |
|---|---|
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

3.1.1     The following chart assigns a letter to each Class of Claims against or Interests in 3083527 Nova Scotia Company (Debtor 21) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

3.1.2     The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

3.2     Classification and Treatment of Claims Against and Interests in SSCC (Debtor 1).

3.2.1     *Class 1A: Priority Non-Tax Claims Against SSCC.*

(a)     Classification:  Class 1A consists of all Priority Non-Tax Claims against SSCC.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1A that is due and payable on or before the

Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 1A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 1A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Class 1A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Priority Non-Tax Claims in Class 1A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 1A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.2.2    *Class 1B: Other Secured Claims Against SSCC.*

(a)    Classification: Class 1B consists of all Other Secured Claims against SSCC.

(b)    Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 1B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 1B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)    Voting: Other Secured Claims in Class 1B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Class 1B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.2.3    *Class 1C: Prepetition Lender Claims Against SSCC.*

(a)    Classification: Class 1C consists of all Prepetition Lender Claims against SSCC.

(b)        Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.   In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)        Voting:  Prepetition Lender Claims in Class 1C are Impaired. Each Holder of an Allowed Prepetition Lender Claim in Class 1C shall be entitled to vote to accept or reject the Plan.

(d)        Allowance:  The Prepetition Lender Claims in Class 1C shall be Allowed pursuant to this Plan in the aggregate principal amount of $969.5 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

3.2.4        *Class 1D: General Unsecured Claims Against SSCC.*

(a)        Classification:  Class 1D consists of all General Unsecured Claims against SSCC.

(b)        Treatment:  Holders of General Unsecured Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date.

(c)        Voting:  General Unsecured Claims in Class 1D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 1D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.2.5        *Class 1E: Intercompany Claims Against SSCC.*

(a)        Classification:  Class 1E consists of all Intercompany Claims against SSCC.

(b)        Treatment:  Holders of Allowed Intercompany Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims

against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSCC may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCC or any Reorganized Debtor, or for any other reason.

       (c)     Voting:  Intercompany Claims in Class 1E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 1E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 1E.

       3.2.6     *Class 1F: SSCC Preferred Interests.*

       (a)     Classification:  Class 1F consists of all SSCC Preferred Interests.

       (b)     Treatment:  On the Effective Date, all SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged. Holders of SSCC Preferred Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.[2]

       (c)     Voting:  SSCC Preferred Interests are Impaired.  Each Holder of an SSCC Preferred Interest in Class 1F shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

       3.2.7     *Class 1G: SSCC Common Interests.*

       (a)     Classification:  Class 1G consists of all SSCC Common Interests.

       (b)     Treatment:  On the Effective Date, all SSCC Common Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged. Holders of SSCC Common Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

       Voting:  SSCC Common Interests are Impaired.  Each Holder of an SSCC Common Interest in Class 1G shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

     3.3     <u>Classification and Treatment of Claims Against and Interests in SSCE (Debtor 2).</u>

       3.3.1     *Class 2A: Priority Non-Tax Claims Against SSCE.*

       (a)     Classification:  Class 2A consists of all Priority Non-Tax Claims against SSCE.

       (b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 2A has agreed in writing to a different treatment (in which event such other writing will

---

[2]  In the event that the Debtors separately classify any Subordinated Securities Claims against SSCC, any such Claims shall be extinguished, cancelled and discharged as of the Effective Date, and any Holders thereof shall receive no distribution in respect of such Claims, pursuant to Section 1129(b)(2)(C) of the Bankruptcy Code.

govern), each Holder of an Allowed Claim in Class 2A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 2A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 2A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Class 2A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Priority Non-Tax Claims in Class 2A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 2A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.3.2    *Class 2B: Other Secured Claims Against SSCE.*

(a)    Classification: Class 2B consists of all Other Secured Claims against SSCE.

(b)    Treatment: Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 2B shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 2B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)    Voting: Other Secured Claims in Class 2B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Class 2B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.3.3    *Class 2C: Prepetition Lender Claims Against SSCE.*

(a)	Classification:  Class 2C consists of all Prepetition Lender Claims against SSCE.

(b)	Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.   In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)	Voting:  Prepetition Lender Claims in Class 2C are Impaired. Each Holder of an Allowed Prepetition Lender Claim in Class 2C shall be entitled to vote to accept or reject the Plan.

(d)	Allowance:  The Prepetition Lender Claims in Class 2C shall be Allowed pursuant to this Plan in the aggregate principal amount of $969.1 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

3.3.4	*Class 2D: Convenience Claims Against SSCE.*

(a)	Classification:  Class 2D consists of all Convenience Claims against SSCE.

(b)	Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Convenience Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed Convenience Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Convenience Claim, the payment of one hundred percent (100%) of such Allowed Convenience Claim in cash.

(c)	Convenience Class Election:  Each Holder of a Claim against SSCE that (i) is in an amount greater than [$10,000] and (ii) would otherwise be classified as a General Unsecured Claim against SSCE may elect to have its Claim treated as a Convenience Claim against SSCE by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Convenience Class Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is

expressly waived in writing by the Debtors with respect to any such Claim. All Convenience Claim Elections submitted before the Voting Deadline shall be final and irrevocable.

(d)     Voting: Convenience Claims in Class 2D are Impaired. Each Holder of an Allowed Convenience Claim in Class 2D shall be entitled to vote to accept or reject the Plan.

### 3.3.5     *Class 2E: General Unsecured Claims Against SSCE.*

(a)     Classification: Class 2E consists of all General Unsecured Claims against SSCE.

(b)     Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the New SSCC Common Stock Pool.

(c)     Voting: General Unsecured Claims in Class 2E Claims are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 2E shall be entitled to vote to accept or reject the Plan.

(d)     Allowance: The Prepetition Noteholder Claims in Class 2E shall be Allowed pursuant to this Plan in the aggregate principal amount of $2.275 billion (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset. The Industrial Revenue Bond Claims in Class 2E shall also be Allowed pursuant to this Plan, in the aggregate principal amount of $163.925 million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset. All other General Unsecured Claims in Class 2E shall be allowed or disallowed in accordance with Article VIII of this Plan and applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

### 3.3.6     *Class 2F: Intercompany Claims Against SSCE.*

(a)     Classification: Class 2F consists of all Intercompany Claims against SSCE. If the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim, the Stone FinCo II Contribution Claim shall be classified and treated as an Allowed Intercompany Claim in Class 2F.

(b)     Treatment: If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSCE shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSCE shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSCE may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCE or any Reorganized Debtor, or for any other reason; (ii) if the Class of General Unsecured Claims against either SSC Canada or

Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims that any Debtor (or Canadian Newco) holds against SSCE shall be treated as Allowed General Unsecured Claims against SSCE for purposes of this Plan and any Debtor (or Canadian Newco) holding such Intercompany Claim shall receive its Pro Rata Share of the New SSCC Common Stock Pool in full and complete satisfaction, settlement, release and discharge of such Claim; and (iii) if the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall receive its Pro Rata Share of the New SSCC Common Stock Pool on account of the Stone FinCo II Contribution Claim in full and complete satisfaction, settlement, release and discharge of such Claim.  Notwithstanding the foregoing provisions, if the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim).

(c)     Voting:  Intercompany Claims in Class 2F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 2F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 2F.  Notwithstanding the foregoing,  if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

3.3.7     *Class 2G:  Interests in SSCE.*

(a)     Classification:  Class 2G consists of all Interests in SSCE.

(b)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSCE shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)     Voting:  Interests in Class 2G are Unimpaired.  Each Holder of an Allowed Interest in Class 2G shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Allowance:  All Interests in SSCE shall be Allowed pursuant to this Plan.

3.4     Classification and Treatment of Claims Against and Interests in Cameo Container (Debtor 3).

3.4.1     *Class 3A: Priority Non-Tax Claims Against Cameo Container.*

(a)     Classification:  Class 3A consists of all Priority Non-Tax Claims against Cameo Container.

(b)　Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 3A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 3A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 3A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 3A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 3A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)　Voting:  Priority Non-Tax Claims in Class 3A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 3A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.4.2　*Class 3B:  Other Secured Claims Against Cameo Container.*

(a)　Classification:  Class 3B consists of all Other Secured Claims against Cameo Container.

(b)　Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 3B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 3B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)　Voting:  Other Secured Claims in Class 3B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 3B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.4.3　*Class 3C: General Unsecured Claims Against Cameo Container.*

(a)	Classification:  Class 3C consists of all General Unsecured Claims against Cameo Container.

(b)	Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Cameo Container shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(c)	Voting:  General Unsecured Claims in Class 3C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 3C shall be entitled to vote to accept or reject the Plan.

### 3.4.4	*Class 3D: Intercompany Claims Against Cameo Container.*

(a)	Classification:  Class 3D consists of all Intercompany Claims against Cameo Container.

(b)	Treatment:  Holders of Allowed Intercompany Claims against Cameo Container shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against Cameo Container shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Cameo Container may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Cameo Container or any Reorganized Debtor, or for any other reason.

(c)	Voting:  Intercompany Claims in Class 3D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 3D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 3D.

### 3.4.5	*Class 3E:  Interests in Cameo Container.*

(a)	Classification:  Class 3E consists of all Interests in Cameo Container.

(b)	Treatment:  As of the Effective Date, each Holder of an Allowed Interest in Cameo Container shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)	Voting:  Interests in Class 3E are Unimpaired.  Each Holder of an Allowed Interest in Class 3E shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d) Allowance: All Interests in Cameo Container shall be Allowed pursuant to this Plan.

3.5 <u>Classification and Treatment of Claims Against and Interests in Calpine Corrugated (Debtor 4)</u>

3.5.1 *Class 4A: Priority Non-Tax Claims Against Calpine Corrugated.*

(a) Classification: Class 4A consists of all Priority Non-Tax Claims against *Calpine Corrugated*.

(b) Treatment: Except to the extent that a Holder of an Allowed Claim in Class 4A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 4A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 4A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 4A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Class 4A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c) Voting: Priority Non-Tax Claims in Class 4A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 4A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.5.2 *Class 4B: Other Secured Claims Against Calpine Corrugated.*

(a) Classification: Class 4B consists of all Other Secured Claims against Calpine Corrugated.

(b) Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 4B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 4B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum

when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

        (c)      Voting:  Other Secured Claims in Class 4B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 4B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.5.3 *Class 4C: Union Bank Claims Against Calpine Corrugated.*

        (a)      Classification:  Class 4C consists of all Union Bank Claims against Calpine Corrugated.

        (b)      Treatment:  On the Effective Date, each Holder of an Allowed Union Bank Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Union Bank Claim, payment of the principal amount of such Allowed Union Bank Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement.

        (c)      Voting:  Union Bank Claims in Class 4C are Impaired.  Each Holder of an Allowed Union Bank Claim in Class 4C shall be entitled to vote to accept or reject the Plan.

        (d)      Allowance:  The Union Bank Claims in Class 4C shall be Allowed pursuant to this Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

### 3.5.4 *Class 4D: CIT Group Claims Against Calpine Corrugated.*

        (a)      Classification:  Class 4D consists of all CIT Group Claims against Calpine Corrugated.

        (b)      Treatment:  On the Effective Date, each Holder of an Allowed CIT Group Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed CIT Group Claim, payment of the principal amount of such Allowed CIT Group Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement.

        (c)      Voting:  CIT Group Claims in Class 4D are Impaired.  Each Holder of an Allowed CIT Group Claim in Class 4D shall be entitled to vote to accept or reject the Plan.

        (d)      Allowance:  The CIT Group Claims in Class 4D shall be Allowed pursuant to this Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

3.5.5    *Class 4E:  General Unsecured Claims Against Calpine Corrugated.*

(a)    Classification:  Class 4E consists of all General Unsecured Claims against Calpine Corrugated.

(b)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Calpine Corrugated shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(c)    Voting:  General Unsecured Claims in Class 4E are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 4E shall be entitled to vote to accept or reject the Plan.

3.5.6    *Class 4F:  Intercompany Claims Against Calpine Corrugated.*

(a)    Classification:  Class 4F consists of all Intercompany Claims against Calpine Corrugated.

(b)    Treatment:  Holders of Allowed Intercompany Claims against Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and, pursuant to the Plan, all Allowed Intercompany Claims against Calpine Corrugated shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Calpine Corrugated may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Calpine Corrugated or any Reorganized Debtor, or for any other reason; and (ii) notwithstanding anything to the contrary herein, Reorganized SSCC, as the successor in interest to SSCE (the Holder of an Intercompany Claim against Calpine Corrugated), shall receive 100% of the New Calpine Corrugated Interests on the Effective Date in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim.

(c)    Voting:  Intercompany Claims in Class 4F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 4F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 4F.

3.5.7    *Class 4G: Interests in Calpine Corrugated.*

(a)    Classification:  Class 4G consists of all Interests in Calpine Corrugated.

(b)    Treatment:  On the Effective Date, all Interests in Calpine Corrugated that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(c)	Voting:  Interests in Calpine Corrugated are Impaired.  Each Holder of an Interest in Calpine Corrugated shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)	Allowance.  All Interests in Calpine Corrugated shall be Allowed pursuant to this Plan.

3.6	Classification and Treatment of Claims Against and Interests in SSPRI (Debtor 5)

3.6.1	*Class 5A: Priority Non-Tax Claims Against SSPRI.*

(a)	Classification:  Class 5A consists of all Priority Non-Tax Claims against SSPRI.

(b)	Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 5A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 5A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 5A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 5A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 5A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)	Voting:  Priority Non-Tax Claims in Class 5A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 5A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.6.2	*Class 5B:  Other Secured Claims Against SSPRI.*

(a)	Classification:  Class 5B consists of all Other Secured Claims against SSPRI.

(b)	Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 5B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The

Debtors' failure to object to the allowance of any Other Secured Claim in Class 5B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)     Voting:  Other Secured Claims in Class 5B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 5B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.6.3     *Class 5C: General Unsecured Claims Against SSPRI.*

(a)     Classification:  Class 5C consists of all General Unsecured Claims against SSPRI.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSPRI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(c)     Voting:  General Unsecured Claims in Class 5C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 5C shall be entitled to vote to accept or reject the Plan.

### 3.6.4     *Class 5D: Intercompany Claims Against SSPRI.*

(a)     Classification:  Class 5D consists of all Intercompany Claims against SSPRI.

(b)     Treatment:  Holders of Allowed Intercompany Claims against SSPRI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against SSPRI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSPRI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSPRI or any Reorganized Debtor, or for any other reason.

(c)     Voting:  Intercompany Claims in Class 5D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 5D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 5D.

3.6.5    *Class 5E: Interests in SSPRI*

(a)    Classification:  Class 5E consists of all Interests in SSPRI.

(b)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSPRI shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)    Voting:  Interests in SSPRI are Unimpaired.  Each Holder of an Allowed Interest in SSPRI shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.7    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14). [3]

3.7.1    *Classes 6A through 14A: Priority Non-Tax Claims Against the Non-Operating Debtors (United States).*

(a)    Classification:  Classes 6A through 14A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (United States).

(b)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 6A through 14A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Classes 6A through 14A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 6A through 14A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 6A through 14A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 6A through 14A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)    Voting:  Priority Non-Tax Claims in Classes 6A through 14A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 6A through 14A

---

[3]  For ease of reference, each of the Classes of Claims or Interests referenced in this Plan beginning with the number: (i) six (6) relate to Claims or Interests, as applicable, against or in Lot 24D Redevelopment Corporation; (ii) seven (7) relate to Claims or Interests, as applicable, against or in Atlanta & Saint Andrews Bay Railway Company; (iii) eight (8) relate to Claims or Interests, as applicable, against or in Stone International Services Corporation; (iv) nine (9) relate to Claims or Interests, as applicable, against or in Stone Global, Inc.; (v) ten (10) relate to Claims or Interests, as applicable, against or in Stone Connecticut Paperboard Properties, Inc.; (vi) eleven (11) relate to Claims or Interests, as applicable, against or in Smurfit Newsprint Corporation; (vii) twelve (12) relate to Claims or Interests, as applicable, against or in SLP Finance I, Inc.; (viii) thirteen (13) relate to Claims or Interests, as applicable, against or in SLP Finance II, Inc.; and (ix) fourteen (14) relate to Claims or Interests, as applicable, against or in SMBI Inc.

shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.7.2    *Classes 6B through 14B:  Other Secured Claims Against the Non-Operating Debtors (United States).*

(a)    Classification:  Classes 6B through 14B consist of all Other Secured Claims against the Non-Operating Debtors (United States).

(b)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 6B through 14B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 6B through 14B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

3.7.3    Voting:  Other Secured Claims in Classes 6B through 14B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 6B through 14B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

3.7.4    *Classes 6C through 14C:  General Unsecured Claims Against the Non-Operating Debtors (United States).*

(a)    Classification:  Classes 6C through 14C consist of all General Unsecured Claims against the Non-Operating Debtors (United States).

(b)    Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date.

(c)    Voting:  General Unsecured Claims in Classes 6C through 14C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Classes 6C through 14C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.7.5    *Classes 6D through 14D: Intercompany Claims Against the Non-Operating Debtors (United States).*

(a)    Holders of Allowed Intercompany Claims against the Non-Operating Debtors (United States)  shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Intercompany Claims against the Non-Operating Debtors (United States)  shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (United States)  may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (United States) or any Reorganized Debtor, or for any other reason.

(b)    Voting:  Intercompany Claims in Classes 6D through 14D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 6D through 14D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 6D through 14D.

3.7.6    *Classes 6E through 14E: Interests in the Non-Operating Debtors (United States).*

(a)    Classification:  Classes 6E through 14E consist of all Interests in the Non-Operating Debtors (United States).

(b)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)    Voting:  Interests in the Non-Operating Debtors (United States) are Unimpaired.  Each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.8    Classification and Treatment of Claims Against and Interests in SSC Canada (Debtor 15).

3.8.1    *Class 15A: Priority Non-Tax Claims Against SSC Canada.*

(a)    Classification:  Class 15A consists of all Priority Non-Tax Claims against SSC Canada.

(b)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 15A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 15A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 15A in accordance with Section 1129(a)(9) of the

Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 15A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Class 15A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting: Priority Non-Tax Claims in Class 15A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 15A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.8.2     *Class 15B: Other Secured Claims Against SSC Canada.*

(a)     Classification: Class 15B consists of all Other Secured Claims against SSC Canada.

(b)     Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 15B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and Section 506(b) of the Bankruptcy Code).

(c)     Voting: Other Secured Claims in Class 15B are Impaired. Each Holder of an Allowed Other Secured Claim in Class 15B shall be entitled to vote to accept or reject the Plan.

### 3.8.3     *Class 15C: Prepetition Canadian Lender Claims Against SSC Canada.*

(a)     Classification: Class 15C consists of all Prepetition Canadian Lender Claims against SSC Canada.

(b)     Treatment: On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of

Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)  Voting:  Prepetition Canadian Lender Claims in Class 15C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 15C shall be entitled to vote to accept or reject the Plan.

(d)  Allowance:  The Prepetition Canadian Lender Claims in Class 15C shall be Allowed pursuant to this Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

### 3.8.4  *Class 15D: General Unsecured Claims Against SSC Canada.*

(a)  Classification:  Class 15D consists of all General Unsecured Claims against SSC Canada.

(b)  Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of SSC Canada and Smurfit-MBI, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date and (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool.  If the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, (a) the Holders of Allowed General Unsecured Claims against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court to be properly allocable to SSC Canada and (b) all General Unsecured Claims against SSC Canada shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, the SSC Canada Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against SSC Canada.

(c)  Voting:  General Unsecured Claims in Class 15D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 15D shall be entitled to vote to accept or reject the Plan.

### 3.8.5  *Class 15E: Intercompany Claims Against SSC Canada.*

(a)  Classification:  Class 15E consists of all Intercompany Claims against SSC Canada.

(b)  Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSC Canada shall not be entitled to receive or retain any monetary distributions or other

property on account of such Claims under the Plan and Allowed Intercompany Claims against SSC Canada shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSC Canada may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSC Canada or any Reorganized Debtor, or for any other reason, and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against SSC Canada shall be treated as Allowed General Unsecured Claims against SSC Canada for purposes of this Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(c)     Voting: Intercompany Claims in Class 15E are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 15E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 15E.

3.8.6     *Class 15F: Stone FinCo II Intercompany Claim Against SSC Canada.*

(a)     Classification: Class 15F consists of the Stone FinCo II Intercompany Claim against SSC Canada.

(b)     Treatment: If (i) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (ii) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Intercompany Claim). On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then (x) the Stone FinCo II Intercompany Claim shall be treated as a Subordinated Securities Claim against SSC Canada and shall be subordinated to all other Claims against SSC Canada, including, without limitation, all General Unsecured Claims and all other Intercompany Claims against SSC Canada, (y) Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claim, shall not be entitled to receive any distributions on account of such Claim under the Plan, and (z) the Stone FinCo II Intercompany Claim shall be deemed settled, cancelled and extinguished on the Effective Date.

(c)     Voting: Stone FinCo II Intercompany Claims in Class 15F are Impaired. Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claims, shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.8.7     *Class 15G: Interests in SSC Canada.*

(a)     Classification: Class 15G consists of all Interests in SSC Canada.

(b)     Treatment:  On the Effective Date, all Interests in SSC Canada that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(c)     Voting:  Interests in SSC Canada are Impaired.  Each Holder of an Interest in SSC Canada shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Allowance.  All Interests in SSC Canada shall be Allowed pursuant to this Plan.

3.9     Classification and Treatment of Claims Against and Interests in Smurfit-MBI (Debtor 16).

3.9.1     *Class 16A: Priority Non-Tax Claims Against Smurfit-MBI.*

(a)     Classification:  Class 16A consists of all Priority Non-Tax Claims against Smurfit-MBI.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 16A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 16A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 16A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 16A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 16A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Class 16A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 16A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.9.2     *Class 16B: Other Secured Claims Against Smurfit-MBI.*

(a)     Classification:  Class 16B consists of all Other Secured Claims against Smurfit-MBI.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 16B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured

Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and Section 506(b) of the Bankruptcy Code).

(c)     Voting:  Other Secured Claims in Class 16B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 16B shall be entitled to vote to accept or reject the Plan.

### 3.9.3     *Class 16C: Prepetition Canadian Lender Claims Against Smurfit-MBI.*

(a)     Classification:  Class 16C consists of all Prepetition Canadian Lender Claims against Smurfit-MBI.

(b)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)     Voting:  Prepetition Canadian Lender Claims in Class 16C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 16C shall be entitled to vote to accept or reject the Plan.

(d)     Allowance:  The Prepetition Canadian Lender Claims in Class 16C shall be Allowed pursuant to this Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

### 3.9.4     *Class  16D: General Unsecured Claims Against Smurfit-MBI.*

(a)     Classification:  Class 16D consists of all General Unsecured Claims against Smurfit-MBI.

(b)     Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of Smurfit-MBI and SSC Canada, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes an Allowed Claim, each

Holder of an Allowed General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, (a) the Holders of Allowed General Unsecured Claims against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court to be properly allocable to Smurfit-MBI and (b) all General Unsecured Claims against Smurfit-MBI shall be deemed to be Excluded Claims for purposes of the CCAA Plan. For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against Smurfit-MBI.

(c)     Voting: General Unsecured Claims in Class 16D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 16D shall be entitled to vote to accept or reject the Plan.

### 3.9.5     *Class 16E: Intercompany Claims Against Smurfit-MBI.*

(a)     Classification: Class 16E consists of all Intercompany Claims against Smurfit-MBI.

(b)     Treatment: If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against Smurfit-MBI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Smurfit-MBI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Smurfit-MBI or any Reorganized Debtor, or for any other reason, and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against Smurfit-MBI shall be treated as Allowed General Unsecured Claims against Smurfit-MBI for purposes of this Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(c)     Voting: Intercompany Claims in Class 16E are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 16E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 16E.

### 3.9.6     *Class 16F: Interests in Smurfit-MBI.*

(a)     Classification: Class 16F consists of all Interests in Smurfit-MBI.

(b)     Treatment:  On the Effective Date, all Interests in Smurfit-MBI that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged. Holders of Interests in Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(c)     Voting:  Interests in Smurfit-MBI are Impaired.  Each Holder of an Interest in Smurfit-MBI shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Allowance.  All Interests in Smurfit-MBI shall be Allowed pursuant to this Plan.

3.10     Classification and Treatment of Claims Against and Interests in MBI Limited (Debtor 17)

3.10.1     *Class 17A: Priority Non-Tax Claims Against MBI Limited.*

(a)     Classification:  Class 17A consists of all Priority Non-Tax Claims against MBI Limited.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 17A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 17A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 17A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 17A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 17A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Class 17A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 17A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.10.2     *Class 17B: Other Secured Claims Against MBI Limited.*

(a)     Classification:  Class 17B consists of all Other Secured Claims against MBI Limited.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 17B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured

Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and Section 506(b) of the Bankruptcy Code).

(c)     Voting:  Other Secured Claims in Class 17B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 17B shall be entitled to vote to accept or reject the Plan.

### 3.10.3    *Class 17C: Prepetition Canadian Lender Claims Against MBI Limited.*

(a)     Classification:  Class 17C consists of all Prepetition Canadian Lender Claims against MBI Limited.

(b)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)     Voting:  Prepetition Canadian Lender Claims in Class 17C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 17C shall be entitled to vote to accept or reject the Plan.

(d)     Allowance:  The Prepetition Canadian Lender Claims in Class 17C shall be Allowed pursuant to this Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

### 3.10.4    *Class 17D: General Unsecured Claims Against MBI Limited.*

(a)     Classification:  Class 17D consists of all General Unsecured Claims against MBI Limited.

(b)     Treatment:  Holders of General Unsecured Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against MBI Limited shall be deemed settled,

cancelled and extinguished on the Effective Date. For purposes of the CCAA Proceedings, all General Unsecured Claims against MBI Limited shall be deemed to be Excluded Claims.

(c)     Voting: General Unsecured Claims in Class 17D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 17D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.10.5     *Class 17E: Intercompany Claims Against MBI Limited.*

(a)     Classification: Class 17E consists of all Intercompany Claims against MBI Limited.

(b)     Treatment: Holders of Allowed Intercompany Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against MBI Limited may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by MBI Limited or any Reorganized Debtor, or for any other reason.

(c)     Voting: Intercompany Claims in Class 17E are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 17E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 17E.

### 3.10.6     *Class 17F: Interests in MBI Limited.*

(a)     Classification: Class 17F consists of all Interests in MBI Limited.

(b)     Treatment: Treatment: As of the Effective Date, each Holder of an Allowed Interest in MBI Limited shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)     Voting: Interests in MBI Limited are Unimpaired. Each Holder of an Allowed Interest in MBI Limited shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Allowance. All Interests in MBI Limited shall be Allowed pursuant to this Plan.

### 3.11     Classification and Treatment of Claims Against and Interests in Stone FinCo II (Debtor 18).

### 3.11.1     *Class 18A: Priority Non-Tax Claims Against Stone FinCo II.*

(a)     Classification:  Class 18A consists of all Priority Non-Tax Claims against Stone FinCo II.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 18A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 18A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 18A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 18A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 18A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Class 18A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 18A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.11.2     *Class 18B: Other Secured Claims Against Stone FinCo II.*

(a)     Classification:  Class 18B consists of all Other Secured Claims against Stone FinCo II.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 18B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 18B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)     Voting:  Other Secured Claims in Class 18B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 18B shall be conclusively deemed to have

accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.11.3   *Class 18C: General Unsecured Claims Against Stone FinCo II.*

(a)   Classification:  Class 18C consists of all General Unsecured Claims against Stone FinCo II.

(b)   Treatment:  If (a) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (b) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.  On the other hand, if (i) the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan or (ii) either the Bankruptcy Court or the Canadian Bankruptcy Court shall have determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canada, then (x) the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive any distributions under this Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any shares of the New SSCC Common Stock that Stone FinCo II shall be entitled to receive under this Plan on account of the Stone FinCo II Contribution Claim; provided, however, that the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under this Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) the Class of General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  If the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is a Disallowed Claim, the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed General Unsecured Claims against Stone FinCo II shall, for purposes of the Chapter 11 Cases, be deemed settled, cancelled and extinguished on the Effective Date.

(c)   Voting:  General Unsecured Claims in Class 18C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 18C shall be entitled to vote to accept or reject this Plan.

### 3.11.4   *Class 18D: Intercompany Claims Against Stone FinCo II.*

(a)   Classification:  Class 18D consists of all Intercompany Claims against Stone FinCo II.

(b)   Treatment:  If the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan, the Holders of Intercompany Claims against Stone

FinCo II shall not be entitled to receive any distributions under the Plan on account of such Claims. If the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan and the Bankruptcy Court determines that the Stone FinCo II Contribution Claim shall be an Allowed Claim, the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of the shares of New SSCC Common Stock that Stone FinCo II shall be entitled to receive under this Plan on account of the Stone FinCo II Contribution Claim. If the Stone FinCo II Contribution Claim is deemed to be a Disallowed Claim, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed Intercompany Claims against Stone FinCo II shall be deemed settled, cancelled and extinguished on the Effective Date.

(c)     Voting: Intercompany Claims in Class 18D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 18D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 18D.

### 3.11.5     *Class 18E: Interests in Stone FinCo II.*

(a)     Classification: Class 18E consists of all Interests in Stone FinCo II.

(b)     Treatment: On the Effective Date, all Interests in Stone FinCo II that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged. Holders of Interests in Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan; provided, however, that Holders of Interests in Stone FinCo II shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General Unsecured Claims against Stone FinCo II have received distributions under this Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

(c)     Voting: Interests in Stone FinCo II are Impaired. Each Holder of an Interest in Stone FinCo II shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Allowance. All Interests in Stone FinCo II shall be Allowed pursuant to this Plan.

### 3.12     Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd. (Debtor 19).

#### 3.12.1     *Class 19A: Priority Non-Tax Claims Against B.C. Shipper Supplies Ltd.*

(a)     Classification: Class 19A consists of all Priority Non-Tax Claims against B.C. Shipper Supplies Ltd.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 19A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 19A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 19A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 19A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 19A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Class 19A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 19A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.12.2     *Class 19B: Other Secured Claims Against B.C. Shipper Supplies Ltd.*

(a)     Classification:  Class 19B consists of all Other Secured Claims against B.C. Shipper Supplies Ltd.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 19B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 19B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(c)     Voting:  Other Secured Claims in Class 19B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 19B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

### 3.12.3 *Class 19C: General Unsecured Claims Against B.C. Shipper Supplies Ltd.*

(a) Classification: Class 19C consists of all General Unsecured Claims against B.C. Shipper Supplies Ltd.

(b) Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against B.C. Shipper Supplies Ltd. shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(c) Voting: General Unsecured Claims in Class 19C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 19C shall be entitled to vote to accept or reject the Plan.

### 3.12.4 *Class 19D: Intercompany Claims Against B.C. Shipper Supplies Ltd.*

(a) Classification: Class 19D consists of all Intercompany Claims against B.C. Shipper Supplies Ltd.

(b) Treatment: Holders of Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against B.C. Shipper Supplies Ltd. may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by B.C. Shipper Supplies Ltd. or any Reorganized Debtor, or for any other reason.

(c) Voting: Intercompany Claims in Class 19D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 19D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 19D.

### 3.12.5 *Class 19E: Interests in B.C. Shipper Supplies Ltd.*

(a) Classification: Class 19E consists of all Interests in B.C. Shipper Supplies Ltd.

(b) Treatment: As of the Effective Date, each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c) Voting: Interests in B.C. Shipper Supplies Ltd. are Unimpaired. Each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall be conclusively deemed

to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)  Allowance.  All Interests in B.C. Shipper Supplies Ltd. shall be Allowed pursuant to this Plan.

3.13  Classification and Treatment of Claims Against and Interests in Francobec Company  (Debtor 20).

3.13.1  *Class 20A: Priority Non-Tax Claims Against Francobec Company.*

(a)  Classification:  Class 20A consists of all Priority Non-Tax Claims against Francobec Company.

(b)  Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 20A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 20A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 20A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 20A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 20A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)  Voting:  Priority Non-Tax Claims in Class 20A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 20A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.13.2  *Class 20B: Other Secured Claims Against Francobec Company.*

(a)  Classification:  Class 20B consists of all Other Secured Claims against Francobec Company.

(b)  Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 20B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and Section 506(b) of the Bankruptcy Code).

(c)     Voting:  Other Secured Claims in Class 20B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 20B shall be entitled to vote to accept or reject the Plan.

3.13.3     *Class 20C: Prepetition Canadian Lender Claims Against Francobec Company.*

(a)     Classification:  Class 20C consists of all Prepetition Canadian Lender Claims against Francobec Company.

(b)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

3.13.4     Voting:  Prepetition Canadian Lender Claims in Class 20C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 20C shall be entitled to vote to accept or reject the Plan.

3.13.5     Allowance:  The Prepetition Canadian Lender Claims in Class 20C shall be Allowed pursuant to this Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

3.13.6     *Class 20D:  General Unsecured Claims Against Francobec Company.*

(a)     Classification:  Class 20D consists of all General Unsecured Claims against Francobec Company.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Francobec Company shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(c)     Voting:  General Unsecured Claims in Class 20D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 20D shall be entitled to vote to accept or reject the Plan.

### 3.13.7     *Class 20E: Intercompany Claims Against Francobec Company.*

(a)     Classification:  Class 20E consists of all Intercompany Claims against Francobec Company.

(b)     Treatment:  Holders of Allowed Intercompany Claims against Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against Francobec Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Francobec Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Francobec Company or any Reorganized Debtor, or for any other reason.

(c)     Voting:  Intercompany Claims in Class 20E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 20E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 20E.

### 3.13.8     *Class 20F: Interests in Francobec Company.*

(a)     Classification:  Class 20F consists of all Interests in Francobec Company.

(b)     Treatment:  On the Effective Date, all Interests in Francobec Company that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(c)     Voting:  Interests in Francobec Company are Impaired.  Each Holder of an Interest in Francobec Company shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

Allowance.  All Interests in Francobec Company shall be Allowed pursuant to this Plan.

### 3.14     Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company (Debtor 21)

### 3.14.1     *Class 21A: Priority Non-Tax Claims Against 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21A consists of all Priority Non-Tax Claims against 3083527 Nova Scotia Company.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 21A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 21A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 21A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 21A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 21A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Class 21A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 21A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.14.2     *Class 21B: Other Secured Claims Against 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21B consists of all Other Secured Claims against 3083527 Nova Scotia Company.

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 21B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and Section 506(b) of the Bankruptcy Code).

(c)     Voting:  Other Secured Claims in Class 21B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 21B shall be entitled to vote to accept or reject the Plan.

3.14.3     *Class 21C: Prepetition Canadian Lender Claims Against 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21C consists of all Prepetition Canadian Lender Claims against 3083527 Nova Scotia Company.

(b)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the

Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(c)     Voting:  Prepetition Canadian Lender Claims in Class 21C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 21C shall be entitled to vote to accept or reject the Plan.

(d)     Allowance:  The Prepetition Canadian Lender Claims in Class 21C shall be Allowed pursuant to this Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

3.14.4     *Class 21D: General Unsecured Claims Against 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21D consists of all General Unsecured Claims against 3083527 Nova Scotia Company.

(b)     Treatment:  Holders of General Unsecured Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed to be Excluded Claims.

(c)     Voting:  General Unsecured Claims in Class 21D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 21D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.14.5     *Class 21E: Intercompany Claims Against 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21E consists of all Intercompany Claims against 3083527 Nova Scotia Company.

(b)     Treatment:  Holders of Allowed Intercompany Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary

distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against 3083527 Nova Scotia Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by 3083527 Nova Scotia Company or any Reorganized Debtor, or for any other reason.

(c)     Voting:  Intercompany Claims in Class 21E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 21E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 21E.

### 3.14.6     *Class 21F: Interests in 3083527 Nova Scotia Company.*

(a)     Classification:  Class 21F consists of all Interests in 3083527 Nova Scotia Company.

(b)     Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)     Voting:  Interests in 3083527 Nova Scotia Company are Unimpaired.  Each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.14.7     Allowance.  All Interests in 3083527 Nova Scotia Company shall be Allowed pursuant to this Plan.

### 3.15     Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25).[4]

### 3.15.1     *Classes 22A through 25A: Priority Non-Tax Claims Against the Non-Operating Debtors (Canada).*

(a)     Classification:  Classes 22A through 25A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (Canada).

(b)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 22A through 25A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in 22A through 25A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete

---

[4]  For ease of reference, each of the Classes of Claims or Interests referenced in this Plan beginning with the number: (i) twenty two (22) relates to Claims or Interests, as applicable, against or in 639647 British Columbia Ltd.; (iii) twenty three (23) relates to Claims or Interests, as applicable, against or in Specialty Containers Inc.; (iv) twenty four (24) relates to Claims or Interests, as applicable, against or in SLP Finance General Partnership; and (v) twenty five (25) relates to Claims or Interests, as applicable, against or in 605681 N.B. Inc.

settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 22A through 25A in accordance with Section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 22A through 25A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code. All Allowed Claims in Classes 22A through 25A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(c)     Voting:  Priority Non-Tax Claims in Classes 22A through 25A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Classes 22A through 25A shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.15.2   *Classes 22B through 25B:  Other Secured Claims Against the Non-Operating Debtors (Canada).*

(a)     Classification:  Classes 22B through 25B consist of all Other Secured Claims against the Non-Operating Debtors (Canada).

(b)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 22B through 25B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to Section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under Section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with Section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 22B through 25B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

3.15.3   Voting:  Other Secured Claims in Classes 22B through 25B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Classes 22B through 25B shall be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

3.15.4   *Classes 22C through 25C:  General Unsecured Claims Against the Non-Operating Debtors (Canada).*

(a)     Classification:  Classes 22C through 25C consist of all General Unsecured Claims against the Non-Operating Debtors (Canada).

(b)     Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (Canada) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed to be Excluded Claims.

(c)     Voting:  General Unsecured Claims in Classes 22C through 25C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Classes 22C through 25C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

3.15.5     *Classes 22D through 25D: Intercompany Claims Against the Non-Operating Debtors (Canada).*

(a)     Holders of Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (Canada)  may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (Canada) or the Reorganized Non-Operating Debtors (Canada), or for any other reason.

(b)     Voting:  Intercompany Claims in Classes 22D through 25D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 22D through 25D.

3.15.6     *Classes 22E through 25E: Interests in the Non-Operating Debtors (Canada).*

(a)     Classification:  Classes 22E through 25E consist of all Interests in the Non-Operating Debtors (Canada).

(b)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(c)     Voting:  Interests in the Non-Operating Debtors (Canada) are Unimpaired.  Each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall

be conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

   3.16    Acceptance or Rejection of the Plan by Classes of Claims and Interests.

      3.16.1    Impaired Classes of Claims Entitled to Vote on the Plan.  Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19C, 20B, 20C, 20D, 21B, and 21C are Impaired and shall be entitled to vote as a Class to accept or reject this Plan.

      3.16.2    Acceptance by Impaired Classes of Claims.  In accordance with Section 1126(c) of the Bankruptcy Code and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that actually vote have timely and properly voted to accept this Plan.

      3.16.3    Presumed Acceptance by Holders of Intercompany Claims.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims.

      3.16.4    Presumed Acceptance by Unimpaired Classes.  Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are Unimpaired under this Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted this Plan and therefore shall not be entitled to vote to accept or reject the Plan.

      3.16.5    Presumed Rejection by Impaired Classes.  Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C are Impaired under this Plan, but the Holders of Claims and Interests in such Classes shall not receive or retain any property under this Plan on account of such Claims or Interests.  Accordingly, pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in such Classes are conclusively presumed to have rejected this Plan and therefore shall not be entitled to vote to accept or reject the Plan.

      3.16.6    Voting for Purposes of the CCAA Plan.  In addition to any entitlement to vote in the Chapter 11 Cases, as described above, Affected Creditors shall be entitled to vote on the CCAA Plan as described in Article IV of this Plan.

## ARTICLE IV: CLASSIFICATION AND TREATMENT OF AFFECTED CLAIMS AGAINST THE CANADIAN DEBTORS IN THE CCAA PROCEEDINGS

   4.1    Purpose and Effect of the CCAA Plan.

      4.1.1    Purpose.  For purposes of the CCAA Proceedings, this Article IV constitutes the CCAA Plan to be proposed to each Class of Affected Claims described below.

4.1.2    Affected Persons.  The CCAA Plan will be implemented under the CCAA and, subject to its terms, will become effective on, and be binding on and after, the Effective Date on the Canadian Debtors and the Classes of Affected Creditors that have voted in favor of its acceptance by the Required Majority, providing it has been sanctioned by the Canadian Bankruptcy Court by CCAA Sanction Order(s) in form and substance satisfactory to the Canadian Debtors.  The only Classes of Affected Creditors that shall be required to have accepted the CCAA Plan by the Required Majority shall be the Affected Secured Creditors.

4.1.3    Unaffected Persons.  For the avoidance of doubt, Affected Creditors in any Class that fails to accept the CCAA Plan by the Required Majority, or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, shall be deemed to be Unaffected Creditors for the purposes of the CCAA Plan.

4.2    Classification of Creditors.

4.2.1    Affected Creditors.  For purposes of voting on and receiving distributions under the CCAA Plan, Affected Creditors are divided into the following Classes:

(a)    Affected Secured Creditors.

(i)    Affected Secured Creditors of SSC Canada;

(ii)    Affected Secured Creditors of Smurfit-MBI;

(iii)    Affected Secured Creditors of MBI Limited;

(iv)    Affected Secured Creditors of Francobec Company; and

(v)    Affected Secured Creditors of 3083527 Nova Scotia Company.

(b)    Affected Unsecured Creditors.

(i)    Affected Unsecured Creditors of SSC Canada;

(ii)    Affected Unsecured Creditors of Smurfit-MBI; and

(iii)    Affected Unsecured Creditors of Stone FinCo II.

(c)    Affected Creditors shall be entitled to prove their respective Affected Claims, vote in respect of the CCAA Plan or otherwise, and receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

4.2.2    Excluded Claims.  For purposes of the CCAA Proceedings, the CCAA Plan shall not affect the following types of Claims (each, an "Excluded Claim" and, collectively, the "Excluded Claims"):

(a)    the indebtedness, liabilities and obligations secured by the Administration Charge;

(b)     the indebtedness, liabilities and obligations secured by the DIP Lenders' Charge;

(c)     the indebtedness, liabilities and obligations secured by the Directors' Charge;

(d)     any amounts owing to employees and officers employed by, and directors of, the Canadian Debtors on the Petition Date that are entitled to priority in payment under the CCAA, including any Claims for wages, salary, benefits, unreimbursed expenses, and amounts owing for accrued but unpaid vacation pay as of the Petition Date that are entitled to priority in payment under the CCAA, but expressly excluding all Non-Qualified Employee Benefit Claims;

(e)     any Post-Filing Claim;

(f)     any Priority Tax Claim against a Canadian Debtor;

(g)     any Claim of a Person who was an officer, director or employee of any Canadian Debtor as of the Petition Date for indemnification and/or contribution with respect to such officer's, director's, or employee's service to such Canadian Debtor, pursuant (and subject) to applicable laws and the policies and procedures of such Canadian Debtor (provided that all such indemnification and/or contribution Claims shall be assumed by Canadian Newco);

(h)     any General Unsecured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, and Stone FinCo II;

(i)     any Secured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, and 3083527 Nova Scotia Company;

(j)     any Intercompany Claim; and

(k)     Affected Claims in any Class that fails to accept the CCAA Plan by the Required Majority or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, from and after the date of such rejection or non-approval by the Canadian Bankruptcy Court (as the case may be).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or to receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.  Nothing in the CCAA Plan shall affect the rights and defenses of any Canadian Debtor, either legal or equitable, with respect to any Excluded Claim, including any rights arising under or pursuant to this CCAA Plan or any rights with respect to legal or equitable defenses or entitlements to setoff or recoupment against such Excluded Claims; provided, however, that the Debtors reserve the right to seek confirmation of the Plan in the Chapter 11 Cases pursuant to Section 1129(b) of the Bankruptcy Code with respect to any Class of Affected Claims that has failed to accept the Plan, in which case the Holders of such Claims shall receive the treatment set forth in Article III and shall be subject to all applicable provisions of the Plan for purposes of the Chapter 11 Cases.

4.3    Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims.

4.3.1    Affected Secured Claims.  Affected Secured Creditors shall be entitled to vote on this CCAA Plan in accordance with the CCAA Creditors' Meeting Order.

(a)    Prepetition Canadian Lender Claims.  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled or (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(b)    Other Secured Claims.  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, or 3083527 Nova Scotia Company, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash.

4.3.2    Treatment of CCAA Charges.  The Canadian Debtors shall satisfy, in full and in cash, all obligations secured by the CCAA Charges.

4.3.3    Treatment of Priority Tax Claims Against the Canadian Debtors. Except to the extent that the Canadian Debtors and the Holder of a Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of a Priority Tax Claim against any of the Canadian Debtors that is a Proven Claim and is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Priority Tax Claim, cash equal to the amount of such Priority Tax Claim on the later of (i) the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and (ii) the first Distribution Date after such Priority Tax Claim becomes a Proven Claim, or as soon thereafter as is reasonably practicable. All Priority Tax Claims against any of the Canadian Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business after the Effective Date in accordance with the applicable non-bankruptcy law governing such Claims.

4.4    Option to Place the Canadian Debtors into Bankruptcy Proceedings.  Each Canadian Debtor reserves the right to file an assignment in bankruptcy under the BIA provided

that such Canadian Debtor has, or shall have been provided with, cash or a satisfactory indemnity in the amount of $50,000 to fund the costs of such bankruptcy proceeding.

4.5     Treatment of Affected Unsecured Claims.

The treatment of Affected Unsecured Claims under the CCAA Plan depends on the identity of the Canadian Debtor against which such Affected Unsecured Claims are asserted.

4.5.1     Affected Unsecured Claims Against SSC Canada.  If:

(a)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(b)      the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(c)     the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1.5 of this Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes a Proven Claim, each Holder of a General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool.

4.5.2     Affected Unsecured Claims Against Smurfit-MBI.  If:

(a)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(b)      the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(c)     the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1.5 of this Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes a Proven Claim, each Holder of a General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool.

4.5.3     Affected Unsecured Claims Against Stone FinCo II.  If:

(a)     the Class of Affected Unsecured Creditors of Stone FinCo II approves the CCAA Plan by the Required Majority,

(b)      neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as an Interest in SSC Canada,

(c)      the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to such Class, and

(d)      the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1.5 of this Plan,

then, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.

4.6      <u>Conditions Precedent to Implementation of CCAA Plan</u>.  In addition to any other approvals and receipt of the CCAA Sanction Order described above, the implementation of the CCAA Plan shall be conditioned upon the fulfillment or satisfaction of the following conditions on or before the Effective Date, each of which may be waived by the Canadian Debtors:

4.6.1      The Classes of Affected Secured Creditors approve the CCAA Plan by the Required Majority;

4.6.2      The CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class;

4.6.3      Execution and delivery of all such agreements, resolutions, indentures, documents and other instruments which are necessary to be executed and delivered by the Canadian Debtors to implement the CCAA Plan and perform their obligations hereunder;

4.6.4      In respect of the CCAA Sanction Orders described above, the expiry of the applicable appeal periods and, in the event of an appeal or application for leave to appeal, final determination by the applicable appellate tribunal;

4.6.5      The Plan shall have become effective in the Chapter 11 Cases in accordance with the terms of Section 9.2 hereof.

4.7      <u>CCAA Creditors' Meeting</u>.  The CCAA Creditors' Meeting shall be held in accordance with the CCAA Plan, the CCAA Creditors' Meeting Order, and any further order which the Canadian Bankruptcy Court may enter from time to time for the purposes of considering and voting on the CCAA Resolution or any other matters to be considered at the CCAA Creditors' Meeting.

4.7.1      <u>Severance</u>.  The CCAA Plan shall be severable such that it may be voted upon and approved by each Class of Affected Creditors separately.

4.7.2      <u>Voting by Creditors</u>.  The Canadian Debtors are seeking approval of the CCAA Plan by the affirmative vote of the Required Majorities of each of the Classes of

Affected Creditors.  Except for the CCAA Resolution, which shall be decided by the Required Majorities on a vote by ballot, any other matter submitted for a vote at the CCAA Creditors' Meeting shall be decided by a majority of votes cast on a vote by a show of hands, unless the CCAA Meeting Chair decides, in his or her sole discretion, to hold such vote by way of ballot.

The result of any vote at the CCAA Creditors' Meeting shall be binding on all Affected Claims of the applicable Class, regardless of whether or not the Holder of such Affected Claim was present and voting (in person or by proxy) at the CCAA Creditors' Meeting.

4.7.3  <u>Claims for Voting Purposes</u>.  Each Holder of a Voting Claim shall be entitled to one (1) vote and the weight attributed to such vote (for the purposes of determining the Required Majorities) shall be equal to the aggregate United States dollar amount of such Voting Claim.  Voting Claims shall not include fractional numbers and shall be rounded to the nearest whole United States dollar amount.

For the purposes of determining the value of Affected Claims denominated in currencies other than United States dollars for voting and distribution purposes under the CCAA Plan, such Affected Claims shall be converted to United States dollars.

If the amount of any Affected Claim is not resolved for voting purposes at least five (5) Business Days prior to the CCAA Creditors' Meeting in accordance with the CCAA Claims Determination Order and the CCAA Creditors' Meeting Order, the Affected Creditor shall be entitled to vote at the CCAA Creditors' Meeting based on that portion of its Affected Claim that has been accepted for voting purposes by the Canadian Debtors and the CCAA Monitor, without prejudice to any rights of such Affected Creditor or the Canadian Debtors with respect to the final determination of such Affected Claim for distribution purposes in accordance with the terms of the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

4.7.4  <u>Claims Bar Date</u>.  If any Person required by the CCAA Bar Date Order and the CCAA Claims Determination Order to file a Proof of Claim by the Claims Bar Date has failed to do so (and is not deemed to have filed a Proof of Claim by the Claims Bar Date pursuant to the CCAA Bar Date Order or the CCAA Claims Determination Order), that Person shall not be permitted to vote at the CCAA Creditors' Meeting and shall not be entitled to receive any distribution under this Plan.

4.7.5  <u>CCAA Creditors' Meeting Chair</u>.  The CCAA Creditors' Meeting Chair shall decide all matters relating to procedure at the CCAA Creditors' Meeting that are not otherwise set out in the CCAA Creditors' Meeting Order.

4.7.6  <u>Application for CCAA Sanction Order(s)</u>.  If the Classes of Affected Secured Claims approve the CCAA Plan, the Canadian Debtors shall apply for a Sanction Order in respect of each Class that has approved the CCAA Plan, providing, *inter alia*, that:

(a)  the compromises and arrangements effected by the CCAA Plan are approved, binding and effective on all Classes of Affected Claims that approved the CCAA Plan;

(b)  consent is given to the assignment of the Canadian Assets to Canadian Newco; and

(c)    no Person who is a party to an obligation or agreement with the Canadian Debtors shall, following the Effective Date, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of such obligation or agreement, by reason:

(i)    of any event(s) which occurred on or prior to the Effective Date that would have entitled any other Person thereto to enforce those rights or remedies (including defaults or events of default arising as a result of the insolvency of the Canadian Debtors);

(ii)    of the fact that the Canadian Debtors have sought or obtained relief under the CCAA or that the reorganization has been implemented by the Canadian Debtors;

(iii)    of the effect on the Canadian Debtors of the completion of any of the transactions contemplated by the CCAA Plan; or

(iv)    of any compromises or arrangements effected pursuant to the CCAA Plan.

4.7.7    <u>Further Stay</u>.  The Canadian Debtors may apply for an interim order extending the CCAA stay period so that the application for the CCAA Sanction Orders may be made before the stay period expires and the stay period shall not expire until the Effective Date.

4.8    <u>General.</u>

4.8.1    <u>CCAA Releases.</u>  On the Effective Date, all Affected Creditors subject to the CCAA Plan as sanctioned by the Canadian Bankruptcy Court, any other Persons asserting such Claims, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally the applicable Canadian Debtors, the CCAA Monitor, and each of their respective Related Persons (collectively, the "<u>CCAA Released Parties</u>") from any and all demands, Claims, actions (including any class actions or proceedings before an administrative tribunal), causes of action, grievances, obligations, counterclaims, suits, debts, sums of money, accounts, covenants, damages, remedies, judgments, expenses, executions, liens and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any such Person may be entitled to assert, including, without limitation, any and all claims for accounting, reconciliation, contribution or indemnity, restitution or otherwise, as well as any Claims in respect of potential statutory liabilities of the former and present directors and officers of the Canadian Debtors, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, dealing, termination, disclaimer, rescission or repudiation of any contract, lease or other agreement, whether written or oral, or other occurrence existing or taking place on or prior to the Effective Date relating to, arising out of or in connection with any Claim, trust, constructive trust or deemed trust, the business and affairs of the Canadian Debtors, the CCAA Plan, the Canadian Asset Sale, or the CCAA Proceedings, provided that nothing herein shall release or discharge (i) any CCAA Released Party if such CCAA Released Party is adjudged by the express terms of a

judgment rendered on a final determination on the merits to have committed fraud or (ii) any director of a Canadian Debtor for a Claim excluded by Section 5.1(2) of the CCAA.

### 4.8.2 Amendments to the CCAA Plan.

(a)     The Canadian Debtors reserve the right, at any time and from time to time, to amend, modify and/or supplement the CCAA Plan, or to waive in whole or in part any condition, provided that any such amendment, modification or supplement must be in a written document which is: (i) filed with the Canadian Bankruptcy Court; and (ii) communicated to the Affected Creditors in such manner, if any, as may be required by the Canadian Bankruptcy Court.  Any supplement or amendment to the CCAA Plan so filed with the Canadian Bankruptcy Court shall, for all purposes, be and deemed to be a part of and incorporated in the CCAA Plan.

(b)     Any amendment, modification, supplement or waiver may be made following the entry of the CCAA Sanction Order unilaterally by the Canadian Debtors, provided that it concerns a matter that, in the opinion of the Canadian Debtors, acting reasonably, is of an administrative nature required to better give effect to the implementation of the CCAA Plan and the CCAA Sanction Order and is not adverse to the financial or economic interest of any Class of Affected Creditors.

(c)     Any supplementary plan or plans of compromise or arrangement filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.

### 4.8.3 Further Assurances.
Notwithstanding that the transactions and events set out in this CCAA Plan shall be deemed to occur without any additional act or formality other than as set out herein, each of the Persons affected hereby shall make, do and execute all such further acts, deeds, agreements, transfers, assurances, instruments, documents or discharges as may be reasonably required by the Canadian Debtors in order to better implement this CCAA Plan.

### 4.8.4 Paramountcy.
From and after the Effective Date, any conflict between the CCAA Plan and the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, credit document, agreement for sale, by-laws of the Canadian Debtors subject to the CCAA Plan, lease or other agreement, written or oral, and any and all amendments or supplements thereto, existing between one or more of the Affected Creditors and the Canadian Debtors subject to the CCAA Plan as of the Effective Date, shall be deemed to be governed by the terms, conditions and provisions of this CCAA Plan and any applicable CCAA Sanction Order, which shall take precedence and priority.  From and after the Effective Date, any conflict between the terms of Article III of this Plan and the CCAA Plan shall be resolved by the Bankruptcy Court and the Canadian Bankruptcy Court in accordance with the terms of the Cross-Border Insolvency Protocol.

### 4.8.5 Termination.
At any time until the Effective Date, the Canadian Debtors may determine not to proceed with this CCAA Plan, notwithstanding any prior approval given at the CCAA Creditors' Meeting.

4.8.6    Successors and Assigns.  This CCAA Plan and any compromise effected by the CCAA Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, representatives, successors and assigns of any Person named or referred to in, or affected by, this Plan for all purposes, as of the Effective Date.

4.8.7    Deeming Provisions.  In this CCAA Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

## ARTICLE V: CANADIAN ASSET SALE

5.1    Sale of the Canadian Assets to Canadian Newco.

5.1.1    Formation of Canadian Newco.  Prior to the Effective Date, the Debtors shall establish Canadian Newco (including, in the Debtors' sole discretion, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in Canadian Newco) as a wholly-owned, direct or indirect, subsidiary of SSCE.  On the Effective Date, the Canadian Newco Certificate of Incorporation and the Canadian Newco By-Laws, in substantially the forms of Exhibit 7 and Exhibit 8 to this Plan (to be filed with the Plan Supplement), respectively, shall become effective.  From and after the Effective Date, Canadian Newco shall be a wholly-owned subsidiary of Reorganized SSCC.

5.1.2    Offer to Purchase the Canadian Assets.  Pursuant to this Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, in consideration for (i) the payment of cash or the distribution of Debt Instruments in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash and/or shares of New SSCC Common Stock in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with Article IV hereof.  For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan.  Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to

Canadian Newco the cash, Debt Instruments, and/or shares of New SSCC Common Stock necessary to consummate the Canadian Asset Sale.

5.1.3    Assumption of Certain Liabilities by Canadian Newco.  Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors.  Such assumed liabilities shall include, without limitation: (i) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company to their current employees, but excluding any obligations with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations are deemed to be Allowed Claims and are not satisfied or discharged pursuant to this Plan.  For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

5.1.4    Assignment of Executory Contracts and Unexpired Leases to Canadian Newco.  Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things:  (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in Exhibit 9  to this Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in Exhibit 10 to this Plan (to be filed with the Plan Supplement).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases.  Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings.  Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

5.1.5    Consensual Transfer of the Canadian Assets to Canadian Newco.  If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order.  The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

5.1.6    Sale of the Canadian Assets if Affected Unsecured Creditors of SSC Canada and Smurfit-MBI Do Not Approve the CCAA Plan.  Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan.  If the CCAA Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should the Plan fail to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected

Creditors, (i) the Debtors, in consultation with the Committee, shall be permitted (with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the Canadian Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of this Plan shall be modified to exclude the cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Competing Bid(s). Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of (i) cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default, and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans. Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI under the Plan. Canadian Newco shall be entitled to participate in the bidding and auction process.

At the conclusion of the auction, the Canadian Bankruptcy Court shall determine whether any Competing Bid constitutes a Superior Competing Bid. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order; provided, however, that the consideration Canadian Newco provides for the Canadian Assets at the conclusion of the auction shall not include any cash and/or shares of New SSCC Common Stock in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool.

## ARTICLE VI: MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     Procedural Consolidation.

        The Plan is a joint plan that does not provide for substantive consolidation of the Estates, and on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes hereof.  Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the other Debtors.  Except as specifically set forth herein, nothing in the Plan or the Disclosure Statement shall constitute, or be deemed to constitute, an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors shall be treated as a separate Claim against each Debtor for all purposes (including, but not limited to, voting and distributions); provided, however, that there shall only be a single recovery on account of any such Claim, any distributions from a Debtor on account of such a Claim shall take into account the Distributions to be made by the other Debtors on account of such Claim pursuant to the Plan, and such Claims shall be administered and treated in the manner provided in this Plan.

6.2     Corporate Governance and Corporate Actions.

        6.2.1     Amended and Restated Certificate of Incorporation and By-Laws.

                (a)     On the Effective Date, the Amended and Restated By-Laws and the Amended and Restated Certificate of Incorporation, in substantially the forms of Exhibit 1 and Exhibit 2 to this Plan (to be filed with the Plan Supplement), respectively, and in a form reasonably acceptable to the Committee, shall become effective.  The Amended and Restated Certificate of Incorporation and the Amended and Restated By-Laws shall include, among other things, (i) provisions authorizing the issuance of [_____] shares of New SSCC Common Stock, of which up to [_____] shares shall initially be issued and outstanding as of the Effective Date; provided, however, that shares representing not less than [____] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the applicable Management Incentive Plan(s) as set forth in Exhibit 3 to this Plan on, and effective as of, the Effective Date; (ii) provisions authorizing the issuance of [_____] shares of New SSCC Preferred Stock; provided, however, that no shares of the New SSCC Preferred Stock shall be issued on the Effective Date; and (iii) provisions, to the extent necessary or appropriate, giving effect to the terms of this Plan.  Consistent with Section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities.

                (b)     The certificates or articles of incorporation, by-laws, limited liability company agreements, and partnership agreements, as applicable, of each of the other Reorganized Debtors shall be amended as necessary to (a) include director and officer liability exculpation and indemnity provisions (including advancement of expenses) to the fullest extent permitted by the law of the applicable state of organization, and (b) satisfy the provisions of the

Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, in accordance with applicable law.

      6.2.2      <u>Directors and Officers of Reorganized SSCC</u>. As of the Effective Date, the initial directors of Reorganized SSCC shall be the persons identified in <u>Exhibit 4</u> to this Plan (to be filed with the Plan Supplement). The term of any current members of the board of directors of SSCC not identified as members of the initial board of directors of Reorganized SSCC shall expire on the Effective Date. The initial board of directors of Reorganized SSCC shall consist of _____ (__) directors, including (a) Patrick J. Moore, the Chief Executive Officer of Reorganized SSCC and (b) Steven J. Klinger, the President and Chief Operating Officer of Reorganized SSCC. On or promptly after the Effective Date, the initial board of directors of Reorganized SSCC shall select a Chairman of the board of directors of Reorganized SSCC.

      6.2.3      In accordance with Section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in <u>Exhibit 4</u> to the Plan (to be filed with the Plan Supplement) the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized SSCC, and to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. Each director of Reorganized SSCC shall serve from and after the Effective Date pursuant to the terms of the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, and applicable law. As set forth in <u>Exhibit 4</u> to the Plan, all existing executive officers of Reorganized SSCC are currently expected to continue to serve in their existing capacities from and after the Effective Date and, where applicable, pursuant to the terms and conditions of the Employment and Retirement Benefit Agreements to which such executive officers are party on the Effective Date, as set forth in <u>Exhibit 12</u> to the Plan.

      6.2.4      <u>Management of Reorganized Debtors Other Than Reorganized SSCC</u>. The board of directors of each Reorganized Debtor other than Reorganized SSCC shall consist of such officers or employees of Reorganized SSCC or the other Reorganized Debtors as shall be designated by the Chief Executive Officer of Reorganized SSCC. All existing executive officers of Reorganized Debtors other than Reorganized SSCC are currently expected to continue to serve in their existing capacities from and after the Effective Date.

      6.2.5      <u>Corporate Action</u>. On the Effective Date, the adoption of the Amended and Restated Certificate of Incorporation or similar constituent documents, the adoption of the Amended and Restated By-Laws, the selection of directors and officers for Reorganized SSCC and the other Reorganized Debtors, and all other corporate actions contemplated by the Plan, including the formation of Canadian Newco pursuant to Section 5.1.1 of this Plan, shall be deemed to have been authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the entity structure of the Debtors or the Reorganized Debtors, and any entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, partners or shareholders of SSCC, Reorganized SSCC, or any of the other Debtors or Reorganized Debtors. On the Effective Date, the appropriate directors and officers of Reorganized SSCC and/or of the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements,

documents, securities and instruments contemplated by the Plan in the name of and on behalf of Reorganized SSCC and/or the other Reorganized Debtors.

6.3     Issuance and Distribution of New Securities and Related Matters.

6.3.1     Issuance of New SSCC Common Stock.  On the Effective Date, Reorganized SSCC shall issue up to [_____] shares of New SSCC Common Stock and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule; provided, however, that shares representing not less than [____] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the pertinent Management Incentive Plan(s) as set forth in Exhibit 3 to this Plan on, and effective as of, the Effective Date.

6.3.2     The issuance and distribution of the New SSCC Common Stock under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy law and under the Bankruptcy Code, including, without limitation, Section 1145(a) of the Bankruptcy Code.  Without limiting the effect of Section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.  In addition, all of the shares of New SSCC Common Stock issued pursuant to the Plan shall be deemed to be fully paid, non-assessable and freely tradable to the fullest extent permissible under Section 1145 of the Bankruptcy Code.

6.3.3     Distribution of New SSCC Common Stock.  On or as soon as reasonably practicable after the Effective Date, all of the shares of the New SSCC Common Stock to which any Holder of a Claim shall become entitled pursuant to the Plan shall be made by delivery of one or more certificates representing such shares or notes as described herein or issued in the name of such Holder or DTC or its nominee or nominees, in accordance with DTC's book-entry exchange procedures, as contemplated by Section 8.7.2 hereof, subject to the terms and conditions of the Plan.  In the period pending distribution of the New SSCC Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and shall be entitled to receive dividends or other distributions payable in respect of such Holder's New SSCC Common Stock (including, without limitation, receiving any proceeds of any permitted transfer of such New SSCC Common Stock), and to exercise all other rights in respect of the New SSCC Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of any shares of the New SSCC Common Stock issued in the name of such Holder pursuant to this Plan).

6.3.4     Issuance of New Calpine Corrugated Interests.  On the Effective Date, Reorganized Calpine Corrugated shall issue 100% of the New Calpine Corrugated Interests to

Reorganized SSCC (as the successor in interest to SSCE) without the necessity of any further act or action under applicable law, regulation, order or rule.

6.4 <u>Listing on the New York Stock Exchange or the NASDAQ Stock Market</u>. As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("<u>NYSE</u>") or the NASDAQ Stock Market ("<u>NASDAQ</u>") but will incur no liability if it is unable to do so. Persons receiving distributions of New SSCC Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with Reorganized SSCC's reasonable requests to assist Reorganized SSCC in its efforts to list the New SSCC Common Stock on the NYSE or NASDAQ, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized SSCC who satisfy the independence and other requirements of the NYSE or NASDAQ and establishing committees of the board of directors of Reorganized SSCC and cooperating with any other requirements of listing on the NYSE or NASDAQ.

6.5 <u>Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors</u>.

On and after the Effective Date, after giving effect to each of the Restructuring Transactions contemplated under this Plan, each of the Reorganized Debtors and Canadian Newco shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation and by-laws, limited liability company agreements or partnership agreements in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan. Notwithstanding anything to the contrary in the Plan, subject to the effect of the Restructuring Transactions contemplated under this Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise. Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Claims, rights and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors and Canadian Newco free and clear of all Claims, Liens, charges, remedies and other encumbrances. On and after the Effective Date, the Reorganized Debtors and Canadian Newco may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, with the sole exception of any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors shall be authorized to pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without the need for any application to the Bankruptcy Court or the Canadian Bankruptcy Court.

6.6 <u>Dissolution of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II</u>.

If the CCAA Plan is approved by each Class of Affected Creditors, then from and after the Confirmation Date and through the Effective Date, SSC Canada, Smurfit-MBI and Stone FinCo II shall continue in existence and each then current officer and director of such Debtors shall continue to serve in his or her respective capacity through the earlier of the date such Debtors are dissolved pursuant to this Plan and the date such officer or director resigns, is replaced, or is terminated.  On the Effective Date, to the extent that the Canadian Assets are transferred to Canadian Newco and the SSC Canada Distribution Reserve and the Smurfit-MBI Distribution Reserve are established, SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II shall be deemed dissolved for all purposes without the necessity for any other or further action by or on behalf of Debtors or any payments to be made in connection therewith; provided, however, that the Debtors or the Reorganized Debtors shall file with the appropriate public office certificates of dissolution for SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II.  From and after the Effective Date, neither the Debtors nor the Reorganized Debtors shall be required to file any document, or take any other action, to withdraw the business operations of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II from any state or province in which such Debtors previously conducted their business operations.

6.7     Vesting of the Canadian Assets in Canadian Newco.

To the extent that the Canadian Assets are transferred to Canadian Newco on the Effective Date, they shall be transferred to and vest in Canadian Newco free and clear of all Liens, Claims, interests and encumbrances of any kind (except as otherwise set forth herein). From and after the Effective Date, Canadian Newco shall operate and may use, acquire and dispose of any Canadian Assets free of any restrictions of the Bankruptcy Code, the CCAA, the Bankruptcy Court, or the Canadian Bankruptcy Court.

The transfer of the Canadian Assets to Canadian Newco on the Effective Date and the assignment of any executory contracts, unexpired leases, licenses or permits to Canadian Newco in connection with the Canadian Asset Sale, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under the Section 1146(a) of the Bankruptcy Code.

6.8     Cancellation of Credit Documents, Debt Instruments, and Interests.

On the Effective Date, after giving effect to the distributions to be made on the Effective Date pursuant to this Plan and except as otherwise provided herein, all (a) Prepetition Credit Documents, Calpine Corrugated Credit Agreements, Prepetition Notes, Prepetition Notes Indentures, Industrial Revenue Bonds, Industrial Revenue Bond Indentures, SSCC Interests, all other Interests that are Impaired under this Plan, and any other notes, bonds, indentures, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan) registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan, shall be cancelled, and (b) the obligations of the Debtors under any agreements, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements and repurchase arrangements, or indentures (including the Prepetition Notes Indentures and the Industrial Revenue Bond Indentures) governing the Prepetition Notes, the Industrial Revenue Bonds, the SSCC Interests,

and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be discharged. Notwithstanding the foregoing and anything contained in the Plan, the Prepetition Notes Indentures shall continue in effect solely to the extent necessary to (i) allow the Reorganized Debtors or the relevant Prepetition Notes Indenture Trustees to make distributions pursuant to the Plan on or about the Effective Date on account of the Prepetition Noteholder Claims under the respective Prepetition Notes Indentures, (ii) permit the relevant Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, (iii) permit the Prepetition Notes Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Prepetition Notes Indenture Trustee is a party, and (iv) permit the applicable Prepetition Notes Indenture Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (iii). As of the Effective Date, any SSCC Interest that has been authorized to be issued but that has not been issued shall be deemed cancelled and extinguished without any further action of any party.

6.9     Cancellation of Liens.

Except as otherwise provided in the Plan, on the Effective Date, (i) all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Documents and the Calpine Corrugated Credit Agreements, shall be terminated, null and void and of no effect, and (ii) any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

6.10    Employee Compensation and Benefit Programs.

6.10.1    Except and to the extent previously assumed pursuant to an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee Benefit Plans and Employment and Retirement Benefit Agreements (as set forth in Exhibit 12 to this Plan), as amended or modified pursuant to this Plan or otherwise, including programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date, except for (i) any executory contracts or plans specifically rejected pursuant to the Plan, and (ii) any executory contracts or plans that have previously been rejected or are the subject of a motion to reject as of the Confirmation Date; provided, however, that (x) the Debtors and the Reorganized Debtors shall pay all "retiree benefits" (as defined in Section 1114(a) of the Bankruptcy Code) and (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements (as set forth in Exhibit 12 to this Plan) shall be amended prior to (or upon) the assumption thereof by the Debtors (and assignment thereof to the Reorganized Debtors) to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" or "Good Cause" (or provide

any other similar basis) for any employee of the Debtors or the Reorganized Debtors to terminate his or her employment.

6.10.2    With respect to the Employment and Retirement Benefit Agreements that the Debtors have not entered into prior to the Confirmation Date, as identified in <u>Exhibit 12</u> to this Plan, the pertinent Debtor shall be deemed to have entered into each such Employment and Retirement Benefit Agreement with the applicable employee(s) on the Confirmation Date pursuant to this Plan.  Such Employment and Retirement Benefit Agreements shall become binding in all respects on the Debtors and the applicable employee(s) on the Effective Date and shall be assigned by the Debtors to the Reorganized Debtors on the Effective Date.

6.10.3    On the Effective Date, Reorganized SSCC and any other Reorganized Debtor whose employees are covered by any of the U.S. Pension Plans shall assume and continue the U.S. Pension Plans, satisfy the minimum funding standards under the U.S. Pension Plans pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the U.S. Pension Plans in accordance with their terms and the provisions of ERISA; and nothing in the Plan shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the U.S. Pension Plans.

6.11    <u>Canadian Pension Plans</u>.

To the extent that the Canadian Assets are transferred to Canadian Newco, then, on the Effective Date, the Canadian Pension Plans shall be assigned to Canadian Newco pursuant to the terms of the CCAA Vesting Order, this Plan, the Confirmation Order, and the CCAA Sanction Order.  From and after the Effective Date, Canadian Newco shall assume and continue the Canadian Pension Plans, satisfy the minimum funding standards thereunder pursuant to applicable Canadian law, and administer the Canadian Pension Plans in accordance with their terms and the provisions of applicable Canadian law.  Nothing in the Plan shall be construed in any way as discharging, releasing or relieving Canadian Newco from liability imposed under any law or regulatory provision with respect to the Canadian Pension Plans.

6.12    <u>Management Incentive Plans</u>.

6.12.1    On the Effective Date, Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the form award agreements) substantially in the form as set forth in <u>Exhibit 3</u> to this Plan.

6.12.2    Not less than [___] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans.  Reorganized SSCC shall deliver (a) the stock option, restricted stock, and/or other equity-based awards to certain officers and other employees on, and effective as of, the Effective Date, in such amounts as are set forth in <u>Exhibit 3</u> to this Plan and in such forms as are included in <u>Exhibit 3</u> to this Plan, pursuant to the Management Incentive Plans and (b) such additional stock options, restricted stock grants and/or other equity-based awards pursuant to the Management Incentive Plans, from time to time on or after the Effective Date, as determined by the

compensation committee of the board of directors of Reorganized SSCC in such committee's discretion. On and after the Effective Date, eligible officers and other employees who receive awards under such Management Incentive Plans shall be entitled to the benefits thereof on the terms and conditions provided for therein, including the applicable award agreements provided pursuant to such Management Incentive Plans. As of the Effective Date, all equity-based awards granted by a Debtor prior to the Petition Date shall terminate and cease to be binding on such Debtor.

6.12.3    The Debtors' 2009 Long-Term Incentive Plan and 2010 Management Incentive Plan, which were previously approved by the Bankruptcy Court, shall have the financial performance goals and (as applicable) restructuring goals, and shall provide for such payments to participants, as set forth in <u>Exhibit 3</u> to this Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

6.12.4    In the event this Plan is modified to embody a sale of all or substantially all assets or equity of SSCC and/or SSCE: (i) on the Confirmation Date, the Debtors shall adopt the Management Sale Incentive Plan in substantially the form set forth in <u>Exhibit 3</u> to this Plan; and (ii) on the Effective Date, the Debtors shall be deemed to have assumed the Management Sale Incentive Plan and shall assign it to the Reorganized Debtors pursuant to the terms of this Plan.

6.13    <u>Restructuring Transactions</u>.

On, prior to, or after the Effective Date, any Debtor or Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect  the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors. In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document

effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Exhibit 13 to this Plan, to be filed with the Plan Supplement, shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in this Section 6.13. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, Sections 1123 and 1141 of the Bankruptcy Code, without any further notice, action, or process of any kind.

      6.14    Additional Transactions Authorized Under the Plan.

      In accordance with the provisions of the Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take such actions as may be necessary or appropriate to Reinstate certain Claims or Interests or to render certain Claims or Interests not Impaired in accordance with the terms of this Plan.

## ARTICLE VII: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN THE CHAPTER 11 CASES AND THE CCAA PROCEEDINGS

      7.1    Assumption/Ratification of Executory Contracts and Unexpired Leases.

      Upon the occurrence of the Effective Date, all executory contracts or unexpired leases of the Debtors shall (i) be deemed assumed in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code and (ii) be deemed ratified by the Canadian Debtor that is a party to such executory contract or unexpired lease, unless such executory contract or unexpired lease (a) was previously assumed or rejected by the Debtors in the Chapter 11 Cases or repudiated by the Canadian Debtors in the CCAA Proceedings, (b) previously expired or terminated in accordance with its terms, or (c) is subject to the Assumption/Rejection Motion in the Chapter 11 Cases. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of each such assumption pursuant to Sections 365(a) and 1123 of the Bankruptcy Code in the Chapter 11 Cases. Entry of the CCAA Sanction Order by the Canadian Bankruptcy Court shall constitute approval of each such ratification in the CCAA Proceedings. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, the terms of the Confirmation Order or the CCAA Sanction Order, as applicable, or applicable law. Except as otherwise set forth herein, (x) all Employee Benefit Plans shall be deemed to have been assumed by the Debtors on the Effective Date and (y) all Non-Qualified Employee Benefit Plans shall be deemed to have been rejected by the Debtors on the Effective Date.

      7.2    Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.

      Any monetary amounts by which each executory contract and unexpired lease to be assumed or ratified pursuant to this Plan is in default shall be satisfied by payment of the default amount in cash on the Effective Date or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee

to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption or ratification of such contract or lease , the cure payments required shall be made following the entry of a Final Order resolving the dispute and approving the assumption or ratification, as applicable. Pending the entry of such Final Order, the executory contract or unexpired lease at issue shall be deemed assumed or ratified by the Debtors, as applicable, unless otherwise ordered by the Bankruptcy Court or the Canadian Bankruptcy Court.

7.3    Assumption of Collective Bargaining Agreements.

All Collective Bargaining Agreements shall be deemed to have been assumed or ratified by the Debtors party thereto upon the occurrence of the Effective Date, provided that the Canadian Collective Bargaining Agreements shall be assigned to Canadian Newco on the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the pertinent Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

7.4    Insurance Policies and Agreements.

Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, (i) the entry of the Confirmation Order shall constitute approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate and (ii) the entry of the CCAA Sanction Order shall constitute approval of such ratification. Unless otherwise determined by the Bankruptcy Court or the Canadian Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement. To the extent that the Bankruptcy Court or the Canadian Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

7.5    Rejection Damages Bar Date.

If the rejection by a Debtor (or repudiation by a Canadian Debtor) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor unless a Proof of Claim with respect to such Claim is filed with the Claims and Noticing Agent and served upon counsel to the Debtors or the Reorganized Debtors (as the case may be) by the earlier of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting such executory contract or unexpired lease.

7.6    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date (including, without limitation, all Employment and Retirement Benefit Agreements entered into by any Debtor after the Petition Date and on or before the Confirmation Date, as set forth in <u>Exhibit 12</u> of this Plan) shall be deemed to have been assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date.

## ARTICLE VIII: PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

8.1     <u>General Provisions on Distributions under the Plan</u>.

Except as otherwise provided herein or as ordered by the Bankruptcy Court or to the extent that any Holder of an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings agrees to different treatment, distributions to be made on account of Claims that are Allowed Claims or Proven Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Notwithstanding anything herein to the contrary, distributions on account of (i) Administrative Expense Claims that are Allowed Claims as of the Effective Date and (ii) CCAA Charges shall be made on, or as soon as practicable after, the Effective Date, with no action to enforce a right to such payment until at least thirty (30) days after the Effective Date. Distributions on account of any Claim that first becomes an Allowed Claim or a Proven Claim after the Effective Date shall be made on the first Distribution Date after such Claim becomes an Allowed Claim or a Proven Claim, as applicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

Notwithstanding any other provision of this Plan to the contrary, no distributions shall be made on account of any Disputed Claims unless and until such Claim has become an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings. Prior to the Effective Date, Disputed Claims in the CCAA Proceedings shall be dealt with in accordance with the terms of the CCAA Claims Determination Order. Following the Effective Date, the resolution of Disputed Claims in the CCAA Proceedings shall continue to be dealt with in accordance with the terms of the CCAA Claims Determination Order.

8.2     <u>No Interest on Claims Unless Otherwise Provided in the Plan</u>.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the DIP Financing Order), or as otherwise required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to the payment of interest accruing on or after the Petition Date on any Claim.

8.3     <u>Distributions by Disbursing Agents</u>.

Except as specifically provided in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to assist in or make the distributions required by the Plan. The Prepetition Agent shall be the Disbursing Agent for all distributions to the Holders of Prepetition Lender Claims and Prepetition Canadian Lender Claims. The Prepetition Notes Indenture Trustees shall be the Disbursing Agents for all distributions to the Holders of Prepetition Noteholder Claims. The Industrial Revenue Bond

Indenture Trustees shall be the Disbursing Agents for all distributions to the Holders of Industrial Revenue Bond Claims. Other than as specifically set forth in the Plan, distributions to be made on account of Prepetition Noteholder Claims or Industrial Revenue Bond Claims shall be made in accordance with the terms of the applicable Prepetition Notes Indenture or Industrial Revenue Bond Indenture, or in accordance with the Plan if such Prepetition Notes Indenture or Industrial Revenue Bond Indenture is silent.

8.4    Delivery of Distributions – Chapter 11 Cases.

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Allowed Claims in the Chapter 11 Cases.

8.4.1    Delivery of Distributions in General. Distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Allowed Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Allowed Claim; (iii) at the address set forth in any written notice of address change delivered to the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of this Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

8.4.2    Distributions to Holders of Prepetition Lender Claims. On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Lender Claims, any distributions that the Debtors are required to make to such Holders pursuant to Article III of this Plan.

8.4.3    Distributions to Holders of Union Bank Claims and CIT Group Claims. On the Effective Date, the Reorganized Debtors shall deliver to Union Bank and CIT Group, for distribution on behalf of Calpine Corrugated, the cash distributions that Calpine Corrugated is required to make to such Holders pursuant to Article III of this Plan.

8.4.4    Distributions to Holders of General Unsecured Claims Against SSCE. On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver shares of the New SSCC Common Stock to the applicable Disbursing Agent for distribution to the Holders of Allowed General Unsecured Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of this Plan.

8.4.5    Distributions to Holders of Convenience Claims. On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute cash to the Holders of Allowed Convenience Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of this Plan.

8.4.6    Distributions to Holders of General Unsecured Claims Against Cameo Container and Calpine Corrugated. On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver to the Holders of Allowed General Unsecured Claims against Cameo Container and Calpine Corrugated the cash distributions that Cameo Container and Calpine Corrugated are required to make to such Holders pursuant to Article III of this Plan.

8.5     Delivery of Distributions – CCAA Proceedings.

        The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Proven Claims in the CCAA Proceedings.

        8.5.1      Delivery of Distributions in General.  Distributions to Holders of Proven Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Proven Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Proven Claim; (iii) at the address set forth in any written notice of address change delivered to the CCAA Monitor or the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of this Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

        8.5.2      Distributions to Holders of Prepetition Canadian Lender Claims.  On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Canadian Lender Claims, any distributions that the Debtors are required to make to such Holders pursuant to Article III and Article IV of this Plan.

        8.5.3      Distributions to Holders of General Unsecured Claims Against SSC Canada and Smurfit-MBI.  On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver cash and/or shares of New SSCC Common Stock to the Holders of Allowed General Unsecured Claims against SSC Canada and Smurfit-MBI in accordance with the procedures set forth in Sections 8.5 and 8.7 of this Plan.

8.6     Undeliverable and Unclaimed Distributions.

        8.6.1      Holding and Investment of Undeliverable and Unclaimed Distributions.  If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address, at which time all previously-missed distributions shall be made to such Holder without interest.

        8.6.2      Failure to Claim Undeliverable Distributions.  Amounts in respect of undeliverable distributions made in cash shall be retained by the Reorganized Debtors until such distributions are claimed.  Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed distribution within six (6) months after the Effective Date shall be deemed to have forfeited its rights to such undeliverable or unclaimed distribution and shall be forever barred and enjoined from seeking the payment of any such undeliverable or unclaimed distribution from the Debtors or the Reorganized Debtors.  In such cases, any cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any shares of New SSCC Common Stock returned to the Debtors and not claimed within one (1) year of return shall irrevocably revert to the Reorganized Debtors and shall be cancelled, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

8.6.3    Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which the check was originally issued.  Any Claim in respect of a voided check shall be made on or before the six (6) month anniversary of the date of issuance of such check.  After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred and the Reorganized Debtors shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary

8.7    Record Date for Distributions.

8.7.1    The Reorganized Debtors and the other Disbursing Agents shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Proven Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes hereof to recognize and make distributions only to those Holders of Allowed Claims or Proven Claims that actually held such Claims as of the close of business on the Distribution Record Date.  The Reorganized Debtors and the other Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as stated on the official claims register in the Chapter 11 Cases, or as reflected in the CCAA Monitor's records, as of the close of business on the Distribution Record Date.

8.7.2    Distributions to Holders of Allowed Prepetition Noteholder Claims administered by each Prepetition Notes Indenture Trustee shall be made to the account of, or at the direction of, the respective Prepetition Notes Indenture Trustee and subject to the rights of each respective Prepetition Notes Indenture Trustees to assert its Prepetition Notes Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions.  In connection with such book-entry exchange, each Prepetition Notes Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Prepetition Noteholder Claims.

8.8    Assignment of Claims.

For purposes of determining entitlement to  receive any distribution pursuant to this Plan, the Debtors, the Reorganized Debtors and the applicable Disbursing Agent, and each of their respective agents, successors and assigns, shall have no obligation to recognize any transfer of a Claim unless and until notice of the transfer or assignment from either the transferor, assignor, transferee or assignee, together with evidence showing ownership, in whole or in part, of such Claim and that such transfer or assignment was valid under applicable law, has been received by the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent, as the case may be, at least ten (10) Business Days prior to the applicable Distribution Date.

8.9    Means of Cash Payment.

Unless otherwise set forth herein, all payments of cash made pursuant to the Plan shall be in United States dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the

Reorganized Debtors; provided that cash payments made to the Prepetition Agent, Union Bank and CIT Group shall be made in immediately available funds by wire transfer. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.10    Withholding and Reporting Requirements.

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Holders of Allowed Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan, each Person or Entity that has received any distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

8.11    Allocation of Plan Distributions Between Principal and Interest. To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest thereon.

8.12    Setoff and Recoupment.

The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan in respect of such Allowed Claim, Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may assert against the Holder of such Allowed Claim; provided, however, that neither the failure to assert such rights of setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any Claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

8.13    Fractional Shares.

No fractional shares of New SSCC Common Stock shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New SSCC Common Stock or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New SSCC Common Stock. The total number of shares of New SSCC Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for herein.

8.14    Compromises and Settlements. Up to and including the Effective Date, the Debtors may compromise and settle, in accordance with Bankruptcy Rule 9019(a), any and all Claims against them. On the Effective Date, such right to compromise and settle Claims shall pass to the Reorganized Debtors as contemplated in Section 8.15 of this Plan, and the

Reorganized Debtors shall thereafter be authorized (subject to the Creditor Representative's approval when necessary under Section 12.11 hereof) to compromise and settle any Disputed Claim and execute all necessary documents, including a stipulation of settlement or release, in their sole discretion, without notice to any party, and without the need for further approval of the Bankruptcy Court.

8.15    Claims Administration Responsibility – Chapter 11 Cases.

8.15.1    Sole Responsibility of the Reorganized Debtors.  From and after the Effective Date, the Reorganized Debtors shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making distributions (if any) with respect to all Claims, including all Administrative Expense Claims; provided, however, that the Reorganized Debtors shall not be authorized to compromise, settle, or resolve any Claim, including any Administrative Expense Claim, if the Allowed amount of such Claim would exceed the Creditor Representative Threshold Amount, without the consent of the Creditor Representative in accordance with Section 12.11 of this Plan.

8.15.2    Objections to Claims.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Debtors or the Reorganized Debtors effect service of such objection in any of the following manners:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable Proof of Claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

8.15.3    Determination of Allowed Claims.  Except as otherwise agreed to by the Debtors in writing or as set forth in this Plan, the Allowed amount of any Claim as to which a Proof of Claim was timely filed in the Chapter 11 Cases, and which Claim is subject to an objection filed by the Debtors or the Reorganized Debtors before the Claims Objection Deadline, will be determined and liquidated pursuant to a Final Order of the Bankruptcy Court.  Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with this Plan.  Any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be deemed Allowed for purposes of this Plan unless otherwise ordered by the Bankruptcy Court.

8.16    Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.

8.16.1    No Distributions Pending Allowance.  No distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

8.16.2    SSCE Distribution Reserve.  On the Effective Date, the Reorganized Debtors shall issue and hold in the SSCE Distribution Reserve shares of the New SSCC Common Stock in such amount as the Reorganized Debtors reasonably determine is necessary to enable them to make the distributions required to be made to the Holders of Allowed General

Unsecured Claims against SSCE once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Damages Claims, is ultimately determined. To the extent that the SSCE Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors shall file a list of such affected Disputed Claims with the Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. To the extent that the SSCE Distribution Reserve incorporates Rejection Damages Claim arising from the rejection of any executory contracts or unexpired leases under the Plan, the Debtors shall, at such time as they file the Assumption/Rejection Motion, identify the amount of the SSCE Distribution Reserve allocated for the putative Rejection Damages Claims arising from the rejection of such executory contracts or unexpired leases. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court sustaining such objection, the Debtors' estimation of each Disputed Claim for purposes of the SSCE Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim, once Allowed, than the pro rata distribution it would have received based on the Debtors' estimation. Shares of the New SSCC Common Stock held in the SSCE Distribution Reserve pending the resolution of all Disputed Claims shall be deemed to have been voted in the same proportion as the shares of New SSCC Common Stock issued on the Initial Distribution Date.

8.16.3 <u>Distributions After Allowance</u>. Except as otherwise set forth herein with respect to General Unsecured Claims against SSCE, promptly after a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors or the Disbursing Agent, as applicable, will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims had such Claim been an Allowed Claim on such dates. After a Final Order has been entered, or other resolution has been reached, with respect to any Disputed Claim that is a General Unsecured Claim against SSCE for less than the amount of the SSCE Distribution Reserve for such Disputed Claim, the excess remaining shares of New SSCC Common Stock in the SSCE Distribution Reserve shall either be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE on the Final Distribution Date or irrevocably surrendered to Reorganized SSCC (together with any dividends, distributions or proceeds received in respect thereof). All Distributions under this Plan on account of Allowed Claims will be made together with any dividends, payments, or other distributions made on account of the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims in such Class.

8.16.4 <u>No Recourse</u>. No Holder of a Disputed Claim shall have any recourse against the Debtors, the Estates, the Reorganized Debtors, the Committee, the Prepetition Agent, the Prepetition Lenders, the Prepetition Notes Indenture Trustees, or the Industrial Revenue Bond Indenture Trustees, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors, in the event that the SSCE Distribution Reserve is insufficient to provide a sufficient distribution on account of any Disputed Claim that becomes an Allowed Claim.

8.16.5 <u>Unliquidated and Contingent Claims</u>. Any Claim that is filed or scheduled as an unliquidated or contingent Claim shall be disallowed as of the Confirmation Date unless the Holder thereof files a motion seeking the allowance or estimation of such Claim at least twenty (20) days prior to the Confirmation Hearing. In addition, the Debtors may, at any time prior to the Confirmation Hearing, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to the allowance of such Claim.

8.17 <u>Distribution Reserve – CCAA Proceedings</u>.

8.17.1 <u>SSC Canada Distribution Reserve</u>. If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the SSC Canada Distribution Pool. The CCAA Monitor shall hold the SSC Canada Distribution Pool in one or more segregated accounts and shall disburse funds and/or shares of New SSCC Common Stock from the SSC Canada Distribution Pool in accordance with the terms of this Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the SSC Canada Distribution Reserve for the purpose of holding cash and/or shares of New SSCC Common Stock from the SSC Canada Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against SSC Canada the amount of cash and/or shares of New SSCC Common Stock that such Holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim against SSC Canada as of the Initial Distribution Date. To the extent that the SSC Canada Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the SSC Canada Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation. Any funds and/or shares of New SSCC Common Stock remaining in the SSC Canada Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the SSC Canada Distribution Reserve to Reorganized SSCC.

8.17.2 <u>Smurfit-MBI Distribution Reserve</u>. If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the Smurfit-MBI Distribution Pool. The CCAA Monitor shall hold the Smurfit-MBI Distribution Pool in one or more segregated accounts and shall disburse funds and/or shares of New SSCC Common Stock from the Smurfit-MBI Distribution Pool in accordance with the terms of this Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the Smurfit-MBI Distribution Reserve for the purpose of holding cash and/or shares of New SSCC Common Stock from the Smurfit-MBI Distribution Pool in the aggregate amount sufficient to

distribute to each Holder of a Disputed Claim against Smurfit-MBI the amount of cash and/or shares of New SSCC Common Stock that such Holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim against Smurfit-MBI as of the Initial Distribution Date.  To the extent that the Smurfit-MBI Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan.  Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the Smurfit-MBI Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation.  Any funds and/or shares of New SSCC Common Stock remaining in the Smurfit-MBI Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the Smurfit-MBI Distribution Reserve to Reorganized SSCC.

## ARTICLE IX:  CONFIRMATION AND CONSUMMATION OF THE PLAN

9.1     <u>Conditions to Confirmation</u>.  The following are conditions precedent to the occurrence of the Confirmation of the Plan, each of which may be satisfied or waived in accordance with <u>Section 9.3</u> of the Plan:

9.1.2     The Bankruptcy Court shall have entered a Final Order, in a form reasonably acceptable to the Debtors and the Committee, approving the adequacy of the Disclosure Statement.

9.1.3     The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) have been entered and (ii) be in form and substance reasonably acceptable to the Debtors and the Committee.

9.1.4     The conditions precedent for implementation of the CCAA Plan, as set forth in Section 4.6 of this Plan, shall have been satisfied.

9.2     <u>Conditions to Occurrence of the Effective Date</u>.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

9.2.1     All conditions to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived in accordance with Section 9.3 of the Plan.

9.2.2     The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

9.2.3    Each CCAA Sanction Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

9.2.4    Each document, instrument, or agreement to be executed in connection with this Plan shall be reasonably acceptable to the Debtors.

9.2.5    The transactions contemplated by Article V of this Plan shall have occurred or shall have been waived by the Debtors in accordance with the terms of this Plan.

9.3    Waiver of Conditions.

Notwithstanding anything to the contrary in Section 9.1 or Section 9.2 hereof, the Debtors (in consultation with the Committee_ may waive in writing the occurrence of any of the foregoing conditions precedent to the Confirmation of the Plan and/or occurrence of the Effective Date or modify any such conditions precedent, other than the conditions set forth in Sections 9.2.2 and 9.2.3 of this Plan. Any such written waiver or modification of a condition precedent may be effected at any time without notice, without leave or order of the Bankruptcy Court or the Canadian Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in the manner set forth above, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

9.4    Consequences of Non-Occurrence of Effective Date.

If the Effective Date has not occurred within one hundred and twenty (120) days of the Confirmation Date (as such date may be extended by the Debtors in consultation with the Committee), upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors will request that the Bankruptcy Court enter an order vacating the Confirmation Order. If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume, assign or reject executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated.

9.5    Notice of Effective Date.

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

## ARTICLE X: INJUNCTIONS, RELEASES AND DISCHARGE

10.1    Discharge.

### 10.1.1    Discharge of Claims and Termination of Interests.

(a)    As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors, the Reorganized Debtors, Canadian Newco, or any of their respective assets, property and Estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a Holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under Section 1141(d)(1)(A) of the Bankruptcy Code and applicable provisions of the CCAA and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is deemed to be an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security Holder in any of the Debtors and all Interests, including, without limitation, the SSCC Interests.

(b)    As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all Persons and Entities shall be precluded from asserting against the Debtors and their respective assets, property and Estates, the Reorganized Debtors, Canadian Newco, and each of their respective Related Persons, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, the Confirmation Order and the CCAA Sanction Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest and termination of all rights of any equity security Holder in any of the Debtors and all Interests, including the SSCC Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code and applicable provisions of the CCAA, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or Canadian Newco, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to

a discharged Claim, debt or liability or terminated right of any equity security Holder in any of the Debtors or terminated Interest, including, without limitation, an SSCC Interest.

(c)     Pursuant to Section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge SSC Canada, Smurfit-MBI or Stone FinCo II from any Claims and other debts or obligations that arose prior to the Petition Date.

### 10.1.2    Discharge Injunction.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or any of their respective assets, property and Estates, the Reorganized Debtors, or Canadian Newco that is discharged pursuant to Section 10.1.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, Canadian Newco, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1.1 of this Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order or the CCAA Sanction Order.

### 10.1.3    Integral to Plan

Each of the discharges and injunctions provided in this Section 10.1 is an integral part of the Plan and is essential to its implementation.  Each of the Debtors, the Reorganized Debtors, and Canadian Newco shall have the right to independently seek the enforcement of the discharge and injunction set forth in this Section 10.1.

### 10.2    Releases.

### 10.2.1    Releases by Debtors and Estates.  Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to,

completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, Canadian Newco, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the Canadian Asset Sale, or the Restructuring Transactions that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates.

10.2.2    Releases by Holders of Claims and Interests. Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the Restructuring Transactions, or the Canadian Asset Sale; provided, however, that each Person that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in this Section 10.2.2 with respect to those Released Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and their respective predecessors, successors and assigns (whether by operation of law or otherwise).

10.2.3    Injunction Related to Releases.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to this Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited,

barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.2 of this Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

### 10.2.4 Integral to Plan.

Each of the releases and injunctions provided in this Section 10.2 is an integral part of the Plan and is essential to its implementation. Each of the Released Parties and any other Persons protected by the releases and injunctions set forth in this Section 10.2 shall have the right to independently seek the enforcement of such releases and injunctions.

### 10.2.5 Deemed Consent.

By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 10.2.2 hereof by marking the appropriate box on the Ballot, each Holder of a Claim or Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 10.2.2.

### 10.2.6 No Waiver.

Notwithstanding anything to the contrary contained in this Section 10.2, the releases and injunctions set forth in this Section 10.2 shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors or Canadian Newco to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors or Canadian Newco pursuant to the Plan.

## 10.3 Supplemental Injunction.

In order to supplement the injunctive effect of the Discharge Injunction, the Confirmation Order and the CCAA Sanction Order shall provide for the following injunctions to take effect as of the Effective Date.

### 10.3.1 *Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in Sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have*

*held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the United States, Canada, or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:*

(a) *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;*

(b) *enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(c) *creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;*

(d) *except as otherwise expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and*

(e) *taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Related Documents, the Confirmation Order, or the CCAA Sanction Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.*

10.3.2 *Bankruptcy Rule 3016 Compliance. The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the*

*Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

### 10.3.3    Integral to Plan.

Each of the injunctions provided in this Section 10.3 is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the injunctions set forth in this Section 10.3 shall have the right to independently seek the enforcement of such injunctions.

### 10.4    Disallowed Claims.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any Order disallowing any Claim or Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims to the extent such Claims are not allowable under any provision of Section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

### 10.5    Exculpation.

10.5.1    No Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Restructuring Transactions, the Canadian Asset Sale, or any contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence, and each Released Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

10.5.2    Notwithstanding any other provision herein, (i) no Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) no other party in interest, (iii) no Person claiming by or through any of the foregoing entities, and (iv) none of the Related

Persons of any of the foregoing entities, shall, or shall be deemed to, have any Claim or right of action whatsoever against any Released Party for, or on account of or relating to (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, the Canadian Asset Sale, or any contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence.

10.6    Revesting of Assets.

Pursuant to Section 1141(b) of the Bankruptcy Code and any applicable provisions of the CCAA, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Interests, except as specifically provided in the Plan, the Confirmation Order, or the CCAA Sanction Order. Without limiting the generality of the foregoing, each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional services and expenses.

10.7    Preservation of Litigation Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims. The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

10.8    Survival of Indemnification Obligations.

10.8.1    Prepetition Indemnification and Reimbursement Obligations. For purposes of the Plan, all respective obligations of SSCC and the other Debtors to indemnify and reimburse persons who are or were directors, officers, managers or employees and agents of the Debtors on the Petition Date or at any time thereafter, whether pursuant to certificates or articles of incorporation, codes of regulation, by-laws, limited liability company agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall be treated as if they are executory contracts that are

assumed pursuant to Section 365 of the Bankruptcy Code under the Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and the Debtors' assumption, of each of the Debtors' director and officer liability insurance policies.  Additionally, the Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be described in greater detail in the Plan Supplement.

       10.8.2     <u>Integral Part of Plan</u>.

Each of the provisions set forth in Section 10.8 is an integral part of the Plan and is essential to its implementation.  Each Person entitled to indemnification and insurance pursuant to this Section 10.8 shall have the right to independently seek the enforcement of each of the terms of this Section 10.8.

**ARTICLE XI:  RETENTION OF JURISDICTION**

    11.1    <u>Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court</u>.

Subject to the Cross-Border Insolvency Protocol, the Bankruptcy Court and the Canadian Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the CCAA Proceedings, and the Plan, pursuant to Sections 105(c) and 1142 of the Bankruptcy Code and applicable provisions of the CCAA, to the fullest extent permitted by law, including, among other things, jurisdiction to:

       11.1.1     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

       11.1.2     grant or deny any applications for allowance of compensation or reimbursement of expenses for periods ending on or before the Effective Date;

       11.1.3     resolve any matters related to the assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

11.1.4    ensure that distributions to Holders of Allowed Claims or Proven Claims are accomplished pursuant to the provisions of the Plan;

11.1.5    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

11.1.6    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the CCAA Sanction Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order;

11.1.7    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

11.1.8    reconcile any inconsistency between the terms of the Confirmation Order and the terms of the CCAA Sanction Order;

11.1.9    approve any modification of the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code and applicable provisions of the CCAA or approve any modification of the Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, , the CCAA Sanction Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order, in such manner as may be necessary or appropriate to consummate the Plan;

11.1.10    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court, provided, however, that (i) the fees and expenses of Professionals retained by the Reorganized Debtors, including counsel fees, that are incurred after the Effective Date, (ii) the fees and expenses of Professionals retained by the Committee, including counsel fees, that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of this Plan, and (iii) the fees and expenses of agents for or external counsel to any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of this Plan, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

11.1.11    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

11.1.12    hear and determine any Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

11.1.13    hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

11.1.14    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan are enjoined or stayed;

11.1.15    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order or the CCAA Sanction Order;

11.1.16    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases and the CCAA Proceedings;

11.1.17    hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

11.1.18    hear and determine all claims, rights or disputes arising under or in connection with the Asset Purchase Agreement and related agreements;

11.1.19    hear and determine any disputes with respect to requests for the allowance of compensation and reimbursement of expenses incurred by any Professional;

11.1.20    hear and determine such other matters as may be provided in the Confirmation Order or the CCAA Sanction Order, or as may be authorized under the Bankruptcy Code or the CCAA;

11.1.21    resolve and finally determine all disputes that may relate to, have an impact on, or arise in connection with this Plan;

11.1.22    hear any other matter consistent with the provisions of the Bankruptcy Code or the CCAA, as the case may be;

11.1.23    enter an order closing the Chapter 11 Cases; and

11.1.24    enter an order winding up the CCAA Proceedings.

## ARTICLE XII: MISCELLANEOUS

12.1    <u>Surrender of Instruments</u>.

12.1.1    As a condition to participation under the Plan, the Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall surrender

such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the beneficial holder of such a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall be deemed to have surrendered such Holder's Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness upon the surrender of such global security by DTC or such other securities depository or custodian thereof, or in the event the DTC or such other securities depository or custodian does not surrender such global security on the Effective Date or as soon as practicable thereafter, then the Debtors may waive any requirement of surrender of such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness. Except as otherwise provided in this Section, if no surrender of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness. The Debtors or the Reorganized Debtors (as the case may be) shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees) and the record Holders of such securities shall be those Holders of record as of the Effective Date.

12.2    Dissolution of the Committee.

The Committee shall continue in existence until the Effective Date. On the Effective Date, the appointment of the Committee shall terminate, and the Committee shall be dissolved, provided however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to: (i) Claims for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to Section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; (iii) any adversary proceedings or contested matter as of the Effective Date to which the Committee is a party; and (iv) responding to creditor inquiries for one hundred and twenty (120) days following the Effective Date. All reasonable fees and expenses incurred by the Professionals retained by the Committee in connection therewith shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, on the Effective Date, the Committee shall be dissolved and the members of the Committee shall be released and discharged of and from all duties, responsibilities and obligations related to or arising from or in connection with the Chapter 11 Cases.

12.3    Pre-Effective Date Injunctions or Stays.

All injunctions or stays that are in effect in the Chapter 11 Cases or the CCAA Proceedings on the Confirmation Date, whether by operation of law (including, without limitation, Section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court or the

Canadian Bankruptcy Court (including, without limitation, the CCAA Initial Order), shall continue and remain in full force and effect through and including the Effective Date.

12.4     Post-Confirmation Date Retention of Professionals.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

12.5     Bar Date for Certain Administrative Expense Claims.

All applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to Section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases (but expressly excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.16 of this Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim.  The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

12.6     Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

12.7     Exemption from Transfer Taxes.

Pursuant to Section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan; (c) the making or assignment of any lease or sublease pursuant to the Plan; or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan, the Confirmation Order or the CCAA Sanction Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under the Bankruptcy Code.

12.8    Payment of Statutory Fees.

All fees payable pursuant to Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

12.9    Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees.

Notwithstanding anything to the contrary in the Plan, the Prepetition Notes Indenture Trustee Fees and the Industrial Revenue Bond Indenture Trustee Fees that are incurred prior to the Effective Date shall be paid in full, in cash, on the Effective Date.  The Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees that are incurred after the Effective Date shall be paid in full, in cash, by the Reorganized Debtors in the ordinary course of business after the Effective Date.

12.10    Proofs of Claim Filed by Prepetition Notes Indenture Trustees.

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Prepetition Notes Indenture Trustees with respect to the Prepetition Noteholder Claims.  If any Prepetition Notes Indenture Trustee files a Proof of Claim in respect of the Prepetition Noteholder Claims and a Prepetition Noteholder also files a Proof of Claim with respect to any Prepetition Noteholder Claim included in the Proof of Claim filed by the Prepetition Notes Indenture Trustee, only the Proof of Claim of the Prepetition Notes Indenture Trustee shall be Allowed.

12.11    Creditor Representative Duties and Payment of Fees

The Committee, in consultation with the Debtors, shall select the Creditor Representative, whose identity shall be disclosed in the Plan Supplement.  From and after the Effective Date, the Creditor Representative, with the assistance of counsel, shall be responsible for (i) approving the settlement or allowance of any Claim where the Allowed amount would exceed the Creditor Representative Threshold Amount and (ii) enforcing the terms of the Plan.  The reasonable fees and expenses of the Creditor Representative (including the reasonable fees and expenses of counsel retained by the Creditor Representative) shall be paid by the Reorganized Debtors after the Effective Date without the need for approval by the Bankruptcy Court, provided that such fees and expenses shall not exceed $[_____] in the aggregate.

12.12    Amendment or Modification of the Plan.

Subject to Section 1127 of the Bankruptcy Code and applicable provisions of the CCAA, the Debtors may alter, amend, modify or supplement the Plan, Plan Supplement or the Exhibits at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

12.13    Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.14   Binding Effect; Successors and Assigns.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and all other parties in interests in these Chapter 11 Cases and the respective successors and assigns of each of the foregoing, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

12.15   Revocation, Withdrawal or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.16   Notice.

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Smurfit-Stone Container Corporation
222 North LaSalle Street
Chicago, IL 60601
Attention: General Counsel
Telephone:
Facsimile:

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Attention:     James F. Conlan
              Matthew A. Clemente
              Dennis M. Twomey
              Bojan Guzina
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

12.17    <u>Governing Law</u>.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law of the United States is applicable to the Plan in the Chapter 11 Cases, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the Plan in the Chapter 11 Cases shall be governed by, and construed and enforced in accordance with, the laws of the United States and the State of Delaware, without giving effect to the principles of conflicts of laws thereof.  Except to the extent that the CCAA or other federal law of Canada is applicable to the CCAA Plan, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the CCAA Plan shall be governed by, and construed and enforced in accordance with, the laws of Canada and the Province of Ontario, without giving effect to the principles of conflicts of laws thereof.

12.18    <u>Reservation of Rights</u>.

Except as expressly set forth herein, the Plan shall have no force and effect unless (i) the Bankruptcy Court has entered the Confirmation Order and (ii) the Canadian Bankruptcy Court has entered the CCAA Sanction Order.  The filing of the Plan, the Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to any Holders of Claims against or Interests in the Debtors.

Dated:  December 1, 2009

> Smurfit-Stone Container Corporation (for itself and on behalf of each of the other Debtors)
>
> By:   /s/ Craig A. Hunt                        .
> Name:  Craig A. Hunt
> Title:  Senior Vice President, Secretary and General Counsel

# EXHIBIT 1

**AMENDED AND RESTATED**

**BYLAWS**

**OF**

**SMURFIT-STONE CONTAINER CORPORATION**
**(f/k/a Smurfit-Stone Container Enterprises, Inc.)**

(hereinafter called the "Corporation")

ARTICLE 1

**OFFICES**

SECTION 1.01.  Registered Office.  The registered office of the Corporation shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 1.02.  Other Offices.  The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine.

ARTICLE 2

**STOCKHOLDERS**

SECTION 2.01.  Annual Meetings.  An annual meeting of stockholders shall be held for the election of directors and the transaction of such other business as may properly be brought before the meeting in accordance with these Bylaws at such date, time and place, if any, as may be fixed by resolution of the Board of Directors of the Corporation (the "Board of Directors") from time to time.  The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but shall be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.  Subject to Section 2.09, any other proper business may be transacted at an annual meeting.

SECTION 2.02.  Special Meetings.  A special meeting of stockholders for any purpose or purposes (x) may be called at any time by the Chairman or the Vice Chairman and (y) shall be called by the Secretary or the Chairman or the Vice Chairman at the request in writing (delivered to such officer at the executive offices of the Corporation) of (i) a majority (subject to the second paragraph of Section 3.05) of the entire Board of Directors pursuant to a resolution adopted thereby (which resolution shall constitute the aforementioned written request) or (ii) the holders of a majority of the voting power of the capital stock of the Corporation issued and outstanding and entitled to vote generally in the election of directors, as promptly as practicable following such request.  Any such request shall specify the purpose or purposes for which the meeting is requested to be called.  The Board of Directors may, in its sole discretion, determine that a special meeting shall not be held in any place, but shall be held solely by means of remote

communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.

SECTION 2.03.  <u>Notice of Meetings</u>.  A written notice of each annual or special meeting of stockholders shall be given stating the place, if any, date and time of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by law, the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation") or these Bylaws, such notice of meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder of record entitled to vote at such meeting, personally, by mail or, to the extent and in the manner permitted by applicable law, electronically.  If mailed, such notice shall be deemed to be given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.

SECTION 2.04.  <u>Adjournments</u>.  Any annual or special meeting of stockholders may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the date, time and place, if any, thereof and the means of remote communication, if any, by which stockholders and proxyholders may be deemed present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting any business may be transacted which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting in accordance with Section 2.03.

SECTION 2.05.  <u>Conduct; Remote Communication</u>.  Meetings of stockholders shall be presided over by the Chairman, or if there is no Chairman or in his or her absence or inability to act, by the Vice Chairman, or in the absence or inability of the Vice Chairman, by a chairman chosen at the meeting.  The Secretary shall act as secretary of the meeting, but in his or her absence the chairman presiding over the meeting may appoint any person to act as secretary of the meeting.

If authorized by the Board of Directors in accordance with these Bylaws and applicable law, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication, (1) participate in a meeting of stockholders and (2) be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, *provided* that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

CH1 5084694v.1

SECTION 2.06.  Quorum.  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the presence in person or by proxy of the holders of shares of capital stock having a majority of the votes which could be cast by the holders of all outstanding shares of capital stock entitled to vote at the meeting shall constitute a quorum at each meeting of stockholders.  In the absence of a quorum, the stockholders so present may, by the affirmative vote of the holders of stock having a majority of the votes which could be cast by all such holders, adjourn the meeting from time to time in the manner provided in Section 2.04 until a quorum is present.  If a quorum is present when a meeting is convened, the subsequent withdrawal of stockholders, even though less than a quorum remains, shall not affect the ability of the remaining stockholders lawfully to transact business.

SECTION 2.07.  Voting.  Except as otherwise provided by the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of capital stock held by such stockholder which has voting power on the matter in question.

Voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors of election unless so required by Section 2.11 of these Bylaws or so determined by the holders of stock having a majority of the votes which could be cast by the holders of all outstanding shares of capital stock entitled to vote which are present in person or by proxy at such meeting.  Directors shall be elected as provided in Section 3.03 of these Bylaws.  Each other question presented to the stockholders at a meeting shall, unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, be decided by the vote of the holders of shares of capital stock having a majority of the votes which could be cast by the holders of all shares of capital stock entitled to vote on such question which are present in person or by proxy at the meeting.

Shares of capital stock of the Corporation standing in the name of another corporation and entitled to vote may be voted by such officer, agent or proxy as the bylaws or other internal regulations of such other corporation may prescribe or, in the absence of such provision, as the board of directors or comparable body of such other corporation may determine.

Shares of capital stock of the Corporation standing in the name of a deceased person, a minor, an incompetent or a debtor in a case under Title 11, United States Code, and entitled to vote may be voted by an administrator, executor, guardian, conservator, debtor-in-possession or trustee, as the case may be, either in person or by proxy, without transfer of such shares into the name of the official or other person so voting.

A stockholder whose shares of voting stock are pledged shall be entitled to vote such shares unless on the transfer records of the Corporation the pledgor has expressly empowered the pledgee to vote such shares, in which case only the pledgee, or such pledgee's proxy, may represent such shares and vote thereon.

If shares of voting stock are held of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with

3

a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (i) if only one votes, such act binds all; (ii) if more than one vote, the act of the majority so voting binds all; and (iii) if more than one votes, but the vote is evenly split on any particular matter each faction may vote such stock proportionally, or any person voting the shares, or a beneficiary, if any, may apply to the Court of Chancery of the State of Delaware or such other court as may have jurisdiction to appoint an additional person to act with the persons so voting the stock, which shall then be voted as determined by a majority of such persons and the person appointed by the Court. If the instrument so filed shows that any such tenancy is held in unequal interests, a majority or even split for the purpose of this subsection shall be a majority or even split in interest.

Shares of capital stock of the Corporation belonging to the Corporation, or to another corporation a majority of the shares entitled to vote in the election of directors of which are held by the Corporation, shall not be voted at any meeting of stockholders and shall not be counted in the total number of outstanding shares for the purpose of determining whether a quorum is present. Nothing in this Section 2.07 shall limit the right of the Corporation to vote shares of stock of the Corporation held by it in a fiduciary capacity.

SECTION 2.08.  List of Stockholders Entitled to Vote.  The Secretary shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, *provided* that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, the list shall be open to the examination of any stockholder during the whole time thereof on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list of stockholders or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

SECTION 2.09.  Business to be Conducted at Stockholder Meetings.  No business may be transacted at any meeting of stockholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors (or any duly authorized committee thereof), (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (c) in the case of an annual meeting, otherwise properly brought before the meeting by any stockholder of the Corporation who (i) is a stockholder of record on the date of the giving of the notice provided for in this Section 2.09 and on the record date for the determination of

stockholders entitled to vote at such annual meeting and (ii) complies with the notice procedures set forth in this Section 2.09.

In addition to any other applicable requirements, for business to be properly brought before any annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation. To be timely, a stockholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the anniversary date of the immediately preceding annual meeting of stockholders; *provided*, *however*, that (x) in the case of the first annual meeting held after the Effective Date of the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [(as Modified)] filed pursuant to Section 1121(a) of Chapter 11 of Title 11 of the United States Code and Section [____] of the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as amended (the "Plan of Reorganization"), and (y) in the event that any other annual meeting is called for a date that is not within thirty (30) days before or after the anniversary date of the immediately preceding annual meeting of stockholders, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was given or public disclosure of the date of the annual meeting was first made, whichever first occurs.

To be in proper written form, a stockholder's notice to the Secretary under this Section 2.09 must set forth as to each matter such stockholder proposes to bring before the annual meeting (i) a brief description of the business desired to be brought before the meeting, (ii) the reasons for conducting such business at the annual meeting, (iii) the text of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment), (iv) a description of all arrangements or understandings between or among such stockholder and/or any beneficial owner of the shares held by such stockholder and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (v) any material interest of such stockholder or any such beneficial owner in such business, (vi) the following information in respect of such stockholder and each such beneficial owner: (A) the name and address of such stockholder or beneficial owner; (B) as of the date of the stockholder notice (1) each class or series and number of shares of capital stock of the Corporation that are owned, directly or indirectly, beneficially or of record by such stockholder or beneficial owner, (2) any option, warrant, convertible security, stock appreciation right or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of capital stock of the Corporation or with a value derived in whole or in part from the value of any class or series of capital stock of the Corporation, whether or not such instrument or right is subject to settlement in the underlying class or series of capital stock of the Corporation (each, a "Derivative Instrument") directly or indirectly owned beneficially by such stockholder or beneficial owner and any other direct or indirect opportunity held or owned beneficially by such stockholder or beneficial owner to profit or share in any profit derived from any increase or decrease in the value of any class or series of shares of capital stock or other securities of the Corporation, (3) any proxy, contract, arrangement, understanding or relationship pursuant to which such stockholder or beneficial

owner has a right to vote any shares of capital stock of the Corporation, (4) any short interest held by such stockholder or beneficial owner in any security of the Corporation, (5) any right owned beneficially by such stockholder or beneficial owner to dividends on any shares of capital stock of the Corporation, which right is separated or separable from the underlying shares, (6) any proportionate interest in any shares of capital stock of the Corporation or Derivative Instrument held directly or indirectly by a general or limited partnership in which such stockholder or beneficial owner is a general partner or with respect to which such stockholder or beneficial owner directly or indirectly owns an interest in a general partner and (7) any performance related fees (other than an asset-based fee) to which such stockholder or beneficial owner is entitled based on an increase or decrease in the value of any shares of capital stock or other securities of the Corporation or any Derivative Instrument; (C) any other information relating to such stockholder or beneficial owner that would be required to be disclosed in a proxy statement or other filing required to be made in connection with the solicitation of proxies for election of directors in a contested election pursuant to Section 14 of the Securities Exchange Act of 1934, as amended from time to time (the "Exchange Act"), and the rules and regulations promulgated thereunder; (D) a representation that such stockholder is a holder of record of a class of capital stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to bring such business before the meeting; and (E) a representation as whether or not such stockholder or beneficial owner intends, or is part of a group that intends, (x) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding voting capital stock required to approve or adopt the proposal or (y) otherwise to solicit proxies from stockholders in support of such proposal. For the purposes of these Bylaws, "beneficially owns" (or any similar phrase) shall have the meaning set forth in Rule 13d-3 under the Exchange Act as in effect from time to time; and a person shall be deemed to hold a "short interest" in a security if such person directly or indirectly, through a contract, arrangement, understanding, relationship or otherwise has the opportunity to profit or share in any profit derived from any decrease in the value of such security.

With respect to the information required to be included in the stockholder notice in respect of the stockholder or any beneficial owner pursuant to subclauses (1) through (7) of clause (B) of the preceding paragraph, the stockholder notice shall also include any interests held by members of the immediate family of such stockholder or beneficial owner sharing the same household. The information included in the stockholder notice pursuant to such subclauses with respect to the stockholder and each beneficial owner and any immediate family members shall be updated by such stockholder by supplemental notices delivered to or mailed and received at the principal executive offices of the Corporation (x) not later than ten (10) days after the record date for the applicable annual meeting and (y) ten (10) days before the applicable annual meeting date, and shall be further updated by delivery of a supplemental notice to the Secretary immediately prior to the commencement of the annual meeting.

No business shall be conducted at any annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.09, and the business transacted at any special meeting of stockholders shall be limited to the purpose or purposes for which such meeting is called, except as otherwise determined by the Board of Directors or the chairman presiding over the meeting. Notwithstanding the foregoing, once business has been properly brought before any meeting of stockholders, nothing in this Section 2.09 shall be deemed to preclude discussion by any stockholder of any such business. If

the chairman presiding over any meeting of stockholders determines that business was not properly brought before such meeting in accordance with the foregoing procedures, the chairman shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Nothing contained in this Section 2.09 shall be deemed to affect any rights of stockholders to request the inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor thereto) under the Exchange Act.

SECTION 2.10. <u>Proxies</u>. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy filed with the Secretary before or at the time of the meeting. No such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing with the Secretary an instrument in writing revoking the proxy or another duly executed proxy bearing a later date.

A stockholder may authorize another person or persons to act for such stockholder as proxy (i) by executing a writing authorizing such person or persons to act as such, which execution may be accomplished by such stockholder or such stockholder's authorized officer, director, partner, employee or agent (or, if the stock is held in a trust or estate, by a trustee, executor or administrator thereof) signing such writing or causing his or her signature to be affixed to such writing by any reasonable means, including, but not limited to, facsimile signature, or (ii) by transmitting or authorizing the transmission of a telegram, cablegram or other means of electronic transmission (a "<u>Transmission</u>") to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such Transmission; *provided* that any such Transmission must either set forth or be submitted with information from which it can be determined that such Transmission was authorized by such stockholder.

Any Inspector or Inspectors appointed pursuant to Section 2.11 of these Bylaws shall examine Transmissions to determine if they are valid. If no Inspector or Inspectors are so appointed, the Secretary or such other person or persons as shall be appointed from time to time by the Board of Directors shall examine Transmissions to determine if they are valid. If it is determined that a Transmission is valid, the person or persons making that determination shall specify the information upon which such person or persons relied.

Any copy, facsimile telecommunication or other reliable reproduction of such a writing or Transmission may be substituted or used in lieu of the original writing or Transmission for any and all purposes for which the original writing or Transmission could be used; *provided* that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or Transmission.

SECTION 2.11. <u>Voting Procedures and Inspectors of Elections</u>. If the Corporation has a class of voting stock that is (i) listed on a national securities exchange, (ii) authorized for

7

quotation on an interdealer quotation system of a registered national securities association or (iii) held of record by more than 2,000 stockholders, the Board of Directors shall, in advance of any meeting of stockholders, appoint one or more inspectors (individually an "Inspector" and collectively the "Inspectors") to act at such meeting and make a written report thereof. The Board of Directors may designate one or more persons as alternate Inspectors to replace any Inspector who shall fail to act. If no Inspector or alternate is able to act at such meeting, the chairman presiding over the meeting shall appoint one or more other persons to act as Inspectors. Each Inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of Inspector with strict impartiality and according to the best of his or her ability.

The Inspectors shall (i) ascertain the number of shares of capital stock of the Corporation outstanding and the voting power of each, (ii) determine the number of shares of capital stock of the Corporation present in person or by proxy at such meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period of time a record of the disposition of any challenges made to any determination by the Inspectors and (v) certify their determination of the number of such shares present in person or by proxy at such meeting and their count of all votes and ballots. The Inspectors may appoint or retain other persons or entities to assist them in the performance of their duties.

The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at such meeting. No ballots, proxies or votes, nor any revocations thereof or changes thereto, shall be accepted by the Inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by any stockholder shall determine otherwise.

In determining the validity and counting of proxies and ballots, the Inspectors shall be limited to an examination of the proxies, any envelopes submitted with such proxies, any information referred to in the second and third paragraphs of Section 2.10 of these Bylaws, ballots and the regular books and records of the Corporation, except that the Inspectors may consider other reliable information for the limited purpose of reconciling proxies and ballots submitted by or on behalf of banks, brokers, their nominees or similar persons which represent more votes than the holder of a proxy is authorized by a stockholder of record to cast or more votes than such stockholder holds of record. If the Inspectors consider other reliable information for the limited purpose permitted herein, the Inspectors, at the time they make their certification pursuant to the second paragraph of this Section 2.11, shall specify the precise information considered by them, including the person or persons from whom such information was obtained, when and the means by which such information was obtained and the basis for the Inspectors' belief that such information is accurate and reliable.

SECTION 2.12. Fixing Date of Determination of Stockholders of Record. In order that the Corporation may determine the stockholders entitled (i) to notice of or to vote at any meeting of stockholders or any adjournment thereof, (ii) to receive payment of any dividend or other distribution or allotment of any rights, (iii) to exercise any rights in respect of any change, conversion or exchange of stock or (iv) to take, receive or participate in any other action, the Board of Directors may fix a record date, which shall not be earlier than the date upon which the resolution fixing the record date is adopted by the Board of Directors and which (1) in the case of

a determination of stockholders entitled to notice of or to vote at any meeting of stockholders or adjournment thereof, shall, unless otherwise required by law, be not more than sixty (60) nor less than ten (10) days before the date of such meeting; and (2) in the case of any other action, shall be not more than sixty (60) days before such action.

If no record date is fixed, (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and (ii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting, but the Board of Directors may fix a new record date for the adjourned meeting.

ARTICLE 3

**DIRECTORS**

SECTION 3.01.  <u>Duties and Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which, directly or through one or more committees thereof as provided herein, may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

SECTION 3.02.  <u>Composition of the Board of Directors</u>.  The directors constituting the Board of Directors immediately following the adoption of these Bylaws shall be those persons who are appointed for such purpose pursuant to the Plan of Reorganization, and such directors shall initially constitute the entire Board of Directors.  The number of directors constituting the entire Board of Directors may at any time and from time to time thereafter be changed by resolution adopted by the Board of Directors.

The composition of the Board of Directors shall comply with the independence requirements of the laws, rules and regulations applicable to the Corporation, including the federal securities laws and the Sarbanes-Oxley Act, the rules of the Securities and Exchange Commission (the "<u>SEC</u>") and the requirements of **[insert the name of the exchange on which the New Common Stock is to be initially listed]** (the "<u>Exchange</u>") or such other securities exchange as may be applicable.  Directors need not be stockholders.

As used in these Bylaws, the term "<u>entire Board of Directors</u>" means the total number of directors which the Corporation would have if there were no vacancies.

SECTION 3.03.  <u>Election</u>.  Except as otherwise provided pursuant to the Certificate of Incorporation in respect of directors to be elected solely by the holders of one or more classes or series of preferred stock and except as provided by Section 3.06 with respect to the filling of vacancies, directors shall be elected by a majority of votes cast by the shares of capital stock represented at a meeting of stockholders and entitled to vote thereon, a quorum being present at

such meeting, unless the election is contested, in which case directors shall be elected by a plurality of votes cast by the shares represented at such meeting.  A "majority of votes cast" for such purpose means that the number of votes cast "for" the election of the nominee exceeds 50% of the total number of votes cast "for" or "against" the election of that nominee.  Stockholders shall also be provided the opportunity to abstain with respect to the election of a director.  In voting on the election of directors, abstentions, votes designated to be withheld from the election of a director and shares present but not voted in respect of the election of a director, if any, shall not be considered as votes cast.  An election shall be considered "contested" if the number of nominees for election is greater than the number of directors to be elected.  For purposes hereof, the number of nominees shall be determined as of the last date on which a stockholder in accordance with these Bylaws may give notice of the nomination of a person for election as a director in order for such nomination to be required to be presented for a vote of the stockholders.

Each director, including a director elected to fill a vacancy, shall hold office until the next annual meeting of stockholders and until his or her successor is duly elected and qualified or until his or her earlier death, incapacity, resignation, retirement, disqualification or removal from office.

SECTION 3.04.  Nomination of Directors.  Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the Certificate of Incorporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors in certain circumstances.  Nominations of persons for election to the Board of Directors may be made at any annual meeting of stockholders or at special meeting of stockholders called for the purpose of electing directors (a) by or at the direction of the Board of Directors (or any duly authorized committee of the Board of Directors) or (b) by any stockholder of the Corporation (i) who is a stockholder of record on the date of the giving of the notice provided for in this Section 3.04 and on the record date for the determination of stockholders entitled to vote at such meeting of stockholders and (ii) who complies with the notice procedures set forth in this Section 3.04.

In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.  To be timely, a stockholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation: (a) in the case of an annual meeting, not less than ninety (90) days nor more than one hundred twenty (120) days prior to the anniversary date of the immediately preceding annual meeting of stockholders; *provided, however*, that (x) in the case of the first annual meeting held after the Effective Date of the Plan of Reorganization and (y) in the event that any other annual meeting is called for a date that is not within thirty (30) days before or after the anniversary date of the immediately preceding annual meeting of stockholders, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was given or public disclosure of the date of the annual meeting was first made, whichever first occurs; and (b) in the case of a special meeting of stockholders called for the purpose of electing directors, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth (10th) day

following the day on which notice of the date of the special meeting was given or public disclosure of the date of the annual meeting was first made, whichever first occurs. In the event that the number of directors to be elected to the Board of Directors at any annual meeting is increased and there is no public announcement by the Corporation naming all the nominees for director or specifying the size of the increased Board of Directors at least ninety (90) days prior to the first anniversary of the preceding year's annual meeting, a stockholder notice required by this Section 3.04 shall also be considered timely, but only with respect to the nominees for any new positions created by such increase, if it shall be received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was given or public disclosure of the date of the annual meeting was first made, whichever first occurs.

To be in proper written form, a stockholder's notice to the Secretary under this Section 3.04 must set forth (a) as to each person whom the stockholder proposes to nominate for election as a director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) each class or series and number of shares of capital stock of the Corporation which are owned of record or beneficially by the person and (iv) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (b) a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings and any other material relationships between or among (1) such nominee and (2) such stockholder, any beneficial owner of the shares held by such stockholder and their respective affiliates and associates or others acting in concert therewith, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC if any person referred to in subclause (2) were the "registrant" for the purposes of Item 404 and the nominee were a director or executive officer of such registrant, (c) in respect of such stockholder and each such beneficial owner, the information that would be required to be set forth in a stockholder notice given under Section 2.09 pursuant to subclauses (A) and (B) of clause (vi) of the third paragraph of that Section, (d) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to nominate the persons named in the notice given pursuant to this Section 3.04 and (e) any other information relating to such stockholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

The Corporation may require any proposed nominee to furnish such other information as it may reasonably require (x) to determine the eligibility of such proposed nominee to serve as a director of the Corporation, (y) to determine whether such nominee qualifies as an "independent director" or "audit committee financial expert" under applicable law, securities exchange rules or regulations or any publicly disclosed corporate governance guidelines or the charter of any committee of the Board of Directors and (z) that could otherwise be material to a reasonable stockholder's understanding of the independence and qualifications, or lack thereof, of such nominee.

No person shall be eligible for election as a director of the Corporation at any meeting of the stockholders unless nominated in accordance with the procedures set forth in this Section 3.04.  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the chairman presiding over any meeting of stockholders shall have the power to (x) determine whether a director nomination was made in accordance with the procedures set forth in this Section 3.04 and (y) declare that a director nomination was not made in compliance with this Section 3.04.  Unless otherwise required by law, if the stockholder (or a qualified representative of the stockholder) who proposed any nominee for director by a notice given pursuant to this Section 3.04 does not appear at the meeting of stockholders to make such nomination, such nomination shall be disregarded notwithstanding that proxies with respect to the election of such nominee may have been received by the Corporation.  For the purposes of this paragraph, to be considered a qualified representative of the stockholder, a person must be a duly authorized officer, manager or partner of such stockholder or authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce evidence of such position or authority.

SECTION 3.05.  <u>Resignation and Removal</u>.  Any director may resign at any time by giving written notice to the Chairman, the Vice Chairman or the Secretary.  A resignation shall take effect when the resignation is delivered to the officer to whom it is directed unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events, without any need for its acceptance.

Any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors.  The Board of Directors shall not request that a special meeting of stockholders be called, at which meeting the removal of a director from office is to be voted on, unless the Board of Directors has first determined, by the affirmative vote of at least 75% of the members of the entire Board of Directors, that there exists Cause (as defined below) to remove such director from the Board of Directors.  For purposes of this Section 3.05, "<u>Cause</u>" means a director's (i) willful and continued failure to substantially perform his or her duties to the Corporation in accordance with his or her established position as an officer or director of the Corporation, (ii) willful conduct which is significantly injurious to the Corporation, monetarily or otherwise, or (iii) conviction of, or pleading guilty to, a felony.

SECTION 3.06.  <u>Vacancies</u>.  Subject to the terms of any one or more classes or series of preferred stock of the Corporation, newly created directorships resulting from any increase in the number of directors and any vacancies in the Board of Directors resulting from death or incapacity, resignation, retirement, disqualification or removal from office may be filled only by the affirmative vote of a majority of the directors then in office, though less than a quorum, or by a sole remaining director, or by stockholders at a special meeting duly called for such purpose, and directors so elected shall hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified, or until their earlier death or incapacity, resignation, retirement, disqualification or removal from office.

SECTION 3.07.  <u>Regular Meetings</u>.  Unless otherwise determined by the Board of Directors, a regular annual meeting of the Board of Directors shall be held, without call or

notice, immediately after and, if the annual meeting of stockholders is held at a place, at the same place as the annual meeting of stockholders, for the purpose of organizing the Board of Directors, electing officers and transacting any other business that may properly come before such meeting.  Additional regular meetings of the Board of Directors may be held without call or notice at such times as shall be fixed by resolution of the Board of Directors.

SECTION 3.08.  Special Meetings.  Special meetings of the Board of Directors may be called by the Chairman, the Vice Chairman, the Chief Executive Officer or the Secretary or by any member of the Board of Directors.  Notice of a special meeting of the Board of Directors shall be given by the person or persons calling the meeting shall be given to each director either (a) by mail not less than forty-eight (48) hours before the date and time of the meeting (and, if such notice is given by mail within seven (7) days prior to the date of the meeting, concurrently by telephone, telegram, telecopier, electronic transmission or cable), (b) by telephone, telegram or  telecopier given not less than twenty-four (24) hours before the date and time of the meeting or (c) on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.  The purpose or purposes of a special meeting need not be stated in the call or notice.

SECTION 3.09.  Organization; Quorum; Actions by Board.  Meetings of the Board of Directors shall be presided over by the Chairman, or if there is no Chairman or in his or her absence or inability to act, by the Vice Chairman, or in the absence or inability to act of the Vice Chairman, by a chairman chosen at the meeting.  The Secretary shall act as secretary of the meeting, but in his or her absence the chairman presiding over the meeting may appoint any person to act as secretary of the meeting.  A majority of the directors present at a meeting, whether or not they constitute a quorum, may adjourn such meeting to any other date, time or place without notice other than announcement at the meeting.

Except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these Bylaws, at all meetings of the Board of Directors, a majority of the entire Board of Directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors.

SECTION 3.10.  Action by Written Consent.  Unless otherwise provided by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all the members of the Board of Directors or such committee, as the case may be, consent thereto in writing (which may be in counterparts) or by electronic transmission, and the written consent or consents or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or such committee.  Such filing shall be made in paper form if the minutes of the Corporation are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

SECTION 3.11.  Meetings by Means of Conference Telephone.  Unless otherwise provided by the Certificate of Incorporation or these Bylaws, members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors, the Independent Directors (as defined in Section 3.12) or such committee by means of conference

telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 3.11 shall constitute presence in person at such meeting.

SECTION 3.12. <u>Independent Director Meetings</u>. Those members of the Board of Directors who are "independent" under the rules of the Exchange (herein "<u>Independent Directors</u>") shall hold periodic meetings. Immediately following the first meeting of the Board of Directors at which these Bylaws are adopted (*provided* that a majority of the Independent Directors are present at such meeting), the Independent Directors shall hold a meeting and elect, by a majority vote of the Independent Directors present at such meeting, a director to act as the lead independent director ("<u>Lead Independent Director</u>"). The Lead Independent Director shall preside at all meetings of the Independent Directors. Meetings of the Independent Directors may be called by the Lead Independent Director on his or her own or at the request of another Independent Director. The meetings may be held at such time and place as determined by the Lead Independent Director. The notice requirements set forth in Section 3.08 shall apply to such meetings, unless waived. The Lead Independent Director shall be elected annually immediately following the Board of Directors meeting held in conjunction with the annual stockholders meeting, and shall serve until his or her successor is duly elected and qualified, or until his earlier death or incapacity, resignation, retirement, disqualification or removal from office.

SECTION 3.13. <u>Committees</u>. In addition to the committees of the Board of Directors provided for in Sections 3.14 through 3.16, the Board of Directors may, by resolution, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of the committee, the member or members present at any meeting and not disqualified from voting, whether or not a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member. Members of a committee shall hold office for such period as may be fixed by a resolution adopted by the Board of Directors, subject to removal at any time by the Board of Directors.

Except as otherwise provided in these Bylaws, any committee, to the extent allowed by applicable law and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation. The Corporation hereby elects to be governed by Section 141(c)(2) of the General Corporation Law of the State of Delaware (the "<u>DGCL</u>"). Each committee shall keep regular minutes and report to the Board of Directors when required.

Unless the Board of Directors otherwise provides, each committee of the Board of Directors may make, alter and repeal rules for the conduct of its business.

SECTION 3.14. <u>Compensation Committee</u>. There is hereby established a Compensation Committee. The Compensation Committee shall consist of such number of directors as from time to time shall be designated by the Board of Directors, who shall serve on such committee for the term for which each member is designated or until such member's successor is duly elected and qualified, or until such member's earlier death or incapacity, resignation, retirement,

disqualification or removal from the Board of Directors or the Compensation Committee. The composition of the Compensation Committee shall comply with the independence requirements of the Exchange or such other securities exchange as may be applicable, and no member of the Compensation Committee shall be an officer or an employee of the Corporation or of any subsidiary of the Corporation. The Compensation Committee shall have the powers and authority set forth in a written charter of the Compensation Committee approved and adopted by the Board of Directors.

SECTION 3.15.  Nominating and Governance Committee.  There is hereby established a Nominating and Governance Committee. The Nominating and Governance Committee shall consist of such number of directors as from time to time shall be designated by the Board of Directors, who shall serve on such committee for the term for which each member is designated or until such member's successor is duly elected and qualified, or until such member's earlier death or incapacity, resignation, retirement, disqualification or removal from the Board of Directors or the Nominating and Governance Committee. The composition of the Nominating and Governance Committee shall comply with the independence requirements of the Exchange or such other securities exchange as may be applicable. The Nominating and Governance Committee shall have the powers and authority set forth in a written charter of the Nominating and Governance Committee approved and adopted by the Board of Directors.

SECTION 3.16.  Audit Committee.  There is hereby established an Audit Committee of the Board of Directors. The Audit Committee shall consist of directors who shall serve on such committee for the term for which each member is designated or until such member's death or incapacity, resignation, retirement, disqualification or removal from the Board of Directors or the Audit Committee. The Audit Committee shall be comprised of not less than three (3) directors each of whom shall meet the independence, experience and any other requirements of the laws, rules and regulations applicable to the Corporation, including the federal securities laws and the Sarbanes-Oxley Act, the rules of the SEC, and the requirements of the Exchange or such other securities exchange as may be applicable. The Audit Committee shall have the powers and authority set forth in a written charter of the Audit Committee approved and adopted by the Board of Directors.

SECTION 3.17.  Compensation.  Unless otherwise restricted by the Certificate of Incorporation, the Board of Directors shall have the authority to fix the compensation of directors. The directors shall be paid their reasonable expenses, if any, of attendance at each meeting of the Board of Directors or a committee thereof and may be paid a fixed sum for attendance at each such meeting and an annual retainer or salary for services as a director or committee member. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

SECTION 3.18.  Interested Directors.  A director who is directly or indirectly a party to a contract or transaction with the Corporation, or is a director or officer of or has a financial interest in any other corporation, partnership, association or other organization which is a party to a contract or transaction with the Corporation, may be counted in determining whether a quorum is present at any meeting of the Board of Directors or a committee thereof at which such contract or transaction is considered or authorized, and such director may participate in such

meeting and vote on such authorization to the extent permitted by applicable law, including Section 144 of the DGCL.

SECTION 3.19. Reliance upon Records. Every director, and every member of any committee of the Board of Directors, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors, or by any other person as to matters the director or member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation, including, but not limited to, such records, information, opinions, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the Corporation's capital stock might properly be purchased or redeemed.

ARTICLE 4

**OFFICERS**

SECTION 4.01. General. The officers of the Corporation shall be chosen by the Board of Directors and shall include a Chief Executive Officer, a President, a Chief Operating Officer, a Chief Financial Officer, a Secretary and a Treasurer. The Board of Directors in its discretion may also elect one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and such other officers as it deems appropriate. The Corporation shall also have a Chairman and may have a Vice Chairman, each of whom shall be chosen by resolution of the Board of Directors from among the directors of the Corporation. A person serving as Chairman or Vice Chairman shall not be deemed to be an officer of the Corporation unless such person separately holds an officer position. Unless otherwise prohibited by applicable law or the Certificate of Incorporation, any number of offices may be held by the same person and any officer who is also a director may be elected as the Chairman or the Vice Chairman. Any Vice President may be designated Executive, Senior or Corporate, or may be given such other designation or combination of designations as the Board of Directors may determine. The officers of the Corporation need not be stockholders of the Corporation nor need such officers be directors of the Corporation.

SECTION 4.02. Election; Resignation; Removal; Vacancies. The Board of Directors at its meeting held after each annual meeting of stockholders shall elect the officers of the Corporation, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier death or incapacity, resignation, retirement, disqualification or removal from office. Any officer may resign at any time by giving written notice to the Chairman, the Chief Executive Officer or the Secretary. Unless otherwise stated in a notice of resignation, it shall take effect when received by the officer to whom it is directed, without any need for its acceptance. The Board of Directors may remove any officer with or without cause at any time, but such removal shall be without prejudice to the contractual rights of such officer, if any, with

16

the Corporation.  A vacancy occurring in any office of the Corporation may be filled for the unexpired portion of the term thereof by the Board of Directors at any regular or special meeting.

SECTION 4.03.  <u>Chairman and Vice Chairman of the Board</u>.  The Chairman shall preside at all meetings of stockholders and of the Board of Directors at which the Chairman is present.  The Chairman shall also perform such other duties and may exercise such other powers as from time to time may be assigned to him or her by these Bylaws or by the Board of Directors.

The Board of Directors may also elect by resolution a Vice Chairman from among the members of the Board of Directors to act in the place of the Chairman in his or her absence or inability to act.

SECTION 4.04.  <u>Chief Executive Officer</u>.  Subject to the control of the Board of Directors, the Chief Executive Officer shall have general supervisory responsibilities with respect to the business affairs and officers of the Corporation.  The Chief Executive Officer shall also perform such other duties and may exercise such other powers as from time to time may be assigned to him or her by these Bylaws or by the Board of Directors.

The Chief Executive Officer shall execute all bonds, mortgages, contracts and other instruments of the Corporation requiring a seal, under the seal of the Corporation, except where required or permitted by applicable law, rule or regulation to be otherwise signed and executed and except that the other officers of the Corporation may sign and execute documents when so authorized by these Bylaws, the Board of Directors or the Chief Executive Officer.

SECTION 4.05.  <u>President</u>.  The President shall assist the Chief Executive Officer in directing the business affairs and officers of the Corporation and shall perform such other duties as from time to time may be assigned to him or her by the Board of Directors or the Chief Executive Officer.   He shall also, in the absence, upon the disability or at the request of the Chief Executive Officer, exercise and perform the duties of the Chief Executive Officer.  The President may execute bonds, mortgages, contracts and other instruments of the Corporation requiring a seal, under the seal of the Corporation, except where required or by applicable law, rule or regulation to be otherwise signed and executed.

SECTION 4.06.  <u>Chief Operating Officer</u>.  The Chief Operating Officer shall have responsibility for the day-to-day operation of the business of the Corporation and shall perform such other duties as from time to time may be assigned to him or her by the Board of Directors, the President or the Chief Executive Officer.  The Chief Operating Officer may execute bonds, mortgages, contracts and other instruments of the Corporation requiring a seal, under the seal of the Corporation, except where required or by applicable law, rule or regulation to be otherwise signed and executed.

SECTION 4.07.  <u>Chief Financial Officer</u>.  The Chief Financial Officer shall exercise general supervision over the finances of the Corporation and shall supervise and be responsible for all matters pertaining to the raising of debt and equity capital and cash management functions of the Corporation.  The Chief Financial Officer shall render periodically such balance sheets and other financial statements or reports relating to the business of the Corporation as may be required by the Board of Directors, the Chairman, the Chief Executive Officer or any other

authorized officer of the Corporation. The Chief Financial Officer shall be a Vice President and shall report to the Chief Executive Officer.

SECTION 4.08. <u>Vice Presidents</u>. At the request of the President or the Chief Operating Officer or in the absence of the President or the Chief Operating Officer or in the event of the inability or refusal of the President or the Chief Operating Officer to act, the Vice President or the Vice Presidents, if there is more than one (first the Executive Vice President, second the Chief Financial Officer and then in the order designated by the Board of Directors) shall perform the duties of the President and Chief Operating Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President or the Chief Operating Officer (as applicable). Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe. If there be no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the President or the Chief Operating Officer or in the event of the inability or refusal of the President or the Chief Operating Officer to act, shall perform the duties of the President or the Chief Operating Officer (as applicable), and when so acting, shall have all the powers of and be subject to all the restrictions upon the President or the Chief Operating Officer (as applicable).

SECTION 4.09. <u>Secretary</u>. The Secretary shall attend all meetings of the Board of Directors and all meetings of stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for the standing committees of the Board of Directors when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and, shall perform such other duties as may be prescribed by the Board of Directors, the Chairman or the Chief Executive Officer, who shall have supervisory authority with respect to the Secretary. If the Secretary shall be unable or shall refuse to cause to be given notice of any meeting of the stockholders or any special meetings of the Board of Directors, and if there be no Assistant Secretary then, either the Board of Directors, the Chairman or the Chief Executive Officer may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be one, shall have authority to affix the same to any instrument or document executed on behalf of the Corporation and, when so affixed, it may be attested by the signature of the Secretary or by the signature of any such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

SECTION 4.10. <u>Treasurer</u>. The Treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chairman, the Chief Executive Officer and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall

be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death or incapacity, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

SECTION 4.11.  <u>Assistant Secretaries</u>.  Except as may be otherwise provided in these Bylaws, Assistant Secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the Chief Executive Officer, the President, the Chief Operating Officer, any Vice President or the Secretary, and in the absence of the Secretary or in the event of his or her disability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

SECTION 4.12.  <u>Assistant Treasurers</u>.  Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the Chief Executive Officer, the President, the Chief Operating Officer, any Vice President, if there be one, or the Treasurer, and in the absence of the Treasurer or in the event of his or her disability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer.  If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death or incapacity, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

SECTION 4.13.  <u>Other Officers</u>.  Such other officers as the Board of Directors may from time to time elect shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors.  The Board of Directors may delegate to any other officer of the Corporation the power to appoint such other officers and to prescribe their respective duties and powers.

SECTION 4.14.  <u>Voting Securities Owned by the Corporation</u>.  Subject to the control of the Board of Directors, powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chief Executive Officer, the President, the Chief Operating Officer, the Executive Vice President, the Chief Financial Officer or any other Vice President and any such officer may, in the name of and on behalf of the Corporation, take all such action such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation or other entity in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and powers incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present.  The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

# ARTICLE 5

## STOCK CERTIFICATES AND TRANSFERS

SECTION 5.01.  <u>Certificates</u>.  Shares of the Corporation's capital stock may be certificated or uncertificated, as determined by the Board of Directors.  Any certificates of stock of the Corporation shall be in such form as may be determined by the Board of Directors, shall be numbered and shall be entered in the books of the Corporation as they are issued.  Any such certificates shall exhibit the holder's name and be signed by or in the name of the Corporation (i) by the Chairman, the Chief Executive Officer, the President, the Chief Operating Officer or a Vice President and (ii) by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares owned by him in the Corporation.

SECTION 5.02.  <u>Signatures</u>.  Any or all of the signatures on a certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

SECTION 5.03.  <u>Lost Certificates</u>.  The Corporation may issue a new certificate for stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such stockholder's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

SECTION 5.04.  <u>Book Entry Shares</u>.  Shares of the Corporation's capital stock may, if so authorized by the Board of Directors, be evidenced by registration in the holder's name in uncertificated, book-entry form on the books of the Corporation.  Except as expressly provided by applicable law, the rights and obligations of the holders of shares represented by certificates and the rights and obligations of the holders of uncertificated shares of the same class and series shall be identical.

SECTION 5.01.  <u>Transfers</u>.  Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for stock of the Corporation duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer or, if the relevant stock certificate is claimed to have been lost, stolen or destroyed, upon compliance with the provisions of Section 5.03 of these By-laws, and upon payment of applicable taxes with respect to such transfer, and in compliance with any restrictions on transfer applicable to such stock certificate or the shares represented thereby of which the Corporation shall have notice and subject to such rules and regulations as the Board of Directors may from time to time deem advisable concerning the transfer and registration of stock certificates, the Corporation shall issue a new certificate or certificates for such stock to the person entitled thereto, cancel the old certificate and record the transaction upon its books.  Transfers of stock shall be made only on the books of the Corporation by the registered holder thereof or by such holder's attorney or successor duly authorized as evidenced by documents filed with the Secretary or transfer agent of the

Corporation. Whenever any transfer of stock shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of transfer if, when the certificate or certificates representing such stock are presented to the Corporation for transfer, both the transferor and transferee request the Corporation to do so.

SECTION 5.02. <u>Additional Rules and Regulations</u>. The Board of Directors may make such additional rules and regulations as it may deem expedient, and not inconsistent with these Bylaws, concerning the issue, transfer and registration of certificated or uncertificated shares of capital stock of the Corporation. All references to stock or shares in these Bylaws shall refer to either stock or shares represented by certificates or uncertificated shares, and no such reference shall be construed to require certificated shares or to grant additional or different rights or obligations as between the holders of certificated and uncertificated shares of the Corporation.

SECTION 5.03. <u>Stockholders of Record</u>. The Corporation shall be entitled to treat the holder of record of any stock of the Corporation as the holder thereof and shall not be bound to recognize any equitable or other claim to or interest in such stock on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by the laws of the State of Delaware.

## ARTICLE 6

## **NOTICES**

SECTION 6.01. <u>Manner of Notice</u>. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, whenever notice is required to be given to any stockholder, director or member of any committee of the Board of Directors, such notice may be given by (i) personal delivery, (ii) depositing it, in a sealed envelope, in the United States mails, first class, postage prepaid, addressed, (iii) delivering to a company for overnight or second day mail or delivery, (iv) delivering it to a telegraph company, charges prepaid, for transmission, or by transmitting it via telecopier, or (v) any other reliable means permitted by applicable law (including, subject to the second paragraph of this Section 6.01, electronic transmission) to such stockholder, director or member, either at the address of such stockholder, director or member as it appears on the records of the Corporation or, in the case of such a director or member, at his or her business address; and such notice shall be deemed to be given at the time when it is thus personally delivered, deposited, delivered or transmitted, as the case may be. Such requirement for notice shall also be deemed satisfied, except in the case of stockholder meetings, if actual notice is received orally or by other writing by the person entitled thereto as far in advance of the event with respect to which notice is being given as the minimum notice period required by law or these Bylaws.

Without limiting the foregoing, any notice to stockholders given by the Corporation pursuant to these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation and shall also be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary of the Corporation, the transfer agent or other person responsible for the

giving of notice; *provided*, *however*, that the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. Notice given by a form of electronic transmission in accordance with these Bylaws shall be deemed given: (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice; and (iv) if by another form of electronic transmission, when directed to the stockholder.

SECTION 6.02. <u>Dispensation with Notice</u>. Whenever notice is required to be given by law, the Certificate of Incorporation or these Bylaws to any stockholder to whom (i) notice of two consecutive annual meetings of stockholders and all notices of meetings of stockholders during the period between such two consecutive annual meetings or (ii) all, and at least two, payments (if sent by first class mail) of dividends or interest on securities of the Corporation during a twelve-month period, have been mailed addressed to such stockholder at the address of such stockholder as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting which shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the Corporation a written notice setting forth the then current address of such stockholder, the requirement that notice be given to such stockholder shall be reinstated.

Whenever notice is required to be given by law, the Certificate of Incorporation or these Bylaws to any person with whom communication is unlawful, the giving of such notice to such person shall not be required, and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

SECTION 6.03. <u>Waiver of Notice</u>. Any written waiver of notice, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee or directors need be specified in any written waiver of notice.

ARTICLE 7

**GENERAL PROVISIONS**

SECTION 7.01. <u>Dividends</u>. Dividends upon the capital stock of the Corporation, if any, may, subject to the provisions of the Certificate of Incorporation, be declared by the Board of Directors at any regular or special meeting, and may be paid in cash, in property, or in shares of capital stock. Before payment of any dividend, there may be set aside out of any funds of the

Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any such reserve.

SECTION 7.02.  Disbursements.  All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

SECTION 7.03.  Fiscal Year.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

SECTION 7.04.  Corporate Seal.  The Board of Directors may provide a corporate seal which shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

ARTICLE 8

**INDEMNIFICATION**

SECTION 8.01.  Power to Indemnify in Actions, Suits or Proceedings other than those by or in the Right of the Corporation.  Subject to Section 8.03, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director or officer of the Corporation, or is or was a director or officer of the Corporation serving at the request of the Corporation as a director, officer, trustee, administrator, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts (including attorneys' fees paid in settlement) actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

SECTION 8.02.  Power to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation.  Subject to Section 8.03, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or is or was a director or officer of the Corporation serving at the request of the Corporation as a director, officer,

trustee, administrator, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such excuses which the Court of Chancery or such other court shall deem proper.

SECTION 8.03. <u>Authorization of Indemnification</u>. Any indemnification under this Article 8 (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of such person is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 8.01 or Section 8.02, as the case may be. Such determination shall be made with respect to a person who is a director or officer at the time of such determination, (i) by the Board of Directors by a majority vote of the directors who were not parties to such action, suit or proceeding (the "<u>Uninvolved Directors</u>") even though less than a quorum, or (ii) by a committee of such Uninvolved Directors designated by majority vote of the Uninvolved Directors, even though less than a quorum, or (iii) if there are no Uninvolved Directors, or if the Uninvolved Directors so direct, by independent legal counsel in a written opinion, or (iv) by the stockholders. To the extent, however, that a director or officer of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding described above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of authorization in the specific case.

SECTION 8.04. <u>Good Faith Defined</u>. For purposes of any determination under Section 8.03, a person shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of account of the Corporation or another enterprise, or on information supplied to such person by the officers of the Corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the Corporation or another enterprise or on information or records given or reports made to the Corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation or another enterprise. The term "<u>another enterprise</u>" as used in this Section 8.04 shall mean any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Corporation as a director, officer, trustee, administrator, employee or agent. The provisions of this Section 8.04 shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 8.01 or 8.02, as the case may be.

SECTION 8.05.  Indemnification by a Court.  Notwithstanding any contrary determination in the specific case under Section 8.03, and notwithstanding the absence of any determination thereunder, any director or officer may apply to any court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Sections 8.01 and 8.02.  The basis of such indemnification by a court shall be a determination by such court that indemnification of the director or officer is proper in the circumstances because he has met the applicable standards of conduct set forth in Section 8.01 or 8.02, as the case may be. Neither a contrary determination in the specific case under Section 8.03 nor the absence of any determination thereunder shall be a defense to such application or create a presumption that the director or officer seeking indemnification has not met any applicable standard of conduct.  Notice of any application for indemnification pursuant to this Section 8.05 shall be given to the Corporation promptly upon the filing of such application.  If successful, in whole or in part, the director or officer seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

SECTION 8.06.  Expenses Payable in Advance.  Expenses (including, without limitation, attorneys' fees) actually and reasonably incurred by a director or officer in defending or investigating a threatened or pending action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized in this Article 8.

SECTION 8.07.  Nonexclusivity of Indemnification and Advancement of Expenses.  The indemnification and advancement of expenses provided by or granted pursuant to this Article 8 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any Bylaw, agreement, contract, vote of stockholders or disinterested directors or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office, it being the policy of the Corporation that indemnification of, and advances of expenses to, the persons specified in Section 8.01 and 8.02 shall be made to the fullest extent permitted by law.  The provisions of this Article 8 shall not be deemed to preclude the indemnification of, and advancement of expenses to, any person who is not specified in Sections 8.01 or 8.02 of this Article 8 but whom the Corporation has the power or obligation to indemnify under the provisions of the DGCL, or otherwise.

SECTION 8.08.  Insurance.  The Corporation may purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation or is or was a director or officer of the Corporation serving at the request of the Corporation as a director, officer, trustee, administrator, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article 8.

SECTION 8.09.  Certain Definitions.  For purposes of this Article 8, references to "the Corporation" shall include, in addition to the Corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger (including, without limitation, Smurfit-Stone Container Corporation, a Delaware corporation incorporated on August 4, 1989 under the name "SIBV/MS Holdings, Inc.", which was merged into the Corporation on [_____], 2010) which, if its separate existence had continued, would have had power and authority to indemnify its directors or officers, so that any person who is or was a director or officer of such constituent corporation, or is or was a director or officer of such constituent corporation serving at the request of such constituent corporation as a director, officer, trustee, administrator, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall stand in the same position under the provisions of this Article 8 with respect to the resulting or surviving corporation as such person would have had with respect to such constituent corporation if its separate existence had continued.  For purposes of this Article 8, references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, trustee, administrator, employee or agent of the Corporation which imposes duties on, or involves services by, such director or officer with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article 8.

SECTION 8.10.  Survival of Indemnification and Advancement of Expenses.  The indemnification and advancement of expenses obligations set forth in this Article 8 shall inure to the benefit of the heirs, executors, administrators and personal representatives of those persons entitled thereto and shall be binding upon any successor to the Corporation to the fullest extent permitted by law.  Neither any amendment or repeal of the provisions of this Article 8 nor adoption of any provision of the Certificate of Incorporation or of these Bylaws which is inconsistent with the provisions of this Article 8 shall adversely affect any right or protection of a person existing at the time of such amendment, repeal or adoption with respect to actions, suits or proceedings relating to acts or omissions of such person occurring prior to such amendment, repeal or adoption.

SECTION 8.11.  Limitation on Indemnification.  Notwithstanding anything contained in this Article 8 to the contrary, except for proceedings to enforce rights to indemnification and rights to advancement of expenses (which shall be governed by Section 8.06), the Corporation shall not be obligated to indemnify, or advance expenses to, any director or officer in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board of Directors.

SECTION 8.12.  Indemnification of Employees and Agents.  The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and to the advancement of expenses to employees and agents of the Corporation and its subsidiaries and joint venture entities similar to those conferred in this Article 8 to directors and officers of the Corporation.

# ARTICLE 9

## AMENDMENTS

SECTION 9.01.  Except as set forth below, these Bylaws may be amended, altered or repealed and new Bylaws adopted by (i) the stockholders, by the affirmative vote of the holders of a majority of the voting power of the shares of capital stock issued and outstanding and entitled to vote generally in the election of directors (voting together as a single class) at a meeting of the stockholders (*provided* notice of the proposed amendment shall be included in the notice of the meeting) or (ii) the Board of Directors, by a majority vote of the entire Board of Directors at any meeting, including any bylaw adopted by the stockholders; *provided*, *however*, that the stockholders may from time to time specify particular provisions of the Bylaws which shall not be amended by the Board of Directors.

CH1 5084694v.1

# EXHIBIT 2

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**SMURFIT-STONE CONTAINER CORPORATION**
(f/k/a Smurfit-Stone Container Enterprises, Inc.)

Smurfit-Stone Container Corporation (the "Corporation"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

That its original Certificate of Incorporation of the Corporation was filed under the name "Stone Container Corporation" with the Secretary of State of the State of Delaware on November 15, 2000; that its name was changed to "Smurfit-Stone Container Enterprises, Inc. pursuant to a Certificate of Merger filed with the Secretary of State of the State of Delaware on November 1, 2004 in connection with the merger of Jefferson Smurfit Corporation (U.S.) into Stone Container Corporation; and that its name was further changed to "Smurfit-Stone Container Corporation" pursuant to a [Certificate of Merger filed with the Secretary of State of the State of Delaware on [_____], 2010 in connection with the merger of Smurfit-Stone Container Corporation, a Delaware corporation incorporated on August 4, 1989 under the name "SIBV/MS Holdings, Inc." (the "Predecessor Corporation"), into the Corporation].

That this Amended and Restated Certificate of Incorporation was duly adopted in accordance with the provisions of Sections 242 and 245 and, to the extent applicable, Section 303, of the General Corporation Law of the State of Delaware (as amended, the "DGCL"), and amends and restates, in their entirety, the provisions of the Corporation's Certificate of Incorporation as currently in effect. Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the order of the United States Bankruptcy Court for the District of Delaware dated as of [_____  __], 2009 confirming the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [(as Modified)] (the "Plan") filed pursuant to Section 1121(a) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

The Corporation's Certificate of Incorporation as currently in effect is hereby amended and restated in its entirety to read as follows:

1.    Name.  The name of the Corporation is Smurfit-Stone Container Corporation.

2.    Registered Office and Agent.  The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.    Purpose:  The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the DGCL.

4. <u>Capital Stock</u>:

     A.    <u>General</u>. The total number of shares of capital stock which the Corporation shall have authority to issue is [_____ million] ([_____]) shares, consisting of: (a) [_____ million] ([_____]) shares of common stock, par value $.001 per share (the "<u>Common Stock</u>"); and (b) [_____ million] ([_____]) shares of preferred stock, par value $.001 per share (the "<u>Preferred Stock</u>").

     B.    <u>Common Stock</u>. Except as otherwise provided by the DGCL or by resolutions, if any, of the Board of Directors fixing the relative powers, preferences and rights and the qualifications, limitations or restrictions of any series of Preferred Stock, the entire voting power of the shares of the Corporation for the election of directors and for all other purposes shall be vested exclusively in the Common Stock. Each share of Common Stock shall have one vote upon all matters to be voted on by the holders of the Common Stock, and shall be entitled to participate equally in all dividends payable with respect to the Common Stock. Each share of Common Stock shall share equally, subject to the rights and preferences of any series of outstanding Preferred Stock (as fixed by resolutions, if any, of the Board of Directors), in all assets of the Corporation, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, or upon any distribution of the assets of the Corporation.

     C.    <u>Preferred Stock</u>. The Board of Directors is expressly authorized to provide for the issuance of all or any shares of the Preferred Stock in one or more classes or series, and to fix for each such class or series such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issuance of such class or series and as may be permitted by the DGCL, including, without limitation, the authority to provide that any such class or series may be (i) subject to redemption at such time or times and at such price or prices, (ii) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or any other series, (iii) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation or (iv) convertible into, or exchangeable for, shares of any other class or classes of stock, or of any other series of the same or any other class or classes of stock, of the Corporation at such price or prices or at such rates of exchange and with such adjustments, all as may be stated in such resolution or resolutions.

     D.    <u>Non-Voting Stock</u>. Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue non-voting capital stock of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) be deemed void or eliminated if required under applicable law.

5. <u>Board of Directors</u>: The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors. Subject to the rights of holders of any series of Preferred Stock to elect additional directors under specified circumstances, the number of directors constituting the whole Board of Directors shall be fixed, and my be altered from time to time, in the manner provided in the bylaws of the Corporation as in effect from time to time (the "<u>Bylaws</u>"). In no case shall a decrease in the number of directors remove or shorten the term of any incumbent director. Directors need not be stockholders of the Corporation or residents of the State of Delaware. Elections of directors need not be by written ballot unless the Bylaws so provide.

6. <u>Limitation on Liability of Directors</u>. To the fullest extent permitted by law, no director shall be personally liable to the Corporation or any of its stockholders for monetary damages for any breach of fiduciary duty as a director, except for liability (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. Any alteration, amendment or repeal of this <u>Article 6</u> by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such alteration, amendment or repeal with respect to acts or omissions occurring prior to such alteration, amendment or repeal.

7. <u>Perpetual Existence</u>. The Corporation is to have perpetual existence.

8. <u>Bylaws</u>. The Bylaws may be altered, amended or repealed in whole or in part, and new Bylaws may be adopted, (i) by the Board of Directors with the affirmative vote of such number of directors as may be required by, and otherwise in accordance with the procedures specified in, the Bylaws or (ii) by the affirmative vote of stockholders required by, and otherwise in accordance with the procedures specified in, the Bylaws.

9. <u>No Stockholder Action Without a Meeting</u>. Any action required or permitted to be taken by the stockholders of the Corporation may be effected solely at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders in lieu of such a meeting.

10. <u>Indemnification</u>. Each person who is or was a director or officer of the Corporation (or the Predecessor Corporation), and each person who is or was a director or officer of the Corporation (or the Predecessor Corporation) serving at the request of the Corporation (or the Predecessor Corporation) as a director, officer, trustee, administrator, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall be indemnified by the Corporation in accordance with, and to the fullest extent authorized by, the DGCL as in effect from time to time.

11. <u>Amendment or Repeal of Articles</u>. The Corporation reserves the right, at any time and from time to time, to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by the laws of the State of Delaware; <u>provided</u>, <u>however</u>, that the amendment, alteration or repeal of <u>Articles 5</u>, <u>6</u>, <u>9</u>, <u>10</u> or <u>11</u> of this Amended and Restated Certificate of Incorporation shall

require the affirmative vote of the holders of a majority of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by [_____], its [_____], this [_] day of [_____], 2010.

<div style="margin-left:40%;">

SMURFIT-STONE CONTAINER CORPORATION

By: _____
Name:
Title:

</div>

# EXHIBIT 3

**SUMMARY OF MANAGEMENT INCENTIVE PLANS FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS SUBSIDIARIES[1]**

## I.       OVERVIEW

Historically and in the ordinary course of its business, the Company has implemented various compensation and benefits programs that are designed to incentivize future performance, align management incentives with those of Company's other stakeholders through equity-based compensation, provide employees with a market-based, competitive compensation opportunities and benefits packages, and reward its management employees for excellent service.  This compensation philosophy continued through the Company's chapter 11 cases as the Company sought, and on April 22, 2009, the Bankruptcy Court approved, annual and long-term cash incentive programs in the form of the Company's 2009 Management Incentive Plan, 2010 Management Incentive Plan, and 2009 Long-Term Incentive Plan, each of which was designed to drive the Company's financial performance and, in the case of the 2009 Long-Term Incentive Plan, restructuring objectives, during the chapter 11 cases.

Consistent with its historical practices and continued efforts to provide management with market-based compensation opportunities after its emergence from bankruptcy, the Company will provide initial grants of equity to key members of management under an Equity Incentive Plan, through a mix of options, restricted stock, and/or other equity-based awards, subject to certain vesting criteria and other terms and conditions, to provide management with immediate incentives to continue to enhance the value of the Company over the long-term as well as provide incentives for them to remain employed with the Company.

Notwithstanding the Company's filing its chapter 11 plan of reorganization, the Debtors believe that it remains important to provide incentives to key management employees to consider a possible sale of the Company that will increase the value of the Company's estate and enhance the recovery of all stakeholders in the chapter 11 cases.  The Plan therefore includes a Management Sale Incentive Plan ("MSIP") that will become effective as of the Confirmation Date if the Plan provides for a sale of all or substantially all of the assets or equity of SSCC and/or SSCE, and potentially provides payments to approximately 50 officers and other key management employees only upon such a sale as part of a plan of reorganization.  The terms of the MSIP are described in this Exhibit 3 to the Plan.

The Company will adopt the Equity Incentive Plan and, to the extent the Plan embodies a sale of the Company, also will adopt the Management Sale Incentive Plan, in each case, as of the Confirmation Date.  Except as otherwise set forth in this Exhibit or the Plan, the Company will

---

[1] This is a summary designed to explain key terms and other details of the Management Incentive Plans as is not a substitute for the terms and conditions of such Management Incentive Plans. The pertinent plan documents will govern in the event of any conflict between this summary and the incentive plan documents.

honor, and as applicable, assume all of the Management Incentive Plans as described in this Exhibit 3 and the Plan as of the Effective Date.


## II.    2010 MANAGEMENT INCENTIVE PLAN

The Company historically paid annual incentives to a broad group of management-level employees pursuant to its annual Management Incentive Plan ("MIP").  Each annual MIP was designed to ensure that annual incentive awards were based primarily on corporate, divisional, and individual performance.  After the commencement of their chapter 11 cases, on March 19, 2009, the Company sought approval from the Bankruptcy Court to continue its annual MIP for each of 2009 and 2010 for the approximately 3,650 management employees who historically had participated in the MIP.  On April 22, 2009, the Bankruptcy Court authorized the Company to implement the 2009 MIP and to implement the 2010 MIP on substantially the same terms as the 2009 MIP (including participant target level incentive bonuses, performance periods, and incentive bonus payout levels), subject to the development of the Company's Budgeted EBITDAR (as defined below) for 2010 and related processes.

Consistent with the 2009 MIP and the Bankruptcy Court order, 2010 MIP participants are divided into four tiers:  Tier I is comprised of 13 Executives; Tier II includes approximately 100 non-Executive employees who are critical to the Company's performance and successful reorganization efforts; Tier III includes approximately 850 managerial employees with corporate or division-specific responsibilities; and Tier IV includes approximately 2,600 employees.

In accordance with the Bankruptcy Court order, annual and semi-annual performance targets will be established for the 2010 MIP plan year (January 1, 2010 through December 31, 2010), including a threshold level of performance below which no award payment will be made (85% of the performance target), levels of performance at which specified percentages of the target award will be paid, and a maximum level of performance (140% of the performance target) above which no additional award shall be paid.  The 2010 MIP "payout curve" will be the same as the 2009 MIP "payout curve", where 2010 MIP participants will receive an award at 50% of target for 85% "threshold" performance; 100% of target payout for 100% of "target" performance; and 175% of target payout for 140% "maximum" performance.

The 2009 MIP performance targets are measured based on three performance periods: two six-month semi-annual performance periods and one annual performance period.  Just as in the 2009 MIP, a 2010 MIP Participant is eligible to receive a semi-annual award pursuant to the 2010 MIP after the end of each semi-annual performance period and an annual award after the end of the annual performance period, subject to the Company's achievement of certain financial and/or operational goals for the performance period, provided that any above-target incentive bonus amount earned with respect to the first six-month semi-annual performance period is scheduled to be paid after the end of the 2010 MIP plan year.  As in the 2009 MIP, under the 2010 MIP, the percentages of the target incentive bonus payouts attributable to each performance period are as follows:  40% of the annual target bonus for the first semi-annual performance period; 30% of the annual target bonus for the second semi-annual performance period; and 30% of the annual target bonus for the annual performance period.

Consistent with the establishment of the 2009 MIP financial performance targets and Bankruptcy Court order authorizing the 2010 MIP, the applicable Company financial performance targets are based on a corporate EBITDAR metric that is calculated based upon Consolidated EBITDA as defined in the Company's DIP Credit Agreement, subject to certain adjustments ("Budgeted EBITDAR").

The Company has developed the Budgeted EBITDAR for 2010 that will be used as the 2010 MIP Performance Targets, which is set forth in Schedule [___] attached hereto.  In the event that the Company has not implemented the 2010 MIP prior to the Confirmation Date, it will adopt and implement it on the Confirmation Date.  Additionally, pursuant to the Plan, the 2010 MIP will remain in effect after the Effective Date.

## III.    2009 LONG-TERM INCENTIVE PLAN

The 2009 LTIP approved by the Bankruptcy Court on April 22, 2009 provides potential cash incentive bonuses for a group of approximately 50 employees whose top-level performance is critical to the Company's success through the chapter 11 cases (the "2009 LTIP Participants").

Each 2009 LTIP Participant will be eligible to receive a potential target long-term cash incentive award that is subject to a two-year plan cycle that runs from January 1, 2009 through December 31, 2010 as set forth in the Bankruptcy Court's order authorizing the 2009 LTIP. Each target award will be divided by a target cash unit value set by the Compensation Committee to determine the number of cash units for that particular award.

The  2009 LTIP "payout curve" is the same as the 2009 MIP "payout curve", where 2009 LTIP Participants will receive an award at 50% of target for 85% "threshold" performance; 100% of target payout for 100% of  "target" performance; and 175% of target payout for 140% "maximum" performance.

The 2009 LTIP Performance Target will be comprised of (i) the average of the actual Company performance over the two-year plan cycle compared to the Company's Budgeted EBITDAR and (ii) achievement of restructuring goals that will be substantially comprised of total enterprise value or a substantially similar financial metric, as provided in the Bankruptcy Court's order.  Fifty percent (50%) of each 2009 LTIP Participant's 2009 LTIP Performance Target will be based solely on the Company's performance relative to the Budgeted EBITDAR, and the remaining 50% will be solely based on the Company's achievement of restructuring goals.

### A.    Budgeted EBITDAR Performance Target

The 2009 LTIP Performance Target that is based on the Budgeted EBITDAR is set forth in Schedule [___] attached hereto.  Any earned awards based on the Company's performance relative to the Budgeted EBITDAR will be paid at the end of the two-year plan cycle, unless the Confirmation Date occurs prior to the end of such plan cycle, in which case, the Company will pay, on the Effective Date, the pro-rata amount of the 2009 LTIP Incentive Bonus (determined

by the number of completed calendar days between January 1, 2009 and the Effective Date) based on the achievement as of the Confirmation Date of the Budgeted EBITDAR.

### B. Restructuring Goal Performance Target

The restructuring goal portion of the 2009 LTIP Performance Target will be based upon improvements in the trading price of the Company's bonds relative to the trading prices of those bonds on the date that the Company commenced its chapter 11 cases (approximately $0.13) and the date that the Bankruptcy Court entered the order approving the 2009 LTIP (approximately $0.25). Each 2009 LTIP Participant will be entitled to receive a full maximum payment (without pro-ration) with respect to the restructuring goal portion of their LTIP Incentive Bonus, provided that the average trading price of the Company's bonds in the 30-day period prior to the Confirmation Date ("Average Bond Trading Price") [2] is not less than $0.[__], further provided that if the Average Bond Trading Price of the Company's bonds is 5% below such Average Bond Trading Price that provides a maximum LTIP Incentive Bonus payment, each 2009 LTIP Participant will be entitled to receive a target level payment (without pro-ration) with respect to the restructuring goal portion of their LTIP Incentive Bonus, further provided that if the Average Bond Trading Price is [__]% below such Average Bond Trading Price that provides a maximum LTIP Incentive Bonus payment, each 2009 LTIP Participant will be entitled to receive a threshold level payment (without pro-ration) with respect to the restructuring goal portion of their LTIP Incentive Bonus, and further provided that if the Average Bond Trading Price is more than [__]% below such Average Bond Trading Price that provides a maximum LTIP Incentive Bonus payment, no 2009 LTIP Participant will be entitled to receive a payment with respect to the restructuring goal portion of their LTIP Incentive Bonus. All earned LTIP Incentive Bonus payments will be made on the Effective Date.


## IV. EQUITY INCENTIVE PLAN AND EMERGENCE EQUITY GRANTS

### A. Purpose

The primary purposes of the Equity Incentive Plan that the Company will implement as of the Effective Date are to align the interests of executive management and other employees with the interests of Company shareholders of creating additional shareholder value in the long term and to retain the Company's management team.

As a result of the Company's chapter 11 cases, the Company has not had the ability to make any equity-based awards that provide appropriate long-term incentives for Company growth. Upon emergence, however, the Company again will have an equity-based compensation vehicle to provide its executive management and other members of its management team with appropriate, market-based, long-term incentive compensation opportunities that will be substantially dependent on Company performance.

---

[2] The Average Bond Trading Price will be calculated using the weighted average of the closing trading prices of the Company's series of five publicly traded bonds over the 30-calendar-day period preceding the Effective Date.

**B.    [__] Percent ([__]%) Reservation of New SSCC Common Stock**

Not less than [___] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the Equity Incentive Plan and, as applicable, the other Management Incentive Plans.

In addition to the specific Emergence Equity Grants set forth in Section IV.C below that will be made pursuant to the terms of the Equity Incentive Plan, under the Equity Incentive Plan Company officers, other employees, and directors are eligible to receive awards at such levels or amounts, and in stock options, restricted stock, any other equity-based vehicle, or any mix of the foregoing, as provided in the Company's plan of reorganization and as otherwise determined in the discretion of the Company's compensation committee of its Board of Directors.  The Equity Incentive Plan also provides for a multi-year ratable vesting schedule with respect to each award, subject to accelerated vesting under certain defined circumstances.

**C.    Management Emergence Equity Grants of New SSCC Common Stock**

The Company's plan of reorganization provides that approximately [__] of the Company's key executives and managers will receive grants of equity in Reorganized SSCC on, and as of, the Effective Date, pursuant to an applicable award agreement(s).  The Emergence Equity Grants will total [__] percent ([__]%) of New SSCC New Common Stock (i.e., [_____] shares of New SSCC Common Stock reserved for issuance pursuant to the Management Incentive Plans as described in Section IV.B of this Exhibit 3).  The following table shows the percentage of the New SSCC Common Stock that will be granted on, and as of, the Effective Date to the following executives individually and to the remaining participants in the aggregate:

| Participants [TBD] | Percent of New SSCC Common Stock [TBD] |
|---|---|
| Total | [__].00% |

With respect to each Emergence Equity Grant, the value of the award will be granted to participants in one or more equity vehicles, which may include stock options, restricted shares, or other equity-based interests.

### D. Vesting and Termination/Change of Control Provisions

Awards under the Equity Incentive Plan will be subject to a multi-year, ratable vesting schedule set forth in the applicable award agreement(s).  An equity-based award subject to a vesting schedule will provide for full accelerated vesting upon certain circumstances.  The specific details of the vesting schedule and related conditions are [TBD].  The forms of award agreements that the Company will adopt based on the foregoing vesting schedule and related conditions are [TBD].


## V. MANAGEMENT SALE INCENTIVE PLAN

As discussed above, notwithstanding the Company's filing its chapter 11 plan of reorganization, the Debtors believe that it remains important to provide incentives to key management employees to consider a possible sale of the Company that will increase the value of the Company's estate and enhance the recovery of all stakeholders in the chapter 11 cases.  The Plan therefore includes the MSIP that will become effective as of the Confirmation Date if the Plan provides for a sale of all or substantially all of the assets or equity of SSCC and/or SSCE, and potentially provides payments to approximately 50 officers and other key management employees only upon such a sale as part of a plan of reorganization.  Additional details concerning, and the specific terms and conditions of, the MSIP are [TBD].

# SMURFIT-STONE CONTAINER CORPORATION

# EQUITY INCENTIVE PLAN

## I     INTRODUCTION

**1.1**    **<u>Purposes</u>.**  The purposes of the Smurfit-Stone Container Corporation Equity Incentive Plan (this "<u>Plan</u>") are (i) to align the interests of the Company's stockholders and the recipients of awards under this Plan by increasing the proprietary interest of such recipients in the Company's growth and success, (ii) to advance the interests of the Company by attracting and retaining directors, officers, other employees and consultants and (iii) to motivate such persons to act in the long-term best interests of the Company and its stockholders.

**1.2**    **<u>Certain Definitions</u>.**

**"<u>Agreement</u>"** shall mean the written agreement evidencing an award hereunder between the Company and the recipient of such award.

**"<u>Bankruptcy Court</u>"** shall have the meaning set forth in Section 5.1.

**"<u>Bankruptcy Proceedings</u>"** shall mean the bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware with respect to <u>In re: Smurfit-Stone Container Corp.</u>, Case No. 09-10235 (BLS).

**"<u>Board</u>"** shall mean the Board of Directors of the Company.

**"<u>Change in Control</u>"** shall have the meaning set forth in Section 5.8(b).

**"<u>Code</u>"** shall mean the Internal Revenue Code of 1986, as amended.

**"<u>Committee</u>"** shall mean the Committee designated by the Board, consisting of two or more members of the Board, each of whom may be (i) a "Non-Employee Director" within the meaning of Rule 16b-3 under the Exchange Act, (ii) an "outside director" within the meaning of Section 162(m) of the Code and (iii) "independent" within the meaning of the rules of **[NASDAQ]** or, if the Common Stock is not listed on **[NASDAQ]**, within the meaning of the rules of the principal national stock exchange on which the Common Stock is then traded.

**"<u>Common Stock</u>"** shall mean the common stock, par value **[$0.01]** per share, of the Company, and all rights appurtenant thereto.

**"<u>Company</u>"** shall mean Smurfit-Stone Container Corporation, a Delaware corporation, or any successor thereto.

**"<u>Emergence Equity Awards</u>"** shall mean stock option, restricted stock or other equity compensation awards granted in connection with the Company's emergence from bankruptcy following the confirmation of the Plan of Reorganization.

"**Employment Agreement**" shall mean the Employment Agreement, if any, between the Company and the recipient of an award.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" shall mean the closing transaction price of a share of Common Stock as reported on **[NASDAQ]** on the date as of which such value is being determined or, if the Common Stock is not listed on **[NASDAQ]**, the closing transaction price of a share of Common Stock on the principal national stock exchange on which the Common Stock is traded on the date as of which such value is being determined or, if there shall be no reported transactions for such date, on the next preceding date for which transactions were reported; provided, however, that if the Common Stock is not listed on a national stock exchange or if Fair Market Value for any date cannot be so determined, Fair Market Value shall be determined by the Committee by whatever means or method as the Committee, in the good faith exercise of its discretion, shall at such time deem appropriate and in compliance with Section 409A of the Code; provided further that, with respect to the Emergence Equity Awards, Fair Market Value shall mean the average of the closing transaction prices of a share of Common Stock as reported on **[NASDAQ]]** for the 30-day period commencing on the date of the Company's emergence from bankruptcy following the confirmation of the Plan of Reorganization.

"**Free-Standing SAR**" shall mean an SAR which is not granted in tandem with, or by reference to, an option, which entitles the holder thereof to receive, upon exercise, shares of Common Stock (which may be Restricted Stock) with an aggregate value equal to the excess of the Fair Market Value of one share of Common Stock on the date of exercise over the base price of such SAR, multiplied by the number of such SARs which are exercised.

"**Incapacity**" shall have the meaning set forth in the Employment Agreement; provided that if a recipient of an award is not a party to an Employment Agreement that contains such definition, then "Incapacity" shall mean an individual's long-term disability as defined under the long-term disability plan of the Company that covers that individual; or if the individual is not covered by such a long-term disability plan, an individual's disability as defined for purposes of eligibility for a disability award under the Social Security Act.

"**Incentive Stock Option**" shall mean an option to purchase shares of Common Stock that meets the requirements of Section 422 of the Code, or any successor provision, which is intended by the Committee to constitute an Incentive Stock Option.

[**"NASDAQ" shall mean the Nasdaq Stock Market of the National Association of Securities Dealers, Inc. Automated Quotation System.**]

"**Non-Employee Director**" shall mean any director of the Company who is not an officer or employee of the Company or any Subsidiary.

"**Nonqualified Stock Option**" shall mean an option to purchase shares of Common Stock which is not an Incentive Stock Option.

"**Performance Measures**" shall mean the criteria and objectives, established by the Committee and set forth in the Agreement, which shall be satisfied or met (i) as a condition to

the grant or exercisability of all or a portion of an option or SAR or (ii) during the applicable Restriction Period or Performance Period as a condition to the vesting of the holder's interest, in the case of a Restricted Stock Award, of the shares of Common Stock subject to such award, or, in the case of a Restricted Stock Unit Award, to the holder's receipt of the shares of Common Stock subject to such award or of payment with respect to such award. To the extent necessary for an award to be qualified performance-based compensation under Section 162(m) of the Code and the regulations thereunder, such criteria and objectives shall include one or more of the following corporate-wide or subsidiary, division, operating unit or individual measures, stated in either absolute terms or relative terms, such as rates of growth or improvement: the attainment by a share of Common Stock of a specified Fair Market Value for a specified period of time, earnings per share, return to stockholders (including dividends), return on assets, return on equity, earnings of the Company before or after taxes and/or interest, revenues, market share, cash flow or cost reduction goals, interest expense after taxes, return on investment, return on investment capital, economic value created, operating margin, net income before or after taxes, pretax earnings before interest, depreciation and/or amortization, pretax operating earnings after interest expense and before incentives, and/or extraordinary or special items, operating earnings, net cash provided by operations, and strategic business criteria, consisting of one or more objectives based on meeting specified market penetration, geographic business expansion goals, cost targets, customer satisfaction, reductions in errors and omissions, reductions in lost business, management of employment practices and employee benefits, supervision of litigation and information technology, quality and quality audit scores, productivity, efficiency, and goals relating to acquisitions or divestitures, or any combination of the foregoing.

"**Performance Option**" shall mean an Incentive Stock Option or Nonqualified Stock Option, the grant of which or the exercisability of all or a portion of which is contingent upon the attainment of specified Performance Measures within a specified Performance Period.

"**Performance Period**" shall mean any period designated by the Committee and set forth in the Agreement during which (i) the Performance Measures applicable to an award shall be measured and (ii) the conditions to vesting applicable to an award shall remain in effect.

"**Performance Unit**" shall mean a right to receive, contingent upon the attainment of specified Performance Measures within a specified Performance Period, a specified cash amount or, in lieu thereof, shares of Common Stock having a Fair Market Value equal to such cash amount.

"**Performance Unit Award**" shall mean an award of Performance Units under this Plan.

"**Plan of Reorganization**" shall mean the Plan of Reorganization approved pursuant to the Bankruptcy Proceedings.

"**Restricted Stock**" shall mean shares of Common Stock which are subject to a Restriction Period and which may, in addition thereto, be subject to the attainment of specified Performance Measures within a specified Performance Period.

"**Restricted Stock Award**" shall mean an award of Restricted Stock under this Plan.

**"Restricted Stock Unit"** shall mean a right to receive one share of Common Stock or, in lieu thereof, the Fair Market Value of such share of Common Stock in cash, which shall be contingent upon the expiration of a specified Restriction Period and which may, in addition thereto, be contingent upon the attainment of specified Performance Measures within a specified Performance Period.

**"Restricted Stock Unit Award"** shall mean an award of Restricted Stock Units under this Plan.

**"Restriction Period"** shall mean any period designated by the Committee and set forth in the Agreement during which (i) the Common Stock subject to a Restricted Stock Award may not be sold, transferred, assigned, pledged, hypothecated or otherwise encumbered or disposed of, except as provided in this Plan or the Agreement relating to such award, or (ii) the conditions to vesting applicable to a Restricted Stock Unit Award shall remain in effect.

**"Retirement"** shall have the meaning set forth in the Employment Agreement; provided that if an Agreement does not specify such definition, then "Retirement" shall mean an employee's retirement from the Company after the attainment of age 55 and the completion of at least five years of service with the Company.

**"SAR"** shall mean a stock appreciation right which may be a Free-Standing SAR or a Tandem SAR.

**"Stock Award"** shall mean a Restricted Stock Award or a Restricted Stock Unit Award.

**"Subsidiary"** shall mean any corporation, limited liability company, partnership, joint venture or similar entity in which the Company owns, directly or indirectly, an equity interest possessing more than 50% of the combined voting power of the total outstanding equity interests of such entity.

**"Tandem SAR"** shall mean an SAR which is granted in tandem with, or by reference to, an option (including a Nonqualified Stock Option granted prior to the date of grant of the SAR), which entitles the holder thereof to receive, upon exercise of such SAR and surrender for cancellation of all or a portion of such option, shares of Common Stock (which may be Restricted Stock) with an aggregate value equal to the excess of the Fair Market Value of one share of Common Stock on the date of exercise over the base price of such SAR, multiplied by the number of shares of Common Stock subject to such option, or portion thereof, which is surrendered.

**"Tax Date"** shall have the meaning set forth in Section 5.5.

**"Ten Percent Holder"** shall have the meaning set forth in Section 2.1(a).

**1.3    Administration.** This Plan shall be administered by the Committee. Any one or a combination of the following awards may be made under this Plan to eligible persons: (i) options to purchase shares of Common Stock in the form of Incentive Stock Options or Nonqualified Stock Options (which may include Performance Options), (ii) SARs in the form of Tandem SARs or Free-Standing SARs, (iii) Stock Awards in the form of Restricted Stock or Restricted

4

Stock Units and (iv) Performance Units. The Committee shall, subject to the terms of this Plan, select eligible persons for participation in this Plan and determine the form, amount and timing of each award to such persons and, if applicable, the number of shares of Common Stock, the number of SARs, the number of Restricted Stock Units and the number of Performance Units subject to such an award, the exercise price or base price associated with the award, the time and conditions of exercise or settlement of the award and all other terms and conditions of the award, including, without limitation, the form of the Agreement evidencing the award. The Committee may, in its sole discretion and for any reason at any time, subject to the requirements of Section 162(m) of the Code and regulations thereunder in the case of an award intended to be qualified performance-based compensation, take action such that (i) any or all outstanding options and SARs shall become exercisable in part or in full, (ii) all or a portion of the Restriction Period applicable to any outstanding Restricted Stock or Restricted Stock Units shall lapse, (iii) all or a portion of the Performance Period applicable to any outstanding Restricted Stock, Restricted Stock Units or Performance Units shall lapse and (iv) the Performance Measures (if any) applicable to any outstanding award shall be deemed to be satisfied at the target or any other level. The Committee shall, subject to the terms of this Plan, interpret this Plan and the application thereof, establish rules and regulations it deems necessary or desirable for the administration of this Plan and may impose, incidental to the grant of an award, conditions with respect to the award, such as limiting competitive employment or other activities, which shall be set forth in the applicable Agreement. All such interpretations, rules, regulations and conditions shall be conclusive and binding on all parties.

The Committee may delegate some or all of its power and authority hereunder to the Board or, subject to applicable law, to the Chief Executive Officer or other executive officer of the Company as the Committee deems appropriate; provided, however, that (i) the Committee may not delegate its power and authority to the Board or the Chief Executive Officer or other executive officer of the Company with regard to the grant of an award to any person who is a "covered employee" within the meaning of Section 162(m) of the Code or who, in the Committee's judgment, is likely to be a covered employee at any time during the period an award hereunder to such employee would be outstanding and (ii) the Committee may not delegate its power and authority to the Chief Executive Officer or other executive officer of the Company with regard to the selection for participation in this Plan of an officer, director or other person subject to Section 16 of the Exchange Act or decisions concerning the timing, pricing or amount of an award to such an officer, director or other person.

No member of the Board or Committee, and neither the Chief Executive Officer nor any other executive officer to whom the Committee delegates any of its power and authority hereunder, shall be liable for any act, omission, interpretation, construction or determination made in connection with this Plan in good faith, and the members of the Board and the Committee and the Chief Executive Officer or other executive officer shall be entitled to indemnification and reimbursement by the Company in respect of any claim, loss, damage or expense (including attorneys' fees) arising therefrom to the full extent permitted by law (except as otherwise may be provided in the Company's Certificate of Incorporation and/or By-laws) and under any directors' and officers' liability insurance that may be in effect from time to time.

A majority of the Committee shall constitute a quorum. The acts of the Committee shall be either (i) acts of a majority of the members of the Committee present at any meeting at which

a quorum is present or (ii) acts approved in writing by all of the members of the Committee without a meeting.

      **1.4**     **Eligibility.**  Participants in this Plan shall consist of such officers, other employees, consultants and nonemployee directors, and persons expected to become officers, other employees, consultants and nonemployee directors, of the Company and its Subsidiaries as the Committee in its sole discretion may select from time to time or as specified in the Plan of Reorganization.  The Committee's selection of a person to participate in this Plan at any time shall not require the Committee to select such person to participate in this Plan at any other time.  For purposes of this Plan, references to employment by the Company shall also mean employment by a Subsidiary.

      **1.5**     **Shares Available.**  Subject to adjustment as provided in Section 5.7 and to all other limits set forth in this Section 1.5, [_____][1] shares of Common Stock shall be available for all awards under this Plan, reduced by the sum of the aggregate number of shares of Common Stock which become subject to outstanding options, outstanding Free-Standing SARs and outstanding Stock Awards and delivered upon the settlement of Performance Units.  To the extent that shares of Common Stock subject to an outstanding option, SAR or stock award granted under the Plan are not issued or delivered by reason of (i) the expiration, termination, cancellation or forfeiture of such award (excluding shares subject to an option cancelled upon settlement in shares of a related tandem SAR or shares subject to a tandem SAR cancelled upon exercise of a related option) or (ii) the settlement of such award in cash, then such shares of Common Stock shall again be available under this Plan.

      Shares of Common Stock to be delivered under this Plan shall be made available from authorized and unissued shares of Common Stock, or authorized and issued shares of Common Stock reacquired and held as treasury shares or otherwise or a combination thereof.

      To the extent necessary for an award to be qualified performance-based compensation under Section 162(m) of the Code and the regulations thereunder (i) the maximum number of shares of Common Stock with respect to which options or SARs or a combination thereof may be granted during any fiscal year of the Company to any person shall be [_____], subject to adjustment as provided in Section 5.7; (ii) the maximum number of shares of Common Stock with respect to which Stock Awards subject to Performance Measures may be granted during any fiscal year of the Company to any person shall be [_____], subject to adjustment as provided in Section 5.7, and (iii) the maximum amount that may be payable with respect to Performance Units granted during any fiscal year of the Company to any person shall be $[_____].

---

[1] **[Number of shares to be determined based upon the [___] percent ([__]%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Company's chapter 11 plan of reorganization (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____] shares of New SSCC Common Stock) that will be reserved pursuant to the Company's chapter 11 plan of reorganization for issuance pursuant to the Management Incentive Plans (with the capitalized terms in this footnote 1 to have the same definitions as set forth in the Company's chapter 11 plan of reorganization).]**

## II        STOCK OPTIONS AND STOCK APPRECIATION RIGHTS

**2.1    Stock Options.**  The Committee may, in its discretion, or shall, pursuant to the Plan of Reorganization, grant options to purchase shares of Common Stock to such eligible persons as may be selected by the Committee or as specified in the Plan of Reorganization. Each option, or portion thereof, that is not an Incentive Stock Option, shall be a Nonqualified Stock Option.  To the extent that the aggregate Fair Market Value (determined as of the date of grant) of shares of Common Stock with respect to which options designated as Incentive Stock Options are exercisable for the first time by a participant during any calendar year (under this Plan or any other plan of the Company, or any parent or Subsidiary) exceeds the amount (currently $100,000) established by the Code, such options shall constitute Nonqualified Stock Options.

Options shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem advisable or as approved in the Plan of Reorganization, and set forth in the applicable Agreement:

(a)    Number of Shares and Purchase Price.  The number of shares of Common Stock subject to an option and the purchase price per share of Common Stock purchasable upon exercise of the option shall be determined by the Committee and set forth in the Agreement; provided, however, that the purchase price per share of Common Stock purchasable upon exercise of a Nonqualified Stock Option or an Incentive Stock Option shall not be less than 100% of the Fair Market Value of a share of Common Stock on the date of grant of such option; provided further, that if an Incentive Stock Option shall be granted to any person who, at the time such option is granted, owns capital stock possessing more than 10 percent of the total combined voting power of all classes of capital stock of the Company (or of any parent or Subsidiary) (a "Ten Percent Holder"), the purchase price per share of Common Stock shall not be less than the price (currently 110% of Fair Market Value) required by the Code in order to constitute an Incentive Stock Option.

(b)    Option Period and Exercisability.  The period during which an option may be exercised shall be determined by the Committee and set forth in the Agreement; provided, however, that no Incentive Stock Option or Nonqualified Stock Option shall be exercised later than ten years after its date of grant; provided further, that if an Incentive Stock Option shall be granted to a Ten Percent Holder, such option shall not be exercised later than five years after its date of grant.  The Committee may, in its discretion, determine that an option is to be granted as a Performance Option and may establish and include in the Agreement an applicable Performance Period and Performance Measures which shall be satisfied or met as a condition to the grant of such option or to the exercisability of all or a portion of such option. The Committee shall determine whether an option shall become exercisable in cumulative or non-cumulative installments and in part or in full at any time. An exercisable option, or portion thereof, may be exercised only with respect to whole shares of Common Stock.

(c)    Method of Exercise.  An option may be exercised (i) by giving written notice to the Company specifying the number of whole shares of Common Stock to be purchased and accompanying such notice with payment therefor in full (or arrangement made for such payment to the Company's satisfaction) either (A) in cash, (B) by delivery (either actual delivery or by

7

attestation procedures established by the Company) of shares of Common Stock having a Fair Market Value, determined as of the date of exercise, equal to the aggregate purchase price payable by reason of such exercise, (C) authorizing the Company to withhold whole shares of Common Stock which would otherwise be delivered having an aggregate Fair Market Value, determined as of the date of exercise, equal to the amount necessary to satisfy such obligation, (D) in cash by a broker-dealer acceptable to the Company to whom the optionee has submitted an irrevocable notice of exercise or (E) a combination of (A), (B) and (C), in each case to the extent set forth in the Agreement relating to the option, (ii) if applicable, by surrendering to the Company any Tandem SARs which are cancelled by reason of the exercise of the option and (iii) by executing such documents as the Company may reasonably request. Any fraction of a share of Common Stock which would be required to pay such purchase price shall be disregarded and the remaining amount due shall be paid in cash by the optionee. No shares of Common Stock shall be issued and no certificate representing Common Stock shall be delivered until the full purchase price therefor and any withholding taxes thereon, as described in Section 5.5, have been paid (or arrangement made for such payment to the Company's satisfaction).

      **2.2**    **Stock Appreciation Rights.** The Committee may, in its discretion, or shall, pursuant to the Plan of Reorganization, grant SARs to such eligible persons as may be selected by the Committee or as specified in the Plan of Reorganization. The Agreement relating to an SAR shall specify whether the SAR is a Tandem SAR or a Free-Standing SAR.

      SARs shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem advisable or as approved in the Plan of Reorganization, and set forth in the applicable Agreement:

      (a)     Number of SARs and Base Price. The number of SARs subject to an award shall be determined by the Committee and set forth in the Agreement. Any Tandem SAR related to an Incentive Stock Option shall be granted at the same time that such Incentive Stock Option is granted. The base price of a Tandem SAR shall be the purchase price per share of Common Stock of the related option. The base price of a Free-Standing SAR shall be determined by the Committee and set forth in the Agreement; provided, however, that such base price shall not be less than 100% of the Fair Market Value of a share of Common Stock on the date of grant of such SAR.

      (b)     Exercise Period and Exercisability. The period for the exercise of an SAR shall be determined by the Committee and set forth in the Agreement; provided, however, that no Tandem SAR shall be exercised later than the expiration, cancellation, forfeiture or other termination of the related option and no Free-Standing SAR shall be exercised later than ten years after its date of grant. The Committee may, in its discretion, establish and include in the Agreement applicable Performance Measures which shall be satisfied or met as a condition to the grant of an SAR or to the exercisability of all or a portion of an SAR. The Committee shall determine whether an SAR may be exercised in cumulative or non-cumulative installments and in part or in full at any time. An exercisable SAR, or portion thereof, may be exercised, in the case of a Tandem SAR, only with respect to whole shares of Common Stock and, in the case of a Free-Standing SAR, only with respect to a whole number of SARs. If an SAR is exercised for

shares of Restricted Stock, a certificate or certificates representing such Restricted Stock shall be issued in accordance with Section 3.2(c), or such shares shall be transferred to the holder in book entry form with restrictions on the Shares duly noted, and the holder of such Restricted Stock shall have such rights of a stockholder of the Company as determined pursuant to Section 3.2(d). Prior to the exercise of an SAR, the holder of such SAR shall have no rights as a stockholder of the Company with respect to the shares of Common Stock subject to such SAR.

(c)     Method of Exercise.  A Tandem SAR may be exercised (i) by giving written notice to the Company specifying the number of whole SARs which are being exercised, (ii) by surrendering to the Company any options which are cancelled by reason of the exercise of the Tandem SAR and (iii) by executing such documents as the Company may reasonably request.  A Free-Standing SAR may be exercised (A) by giving written notice to the Company specifying the whole number of SARs which are being exercised and (B) by executing such documents as the Company may reasonably request.

2.3     **Termination of Employment or Service.**  All of the terms relating to the exercise, cancellation or other disposition of an option or SAR upon a termination of employment or service with the Company of the holder of such option or SAR, as the case may be, whether by reason of Incapacity, Retirement, death or any other reason, shall be determined by the Committee and set forth in the Agreement, Employment Agreement and/or any other agreement between the Company and the recipient of an award.

2.4     **No Repricing.**  Notwithstanding anything in this Plan to the contrary and subject to Section 5.7, without the approval of the stockholders of the Company the Committee will not amend or replace any previously granted option or SAR in a transaction that constitutes a "repricing," as such term is used in **[IM-5635-1 of the NASDAQ Listing Rules]**.

### III     STOCK AWARDS

3.1     **Stock Awards.**  The Committee may, in its discretion, or shall, pursuant to the Plan of Reorganization, grant Stock Awards to such eligible persons as may be selected by the Committee or as specified in the Plan of Reorganization.  The Agreement relating to a Stock Award shall specify whether the Stock Award is a Restricted Stock Award or a Restricted Stock Unit Award.

3.2     **Terms of Restricted Stock Awards.**  Restricted Stock Awards shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem advisable or as approved in the Plan of Reorganization, and set forth in the applicable Agreement.

(a)     Number of Shares and Other Terms.  The number of shares of Common Stock subject to a Restricted Stock Award and the Restriction Period, Performance Period (if any) and Performance Measures (if any) applicable to a Restricted Stock Award shall be determined by the Committee and set forth in the Agreement.

(b)     Vesting and Forfeiture.  The Agreement relating to a Restricted Stock Award shall provide, in the manner determined by the Committee, in its discretion, and subject to the

provisions of this Plan, for the vesting of the shares of Common Stock subject to such award (i) if the holder of such award remains continuously in the employment of the Company during the specified Restriction Period and (ii) if specified Performance Measures (if any) are satisfied or met during a specified Performance Period, and for the forfeiture of the shares of Common Stock subject to such award (x) if the holder of such award does not remain continuously in the employment of the Company during the specified Restriction Period or (y) if specified Performance Measures (if any) are not satisfied or met during a specified Performance Period. The Committee may, in its sole discretion, grant shares of Common Stock pursuant to the Plan that are not subject to any vesting or performance conditions.

(c)     _Stock Issuance_.  During the Restriction Period, the shares of Restricted Stock shall be held by a custodian in book entry form with restrictions on such shares duly noted or, alternatively, a certificate or certificates representing a Restricted Stock Award shall be registered in the holder's name and may bear a legend, in addition to any legend which may be required pursuant to Section 5.6, indicating that the ownership of the shares of Common Stock represented by such certificate is subject to the restrictions, terms and conditions of this Plan and the Agreement relating to the Restricted Stock Award.  All such certificates shall be deposited with the Company, together with stock powers or other instruments of assignment (including a power of attorney), each endorsed in blank with a guarantee of signature if deemed necessary or appropriate, which would permit transfer to the Company of all or a portion of the shares of Common Stock subject to the Restricted Stock Award in the event such award is forfeited in whole or in part.  Upon termination of any applicable Restriction Period (and the satisfaction or attainment of applicable Performance Measures), subject to the Company's right to require payment of any taxes in accordance with Section 5.5, the restrictions shall be removed from the requisite number of any shares of Common Stock that are held in book entry form, and all certificates evidencing ownership of the requisite number of shares of Common Stock shall be delivered to the holder of such award.

(d)     _Rights with Respect to Restricted Stock Awards_.  Unless otherwise set forth in the Agreement relating to a Restricted Stock Award, and subject to the terms and conditions of a Restricted Stock Award, the holder of such award shall have all rights as a stockholder of the Company, including, but not limited to, voting rights, the right to receive dividends and the right to participate in any capital adjustment applicable to all holders of Common Stock; _provided_, _however_, that a distribution with respect to shares of Common Stock, other than a regular cash dividend, shall be deposited with the Company and shall be subject to the same restrictions as the shares of Common Stock with respect to which such distribution was made.

**3.3     Terms of Restricted Stock Unit Awards.**  Restricted Stock Unit Awards shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem advisable or as approved in the Plan of Reorganization, and set forth in the applicable Agreement.

(a)     _Number of Shares and Other Terms_.  The number of shares of Common Stock subject to a Restricted Stock Unit Award and the Restriction Period, Performance Period (if any) and Performance Measures (if any) applicable to a Restricted Stock Unit Award shall be determined by the Committee and set forth in the Agreement.

(b)    <u>Vesting and Forfeiture</u>.  The Agreement relating to a Restricted Stock Unit Award shall provide, in the manner determined by the Committee, in its discretion, and subject to the provisions of this Plan, for the vesting of such Restricted Stock Unit Award (i) if the holder of such award remains continuously in the employment of the Company during the specified Restriction Period and (ii) if specified Performance Measures (if any) are satisfied or met during a specified Performance Period, and for the forfeiture of the shares of Common Stock subject to such award (x) if the holder of such award does not remain continuously in the employment of the Company during the specified Restriction Period or (y) if specified Performance Measures (if any) are not satisfied or met during a specified Performance Period.  The Committee may, in its sole discretion, grant units representing the right to receive shares of Common Stock that are not subject to any vesting or performance conditions.

(c)    <u>Settlement of Vested Restricted Stock Unit Awards</u>.  The Agreement relating to a Restricted Stock Unit Award shall specify (i) whether such award may be settled in shares of Common Stock or cash or a combination thereof and (ii) whether the holder thereof shall be entitled to receive, on a current or deferred basis, dividend equivalents, and, if determined by the Committee, interest on, or the deemed reinvestment of, any deferred dividend equivalents, with respect to the number of shares of Common Stock subject to such award.  Prior to the settlement of a Restricted Stock Unit Award, the holder of such award shall have no rights as a stockholder of the Company with respect to the shares of Common Stock subject to such award.

**3.4    Termination of Employment or Service.**  All of the terms relating to the satisfaction of Performance Measures and the termination of the Restriction Period or Performance Period relating to a Stock Award, or any forfeiture and cancellation of such award upon a termination of employment or service with the Company of the holder of such award, whether by reason of Incapacity, Retirement, death or any other reason, shall be determined by the Committee and set forth in the Agreement, Employment Agreement and/or any other agreement between the Company and the recipient of an award.

IV    PERFORMANCE UNIT AWARDS

**4.1    Performance Unit Awards.**  The Committee may, in its discretion, or shall, pursuant to the Plan of Reorganization, grant Performance Unit Awards to such eligible persons as may be selected by the Committee or as specified in the Plan of Reorganization.

**4.2    Terms of Performance Unit Awards.**  Performance Unit Awards shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of this Plan, as the Committee shall deem advisable or as approved in the Plan of Reorganization and set forth in the applicable Agreement.

(a)    <u>Number of Performance Units and Performance Measures</u>.  The number of Performance Units subject to a Performance Unit Award and the Performance Measures and Performance Period applicable to a Performance Unit Award shall be determined by the Committee and set forth in the Agreement.

(b)    <u>Vesting and Forfeiture</u>.  The Agreement relating to a Performance Unit Award shall provide, in the manner determined by the Committee, in its discretion, and subject to the

provisions of this Plan, for the vesting of such Performance Unit Award if the specified Performance Measures are satisfied or met during the specified Performance Period and for the forfeiture of such award if the specified Performance Measures are not satisfied or met during the specified Performance Period.

(c)     Settlement of Vested Performance Unit Awards.  The Agreement relating to a Performance Unit Award shall specify whether such award may be settled in shares of Common Stock (including shares of Restricted Stock) or cash or a combination thereof.  If a Performance Unit Award is settled in shares of Restricted Stock, such shares of Restricted Stock shall be issued to the holder in book entry form or a certificate or certificates representing such Restricted Stock shall be issued in accordance with Section 3.2(c) and the holder of such Restricted Stock shall have such rights as a stockholder of the Company as determined pursuant to Section 3.2(d). Prior to the settlement of a Performance Unit Award in shares of Common Stock, including Restricted Stock, the holder of such award shall have no rights as a stockholder of the Company.

**4.3**     **Termination of Employment or Service.**  All of the terms relating to the satisfaction of Performance Measures and the termination of the Performance Period relating to a Performance Unit Award, or any forfeiture and cancellation of such award upon a termination of employment or service with the Company of the holder of such award, whether by reason of Incapacity, Retirement, death or any other reason, shall be determined by the Committee and set forth in the Agreement, Employment Agreement and/or any other agreement between the Company and the recipient of an award.

## V     GENERAL

**5.1**     **Effective Date and Term of Plan.**  This Plan shall be submitted to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for approval in connection with the Plan of Reorganization and, if approved, shall become effective as of the effective date of the Plan of Reorganization.  This Plan shall terminate as of the first annual meeting of the Company's stockholders to occur on or after the tenth anniversary of its effective date, unless terminated earlier by the Board. Termination of this Plan shall not affect the terms or conditions of any award granted prior to termination.

Awards hereunder may be made at any time prior to the termination of this Plan, provided that no award may be made later than ten years after the effective date of this Plan. In the event that this Plan is not approved by the Bankruptcy Court, this Plan and any awards hereunder shall be void and of no force or effect.

**5.2**     **Amendments.**  The Board may amend this Plan as it shall deem advisable, subject to any requirement of stockholder approval required by applicable law, rule or regulation, including Section 162(m) of the Code and any rule of **[NASDAQ]**, or, if the Common Stock is not listed on **[NASDAQ]**, any rule of the principal national stock exchange on which the Common Stock is then traded; provided, however, that no amendment may impair the rights of a holder of an outstanding award without the consent of such holder.

**5.3**     **Agreement.**  Each award under this Plan shall be evidenced by an Agreement setting forth the terms and conditions applicable to such award. No award shall be valid until

approved by the Company or, with respect to the Emergence Equity Awards, the Bankruptcy Court.  Such award shall be effective as of the effective date set forth in the Agreement.

**5.4**   **Non-Transferability.**  No award shall be transferable other than by will, the laws of descent and distribution or pursuant to beneficiary designation procedures approved by the Company or, to the extent expressly permitted in the Agreement relating to such award, to the holder's family members, a trust or entity established by the holder for estate planning purposes or a charitable organization designated by the holder.  Except to the extent permitted by the foregoing sentence or the Agreement relating to an award, each award may be exercised or settled during the holder's lifetime only by the holder or the holder's legal representative or similar person.  Except as permitted by the second preceding sentence, no award may be sold, transferred, assigned, pledged, hypothecated, encumbered or otherwise disposed of (whether by operation of law or otherwise) or be subject to execution, attachment or similar process.  Upon any attempt to so sell, transfer, assign, pledge, hypothecate, encumber or otherwise dispose of any award, such award and all rights thereunder shall immediately become null and void.

**5.5**   **Tax Withholding.**  The Company shall have the right to require, prior to the issuance or delivery of any shares of Common Stock or the payment of any cash pursuant to an award made hereunder, payment by the holder of such award of any federal, state, local or other taxes which may be required to be withheld or paid in connection with such award.  An Agreement may provide that (i) the Company shall withhold whole shares of Common Stock which would otherwise be delivered to a holder, having an aggregate Fair Market Value determined as of the date the obligation to withhold or pay taxes arises in connection with an award (the "Tax Date"), or withhold an amount of cash which would otherwise be payable to a holder, in the amount necessary to satisfy any such obligation or (ii) the holder may satisfy any such obligation by any of the following means: (A) a cash payment to the Company, (B) delivery (either actual delivery or by attestation procedures established by the Company) to the Company of previously owned whole shares of Common Stock having an aggregate Fair Market Value, determined as of the Tax Date, equal to the amount necessary to satisfy any such obligation, (C) authorizing the Company to withhold whole shares of Common Stock which would otherwise be delivered having an aggregate Fair Market Value, determined as of the Tax Date, or withhold an amount of cash which would otherwise be payable to a holder, equal to the amount necessary to satisfy any such obligation, (D) in the case of the exercise of an option and except as may be prohibited by applicable law, a cash payment by a broker-dealer acceptable to the Company to whom the optionee has submitted an irrevocable notice of exercise or (E) any combination of (A), (B) and (C), in each case to the extent set forth in the Agreement relating to the award. Shares of Common Stock to be delivered or withheld may not have an aggregate Fair Market Value in excess of the amount determined by applying the minimum statutory withholding rate.  Any fraction of a share of Common Stock which would be required to satisfy such an obligation shall be disregarded and the remaining amount due shall be paid in cash by the holder.

**5.6**   **Restrictions on Shares.**  Each award made hereunder shall be subject to the requirement that if at any time the Company determines that the listing, registration or qualification of the shares of Common Stock subject to such award upon any securities exchange or under any law, or the consent or approval of any governmental body, or the taking of any other action is necessary or desirable as a condition of, or in connection with, the delivery of

shares thereunder, such shares shall not be delivered unless such listing, registration, qualification, consent, approval or other action shall have been effected or obtained, free of any conditions not acceptable to the Company. The Company may require that certificates evidencing shares of Common Stock delivered pursuant to any award made hereunder bear a legend indicating that the sale, transfer or other disposition thereof by the holder is prohibited except in compliance with the Securities Act of 1933, as amended, and the rules and regulations thereunder.

    **5.7**   **Adjustment.** In the event of any stock split, stock dividend, recapitalization, reorganization, merger, consolidation, combination, exchange of shares, liquidation, spin-off or other similar change in capitalization or event, or any distribution to holders of Common Stock other than a regular cash dividend, the number and class of securities available under this Plan, the number and class of securities subject to each outstanding option and the purchase price per security, the terms of each outstanding SAR, the terms of each outstanding Restricted Stock Award and Restricted Stock Unit Award, including the number and class of securities subject thereto, the terms of each outstanding Performance Unit, the maximum number of securities with respect to which options or SARs may be granted during any fiscal year of the Company to any one grantee and the maximum number of shares of Common Stock that may be awarded during any fiscal year of the Company to any one grantee pursuant to a Stock Award that is subject to Performance Measures shall be equitably adjusted by the Committee, such adjustments to be made in the case of outstanding options and SARs in accordance with Section 409A of the Code. The decision of the Committee regarding any such adjustment shall be final, binding and conclusive. If any such adjustment would result in a fractional security being (a) available under this Plan, such fractional security shall be disregarded, or (b) subject to an award under this Plan, the Company shall pay the holder of such award, in connection with the first vesting, exercise or settlement of such award, in whole or in part, occurring after such adjustment, an amount in cash determined by multiplying (i) the fraction of such security (rounded to the nearest hundredth) by (ii) the excess, if any, of (A) the Fair Market Value on the vesting, exercise or settlement date over (B) the exercise or base price, if any, of such award.

    **5.8**   **Change in Control.**

    (a)   Notwithstanding any provision in this Plan or any Agreement, in the event of a Change in Control, (i) all outstanding options and SARs shall immediately become exercisable in full, (ii) the Restriction Period applicable to any outstanding Restricted Stock Award or Restricted Stock Unit Award shall lapse, (iii) the Performance Period applicable to any outstanding award shall lapse, (iv) the Performance Measures applicable to any outstanding award shall be deemed to be satisfied at the maximum level and (v) the Board (as constituted prior to such Change in Control) may, in its discretion:

        (1)   require that shares of stock of the corporation resulting from such Change in Control, or a parent corporation thereof, be substituted for some or all of the shares of Common Stock subject to an outstanding award, with an appropriate and equitable adjustment to such award as shall be determined by the Board in accordance with Section 5.7; and/or

(2)    require outstanding awards, in whole or in part, to be surrendered to the Company by the holder, and to be immediately cancelled by the Company, and to provide for the holder to receive (A) a cash payment in an amount equal to (i) in the case of an option or an SAR, the number of shares of Common Stock then subject to the portion of such option or SAR surrendered multiplied by the excess, if any, of the Fair Market Value of a share of Common Stock as of the date of the Change in Control, over the purchase price or base price per share of Common Stock subject to such option or SAR, (ii) in the case of a Stock Award, the number of shares of Common Stock then subject to the portion of such award surrendered multiplied by the Fair Market Value of a share of Common Stock as of the date of the Change in Control, and (iii) in the case of a Performance Unit Award, the number of Performance Units then subject to the portion of such award surrendered; (B) shares of capital stock of the corporation resulting from such Change in Control, or a parent corporation thereof, having a fair market value not less than the amount determined under clause (A) above; or (C) a combination of the payment of cash pursuant to clause (A) above and the issuance of shares pursuant to clause (B) above.

(b)    For purposes of this Plan, a "Change in Control" shall mean the occurrence of any one or more of the following events following the effective date of the Plan of Reorganization:

(1)    The "beneficial ownership" of securities representing more than 20% of the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Company Voting Securities") is accumulated, held or acquired by a Person (as defined in Section 3(a)(9) of the Exchange Act, as modified, and used in Sections 13(d) and 14(d) thereof) other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company, any corporation owned, directly or indirectly, by the Company's stockholders in substantially the same proportions as their ownership of stock of the Company; provided, however, that any acquisition from the Company or any acquisition pursuant to a transaction that complies with clauses (i), (ii) and (iii) of subparagraph (3) of this definition will not be a Change in Control under this subparagraph (1), and provided further that immediately prior to such accumulation, holding or acquisition, such person was not a direct or indirect beneficial owner of 20% or more of the Company Voting Securities; or

(2)    Individuals who, as of the day next following the effective date of the Plan of Reorganization, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that an individual becoming a director subsequent to that date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board will be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(3)     Consummation by the Company of a reorganization, merger or consolidation, or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets or stock of another entity (a "Business Combination"), in each case, unless immediately following such Business Combination: (i) more than 60% of the combined voting power of then outstanding voting securities entitled to vote generally in the election of directors of (A) the corporation resulting from such Business Combination (the "Surviving Corporation"), or (B) if applicable, a corporation that as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries (the "Parent Corporation"), is represented, directly or indirectly, by Company Voting Securities outstanding immediately prior to such Business Combination (or, if applicable, is represented by shares into which such Company Voting Securities were converted pursuant to such Business Combination), and such voting power among the holders thereof is in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the Company Voting Securities; (ii) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of the combined voting power of the then outstanding voting securities eligible to elect directors of the Parent Corporation (or, if there is no Parent Corporation, the Surviving Corporation) except to the extent that such ownership of the Company existed prior to the Business Combination; and (iii) at least a majority of the members of the board of directors of the Parent Corporation (or, if there is no Parent Corporation, the Surviving Corporation) were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination;

(4)     Approval by the Company's stockholders of a complete liquidation or dissolution of the Company;

(5)     The consummation of a reorganization under the U.S. Bankruptcy Code; or

(6)     The consummation of a complete liquidation or dissolution of the Company under the U.S. Bankruptcy Code.

However, in no event will a Change in Control be deemed to have occurred, with respect to a Participant's award, if the Participant is part of a purchasing group that consummates the Change in Control transaction.  A Participant will be deemed "part of a purchasing group" for purposes of the preceding sentence if the Participant is an equity participant in the purchasing company or group (except: (i) passive ownership of less than 2% of the stock of the purchasing company; or (ii) ownership of equity participation in the purchasing company or group that is otherwise not significant, as determined prior to the Change in Control by a majority of the non-employee continuing directors).  For the avoidance of doubt, a Change in Control shall not include transactions pursuant to the Plan of Reorganization (as defined herein).

**5.9     Deferrals.**  The Committee may determine that the delivery of shares of Common Stock or the payment of cash, or a combination thereof, upon the exercise or settlement of all or

a portion of any award (other than awards of Incentive Stock Options, Nonqualified Stock Options and SARs) made hereunder shall be deferred, or the Committee may, in its sole discretion, approve deferral elections made by holders of awards. Deferrals shall be for such periods and upon such terms as the Committee may determine in its sole discretion and as set forth in the Agreement, subject to the requirements of Section 409A of the Code.

**5.10    No Right of Participation, Employment or Service.**  Unless otherwise set forth in an employment agreement, no person shall have any right to participate in this Plan.  Neither this Plan nor any award made hereunder shall confer upon any person any right to continued employment by or service with the Company, any Subsidiary or any affiliate of the Company or affect in any manner the right of the Company, any Subsidiary or any affiliate of the Company to terminate the employment of any person at any time without liability hereunder.

**5.11    Rights as Stockholder.**  No person shall have any right as a stockholder of the Company with respect to any shares of Common Stock or other equity security of the Company which is subject to an award hereunder unless and until such person becomes a stockholder of record with respect to such shares of Common Stock or equity security.

**5.12    Designation of Beneficiary.**  A holder of an award may file with the Committee a written designation of one or more persons as such holder's beneficiary or beneficiaries (both primary and contingent) in the event of the holder's death or incapacity.  To the extent an outstanding option or SAR granted hereunder is exercisable, such beneficiary or beneficiaries shall be entitled to exercise such option or SAR pursuant to procedures prescribed by the Committee.

Each beneficiary designation shall become effective only when filed in writing with the Committee during the holder's lifetime on a form prescribed by the Committee.  The spouse of a married holder domiciled in a community property jurisdiction shall join in any designation of a beneficiary other than such spouse.  The filing with the Committee of a new beneficiary designation shall cancel all previously filed beneficiary designations.

If a holder fails to designate a beneficiary, or if all designated beneficiaries of a holder predecease the holder, then each outstanding option and SAR hereunder held by such holder, to the extent exercisable, may be exercised by such holder's executor, administrator, legal representative or similar person.

**5.13    Governing Law.**  This Plan, each award hereunder and the related Agreement, and all determinations made and actions taken pursuant thereto, to the extent not otherwise governed by the Code or the laws of the United States, shall be governed by the laws of the State of Delaware and construed in accordance therewith without giving effect to principles of conflicts of laws.

**5.14    Foreign Employees.**  Without amending this Plan, the Committee may grant awards to eligible persons who are foreign nationals on such terms and conditions different from those specified in this Plan as may in the judgment of the Committee be necessary or desirable to foster and promote achievement of the purposes of this Plan and, in furtherance of such purposes the Committee may make such modifications, amendments, procedures, subplans and the like as

may be necessary or advisable to comply with provisions of laws in other countries or jurisdictions in which the Company or its Subsidiaries operates or has employees.