UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------x  Chapter 11
                                                  :
In re                                             :
                                                  :  Case No. 09-10235 (BLS)
Smurfit-Stone Container Corporation, et al.,      :  (Jointly Administered)
                                                  :
                Debtors.                          :  **Re: Docket No. 1661**
---------------------------------------------------x

**SUPPLEMENTAL BRIEF OF MARINER INVESTMENT GROUP, LLC,
IN SUPPORT OF MOTION OF CASPIAN CAPITAL ADVISORS FOR AN ORDER
APPOINTING AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

Mariner Investment Group, LLC (the "**Movant**" or "**Mariner**"), by and through undersigned counsel, respectfully submits this supplemental brief (the "**Supplemental Brief**") in support of the motion (the "**Motion**") for an order appointing an official committee of equity security holders of Smurfit-Stone Container Corporation ("**SSCC**" or the "**Company**"). In support thereof, Movant respectfully states as follows:

**RELIEF REQUESTED**

1. There can be no doubt any longer: the Debtors' equity holders need the protection of an equity committee, and the Court should grant this Motion. On December 1, the Debtors filed a placeholder Plan of Reorganization (the "Placeholder Plan") and a Disclosure Statement that deny *any* recovery to equity, even though the Debtors' expert witness, Joseph Miller, a Director at Lazard, the Debtors' financial advisor, testified repeatedly that, as of December 2, Lazard has not conducted *any* valuation or recovery analysis, has never seen a valuation or recovery analysis prepared for the Debtors by anyone else, and has not been asked to take even preliminary steps to value the Company. Without even the pretext of a valuation process -- formal or otherwise -- the Debtors have decided for themselves that equity is simply out of the money, and they are bound and determined to keep it that way. They have no desire to

be inconvenienced by having a professional spend the time to determine whether distributable value for equity actually exists. That is precisely the circumstance where an equity committee is necessary.

2. Indeed, when presented with a serious, professional attempt to test the Company's assertion that no distributable value exists for equity -- which Moelis has provided by comparing the Debtors' *own* projections and the Debtors' *own* sensitivity analysis against objective third-party data provided by industry sources and research analysts -- the Debtors have done little more than snipe from the backbench. Although they criticize Moelis's methodology as flawed, they offer *no* valuation methodology of their own. Instead, they appear content to repeat their conclusory refrain that equity is out of the money, as if saying it often enough will make it so. It won't. Someone has to take the time and trouble to sit down and fairly value the Company. Given the Debtors' indifference -- if not outright hostility -- to that obligation to date, appointment of an equity committee is the only way to ensure this critical task will be performed.

3. There is no need to reiterate at any length the legal standard for the appointment of an equity committee in these proceedings; the Court has heard extensive legal argument from all sides about that. Simply put, an equity committee is necessary to protect public investors of corporations who file for bankruptcy protection, because bankruptcy proceedings are "literally the last clear chance to conserve for [shareholders] values that corporate financial stress or insolvency ha[s] placed in jeopardy." S. Rep. No. 95-989, at 10 (1978). An equity committee "counteract[s] the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." Id.

4. Section 1102(a)(2) of the Bankruptcy Code provides for the appointment of a committee "of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2). While the Bankruptcy Code does not provide a test for determining whether a constituent is adequately represented, courts have considered a variety of factors in making that case-by-case determination:

> (a) whether the interests of shareholders are otherwise already adequately represented;
>
> (b) whether the debtor appears to be hopelessly insolvent;
>
> (c) the complexity of the case;
>
> (d) whether the stock is widely held and actively traded;
>
> (e) the timing of the request; and
>
> (f) whether the cost of the additional committee significantly outweighs the concerns for adequate representation.

See, e.g., In re Exide Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of debtor and official committee of unsecured creditors). In considering whether the Debtors are hopelessly insolvent, the court should rely on expert evidence concerning the Debtors' value. Independent expert analysis constitutes more than "assumptions and economic speculation," and is reliable in determining whether a debtor is hopelessly insolvent. See Exide Technologies v. State of Wisconsin Investment Board, No. 02-1572-SLR, 2002 U.S. Dist. LEXIS 27210, at *5–6 (Dist. Del. Dec. 23, 2002) (upholding the appointment of an equity committee over debtor's objections, despite "admittedly speculative prospects for a recovery for equity," based on expert evidence in the record indicating that the debtor was not hopelessly insolvent).

5. As the Court has heard, and as discussed in more detail below, each of these factors favors the establishment of an Equity Committee. (See Reply Br. ¶¶ 16-24.)

### An Equity Committee Is Crucial To Prevent The Debtors From Excluding Equity Holders From Recovery.

6.  The Debtors doubtless intend to argue that the filing of the Placeholder Plan reduces the equity holders to arguing about valuation at the confirmation hearing, that there is no other meaningful role for them to play, and, thus, that an Equity Committee is unnecessary. Nothing could be further from the truth.

7.  First, under the Placeholder Plan, the interests of both common and preferred equity holders in the Company "shall be extinguished, cancelled, and discharged." (Placeholder Plan at 38.) The Debtors have determined that equity holders will be stripped of their interests. They have not done any analysis, however, to support their decision. They have no valuation showing equity out of the money. They have no recovery analysis showing that the Company has insufficient value to pay off the entire claims pool. As their financial adviser and expert testified, they have not requested nor received a valuation, even though their expert has never been involved in a case where a plan was filed before the debtor's financial advisor was asked to prepare a valuation. Though the Debtors have claimed that equity holders are adequately represented by the Creditors' Committee, their experts, Houlihan Lokey and FTI Consulting, have not performed any valuation or recovery analysis, either. At present, therefore, no one is questioning the Debtors' "don't ask don't tell" policy on valuation, and for good reason. If equity is wiped out, everyone else receives a windfall. But simply refusing to ask whether the Debtors have value that equity could recover is not enough. This isn't Oz: the Debtors cannot simply say they are hopelessly insolvent, close their eyes, click their heels three times, and have it be true.

8.  Second, the filing of the Placeholder Plan does not moot this Motion. Any argument that the clock has run out on Movant -- who first sought appointment of an Equity

Committee in August -- makes no sense when the Debtors seek to exclude equity holders without any determination of the value of the Company. The filing of the Placeholder Plan, unsupported by any valuation or recovery analysis, only emphasizes the meaningful role that an Equity Committee can play here. Perhaps most telling, the Debtors' themselves have reserved the right to abandon the Placeholder Plan in its entirety if a better alternative comes along. (See Discl. Stmt. at 13.)[1] Even if the Placeholder Plan is not abandoned, numerous terms remain to be negotiated or are outright missing:

- The Debtors have not proposed a timeframe for the filing of a solicitation motion or a hearing to approve the Disclosure Statement;

- The Placeholder Plan does not contain any indication that the Canadian Bankruptcy Court has issued a CCAA Plan Filing and Meeting Order, which would allow the Placeholder Plan to be solicited with respect to the Canadian debtors;

- All estimated claims amounts subject to treatment under the Placeholder Plan are bracketed (See Plan at 14-15);

- The Debtors have not provided an estimated recovery for certain general unsecured claims (Id. at 16);

- The Placeholder Plan does not contain any indication of the amount of stock that will be granted under the Management Sale Incentive Plan or for Emergence Equity Grants, and participants have yet to be identified. (Id. at 13);

- The identities of officers that will receive employment agreements has not been finalized, nor are the details of such arrangements disclosed, in spite of the requirements of the Bankruptcy Code that the post-emergence compensation arrangements for insiders be disclosed (Id. at 22);

---

[1] The Disclosure Statement states: "Notwithstanding the fact that the Plan provides for an internal reorganization of the Debtors which equitizes the Prepetition Noteholder Claims and certain other Claims, if not later than ten (10) days prior to the hearing to approve the Disclosure Statement a third party purchaser determined to be credible by the Debtors expresses an interest, and demonstrates the wherewithal, to (i) purchase all or a substantial portion of the New SSCC Common Stock for the Full Payment Amount, or (ii) purchase all of the assets of the Debtors for the Full Payment Amount and satisfy all other obligations provided for in the Plan, the Debtors reserve the right, in consultation with the Committee, to modify the Plan and this Disclosure Statement, including by seeking approval of appropriate sale or other procedures, in a manner necessary to allow such a transaction to be pursued." (Discl. Stmt. at 13.)

-5-

- The number of shares of reorganized SSCC has not been established (Id. at 53)

- The Placeholder Plan contemplates that "debt instruments" may be issued to Reorganized Debtors, but the terms are not yet set and are to be "developed by the Debtors in consultation with the Committee" (Id. at 12); and

- The Disclosure Statement references an exit financing credit facility, but does not contain any indication that a commitment for such facility has been obtained or even allude to the terms of such facility. (Discl. Stmt. at 199.)

The Placeholder Plan is clearly not close to final. Its treatment of equity holders' interests lacks any supporting analysis from the Debtors' financial advisor or anyone else. The Debtors simply cannot credibly argue that an Equity Committee would not be able to play a meaningful role in the negotiation of the terms of a plan.[2]

**The Debtors Are Not Hopelessly Insolvent.**

9. Given that an Equity Committee could still impact the terms of the Placeholder Plan, the question remains whether the Debtors are hopelessly insolvent. They are not.

10. Following the first round of briefing and the September 30 hearing, the Court requested the submission of additional evidence regarding whether the Debtors are hopelessly insolvent, and whether their exists the likelihood of a meaningful recovery by the Debtors' shareholders. In order to analyze that likelihood, Movant retained Mark Hootnick of Moelis & Company ("**Moelis**"), an experienced, well-respected expert in restructuring. Through a multi-part valuation analysis, Mr. Hootnick determined a range of projected values for the

---

[2] The Court should also note that the Debtors' bonds are now trading above 80% (up from 64.5% on September 24, 2009), and that the application of any reasonable discount rate to the trading level suggests that the market expects future recoveries of those bonds to be near par value.

Company that demonstrate there is indeed a likelihood of a meaningful recovery for equity holders.

11. To develop that range of possible values, Mr. Hootnick first developed a revised set of EBITDA projections. Mr. Hootnick started with the Debtors' *own* EBITDA projections. Next, based on the application of the Debtors' *own* calculations of the sensitivity of the Company's EBITDA to various drivers or inputs, such as linerboard price, sales volume, cost of raw materials, and the cost of fuel, Mr. Hootnick tested the Debtors' EBITDA projections against projected EBITDA based on inputs for those same variables taken from objective third-party sources, such as research analysts for the industry. As a result of that process, Mr. Hootnick concluded that the Debtors' EBITDA projections likely materially understate the value of the Company. In reaching that conclusion, Mr. Hootnick factored in the cyclical nature of the industry in which the Debtors operate -- which the Debtors' EBITDA projections ignored -- and determined that the industry, which is currently (and has been since the second quarter of 2008) in a trough, could realize tremendous value as the broader economy recovers. For example, even holding all other variables constant, rising linerboard prices would significantly raise the Company's EBITDA, and virtually all of the major players in the industry have announced price increases for January 1, 2010. On December 2, 2009 in fact, the Company announced a $50-$70 per ton price increase of containerboard, which their *own* sensitivity analysis translates to potentially at least $250 million of EBITDA. Mr. Hootnick concluded that it was reasonable to expect that the Company would benefit as the industry emerges from the trough. Indeed, Mr. Hootnick's analysis suggests that the Debtors' conservative estimates ignore significant earning potential.

12. In addition to analyzing the potential spectrum of the Company's earnings, Mr. Hootnick also examined the potential for recovery of value from various other sources, including government subsidy programs such as the black liquor tax credit and the Biomass Crop Assistance Program ("**BCAP**"). The Debtors could realize as much as $265 million per year for two years from BCAP, though Mr. Hootnick's valuation analysis only includes half of that amount. It is also possible that the Debtors' Net Operating Losses ("**NOLs**") could result in some additional value, but, given a dearth of information made available on the Debtors' NOLs, Mr. Hootnick was unable to quantify that value.

13. Mr. Hootnick also believes that a strategic purchase of the Company by a healthier competitor is a strong possibility, because of the highly competitive nature of the industry and huge potential profits that could result from a reduction in industry capacity. Historically, the less excess capacity that exists in the industry, the greater the control that the Company and its competitors have been able to exercise over pricing, which leads to increased earnings. The Company's current condition makes it an extremely attractive target for a strategic acquiror, and indeed, the inclusion of a Management Sale Incentive Program by the Company in a draft of the plan of reorganization and disclosure statement strongly suggests that the Debtors are considering such a possibility. A merger would create significant additional value. At present, who has the incentive to negotiate a deal to yield recovery in excess of the Company's debt? Certainly not the creditors whose committee the Debtors claim represents equity holders' interests.[3]

14. Mr. Hootnick also analyzed the possibility that the claims arising from the Company's underfunded pension obligations would prevent equity holders from recovering, and

---

[3] During his deposition, Mr. Miller, the Debtors' expert, was directed not to answer whether any ongoing merger discussions exist.

concluded that there was a meaningful likelihood that it would not. Mr. Hootnick concluded that the underfunding of the pension obligations is unusually high at the present time because of the current interest rate environment. In other words, interest rates are historically low, and Mr. Hootnick's analysis concludes that as the interest rate environment improves and the discount rate returns to its historical levels, the pension underfunding will decrease dramatically. The Debtors' failure to account for that potential increase, and its offsetting reduction in the size of the underfunding of the pension obligations, results in an understatement of the Debtors' distributable value.

15. In response to Mr. Hootnick's conclusion that there is a likelihood of a meaningful recovery for equity holders, the Debtors offer no analysis of their own. They are content instead only to throw rocks at Mr. Hootnick's report, and they do so poorly. The Rebuttal to Moelis Report prepared by Lazard (the "**Rebuttal Report**") levels a number of criticisms at Mr. Hootnick's report, only a few of which even merit a response. First and foremost, the Rebuttal Report criticizes Mr. Hootnick for refusing to focus exclusively on the last twelve months and the Company's actual and forecasted results for 2009 and 2010. (Rebuttal Rep. at 3.) As Mr. Hootnick opined, however, 2008 and 2009 represented an historically bleak financial period, not just for the Debtors or the industry, but for the American economy as a whole. To value the Company as a going concern on a plainly aberrant business cycle, as opposed to more normalized historical cycles as Mr. Hootnick did, improperly depresses the Company's value. Rather than accounting for potential increases in value through the use of projections for mid-cycle (average EBITDA for 2011 and 2012) and peak (average EBITDA for 2012 and 2013) as Mr. Hootnick did, the Rebuttal Report relies on the Debtors' LTM, 2009E and 2010E EBITDA projections to value the Company based on the trough of the cycle.

16. Second, rather than attempting to demonstrate what additional value the Company will receive from the black liquor tax credit or BCAP, the Rebuttal Report simply criticizes Mr. Hootnick for including additional potential value from government subsidies in its analysis at all. In regards to the black liquor tax credit, Lazard glosses over how, at a minimum, the Company will be receiving payment of $58 million in 2010, which Mr. Hootnick and the Company's own projections take into account. In regards to BCAP, Lazard's only rebuttal is to criticize a source that Mr. Hootnick did not rely on its BCAP analysis and which does not include a full discussion of the benefits of BCAP.[4] Lazard does not even acknowledge the detailed sources on which he relies or that his report accounts for indirect, not the direct, benefits of BCAP on the company.

17. In sum, the Debtors' critique of the Moelis Report misses the mark. At best, the Debtors have presented an expert who disagrees with the methodology and conclusions of the Moelis Report. For the reasons stated, that criticism is unjustified. More importantly, however, the Debtors offer no alternative methodology of their own. That is not surprising, inasmuch as they have not asked Lazard or any other professional to perform a valuation of the Company. It is enough, they believe, for them to assert that Mr. Hootnick might be wrong. That is not the test for the appointment of an equity committee, however. The test is whether there is a likelihood of meaningful recovery by equity holders, and Mr. Hootnick has demonstrated that the trajectory of the industry, the objective views of those who observe it, and the Debtors' own projections all combine to demonstrate that such a likelihood exists. The Debtors have offered no credible evidence to the contrary.

---

[4] Mr. Miller's critique rings particularly hollow when Lazard admittedly has done *no analysis* of this or any other analyst conclusions on the value of the Debtors.

## CONCLUSION

For the reasons stated herein and in the Motion, Mariner respectfully requests that the Court grant its Motion and such other and different relief as the Court deems just and proper.

Dated: December 3, 2009

                                                            CROSS & SIMON L.L.C.

By: _____
      Christopher P. Simon (No. 3697)
      Kevin S. Mann (No. 4576)
      913 North Market Street, 11th Floor
      Wilmington, DE 19801
      Telephone: (302) 777-4200
      Facsimile: (302) 777-4224
      kmann@crosslaw.com

- and -

WILLKIE FARR & GALLAGHER LLP

Rachel C. Strickland
Brian E. O'Connor
David Gise
Joshua M. Troy
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

Co-counsel to Mariner Investment Group, LLC