**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09-10235 (BLS) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone:  (416) 869-5261
Facsimile:  (416) 947-0866

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware, 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

Counsel to the Debtors and Debtors in Possession

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY OTHER PURPOSE UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

---

**IMPORTANT DATES**

- Date by which Ballots and Master Ballots must be received:  [_____]

- Date by which objections to Confirmation of the Plan must be filed and served:  [_____]

- Hearing on Confirmation of the Plan:  [_____] at [   --.m.] (Prevailing Eastern Time)

---

CH1 5049998 5118439v. 74

DISCLAIMER ............................................................................................................... 1

I. INTRODUCTION ................................................................................................... 4

    **A.**     **Overviews of Chapter 11 and CCAA Proceedings.** ................................. 5

        **1.**     **Chapter 11 Proceedings.** ................................................................. 5

        **2.**     **CCAA Proceedings.** ......................................................................... 6

    **B.**     **Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.** ............................................................................................. 7

        **1.**     **Parties Entitled to Vote on the Plan.** ...................................... 7

        **2.**     **Solicitation Package.** ....................................................................... 8

        **3.**     **Voting Procedures, Ballots, and Voting Deadline.** ................. 9

        **4.**     **Plan Confirmation Hearing.** ...................................................... 10

        **5.**     **Objections to Confirmation.** ...................................................... 10

    **C.**     **Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.** ................................................................................................ 11

II. OVERVIEW OF THE PLAN AND CCAA PLAN ........................................... 12

    **A.**     **General Overview.** ........................................................................... 12

    **B.**     **Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors <span style="color:blue">and Canadian Debtors</span> Under the Plan.** ................................................................................................. 14

    **C.**     **Canadian Asset Sale.** ...................................................................... 17

    **D.**     **Executive Compensation:  Management Incentive Plans and Employment Agreements.** ............................................................... 20

        **1.**     **Management Incentive Plans.** .................................................... 20

        **2.**     **Executive Employment Agreements.** ................................ ~~22~~23

III. GENERAL INFORMATION ....................................................................... ~~22~~23

    **A.**     **The Debtors' Businesses and Properties.** ............................ ~~22~~27

        **1.**     **Company Overview.** .................................................... ~~22~~27

|   | 2. | Properties. | ........................................................ | ~~22~~27 |
| B. |   | **Operational Structure of the Debtors.** | ....................................... | ~~23~~27 |
|   | 1. | **Products and Materials.** | ............................................ | ~~23~~28 |
|   | 2. | **Materials.** | ........................................................ | ~~25~~29 |
|   | 3. | **Customers.** | ....................................................... | ~~25~~29 |
|   | 4. | **Employees.** | ....................................................... | ~~25~~30 |
|   | 5. | **Recent Operations.** | ............................................... | ~~26~~30 |
|   | 6. | **Corporate History and Business Acquisitions.** | ................. | ~~26~~31 |
| C. |   | **Management of Debtors.** | ............................................... | ~~27~~32 |
|   | 1. | **Board of Directors.** | .............................................. | ~~27~~32 |
|   | 2. | **Biographies of Directors.** | ....................................... | ~~28~~32 |
|   | 3. | **Committees of the Board of Directors.** | .......................... | ~~29~~34 |
|   | 4. | **Compensation of Directors.** | ...................................... | ~~30~~34 |
|   | 5. | **Executive Officers.** | .............................................. | ~~30~~35 |
|   | 6. | **Biographies of the Senior Executive Officers.** | .................. | ~~31~~35 |
|   | 7. | **Executive Compensation.** | .......................................... | ~~34~~39 |
| D. |   | **Compensation and Benefits Programs.** | ................................. | ~~35~~39 |
|   | 1. | **Historical Incentive Programs Prior to the Chapter 11 Cases.** | ....... | ~~36~~40 |
|   | 2. | **Short-Term and Long-Term Incentive Compensation Plans Approved During the Chapter 11 Cases.** | ........................ | ~~36~~41 |
|   | 3. | **Executive Agreements.** | ............................................ | ~~42~~46 |
|   | 4. | **Retirement Plans.** | ................................................ | ~~43~~47 |
|   | 5. | **Other Post-Retirement Benefit Programs.** | ......................... | ~~44~~48 |
| E. |   | **Pre-Petition Debt and Capital Structure of the Company.** | ............. | ~~45~~49 |
|   | 1. | **Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement.** | ............................................... | ~~45~~49 |

| | | | |
|---|---|---|---|
| 2. | **Senior Note Debt.** | .............................................................................. | ~~47~~51 |
| 3. | **Securitization Facilities.** | ................................................................ | ~~47~~51 |
| 4. | **Utility and Industrial Revenue Bonds and Other Debt Obligations.** | ........................................................ | ~~48~~52 |
| 5. | **Intercompany Debt.** | ...................................................... | ~~49~~53 |
| 6. | **Trade Debt.** | ................................................................... | ~~53~~57 |
| 7. | **Equity of SSCC.** | ........................................................ | ~~53~~57 |

| | | |
|---|---|---|
| F. | **Post-Effective Date Debt and Capital Structure of the Company.** ...... | ~~53~~57 |
| | 1.    Post-~~Confirmation~~**Effective Date** Equity in **Reorganized** SSCC .... | ~~53~~58 |
| | 2.    **Exit Financing for Reorganized Debtors.** ................. | 58 |
| G. | **Pending Litigation Against the Debtors.** ..................................... | ~~54~~58 |
| H. | **Events Leading up to Chapter 11.** ................................................. | ~~54~~59 |

| | |
|---|---|
| IV. EVENTS DURING THE PROCEEDINGS ............................................... | ~~55~~59 |

| | | |
|---|---|---|
| A. | **First-Day Relief in the Chapter 11 Cases.** ................................ | ~~55~~60 |
| | 1.    **Utility Services.** ......................................................... | ~~55~~60 |
| | 2.    **Payment of Federal, State and Local Taxes.** ................... | ~~56~~60 |
| | 3.    **Shippers, Warehousemen and Other Lien Claimants.** ......... | ~~56~~61 |
| | 4.    **Critical Trade Vendor Treatment and Payment of Priority Claims.** ...................................................... | ~~56~~61 |
| | 5.    **Continuation and Payment of Prepetition Insurance.** ......... | ~~57~~61 |
| | 6.    **Customer Programs.** ................................................... | ~~57~~62 |
| | 7.    **Employee Compensation and Benefits.** ........................ | ~~57~~62 |
| | 8.    **Cash Management.** ..................................................... | ~~58~~62 |
| | 9.    **Use of Cash Collateral.** ............................................. | ~~58~~63 |
| | 10.   **Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.** ........................ | ~~58~~63 |

CH1 ~~5049998~~5118439v.~~74~~

B.         **Relief in CCAA Proceedings.**..................................................................~~58~~63

C.         **Debtor-in-Possession Financing.**........................................................~~60~~65

     1.     **Post-Petition Financing Needs.**.............................................~~60~~65

     2.     **The DIP Financing Motion and Orders.**................................~~60~~65

     3.     **The DIP Facility.**..................................................................~~61~~65

D.         **Appointment of Creditors' Committee.**................................................~~62~~67

E.         **Professional Retention.**.........................................................................~~62~~67

F.         **Cross-Border Insolvency Protocol.**.....................................................~~64~~69

G.         **Substantive Matters in the Proceedings.**............................................~~64~~69

     1.     **Exclusive Procedures for Section 503(b)(9) Claims.**...............~~64~~69

     2.     **Extension of Time to Remove Actions.**................................~~64~~69

     3.     **Executory Contracts and Unexpired Leases.**.......................~~64~~69

     4.     **Asset Sales.**.........................................................................~~65~~70

     5.     **Hodge Trustee's Motion for Payment of Administrative Expenses.**........................................................................~~67~~72

     6.     **Georgia Pacific Litigation.**..................................................~~68~~73

     7.     **i2i Europe, ltd. Adversary Proceeding.**..............................~~68~~73

     8.     **Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders.**...........................~~69~~74

     ~~9.~~     ~~**Stone FinCo II Motion.**~~.....................................................~~70~~

     10.    **Motions to Lift or Modify the Automatic Stay.**.................~~70~~76

H.         **Administrative Matters in the Proceedings.**.......................................~~71~~76

     1.     **Schedules of Assets and Liabilities; Statements of Financial Affairs.**.................................................................~~71~~76

     2.     **Filing Claims and Bar Date.**................................................~~71~~76

     3.     **Bankruptcy Rule 2015.3 Reports.**.......................................~~73~~78

| | 4. | Exclusivity Period. | 73 78 |
| I. | | Avoidance Actions. | 74 79 |
| | 1. | Preference Actions. | 74 79 |
| | 2. | Fraudulent Transfer and Conveyance Actions. | 74 79 |

V. THE PLAN OF REORGANIZATION ... 75 80

| A. | | Classification and Allowance of Claims & Equity Interests Generally. | 76 81 |
| B. | | Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases. | 76 81 |
| | 1. | Administrative Expense Claims. | 76 81 |
| | 2. | No Double Payment of Administrative Expense Claims. | 77 82 |
| | 3. | DIP Facility Claims. | 77 82 |
| | 4. | Priority Tax Claims. | 77 83 |
| C. | | Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases. | 78 83 |
| | 1. | Summary of Classification and Treatment of Classified Claims and Interests. | 78 83 |
| | 2. | Classification and Treatment of Claims Against and Interests in SSCC. | 83 88 |
| | 3. | Classification and Treatment of Claims Against and Interests in SSCE. | 86 92 |
| | 4. | Classification and Treatment of Claims Against and Interests in Cameo Container. | 91 97 |
| | 5. | Classification and Treatment of Claims Against and Interests in Calpine Corrugated. | 94 100 |
| | 6. | Classification and Treatment of Claims Against and Interests in SSPRI. | 98 104 |
| | 7. | Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States). | 100 106 |
| | 8. | Classification and Treatment of Claims Against and Interests in SSC Canada. | 103 109 |

9.      **Classification and Treatment of Claims Against and Interests in Smurfit-MBI.** ................................................................ ~~107~~113

10.     **Classification and Treatment of Claims Against and Interests in MBI Limited.** ................................................................ ~~111~~117

11.     **Classification and Treatment of Claims Against and Interests in Stone FinCo II.** ................................................................ ~~114~~120

12.     **Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd.** ................................................ ~~117~~123

13.     **Classification and Treatment of Claims Against and Interests in Francobec Company.** ........................................................ ~~120~~126

14.     **Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company.** .......................................... ~~123~~129

15.     **Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) .** ...................................... ~~126~~132

16.     **Acceptance or Rejection of the Plan by Classes of Claims and Interests.** ........................................................................ ~~129~~135

D.     **Classification and Treatment of Affected Claims Against the Canadian Debtors in the CCAA Proceedings.** ............................................ ~~130~~136

    1.     **Purpose and Effect of the CCAA Plan.** .................................. ~~130~~136

    2.     **Classification of Creditors.** .............................................. ~~131~~137

    3.     **Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims.** ...................................................... ~~133~~139

    ~~4.~~     ~~**Option to Place the Canadian Debtors into Bankruptcy Proceedings.**~~ .................................................................... ~~134~~

    ~~5.~~     **Treatment of Affected Unsecured Claims** .............................. ~~134~~140

    ~~6.~~5.     **Conditions Precedent to Implementation of CCAA Plan.** ........... ~~135~~141

    ~~7.~~6.     **CCAA Creditors' Meeting.** ............................................... ~~136~~141

    ~~8.~~7.     **General.** ...................................................................... ~~138~~144

E.     **The Canadian Asset Sale.** ...................................................... ~~140~~146

    1.     **Sale of the Canadian Assets to Canadian Newco.** ...................... ~~140~~146

F.       **Means For Implementation of the Plan.**................................................143149

     1.     **Procedural Consolidation.**.............................................143149

     2.     **Corporate Governance and Corporate Actions.**.........................144149

     3.     **Issuance and Distribution of New Securities and Related Matters.**..................................................146151

     4.     **Listing on the New York Stock Exchange or the NASDAQ Stock Market.**..................................147152

     **5.**     **Exit Facilities.**................................................................153

     **6.**     **Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.**..............................147153

     6.**7.**     **Dissolution of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II.**..............................148153

     7.**8.**     **Vesting of the Canadian Assets in Canadian Newco.**.................148154

     8.**9.**     **Cancellation of Credit Documents, Debt Instruments, and Interests.**................................................148154

     9.**10.**     **Cancellation of Liens.**.................................................149155

     10.**11.**     **Employee Compensation and Benefit Programs.**.......................149155

     11.**12.**     **Canadian Pension Plans.**..............................................150156

     12.**13.**     **Management Incentive Plans.**.........................................150157

     13.**14.**     **Restructuring Transactions.**...........................................151157

     14.**15.**     **Additional Transactions Authorized Under the Plan.**................152158

     **16.**     **Cash-Out Auction for Eligible Cash-Out Participants.**................158

G.       **Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases and the CCAA Proceedings.**......................152161

     1.     **Assumption/Ratification of Executory Contracts and Unexpired Leases.**..........................................152161

     2.     **Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.**................................153161

     3.     **Assumption of Collective Bargaining Agreements.**....................153161

4.    **Insurance Policies and Agreements.**............................................~~153~~162

5.    **Rejection Damages Bar Date.**................................................~~154~~162

6.    **Post-Petition Contracts and Leases.**.....................................~~154~~162

H.    **Provisions Governing the Distributions Under the Plan.**........................~~154~~162

1.    **General Provisions on Distributions under the Plan.**..................~~154~~162

2.    **No Interest on Claims Unless Otherwise Provided in the Plan.**....~~155~~163

3.    **Distributions by Disbursing Agents.**...................................~~155~~163

4.    **Delivery of Distributions – Chapter 11 Cases.**...........................~~155~~164

5.    **Delivery of Distributions – CCAA Proceedings.**........................~~156~~165

6.    **Undeliverable and Unclaimed Distributions.**..............................~~157~~165

7.    **Record Date for Distributions.**.............................................~~157~~166

8.    **Assignment of Claims.**.......................................................~~158~~167

9.    **Means of Cash Payment.**....................................................~~158~~167

10.   **Withholding and Reporting Requirements.**..............................~~158~~167

11.   **Allocation of Plan Distributions Between Principal and Interest.**....................................................................~~159~~168

12.   **Setoff and Recoupment.**.....................................................~~159~~168

13.   **Fractional Shares.**.............................................................~~159~~168

14.   **Compromises and Settlements.**..............................................~~159~~168

15.   **Claims Administration Responsibility – Chapter 11 Cases.**........~~160~~168

16.   **Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.**........................................................~~160~~169

17.   **Distribution Reserve– CCAA Proceedings.**................................~~162~~172

I.    **Confirmation and Consummation of the Plan.**.............................~~163~~173

1.    **Conditions to Confirmation.**.................................................~~163~~173

2.    **Conditions to Occurrence of the Effective Date.**.......................~~164~~173

CH1 ~~5049998~~5118439v.~~7~~4

3.      Waiver of Conditions. ..................................................................... ~~164~~174

4.      Consequences of Non-Occurrence of Effective Date. .................. ~~165~~174

5.      Notice of Effective Date. ................................................................ ~~165~~174

J.      Injunctions, Releases And Discharge. .................................................... ~~165~~174

1.      Discharge. ......................................................................................... ~~165~~174

2.      Releases. ........................................................................................... ~~167~~177

3.      Supplemental Injunction. ................................................................ ~~169~~179

4.      Disallowed Claims. ........................................................................... ~~171~~180

5.      Exculpation. ..................................................................................... ~~171~~181

6.      Revesting of Assets. ........................................................................ ~~172~~182

7.      Preservation of Litigation Claims. ................................................. ~~173~~182

8.      Survival of Indemnification Obligations. ....................................... ~~173~~182

K.      Retention of Jurisdiction. ........................................................................ ~~174~~183

1.      Jurisdiction of the Bankruptcy Court and the Canadian
        Bankruptcy Court. ............................................................................ ~~174~~183

L.      Miscellaneous. .......................................................................................... ~~176~~186

1.      Surrender of Instruments. ............................................................... ~~176~~186

2.      Dissolution of the Committee. ......................................................... ~~177~~187

3.      Pre-Effective Date Injunctions or Stays. ....................................... ~~177~~187

4.      Post-Confirmation Date Retention of Professionals. .................. ~~178~~187

5.      **Payment of the Fee Auditor's Fees and Expenses.** ............................ 187

**6.**    Bar Date for Certain Administrative Expense Claims. .............. ~~178~~188

~~6.~~**7.**  Effectuating Documents and Further Transactions. ................... ~~178~~188

~~7.~~**8.**  Exemption from Transfer Taxes. ..................................................... ~~178~~188

~~8.~~**9.**  Payment of Statutory Fees. ............................................................. ~~179~~188

CH1 ~~5049998~~5118439v.~~74~~

9.10. **Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees.**......................179189

10.11. **Proofs of Claim Filed by Prepetition Notes Indenture Trustees.** 179189

12. **Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.** ........................................................................ 189

11.13. **Creditor Representative Duties and Payment of Fees**................179189

12.14. **Amendment or Modification of the Plan.**...................................179189

13.15. **Severability of Plan Provisions.** ...............................................180190

14.16. **Binding Effect; Successors and Assigns.** ....................................180190

15.17. **Revocation, Withdrawal or Non-Consummation.** .......................180190

16.18. **Notice.**........................................................................................180190

17.19. **Governing Law.**...........................................................................181191

18.20. **Reservation of Rights.**.................................................................181191

VI. VOTING PROCEDURES AND REQUIREMENTS ..................................................182192

    A. **Voting Procedures/Solicitation in the Chapter 11 Proceedings.**.............182192

        1. **Voting Deadline.**..............................................................................182192

        2. **Vote Required for Acceptance by a Class of Claims.** .................183193

        3. **Voting Procedures.**..........................................................................183193

    B. **Canadian Voting Procedures.** ................................................................184194

        1. **Voting and Acceptance of Plan in CCAA Proceedings.**..............184194

        2. **Solicitation in CCAA Proceedings.**...............................................184194

VII. CONFIRMATION OF THE PLAN ......................................................................186196

    A. **Confirmation in Chapter 11 Cases.** ......................................................186196

        1. **Confirmation Hearing.** ..................................................................186196

        2. **Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases.** ..........................................................................187197

CH1 5049998 5118439v.74

B.       **Canadian Requirements for Sanction of CCAA Plan.**............................~~192~~202

VIII. PROJECTED FINANCIAL INFORMATION ........................................................~~192~~202

IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS.................~~194~~204

X.  CERTAIN RISK FACTORS TO BE CONSIDERED ................................................~~194~~204

    A.      **Certain Bankruptcy Considerations.**..................................................~~195~~205

          1.      **Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**........~~195~~205

          2.      **Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.**..................................................................~~196~~206

          3.      **Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.**........~~196~~206

    B.      **Risks Relating to the Reorganized Debtors' Financial Results and Condition.**.......................................................................................~~197~~206

          1.      **The Reorganized Debtors' Failure to Achieve Their Projected Financial Results May Affect Their Ability to Pay Obligations.**~~197~~206

          2.      **The Debtors' Financial Projections Are Based on Assumptions and Subject to Uncertainty.**.........................................................~~197~~207

          3.      **Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.**...................................................................~~198~~207

          4.      **Historical Financial Information May Not Be Comparable.**........~~198~~208

    C.      **Risks Relating to the Reorganized Debtors' Business.**...........................~~198~~208

          1.      **Global Economic Conditions and Credit Tightening Materially and Adversely Affect the Reorganized Debtors' Business.**..........~~198~~208

          2.      **The Reorganized Debtors May Be Required to Record Impairment On Their Long-Lived Assets.**...................................~~199~~208

          3.      **The Reorganized Debtors' Capital Structure.**.............................~~199~~209

          4.      **The Reorganized Debtors' Exit Financing Credit Facility May Limit Their Ability to Plan For or Respond to Changes in Their Business.**.................................................................................~~199~~209

          5.      **The Debtors' Industry is Cyclical and May Experience Periods of Overcapacity.**...............................................................~~199~~209

6. The Debtors' Industry is Highly Competitive.............................200210

7. The Debtors' Pension Plans Are Underfunded and Will Require Additional Cash Contributions. ..................................................200210

8. Fluctuations in Energy, Transportation and Raw Materials Prices Could Adversely Affect Reorganized Debtors' Manufacturing Costs. ...............................................................201211

9. Factors Beyond the Reorganized Debtors' Control Could Hinder ~~their~~Their Ability to Service Debt and Meet Operating Requirements. ......................................................................201211

10. Cost of Compliance with Government Regulation May Adversely Affect the Reorganized Debtors' Financial Results....202212

11. Failure to Maintain Customer Relationships May Adversely Affect Financial Results. ...................................................202212

12. Failure to Attract and Retain Employees May Adversely Affect Financial Results. ..............................................................203212

13. Foreign Currency Risks and Exchange Rate Fluctuations Could Hinder the Results of the Reorganized Debtors' Canadian Operations..................................................................203213

14. Work Stoppages and Other Labor Relations Matters May Have an Adverse Effect on the Reorganized Debtors' Financial Results. ...........................................................................203213

D. Risks Relating to the New SSCC Common Stock. ................................203213

1. A Liquid Trading Market for the New SSCC Common Stock May Not Develop..............................................................203213

2. Certain Holders May be Restricted Under Applicable Securities Laws in ~~their~~Their Ability to Sell or Transfer New SSCC Common Stock. ....................................................................204214

3. The Market Price of Shares of New SSCC Common Stock May Fluctuate Significantly.....................................................204214

4. Sales of a Substantial Number of Shares of New SSCC Common Stock Could Depress Stock Prices...................................205215

5. Value of New SSCC Common Stock May be Diluted................205215

xiv

**6.    Lack of Dividends on New SSCC Common Stock May Adversely Affect Liquidity.** ....................................... ~~205~~215

**XI.  CERTAIN TAX CONSEQUENCES OF THE PLAN** ..................................~~205~~215

   **A.    U.S. Federal Income Tax Consequences to the Debtors.** ........................~~206~~216

   **B.    U.S. Federal Income Tax Consequences to the Holders of Claims.** ........~~208~~218

   **C.    Certain Canadian Federal Income Tax Consequences of ~~CCAA~~the Plan.** ..............................................................................~~214~~223

   **D.    Importance of Obtaining Professional Tax Assistance.** .........................~~218~~227

   **E.    Reservation of Rights.** ....................................................~~218~~227

**XII.  CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN SECURITIES LAW CONSIDERATIONS** ..............................~~218~~227

   **A.    Exemption From Registration Requirements.** ....................................~~218~~227

   **B.    Subsequent Transfers of Securities.** .............................................~~219~~228

   **C.    Canadian Securities Law Considerations.** .......................................~~220~~229

**XIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND CCAA PLAN** ..........................................~~220~~229

   **A.    Continuation of the Chapter 11 Cases.** ...........................................~~220~~229

   **B.    Liquidation Under Chapter 7 or Chapter 11.** ....................................~~221~~230

   **C.    Alternatives in CCAA Proceedings.** ..............................................~~221~~230

**XV.  CONCLUSION AND RECOMMENDATION** ...................................~~221~~230

CH1 ~~5049998~~5118439v.~~3~~4

## INDEX OF EXHIBITS

Exhibit A       Debtors' Joint Plan of Reorganization and Plan of Compromise and Arrangement

Exhibit B -1    Petition Date Corporate Structure Chart

Exhibit B-2    Anticipated Post-Effective Date Corporate Structure Charts

Exhibit C       Projected Financial Information

Exhibit D       Liquidation Analysis

Exhibit E       Selected Historical Financial Statements: Smurfit-Stone Container Corporation Quarterly Report on Form 10-Q For the Quarterly Period Ended September 30, 2009

CH1 5049998 5118439 v. 7 4

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN (AS DEFINED BELOW) AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY INCOMPLETENESS OF ANY SUMMARY OR STATEMENT MADE IN THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW) AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF CANADA OR ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

1

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

EXCEPT FOR THE HISTORICAL INFORMATION CONTAINED IN THIS DOCUMENT, CERTAIN MATTERS DISCUSSED HEREIN CONTAIN FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. ALTHOUGH THE DEBTORS BELIEVE THAT, IN MAKING ANY SUCH STATEMENTS, THEIR EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS, ANY SUCH STATEMENTS MAY BE INFLUENCED BY FACTORS THAT COULD CAUSE ACTUAL OUTCOMES AND RESULTS TO BE MATERIALLY DIFFERENT FROM THOSE CONTAINED IN SUCH FORWARD-LOOKING STATEMENTS. WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATES," "BELIEVES," "EXPECTS," "INTENDS" AND SIMILAR EXPRESSIONS AS THEY RELATE TO THE DEBTORS, THEIR OPERATIONS OR THEIR MANAGEMENT ARE INTENDED TO IDENTIFY SUCH FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO NUMEROUS RISKS AND UNCERTAINTIES. THERE ARE IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN FORWARD-LOOKING STATEMENTS, CERTAIN OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THESE FACTORS, RISKS AND UNCERTAINTIES ARE DISCUSSED BELOW IN ARTICLE X OF THIS DISCLOSURE STATEMENT.

THE DEBTORS' ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENT COULD DIFFER MATERIALLY FROM THOSE EXPRESSED IN, OR IMPLIED BY, THESE FORWARD-LOOKING STATEMENTS. ACCORDINGLY, THE DEBTORS CAN GIVE NO ASSURANCES THAT ANY OF THE EVENTS ANTICIPATED BY THE FORWARD-LOOKING STATEMENTS WILL TRANSPIRE OR OCCUR OR, IF ANY OF THEM DO SO, WHAT IMPACT THEY WILL HAVE ON THE DEBTORS' RESULTS OF OPERATIONS OR FINANCIAL CONDITION. THE DEBTORS EXPRESSLY DECLINE ANY OBLIGATION TO PUBLICLY REVISE ANY FORWARD-LOOKING STATEMENTS THAT HAVE BEEN MADE TO REFLECT THE OCCURRENCE OF EVENTS AFTER THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS, IN CONSULTATION WITH THE DEBTORS' PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS (AS DEFINED BELOW) PROVIDED IN THIS DISCLOSURE STATEMENT. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO

SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT BE CORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

# I. INTRODUCTION

On January 26, 2009 (the "Petition Date"),[2] Smurfit-Stone Container Corporation ("SSCC") and its subsidiaries Smurfit-Stone Container Enterprises, Inc. ("SSCE"), Calpine Corrugated, LLC, Cameo Container Corporation, Lot 24D Redevelopment Corporation, Atlanta & Saint Andrews Bay Railway Company, Stone International Services Corporation, Stone Global, Inc. Stone Connecticut Paperboard Properties, Inc., Smurfit-Stone Puerto Rico, Inc., Smurfit Newsprint Corporation, SLP Finance I, Inc., SLP Finance II, Inc., SMBI Inc., Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. (collectively with SSCC, the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (collectively, the "Chapter 11 Cases").

On the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including Smurfit-Stone Container Canada Inc. ("SSC Canada"), a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Canadian Debtors")[3] – applied for protection from their creditors in Canada pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA) in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court"). On the Petition Date, the Canadian Bankruptcy Court issued an order that, *inter alia*, imposed a stay of all proceedings (the "CCAA Stay") against the Canadian Debtors and their property (as amended and restated on January 28, 2009, the "CCAA Initial Order"). The proceedings before the Canadian Bankruptcy Court are referred to herein as the "CCAA Proceedings," and together with the Chapter 11 Cases as the "Proceedings".

On December ~~1,~~22, 2009, the Debtors filed their Joint Plan of Reorganization and Plan of Compromise and Arrangement (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court. The Plan provides for a coordinated restructuring and compromise of all Claims against and Interests in the Debtors, including the Canadian Debtors, in both the Chapter 11 Cases and the CCAA Proceedings. Article IV of the Plan shall also serve as the plan of compromise and arrangement (the "CCAA Plan") to be proposed in the CCAA Proceedings to each Class of Affected Claims against the Canadian Debtors. A copy of the Plan is attached hereto as Exhibit A. The Debtors hereby submit this Disclosure Statement pursuant to ~~Section~~section 1125 of the Bankruptcy Code to the Holders of certain Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [_____], commencing at [ ] --.m. prevailing Eastern Time. In advance of

---

[2] Unless otherwise defined elsewhere in this Disclosure Statement, capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Bankruptcy Code.

[3] The Canadian Debtors are Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. Smurfit-MBI and SLP Finance General Partnership did not apply for protection under the CCAA but instead sought recognition of their respective Chapter 11 Cases in the Canadian Bankruptcy Court under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.

the hearing on confirmation, the Debtors will file a Plan Supplement containing certain exhibits to the Plan that were not filed with the Plan.

The Plan constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases and the CCAA Plan constitutes a separate plan of compromise and arrangement for each Canadian Debtor in the CCAA Proceedings. The Debtors reserve the right to withdraw the Plan or the CCAA Plan with respect to one or more Debtors or Canadian Debtors, as applicable, while seeking confirmation or approval of the Plan or the CCAA Plan with respect to all other Debtors or Canadian Debtors, as applicable.

The purpose of this Disclosure Statement is to describe the Plan, including the CCAA Plan, and the provisions thereof, provide certain information, as required under ~~Section~~section 1125 of the Bankruptcy Code, to ~~creditors~~Holders of Claims who will have the right to vote to accept or reject the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan. ~~Creditors~~Holders of Claims entitled to vote to accept or reject the Plan will receive a ballot ("Ballot") together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of these Proceedings. This Disclosure Statement also contains information respecting significant events that have occurred during these Proceedings, including the formulation and development of the Plan. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

By order dated [_____], the Bankruptcy Court approved this Disclosure Statement, in accordance with ~~Section~~section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims should not rely on any information relating to the Debtors and their businesses, other than the information contained in this Disclosure Statement, the Plan, and all exhibits and appendices hereto and thereto.

The Debtors may supplement and/or amend this Disclosure Statement or any Exhibits attached thereto, including filing the Exhibits referenced herein, at any time prior to the hearing to approve ~~the~~this Disclosure Statement.

**A.     Overviews of Chapter 11 and CCAA Proceedings.**

**1.     Chapter 11 Proceedings.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and

its equity security holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of the claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.  The Debtors are submitting this Disclosure Statement to certain Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

## 2. CCAA Proceedings.

Over the last twenty-five years, the CCAA has emerged as the principal Canadian statute for carrying out major insolvency restructurings.  Similar to chapter 11, the CCAA is "debtor-in-possession" legislation.  The CCAA creates a Court-supervised process that allows the debtor to carry on business and maintain control over its assets while it negotiates, and seeks approval for, a plan of compromise and arrangement acceptable to its creditors.  The consummation of a plan of compromise and arrangement is the CCAA's principal objective.

Where a plan is proposed between a debtor company and its secured or unsecured creditors, or any class thereof, the Canadian Bankruptcy Court may (but is not obligated to) order a meeting of creditors or class of creditors.  The Canadian Bankruptcy Court order calling the meeting will approve the process for creditors to vote on the proposed plan and will also, among other things, establish classes of creditors for plan voting purposes.  While the debtor has the ability to define the classes of creditors subject to the proposed plan, they remain subject to the Canadian Bankruptcy Court's approval.  In evaluating proposed classes, courts will consider (a) the commonality of interest of creditors who share a class, and (b) the purposes of the CCAA.

A plan must be approved by a majority in number representing two-thirds of the value of the creditors, or the class of creditors, as the case may be, voting at the meeting held for that

purpose in person or by proxy. The Canadian Bankruptcy Court may, but is not obligated to, sanction a plan that has received the requisite creditor vote.

Following sanction by the Canadian Bankruptcy Court, the plan becomes binding on the debtor and on all classes of creditors that (i) are affected by the plan and (ii) accepted the plan. The plan will ordinarily provide that all claims against the debtor (except for certain unaffected claims) shall be settled in accordance with the terms of the plan if the class of such claims accepts the plan, and the ability of the holder of any such claim to proceed against the debtor is forever discharged and any proceedings relating to such claims are stayed.

While certain references are made to the CCAA Proceedings below, creditors of the Canadian Debtors should make reference to the reports filed with the Canadian Bankruptcy Court by the CCAA Monitor and available on its website: www.deloitte.com/ca/smurfitstonecanada (the "Monitor's Reports") and the materials included in the "Canadian Solicitation Package" described below in addition to reviewing this Disclosure Statement.

**CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORTS AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".**

B.    **Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.**

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN IN THE CANADIAN PROCEEDINGS, SEE SECTION I.C, "OVERVIEW OF SOLICITATION AND VOTING ON THE PLAN IN THE CCAA PROCEEDINGS" AND SECTION VI.B. "CANADIAN VOTING PROCEDURES."

1.    **Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are also not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan."

The following sets forth which classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19C, 20B, 20C, 20D, 21B and 21C.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C because those Claims and Interests are impaired under the Plan and the Holders are receiving no distribution on account of such Claims and Interests. These Holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E because those Claims and Interests are unimpaired under the Plan, and the Holders of Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

- The Debtors, as the Plan Proponents, and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; provided, however, if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, Sections B, C, D and E.

**2.  Solicitation Package.**

Accompanying this Disclosure Statement (which is provided on CD-ROM) to Holders of Claims in Classes voting to accept or reject the Plan is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving this Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Voting Procedures Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the Voting Deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against and Interests in the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan;

- the notice of Confirmation Hearing and entry of the Voting Procedures Order; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by Holders of Claims who are entitled to vote on the Plan.

3.    **Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (only original signatures will be accepted).  Please return your completed Ballot to the Voting Agent, unless you are a beneficial ~~Holder~~holder of one of the series of Prepetition Notes (each as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee.  Ballots should not be sent to the Debtors or to ~~the indenture trustee for~~ each ~~series of~~Prepetition Notes Indenture Trustee.

**If you are a beneficial holder of a Prepetition Note who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [_____] at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline").  If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline.  Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.  Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent, at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain at your own expense an additional copy of this Disclosure Statement and its appendices and exhibits, please contact the Voting Agent.

Before voting on the Plan, each Holder of a Claim in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

4.    **Plan Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Bankruptcy Court has scheduled the Confirmation Hearing on [_____], [_____] at [__:__.m.] (prevailing Eastern time) before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

5.     **Objections to Confirmation.**

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Court, together with proof of service, and served so that they are received **on or before [_____] at 4:00 p.m., prevailing Eastern Time,** by the following parties:

**Counsel to the Debtors:**

| | |
|---|---|
| Sidley Austin LLP | Young Conaway Stargatt & Taylor, LLP |
| One South Dearborn Street | The Brandywine Building |
| Chicago, Illinois 60603 | 1000 West Street, 17th Floor |
| Facsimile: (312) 853-7036 | P.O. Box 391 |
| Attn: Matthew A. Clemente | Wilmington, Delaware 19899-0391 |
| | Facsimile:  (302) 571-1253 |
| | Attn: Robert S. Brady |

**The U.S. Trustee:**

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

**Counsel to the Official Committee of Unsecured Creditors:**

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

C.     **Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.**

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan. Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be

bound by the CCAA Plan for purposes of the CCAA Proceedings. The votes of Affected Creditors to accept or reject the Plan will be counted once for the purposes of both the CCAA Proceedings and the Chapter 11 Cases.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes: (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable, against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company) and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA Plan. The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order"). The CCAA Creditors' Meeting Order provides, among other things, that:

- The CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement the CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct a meeting of Affected Creditors for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve the CCAA Plan;

- For purposes of voting on the CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

    (a) The CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; and

    (b) The Disclosure Statement, Plan, and Voting Procedures Order, including the form of proxy (Ballot) for use at the Creditors' Meeting, attached as Exhibit [_] to the Voting Procedures Order.

11

- If the CCAA Plan is accepted by the Required Majority of a Class of Affected Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## II. OVERVIEW OF THE PLAN AND CCAA PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

FOR A MORE DETAILED DESCRIPTION OF THE TERMS AND PROVISIONS OF THE PLAN AND CCAA PLAN, SEE ARTICLE V OF THIS DISCLOSURE STATEMENT, "THE PLAN OF REORGANIZATION."

## A.    General Overview.

Between the Petition Date and filing of the Plan and Disclosure Statement, the Debtors have undertaken a careful review of their business operations and implemented various restructuring efforts, in an effort to improve the Company's business results and financial condition. At the same time, the Debtors engaged in ongoing discussions with the Official Committee of Unsecured Creditors (the "Committee") appointed in these Chapter 11 Cases, regarding the terms of its equity and capital structure, and the formulation and implementation of an advantageous capital structure for the Reorganized Debtors.

At its core, the Plan, a copy of which is also attached as Exhibit A to this Disclosure Statement, provides that (i) Holders of the Allowed Prepetition Lender Claims will receive 100% recovery in the form of cash ~~and/or Debt Instruments~~, (ii) CIT Group Claims and Union Bank Claims will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against SSCE will receive their ~~pro rata share~~Pro Rata Share of the New SSCC Common Stock Pool to be issued pursuant to the Plan,[4] Holders of General Unsecured Claims against

---

[4] Pursuant to the Plan, ~~Holders~~a Holder of~~a~~ General Unsecured ~~Claims~~Claim against SSCE may be eligible to receive cash on account of its claim by either (i) electing Convenience Class treatment described below in Section V.C.3(d) of this Disclosure Statement or (ii) participating in the Cash-Out Auction described below in Section V.F.16 of this Disclosure Statement. Alternatively, such ~~Holders have~~Holder has the option of selling ~~their~~its Claim for cash to a claims buyer. This liquid market provides Holders an alternative to participating in the reorganization process. If a Holder decides to sell its Claim, however, it will not be entitled to any further recovery on account of the Claim (other than the cash received from the sale), and ~~they~~it will no longer have any rights in the Chapter 11 Cases arising from that Claim. ~~Further~~Holders may find further information on selling ~~a Claim~~their Claims, along with a list of potential claims buyers that have either appeared in these Chapter 11 Cases or have expressed an interest in buying and selling General Unsecured Claims in these cases, can be found on the Smurfit-Stone Creditors Committee website at: www.smurfitcreditorscommittee.com.

~~Operating Subsidiaries~~<u>Cameo Container, Calpine Corrugated and SSPRI</u> will receive a 100% recovery in the form of cash, (iv) Holders of General Unsecured Claims against SSCC and Holders of General Unsecured Claims against Non-Operating Debtors <u>(United States)</u> will be extinguished and receive no recovery, and (v) SSCC Interests will be extinguished.

The Plan and also provides that the Canadian Assets will be sold. If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI vote to accept the Plan, the Canadian Assets will be transferred to Canadian Newco and the unsecured creditors of SSC Canada and Smurfit-MBI will receive their ~~pro rata share~~<u>Pro Rata Share</u> of the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, respectively. On the other hand, if the Classes of General Unsecured Claims against SSC Canada or Smurfit-MBI do not approve the Plan, the Canadian Assets will be sold pursuant to a process ordered by the Canadian Bankruptcy Court. Affected Creditors will be treated as follows: (i) Holders of the Allowed Prepetition Canadian Lender Claims will receive 100% recovery in the form of cash ~~and/or Debt Instruments~~, (ii) if they vote to accept the Plan, Holders of General Unsecured Claims against SSC Canada and Smurfit-MBI will receive their ~~pro rata share~~<u>Pro Rata Share</u> of cash ~~and/or New SSCC Common Stock~~ from the SSC Canada Distribution Pool and Smurfit-MBI Distribution Pool, respectively, and Holders of General Unsecured Claims against B.C. Shippers Supplies and Francobec Company will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against Stone FinCo II will receive their ~~pro rata share~~<u>Pro Rata Share</u> of the Stone FinCo II Settlement Distribution if they vote to accept the plan, (iv) Holders of General Unsecured Claims against MBI Limited, 3083527 Nova Scotia Company and Non-Operating Debtors <u>(Canada)</u> will be extinguished and receive no recovery, and (v) SSC Canada Interests, Smurfit-MBI Interests and Francobec Company Interests will be extinguished.

Notwithstanding the fact that the Plan provides for an internal reorganization of the Debtors which equitizes the Prepetition Noteholder Claims and certain other Claims, if not later than ten (10) days prior to the hearing to approve ~~the~~<u>this</u> Disclosure Statement a third party purchaser determined to be credible by the Debtors expresses an interest, and demonstrates the wherewithal, to (i) purchase all or a substantial portion of the New SSCC Common Stock for the Full Payment Amount,[5] or (ii) purchase all of the assets of the Debtors for the Full Payment Amount and satisfy all other obligations provided for in the Plan, the Debtors reserve the right, in consultation with the Committee <u>and the CCAA Monitor</u>, to modify the Plan and this Disclosure Statement, including by seeking approval of appropriate sale or other procedures, in a manner necessary to allow such a transaction to be pursued<u>, and appropriate management incentive compensation and other terms and conditions of employment in the event of such a transaction</u>.[6]

**B.      Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the <u>Debtors and Canadian</u> Debtors Under the Plan.**

---

[5] "<u>Full Payment Amount</u>" means an amount of cash sufficient to satisfy all Allowed Claims against the Debtors (including, without limitation, all Allowed Administrative Expense Claims and all Allowed General Unsecured Claims) in full, plus all post-petition interest, fees and costs that are Allowed against any Debtor under applicable law.

[6] In addition, the Committee shall have consultation rights with respect to whether any potential third party purchaser is credible.

The following charts summarize the projected distributions to Holders of Allowed Claims against and Interests in each of the Debtors and Canadian Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries in the Summary Chart are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court and in the CCAA Proceedings, as applicable. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – UNITED STATES | | |
|---|---|---|
| **Class & Description** | **Estimated Allowed Claims** | **Treatment and Estimated Recovery** |
| **DIP Facility Claims:** | $[0][7] | **Unimpaired -** 100%. |
| **Administrative Expense Claims:** | $[62.6] million | **Unimpaired -** 100%. |
| **Priority Tax Claims:** | $[1.7] million | **Unimpaired –** 100%. |
| **Priority Non-Tax Claims:** | $[0] | **Unimpaired –** 100%. |
| **Other Secured Claims:** | $[3.5] million | **Unimpaired –** 100% in the form of cash, reinstatement, or surrender of collateral. |
| **Prepetition Lender Claims:** | $[969.1] million | **Impaired –** 100% in the form of cash and/or Debt Instruments. |
| **Union Bank Claims:** | $[8.6] million | **Impaired –** 100% in the form of cash. |

---

[7] On September 9, 2009, SSCE made a voluntary $250 million prepayment on the $400 million U.S. term loan under the DIP Facility. Following the prepayment, there was approximately $137 million outstanding under the U.S. term loan and $35 million under the Canadian term loan under the DIP Facility. The Company continues to have zero borrowings outstanding under revolving credit facilities under the DIP Facility Credit Agreement and it anticipates that all existing borrowings under the U.S. term loan and the Canadian term loan will be repaid in full prior to the Effective Date.

14

| CIT Group Claims: | $[34.9] million | Impaired – 100% in the form of cash. |
|---|---|---|
| General Unsecured Claims: | $[2.9] billion | SSCE: Impaired – Less than 100% in the form of a Pro Rata Share of New SSCC Common Stock.[8] |
| | $[11.2] million | SSCC and Non-Operating Debtors (United States): Impaired – 0%. |
| | $[4] million | Cameo Container, Calpine Corrugated and SSPRI: Impaired – 100% in the form of cash. |
| Convenience Claims: | $[25-30] million | Impaired – 100% in the form of cash. |
| Intercompany Claims: | N/A[89] | Impaired – 0%. |
| SSCC Interests: | N/A | Impaired – 0%. |
| Subsidiary Interests: | N/A | SSCE, Cameo Container, SSPRI and the Non-Operating Debtors (United States): Unimpaired – retained. |
| | N/A | Calpine Corrugated: Impaired – 0%. |

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – CANADIAN DEBTORS | | |
|---|---|---|
| **Class & Description** | **Estimated Allowed Claims** | **Treatment and Estimated Recovery** |
| DIP Facility Claims: | $[0][910] | Unimpaired – 100%. |
| Administrative Expense Claims: | $[8] million | Unimpaired – 100%. |
| Priority Tax Claims: | $[0] | Unimpaired – 100%. |
| Priority Non-Tax | $[0] | Unimpaired – 100%. |

---

[8] Provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

[89] A summary chart in Section III.E.5 below provides additional detail on the Intercompany Claims.

[910] See footnote 7, *supra*.

CH1 504999985118439v.74

| Claims: | | |
|---|---|---|
| **Other Secured Claims:** | $[1.05] million | **SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company: Impaired** – 100% in the form of cash. |
| | $[1.00] million | **Stone FinCo II, B.C. Shipper Supplies Ltd. and Non-Operating Debtors (Canada): Unimpaired** - 100% in the form of cash, reinstatement, or surrender of collateral. |
| **Prepetition Canadian Lender Claims:** | $[393] million | **Impaired** – 100% in the form of cash ~~and/or Debt Instruments~~. |
| **General Unsecured Claims:** | $[57] million | **SSC Canada: Impaired** – (i) if Class accepts the Plan, [~~TBD%~~ __]% in the form of cash ~~and/or New SSCC Common Stock~~, or (ii) if Class rejects the Plan, ~~0%~~<u>such recovery, if any, shall depend on the outcome of the sale described below in Section II.C.</u> |
| | $[29] million | **Smurfit-MBI: Impaired** – (i) if Class accepts the Plan, [~~TBD%~~ __]% in the form of cash ~~and/or New SSCC Common Stock~~, or (ii) if Class rejects the Plan, ~~0%.~~ <u>such recovery, if any, shall depend on the outcome of the sale described below in Section II.C.</u> |
| | $[~~2.1~~0] million | **MBI Limited, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Impaired** – 0%. |
| | $[295,000] | |
| | $[0] | **Stone FinCo II: Impaired** – (i) if Class accepts the Plan, [~~TBD%~~ __]%, or (ii) if Class rejects the Plan, 0%.[~~10~~11] |

---

[~~10~~ ~~If~~[11] <u>If (i) the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan or (ii) either the Bankruptcy Court or the Canadian Bankruptcy Court shall have determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canada, then the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless</u> the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, <u>in which case</u> the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive their Pro Rata Share of any shares of the New SSCC Common Stock that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim; provided, however, that the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II.

CH1 ~~5049998~~5118439v.~~7~~4

| | | B.C. Shipper Supplies Ltd., Francobec Company: Impaired – 100% in the form of cash. |
|---|---|---|
| **Intercompany Claims:** | N/A[11][12] | **SSC Canada and Smurfit-MBI: Impaired – 0%.** |
| | N/A | **MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Impaired – 0%.**[12] |
| | N/A | **Stone FinCo II: Impaired - 0%.** |
| **Stone FinCo II Intercompany Claim:** | $[200.7] million | **Impaired – 0%.** |
| **Subsidiary Interests:** | N/A | **SSC Canada, Smurfit-MBI and Francobec Company: Impaired – 0%.** |
| | N/A | **Stone FinCo II: Impaired – 0%.**[13] |
| | N/A | **MBI Limited, B.C. Shipper Supplies Ltd., 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Unimpaired –** retained. |

C.      **Canadian Asset Sale.**

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA Monitor) shall establish Canadian Newco (including, ~~in the Debtors' sole discretion~~without limitation, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in Canadian Newco) as a wholly-owned, direct or indirect, subsidiary of SSCE. On the Effective Date, the Canadian Newco Certificate of Incorporation and the Canadian Newco By-Laws, in substantially the forms of Exhibit 7 and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively, shall become effective.  From and after the Effective Date, Canadian Newco shall be a wholly-owned subsidiary of Reorganized SSCC.

---

[11][12] See footnote ~~8~~9, *supra.*
~~12~~

[13] SSCE, as the sole Holder of Interests in Stone FinCo II, shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

CH1 ~~5049998~~5118439v.~~7~~4

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, in consideration for (i) the payment of cash ~~or the distribution of Debt Instruments~~ in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash ~~and/or shares of New SSCC Common Stock~~ in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with <u>Article IV</u> of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash, ~~Debt Instruments, and/or shares of New SSCC Common Stock~~ necessary to consummate the Canadian Asset Sale.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company to their current employees, but excluding any obligations with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations are deemed to be Allowed Claims and are not satisfied or discharged pursuant to the Plan. For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in Exhibit 9 to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in Exhibit 10 to the Plan (to be filed with the Plan Supplement). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases. Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings. Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order. The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan. If the CCAA Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should the Plan fail to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, (i) the Debtors, in consultation with the Committee and the CCAA Monitor, shall be permitted (with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the Canadian Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Competing Bid(s)determine whether any such Competing Bid constitutes a Superior Competing Bid. Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of (i) cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) cash in

the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default, and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans. Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI ~~under the Plan. Canadian Newco shall be entitled to participate in the bidding and auction process.At the conclusion of the auction, the Canadian Bankruptcy Court shall determine whether any Competing Bid constitutes a Superior Competing Bid~~. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order~~; provided, however, that the consideration Canadian Newco provides~~. If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets ~~at the conclusion of the auction~~, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s). Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not ~~be required to, revise its bid to~~ include ~~any~~ cash ~~and/or shares of New SSCC Common Stock in the amounts necessary to fund the SSC Canada Distribution Pool~~or other consideration that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and ~~the~~/or Smurfit-MBI ~~Distribution Pool.~~.

**D.** **Executive Compensation: Management Incentive Plans and Employment Agreements.**

    **1.** **Management Incentive Plans.**

On the Effective Date, the Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the ~~form~~forms of the stock option and restricted stock unit award agreements) substantially in the ~~form as~~forms set forth in Exhibit 3 to the Plan.

These Management Incentive Plans include the Equity Incentive Plan, pursuant to which Reorganized SSCC will make grants of equity-based compensation to certain officers and other employees, including on the Effective Date. ~~Not less than [____]~~Eight percent (~~[___]~~8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., ~~[_____]~~8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans. ~~[___]~~Four and one tenth percent (~~[___]~~4.1%) of ~~such reserved~~ New SSCC Common Stock (or approximately half of the number of shares

reserved) will be granted to officers and other employees ~~on the Effective Date~~at, and as of, the times set forth in Exhibit 3 to the Plan (the "Emergence Equity Grants")") pursuant to the Equity Incentive Plan.  Emergence Equity Grants of restricted stock units will be made on the Effective Date, and Emergence Equity Grants of stock options will be made on the first date on which the New SSCC Common Stock is listed for trading.

Management Incentive Plans also include the 2009 Long-Term Incentive Plan (the "2009 LTIP") and the annual short-term Management Incentive Plan for 2010 (the "2010 MIP") (both of which previously were approved by the Bankruptcy Court subject to the development of certain performance goals and are described in Section III.D.2 of this Disclosure Statement) which will have the financial performance goals and (as applicable) restructuring goals, and will provide for such payments to participants, as set forth in Exhibit 3 to the Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

The 2009 LTIP, 2010 MIP and Equity Incentive Plan, together in the aggregate, will provide appropriate incentives and create competitive, market-based compensation opportunities for the Company's management team in the short term as the Company emerges from its Chapter 11 cases that will continue in the long-term.

~~The Company also will adopt as of the Confirmation Date (but only in the event that a sale of the Company is embodied in the confirmed Plan), a Management Sale Incentive Plan ("MSIP") that only would provide potential payments in the event of a sale of the Company through the Plan. The MSIP specifically is designed to incentivize management to consider potential opportunities to create additional value through the sale of the Company pursuant to the Plan.~~

(a)     Equity Incentive Plan.

As a result of the Company's ~~chapter~~Chapter 11 cases, the Company has not had the ability to make any equity-based awards that provide appropriate long-term incentives for Company growth.  Upon emergence, however, the ~~Company~~Reorganized Debtors (as defined herein) again will have ~~an~~ equity-based compensation ~~vehicle~~vehicles to provide its executive management and other members of its management team with appropriate, market-based, long-term incentive compensation opportunities that will be substantially dependent on ~~Company~~ performance. Consistent with its historical practice, ~~the Company~~Reorganized SSCC will be reestablishing an equity-based long-term incentive plan – the Equity Incentive Plan – to align the interest of executive management and other employees with the interests of ~~Company~~Reorganized SSCC's shareholders in creating additional shareholder value in the long term and to retain the ~~Company's~~ management team.

~~Not less than~~ [_____]Eight percent ([___]8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____]8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the Equity Incentive Plan and other Management Incentive Plans.  Awards under the Equity Incentive Plan will be made in stock options, restricted stock units, and/or other equity-based interests (a) to certain officers and other employees ~~on~~at, and effective as of, ~~the Effective Date, as~~such times as are set forth in Exhibit 3 to

the Plan and described below as the Emergence Equity Grants, and (b) to officers, other employees, and directors from time to time on or after the Effective Date as determined by the compensation committee of the board of directors of Reorganized SSCC in such committee's discretion.  Awards under the Equity Incentive Plan generally are subject to a ~~multi~~three-year ratable vesting schedule, subject to full accelerated vesting ~~under certain conditions~~in the event of a change of control of the Reorganized Debtors or the termination of a participant's employment without cause, a resignation for Good Reason, death, incapacity, and retirement (except in the case of the Emergence Equity Grants which are subject to special vesting conditions as described below).

   (b) Emergence Equity Grants Totaling 4.1% of New SSCC ~~New~~ Common Stock.

  The Company's Plan provides that a group of the Company's key executives and managers designated by the Company prior to the Effective Date will receive grants of equity in Reorganized SSCC~~, on and as of the Effective Date,~~ pursuant to an applicable award agreement(s) and the Equity Incentive Plan.  The Emergence Equity Grants will total [____]four and one-tenth percent ([____]4.1%) of New SSCC Common Stock, which means that ~~the Company~~Reorganized SSCC will grant [____]%approximately half of the [____]8% total reservation of New SSCC Common Stock under the Plan (as described above) ~~upon the Effective Date~~as Emergence Equity Grants. Providing initial grants of equity will provide an immediate and meaningful incentive for management to continue to enhance the value of the ~~Company~~Reorganized Debtors post-emergence.

  The following table shows the percentage of the ~~Reorganized~~New SSCC ~~New~~ Common Stock that will be allocated and granted upon emergence to the ~~following executives~~Company's current President/Chief Operating Officer ("COO") individually and to the remaining participants in the aggregate:

| Participant | Percent of Shares Granted | Approx. Percentage of Shares Granted in Restricted Stock Units | Approx. Percentage of Shares Granted in Stock Options |
| --- | --- | --- | --- |
| President and COO | 0.90% | 0.22% | 0.68% |
| Remaining Participants ~~[TBD]~~<br>  (in the aggregate) | ~~Percent of New Common Stock[TBD]~~3.20% | 0.78% | 2.42% |
| Total Percent of Shares | ~~[____]1.00%~~4.10% | 1.00% | 3.10% |

The Company's current Chief Executive Officer will not receive an Emergence Equity Grant, but rather will receive certain cash compensation in lieu of receiving such an equity grant as described in Section III.D.2 below.

With respect to each Emergence Equity Grant, the award will be granted to participants using two equity vehicles – restricted stock units and options.  One percent (1%) on a fully diluted basis of New SSCC Common Stock (or approximately 24% of the Emergence Equity Grants) will be granted in the form of restricted stock units on and as of the Effective Date.

Three and one-tenth percent (3.1%) on a fully diluted basis of New SSCC Common Stock (or approximately 76% of the Emergence Equity Grants) will be granted in the form of options ("Emergence Options") on and as of the first date after the Effective Date on which New SSCC Common Stock becomes listed for trading on the NYSE or the NASDAQ (the "Listing Date").  Each Emergence Option will have a seven-year term and a strike price equal to the average of the closing transaction prices of the New SSCC Common Stock for the thirty (30) calendar day period beginning on the Listing Date.

To preserve the potential value of the Emergence Options (and the performance-based incentives associated therewith) in the event of an offer to purchase Reorganized SSCC prior to the option grants or calculation of the option strike price, in the event that a bona fide offer for the acquisition of Reorganized SSCC (a "Transaction") is announced after the Listing Date but before the end of such thirty (30) calendar day period, and the option strike price exceeds the per share value of the New SSCC Common Stock as of the Effective Date determined by using the Debtors' Average Bond Trading Price (as defined in Exhibit 3 to the Plan) (such per share value, the "Effective Date Value"), then, in addition to retaining all of the Emergence Options, each optionee will receive a cash payment from the Reorganized Debtors, in an amount equal to the number of shares of New SSCC Common Stock subject to the optionee's outstanding Emergence Options multiplied by the lesser of (i) the excess of the strike price over the Effective Date Value or (ii) the excess of the per share consideration received by holders of New SSCC Common Stock in such Transaction over the Effective Date Value, with the applicable amount payable upon the closing of such Transaction.  Similarly, in the event that a Transaction is announced and closes on or before the date on which the New SSCC Common Stock has become listed, then in lieu of the Emergence Options grants, each prospective recipient of Emergence Options will receive a cash payment from the Reorganized Debtors equal difference between the value of the number of shares of New SSCC Common Stock that would have been subject to the employee's Emergence Option grant in such Transaction and the value of those shares based upon the Effective Date Value, with such amount payable upon the closing of such Transaction.

Consistent with awards that will be made under the Equity Incentive Plan generally, the Emergence Equity Grants will be subject to a ~~multi~~three-year, ratable vesting schedule subject to full accelerated vesting ~~under certain conditions.~~ upon a change in control, a termination of employment without cause, a resignation for Good Reason, death, disability, and retirement, except that if the employment of a participant terminates without Cause, for Good Reason, or due to retirement within the first 12 months after the Effective Date, only 33.3% of the participant's Emergence Equity Grant would become fully vested, and the remaining 66.7% would remain unvested and would be canceled (in all circumstances subject to any different vesting terms and conditions provided in an employment agreement or award agreement).  A summary of the vesting schedule with respect to the Emergence Equity Grants is contained in Exhibit 3 to the Plan ~~under certain conditions.~~

(c)     Management Sale Incentive Plan.

Notwithstanding the Company's filing its chapter 11 plan of reorganization, it remains important to provide incentives to key management employees to consider a possible sale of the Company that will increase the value of the Company's estate and enhance the recovery of all stakeholders in the chapter 11 cases. The Plan therefore includes a Management Sale Incentive Plan ("MSIP") that will become effective as of the Confirmation Date if the Plan provides for a sale of the Company, and potentially provides payments to approximately 50 officers and other key management employees only upon a sale of all or substantially all of the Company as part of a plan of reorganization. The terms of the MSIP are described in Exhibit 3 to the Plan.

## 2. Executive Employment Agreements.

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit 12 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan. Described below are some of the key terms of these agreements.

[*Patrick J. Moore's Employment Agreement*]

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement with Mr. Moore (the "Moore Employment Agreement"). This agreement will be substantially in the form contained in Exhibit 12 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan. Described below are some of the key terms of Mr. Moore's employment agreement.

Mr. Moore's Employment Agreement requires him to devote substantially all of his business time to the Reorganized Debtors' operations through a specified post-emergence retirement date (with the specific date still to be determined but in any event, not later than one year after the Effective Date), at which time he will retire from his employment with Reorganized SSCC, unless his retirement date is accelerated or his employment otherwise terminates sooner in accordance with the provisions of his Employment Agreement. He will continue in his position as Chief Executive Officer until his retirement. During his employment, Mr. Moore will receive a base salary and will be eligible to participate in the Reorganized Debtors' annual incentive bonus plan and receive other benefits and perquisites as are made available to their senior executives generally.

Upon his retirement from Reorganized SSCC, Mr. Moore is eligible, pursuant to the terms of his Employment Agreement, to receive, among other things, (i) a retirement benefit determined under the benefit formula contained in the Company's supplemental income pension plan in which he had participated as a senior executive of the Company; (ii) a special incentive bonus payment of $3,500,000 in lieu of Mr. Moore's participation in the Reorganized SSCC Equity Incentive Plan (in which all other senior executives except Mr. Moore will participate) that is designed to provide market-based long-term incentive compensation to Mr. Moore during his employment preceding his retirement; (iii) to the extent Mr. Moore's retirement date is accelerated, certain additional amounts that represent the difference between one year of Mr.

Moore's annual base salary and incentive bonus amounts and the base salary and incentive bonus amounts already paid to him prior to his retirement date; and (iv) certain other benefits.  His Employment Agreement does not provide for any additional benefits if his employment terminates prior to the specified post-emergence retirement date; however, he will remain eligible to receive certain of the payments and benefits described above depending on the circumstances of his termination of employment.

Because Mr. Moore is not participating in the Reorganized SSCC Equity Incentive Plan, the Employment Agreement provides that he is eligible to receive a cash incentive payment in the event of that Reorganized Debtors receive, prior to the cessation of his employment, an offer to acquire them (or otherwise engage in a transaction) that results in a Change in Control prior to prior the end of the six-month period following the cessation of his employment, provided that Mr. Moore has participated in the efforts to attempt to sell the Reorganized Debtors (or to engage in such other transaction).  The cash payment will be determined based upon the monetary value of the equity-based compensation that the individual holding the positions of President and Chief Operating Officer ("COO") of Reorganized SSCC as of the Effective Date would receive if all of the equity-based compensation that such President and COO received in accordance with the Company's Plan of Reorganization (i.e., 0.9% of the common shares of the New SSCC Common Stock on a fully diluted basis issued on the Effective Date) were fully vested and liquidated upon the acquisition of the Reorganized Debtors, reduced by the $3,500,000 special incentive bonus payment described above.

[ *Steven J. Klinger's Employment Agreement*] *and Retirement Agreement*

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement, and an amended and restated retirement agreement, with Mr. Klinger (respectively, the "Klinger Employment Agreement" and "Klinger Retirement Agreement"). Each of these agreements will be substantially in the forms contained in Exhibit 12 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan. Described below are some of the key terms of these agreements.

The Klinger Employment Agreement requires Mr. Klinger to devote substantially all of his business time to the Reorganized Debtors' operations through the term of his employment and is subject to automatic renewal for successive two-year terms unless sooner terminated by either party in accordance with the provisions of the Klinger Employment Agreement.  The Klinger Employment Agreement also provides that he shall be eligible to participate in any annual performance bonus plans, long-term incentive plans, and/or equity-based compensation plans established or maintained by the Reorganized Debtors for their senior executive officers, including the MIP and the Equity Incentive Plan, and provides that he will receive an Emergence Equity Grant of 0.9% of the shares of New SSCC Common Stock (on a fully diluted basis) issued as set forth in the Plan and Exhibits 3 and 12 to the Plan.

The Klinger Employment Agreement also provides that if Reorganized SSCC terminates the executive's employment "without cause" or the executive terminates his employment with "good reason", Reorganized SSCC will pay as severance, in a lump sum, a multiple of two times (which multiple will increase to 2.99 times if he is CEO) the sum of his base salary and the highest of higher of the Executive's (x) average annual incentive bonus for the three fiscal years preceding

the effective termination date of his employment; and (v) actual annual incentive bonus paid with respect to the fiscal year immediately preceding the effective termination date of his employment, provided that in the event that Mr. Klinger's employment terminates within the first 12 months following the Effective Date "without cause" or for "good reason", then he is entitled to receive the greater of $5 million and the foregoing severance pay. In particular, Mr. Klinger will be eligible to resign for "good reason" and receive the greater of $5 million and the foregoing severance pay in the event he is not promoted to CEO, upon such terms and conditions as Mr. Klinger and Reorganized SSCC shall in good faith negotiate, after the retirement of the current CEO. In addition to the foregoing severance pay, Reorganized SSCC also will: (i) continue the executive's coverage under the its medical, dental, life, disability, pension, profit-sharing and other executive benefit plans and perquisites for two (2) years after the termination of his employment (which will increase to three (3) years if he becomes CEO); (ii) pay him the supplemental retirement benefit he would have received had he remained employed and retired at such time as set forth in the Employment Agreement; (iii) cause accelerated vesting of 33.3% of any unvested equity-based awards if the termination of his employment or resignation for "good reason" occurs within the first 12 months after the Effective Date, and full accelerate vesting of such awards if such termination occurs after the first 12 months following the Effective Date; and (iv) provide outplacement services. If, at any time, his employment terminates "without cause" or for "good reason" within 24 months following a "change of control" of Reorganized SSCC, he will receive the foregoing benefits and in addition, if the payments and benefits described above would be "excess parachute payments" as defined in Section 280G of the Internal Revenue Code, with the effect that the executive is liable for the payment of an excise tax, then Reorganized SSCC will in certain circumstances pay the executive an additional amount to "gross up" the executive for such excise tax. Payment of any severance benefits provided to Mr. Klinger is conditioned upon, among other things, his execution of a valid release of claims.

Mr. Klinger's Employment Agreement also prohibits him from: (i) disclosing the Reorganized Debtors' confidential information, inventions or developments; (ii) diverting any business opportunities or prospects from the Reorganized Debtors; and (iii) during his employment and for a period of up to two years following termination of his employment, competing with any business conducted by the Reorganized Debtors or any of their affiliates, or soliciting any employees, customers or suppliers of the Reorganized Debtors within the United States, Canada, Mexico, or China.

*Mr. Klinger's Retirement Agreement*

Prior to the commencement of the Chapter 11 Cases, the Company and Mr. Klinger were parties to an Executive Retirement Agreement that provides certain retirement-related benefits to Mr. Klinger. Pursuant to the Plan, Reorganized SSCC will be assuming the Klinger Retirement Agreement upon emergence from bankruptcy. The Klinger Retirement Agreement was designed to provide a target benefit to Mr. Klinger. Service is earned while he is employed by the Company. The benefit formula is 50% of final average earnings less the annuity equivalent of the benefit earned under his previous employer's pension plan and benefits earned under any Company sponsored retirement plans excluding accruals attributable to salary deferrals and matching employer contributions. Earnings include basic salary and annual incentive bonuses, but exclude compensation under long-term incentive plans and any other bonus or incentive compensation.

26

Final average earnings are the average of the highest four consecutive years of earnings out of the last 10 years prior to termination. Mr. Klinger is immediately vested in his benefit. Prior to completing 15 years of service with the Company, the benefit will be prorated by the ratio of service at termination to 15. Mr. Klinger is entitled to a full retirement benefit after completion of 15 years of service. Benefits commence on the first day of the seventh month following termination, if he has completed at least 15 years of service, or on the first day of the seventh month following age 62 if he has not completed 15 years of service. The normal form of payment is a single-life annuity. The value of the single-life annuity benefit is converted and paid in five equal annual installments.

[*Other Executives' Employment Agreements*]
      [Charles A. Hinrichs Non-compete and Consulting Agreement]

      The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit 12 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.

*Employment Security Agreements*

      The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit 12 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.


# III.  GENERAL INFORMATION

## A.    The Debtors' Businesses and Properties.

### 1.    Company Overview.

Based in Creve Coeur, Missouri, and Chicago, Illinois, the Company is one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers. The Company sells a broad range of paper-based packaging products, including containerboard, corrugated containers, kraft paper and point of purchase displays, to a broad range of manufacturers of industrial and consumer products. The Company also has a complete line of graphics capabilities for packaging. As of the Petition Date, the Company held approximately 18% of the North American containerboard market capacity.

As of the Petition Date, the Company operated 159 manufacturing facilities located primarily in the United States and Canada. The Company's operations span all phases of the container industry including: 14 paper mills which produce containerboard; 117 corrugated

container facilities which convert containerboard into corrugated containers that are sold to a wide array of customers, principally in the food and beverage consumer product industries; and 26 reclamation plants which process recyclable materials to be sold to the Company's mills or third-party customers. In addition, the Company operated one wood products plant and one lamination plant. The Company also owned approximately one million acres of timberland in Canada and operates wood harvesting facilities in the United States. The Company employed approximately 21,250 employees as of the Petition Date.

### 2. Properties.

The current corporate headquarters of the Company are located at 222 North LaSalle Street, Chicago, Illinois 60601.[14] As of September 30, 2009 the Company's operations included 14 paper mills, 109 corrugated container facilities, 27 reclamation plants and one lamination plant, in addition to owning and leasing several other properties in connection with operating the Company's businesses. The general character, location and approximate size of the principal physical properties used by the Company as of the Petition Date are listed in the Company's Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

### B.  Operational Structure of the Debtors.

SSCC is a non-operating holding company that primarily conducts its business operation through its wholly-owned subsidiary SSCE. SSCE is the direct or indirect parent company of all of the other Debtors and non-debtor affiliates. A chart depicting the Company's corporate structure as of the Petition Date is annexed hereto as Exhibit B-1.

### 1.  Products and Materials.

(a)  Paper Products

The Company also produces a full range of high-quality, corrugated containers designed to protect, ship, store and display products. Corrugated containers are used to transport such diverse products as home appliances, electric motors, small machinery, grocery products, produce, books, and furniture. The containers are made to the merchandising and distribution specifications of the Company's customers and are sold to a broad range of consumer goods manufacturers. The Company also manufactures and sells a variety of retail-ready, point-of-purchase displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the food industry, Cordeck® recyclable pallets, and custom die-cut products to display merchandise on the sales floor. In 2008, the container division generated approximately 63% of the Company's net sales.

The Company also produces a full line of containerboard, which is used primarily in the production of corrugated packaging. Sixty-nine percent of the Company's containerboard

---

[14] Pursuant to the Debtors' Tenth Omnibus Motion Of The Debtors For Entry Of An Order Authorizing Rejection Of Certain Executory Contracts And Unexpired Leases Pursuant To Section 365 Of The Bankruptcy Code filed on June 19, 2009 and the Court's subsequent entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Leases Pursuant To Section 365 of the Bankruptcy Code on July 9, 2009, the Debtors changed corporate headquarters from 150 N. Michigan Avenue, Chicago Illinois 60601 to 222 North LaSalle Street, Chicago, Illinois 60601 as of August 31, 2009.

CH1 5049998 5118439v.7 4

production that is comprised of linerboard and medium is consumed internally. In 2008, the containerboard operations generated approximately 20% of the Company's net sales. The Company also produces market pulp, including southern hardwood pulp, bleached southern softwood pulp, and fluff pulp, kraft paper, and other specialty products. Market pulp is sold to manufacturers of paper products as well as those within the printing and writing sectors. The Company's kraft paper is used in consumer and industrial bags, grocery and other types of shopping bags, counter rolls, handle stock, and refuse bags.

> (b)     Paper and Corrugated Container Manufacturing Process

Several steps are necessary to manufacture paper suitable for paper-based packaging. To begin, pulpwood is debarked and sent through a chipper. The resulting chips are then placed into a pressure cooker with specified chemicals that separates the wood fiber. This fiber is washed to remove additional chemicals. Black liquor results from the washing and is put in recovery boilers to create steam. Other byproduct materials created in the papermaking process such as bark, sawdust and wastewater treatment solids are put into power boilers to also create steam. The pulp is then moved to a decker (a machine used to thicken fibers), where a disc refiner brushes and cuts the fibers to increase strength. This mixture then travels to a machine tank, where it is diluted with water. Chemicals may also be added, depending on the requirements of the finished paper. The pulp then moves to the paper machine headbox, which distributes the material on a wire mesh conveyor to remove excess water. The paper then moves through a dryer section. Finally, the paper is rolled, cut and shipped to customers, including corrugated converting plants, where it can then be transformed into paper-based packaging. In addition to the use of virgin fiber as described above, the Company also utilizes waste paper fiber in the papermaking process as additional raw material with the virgin fiber.

Producing corrugated containers also involves several steps. Production begins with medium, a containerboard component, being inserted into a machine, where it is heated, moistened and formed into a fluted pattern and bonded to the inside of single-face linerboard, the other component of containerboard. Single-face board is then fed into a machine where the outside paper, or double-face linerboard, is affixed to the fluted medium to form single-wall corrugated board. Hot plates remove excess moisture and help set starch-based glue. The board is then fed into a device that trims the board to appropriate widths and adds lines for later folding. Knives cut the board to the required length. These cut-to-size sheets are stacked in preparation for finishing. Finishing then cuts, prints, folds, and glues the sheets into the finished product. Finally, flat boxes are bundled, stacked into units and banded for shipment.

> (c)     Reclamation Facilities

The Company's reclamation operations procure fiber resources for its containerboard mills as well as for other producers. The Company currently operates 27 reclamation facilities in the United States that collect, sort, grade and bale recovered paper. The Company also collects aluminum, glass and plastic materials for resale to manufacturers that utilize such materials. In addition, the Company operates a nationwide brokerage system whereby it purchases and resells reclaimed paper to its recycled paper mills and other producers of recycled products on a regional and national contract basis. The Company's waste reduction services operation extracts additional recyclables from the waste stream by partnering with customers to reduce their waste expenses and

increase recycling.  Brokerage contracts provide bulk purchasing, often resulting in lower prices and cleaner reclaimed paper.  Many of the Company's reclamation facilities are located close to the recycled paper mills to ensure availability of supply with minimal shipping costs.

**2.** **Materials.**

(a) Raw Materials

The products that the Company produces require wood fiber and reclaimed fiber as the principal raw materials.  The Company satisfies the majority of its demand for wood fiber through purchases on the open market or under supply agreements with certain providers.  Approximately 90% of the Company's wood fiber needs are purchased in the open market.  The remaining 10% comes directly from individual landowners.  The Company satisfies essentially all of its need for reclaimed fiber through its reclamation facilities and nationwide brokerage system.

(b) Supplier Exchanges

The Company is also party to several different exchange agreements with certain paper manufacturers.  These agreements create a reciprocal relationship in which the Company requires a quantity of containerboard from certain suppliers.  In consideration, the Company exchanges its internally produced containerboard with these suppliers.  The exchanges under these agreements reduce costs (primarily freight costs), maximize paper machine efficiencies, and allow the Company to obtain grades of paper which it does not produce.

**3.** **Customers.**

The Company obtains new customers and maintains long-term customer relationships through various sales, marketing, and distribution channels.  The Company's marketing strategy is based on selling a broad range of paper-based packaging products to manufacturers of industrial and consumer products.  This strategy has created a broad customer base which consists of sales directly to end users and converters as well to resellers.  To serve its customer base, the Company has centralized its marketing and sale of containerboard and pulp to third parties in the Company's board sales group located in Chicago, Illinois, and West Point, Virginia.  The Company's corrugated container sales organization is centralized with sales responsibilities for all converting facilities.

The Company greatly values its diversified and high-quality customer base.  The Company produces paper products and containerboard for some of the world's largest consumer products companies.  The Company's top customers include Kellogg Company, PepsiCo Inc., Unilever, and Smithfield Foods Inc.  In addition to these high-volume customers, the Company is also able to efficiently and economically serve local and regional customers.  No single customer accounted for more than three percent (3%) of the Company's sales during the twelve months ending September 2009.  During that time period, the Company's top fifteen customers represented approximately twenty percent (20%) of the Company's total sales.

**4.** **Employees.**

The Company currently employs approximately 20,000 active employees (the "Employees"), of whom approximately 14,200 are hourly and 5,800 are salaried. Approximately 11,640, or more than fifty-eight percent (58%), of these Employees are represented by unions and covered under one of the approximately 120 collective bargaining agreements. The collective bargaining agreements expire at various times between 2009 and 2013. While the terms of the collective bargaining agreements may vary, the material terms of such agreements are customary for the industry, the type of facility, the classification of the employees, and the geographic location covered thereby.

5.      **Recent Operations.**

As of September 30, 2009, the Company reported total assets having a net book value of approximately $5.276 billion and total liabilities of approximately $6.600 billion. In addition, the Company had net sales of approximately $7.042 billion for the year ending December 31, 2008. For the nine months ended September 30, 2009, the Company had net sales of approximately $4.195 billion. The Company's financial position had been adversely impacted by the recent downturn in the global economy, substantial price competition and volatility in the pulp and paper industry, and recent volatility in the cost of energy and raw materials.

During 2009, the Company has received refunds related to an allowance of an excise tax credit for alternative fuel mixtures produced for sale or for use as a fuel in a taxpayer's trade or business. This credit is scheduled to expire on December 31, 2009. On May 6, 2009, the Company was notified that its registration as an alternative fuel mixer was approved by the Internal Revenue Service. The Company submitted refund claims of approximately $473 million for the nine months ended September 30, 2009 related to production at ten of its U.S. mills and has received refund claims of approximately $415 million for such period. During the nine months ended September 30, 2009, the Company recorded other operating income of $455 million, net of fees and expenses, in its consolidated statements of operations related to this matter.

For the nine months ended September 30, 2009, the Company had net income attributable to common stockholders of $3 million, or $0.01 per diluted share, compared to net income of $6 million, or $0.02 per diluted share, for the same period last year. The 2009 results benefited from the alternative fuel tax credit income of $455 million, but were negatively impacted by debtor-in-possession debt issuance costs of $63 million, reorganization items of $109 million, lower segment operating profits of $80 million, higher interest expense of $30 million and loss on early extinguishment of debt of $20 million. The 2008 results benefited from the resolution of certain Canadian income tax examination matters and higher non-cash foreign currency exchange gains, but were negatively impacted by a charge of $22 million to fully reserve for all amounts due from Calpine Corrugated, LLC and litigation charges of $8 million. The segment operating results for the nine months ended September 30, 2009 were negatively impacted by lower sales volume for containerboard and corrugated containers and lower average selling prices for containerboard and corrugated containers. The 2009 nine month results benefited from lower energy and reclaimed fiber costs compared to the comparable period in 2008.

6.      **Corporate History and Business Acquisitions.**

Jefferson Smurfit Group plc, an Ireland-based packaging conglomerate, formed Jefferson Smurfit Corporation ("JSC") in 1983 as a holding company for its U.S. interests. In the years following its formation, JSC acquired several container companies and operations, including Container Corporation of America and Alton Boxboard Company. By 1997, JSC had achieved sales of more than $3 billion.

Stone Container Corporation ("Stone") was founded in 1926 as J.H. Stone and Company in Chicago, Illinois, and incorporated in 1945 under the name Stone Container Corporation. Following this formation, Stone expanded throughout the Midwest, both building and buying corrugated container plants. Stone continued this expansion by purchasing mills throughout the U.S. and establishing an international presence in Canada, Latin America, Asia and Europe.

In, 1998, JSC, now known as SSCC, completed a merger with Stone and Stone became a wholly-owned subsidiary of SSCC (the "Merger"). In 2004, a subsequent internal reorganization transaction resulted in Stone being renamed SSCE. SSCC continues to own 100% of the equity interest of SSCE.

This combined Company then focused on strategic expansion, elimination of unnecessary facilities and operations, and cost reduction. In the years following the Merger, the Company closed 10 containerboard mills, a market pulp mill and 82 container plants, including 47 such closures since 2005. As the initial phase of its divestiture strategy in 1999-2000, the Company sold its U.S. timberlands, newsprint mills, its ownership position in Abitibi-Consolidated, Inc. and a pulp mill. The Company's strategy for expansion entailed acquiring corporations that would enable it to improve efficiency levels, broaden its high-quality containerboard offerings, and meet the growing demand for value-added packaging. As part of this strategy, in May 2000, the Company acquired Montreal-based St. Laurent Paperboard, Inc., a major manufacturer, supplier, and converter of high-quality, value-added paperboard products including containerboard and food board. Additionally, in September 2002, the Company acquired a large corrugated medium mill and related assets located in Stevenson, Alabama, and sold its industrial packaging operations. In March 2003, the Company completed a transaction with Jefferson Smurfit Group involving (a) the sale of the Company's European operations to the Jefferson Smurfit Group plc and (2) the Company's purchase of the Jefferson Smurfit Group's 50% ownership in Smurfit-MBI, a Canadian packaging business. This transaction gave the Company 100% ownership of Smurfit-MBI and effectively ended its manufacturing presence in Europe. In 2006, the Company sold its consumer packaging business, which allowed it to be solely focused on its core business of containerboard, corrugated containers and recycling, and in 2007 the Company sold its Brewton, Alabama white top linerboard and solid bleached sulfate mill. In July 2008, the Company acquired a 90% ownership in Calpine Corrugated, LLC, which enabled the Company to accelerate the optimization of its Northern California business unit and improve its position in the agricultural market segment.

C.     **Management of Debtors.**

1.     **Board of Directors.**

The board of directors of the Company (the "Board of Directors") currently consists of nine (9) members. Seven of the nine members are independent directors. Set forth below are the directors of the Company as of the date of this Disclosure Statement.

2.    **Biographies of Directors.**

*James R. Boris, Board Member*

James R. Boris was first elected as a Director in 2003. He is the retired Chairman and Chief Executive Officer of EVEREN Capital Corporation and its primary subsidiary EVEREN Securities, Inc. (now known as Wachovia Securities, Inc.). Mr. Boris is the non-executive Chairman of the Board of Integrys Energy Group, Inc., and lead director of the Chicago Board Options Exchange.

*Connie K. Duckworth, Board Member*

Connie K. Duckworth was first elected as a Director in 2004. She has been President and Chairman of Arzu, Inc. since August 2003. She was a partner of Circle Financial Group, LLC from January 2003 to December 2004. Ms. Duckworth retired from Goldman, Sachs & Co. as Advisory Director in 2001. Ms. Duckworth is a director of Northwestern Mutual Life Insurance Company, DNP Select Fund, and Russell Investment Group.

*Steven J. Klinger, President and Chief Operating Officer*

Steven J. Klinger joined Smurfit-Stone as President and Chief Operating Officer in May 2006. He was appointed to the Board of Directors on December 11, 2008. Prior to joining Smurfit-Stone, Mr. Klinger was employed by Georgia-Pacific Corporation for 23 years, most recently as Executive Vice President of Packaging from February 2003 to May 2006, and President, Packaging and Containerboard Sales/Logistics from August 2001 to January 2003. He is a graduate of Georgia State University, with a degree in accounting, and Duke University's Advanced Management Program. In June 2008, Mr. Klinger was appointed to the board of directors of Navistar International Corporation.

*William T. Lynch, Jr., Board Member*

William T. Lynch was first elected as a Director in 2003. He has been President and Chief Executive Officer of Liam Holdings, LLC since April 1997. He is the retired President and Chief Executive Officer of Leo Burnett Company. Mr. Lynch is also a director of Pella Corporation.

*Patrick J. Moore, Chairman and Chief Executive Officer*

Patrick J. Moore has served as Chairman and Chief Executive Officer since May 2006. He had been Chairman, President and Chief Executive Officer since May 2003, and prior to that he was President and Chief Executive Officer since January 2002, when he was also elected as a director of the Company. He was Vice President and Chief Financial Officer from November 1998 until January 2002. Mr. Moore is the lead director for Archer Daniels Midland Company and serves on the board of directors of DePaul University in Chicago. He also serves on the Nasdaq

CEO Council, J.P. Morgan's National Advisory Board, and the boards of the YMCA of Greater St. Louis, Boys Hope Girls Hope, and Big Shoulders in Chicago.

*James J. O'Connor, Board Member*

James J. O'Connor was first elected as a Director in 1998 and serves as the Lead Independent Director. He is the former Chairman and Chief Executive Officer of Unicom Corporation and its subsidiary, Commonwealth Edison Company. He is a director of Armstrong World Industries, Inc., Corning Incorporated and UAL Corporation.

*Jerry K. Pearlman, Board Member*

Jerry K. Pearlman was first elected as a Director in 1998. He is the retired Chairman of the Board and Chief Executive Officer of Zenith Electronics Corporation. Mr. Pearlman is a director of Nanophase Technologies Corporation, and from 1984 to 1998 served as a director of Stone Container Corporation, a predecessor of the Company.

*Thomas A. Reynolds, III, Board Member*

Thomas A. Reynolds was first elected as a Director in 1997. He has been a Partner with Winston & Strawn LLP, a law firm that has regularly represented the Company on numerous matters, since 1984, and is a member of Winston & Strawn LLP's executive committee.

*William D. Smithburg, Board Member*

William D. Smithburg was first elected as a Director in 2003. He is the retired Chairman, President and Chief Executive Officer of The Quaker Oats Company. He is a director of Abbott Laboratories, Barry Wehmiller Companies, Inc., Northern Trust Corporation, and Corning Incorporated.

**3.      Committees of the Board of Directors.**

SSCC's Board of Directors has four committees: (i) the Audit Committee, (ii) the Compensation Committee, (iii) the Nominating and Governance Committee, and (iv) the Strategy and Finance Committee.  The Audit Committee ~~maintains~~assists the Board of Directors in fulfilling its oversight responsibilities with respect to auditing, financial reporting, internal control ~~processes~~systems, and compliance with legal and regulatory requirements.  The members of the Audit Committee are Mr. Boris, Mr. O'Connor, and Mr. Pearlman (Chair).  The Compensation Committee has the responsibility ~~of~~for (i) annually ~~reviewing~~appraising the performance of the executive officers of the Company and reviewing and establishing ~~annual salaries, incentives, and other compensation plans for the executive officers, as well as administering~~the annual salary and incentive plan participation levels and bases of participation, (ii) administering, reviewing, and subject to board approval, approving any changes to incentive compensation plans for executive officers, (iii) reviewing and approving payments, as appropriate, under incentive compensation

34

plans for executive officers, (iv) administering, reviewing and, subject to Board approval, approving any changes to stock option and any other stock-based compensation plans~~, recommending new~~ in which executive ~~compensation plans~~officers participate, and (v) reviewing and, subject to Board approval, approving employment, severance~~,~~ and compensation agreements with individual executive officers.  The members of the Compensation Committee are Ms. Duckworth, Mr. Lynch, Mr. Pearlman, and Mr. Smithburg (Chair).  The Nominating and Governance Committee assists the Board of Directors by ~~overseeing the composition of the Board of Directors and its committees' composition and the development, maintenance and evolution of~~identifying individuals qualified to become Board members, recommending to the Board the director nominees to be proposed for election by the stockholders and recommending to the Board the corporate governance guidelines~~, policies~~ and procedures applicable to the Company.  The members of the Nominating and Governance Committee are Mr. Lynch, Mr. O'Connor (Chair) and Mr. Smithburg.  The Strategy and Finance Committee was established to provide guidance on major strategic initiatives and financing strategies and to review the Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans'~~s~~ administration, investment and management of the Company's retirement plans and plan assets.  The members of the Strategy and Finance Committee are Mr. Boris (Chair), Ms. Duckworth, Mr. Lynch, and Mr. Reynolds.

## 4.      Compensation of Directors.

Each independent director is entitled to receive an annual fee of $120,000 as compensation for serving on the board.  Independent Directors also receive a fee of $1,500 per board and committee meeting attended, plus travel expenses.  The Chairman of the Audit Committee receives an additional fee of $10,000 annually, and the Chairmen of the Compensation Committee, the Nominating and Governance Committee, and the Strategy and Finance Committee receive an additional fee of $7,500 annually.  Mr. O'Connor, as Lead Independent Director, also receives a fee of $20,000 annually for his service in that capacity.  The Company also maintains a matching gift program for charitable donations of up to $7,500 per year made by independent directors.  Mr. Moore and Mr. Klinger do not receive any additional compensation by reason of their membership on, or attendance at meetings of, the Board.

## 5.      Executive Officers.

Set forth below are the senior executive officers of SSCC as of the date of this Disclosure Statement and each officer's position within SSCC.

| Name | Position |
| --- | --- |
| Patrick J. Moore | Chairman of the Board and Chief Executive Officer |
| Steven J. Klinger | President and Chief Operating Officer |
| John R. Murphy | Senior Vice President and Chief Financial Officer |

CH1 ~~5049998~~5118439v.~~7~~4

| Craig A. Hunt | Senior Vice President, Secretary and General Counsel |
| Ronald D. Hackney | Senior Vice President, Human Resources |
| Susan M. Neumann | Senior Vice President of Corporate Communications and Public Affairs |
| Mark R. O'Bryan | Senior Vice President of Strategic Initiatives and Chief Information Officer |
| Mathew J. Blanchard | Senior Vice President and General Manager, Board Sales |
| Michael P. Exner | Senior Vice President and General Manager, Containerboard Mill Division (effective January 1, 2010) |
| Paul K. Kaufmann | Senior Vice President and Corporate Controller |
| John L. Knudsen | Senior Vice President of Corporate Strategy |
| Michael R. Oswald | Senior Vice President and General Manager, Recycling Division |
| Steven C. Strickland | Senior Vice President, Container Operations |

**6.** **Biographies of the Senior Executive Officers.**

*Patrick J. Moore, Chairman of the Board and Chief Executive Officer*

See Section III.C.2 – "Biographies of Directors"

*Steven J. Klinger, President and Chief Operating Officer*

See Section III.C.2 – "Biographies of Directors"

*John R. Murphy, Senior Vice President and Chief Financial Officer*

John R. Murphy is senior vice president and chief financial officer for Smurfit-Stone Container Corporation. Mr. Murphy joined Smurfit-Stone in May 2009. Prior to joining Smurfit-Stone, he served as president and chief executive officer, and as a member of the board of directors of Accuride Corporation of Evansville, IN. During his 10-year tenure with Accuride, Mr. Murphy served as president and chief operating officer; chief financial officer; and executive vice president. Mr. Murphy also held key leadership positions with North American Stainless, Inc., Armco, Inc. and Corning, Inc. He began his career with PricewaterhouseCoopers. Mr. Murphy currently serves on the board of directors and holds committee positions with O'Reilly Automotive, Inc., of Springfield, MO. He holds a bachelor's degree in accounting from Pennsylvania State University, an MBA from the University of Colorado, and is a certified public accountant.

*Craig A. Hunt, Senior Vice President, Secretary and General Counsel*

Craig A. Hunt is senior vice president, general counsel and secretary for Smurfit-Stone Container Corporation. He is also a member of the ~~company~~Company's executive committee. Mr. Hunt joined the former Jefferson Smurfit Corporation in November 1990 as staff counsel. In 1993, he began serving as senior counsel and assistant secretary. He assumed his current post in 1998. Mr. Hunt practiced general corporate law for several years in the corporate finance section of the Shook, Hardy & Bacon law firm in Kansas City. He earned a bachelor's degree in economics and a Juris Doctor degree from the University of Kansas.

*Ronald D. Hackney, Senior Vice President, Human Resources*

Ronald D. Hackney is senior vice president of human resources for Smurfit-Stone Container Corporation, a post he assumed in 2003. He is also a member of the company's executive committee. A 32-year veteran in human resources management, Mr. Hackney joined one of Smurfit-Stone's predecessor companies, Container Corporation of America, in 1976. He served as corporate labor relations manager from 1986 to 1995 and held regional human resources posts in the container and mill operations divisions prior to that. From 1995 to 2003, Mr. Hackney served as human resources manager for the company's Mill division. Mr. Hackney earned a bachelor's degree from Berea College in Kentucky and a master's degree in business administration from Ball State University in Indiana.

*Susan M. Neumann, Senior Vice President of Corporate Communications and Public Affairs*

Susan M. Neumann is senior vice president of corporate communications and public affairs for Smurfit-Stone Container Corporation and is a member of the company's executive committee. Ms. Neumann has more than 25 years of corporate communications experience in the retail food/drug and manufacturing industries. Before joining Smurfit-Stone in 2006, Ms. Neumann was senior vice president of corporate communications and education for Albertsons, Inc., one of the nation's largest food and drug retailers. Prior to the acquisition by Albertsons, she was vice president of communications for the former American Stores Company. Ms. Neumann also held positions of increasing responsibility at Whirlpool Corporation, including director of corporate communications for the company's North American Appliance Group. Ms. Neumann earned a bachelor's degree in political science and journalism, and a master's degree in organizational communications from Western Michigan University in Kalamazoo, MI. She was appointed to serve on the Economic Development Council for the City of Creve Coeur, MO, and is a member of the St. Louis Forum and the St. Louis Executive Leadership Team of Go Red for Women. Ms. Neumann serves on the board of directors of Webster University in St. Louis and the Western Michigan University Alumni Association.

*Mark R. O'Bryan, Senior Vice President of Strategic Initiatives and Chief Information Officer*

Mark R. O'Bryan is senior vice president of strategic initiatives and chief information officer for Smurfit-Stone Container Corporation. He is also a member of the company's executive

committee. He previously served as vice president of operational improvement for the company's former Consumer Packaging division. Mr. O'Bryan joined the company in October 1999 as vice president of procurement. He was appointed to his current role in July 2005. Mr. O'Bryan has 13 years' experience with General Electric Company (GE), holding senior-level positions in sourcing and materials management at several GE manufacturing businesses, and serving as manager of global materials and sourcing for GE Aircraft Engines in Evendale, OH. Prior to that, he held similar posts with GE Plastics in Pittsfield, MA, and a GE Power Systems operation in Florence, Italy. Mr. O'Bryan holds bachelor's and master's degrees in mechanical engineering from the University of Dayton.

*Mathew J. Blanchard, Senior Vice President and General Manager, Board Sales*

Mathew J. Blanchard is senior vice president and general manager of board sales for Smurfit-Stone Container Corporation – a post he assumed in 2000. He joined the company in 1995 and has earned positions of increasing responsibility within the board sales group. Mr. Blanchard served as vice president of supply chain operations for the former St. Laurent Paperboard Inc., which Smurfit-Stone acquired in 2000. He served as both vice president and director of operations planning for several St. Laurent facilities. Prior to that, he held a variety of positions with Avenor Inc. Mr. Blanchard received a bachelor's degree from Dalhousie University in Halifax, Nova Scotia.

*Michael P. Exner, Senior Vice President and General Manager, Containerboard Mill Division*

Michael P. Exner was appointed senior vice president and general manager of the Containerboard Mill division of Smurfit-Stone Container Corporation, effective as of January 1, 2010. Mr. Exner will join the Company from International Paper Company where he was vice president of manufacturing for containerboard since 2003. Prior to that he was director of manufacturing for its commercial printing and imaging papers division from 1997 to 2003, and mill manager of two of its paper mills from 1992 to 1997. Mr. Exner received his bachelor's degree in Chemistry from Lawrence University and a master's degree from The Institute of Paper Chemistry.

*Paul K. Kaufmann, Senior Vice President and Corporate Controller*

Paul K. Kaufmann is senior vice president and corporate controller for Smurfit-Stone Container Corporation. Mr. Kaufmann assumed his current position in 1998. Mr. Kaufmann joined the former Jefferson Smurfit Corporation (JSC) in 1990 as a corporate accounting manager and was promoted to director of corporate accounting in 1991. He was controller of the Mill division from 1993 to 1998. Prior to his employment with JSC, Mr. Kaufmann was a senior manager at Ernst & Young, where he worked from 1978 to 1990. Mr. Kaufmann earned a bachelor's degree from the University of Iowa and a master's degree in business administration from the University of Illinois.

*John L. Knudsen, Senior Vice President of Corporate Strategy*

John L. Knudsen is senior vice president of corporate strategy and is responsible for developing and executing the company's overall capital investment strategy, as well as leading key manufacturing and strategic services. Mr. Knudsen has more than 20 years of experience in operations management and strategic planning for the Container division. He served from October 2005 until November 2008 as senior vice president of manufacturing. Previous positions included vice president of strategic planning and vice president and regional manager of the Container division. Prior to that, Mr. Knudsen held positions of increasing responsibility, including general manager, area production manager, regional quality assurance manager and production manager. He began his career with the former Container Corporation of America, a predecessor company to Smurfit-Stone, in 1986 as a production supervisor. Mr. Knudsen is a graduate of Michigan Technological University with a degree in civil engineering. He obtained a degree in accounting from Northern Michigan University and a master's degree in business administration from the University of Michigan. Currently he is a board member of the Fibre Box Association.

*Michael R. Oswald, Senior Vice President and General Manager, Recycling Division*

Michael R. Oswald is senior vice president and general manager for the Recycling division of Smurfit-Stone Container Corporation. He assumed his current position in 2005 after serving as vice president of operations for the division from 1997 to 2005. Mr. Oswald has 30 years' experience in the recycling industry and began his career at Smurfit-Stone as a fiber coordinator. He has held a variety of operational, sales and management positions, including general manager, regional manager of operations, and vice president and regional manager of East Coast operations. Mr. Oswald earned a bachelor's degree from the University of Missouri–Columbia and a master's degree in business administration from Washington University in St. Louis. He is a member of the American Forest & Paper Association (AF&PA) Recovered Fiber Executive Committee.

*Steven C. Strickland, Senior Vice President, Container Operations*

Steven C. Strickland is senior vice president of container operations for the Container division of Smurfit-Stone Container Corporation and is responsible for the division's sales and manufacturing activities. He joined the company in 2006 as senior vice president of container sales after gaining more than 30 years of experience in executive and sales leadership roles for packaging manufacturers. Mr. Strickland previously served as senior vice president of packaging and facility supplies for Unisource, a distributor of commercial printing and imaging paper, packaging systems and facility supplies. Prior to that, Mr. Strickland served as senior vice president of operations–East, and vice president of national sales. Before joining Unisource, Mr. Strickland spent 19 years with Georgia-Pacific, where he served in various sales management roles for the containerboard, packaging and consumer products businesses.

CH1 5049998 5118439v.74

### 7. Executive Compensation.

Compensation of the Company's named executive officers (the "NEOs") is defined in Item 402(a) of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended, for the fiscal year 2008 is reflected in the summary compensation table set forth below.

| Name & Principal Position | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[15] | Non-equity Incentive Plan Compensation ($) | Change in Pension Value & Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Patrick J. Moore - Chairman & CEO | 1,089,000 | 0 | 1,032,284 | (349,067) | 553,500 | 63,285 | 93,527 | 2,482,529 |
| Charles A. Hinrichs- Senior Vice President and Chief Financial Officer.[16] | 415,875 | 0 | 129,914 | (78,053) | 130,000 | 75,410 | 11,840 | 684,986 |
| Steven J. Klinger - President and Chief Operating Officer | 783,750 | 0 | 1,035,643 | (90,447) | 397,500 | 108,966 | 11,022 | 2,246,434 |
| Craig A Hunt - Senior Vice President, General Counsel and Secretary | 403,875 | 0 | 111,094 | (31,223) | 204,250 | 70,660 | 11,403 | 770,059 |
| Steven C. Strickland – Senior Vice President- Container Operations | 349,000 | 65,000 | 199,963 | (41,490) | 129,000 | 0 | 7,750 | 709,223 |

## D. Compensation and Benefits Programs.

The Compensation Committee determines the compensation of all of the Company's executive officers. There are several elements to the compensation package, including a base salary, annual incentives based on corporate, division and operating performance, long term incentives in the form of stock options and restricted stock units, customary benefits such as group insurance and savings plans, and pension plans.[17] Historically and in the ordinary course of its business, the Company has implemented various compensation and benefits programs that are designed to incentivize future performance, align management incentives with those of

---

[15] Because the vesting requirements for certain options were not met, the value recorded for those options in 2006 and 2007 was reversed in 2008.

[16] On the Petition Date, Charles A. Hinrichs was Senior Vice President and Chief Financial Officer for the Company. Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and John R. Murphy became Senior Vice President and Chief Financial Officer on that date.

[17] All of the executive officers hired by the Company prior to January 1, 2006 participate in the Company's qualified and non-qualified pension plans for salaried employees. Salaried employees hired after January 1, 2006 are not eligible to participate in the pension plans.

CH1 5049998 5118439v.7 4

Company's other stakeholders through equity-based compensation, provide employees with market-based, competitive compensation opportunities and benefits packages, and reward its management employees for excellent service. The Company also has entered into various employment and other similar agreements with certain of its senior executives.

Certain of these employee compensation and benefits programs and agreements are generally described below, with the blanket exception of insured and self-insured programs (e.g., health plans), and customary fringe benefit policies (e.g., vacation, sick leave). The list of programs, descriptions, and agreements set forth below is not, and is not intended to be, exhaustive or comprehensive. In the event the Company substantially modifies or terminates any compensation or benefit programs or employment agreements prior to the Confirmation Date, it will file an amendment to Exhibits 11 and 12 to the Plan, as applicable.

**1.    Historical Incentive Programs Prior to the Chapter 11 Cases.**

(a)    The Company's Annual Management Incentive Plan.

The Company historically has provided market-based, annual incentive bonus opportunities to more than 3,650 management employees pursuant to its Management Incentive Plan and other similar annual incentive bonus plans (collectively, the "MIP"). The purpose of the MIP is to ensure that annual incentive awards were based on achievement of corporate, division and individual performance objectives. The MIP remains an important element of the Company's continued efforts to further align management interests with other Company stakeholders, provide its management-level employees with market-based, competitive incentive bonus compensation opportunities and, ultimately, to reward superior performance.

(b)    The Company's Long-Term Incentive Plan.

The Company also has a long history of granting long-term incentive awards in the form of stock options, restricted stock units, and other equity-based vehicles, which were designed to align the long-term interests of executive officers with those of the stockholders of the Company to increase long-term Company value. The long-term incentives typically included multi-year vesting requirements to encourage executive officers to remain employed with the Company. When making such awards, the Compensation Committee considered the value of the long-term incentives and the impact of long-term incentives on total compensation of the executive officers relative to appropriate paper and pulp and general industry peer groups to provide market-based compensation opportunities for management.

**2.    Short-Term and Long-Term Incentive Compensation Plans Approved During the Chapter 11 Cases.**

The Company's compensation philosophy of providing appropriate, market-based financial incentives to enhance Company performance continued through the Company's Chapter 11 cases. On March 19, 2009, the Company filed the Motion of the Debtors for Entry of an Order Authorizing, But Not Directing, the Debtors to Implement Their Short-Term and Long-Term Incentive Compensation Plans wherein the Company requested authorization to continue their

historical practice of providing employees performance-based short-term and long-term incentive compensation.

On April 22, 2009, the Bankruptcy Court entered an order approving performance-based, annual and long-term cash incentive programs in the form of the Company's 2009 Management Incentive Plan ("2009 MIP"), 2010 Management Incentive Plan ("2010 MIP"), and 2009 Long-Term Incentive Plan ("2009 LTIP") (such order, the "Incentive Plan Order"). These plans were designed to drive the Company's financial performance and, in the case of the 2009 LTIP, restructuring objectives, during the Chapter 11 cases. Pursuant to the Incentive Plan Order, the Company was authorized to implement its 2010 MIP on the same terms as its 2009 MIP, subject only to the development of a 2010 budget to provide the objective financial performance metrics.

        (a)        2009 MIP and 2010 MIP.

The more than 3,650 management employees who historically participated in the MIP in 2009 will continue to participate in 2010. These MIP participants are divided into four tiers: Tier I is comprised of 13 senior executives; Tier II includes approximately 100 additional management employees who are critical to the Company's performance and successful reorganization efforts; Tier III includes approximately 850 managerial employees with corporate or division-specific responsibilities; and Tier IV includes approximately 2,600 employees whose responsibilities significantly impact the Company's ability to meet its budgeted financial targets at the Company and divisional levels.

Each MIP participant has an annual target incentive bonus potential that is expressed as a percentage of his or her base salary. On April 28, 2009, the Compensation Committee established the Company's NEOs' target level incentive bonuses for 2009 and 2010 consistent with the Incentive Compensation Order (expressed as a percentage of the participant's annual base salary) as follows:

| **Named Executive Officer** | **Target** |
| --- | --- |
| Patrick J. Moore,<br>Chairman and Chief Executive Officer | 125% |
| Steven J. Klinger,<br>President and Chief Operating Officer | 125% |
| John R. Murphy,*<br>Senior Vice President and Chief Financial Officer | 100% |
| Craig A. Hunt<br>Senior Vice President, Secretary and General Counsel | 100% |
| Steven C. Strickland,<br>Senior Vice President of Container Operations | 100% |

\* Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the first semi-annual performance period (as described below). He is, however, eligible to participate in the second semi-annual and annual performance periods on a pro-rated basis. Mr. Murphy's predecessor, Charles A. Hinrichs, participated in the 2009 MIP from January 1, 2009 until the cessation of his employment on May 18, 2009, and received a pro-rata award under the MIP as a result.

The MIP plan years are from January 1 through December 31 for 2009 and 2010, and are comprised of three performance periods: two six-month, semi-annual performance periods and one annual performance period. Accordingly, consistent with the Incentive Plan Order, a MIP participant is eligible to receive a semi-annual award after the end of each semi-annual performance period and an annual award after the end of the annual performance period, subject to the Company's achievement of the financial and/or operational goals for the applicable performance period. The percentages of the target incentive bonus payouts attributable to each performance period for each MIP participant (except certain Tier IV participants as described below) are as follows:

| Performance Targets Evaluation Date | Percentage Payout of Target Bonus |
|---|---|
| June 30 (based on semi-annual performance) | 40% of annual target bonus (based on semi-annual performance – January 1 through June 30) |
| December 31 (based on semi-annual performance) | 30% of annual target bonus (based on semi-annual performance – July 1 through December 31) |
| December 31 (based on annual performance) | 30% of annual target bonus (based on annual performance – January 1 through December 31) |

Certain Tier IV B MIP Participants, however, are eligible to receive a quarterly award pursuant to the 2009 MIP and 2010 MIP after the end of each calendar quarter, consistent with the Company's past practice and the Incentive Plan Order.

With the exception of certain participants in Tier IV whose performance targets are based upon plant or area key performance indicators, the Company's objective financial performance targets applicable under the MIP are based on a corporate EBITDAR metric and a divisional EBITDA metric. The Company previously established the 2009 MIP performance targets and has developed the budgeted 2010 EBITDAR that will be used as the 2010 MIP Performance Targets, which is set forth in <u>Exhibit 3, Schedule [  ]3</u> of the Plan.

Because the MIP performance targets are entirely performance-based, actual earned incentive bonuses will vary depending on the extent to which the Company achieves the established performance targets. Like the 2009 MIP, the 2010 MIP establishes a threshold level of

performance (85% of the performance target) at which 50% of the target incentive bonus will be paid (and below which level no bonus payment will be made), a target level of performance at which 100% of the target incentive bonus will be paid, and a maximum level of performance (140% of the performance target) at which a maximum level bonus payment will be paid (175% of the target incentive bonus), provided that any above-target incentive bonus amount earned with respect to the first six-month semi-annual performance period is scheduled to be paid after the end of the MIP plan year. Additionally, only Tier I and II participants are eligible to earn any above-target level payments under the MIP.

In the event that the Company has not implemented the 2010 MIP prior to the Confirmation Date as authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date pursuant to the terms of the Plan. Additionally, pursuant to the Plan, the 2010 MIP will be assumed by the Reorganized Company and will remain in effect after the Effective Date.

## MIP Awards for the First 2009 Semi-annual Performance Period

For the first semi-annual performance period from January 1, 2009 through June 30, 2009 (the only performance period that has been completed as of the filing of this Disclosure Statement), the Company exceeded the corporate and divisional 2009 MIP EBITDAR performance targets. As a result, each of the Tier I and II participants (including the NEOs) earned the maximum 175% of his or her target level incentive bonus for the first semi-annual performance period. However, because the amount of the payout for the first semi-annual performance period is capped at 40% of the annual target, the balance of the earned bonus was carried over and will be paid to such participants after the end of the 2009 MIP year, consistent with the Incentive Plan Order.

The value of the award paid for the first semi-annual performance period is set forth below and expressed as a percentage of annual base salary. The amount carried over and to be paid after the end of the 2009 MIP year is also set forth below. Total awards earned under the 2009 MIP for the first semi-annual performance period amounted to approximately $22 million, with approximately $3.8 million of such amount being awarded to executive officers.

| Named Executive Officer | Target | Value of Award Paid for First Semi-Annual Performance Period | Earned Award Carried Over for Payment in 2010 |
| --- | --- | --- | --- |
| Patrick J. Moore, Chairman and Chief Executive Officer | 125% | $553,500 (50% of salary) | $415,125 |
| Steven J. Klinger, President and Chief Operating Officer | 125% | $397,500 (50% of salary) | $298,125 |
| John R. Murphy,* Senior Vice President and Chief Financial Officer | 0% | $0 (0% of salary) | $0 |

44

| | | | |
|---|---|---|---|
| Charles A. Hinrichs,**<br>Former Senior Vice<br>President and Chief<br>Financial Officer | 80% | $89,173 (21.3% of salary) | $0 |
| Steven C. Strickland,<br>Senior Vice President -<br>Container Operations | 100% | $142,800 (40% of salary) | $107,100 |
| Craig A. Hunt<br>Senior Vice President,<br>Secretary and General<br>Counsel | 100% | $163,400 (40% of salary) | $122,550 |

\*  Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the first semi-annual performance period.

\*\*  Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and he earned a pro-rata award under the 2009 MIP for the period from January 1, 2009 through May 18, 2009.

(b)    The 2009 LTIP.

The 2009 LTIP approved by the Incentive Plan Order provides market-based, potential cash incentive bonuses for a group of approximately 50 employees whose top-level performance is critical to the Company's success through the Chapter 11 cases (the "2009 LTIP Participants"). The 2009 LTIP is based upon a two-year plan cycle that runs from January 1, 2009 through December 31, 2010 as set forth in the Incentive Plan Order, provided that the Company will pay out earned 2009 LTIP incentive bonus as of the Effective Date, as described below.  In the event that the Company has not implemented the 2009 LTIP prior to the Confirmation Date as authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date pursuant to the terms of the Plan.

Each 2009 LTIP Participant is eligible to receive a long-term cash incentive bonus target award expressed as a percentage of base salary.  Consistent with the Incentive Plan Order, the Company's NEOs' target level bonuses under the 2009 LTIP (expressed as a percentage of base salary) are as follows:

| **Named Executive Officer** | **Target** |
|---|---|
| Patrick J. Moore,<br>Chairman and Chief Executive Officer | 375% |
| Steven J. Klinger,<br>President and Chief Operating Officer | 375% |
| John R. Murphy,*<br>Senior Vice President and Chief Financial Officer | 100% |
| Craig A. Hunt<br>Senior Vice President, Secretary and General Counsel | 150% |

Steven C. Strickland,                                                       120%
Senior Vice President of Container Operations

\* Mr. Murphy joined the Company on May 18, 2009, and is eligible to participate in the 2009 LTIP on a pro-rated basis based upon factors including his length of service during the plan cycle and the discretion of the Compensation Committee. Mr. Murphy's predecessor, Mr. Hinrichs, is not eligible to participate in the 2009 LTIP due to the cessation of his employment on May 18, 2009.

Under the 2009 LTIP "payout curve" as approved pursuant to the Incentive Plan Order, 2009 LTIP Participants will receive an award at 50% of target for 85% "threshold" achievement of the performance objectives; 100% of target payout or 100% of "target" level achievement of the performance objectives; and 175% of target payout for 140% "maximum" achievement of the performance objectives.

The 2009 LTIP "Performance Target" will be comprised of (i) the average of the Debtors' actual ~~Company~~ performance over the two-year plan cycle compared to the ~~Company's Budgeted EBITDAR as set forth in Exhibit 3, Schedule [ ] of the Plan~~Debtors' combined Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) and (ii) achievement of restructuring goals that will be substantially comprised of total enterprise value or a substantially similar financial metric as provided in the Incentive Plan Order. Fifty percent (50%) of each 2009 LTIP Participant's 2009 LTIP ~~incentive bonus~~Performance Target will be based solely on the ~~Company's~~Debtors' performance relative to the combined Budgeted EBITDAR, and the remaining 50% will be solely based on the ~~Company's~~Debtors' achievement of ~~a~~ restructuring ~~goal~~goals.

        (i)        Budgeted EBITDAR Performance Target.

The 2009 LTIP Performance Target that is based on the combined Budgeted EBITDAR for 2009 and 2010 is set forth in Exhibit ~~3, Schedule [ ]~~3 of the Plan. Any earned awards based on the Company's performance relative to the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) will be paid at the end of the two-year plan cycle, unless the Confirmation Date occurs prior to the end of such plan cycle, in which case, the Company will pay, on the Effective Date, the pro-rata amount of the 2009 LTIP Incentive Bonus (determined by the number of completed calendar days between January 1, 2009 and the Effective Date) based on the achievement as of the Confirmation Date of the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year).

        (ii)        Restructuring Goal Performance Target.

The restructuring goal portion of the 2009 LTIP Performance Target will be based upon improvements in the trading price of the Company's bonds relative to the trading prices of those bonds on the date that the Company commenced its chapter 11 cases (approximately $0.13) and the date that the Bankruptcy Court entered the Incentive Plan Order approving the 2009 LTIP (approximately $0.25).

CH1 ~~5049998~~5118439v.~~74~~

Each 2009 LTIP Participant will be entitled to receive a full maximum payment (without pro-ration) with respect to the restructuring goal portion of their LTIP incentive bonus, provided that the average trading price of the Company's bonds in the 30-day period prior to the Confirmation Date ("Average Bond Trading Price")[18] is not less than $~~0.[___], further provided that if the Average Bond Trading Price of the Company's bonds is 5% below such Average Bond Trading Price that provides a maximum LTIP incentive bonus payment, each 2009 LTIP Participant will be entitled to receive a target level payment (without pro-ration) with respect to the restructuring goal portion of their LTIP incentive bonus, further provided that if the Average Bond Trading Price is [___]% below such Average Bond Trading Price that provides a maximum LTIP incentive bonus payment, each 2009 LTIP Participant will be entitled to receive a threshold level payment (without pro-ration) with respect to the restructuring goal portion of their LTIP incentive bonus, and further provided that if the Average Bond Trading Price is more than [___]% below such Average Bond Trading Price that provides a maximum LTIP incentive bonus payment, no 2009 LTIP Participant will be entitled to receive a payment with respect to the restructuring goal portion of their LTIP incentive bonus.~~0.50. All earned LTIP incentive bonus payments will be made on the Effective Date or at such later time as set forth in the 2009 LTIP.

3.    **Executive Agreements.**

The Company's Board of Directors historically has approved customary employment agreements for certain senior executives of the Company, including the Chairman and Chief Executive Officer, the President and Chief Operating Officer, and for the former Senior Vice President and Chief Financial Officer, whose retention has been critical to the success of the Company.

These employment agreements generally provided that the executives will devote substantially all of their business time to the Company's operations through the term of each executive's respective Employment Agreement, unless sooner terminated by either party in accordance with the provisions thereof. The executive is prohibited from disclosing the confidential information of the Company, diverting business opportunities or prospects from the Company; and, for two years following the termination of employment, competing with any business conducted by the Company or its affiliates, or soliciting any employees, customers or suppliers of the Company within the United States. If the Company terminated the executive's employment "without cause" or if the executive terminated his employment with "good reason", the Company would (i) pay the executive his expected compensation for the remainder of the term, (ii) continue the coverage under group insurance, pension, and other executive benefit plans through the end of the term, (iii) provide certain perquisites, (iv) continue to count the period through the end of the term for purposes of determining the executive's age and service with the Company for the benefit plans and vesting of equity-based compensation awards, and (v) provide outplacement services. Furthermore, if the executive's employment is terminated "without cause" or the executive terminates his employment "for good reason" within twenty-four months following a "change of control" of the Company, the Company would make certain payments within the ten days following the termination of the employment

---

[18] The Average Bond Trading Price will be calculated using the weighted average of the closing trading prices of the Company's series of five publicly traded bonds over the 30-calendar-day period preceding the Effective Date.

CH1 ~~5049998~~5118439v.~~7~~4

Recognizing the key roles of its senior vice presidents, generally, the Board of Directors also historically approved Employment Security Agreements which, among other things, provided lump-sum payments under certain circumstances following a "change of control" of the Company. These agreements ~~are~~were beneficial to the Company by providing for the continuity of service by these executive officers in the critical period surrounding a change of control transaction.

### 4. Retirement Plans.

Retirement benefits are provided to employees through savings and pension plans, which are generally described below.

(a)     Employee Savings Plans.

In the ordinary course of business the Company maintains a number of 401(k) savings plans (the "Employee Savings Plans") for the benefit of its United States employees. Additionally, the Company maintained savings plans for the benefit of the Canadian employees. These Employee Savings Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating employee's paycheck. Approximately 18,400 employees are eligible to participate in the Employee Savings Plans, and they contributed approximately $48 million of their own funds into the Employee Savings Plans during 2008. The Company also makes varying contributions, which are indexed to employee contributions to the Employee Saving Plans for certain participating employees. During 2008, the Company made contributions to the Employee Savings Plans in the amount of approximately $17 million.

(b)     Pension Plans.

The Company maintained two (2) defined benefit pension plans for United States employees and former employees. The Company further maintained four (4) non-qualified pension plans for United States employees and former employees. In Canada, the Company maintained six (6) registered pension plans and four (4) non-registered pension plans for the benefit of its Canadian employees and former employees.

The Company also makes contributions to ten (10) multi-employer pension plans pursuant to the collective bargaining agreements governing approximately thirty (30) of its facilities in the United States and Canada (the "Multi-Employer Plans"). The Company's Multi-Employer Plan contribution requirements vary by collective bargaining agreement and are generally based on a percentage of earnings as calculated on a shift, hourly, or weekly basis. The Multi-Employer Plan contributions are paid on a monthly basis, and the Company paid approximately $4 million in total contributions in such plans in 2008.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the Company were under funded by approximately $900 million. The Company estimates that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to

these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans. These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. The Company currently estimates that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan. The Company currently estimates that these contributions will potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

### 5. Other Post-Retirement Benefit Programs.

#### (a) Health Care and Life Insurance Continuation

The Company maintains a self-insured plan that provides different levels of medical, dental and prescription drug programs to approximately 6,800 retired non-union and union former employees and approximately 60 retired former employees that receive such benefits through HMOs (collectively, the "Retiree Medical Benefits"). The Retiree Medical Benefits are administered though Blue Cross Blue Shield. The Company also maintains a retiree life insurance plan that is provided by a third party insurer (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits"). The Retiree Life Insurance provides benefits to approximately 13,900 retired non-union and union former employees. The Company spends an average of $1.6 million on Retiree Medical Benefits per month and pays a monthly premium of $215,000 for the Retiree Life Insurance.

#### (b) Severance Benefits.

Prior to the Petition Date and in the ordinary course of business, the Company maintained severance plans in the United States and allocated severance in Canada in accordance with Canadian law (the "Severance Programs") for all active, full-time non-union salaried employees and certain active, full-time hourly employees. Pursuant to the Severance Programs, employees become eligible for severance payments and benefits ("Severance") if (i) their employment was terminated without cause; and (ii) the employee has worked for the Company for at least thirty (30) days prior to termination. In the U.S., employees entitled to Severance generally receive one week of salary for each year of service with the Company, plus four additional weeks. In Canada, Severance varies depending on the employee's location, years of service and job responsibilities. The amount and duration of the employee's Severance depends on whether the employee signs a company-provided agreement containing, among other things, a waiver and release of claims.

In addition to the employees included in the Company's Severance Programs, the Company's union employees typically obtain severance payment and/or payments during specified notice periods prior to termination and heath care benefits (the "CBA Severance")

pursuant to agreements (the "CBA Severance Agreements") negotiated between the Debtors and the unions in accordance with the governing collective bargaining agreements. The Company currently is providing CBA Severance pursuant to six (6) CBA Severance Agreements.

On February 23, 2009, the Bankruptcy Court entered an order permitting the Debtors to continue the Severance Programs in the ordinary course of business (the "Severance Continuation Order"). The Severance Continuation Order authorized the Debtors to pay for and provide all prepetition Severance relating to the Severance Programs in accordance with the Debtors' prepetition policies and practices, and further authorized the Debtors to continue the Severance Programs in the ordinary course of business. The Severance Continuation Order did impose certain limitations, however. The Debtors are required to first seek Court approval before making any payment under the Severance Programs to an insider, as defined in the Bankruptcy Code, that would be subject to ~~Section~~ section 503(c)(2) of the Bankruptcy Code, and the Severance Continuation Order does not apply to any employees that are party to an executive severance plan or individual employment agreements or similar agreements that provide for severance.

### E. Pre-Petition Debt and Capital Structure of the Company.

Prior to the Petition Date, the Debtors funded their operations with four different types of debt financing. First, the Debtors arranged senior secured bank financing comprised of term loans and revolving credit facilities (the "Pre-Petition Secured Debt"). The aggregate amount of Pre-Petition Secured Debt outstanding as of the Petition Date was approximately $1.2 billion. Second, the Debtors issued long-term debt comprised of five series of unsecured notes, which ~~have~~ had an aggregate principal amount outstanding of $2.275 billion (the "Senior Note Debt") as of the Petition Date. Third, the Debtors established two accounts receivable securitization facilities (the "Securitization Facilities") – one in the United States (the "U.S. Securitization Facility") and one in Canada (the "Canadian Securitization Facility"). As of the Petition Date, receivables sold by the Debtors (in which the Debtors have a residual interest) secured approximately $350 million and $30 million in obligations related to the U.S. Securitization Facility and the Canadian Securitization Facility, respectively.[19] Finally, as of the Petition Date, the Debtors were obligated on approximately $284 million of tax-exempt utility systems bonds, industrial revenue bonds and similar bonds. Each of the Debtors' four primary types of pre-petition financing and the Debtors' other pre-petition obligations are described in greater detail below.

#### 1. Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement.

Prior to the Petition Date, SSCE and its wholly-owned subsidiary, SSC Canada, were borrowers under that certain Credit Agreement, dated as of November 1, 2004, with JPMorgan Chase Bank and several other financial institutions (as amended, restated or modified from time to time, the "Prepetition Credit Agreement"), which established the Pre-Petition Secured Debt. The Prepetition Credit Agreement provided for (i) a revolving credit facility of $600 million to SSCE and (ii) a revolving credit facility of $200 million to SSCE and SSC Canada. The Prepetition Credit Agreement also provided for a Tranche B term loan to SSCE in the aggregate principal

---

[19] After the Petition Date, the Debtors applied proceeds from the DIP Facility, as defined below, to defease the outstanding notes under the Securitization Facilities in order to regain ownership of the receivables.

amount of $975 million, a Tranche C term loan to SSC Canada in the aggregate principal amount of $300 million, and a Tranche C-1 loan to SSC Canada in the aggregate principal amount of $90 million. Certain letters of credit (for both U.S. and Canada) were issued under the Pre-Petition Credit Agreement.

In addition, the Prepetition Credit Agreement provided for a deposit funded facility (the "Prepetition Revolving Facility Letters of Credit") for approximately $120 million relating to the variable rate industrial revenue bonds issued by SSCE relating to the Stevenson Facility (the "Stevenson Notes").[20]

As of the Petition Date, the Debtors were indebted under the Prepetition Credit Agreement (a) on account of loans made to SSCE, in the approximate aggregate principal amount of not less than approximately $746 million plus letters of credit issued in the approximate aggregate stated amount of not less than approximately $252.8 million,[21] plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and other obligations, including, without limitation, on account of certain swap agreements (the "Pre-Petition U.S. Obligations"), and (b) on account of loans made to SSC Canada, in the approximate aggregate principal amount of not less than approximately $366 million, plus letters of credit in the approximate aggregate stated amount of not less than approximately $27.6 million, plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and obligations, including, without limitation, on account of certain Swap agreements (the "Pre-Petition Canadian Obligations").

Pursuant to the Prepetition Credit Agreement, certain of the Debtors executed Guarantee Agreements and Security Documents (as defined in the Pre-Petition Credit Agreement) to secure the Pre-Petition Secured Debt. SSCE's Pre-Petition U.S. Obligations were unconditionally guaranteed by SSCC.[22] SSC Canada's Pre-Petition Canadian Obligations were unconditionally guaranteed by MBI Limited/Limitée, Smurfit-MBI, 3083527 Nova Scotia Company and Francobec Company (the "Pre-Petition Canadian Guarantors"), as well as SSCE and SSCC. Certain of the Debtors also granted security interests, mortgages and liens (the "Pre-Petition Liens") on personal and real property and the proceeds thereof (as described and defined as "Collateral"). The Pre-Petition U.S. Obligations are secured by those Pre-Petition Liens granted by SSCC and SSCE, as well as by the capital stock of SSCE and 65% of the capital stock of SSC Canada. The Pre-Petition Canadian Obligations are secured by those Pre-Petition Liens granted by SSC Canada and the Pre-Petition Canadian Guarantors, pledges of all of the capital stock of the Pre-Petition Canadian Guarantors, and the liens and stock pledges securing the Pre-Petition U.S. Obligations.

### 2. Senior Note Debt.

---

[20] After the Petition Date, the indenture trustee of the Stevenson Notes drew on the Prepetition Revolving Facility Letters of Credit to fully repay the Stevenson Notes. SSCE's obligations under the Stevenson Notes are described below in ~~section~~Section III.E.4.

[21] As of the Petition Date, none of the issued letters of credit had been drawn on.

[22] The Prepetition Credit Agreement also required SSCE's material domestic subsidiaries to guarantee SSCE's obligations under the agreement. However, as of the Petition Date, none of SSCE's domestic subsidiaries were deemed material for purposes of the agreement and none are obligated on a guaranty of SSCE's obligations under the agreement.

CH1 ~~5049998~~5118439v.~~7~~4

SSCE is obligated under five separate series of unsecured notes (the "Prepetition Notes") with an aggregate principal amount of $2.275 billion:

(i) 8.375% unsecured notes in the aggregate principal amount of $400 million, due on July 1, 2012;

(ii) 8.25% unsecured notes in the aggregate principal amount of $700 million, due on October 1, 2012;

(iii) 7.50% unsecured notes in the aggregate principal amount of $300 million, due on June 1, 2013;

(iv) 7.375% unsecured notes in the aggregate principal amount of $200 million, due on July 15, 2014; and

(v) 8.00% unsecured notes in the aggregate principal amount of $675 million, due on March 15, 2017.

The 7.375% unsecured notes were issued by Stone FinCo II and were guaranteed by SSCE. Each of the other four series of Prepetition Notes was issued directly by SSCE or by a predecessor of SSCE.

### 3. Securitization Facilities.

Prior to the Petition Date SSCE participated in the $475 million U.S. Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its accounts receivable to Stone Receivables, LLC ("SRC"), a wholly-owned non-consolidated subsidiary of SSCE. SRC then transferred the receivables to a non-consolidated subsidiary, SSCE Funding, LLC (the "Securitization Issuer"). The Securitization Issuer in turn issued notes to third-party investors, pursuant to (a) that certain Master Indenture, dated as of November 23, 2004 (the "Indenture"), between the Securitization Issuer and Deutsche Bank Trust Company Americas, as Indenture Trustee (in such capacity, the "Securitization Trustee"), (b) that certain Series 2004-1 Indenture Supplement to Master Indenture, dated as of November 23, 2004 (the "Indenture Supplement"), between the Securitization Issuer and the Securitization Trustee, and (c) that certain Series 2004-2 Indenture Supplement to Master Indenture, dated as of November 23, 2004, between the Securitization Issuer and the Securitization Trustee, in each case, as amended, restated, modified or waived from time to time. The notes issued pursuant to the Series 2004-2 Indenture Supplement have since been defeased. The U.S. Securitization Facility was scheduled to mature on November 15, 2009. As of the Petition Date, more than $485 million of receivables sold by SSCE into the U.S. Securitization Facility secured approximately $350 million in outstanding notes issued by the Securitization Issuer under the Indenture.

Additionally, prior to the Petition Date, SSCE, through its wholly-owned subsidiary Smurfit-MBI, also participated in the $70 million Canadian Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its Canadian accounts

CH1 5049998 5118439v.7 4

receivable to an asset-backed commercial paper conduit (the "Canadian CP Conduit").[23] The Canadian Securitization Facility was scheduled to mature on March 31, 2009. As of the Petition Date, over $52 million of receivables sold by SSCE into the Canadian Securitization Facility secured approximately $30.4 million in indebtedness and other obligations outstanding under the Canadian Securitization Facility.

After the Petition Date, the Debtors applied certain of the proceeds of the DIP Facility (as defined below) to defease the outstanding notes under the Securitization Facilities, as authorized by the Court in an interim order approving the DIP Facility entered on January 27, 2009, in order to regain ownership of the receivables.

### 4. Utility and Industrial Revenue Bonds and Other Debt Obligations.

SSCE is an obligor on approximately $284 million in aggregate principal amount of tax-exempt utility bonds, environmental improvement bonds, industrial revenue bonds and similar bonds issued by local government entities:

(i)    certain Series 1986 revenue bonds issued by the Industrial Development Board of the City of Stevenson (the "Stevenson IDB") in the aggregate principal amount of $7,165,000 due on November 1, 2016;

(ii)    certain Series 1996 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on January 1, 2031;

(iii)    certain Series 1997 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on June 1, 2032;

(iv)    certain Series 1998B revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on April 1, 2033;

(v)    certain Series 1998C revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $8,000,000 due on November 1, 2033;

(vi)    certain Series 1998D revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $4,950,000 due on November 1, 2011;

(vii)    certain Series 1999A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $15,000,000 due on February 1, 2034;

(viii)    certain Series 2000A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $10,000,000 due on October 1, 2035;

(ix)    certain Series 2003 revenue bonds issued by the Village of Hodge, Louisiana in the aggregate principal amount of $58,085,000, due on March 1, 2024;

---

[23] The sale occurred pursuant to that certain Receivables Purchase Agreement, dated as of March 30, 2004, among MBI Limited/Limitée, as general partner of Smurfit-MBI, and certain other parties.

(x)  certain Series 2005 revenue bonds issued by the City of Coshocton, Ohio in the aggregate principal amount of $30,000,000, due on August 1, 2013;

(xi)  certain Series 2005 revenue bonds issued by the Industrial Development Authority of the City of Hopewell, Virginia in the aggregate principal amount of $41,340,000, due on June 1, 2015;

(xii) certain Series 1996 revenue bonds issued by the Industrial Development Authority of the County of Navajo, Arizona (the "Navajo IDA")  in the aggregate principal amount of $20,000,000, due on April 1, 2026; and

(xiii)  certain Series 1997 revenue bonds issued by the Navajo IDA in the aggregate principal amount of $14,500,000, due on June 1, 2027.

The industrial revenue bonds described above in (i) through (vii) are secured by the Prepetition Revolving Facility Letters of Credit.

Additionally, in conjunction with its July 29, 2008 acquisition of Calpine Corrugated, LLC ("Calpine") – an independent corrugated container producer in Fresno, California, for which SSCC is the primary containerboard supplier – SSCE agreed to guarantee Calpine's outstanding funded bank debt.  As of the Petition Date, Calpine's aggregate amount of debt guaranteed by SSCE was approximately $46 million.

**5.  Intercompany Debt.**

In the normal operations of the Company's businesses, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions.  Certain receivables and payables among the Debtors and/or the Debtors and non-debtor subsidiaries of SSCC are evidenced by intercompany notes (the "Intercompany Note Claims").  In addition to Intercompany Note Claims, the Debtors and/or the Debtors and non-debtor subsidiaries of SSCC engaged in intercompany trading transactions which give rise to Claims between Debtors and/or Debtors and non-Debtor subsidiaries (the "Intercompany Trade Claims", and together with the Intercompany Note Claims, the "Intercompany Claims").   As a result, on any given date, there are numerous Intercompany Claims that reflect intercompany receivables and payables made and/or accrued in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Transactions").  These Intercompany Transactions include, but are not limited to:

Accounts Receivable, Accounts Payable and Payroll.  In the ordinary course of business, the Debtors contribute cash and process disbursements through a centralized cash management system.  Each of the Debtors, with the exception of Cameo Container Corporation, maintains its own separate accounts, all of which are managed at the corporate level.  Occasionally, SSCE will fund disbursements and collect accounts on behalf of the other debtors, resulting in Intercompany Claims between the Debtors.  The Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Debtor.  Prior to the Petition Date, such accounts were never settled in cash.  From and after the Petition

54

Date, such accounts, with the exception of the balance ~~owning~~owing between SSCE and Cameo, are settled in cash on a monthly basis.

Centrally Billed Expenses.  In the ordinary course of business, the Debtors and Stone Container de Mexico S. de R.L. de C. V. ("Stone Container Mexico"), a wholly-owned non-debtor subsidiary of SSCE,  incur centrally billed expenses, such as employee medical costs, insurance premiums, certain taxes (including real estate, franchise, sales taxes, etc.) and leased equipment.  These charges are allocated among the Debtors and Stone Container Mexico and are reflected in the intercompany accounts.

Corporate Expense Allocation.  Charges for corporate expenses provided by SSCE to the other Debtors are allocated among the Debtors based upon the cost of service provided, directly identifiable costs, and other allocation methods, in addition to a services fee payable to SSCE.

Containerboard Sales.  In the ordinary course of business, SSC Canada sells containerboard from its mills to SSCE, with such sales resulting in a corresponding Intercompany Claim.  Prior to the Petition Date, SSC Canada had a large Intercompany Claim owing from SSCE which was never settled in cash.  From and after the Petition Date, such sales are settled in cash on a monthly basis.

Containerboard Purchases.  In the ordinary course of business, SSCE sells containerboard, including that purchased from SSC Canada to certain of its Debtor and non-debtor affiliates, with such sales resulting in a corresponding Intercompany Claim.  For example, SSCE regularly sells containerboard to Smurfit-Stone Puerto Rico, Inc., Stone Container Mexico, and Smurfit-MBI.  The prices for such containerboard are determined by SSCE based on the prices applicable to certain third parties that purchase containerboard from SSCE on an arm's-length basis.  Prior to the Petition Date, such intercompany purchases resulted in a corresponding Intercompany Claim which was never settled in cash. From and after the Petition Date, the Debtors have settled all such intercompany purchases in cash on a monthly basis.

Below is a summary of the net receivables or payables comprising, as applicable, the Intercompany Claims for each Debtor as of the Petition Date.

| | Net I/C Balances (US$) as of January 25, 2009 | | |
| --- | --- | --- | --- |
| | I/C Note Receivable/ (Payable) (1) | Other I/C Transactions Receivable/ (Payable) | Total Net Receivable/ (Payable) |
| _**U.S. Debtors Net I/C Balances**_ | | | |
| Cameo Container Corporation | (76,899,599) | 118,956,524 | 42,056,925 |
| Smurfit-Stone Puerto Rico, Inc. | - | (8,229,063) | (8,229,063) |
| Smurfit Newsprint Corporation | - | 51,821 | 51,821 |

55

| | | | |
|---|---|---|---|
| Smurfit-Stone Container Enterprises, Inc. (SSCE) | **112,607,660** | **(214,697,924)** | **(102,090,264)** |
| *(To) From Stone de Mexico* | 35,506,929 | (322,804) | 35,184,125 |
| *(To) From SSC Canada* | (50,000,000) | (193,797,070) | (243,797,070) |
| *(To) From SMBI* | - | 27,057,213 | 27,057,213 |
| *(To) From Cameo* | 76,899,599 | (118,956,524) | (42,056,925) |
| *(To) From Calpine* | 50,201,132 | (6,840,899) | 43,360,233 |
| *(To) From Smurfit Newsprint Corporation* | - | (51,821) | (51,821) |
| *(To) From Smurfit-Stone Puerto Rico, Inc.* | - | 8,229,063 | 8,229,063 |
| *(To) From Stone International Services Corp* | - | 3,876,850 | 3,876,850 |
| *(To) From Stone Finance Company of Canada II* | - | 66,108,068 | 66,108,068 |
| Calpine Corrugated LLC | (50,201,132) | 6,840,899 | (43,360,233) |
| Stone International Services Corporation | - | (3,876,850) | (3,876,850) |
| ***Total US Debtor Net I/C Balances*** | **(14,493,071)** | **(100,954,593)** | **(115,447,664)** |

***Canadian Debtors Net I/C Balances***

| | | | |
|---|---|---|---|
| SLP Partnership | 427,474,132 | - | 427,474,132 |
| Smurfit-Stone Container Canada Inc. (SSCCI) | **(257,557,534)** | **206,913,663** | **(50,643,871)** |
| *(To) From Nova Scotia* | 209,252,768 | 11,423,695 | 220,676,463 |
| *(To) From Smurfit-MBI* | (89,336,170) | - | (89,336,170) |
| *(To) From SSCE* | 50,000,000 | 193,797,070 | 243,797,070 |
| *(To) From Francobec* | - | 303,036 | 303,036 |
| *(To) From 605861 N B Inc.* | - | 1,389,862 | 1,389,862 |
| *(To) From Stone Finance Company of Canada II* | - | - | - |
| *(To) From SLP Partnership* | (427,474,132) | - | (427,474,132) |
| B.C. Shipper Supplies Ltd. | - | (1,696,793) | (1,696,793) |
| Specialty Containers Inc. | - | (408,374) | (408,374) |
| 605861 N B Inc. | - | (1,389,862) | (1,389,862) |
| Smurfit-MBI | **89,336,170** | **(24,952,046)** | **64,384,124** |
| *(To) From SSC Canada* | 89,336,170 | - | 89,336,170 |
| *(To) From SSCE* | - | (27,057,213) | (27,057,213) |

CH1 ~~5049998~~5118439v.~~7~~4

| | | | |
|---|---|---|---|
| *(To) From BC Shippers* | - | 1,696,793 | 1,696,793 |
| *(To) From Specialty Containers Inc.* | - | 408,374 | 408,374 |
| 3083527 Nova Scotia Company | (209,252,768) | (11,423,695) | (220,676,463) |
| Francobec Company | - | (303,036) | (303,036) |
| Stone Container Finance Co of Canada II | - | (66,108,068) | (66,108,068) |
| **Total Canadian Debtors Net I/C Balances** | **50,000,000** | **100,631,789** | **150,631,789** |
| **_Non-Debtors Net I/C Balances_** | **(35,506,929)** | **322,804** | **(35,184,125)** |
| **Consolidated Intercompany Balances** | - | (0) | (0) |

*\* The balances above do not reflect an amount of $200,677,778 issued by Stone FinCo II to SSC Canada in the form of equity.*

Below is a summary of Intercompany Claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

**Intercompany 503(b)(9) Claims**

| Creditor | Debtor | Description | 503(B)(9) Amount |
|---|---|---|---|
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SSCE container plants and warehouses | 1,873,481 |
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SMBI container plants and warehouses (via CBM) | 341,166 |
| **SSCCI** | **SSCE** | | **2,214,647** |
| SSCE (CBM) | SMBI | Shipments from SSC Canada mills received by SMBI container plants and warehouses | 341,166 |
| SSCE (Mills) | SMBI | Shipments from SSCE mills to SMBI container plants | 14,087,733 |
| SSCE (Plants) | SMBI | Shipments from SSCE plants to SMBI plants | 595,086 |
| **SSCE** | **SMBI** | | **15,023,985** |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE container plants | 625,572 |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE Reclamation Division | 83,122 |
| **SMBI** | **SSCE** | | **708,693** |

### 6. Trade Debt.

As of the Petition Date, the Debtors had accrued approximately $[~~363.8~~365.0] million in trade debt (excluding amounts for payments by check dishonored post-petition and goods shipped or services rendered pre-petition, but invoiced post-petition).[24]  These amounts, for goods and services, constitute a relatively small percentage of the Debtors' prepetition debt profile.

### 7. Equity of SSCC.

SSCC currently has two classes of equity interests.  SSCC's common stock has a par value of $0.01 per share with 400,000,000 shares authorized.  As of September 30, 2009, SSCC had 256,658,958 shares of common stock issued and outstanding.  SSCC's preferred stock is 7% Series A Cumulative Exchangeable Redeemable Convertible Preferred Stock with a par value of $0.01.  As of September 30, 2009, 25,000,000 preferred shares were authorized, 4,599,300 preferred shares were issued and outstanding, and the aggregate liquidation preference was $116.

## F. **Restructuring Transactions and** Post-Effective Date Debt and Capital Structure of the Company.

### 1. Restructuring Transactions.

On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in the Plan.  Through such Restructuring Transactions, SSCC will be merged into SSCE (the "SSCC/SSCE Merger"), which will survive the merger and become Reorganized SSCC under the Plan ("Reorganized SSCC") and continue to be the ultimate parent company of each of the remaining reorganized Debtors (collectively, the "Reorganized Debtors") and of each of the remaining non-debtor subsidiaries of the Debtors.  In addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Exhibit 13 to the Plan (to be filed with the Plan Supplement) shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions.  A chart depicting the Company's planned post-Effective Date corporate structure is annexed hereto as Exhibit B-2.

---

[24] This amount does not include certain prepetition trade debt that has been satisfied through payments made pursuant to one of the "first day" motions described below in Section IV.A, "First-Day Relief in the Chapter 11 Cases."

## 2.     1.  Post-~~Confirmation~~Effective Date Equity in Reorganized SSCC.

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of [_____]150,000,000 shares, and will issue approximately [_____]1000,000,000 shares, of new common stock (the "New SSCC Common Stock") for distribution to creditors as set forth herein, with ~~no less than~~ [____]eight percent ([____]8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____]8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans.  The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will also authorize the issuance of [_____]10,000,000 shares of preferred stock (the "New SSCC Preferred Stock").

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market but will incur no liability if it is unable to do so.[24][25]

## 3.     Exit Facilities of Reorganized Debtors.

In order to, among other things, facilitate the consummation of the Plan, and to provide working capital for the business operations and general corporate purposes of the Reorganized Debtors, on or prior to the Effective Date, certain of the Debtors shall enter into such financing agreements and commitments as the Debtors, in consultation with the Committee and the CCAA Monitor, shall have arranged on or prior to the Effective Date, including term loans and revolving credit facilities (the "Exit Facilities").  The Exit Facilities may include back-to-back letters of credit that will be used to replace any unexpired letters of credit outstanding under the DIP Facility.  Definitive documentation for the Exit Facilities will be filed in substantially the form attached as Exhibit 14 to the Plan, which shall be filed with the Plan Supplement.

## G.     Pending Litigation Against the Debtors.

As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to ~~Section~~section 362 of the Bankruptcy Code.[25][26]

---

[24][25] Effective as of the opening of business on February 4, 2009, SSCC's common stock and preferred stock were delisted from the NASDAQ Global Select Market and the trading of these securities was suspended.  SSCC's common stock and preferred stock are now quoted on the Pink Sheets Electronic Quotation Service under the ticker symbols "SSCCQ.PK" and "SSCJQ.PK," respectively.

[25][26] On June 18, 2009, the Debtors filed a verified complaint in the Bankruptcy Court [Adv. Pro. No. 09-51067] against the plaintiffs in an ERISA lawsuit (the "ERISA Action") filed against certain key executives and officers of the Debtors seeking to hold them liable for alleged violations of their fiduciary duties in connection with the administration of the Company's employee savings plans.  The Debtors' verified complaint sought an extension of the automatic stay to the defendants in the ERISA Action, and in conjunction therewith, or in the alternative, temporary and preliminary injunctive relief with respect to the ERISA Action.  At a hearing on  November 4, 2009, the Court

The Company is involved in various legal proceedings arising in the ordinary course of business, as well as certain litigation and tax matters. The Company periodically assesses its liabilities and contingencies in connection with these matters based upon the latest information available to it. Based on its review of the latest information available, the Company believes its ultimate liability in connection with pending or threatened legal proceedings will not have a material effect on its results of operations, cash flows or financial position.

As of the Petition Date, the Company had approximately 21 employment-related actions filed against it, 70 employment-related administrative charges, as well as 11 environmental actions, 19 personal injury actions, and several other workers' compensation, union grievance, contract, tax, and asbestos- related actions. A list of the litigation pending prior to the Petition Date is included in the Debtors' Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

The Debtors anticipate that, to the extent any of the pending litigation is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with their powers under the Bankruptcy Code, such litigation will continue after the Effective Date in the forum(s) in which it was initiated. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of these Chapter 11 Cases and the Bankruptcy Code.

## H.    Events Leading up to Chapter 11.

The Company's financial performance depends primarily upon the market demand for its products and the prices that it receives for such products. The recent downturn in the global economy resulted in an unprecedented decline in demand for the Company's products, leading to increased inventory levels and downward pressure on the Company's operating income. At the same time, substantial price competition and volatility in the pulp and paper industry resulted in decreased prices for the Company's products which, coupled with the Company's leveraged financial position and the recent volatility in energy prices and the cost of raw materials, have adversely impacted the Company's financial performance. In addition dramatic changes in the capital markets adversely impacted the Company's prospects for refinancing its revolving credit and securitization facilities. Because of these factors, the Debtors found it necessary to commence these Chapter 11 Cases.

## IV.  EVENTS DURING THE PROCEEDINGS

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Brendan L. Shannon and have been administratively consolidated under case number 09-10235 (BLS). Also on the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including SSC Canada, a wholly-owned subsidiary of SSCE, and the other Canadian Debtors – applied for protection from their creditors in Canada

---

ordered that the automatic stay be extended to protect the Debtors' executives and officers named as defendants in the ERISA Action. The Court stayed the ERISA Action for a period of 120 days and ordered a status hearing immediately prior to the conclusion of that period to consider whether the stay should remain in effect.

CH1 5049998 5118439v.7 4

pursuant to the CCAA in the Canadian Bankruptcy Court. The CCAA Proceedings have been assigned to Justice Pepall and are being administered under court file number CV-09-7966-00CL.

## A. First-Day Relief in the Chapter 11 Cases.

On the Petition Date, the Debtors also filed "first day" motions seeking authority to, among other things, (i) prohibit utility companies from discontinuing, altering, or refusing service, (ii) make tax payments to federal, state and local taxing authorities on an uninterrupted basis, (iii) pay certain pre-petition claims of shippers, warehousemen and other lien claimants; (iv) make payments to certain pre-petition creditors that are critical to the Debtors' uninterrupted operations; (v) continue pre-petition insurance programs and pay all premium installments outstanding in connection therewith; (vi) honor prepetition obligations to certain customers and brokers and continue customer programs; (vii) pay pre-petition wages and other benefits to their employees; (viii) continue use of their existing cash management system, bank accounts and business forms; (ix) for authority to continue using cash collateral, and (x) extend time to file schedules of assets and liabilities. All of the Debtors' first-day motions were granted by the Bankruptcy Court in substantially the manner requested by the Debtors on an interim or final basis.

### 1. Utility Services.

In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services (the "Utility Services"). Because uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts, the Debtors requested entry of (i) an interim order and (ii) a final order (a) prohibiting utility providers from altering, refusing, or discontinuing utility services, (b) providing that utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services, and (c) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers (the "Utility Motion"). The Bankruptcy Court entered the interim order on January 27, 2009 and entered the final order on February 23, 2009.

### 2. Payment of Federal, State and Local Taxes.

In the ordinary course of business, the Debtors incur certain sales, use, property, and other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various state, local and foreign taxing authorities (collectively, the "Taxing Authorities") as such payments become due. On the Petition Date, the Debtors filed a motion seeking authority to pay the relevant Taxing Authorities (i) any pre-petition Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date and (ii) any pre-petition Taxes that arose prior to the Petition Date that become due and owing during the pendency of the cases in the ordinary course of business (the "Tax Motion"). The order, signed January 27, 2009, granted the Debtors the authority to pay any accrued and outstanding pre-petition Taxes up to an aggregate amount of $23,100,000.

### 3. Shippers, Warehousemen and Other Lien Claimants.

The Debtors' supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carriers, less-than-truckload carriers, freight-forwarders, ocean carriers, parcel carriers, and non-asset based carriers (collectively, the "Shippers") as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen"). In addition, the Debtors utilize the services of customs agents to facilitate the shipment of goods into and out of the United States. On the Petition Date, the Debtors sought authority to pay certain pre-petition claims held by Shippers and Warehousemen in amounts necessary or appropriate to (i) obtain releases of critical or valuable goods or equipment that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and (iii) induce critical Shippers and Warehousemen and other lien claimants to continue to carry goods and equipment and make timely deliveries thereof. By an order dated January 27, 2009, the Bankruptcy Court granted the Debtors the authority to satisfy the pre-petition claims of the Shippers and Warehousemen in an amount not to exceed $33 million.

### 4. Critical Trade Vendor Treatment and Payment of Priority Claims.

On the Petition Date, the Debtors sought the authority to pay the pre-petition claims of critical vendors that delivered essential goods or provided essential services to the Debtors prior to the Petition Date (the "Critical Vendor Motion"). The ability to pay critical vendors is essential because the Debtors need to ensure that they can continue to receive such goods and services to continue operating their businesses. The Bankruptcy Court entered an interim order dated January 27, 2009 granting the Critical Vendor Motion and authorizing the Debtors to pay critical vendors in a total amount not to exceed $50 million. The Court entered a final order dated February 23, 2009 (the "Critical Vendor Order"). Pursuant to the Critical Vendor Order, in return for payment of their pre-petition claims, such Critical Vendors were required to continue providing the Debtors with goods or services according to customary trade terms, or such other favorable trade terms as mutually agreed upon.

### 5. Continuation and Payment of Prepetition Insurance.

On the Petition Date, the Debtors filed a motion requesting the authority to continue performing their obligations under prepetition insurance policies and premium financing agreements (the "Insurance Motion"). By order dated January 27, 2009, the Bankruptcy Court authorized the Debtors to (i) make all post-petition installment payments under certain pre-petition insurance premium finance agreements as such installment payments come due, (ii) continue all of the Debtors' prepetition insurance programs in the ordinary course of business, and (iii) pay all prepetition obligations in respect thereof. The ability to continue payments under their policies was necessary to ensure that the Debtors maintained insurance coverage with respect to their business activities.

### 6. Customer Programs.

Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation with their customers and in the marketplace for their products (collectively, the "Customer Programs").

Additionally, the Debtors utilized the services of several independent brokers or broker groups (collectively, the "Brokers") in order to obtain new customers and maintain long-term customer relationships for certain of their products through various sale and distribution channels. Accordingly, the Debtors requested the entry of an order granting them the authority to (i) perform their pre-petition obligations related to the Customer Programs, (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs without further application to this Court, (iii) maintain their relationships with the Brokers, and (iv) perform and pay certain pre-petition obligations the Debtors owe to the Brokers (the "Customer Motion"). The Bankruptcy Court granted the relief requested in the Customer Motion on January 27, 2009.

7. **Employee Compensation and Benefits.**

On the Petition Date, the Debtors filed a motion seeking court authority to (i) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtors' employees, (ii) pay all prepetition compensation owed to individuals who work regularly as the Debtors' independent contractors and temporary workers, (iii) reimburse all prepetition business expenses to employees, (iv) make all payments for which pre-petition payroll and tax deductions were made, (v) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course, and (vi) honor workers' compensation obligations, (vii) make all payments to third parties relating to the foregoing payments and contributions (the "Employee Wage Motion"). The Debtors sought this relief to minimize the personal hardship that the employees, independent contractors, and temporary workers will suffer if the pre-petition employee-related obligations are not paid when due, as well as to maintain morale and an essential workforce. By order entered on January 27, 2009, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested, except that the Bankruptcy Court held a hearing and authorized the Debtors to continue their severance plans on February 23, 2009.

8. **Cash Management.**

Prior to the Petition Date, the Debtors utilized a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses (the "Centralized Cash Management System"). In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) authorizing the continued use of the Centralized Cash Management System, (ii) authorizing continued use of existing bank accounts and business forms, (iii) authorizing the continuation of certain intercompany transactions, (iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis, and (v) granting administrative expense status to post-petition intercompany transactions (the "Cash Management Motion"). By an interim order signed January 27, 2009, and a final order entered on February 23, 2009, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis.

9. **Use of Cash Collateral.**

In order to continue running its business in the ordinary course throughout the Chapter 11 Case, the Debtors sought an interim order on the Petition Date (i) authorizing Calpine Corrugated, LLC, one of the Debtors herein, to use cash collateral in accordance with the terms of the budget

set forth therein and granting adequate protection to pre-petition lenders pursuant to section 363 of the Bankruptcy Code (the "Cash Collateral Motion").  The relief sought in the Cash Collateral Motion was necessary as Calpine ~~Corrugated, LLC~~ had an immediate and critical need to use the cash to maintain its business and pay related expenses.  The relief requested in the Cash Collateral motion was granted on an interim basis on January 27, 2009, a second interim order was entered on February 23, 2009 and a final order was entered on March 10, 2009.

> 10. **Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.**

On the Petition Date, the Debtors sought entry of an order granting the Debtors an extension of thirty (30) days (in addition to the thirty (30) day extension under Local Rule 1007-1(b)) to file their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), allowing the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements.  The Bankruptcy Court granted the requested relief on January 27, 2009 and the Debtors filed their Schedules and Statements on April 6, 2009.

On August 26, 2009, SSCE filed an amended Schedule F.  On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F.  On October 15, 2009, SSCE again filed an amended Schedule F.

**B.    Relief in CCAA Proceedings.**

On the Petition Date, certain of the Canadian Debtors brought a motion seeking the CCAA Initial Order.  The CCAA Initial Order provides that the Canadian Debtors shall remain in possession and control of their current and future property and grants the CCAA Stay, which precludes any proceeding or enforcement process in any court or tribunal from being commenced or continued in respect of the Canadian Debtors or the CCAA Monitor (as defined below) or affecting the business or property, and stays and suspends any such proceedings currently under way, during the specified stay period (the "CCAA Stay Period").  By order of the Canadian Bankruptcy Court, the CCAA Stay Period has been extended to December 24, 2009.  Among other things, the CCAA Initial Order also:

- appointed Deloitte and Touche Inc. to act as monitor for the Canadian Debtors (the "CCAA Monitor").  The CCAA Monitor is an officer of the Canadian Bankruptcy Court charged with monitoring the Canadian Debtors' property and the conduct of their business.  The CCAA Monitor has the powers and obligations set out in the CCAA and in the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to retain and employee their employees, consultants, agents, experts, accountants and counsel ("Assistants") with liberty to retain such further Assistants as deemed reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to utilize the Centralized Cash Management System;

- entitles, but does not require, the Canadian Debtors to pay certain expenses (whether incurred prior to or after the Petition Date), including (i) all outstanding future wages, salaries, employee and pension benefits and contributions, vacation pay, bonuses and expenses payable on or after the Petition Date, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; (ii) the fees and disbursements of any Assistants retained in respect of the CCAA proceedings; and (iii) amounts owing for goods and services actually supplied to the Canadian Debtors, or to obtain the release of goods contracted for, prior to the date of the CCAA Initial Order, (A) by railways, trucking companies and other carriers and customs brokers, with the consent of the CCAA Monitor and the Canadian DIP Agent, and (ii) with the consent of the CCAA Monitor and the Canadian DIP Agent, up to $11.6 million by other critical vendors;

- entitles, but does not require, the Canadian Debtors to pay all reasonable expenses incurred by them in carrying on the business in the ordinary course and in carrying out the provisions of the CCAA Initial Order;

- directs the Canadian Debtors to pay, until the delivery of written notice of repudiation, all amounts constituting rent under real property leases or as otherwise may be negotiated between the Canadian Debtors and the relevant landlords;

- directs the Canadian Debtors, except as permitted in the CCAA Initial Order or in the DIP Credit Agreement and other documents, until further order of the Canadian Bankruptcy Court: (i) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Canadian Debtors to any of their creditors as of the date of the CCAA Initial Order; (ii) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of their property; and (iii) to not grant creditor or incur liabilities except in the ordinary course of business;

- permits the Canadian Debtors, subject to the DIP Documents, to pursue an orderly restructuring of the business by (i) within certain limits, permanently or temporarily ceasing, downsizing or shutting down any of their business or operations and disposing of redundant or non-material assets; (ii) terminating the employment of such of their employees or temporarily laying off such of their employees as deemed appropriate; (iii) subject to the terms of the CCAA Initial Order, vacating, abandoning or quitting the whole but not part of any leased premises and/or repudiating any real property lease; (iv) repudiating such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Canadian Debtors deem appropriate; and (v) pursuing all avenues of refinancing and offers for material parts of the business or property, subject to prior Court approval before any material refinancing or sale;

- precludes any person during the CCAA Stay Period from discontinuing, failing to honor, altering, interfering with, repudiating, terminating or ceasing to perform any

CH1 5049998 5118439v.7 4

right, renewal right, contract, agreement, license or permit in favor of or held by the Canadian Debtors;

- restrains, during the CCAA Stay Period, all persons having oral or written agreements with a Canadian Debtor from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Canadian Debtors, subject to the terms set forth in the CCAA Initial Order; and

- authorized the Canadian Debtors to enter into the DIP Credit Agreement to borrow up to $350 million thereunder.

## C.    Debtor-in-Possession Financing.

### 1.    Post-Petition Financing Needs.

The Debtors required additional working capital financing in order to preserve and maintain their business.  The level of necessary additional borrowing was not limited to the Debtors' need for incremental working capital.  The Debtors also sought to replace the Securitization Facilities because both facilities would automatically "unwind" as a result of the Debtors' bankruptcy filings, and the Debtors would be denied access to the proceeds of approximately $537 million in accounts receivable unless and until the Securitization Facilities were satisfied.

### 2.    The DIP Financing Motion and Orders.

On the Petition Date, the Debtors requested entry of an order (i) authorizing Debtors to obtain post-petition financing; (ii) granting liens, including priming liens, and superpriority claims pursuant to 11 U.S.C. § 364; (iii) authorizing use of proceeds to effectuate payout of the Securitization Facilities; (iv) authorizing use of cash collateral pursuant to 11 U.S.C. § 363; and (v) granting adequate protection pursuant to 11 U.S.C. §§ 363 and 364.   The immediate access to sufficient post-petition financing and access to cash collateral was vital to the preservation of the Debtors' business and the success of the Debtors' reorganization.  On January 27, 2009, the Bankruptcy Court entered an interim order granting the relief requested and entered a final order on February 23, 2009.

### 3.    The DIP Facility.

Prior to initiating their pursuit of debtor-in-possession ("DIP") financing, the Debtors, with the assistance of their advisors, had pursued out-of-court financing.  Toward the end of 2008, the Debtors' advisors initially contacted approximately twenty-five (25) potential lenders regarding possible out-of-court financing.  It soon became apparent that the Debtors would not be able to secure out-of-court financing in the then current lending market in the time period available to the Debtors, particularly in light of their liquidity position and their significant leverage.  The Debtors and their advisors then pursued DIP financing.  The number of potential lenders who could meet their DIP financing requirements was limited due to the size and complexity (given the cross-border and securitization components) of the requested facility and because the DIP facility would require the priming of the prepetition Debt.

The Debtors determined that ~~the~~a proposed financing arrangement (the "DIP Facility") was the best, and only available and viable option. The DIP Facility was established pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement") by and between SSCE and SSC Canada, SSCC, the other Loan Parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "U.S. DIP Agent"), JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent and Canadian collateral agent ("Canadian DIP Agent", collectively with the U.S. DIP Agent, the "DIP Agents"), and the Lenders party thereto (the "DIP Lenders", collectively with the DIP Agents, the "DIP Secured Parties"). The DIP Facility was established to provide the Debtors with much needed liquidity to fund their operating, working capital, and capital expenditure needs during the course of the Chapter 11 Cases, as well as the retirement of obligations owing in connection with the Securitization Facilities.

The DIP Credit Agreement provided for borrowings up to an aggregate amount of US$750 million, consisting of (i) a US$400 million U.S. term loan for borrowings by SSCE; (ii) a US$35 million Canadian term loan for borrowings by SSC Canada; (iii) a US$250 million U.S. revolving loan for borrowings by SSCE and/or SSC Canada; and (iv) a US$65 million Canadian revolving loan for borrowings by SSCE and/or SSC Canada. SSCE and the U.S. Debtors (other than SMBI, Inc.) (collectively, the "U.S. Guarantors") and SSC Canada guaranteed all of the obligations under the DIP Facility and the Canadian Debtors (other than SSC Canada) and SMBI, Inc. (collectively, the "Canadian Guarantors") guaranteed the obligations of SSC Canada as borrower under the DIP Facility.

The DIP Facility grants, inter alia, (i) with respect to SSCE, the U.S. Guarantors and SSC Canada, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of SSCE, the U.S. Guarantors and SSC Canada and all proceeds thereof; and (ii) with respect to the Canadian Guarantors, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the Canadian obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of Canadian Guarantors and all proceeds thereof. The Debtors granted a perfected first priority lien on all unencumbered property of the Debtors and granted a perfected junior lien on all property of the Debtors that is subject to valid, perfected and unavoidable liens in existence on the petition Date. Additionally, the Debtors granted a perfected first priority, senior priming lien an all property of the Debtors that is subject to existing liens which secure the obligations of the Debtors under the Pre-Petition Credit Agreement and other liens, obligations, or indebtedness junior to the Pre-Petition Credit Agreement.

## D.     Appointment of Creditors' Committee.

On February 5, 2009, the United States Trustee for the District of Delaware appointed the Committee. The Committee is comprised of the following parties: (i) Wilmington Trust Company, as Successor Indenture Trustee; (ii) United Steelworkers; (iii) Pension Benefit Guaranty Corporation; (iv) UMB Bank, N.A.; (v) Aegon USA Investment Management; (vi) Corn Products International; and (vii) Voith Paper Fabrics US Sales, Inc. On or about April 27, 2009,

Wilmington Trust Company determined that it had to resign as indenture trustee for the 7 3/8% Senior Notes due July 15, 2004 and, upon its resignation, Manufacturers and Traders Trust Company ("M&T") was appointed as successor indenture trustee for the 7 3/8% Notes effective May 7, 2009.  M&T was thereafter appointed as an *ex officio* member of the Committee..

The Committee applied for an order authorizing the retention of Kramer Levin Naftalis & Frankel, LLP ("Kramer Levin") as its counsel under section 328(a) and 1103 of the Bankruptcy Code on March 5, 2009.  The order approving Kramer Levin's retention was entered on March 23, 2009.  In addition, the Committee also filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZJ") as Delaware bankruptcy co-counsel on March 10, 2009.  The order approving PSZJ's retention was signed on or about April 2, 2009.  To further assist them in carrying out their duties, the Committee also retained the following professionals with the Bankruptcy Court's approval: (i) FTI Consulting, Inc., as financial advisors; (ii) Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisors and investment banker; and (iii) Bennett Jones, LLP, as Canadian Counsel.

On March 6, 2009, the Committee filed a motion to: (i) limit creditor access to confidential information *nunc pro tunc* to February 5, 2009; (ii) establish related procedures pursuant sections 105(a), 1102(b)(3) and 1103(c) of the Bankruptcy Code; and (iii) to retain Kurtzman Carson Consultants LLC as website administrative agent (the "Information Protocol Motion").  The order approving the Information Protocol Motion was entered on March 23, 2009.

**E.  Professional Retention.**

The Debtors applied for an order authorizing the retention of Sidley Austin LLP ("Sidley") as their general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code on February 5, 2009 (the "Sidley Retention").  The order approving the Sidley Retention was entered on February 23, 2009.

The Debtors also filed an application to retain Young Conaway Stargatt & Taylor, LLP ("YCST") as Delaware bankruptcy co-counsel in these Chapter 11 Cases (the "YCST Retention"). The YCST Retention was filed on February 19, 2009 and the application was approved by an order entered on March 6, 2009.

Additionally, the Debtors filed an application to retain Armstrong Teasdale, LLP as special counsel to the Debtor.  The application was filed on February 5, 2009 and the application was approved by an order entered on February 23, 2009.

The Debtors filed an application to retain Lazard Fréres & Co., LLC ("Lazard") as their investment banker and financial advisors (the "Lazard Retention") on February 5, 2009.  The order approving the Lazard Retention was entered on February 23, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval: (i) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and Balloting agent; (ii) PricewaterhouseCoopers, LLP, as financial advisors and tax advisors; (iii) Ernst & Young LLP, as auditors, tax advisors, and risk advisory services provider; (iv) Hewitt Associates LLC, as compensation consultants; (v) State Tax Solutions LLC,

as special counsel for the recovery and recoupment of excessive tax payments; (vi) The Levin Group LP, as strategic and financial advisors; (vii) Studley, Inc., as real estate broker; (viii) Grubb & Ellis Co., as real estate broker; and (ix) KPMG LLP, as fresh start valuation consultants. The Debtors have retained Stikeman Elliott LLP as their Canadian Counsel.

In addition, the Debtors filed a motion seeking authorization to retain, employ, and compensate certain professionals utilized in the ordinary course of the Debtors' business (the "Ordinary Course Motion"). The Ordinary Course Motion was approved by order entered February 23, 2009.

On June 19, 2009, the Bankruptcy Court entered an order (i) appointing Warren H. Smith & Associates, P.C. as the fee auditor, effective *nunc pro tunc* as of May 19, 2009, to act as special consultant to the Bankruptcy Court for professional fee and expense review and analysis and (ii) establishing uniform procedures for the review, allowance and payment of fees and expenses of (a) all professionals employed pursuant to section 327, 328, 1103 or 1106 of the Bankruptcy Code, including professionals retained by the Debtors and by the Committee, (b) all members of the official committees, and (c) any claims for reimbursement of professional fees and expenses under section 503(b) of the Bankruptcy Code, to ensure compliance with section 330 of the Bankruptcy Code and other applicable rules and guidelines.

On ~~November 30, 2009, the Debtors filed an application to retain~~December 16, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of Spencer Stuart as search consultant under section 327(a) and 328(a) of the Bankruptcy Code, nunc pro tunc to October 2, 2009 (the "Spencer Stuart Retention"), with a hearing scheduled for December 18, 2009.). As the unsecured creditors will be the future owners of the reorganized Debtors, the Committee and the Debtors have agreed to allow certain members of the Committee to actively participate in identifying, interviewing and selecting qualified candidates for the board of directors of Reorganized SSCC. Spencer Stuart will assist the Debtors and Committee in their search for seven independent directors to serve on the board of directors of Reorganized SSCC. The identity of the seven independent directors will be disclosed in a Plan Supplement. On or promptly after the Effective Date, the ~~board~~initial Board of ~~directors~~Directors of Reorganized SSCC shall select a ~~new Chairman~~non-executive Chairman of the Board of Directors of Reorganized SSCC; provided, however, that nothing in the Plan or in the Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC after the Effective Date.

## F.  **Cross-Border Insolvency Protocol.**

To facilitate coordination between the Chapter 11 Cases and the CCAA Proceedings, the Debtors filed a motion seeking approval of a Cross-Border Insolvency Protocol (the "Protocol"). The Bankruptcy Court entered an order approving the Protocol on March 10, 2009. The Canadian Debtors also submitted the Protocol to the Canadian Bankruptcy Court, and the CCAA Monitor recommended that the Canadian Bankruptcy Court approve the Protocol on March 6, 2009. The Protocol provides that its purpose is to effectuate an orderly and efficient administration of the Chapter 11 Cases and CCAA Proceedings (collectively, the "Proceedings") and to maintain the

respective independent jurisdiction of the Canadian Bankruptcy Court and the Bankruptcy Court. The Canadian Bankruptcy Court shall have sole and exclusive jurisdiction over the CCAA Proceedings, and the Bankruptcy Court shall have sole and exclusive jurisdiction over the Chapter 11 Cases. The Bankruptcy Court and the Canadian Bankruptcy Court may coordinate activities, communicate with one another and conduct joint hearings. The Protocol provides that any creditors or other interested parties have the right to be heard in the Canadian Bankruptcy Court or the Bankruptcy Court as if the party was domiciled in the forum country, subject to any local rules or regulations generally applicable to all parties appearing in the forum, provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the relevant court. An appearance by the Committee in the CCAA Proceedings, however, shall not form a basis for personal jurisdiction in Canada over the members of the Committee.

**G.    Substantive Matters in the Proceedings.**

**1.    Exclusive Procedures for Section 503(b)(9) Claims.**

By its order dated March 10, 2009, the Bankruptcy Court entered an order establishing and implementing exclusive, global procedures for the allowance of claims under 11 U.S.C § 503(b)(9) relating to goods received within 20 days prior to the Petition Date (the "503(b)(9) Order"). Pursuant to the 503(b)(9) Order, all creditors asserting claims under 11 U.S.C. § 503(b)(9) must have done so prior to the Bar Date (defined below).

**2.    Extension of Time to Remove Actions.**

Pursuant to an order entered on May 5, 2009, the Bankruptcy Court extended the time within which the Debtors may seek to remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rules 9027 and 9006 (the "Removal Period") through August 24, 2009. On August 21, 2009, the Debtors filed a motion seeking to further extend the Removal Period, and on September 9, 2009, the Bankruptcy Court entered an order further extending the Removal Period through December 22, 2009. On December 21, 2009, the Debtors filed their third motion to further extend the Removal Period. This motion is set to be heard by the Bankruptcy Court at the January 14, 2010 omnibus hearing.

**3.    Executory Contracts and Unexpired Leases.**

On February 23, 2009, the Bankruptcy Court entered an order approving the Debtors' first omnibus motion to reject executory contracts and unexpired leases, which authorized the rejection of approximately sixty-nine (69) executory contracts and twelve (12) leases of vacant office and plant space, resulting in annual cost savings to the Debtors of over $3 million. Since that time, the Bankruptcy Court has entered orders approving the Debtors' second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth ~~and,~~ fifteenth and sixteenth omnibus motions to reject executory contracts and unexpired leases, on March 10, 2009, March 23, 2009, April 7, 2009, April 21, 2009, May 5, 2009, May 20, 2009, June 4, 2009, June 19, 2009 July 8, 2009, August 17, 2009, September 8, 2009, September 30, 2009, October 19, 2009, November 16, 2009 and ~~November~~December 16, 2009, respectively, resulting in the rejection of approximately seventy-~~seven~~nine (~~77~~79) additional unexpired leases and the rejection of approximately one hundred ~~three~~nine (~~103~~109) additional executory contracts.

On April 15, 2009, Debtors filed a motion requesting a ninety (90) day extension of the deadline for the Debtors to assume or reject their remaining leases of nonresidential real property. The Bankruptcy Court approved the motion by order entered on May 7, 2009 and extended the time to assume or reject leases of nonresidential real property through and including August 24, 2009. On August 19, 2009 the Bankruptcy Court entered an order authorizing the Debtors to assume approximately one hundred twenty (120) unexpired leases of non-residential real property.

**4.  Asset Sales.**

(a)  1424 S. Raymond Avenue, Fullerton, California

On June 5, 2009, the Debtors filed a motion seeking the Bankruptcy Court's approval of the sale of that certain real property located at 1424 S. Raymond Avenue, Fullerton, California (the "Fullerton Property"), free and clear of all liens, claims and encumbrances (except for certain permitted exceptions) to Western Realco, LLC for $8,250,000.00, or to any bidder who presented a higher and better offer. The Fullerton Property was owned by SSCE and was no longer being used in the Debtors' business operations. The Fullerton Property consists of 14.91 acres and contains approximately 192,500 square feet of existing structures in addition to several concrete loading platforms, all of which would require demolition. The purchase agreement between Western Realco, LLC and SSCE provided that Western Realco, LLC would pay $8,250,000 in cash for the Fullerton Property. The Debtors established procedures whereby other parties could submit higher and better bids for the Fullerton Property, however no other parties submitted bids for the property. The Bankruptcy Court entered an order approving the sale of the Fullerton Property on July 6, 2009, and entered an amended order approving the sale on July 8, 2009.

(b)  Canadian Timberlands

On July 30, 2009, the Debtors filed a motion seeking (i) the Bankruptcy Court's approval of a sale of approximately 962,204 acres of timberlands located in Québec, Canada (the "Timberlands") and (ii) authorization to (a) enter into and perform all of the Debtors' obligations under the asset purchase agreement, (b) assume and assign certain executory contracts and unexpired leases, (c) share a portion of the sale proceeds with AbitibiBowater Inc. ("Abitibi"), (d) enter into a wood fiber supply agreement with Abitibi, (e) pay all related transaction costs, and (f) reject certain existing wood supply agreements with Abitibi (the "Timberlands Motion"). SSC Canada, the owner of the Timberlands, proposed to sell the Timberlands and certain related assets and operations, free and clear of all rights, claims, liens, security interests and other encumbrances, to Société générale de financement du Québec, an investment arm of the provincial government of Québec for CAD$60,400,000 (based on the exchange rate reported for July 29, 2009, approximately US$55,374,720). The Canadian Debtors also sought approval of this transaction in the CCAA Proceedings on July 30, 2009.

The purchase agreement for the Timberlands required the Debtors to terminate the existing cutting and harvesting agreements between the Debtors and Abitibi and required Abitibi to release the Debtors from all obligations going forward. To replace the terminated agreements, SSCE, SSC Canada and Abitibi proposed to enter into a wood fiber supply agreement to ensure a supply of wood fiber for SSC Canada's paper mill located in La Tuque, Québec. Additionally, the Debtors proposed to share with Abitibi fifty percent (50%) of the net proceeds of the sale derived from a

71

portion of the Timberlands representing approximately ninety-eight percent (98%) of the total surface area (approximately CAD$28 million).  Abitibi held a right of first refusal in connection with a sale of that portion of the Timberlands, and agreed to waive the right of first refusal in exchange for a share of the sale proceeds attributable to that portion of the Timberlands.  The Bankruptcy Court entered an order approving the Timberlands Motion on August 14, 2009, and the Canadian Bankruptcy Court approved the Timberlands Motion on August 17, 2009.  The sale of the Timberlands closed on September 11, 2009, and the proceeds of the sale were received on October 23, 2009, except for $1 million held in escrow pending the satisfaction of certain title matters relating to a small number of parcels included in the transaction, which is expected to be released by the end of January 2010.  The proceeds were then applied on October 26, 2009 to pay down portions of the Canadian term loan issued under the DIP Facility.

(c)     De Minimis Asset Sales

In order to establish a framework to effect sales and other dispositions of relatively modest value, the Debtors filed a motion to set procedures for the sale, transfer or abandonment of de minimis assets ("De Minimis Sales Motion").  Pursuant to an order of the Bankruptcy Court approving the procedures set forth in the De Minimis Sales Motion, dated March 11, 2009 (the "De Minimis Sales Order"), the Debtors have pursued several such asset sales. [2627]  The De Minimis Sales Order provides that, for transactions with a selling price equal to or less than $500,000, the Debtors are authorized to consummate the sale without providing notice to interested parties and without the need for any further authorization from the Bankruptcy Court so long the Debtors determine that the transaction is in the best interests of their estates and otherwise complies with the De Minimis Sales Order, and so long as the sale is consistent with the terms of the DIP Facility.

The De Minimis Sales Order further provides that, for transactions with a selling price greater than $500,000 but less than or equal to $5 million, the Debtors are authorized to consummate the sale without further authorization of the Bankruptcy Court after the Debtors provide at least five business days written notice of each sale to certain notice parties.  If there are no written objections filed within the five business day notice period, the Debtors are authorized to immediately consummate such sale after the entry of an order approving such sale under certification of counsel.  If written objections are filed, the sale will only proceed upon either the consensual resolution of the objection or further order of the Bankruptcy Court after notice and a hearing.

The Debtors filed their quarterly reports of such sales on April 22, 2009, July 30, 2009, and October 30, 2009.  As reported in the first quarterly report, second quarterly report and third quarterly report, the Debtors have reported fifty-four (54) sales of equipment, trailers, a warehouse, and other assets pursuant to the procedures for transactions with a selling price equal to or less than $500,000.  Additionally, the Debtors have ~~completed five (5) sales and have one (1) sale pending~~ sold certain property pursuant to the procedures for transactions with a selling price greater than $500,000 but less than or equal to $5 million.  Under such procedures, the Debtors sold or have received authority to sell the following assets: (i) a mill in Carthage, Indiana, (ii) real property in St. Joseph, Missouri, (iii) Coastal Particulate Matter less than 10 microns (PM10) Short

---

[2627] The CCAA Initial Order similarly provides for the sale, transfer or abandonment of de minimis assets, not to exceed CAD$2,000,000 for any one transaction or CAD$25,000,000 in the aggregate.

CH1 ~~5049998~~5118439v.~~7~~4

Term Emission Reduction Credits, (iv) real property in Fresno, California, (v) a sawmill business in Homerville, GA ~~and~~, (vi) real property in New Richmond, Quebec, Canada.[27] ~~The Debtors are currently in the process of obtaining authority, pursuant to the De Minimis Sales Order, to sell the following assets (a~~: (vii) real property in Portage-du-Fort, Quebec, Canada, (~~b~~viii) real property in Edmonton, Alberta, Canada, (~~c~~ix) real property in Bathurst, New Brunswick, Canada, and (~~d~~x) real property in Whitby, Ontario, Canada.

### 5.    Hodge Trustee's Motion for Payment of Administrative Expenses.

On April 24, 2009, U.S. Bank Trust National Association, as Indenture Trustee (the "<u>Hodge Trustee</u>") for the Village of Hodge Louisiana Combined Utility System Bonds filed a motion seeking entry of an order (i) allowing an administrative expense priority claim against SSCE's estate in the amount of not less than $17,599,249.23; and (ii) compelling the Debtors to immediately pay the outstanding obligations due and owing associated with the administrative expense claim.

The Debtors operate a paper manufacturing facility located in Hodge, Louisiana (the "<u>Hodge Mill</u>").  In connection with the manufacturing operations of the Hodge Mill, the Debtors use large amounts of electricity, steam, water, and treatment and disposal services for sewage and industrial waste (the "<u>Contract Services</u>").  The Debtors receive the Contract Services pursuant to the terms of a Utility Contract dated as of March 1, 1972, by and between SSCE and the Village of Hodge, as amended on January 1, 1990, and December 1, 2003 (the "<u>Utility Contract</u>").  In consideration of receiving the Contract Services, the Debtors are required to pay the Village of Hodge the amounts set forth under the Utility Contract.  The Hodge Trustee asserts that the Debtors have refused to pay the amounts that have come due after the Petition Date under the Utility Contract.

On May 14, 2009, the Debtors filed an opposition to the Hodge Trustee's Motion.  The Debtors submit that the Debtors have continued to pay all of the costs relating to the actual operation and maintenance of the utility facilities.  The Debtors have not paid the debtor service portions of the utility contract that are for the benefit of the bondholders, because the Debtors believe that such amounts are not administrative expenses and do not benefit the estate.  The Bankruptcy Court entered a Scheduling Order applying to this contested matter on July 7, 2009.  On November 13, 2009, the Debtors filed a motion for summary judgment on this matter.  On November 23, 2009, the Hodge Trustee filed a cross-motion for summary judgment on this matter.  ~~An evidentiary hearing, if necessary, will occur between~~On December ~~14 and December 17,~~2, 2009 ~~as ordered by~~ the Bankruptcy Court~~.~~ entered an Agreed Revised Scheduling Order with respect to this matter.  On December 8, 2009 the Debtors filed a brief opposing the Hodge Trustee's cross-motion for summary judgment and in support of their brief for summary judgment.  On December 15, 2009, the Hodge Trustee filed a reply brief in further support of its cross-motion for summary judgment.  A hearing on the parties' cross-motions for summary judgment will be conducted on January 6, 2010.

---

[27] ~~The Debtors have obtained authority from the Bankruptcy Court to sell the real property in New Richmond, Quebec, but the transaction has not yet closed.~~

6.      **Georgia Pacific Litigation.**

On July 23, 2008, Georgia-Pacific Corrugated I, LLC and GNN Investor, LLC (collectively "Georgia-Pacific") and SSCE entered into a purchase agreement wherein SSCE agreed to purchase and Georgia-Pacific agreed to sell that certain parcel of real property located at 210 Grove Street, Franklin, Norfolk County, Massachusetts and certain personal property associated therewith for a purchase price of $15 million. In connection with that purchase agreement, SSCE entered into an escrow agreement and deposited $1 million with Land America Title Insurance Company as earnest money to be applied against the agreed purchase price at closing. Georgia-Pacific and SSCE never closed the contemplated transaction.

On January 15, 2009, Georgia-Pacific filed a complaint for breach of contract in the Superior Court of Fulton County, Georgia against SSCE in the action styled *Georgia Pacific Corrugated I, LLC et al. v. Smurfit-Stone Container Enterprises, Inc.*, Civil Action No., 2009 CV 163117. Subsequent to the Petition Date, on May 4, 2009, an order was entered staying the action pending in state court. On June 1, 2009, Georgia-Pacific instituted an adversary proceeding in this Bankruptcy Court by filing a complaint for breach of contract and seeking declaratory and injunctive relief against SSCE. On September 11, 2009, SSCE filed a motion seeking the Bankruptcy Court's approval of the settlement agreement reached between Georgia-Pacific and SSCE. The settlement agreement provided that the parties would direct the escrow agent to disburse $700,000 of the $1 million to Georgia-Pacific and to disburse the remaining funds, including any accrued interest, to SSCE. The settlement agreement shall not constitute an admission of liability as to the facts alleged in the actions or an admission as to whether the funds held in escrow were property of the estate. Furthermore, the settlement agreement provides that Georgia-Pacific and SSCE agree that after the funds are disbursed, any and all claims arising from the purchase agreement , escrow agreement, and settlement agreement will be waived and released, provided, however, that the settlement agreement should not be interpreted to waive, release, or settle any other claims between or among Georgia-Pacific and Smurfit. The action pending in state court and the adversary proceeding will be dismissed with prejudice. The Bankruptcy Court approved the Georgia-Pacific and SSCE settlement agreement in an order entered on October 13, 2009.

7.      **i2i Europe, ltd. Adversary Proceeding.**

i2i Europe, ltd. ("i2i Europe") is a United Kingdom corporation that operates a design center in United Kingdom, and is a joint venture between SSCE and Weedon Holdings Ltd. ("Weedon Holdings"). i2i Europe was formed on October 24, 2005, by the execution of three agreements: the Shareholders Agreement, Sales Broker Agreement and Noncompetition Agreement, each of which is governed by English law.

On September 11, 2009, the Debtors filed the Thirteenth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code (the "Rejection Motion"), formally seeking to reject the Noncompetition Agreement and Sales Broker Agreement. i2i Europe filed an objection to the Rejection Motion on September 23, 2009. On the same day, i2i Europe initiated an adversary proceeding by filing a complaint seeking entry of an order enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information in alleged

CH1 ~~5049998~~5118439v.~~7~~4

violation of the Noncompetition Agreement. i2i Europe also filed a motion seeking entry of a temporary restraining order and preliminary injunction enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information.

On October 5, 2009, SSCE filed a motion seeking authority pursuant to ~~Section~~section 554(a) of the Bankruptcy Code for SSCE to abandon SSCE's shares of i2i Europe (the "Abandonment Motion"). i2i Europe objected to the Abandonment Motion on October 15, 2009. At the October 20, 2009 hearing, the Bankruptcy Court adjourned the matter until a hearing on October 27, 2009.

At the October 27, 2009 hearing, the Court entered an order approving the terms of a settlement agreement between the Debtors and i2i Europe. The result of such settlement agreement, generally, was that the Debtors transferred their ownership interest in i2i Europe to Weedon Holdings in addition to paying Weedon Holdings $290,000. Simultaneously, Weedon Holdings paid $45,000 to an Asian subsidiary of SSCE to settle ordinary course business balances. Finally, all agreements among and between the Debtors, i2i Europe and Weedon Holdings were terminated and all pleadings in the Bankruptcy Court related to such agreements and parties were withdrawn.

### 8.    Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders.

Caspian Capital Advisors ("Caspian") filed a motion for an order appointing an official committee of equity security holders (an "Equity Committee") of SSCC (the "Equity Committee Motion") on August 20, 2009. The Equity Committee Motion followed a letter dated August 7, 2009, that Caspian sent to the U.S. Trustee requesting the appointment of an Equity Committee. In the Equity Committee Motion, Caspian asserted that it was an investment manager on behalf of certain entities and currently held shares of SSCC in excess of fourteen percent (14%) of the issued and outstanding 7% Series A Preferred Stock of SSCC. Caspian argued that the shareholders of SSCC will not be adequately represented in the Debtors' Chapter 11 Cases without the appointment of an official committee. Caspian further argued that the Debtors' financial outlook was improving, that the common stock and preferred stock of SSCC were widely held and actively traded, that the complexity of the Chapter 11 Cases warranted the appointment of an Equity Committee, that the request was timely, and that the need for adequate representation of shareholders outweighed the costs associated with an official Equity Committee. Fiduciary Counselors Inc. filed a joinder to the Equity Committee Motion on September 21, 2009. On September 28, 2009, Smith Management LLC filed a statement in support of the Equity Committee Motion.

The Debtors, the Committee, and the U.S. Trustee each filed objections to the Equity Committee Motion. The Debtors argued Caspian failed to establish that there was a substantial likelihood that the equity holders would receive a meaningful distribution or that equity holders' interests were not represented without an official equity committee. Furthermore, the Debtors argued that the significant costs associated with an official Equity Committee would not justify the minimal benefit, if any, in appointing an Equity Committee. Mariner Investment Group, LLC filed a reply to the objections of the U.S. Trustee, the Committee, and the Debtors, and the Bankruptcy Court held a hearing on the Equity Committee Motion on September 30, 2009. The

Bankruptcy Court held that the moving parties had not met the heavy burden required to demonstrate the need to appoint an Equity Committee, but the Bankruptcy Court adjourned the matter until the December 4, 2009 hearing to allow for a more substantive hearing.

After further briefing, and submission by Caspian of the report of Moelis & Company (the "Moelis Report") and by the Debtors of the rebuttal report of Lazard in opposition to the Equity Committee Motion (the "Lazard Report"), on December 4, 2009, the Bankruptcy Court heard further oral arguments on this matter. On December 10, 2009, the Bankruptcy Court entered a memorandum order denying the relief requested in the Equity Committee Motion (the "Equity Order"). In the Equity Order, the Court found the aggregate secured and unsecured Claims in the Proceedings to total at least $5.627 billion, and cited the "comparable company" and "precedent transaction" analyses in the Lazard Report in finding that the estimated range of values for the Debtors "falls (at best) between $700 million and $900 million short of the point at which distributable value is likely to be available for shareholders."

9.      **Stone FinCo II Motion.**

On October 7, 2009, Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P., fund managers for funds holding a majority of the 7 3/8% Notes (together, the "Stone Finance II Fund Managers"), brought a motion before the Canadian Bankruptcy Court with the support of the indenture trustee, M&T. Referencing (amongst other things) the fact that the proceeds of the issuance of the 7 3/8% Notes were ~~lent~~advanced to SSC Canada pursuant to an intercompany loan agreement dated July 20, 2004, the Stone Finance II Fund Managers sought, among other things, an order: (a) declaring that the interests of the officers and directors of Stone FinCo II, the Canadian Monitor and counsel to the Canadian Debtors conflict irreconcilably with the interests of Stone FinCo II; (b) declaring that counsel to the Canadian Debtors cannot continue to act for Stone FinCo II; (c) directing the officers and directors of Stone FinCo II to file an assignment in bankruptcy under the *Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B-3, as amended, in respect of Stone FinCo II; and (d) discharging the Canadian Monitor vis-à-vis Stone FinCo II.

The Canadian Debtors opposed the motion with the support of the Canadian Monitor and the Committee and, on October 20, 2009, the Canadian Bankruptcy Court released its endorsement, dismissing the motion. In its endorsement, the Canadian Bankruptcy Court directed the parties to address the issue of the proper characterization of Stone FinCo II's intercompany claim against SSC Canada. ~~Subject to further direction from the Canadian Bankruptcy Court, the Applicants and Partnerships intend to bring~~The Applicants subsequently brought a motion to resolve the characterization and amount of the Stone FinCo II intercompany claim, which ~~is tentatively scheduled for December 11, 2009,~~the Canadian Bankruptcy Court heard on December 11, 2009, and which relief was supported by the Canadian Monitor and the Committee. The Canadian Bankruptcy Court's decision on the Applicants' motion is currently under reserve.

10.     **Motions to Lift or Modify the Automatic Stay.**

Numerous motions have been filed seeking to lift or modify the automatic stay under section 362 of the Bankruptcy Code. Movants have sought to modify the automatic stay for reasons consisting of, but not limited to, continuing pre-petition litigation outside of the

Bankruptcy Court, filing actions in state court to perfect pre-petition mechanics' liens, compelling the Debtors to assume or reject executory contracts and effectuating setoffs of pre-petition payables and receivables. The Debtors have generally cooperated with movants in stipulating to mutually agreeable orders allowing limited relief from the automatic stay in these matters. In a few instances, automatic stay lift motions have been withdrawn without the need for stipulation by the Debtors.

## H. Administrative Matters in the Proceedings.

### 1. Schedules of Assets and Liabilities; Statements of Financial Affairs.

On April 6, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Among other things, the Debtors' Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such Claims. The Debtors' Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders", payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

On August 26, 2009, SSCE filed its amended Schedule F to its Schedules [Docket No. 1765], which lists creditors holding unsecured nonpriority claims. On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F to the Schedules [Docket Nos. 2214, 2217 and 2216, respectively]. On October 15, 2009, SSCE again filed an amended Schedule F to its Schedules [Docket No. 2313].

### 2. Filing Claims and Bar Date.

On June 12, 2009, the Debtors filed the Motion of the Debtors for an Order Pursuant to Bankruptcy Rule 3003(c)(3), and Local Rule 2002-1(e) Establishing Certain Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion"). In the Bar Date Motion, the Debtors requested that the Bankruptcy Court establish certain deadlines for filing Proofs of Claim (as defined in the Bar Date Motion). Specifically, the Debtors requested that the Bankruptcy Court (i) establish August 28, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the deadline for all persons and entities, including governmental units (as such term is defined in the Bankruptcy Code) holding a claim against any of the Debtors to file a proof of such claim in the Chapter 11 Cases, except as otherwise provided in the Bar Date Motion; (ii) except where a claim has previously been included in the Schedules (as defined in the Bar Date Motion) as disputed, contingent, or unliquidated, establish the later of (a) the Bar Date or (b) twenty (20) days after the holder of such claim is served with notice of the applicable amendment or supplement to the Schedules as the bar date for filing a Proof of Claim with respect to such amended claim; and (iii) except as otherwise set forth in any order authorizing rejection of an executory contract or unexpired lease, establish the later of (y) the Bar Date or (z) thirty (30) days after the entry of any order authorizing the rejection of an executory contract or unexpired lease, as the bar date by which a Proof of Claim for any damages resulting from the Debtors' rejection of such executory contract or unexpired lease must be filed.

The Bankruptcy Court approved the Bar Date Motion on June 22, 2009, and set August 28, 2009 at 4:00 p.m. prevailing Eastern Time as the Bar Date for filing proofs of claim against the Debtors in the Chapter 11 Cases on account of claims arising, or deemed to have arisen pursuant to section 501(d) of the Bankruptcy Code, prior to the Petition Date (the "Pre-petition Claims"). Each person or entity asserting a ~~pre~~Pre-petition Claim against one or more of the Debtors was required to file a separate proof of claim that substantially complies with Official Bankruptcy Form 10 against each such Debtor so as to be actually received on or before the Bar Date by Epiq Bankruptcy Solutions, LLC; provided, however, proofs of claim filed against Canadian Debtors were accepted and considered timely in the Chapter 11 Cases if received by the CCAA Monitor prior to the expiration of the Canadian Bar Date (as defined below), and pursuant to the claims procedures established in the CCAA Proceedings.

On June 25, 2009, the Canadian Bankruptcy Court issued an order approving certain notice procedures and procedures for filing proofs of claim against the Canadian Debtors (the "Canadian Claims Procedure Order"). In the Canadian Claims Procedure Order, the Canadian Bankruptcy Court set the bar date for filing proofs of claim in respect of pre-petition claims against the Canadian Debtors ("Claims") as August 28, 2009 (the "Canadian Bar Date") and the bar date for filing claims arising as a result of or in connection with the repudiation, termination or restructuring of any contract, lease or other agreement after the Petition Date ("Subsequent Claims") as the later of the Canadian Bar Date and the date established for such purpose by the Canadian Bankruptcy Court or the Bankruptcy Court ("Canadian Subsequent Claims Bar Date"). Holders of Claims or Subsequent Claims against the Canadian Debtors must have filed their proofs of claim with the CCAA Monitor so that they are actually received by the CCAA Monitor by the Canadian Bar Date or Canadian Subsequent Claims Bar Date, as the case may be. Proofs of claim filed against the Canadian Debtors in the Chapter 11 Cases are deemed Claims or Subsequent Claims timely filed in the CCAA Proceedings ("Deemed Canadian Claims") if the proofs of claim were properly and timely filed in accordance with the procedures established for filing claims in the Chapter 11 Cases.

On November 6, 2009, the Canadian Bankruptcy Court issued an order approving certain procedures for reviewing and determining the classification and amount of Claims and Subsequent Claims (the "Canadian Claims Determination Order"). Among other things, the Canadian Claims Determination Order directs the Canadian Debtors and the CCAA Monitor to review each proof of claim and determine whether to accept, revise or disallow each Claim or Subsequent Claim in the CCAA Proceedings. Any holder of a Claim or Subsequent Claim that disputes the classification or amount of its Claim or Subsequent Claim may deliver a Notice of Dispute, at which time the Canadian Debtors and the CCAA Monitor may (a) attempt to consensually resolve the classification and amount of the Claim or Subsequent Claim, (b) send the dispute to a "Claims Officer", or (c) schedule a motion with the Canadian Bankruptcy Court to resolve the Claim or Subsequent Claim.

Despite the foregoing, the Canadian Debtors and the CCAA Monitor have the ability, subject to objection by the creditor, to elect to resolve Deemed Canadian Claims in the Chapter 11 Proceedings by objecting to the Claim or Subsequent Claim in those proceedings rather than in the CCAA Proceedings. Deemed Canadian Claims resolved in the Chapter 11 Proceedings shall be deemed to have been accepted as proven claims in the CCAA Proceedings on those terms. If the holder of a Claim or Subsequent Claim objects to the choice of forum and the issue cannot be

resolved consensually, a joint hearing may be requested under the Protocol to resolve the choice of forum.

As of the Bar Date, the Debtors' Claims Agent and the CCAA Monitor received approximately 13,800 timely filed Proofs of Claim that totaled, along with the scheduled Claims against the Debtor, approximately $64 billion. However, the Debtors believe that many of the Claims filed in the Chapter 11 Cases are invalid, untimely, duplicated and/or overstated. The Debtors are in the process of evaluating the Proofs of Claim and anticipate that they will continue filing objections to many of the Proofs of Claim. The Debtors believe that, following reconciliation of filed and scheduled Claims, the estimated Allowed Amount of Claims in each Class will be as set forth in the summary chart included in ~~section~~Section II.B~~.~~ of this Disclosure Statement.

### 3.    Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3") which became effective on December 1, 2008. Pursuant to Rule 2015.3, the Debtors are required to file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). The Debtors hold a direct ownership interest of at least fifty percent (50%) in nine (9) non-debtor entities and hold direct ownership interests of between twenty percent (20%) and fifty percent (50%) in nineteen (19) non-debtor entities. Because of the nature of the Debtors' interest in these entities, compliance with Rule 2015.3 and the production of the 2015.3 Reports presented challenges to the Debtors in terms of, among other things, achieving workable reporting mechanics. On February 19, 2009, the Debtors filed a motion seeking additional time to file their initial 2015.3 Reports or seek a modification of such reporting requirements and subsequently on March 19, 2009, filed an additional motion requesting another extension of time to file their 2015.3 Reports (the "2015.3 Extension Motions"). On April 22, 2009, the Debtors filed a motion to approve a modification of the Rule 2015.3 reporting requirements. The Debtors requested that the reporting requirements be (i) modified for non-Debtor entities in which the Debtors maintained a direct ownership of at least fifty percent (50%) of the interests and (ii) waived for all other non-Debtor entities. This matter has been adjourned until the ~~December 18, 2009~~January 14, 2010 hearing.

### 4.    Exclusivity Period.

On May 1, 2009, the Debtors filed a motion requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances thereto (the "Exclusivity Motion"). In the Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including September 23, 2009, and the extension of the exclusive right to solicit acceptance of such plan through and including November 23, 2009. By order entered May 20, 2009, the Bankruptcy Court granted the relief requested in the Exclusivity Motion.

On August 24, 2009, the Debtors filed a motion requesting a further extension of the Debtors' exclusive period within in which to file a chapter 11 plan and solicit acceptances thereto (the "Second Exclusivity Motion"). In the Second Exclusivity Motion, the Debtors requested an

extension of the exclusivity period through and including January 21, 2010, and the extension of the exclusive right to solicit acceptance of such plan through and including March 23, 2010.  On September 9, 2009, the Bankruptcy Court granted the relief requested in the Second Exclusivity Motion without prejudice to the Debtor's right to seek further extensions of the exclusivity period and the extension of the exclusive right to solicit acceptances of the plan.  The Debtors anticipate seeking a further extension of the exclusivity periods before January 21, 2010.

## I.      Avoidance Actions.

Certain transactions that occurred prior to the Petition Date may have given rise to claims, including preference actions, fraudulent transfers, and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law.

### 1.      Preference Actions.

Under section 547 of the Bankruptcy Code, a debtor may seek to avoid and receive certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made.  Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing a petition under chapter 11 of the Bankruptcy Code (the "Preference Period").  Under section 547 of the bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought.  Among other defenses, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period.  The creditor has the initial burden of proof as to the aforementioned defenses.

### 2.      Fraudulent Transfer and Conveyance Actions.

Under sections 548 and 544 of the Bankruptcy Code, a debtor may seek to recover certain fraudulent transfers and conveyances.  Generally, a conveyance or transfer is fraudulent if (i) it was made with the actual intent to hinder, delay, or defraud a creditor (i.e., an intentional fraudulent conveyance or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and (a) the debtor was insolvent at the time of the transfer, (b) was rendered insolvent as a result of the transfer or (c) was left with insufficient capitalization as a result of the transfer (i.e., a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyances law exist in a chapter 11 case.

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred within two years before the date the bankruptcy case was filed.

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code – the so-called strong arm provision – under which the debtor in possession (or creditors with bankruptcy court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent. State fraudulent conveyance laws generally have statutes of limitations longer than two years and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case. If such statute of limitations has not yet expired, the debtor in possession (or creditors with bankruptcy court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the statute of limitations period expires prior to the expiration of such time.

## V.  THE PLAN OF REORGANIZATION

The following sections describe and summarize the proposed Plan for the resolution of outstanding Claims against and Interests in the Debtors. The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor. The Plan shall also serve as the CCAA Plan for the Canadian Debtors in the CCAA Proceedings.

The Plan provides for the coordinated restructuring and compromise of all Claims against and Interests in the Debtors in both the Chapter 11 Cases and the CCAA Proceedings. The effectiveness of the Plan in the Chapter 11 Cases is conditioned upon the effectiveness and implementation of the CCAA Plan in the CCAA Proceedings, and the effectiveness of the CCAA Plan in the CCAA Proceedings is conditioned upon the effectiveness and implementation of the Plan in the Chapter 11 Cases. The Debtors will seek the confirmation of the Plan by the Bankruptcy Court and the sanction of the CCAA Plan by the Canadian Bankruptcy Court.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT HAVE NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT DO CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS ~~SECTION~~ARTICLE V OF ~~THE~~THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS ~~SECTION~~ARTICLE V OF ~~THE~~THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**A.  Classification and Allowance of Claims & Equity Interests Generally.**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors.  Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests.  Only holders of Allowed Claims are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

**B.  Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases.**

In accordance with ~~Section~~section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims have not been classified for purposes of the Chapter 11 Cases and therefore are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases is set forth below.

**1.  Administrative Expense Claims.**

Subject to the provisions of ~~Sections~~sections 328, 330, 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, on either: (i) the latest to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Distribution Date after such Administrative Expense Claim becomes an Allowed Claim, and (c) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, (x) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (y) such other treatment as the Debtors and the Holder of such Administrative Expense Claim shall have agreed; provided, however, that (aa) Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of the Reorganized Debtors' business operations and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations; and (bb) Allowed Administrative Expense Claims against SSC Canada or Smurfit-MBI that are not yet due

on the Effective Date, or that represent obligations incurred by SSC Canada or Smurfit-MBI in the ordinary course of their business operations after the Petition Date, shall be assumed by Canadian Newco pursuant to the Asset Purchase Agreement and shall be paid or performed by Canadian Newco when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations.

If all Classes of Impaired Claims against a particular Debtor vote to accept the Plan, such Debtor may agree to waive, and may not receive any distributions under the Plan on account of, any Post-Petition Intercompany Claims held by such Debtor. On the other hand, if any Class of Impaired Claims against a particular Debtor votes to reject the Plan, any Post-Petition Intercompany Claims held by such Debtor shall be paid in full in cash on the latest to occur of (i) the Effective Date and (ii) the date on which such Post-Petition Intercompany Claim becomes payable in the ordinary course of the Debtors' business operations; provided, however, that any Post-Petition Intercompany Claim may be cancelled, waived, subordinated or reinstated, in full or in part, in the Debtors' sole discretion, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liability, or for any other reason.

## 2. No Double Payment of Administrative Expense Claims.

To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Administrative Expense Claim. In addition, to the extent any obligation that would otherwise constitute an Administrative Expense Claim is paid as a CCAA Charge in the CCAA Proceedings, the payment of such CCAA Charge in the CCAA Proceedings shall be the only payment on account of such Administrative Expense Claim under the Plan.

## 3. DIP Facility Claims.

The DIP Facility Claims shall be Allowed on the Effective Date pursuant to the Plan. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall pay all Allowed DIP Facility Claims (if any) in full in cash on the Effective Date. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall either be (i) returned to the issuer undrawn and marked canceled or, (ii) cash collateralized with cash in an amount equal to 105% of the face amount of such outstanding letter of credit, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such outstanding letter of credit and in form and substance acceptable to the issuer thereof.

## 4. Priority Tax Claims.

Except to the extent that the Debtors and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim on the later

of the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and the first Distribution Date after such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, or (ii) pursuant to ~~Section~~section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

## C. Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases.

### 1. Summary of Classification and Treatment of Classified Claims and Interests.

(a) General

(i) Pursuant to ~~Sections~~sections 1122 and 1123 of the Bankruptcy Code, Claims against and Interests in the Debtors are classified for all purposes, including, without express or implied limitation, voting, confirmation and distributions pursuant to the Plan, as set forth in the Plan and described in this Disclosure Statement. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for any purposes under the Plan.

(ii) The Plan does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan. Unless otherwise provided in the Plan or the Confirmation Order, Allowed Claims against a particular Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor by any of the other Debtors solely for purposes of consummating the Plan. Except as specifically set forth in the Plan, nothing in the Plan or ~~the~~this Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is liable for any Claims against any other Debtor. Claims that are asserted against multiple Debtors shall be treated as separate Claims against each applicable Debtor for all purposes (including, but not limited to, voting and distributions), provided that (i) there shall only be a single recovery on account of such Claims and the aggregate distributions to the Holders of

such Claims shall not exceed the largest Allowed amount of any such Claim against any particular Debtor, (ii) any distributions from a particular Estate on account of such Claims shall take into account the distributions to be made on account of such Claims by the other Estates, and (iii) such Claims shall be administered and treated in the manner set forth in the Plan and described below.

(iii)     All Claims against SSCE that are held by a single Holder as of the Record Date shall be deemed to be aggregated and shall be treated as a single Claim for purposes of classification and treatment as a Convenience Claim under the Plan, regardless of whether or not any such Claim is subsequently assigned, in whole or in part, to any other Person or Entity.

(iv)     For purposes of brevity and convenience, but with the same legal force and effect as if set forth at length in the Plan, the classification and treatment of Claims against and Interests in the Debtors under the Plan has been set forth in the following groups: (i) SSCC (Debtor 1), (ii) SSCE (Debtor 2), (iii) Cameo Container (Debtor 3), (iv) Calpine Corrugated (Debtor 4), (v) SSPRI (Debtor 5), (vi) the Non-Operating Debtors (United States) (Debtors 6 through 14), (vii) SSC Canada (Debtor 15); (viii) Smurfit-MBI (Debtor 16), (ix) MBI Limited (Debtor 17), (x) Stone FinCo II (Debtor 18), (xi) B.C. Shipper Supplies Ltd. (Debtor 19), (xii) Francobec Company (Debtor 20), (xiii) 3083527 Nova Scotia Company (Debtor 21), and (xiv) the Non-Operating Debtors (Canada) (Debtors 22 through 25).

(b)     Identification of Classes of Claims Against and Interests in the Debtors.

(i)     The following chart assigns a letter to each Class of Claims against or Interests in SSCC (Debtor 1) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | SSCC Preferred Interests[28] |
| G | SSCC Common Interests |

(ii)     The following chart assigns a letter to each Class of Claims against or Interests in SSCE (Debtor 2) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |

---

[28] The Debtors reserve the right, if and as appropriate, to classify any potential Subordinated Securities Claim against SSCC as either an SSCC Preferred Interest or an SSCC Common Interest, depending on the SSCC Interest on which such Subordinated Securities Claim is based, or in a separate Class of Subordinated Securities Claims.

| | |
|---|---|
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | Convenience Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(iii)  The following chart assigns a letter to each Class of Claims against or Interests in Cameo Container (Debtor 3) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(iv)  The following chart assigns a letter to each Class of Claims against or Interests in Calpine Corrugated (Debtor 4) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Union Bank Claims |
| D | CIT Group Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(v)  The following chart assigns a letter to each Class of Claims against or Interests in SSPRI (Debtor 5) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(vi)  The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |

| | |
|---|---|
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(vii)     The following chart assigns a letter to each Class of Claims against or Interests in SSC Canada (Debtor 15) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Stone FinCo II Intercompany Claim |
| G | Interests |

(viii)    The following chart assigns a letter to each Class of Claims against or Interests in Smurfit-MBI (Debtor 16) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(ix)     The following chart assigns a letter to each Class of Claims against or Interests in MBI Limited (Debtor 17) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(x)     The following chart assigns a letter to each Class of Claims against or Interests in Stone FinCo II (Debtor 18) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|

| | |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(xi)     The following chart assigns a letter to each Class of Claims against or Interests in B.C. Shipper Supplies Ltd. (Debtor 19) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(xii)     The following chart assigns a letter to each Class of Claims against or Interests in Francobec Company (Debtor 20) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(xiii)     The following chart assigns a letter to each Class of Claims against or Interests in 3083527 Nova Scotia Company (Debtor 21) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(xiv)     The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |

| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

2.    **Classification and Treatment of Claims Against and Interests in SSCC.**

(a)    Class 1A: Priority Non-Tax Claims Against SSCC

(i)    Classification:  Class 1A consists of all Priority Non-Tax Claims against SSCC.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 1A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 1A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 1A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 1A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 1A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 1B: Other Secured Claims Against SSCC.

(i)    Classification:  Class 1B consists of all Other Secured Claims against SSCC.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 1B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the

election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 1B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 1B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 1B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)    Class 1C: Prepetition Lender Claims Against SSCC.

(i)    Classification:  Class 1C consists of all Prepetition Lender Claims against SSCC.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.~~.  In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled ~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the

90

face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)    Voting:  Prepetition Lender Claims in Class 1C are Impaired.  Each Holder of an Allowed Prepetition Lender Claim in Class 1C shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Lender Claims in Class 1C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.5969.1 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 1D: General Unsecured Claims Against SSCC.

(i)    Classification:  Class 1D consists of all General Unsecured Claims against SSCC.

(ii)    Treatment:  Holders of General Unsecured Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)    Voting:  General Unsecured Claims in Class 1D are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 1D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)    Class 1E: Intercompany Claims Against SSCC.

(i)    Classification:  Class 1E consists of all Intercompany Claims against SSCC.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSCC may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax

or similar liabilities by SSCC or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 1E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 1E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 1E.

(f)     Class 1F: SSCC Preferred Interests.

(i)     Classification:  Class 1F consists of all SSCC Preferred Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Preferred Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.[29]

(iii)     Voting:  SSCC Preferred Interests are Impaired.  Each Holder of an SSCC Preferred Interest in Class 1F shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)     Class 1G: SSCC Common Interests.

(i)     Classification:  Class 1G consists of all SSCC Common Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Common Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Common Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  SSCC Common Interests are Impaired.  Each Holder of an SSCC Common Interest in Class 1G shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**3.     Classification and Treatment of Claims Against and Interests in SSCE.**

(a)     Class 2A: Priority Non-Tax Claims Against SSCE.

---

[29] In the event that the Debtors separately classify any Subordinated Securities Claims against SSCC, any such Claims shall be extinguished, cancelled and discharged as of the Effective Date, and any Holders thereof shall receive no distribution in respect of such Claims, pursuant to ~~Section~~section 1129(b)(2)(C) of the Bankruptcy Code.

CH1 ~~5049998~~5118439v.~~7~~4

(i)      Classification:  Class 2A consists of all Priority Non-Tax Claims against SSCE.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 2A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 2A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 2A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 2A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 2A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 2A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claim in Class 2A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 2B: Other Secured Claims Against SSCE.

(i)      Classification:  Class 2B consists of all Other Secured Claims against SSCE.

(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 2B shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 2B during the course of

93

the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii) Voting: Other Secured Claims in Class 2B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Class 2B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c) Class 2C: Prepetition Lender Claims Against SSCE.

(i) Classification: Class 2C consists of all Prepetition Lender Claims against SSCE.

(ii) Treatment: On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments~~. In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled, ~~or~~(y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii) Voting: Prepetition Lender Claims in Class 2C are Impaired. Each Holder of an Allowed Prepetition Lender Claim in Class 2C shall be entitled to vote to accept or reject the Plan.

94

(iv)     Allowance:  The Prepetition Lender Claims in Class 2C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.1 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 2D: Convenience Claims Against SSCE.

(i)     Classification:  Class 2D consists of all Convenience Claims against SSCE.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Convenience Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed Convenience Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Convenience Claim, the payment of one hundred percent (100%) of such Allowed Convenience Claim in cash.

(iii)     Convenience Class Election:  Each Holder of a Claim against SSCE that (i) is in an amount greater than [$10,000] and (ii) would otherwise be classified as a General Unsecured Claim against SSCE may elect to have its Claim treated as a Convenience Claim against SSCE by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Convenience Class Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.  All Convenience Claim Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)     Voting:  Convenience Claims in Class 2D are Impaired.  Each Holder of an Allowed Convenience Claim in Class 2D shall be entitled to vote to accept or reject the Plan.

(e)     Class 2E: General Unsecured Claims Against SSCE.

(i)     Classification:  Class 2E consists of all General Unsecured Claims against SSCE.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the New SSCC Common

95

Stock Pool; provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

(iii)    Cash-Out Election: Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction pursuant to the procedures set forth in Section 6.16 of the Plan by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline. Any Cash-Out Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim. All Cash-Out Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)    (iii) Voting: General Unsecured Claims in Class 2E Claims are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 2E shall be entitled to vote to accept or reject the Plan.

(v)    (iv) Allowance: The Prepetition Noteholder Claims in Class 2E shall be Allowed pursuant to the Plan in the aggregate principal amount of $2.275 billion (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset. The Industrial Revenue Bond Claims in Class 2E shall also be Allowed pursuant to the Plan, in the aggregate principal amount of $163.925105.840 million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset. All other General Unsecured Claims in Class 2E (including, without limitation, the Hodge Industrial Revenue Bond Claims) shall be allowed or disallowed in accordance with Article VIII of the Plan and applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(f)    Class 2F: Intercompany Claims Against SSCE.

(i)    Classification: Class 2F consists of all Intercompany Claims against SSCE. If the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim, the Stone FinCo II Contribution Claim shall be classified and treated as an Allowed Intercompany Claim in Class 2F.

(ii)    Treatment: If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed

96

Intercompany Claims against SSCE shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSCE shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSCE may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCE or any Reorganized Debtor, or for any other reason; (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims that any Debtor (or any purchaser of the Canadian ~~Newco~~Assets) holds against SSCE shall be treated as Allowed General Unsecured Claims against SSCE for purposes of the Plan and any Debtor (or any purchaser of the Canadian ~~Newco~~Assets) holding such Intercompany Claim shall receive its Pro Rata Share of the New SSCC Common Stock Pool in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim on the Initial Distribution Date; and (iii) if the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall receive its Pro Rata Share of the New SSCC Common Stock Pool on account of the Stone FinCo II Contribution Claim in full and complete satisfaction, settlement, release and discharge of such Claim. Notwithstanding the foregoing provisions, if (x) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (y) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim).

(iii)     Voting:  Intercompany Claims in Class 2F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 2F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 2F.  Notwithstanding the foregoing,  if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(g)     Class 2G:  Interests in SSCE.

(i)      Classification:  Class 2G consists of all Interests in SSCE.

(ii)      Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSCE shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)      Voting:  Interests in Class 2G are Unimpaired.  Each Holder of an Allowed Interest in Class 2G shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~ section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)      Allowance:  All Interests in SSCE shall be Allowed pursuant to the Plan.

**4.      Classification and Treatment of Claims Against and Interests in Cameo Container.**

(a)      Class 3A: Priority Non-Tax Claims Against Cameo Container.

(i)      Classification:  Class 3A consists of all Priority Non-Tax Claims against Cameo Container.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 3A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 3A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 3A in accordance with ~~Section~~ section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 3A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~ section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 3A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 3A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 3A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~ section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 3B:  Other Secured Claims Against Cameo Container.

(i)     Classification:  Class 3B consists of all Other Secured Claims against Cameo Container.

(ii)    Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 3B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 3B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)   Voting:  Other Secured Claims in Class 3B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 3B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 3C: General Unsecured Claims Against Cameo Container.

(i)     Classification:  Class 3C consists of all General Unsecured Claims against Cameo Container.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Cameo Container shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting:  General Unsecured Claims in Class 3C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 3C shall be entitled to vote to accept or reject the Plan.

(d)    Class 3D: Intercompany Claims Against Cameo Container.

(i)    Classification:  Class 3D consists of all Intercompany Claims against Cameo Container.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against Cameo Container shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against Cameo Container shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Cameo Container may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Cameo Container or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 3D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 3D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 3D.

(e)    Class 3E:  Interests in Cameo Container.

(i)    Classification:  Class 3E consists of all Interests in Cameo Container.

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in Cameo Container shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in Class 3E are Unimpaired.  Each Holder of an Allowed Interest in Class 3E shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  All Interests in Cameo Container shall be Allowed pursuant to the Plan.

**5.    Classification and Treatment of Claims Against and Interests in Calpine Corrugated.**

(a)    Class 4A: Priority Non-Tax Claims Against Calpine Corrugated.

100

(i)　　Classification:  Class 4A consists of all Priority Non-Tax Claims against Calpine Corrugated.

(ii)　　Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 4A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 4A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 4A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 4A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 4A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)　　Voting:  Priority Non-Tax Claims in Class 4A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 4A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)　　Class 4B:  Other Secured Claims Against Calpine Corrugated.

(i)　　Classification:  Class 4B consists of all Other Secured Claims against Calpine Corrugated.

(ii)　　Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 4B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 4B during

101

the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 4B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 4B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 4C: Union Bank Claims Against Calpine Corrugated.

(i)     Classification:  Class 4C consists of all Union Bank Claims against Calpine Corrugated.

(ii)     Treatment:  On the Effective Date, each Holder of an Allowed Union Bank Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Union Bank Claim, payment of the principal amount of such Allowed Union Bank Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement.  In addition, the reasonable fees and expenses of counsel and financial advisors to Union Bank that were incurred prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Union Bank Claims in Class 4C are Impaired.  Each Holder of an Allowed Union Bank Claim in Class 4C shall be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  The Union Bank Claims in Class 4C shall be Allowed pursuant to the Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 4D: CIT Group Claims Against Calpine Corrugated.

(i)     Classification:  Class 4D consists of all CIT Group Claims against Calpine Corrugated.

(ii)     Treatment:  On the Effective Date, each Holder of an Allowed CIT Group Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such

Allowed CIT Group Claim, payment of the principal amount of such Allowed CIT Group Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement. In addition, the reasonable fees and expenses of counsel and financial advisors to CIT Group that were incurred prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors not later than thirty (30) days after the Effective Date.

(iii)    Voting:  CIT Group Claims in Class 4D are Impaired.  Each Holder of an Allowed CIT Group Claim in Class 4D shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The CIT Group Claims in Class 4D shall be Allowed pursuant to the Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(e)    Class 4E:  General Unsecured Claims Against Calpine Corrugated.

(i)    Classification:  Class 4E consists of all General Unsecured Claims against Calpine Corrugated.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Calpine Corrugated shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting:  General Unsecured Claims in Class 4E are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 4E shall be entitled to vote to accept or reject the Plan.

(f)    Class 4F:  Intercompany Claims Against Calpine Corrugated.

(i)    Classification:  Class 4F consists of all Intercompany Claims against Calpine Corrugated.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and, pursuant to the Plan, all Allowed Intercompany Claims against Calpine Corrugated shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Calpine Corrugated may be Reinstated, in full or in part, to

103

the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Calpine Corrugated or any Reorganized Debtor, or for any other reason; and (ii) notwithstanding anything to the contrary in the Plan, Reorganized SSCC, as the successor in interest to SSCE (the Holder of an Intercompany Claim against Calpine Corrugated), shall receive 100% of the New Calpine Corrugated Interests on the Effective Date in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim.

(iii)     Voting:  Intercompany Claims in Class 4F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 4F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 4F.

(g)     Class 4G: Interests in Calpine Corrugated.

(i)     Classification:  Class 4G consists of all Interests in Calpine Corrugated.

(ii)     Treatment:  On the Effective Date, all Interests in Calpine Corrugated that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in Calpine Corrugated are Impaired.  Each Holder of an Interest in Calpine Corrugated shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in Calpine Corrugated shall be Allowed pursuant to the Plan.

**6.     Classification and Treatment of Claims Against and Interests in SSPRI.**

(a)     Class 5A: Priority Non-Tax Claims Against SSPRI.

(i)     Classification:  Class 5A consists of all Priority Non-Tax Claims against SSPRI.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 5A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 5A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 5A in accordance with

~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 5A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code. All Allowed Claims in Class 5A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 5A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 5A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 5B:  Other Secured Claims Against SSPRI.

(i)    Classification:  Class 5B consists of all Other Secured Claims against SSPRI.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 5B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 5B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 5B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Class 5B shall be

conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c) Class 5C: General Unsecured Claims Against SSPRI.

(i) Classification: Class 5C consists of all General Unsecured Claims against SSPRI.

(ii) Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSPRI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii) Voting: General Unsecured Claims in Class 5C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 5C shall be entitled to vote to accept or reject the Plan.

(d) Class 5D: Intercompany Claims Against SSPRI.

(i) Classification: Class 5D consists of all Intercompany Claims against SSPRI.

(ii) Treatment: Holders of Allowed Intercompany Claims against SSPRI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against SSPRI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSPRI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSPRI or any Reorganized Debtor, or for any other reason.

(iii) Voting: Intercompany Claims in Class 5D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 5D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 5D.

(e) Class 5E: Interests in SSPRI.

(i) Classification: Class 5E consists of all Interests in SSPRI.

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSPRI shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in SSPRI are Unimpaired.  Each Holder of an Allowed Interest in SSPRI shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**7.    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States).**

(a)    Classes 6A through 14A: Priority Non-Tax Claims Against the Non-Operating Debtors (United States).

(i)    Classification:  Classes 6A through 14A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (United States).

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 6A through 14A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Classes 6A through 14A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 6A through 14A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 6A through 14A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 6A through 14A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Classes 6A through 14A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 6A through 14A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Classes 6B through 14B:  Other Secured Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6B through 14B consist of all Other Secured Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 6B through 14B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 6B through 14B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Classes 6B through 14B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 6B through 14B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)     Classes 6C through 14C:  General Unsecured Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6C through 14C consist of all General Unsecured Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)    Voting:  General Unsecured Claims in Classes 6C through 14C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Classes 6C through 14C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)    Classes 6D through 14D: Intercompany Claims Against the Non-Operating Debtors (United States).

(i)    Treatment:  Holders of Allowed Intercompany Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Intercompany Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (United States) may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (United States) or any Reorganized Debtor, or for any other reason.

(ii)    Voting:  Intercompany Claims in Classes 6D through 14D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 6D through 14D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 6D through 14D.

(e)    Classes 6E through 14E: Interests in the Non-Operating Debtors (United States).

(i)    Classification:  Classes 6E through 14E consist of all Interests in the Non-Operating Debtors (United States).

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in the Non-Operating Debtors (United States) are Unimpaired.  Each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall be conclusively deemed to have accepted the Plan pursuant to Sectionsection 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**8.    Classification and Treatment of Claims Against and Interests in SSC Canada.**

(a)     Class 15A: Priority Non-Tax Claims Against SSC Canada.

(i)     Classification:  Class 15A consists of all Priority Non-Tax Claims against SSC Canada.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 15A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 15A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 15A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 15A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 15A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 15A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 15A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 15B: Other Secured Claims Against SSC Canada.

(i)     Classification:  Class 15B consists of all Other Secured Claims against SSC Canada.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 15B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and ~~Section~~section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 15B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 15B shall be entitled to vote to accept or reject the Plan.

(c)     Class 15C: Prepetition Canadian Lender Claims Against SSC Canada.

(i)     Classification:  Class 15C consists of all Prepetition Canadian Lender Claims against SSC Canada.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments~~.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled ~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 15C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 15C shall be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 15C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9  million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class  15D: General Unsecured Claims Against SSC Canada.

(i)     Classification:  Class 15D consists of all General Unsecured Claims against SSC Canada.

111

(ii)    Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of SSC Canada and Smurfit-MBI, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date and (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, (a) the Holders of Allowed General Unsecured Claims against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to SSC Canada and (b) all General Unsecured Claims against SSC Canada shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, the SSC Canada Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against SSC Canada.

(iii)    Voting:  General Unsecured Claims in Class 15D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 15D shall be entitled to vote to accept or reject the Plan.

(e)    Class 15E: Intercompany Claims Against SSC Canada.

(i)    Classification:  Class 15E consists of all Intercompany Claims against SSC Canada.

(ii)    Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSC Canada shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSC Canada may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSC Canada or any Reorganized Debtor, or for any other reason and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against SSC Canada shall be treated as Allowed General Unsecured Claims against

SSC Canada for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)    Voting:  Intercompany Claims in Class 15E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 15E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 15E.

(f)    Class 15F: Stone FinCo II Intercompany Claim Against SSC Canada.

(i)    Classification:  Class 15F consists of the Stone FinCo II Intercompany Claim against SSC Canada.

(ii)    Treatment:  If (i) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (ii) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Intercompany Claim).  On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then (x) the Stone FinCo II Intercompany Claim shall be treated as a Subordinated Securities Claim against SSC Canada and shall be subordinated to all other Claims against SSC Canada, including, without limitation, all General Unsecured Claims and all other Intercompany Claims against SSC Canada, (y) Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claim, shall not be entitled to receive any distributions on account of such Claim under the Plan, and (z) the Stone FinCo II Intercompany Claim shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)    Voting:  Stone FinCo II Intercompany Claims in Class 15F are Impaired.  Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claims, shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)    Class 15G:  Interests in SSC Canada.

(i)    Classification:  Class 15G consists of all Interests in SSC Canada.

(ii)     Treatment:  On the Effective Date, all Interests in SSC Canada that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in SSC Canada are Impaired.  Each Holder of an Interest in SSC Canada shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in SSC Canada shall be Allowed pursuant to the Plan.

**9.     Classification and Treatment of Claims Against and Interests in Smurfit-MBI.**

(a)     Class 16A: Priority Non-Tax Claims Against Smurfit-MBI.

(i)     Classification:  Class 16A consists of all Priority Non-Tax Claims against Smurfit-MBI.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 16A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 16A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 16A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 16A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 16A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 16A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 16A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 16B: Other Secured Claims Against Smurfit-MBI.

114

(i)     Classification:  Class 16B consists of all Other Secured Claims against Smurfit-MBI.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 16B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and ~~Section~~section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 16B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 16B shall be entitled to vote to accept or reject the Plan.

(c)     Class 16C: Prepetition Canadian Lender Claims Against Smurfit-MBI.

(i)     Classification:  Class 16C consists of all Prepetition Canadian Lender Claims against Smurfit-MBI.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.~~.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled ~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

115

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 16C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 16C shall be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 16C shall be Allowed pursuant to the Plan in the aggregate principal amount of $ 392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class  16D: General Unsecured Claims Against Smurfit-MBI.

(i)     Classification:  Class 16D consists of all General Unsecured Claims against Smurfit-MBI.

(ii)     Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of Smurfit-MBI and SSC Canada, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, (a) the Holders of Allowed General Unsecured Claims against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to Smurfit-MBI and (b) all General Unsecured Claims against Smurfit-MBI shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against Smurfit-MBI.

(iii)     Voting:  General Unsecured Claims in Class 16D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 16D shall be entitled to vote to accept or reject the Plan.

(e)     Class 16E: Intercompany Claims Against Smurfit-MBI.

(i)     Classification:  Class 16E consists of all Intercompany Claims against Smurfit-MBI.

(ii)     Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against Smurfit-MBI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Smurfit-MBI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Smurfit-MBI or any Reorganized Debtor, or for any other reason, and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against Smurfit-MBI shall be treated as Allowed General Unsecured Claims against Smurfit-MBI for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)     Voting:  Intercompany Claims in Class 16E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 16E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 16E.

(f)     Class 16F: Interests in Smurfit-MBI.

(i)     Classification:  Class 16F consists of all Interests in Smurfit-MBI.

(ii)     Treatment:  On the Effective Date, all Interests in Smurfit-MBI that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in Smurfit-MBI are Impaired.  Each Holder of an Interest in Smurfit-MBI shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in Smurfit-MBI shall be Allowed pursuant to the Plan.

**10.     Classification and Treatment of Claims Against and Interests in MBI Limited.**

(a)     Class 17A: Priority Non-Tax Claims Against MBI Limited.

117

(i)     Classification:  Class 17A consists of all Priority Non-Tax Claims against MBI Limited.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 17A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 17A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 17A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 17A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 17A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 17A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 17A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 17B: Other Secured Claims Against MBI Limited.

(i)     Classification:  Class 17B consists of all Other Secured Claims against MBI Limited.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 17B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and ~~Section~~section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 17B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 17B shall be entitled to vote to accept or reject the Plan.

(c)     Class 17C: Prepetition Canadian Lender Claims Against MBI Limited.

CH1 ~~5049998~~5118439v.~~7~~4

(i)     Classification:  Class 17C consists of all Prepetition Canadian Lender Claims against MBI Limited.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.~~.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled ~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)   Voting:  Prepetition Canadian Lender Claims in Class 17C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 17C shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 17C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 17D: General Unsecured Claims Against MBI Limited.

(i)     Classification:  Class 17D consists of all General Unsecured Claims against MBI Limited.

(ii)    Treatment:  Holders of General Unsecured Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of

119

the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date. For purposes of the CCAA Proceedings, all General Unsecured Claims against MBI Limited shall be deemed to be Excluded Claims.

(iii)    Voting:  General Unsecured Claims in Class 17D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 17D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)    Class 17E: Intercompany Claims Against MBI Limited.

(i)    Classification:  Class 17E consists of all Intercompany Claims against MBI Limited.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against MBI Limited may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by MBI Limited or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 17E are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 17E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 17E.

(f)    Class 17F: Interests in MBI Limited.

(i)    Classification:  Class 17F consists of all Interests in MBI Limited.

(ii)    Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in MBI Limited shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in MBI Limited are Unimpaired. Each Holder of an Allowed Interest in MBI Limited shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in MBI Limited shall be Allowed pursuant to the Plan.

**11.     Classification and Treatment of Claims Against and Interests in Stone FinCo II.**

(a)     Class 18A: Priority Non-Tax Claims Against Stone FinCo II.

(i)     Classification:  Class 18A consists of all Priority Non-Tax Claims against Stone FinCo II.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 18A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 18A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 18A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 18A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 18A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 18A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 18A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 18B: Other Secured Claims Against Stone FinCo II.

(i)     Classification:  Class 18B consists of all Other Secured Claims against Stone FinCo II.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 18B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b)

121

payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 18B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 18B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 18B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 18C: General Unsecured Claims Against Stone FinCo II.

(i)     Classification:  Class 18C consists of all General Unsecured Claims against Stone FinCo II.

(ii)     Treatment:  If (a) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (b) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution. On the other hand, if (i) the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan or (ii) either the Bankruptcy Court or the Canadian Bankruptcy Court shall have determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canada, then (x) the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and

CH1 ~~5049998~~5118439v.~~7~~4

complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any of the New SSCC Common Stock that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim; provided, however, that the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) the Class of General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  If the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is a Disallowed Claim, the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed General Unsecured Claims against Stone FinCo II shall, for purposes of the Chapter 11 Cases, be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting:  General Unsecured Claims in Class 18C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 18C shall be entitled to vote to accept or reject the Plan.

(d)     Class 18D: Intercompany Claims Against Stone FinCo II.

(i)     Classification:  Class 18D consists of all Intercompany Claims against Stone FinCo II.

(ii)     Treatment:  If the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan on account of such Claims.  If the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan and the Bankruptcy Court determines that the Stone FinCo II Contribution Claim shall be an Allowed Claim, the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of the shares of New SSCC Common Stock that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim.  If the Stone FinCo II Contribution Claim is deemed to be a Disallowed Claim, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed Intercompany Claims against Stone FinCo II shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting:  Intercompany Claims in Class 18D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in

123

Class 18D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 18D.

(e)     Class 18E: Interests in Stone FinCo II.

(i)     Classification:  Class 18E consists of all Interests in Stone FinCo II.

(ii)     Treatment:  On the Effective Date, all Interests in Stone FinCo II that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan; provided, however, that Holders of Interests in Stone FinCo II shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

(iii)     Voting:  Interests in Stone FinCo II are Impaired.  Each Holder of an Interest in Stone FinCo II shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in Stone FinCo II shall be Allowed pursuant to the Plan.

## 12.     Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd.

(a)     Class 19A: Priority Non-Tax Claims Against B.C. Shipper Supplies Ltd.

(i)     Classification:  Class 19A consists of all Priority Non-Tax Claims against B.C. Shipper Supplies Ltd.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 19A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 19A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 19A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 19A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy

124

Code.  All Allowed Claims in Class 19A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 19A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 19A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 19B: Other Secured Claims Against B.C. Shipper Supplies Ltd.

(i)     Classification:  Class 19B consists of all Other Secured Claims against B.C. Shipper Supplies Ltd.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 19B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 19B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 19B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 19B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 19C:  General Unsecured Claims Against B.C. Shipper Supplies Ltd.

CH1 ~~5049998~~5118439v.~~7~~4

(i)     Classification:  Class 19C consists of all General Unsecured Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against B.C. Shipper Supplies Ltd. shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)   Voting:  General Unsecured Claims in Class 19C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 19C shall be entitled to vote to accept or reject the Plan.

(d)     Class 19D: Intercompany Claims Against B.C. Shipper Supplies Ltd.

(i)     Classification:  Class 19D consists of all Intercompany Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against B.C. Shipper Supplies Ltd. may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by B.C. Shipper Supplies Ltd. or any Reorganized Debtor, or for any other reason.

(iii)   Voting:  Intercompany Claims in Class 19D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 19D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 19D.

(e)     Class 19E: Interests in B.C. Shipper Supplies Ltd.

(i)     Classification:  Class 19E consists of all Interests in B.C. Shipper Supplies Ltd.

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in B.C. Shipper Supplies Ltd. are Unimpaired. Each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in B.C. Shipper Supplies Ltd. shall be Allowed pursuant to the Plan.

**13.    Classification and Treatment of Claims Against and Interests in Francobec Company.**

(a)    Class 20A: Priority Non-Tax Claims Against Francobec Company.

(i)    Classification:  Class 20A consists of all Priority Non-Tax Claims against Francobec Company.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 20A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 20A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 20A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 20A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 20A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 20A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 20A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 20B: Other Secured Claims Against Francobec Company.

(i)    Classification:  Class 20B consists of all Other Secured Claims against Francobec Company.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date

127

after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 20B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and ~~Section~~section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 20B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 20B shall be entitled to vote to accept or reject the Plan.

(c)     Class 20C: Prepetition Canadian Lender Claims Against Francobec Company.

(i)     Classification:  Class 20C consists of all Prepetition Canadian Lender Claims against Francobec Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments~~.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 20C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 20C shall be entitled to vote to accept or reject the Plan.

128

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 20C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 20D:  General Unsecured Claims Against Francobec Company.

(i)    Classification:  Class 20D consists of all General Unsecured Claims against Francobec Company.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Francobec Company shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting:  General Unsecured Claims in Class 20D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 20D shall be entitled to vote to accept or reject the Plan.

(e)    Class 20E: Intercompany Claims Against Francobec Company.

(i)    Classification:  Class 20E consists of all Intercompany Claims against Francobec Company.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against Francobec Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Francobec Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Francobec Company or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 20E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 20E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 20E.

(f)    Class 20F: Interests in Francobec Company.

(i)      Classification:  Class 20F consists of all Interests in Francobec Company.

(ii)      Treatment:  On the Effective Date, all Interests in Francobec Company that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)      Voting:  Interests in Francobec Company are Impaired.  Each Holder of an Interest in Francobec Company shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)      Allowance.  All Interests in Francobec Company shall be Allowed pursuant to the Plan.

**14.      Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company.**

(a)      Class 21A: Priority Non-Tax Claims Against 3083527 Nova Scotia Company.

(i)      Classification:  Class 21A consists of all Priority Non-Tax Claims against 3083527 Nova Scotia Company.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 21A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 21A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 21A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 21A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 21A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 21A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 21A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section

130

1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 21B: Other Secured Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21B consists of all Other Secured Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 21B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and ~~Section~~section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 21B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 21B shall be entitled to vote to accept or reject the Plan.

(c)     Class 21C: Prepetition Canadian Lender Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21C consists of all Prepetition Canadian Lender Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive ~~distributions equal in value to~~a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement~~, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments.~~.   In addition, (i) on the Effective Date, each Prepetition Canadian Revolving ~~Canadian~~ Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled ~~or~~, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105%

131

of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)    Voting:  Prepetition Canadian Lender Claims in Class 21C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 21C shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 21C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9 million, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 21D: General Unsecured Claims Against 3083527 Nova Scotia Company.

(i)    Classification:  Class 21D consists of all General Unsecured Claims against 3083527 Nova Scotia Company.

(ii)    Treatment:  Holders of General Unsecured Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed to be Excluded Claims.

(iii)    Voting:  General Unsecured Claims in Class 21D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 21D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)    Class 21E: Intercompany Claims Against 3083527 Nova Scotia Company.

(i)    Classification:  Class 21E consists of all Intercompany Claims against 3083527 Nova Scotia Company.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and

extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against 3083527 Nova Scotia Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by 3083527 Nova Scotia Company or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 21E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 21E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 21E.

(f)    Class 21F: Interests in 3083527 Nova Scotia Company.

(i)    Classification:  Class 21F consists of all Interests in 3083527 Nova Scotia Company.

(ii)    Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in 3083527 Nova Scotia Company are Unimpaired.  Each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in 3083527 Nova Scotia Company shall be Allowed pursuant to the Plan.

## 15.    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) .

(a)    Classes 22A through 25A: Priority Non-Tax Claims Against the Non-Operating Debtors (Canada).

(i)    Classification:  Classes 22A through 25A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (Canada).

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 22A through 25A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in 22A through 25A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim

in Classes 22A through 25A in accordance with ~~Section~~section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 22A through 25A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to ~~Section~~section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 22A through 25A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Classes 22A through 25A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 22A through 25A shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Classes 22B through 25B:  Other Secured Claims Against the Non-Operating Debtors (Canada).

(i)    Classification:  Classes 22B through 25B consist of all Other Secured Claims against the Non-Operating Debtors (Canada).

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 22B through 25B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to ~~Section~~section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under ~~Section~~section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with ~~Section~~section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 22B through 25B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Classes 22B through 25B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 22B through 25B shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)     Classes 22C through 25C:  General Unsecured Claims Against the Non-Operating Debtors (Canada).

(i)     Classification:  Classes 22C through 25C consist of all General Unsecured Claims against the Non-Operating Debtors (Canada).

(ii)     Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (Canada) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed to be Excluded Claims.

(iii)     Voting:  General Unsecured Claims in Classes 22C through 25C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Classes 22C through 25C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Classes 22D through 25D: Intercompany Claims Against the Non-Operating Debtors (Canada).

(i)     Treatment:  Holders of Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (Canada)  may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (Canada) or the Reorganized Non-Operating Debtors (Canada), or for any other reason.

(ii)     Voting:  Intercompany Claims in Classes 22D through 25D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited

135

from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 22D through 25D.

(e)     Classes 22E through 25E: Interests in the Non-Operating Debtors (Canada).

(i)     Classification:  Classes 22E through 25E consist of all Interests in the Non-Operating Debtors (Canada).

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in the Non-Operating Debtors (Canada) are Unimpaired.  Each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall be conclusively deemed to have accepted the Plan pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**16.     Acceptance or Rejection of the Plan by Classes of Claims and Interests.**

(a)     Impaired Classes of Claims Entitled to Vote on the Plan.

Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19C, 20B, 20C, 20D, 21B and 21C are Impaired and shall be entitled to vote as a Class to accept or reject the Plan.

(b)     Acceptance by Impaired Classes of Claims.

In accordance with ~~Section~~section 1126(c) of the Bankruptcy Code and except as provided in ~~Section~~section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that actually vote have timely and properly voted to accept the Plan.

(c)     Presumed Acceptance by Holders of Intercompany Claims.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims.

(d)     Presumed Acceptance by Unimpaired Classes.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are Unimpaired under the Plan.  Pursuant to ~~Section~~section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such

136

Classes are conclusively presumed to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

        (e)      Presumed Rejection by Impaired Classes.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, ~~17F,~~ 18E, 20F, 21D, and 22C through 25C are Impaired under the Plan, but the Holders of Claims and Interests in such Classes shall not receive or retain any property under the Plan on account of such Claims or Interests. Accordingly, pursuant to ~~Section~~ section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

        (f)      Voting for Purposes of the CCAA Plan.

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, Affected Creditors shall be entitled to vote on the CCAA Plan as described in Article IV of the Plan.

## D.    Classification and Treatment of Affected Claims Against the Canadian Debtors in the CCAA Proceedings.

**1.    Purpose and Effect of the CCAA Plan.**

        (a)      Purpose.

For purposes of the CCAA Proceedings, Article IV of the Plan constitutes the CCAA Plan to be proposed to each Class of Affected Claims described below.

        (b)      Affected Persons.

The CCAA Plan will be implemented under the CCAA and, subject to its terms, will become effective on, and be binding on and after, the Effective Date on the Canadian Debtors and the Classes of Affected Creditors that have voted in favor of its acceptance by the Required Majority, providing it has been sanctioned by the Canadian Bankruptcy Court by CCAA Sanction Order(s) in form and substance satisfactory to the Canadian Debtors. The only Classes of Affected Creditors that shall be required to have accepted the CCAA Plan by the Required Majority shall be the Affected Secured Creditors.

        (c)      Unaffected Persons.

For the avoidance of doubt, Affected Creditors in any Class that fails to accept the CCAA Plan by the Required Majority, or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, shall be deemed to be Unaffected Creditors for the purposes of the CCAA Plan.

**2.    Classification of Creditors.**

        (a)      Affected Creditors.

For purposes of voting on and receiving distributions under the CCAA Plan, Affected Creditors are divided into the following Classes:

(i)    Affected Secured Creditors.

(1) Affected Secured Creditors of SSC Canada;

(2) Affected Secured Creditors of Smurfit-MBI;

(3) Affected Secured Creditors of MBI Limited;

(4) Affected Secured Creditors of Francobec Company; and

(5) Affected Secured Creditors of 3083527 Nova Scotia Company.

(ii)   Affected Unsecured Creditors.

(1) Affected Unsecured Creditors of SSC Canada;

(2) Affected Unsecured Creditors of Smurfit-MBI; and

(3) Affected Unsecured Creditors of Stone FinCo II.

(iii)  Affected Creditors shall be entitled to prove their respective Affected Claims, vote in respect of the CCAA Plan or otherwise, and receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(b)    Excluded Claims.

For purposes of the CCAA Proceedings, the CCAA Plan shall not affect the following types of Claims (each, an "Excluded Claim" and, collectively, the "Excluded Claims"):

(i)   the indebtedness, liabilities and obligations secured by the Administration Charge;

(ii)  the indebtedness, liabilities and obligations secured by the DIP Lenders' Charge;

(iii)  the indebtedness, liabilities and obligations secured by the Directors' Charge;

(iv)  any amounts owing to employees and officers employed by, and directors of, the Canadian Debtors on the Petition Date that are entitled to priority in payment under the CCAA, including any Claims for wages, salary, benefits, unreimbursed expenses, and amounts owing for accrued but unpaid vacation pay as of the Petition Date that are entitled to priority in

138

payment under the CCAA, but expressly excluding all Non-Qualified Employee Benefit Claims;

(v) any Post-Filing Claim;

(vi) any Other Secured Claim against a Canadian Debtor;

(vii) any Priority Tax Claim against a Canadian Debtor;

(viiviii) any Claim of a Person who was an officer, director or employee of any Canadian Debtor as of the Petition Date for indemnification and/or contribution with respect to such officer's, director's, or employee's service to such Canadian Debtor, pursuant (and subject) to applicable laws and the policies and procedures of such Canadian Debtor (provided that all such indemnification and/or contribution Claims shall be assumed by Canadian Newco);

(viiiix) any General Unsecured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, and Stone FinCo II;

(ixx) any Secured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, and 3083527 Nova Scotia Company;

(xxi) any Intercompany Claim; and

(xixii) Affected Claims in any Class that fails to accept the CCAA Plan by the Required Majority or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, from and after the date of such rejection or non-approval by the Canadian Bankruptcy Court (as the case may be).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or to receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan. Nothing in the CCAA Plan shall affect the rights and defenses of any Canadian Debtor, either legal or equitable, with respect to any Excluded Claim, including any rights arising under or pursuant to the CCAA Plan or any rights with respect to legal or equitable defenses or entitlements to setoff or recoupment against such Excluded Claims; provided, however, that the Debtors reserve the right to seek confirmation of the Plan in the Chapter 11 Cases pursuant to Sectionsection 1129(b) of the Bankruptcy Code with respect to any Class of Affected Claims that has failed to accept the Plan, in which case the Holders of such Claims shall receive the treatment set forth in Article III of the Plan and shall be subject to all applicable provisions of the Plan for purposes of the Chapter 11 Cases.

3.    **Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims.**

(a) Affected Secured Claims.

(i) Voting: Affected Secured Creditors shall be entitled to vote on the CCAA Plan in accordance with the CCAA Creditors' Meeting Order.

(i) Prepetition Canadian Lender Claims.

(ii) Treatment: On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive distributions equal in value to a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, with such distributions to be made, in the Debtors' discretion, in consultation with the Committee, in the form of cash, Debt Instruments to be issued by the Reorganized Debtors (which may consist of a roll, refinancing or reinstatement of the Prepetition Credit Agreement on the Effective Date), or a combination of cash and such Debt Instruments. In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Canadian Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled or, (y) cash collateralized with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(ii) Other Secured Claims. On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, or 3083527 Nova Scotia Company, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash.

(b) Treatment of CCAA Charges.

The Canadian Debtors shall satisfy, in full and in cash, all obligations secured by the CCAA Charges on the Effective Date.

(c)     Treatment of Priority Tax Claims Against the Canadian Debtors.

Except to the extent that the Canadian Debtors and the Holder of a Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of a Priority Tax Claim against any of the Canadian Debtors that is a Proven Claim and is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Priority Tax Claim, cash equal to the amount of such Priority Tax Claim on the later of (i) the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and (ii) the first Distribution Date after such Priority Tax Claim becomes a Proven Claim, or as soon thereafter as is reasonably practicable.  All Priority Tax Claims against any of the Canadian Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business after the Effective Date in accordance with the applicable non-bankruptcy law governing such Claims.

~~4.     Option to Place the Canadian Debtors into Bankruptcy Proceedings.~~

~~Each Canadian Debtor reserves the right to file an assignment in bankruptcy under the BIA provided that such Canadian Debtor has, or shall have been provided with, cash or a satisfactory indemnity in the amount of $50,000 to fund the costs of such bankruptcy proceeding.~~

**4.     ~~5.~~ Treatment of Affected Unsecured Claims.**

The treatment of Affected Unsecured Claims under the CCAA Plan depends on the identity of the Canadian Debtor against which such Affected Unsecured Claims are asserted.

(a)     Affected Unsecured Claims Against SSC Canada.

If:

(i)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(ii)     the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(iii) the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1 of the Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes a Proven Claim, each Holder of a General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool.

(b)     Affected Unsecured Claims Against Smurfit-MBI.

If:

(i)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(ii)     the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(iii)     the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1 of the Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes a Proven Claim, each Holder of a General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool.

(c)     Affected Unsecured Claims Against Stone FinCo II.

If:

(i)     the Class of Affected Unsecured Creditors of Stone FinCo II approves the CCAA Plan by the Required Majority,

(ii)     neither the Bankruptcy Court nor the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as an Interest in SSC Canada,

(ii)     the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to such Class, and

(iii)     the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.15.1.5 of the Plan,

then, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.

**5.**     6.  **Conditions Precedent to Implementation of CCAA Plan.**

In addition to any other approvals and receipt of the CCAA Sanction Order described above, the implementation of the CCAA Plan shall be conditioned upon the fulfillment or satisfaction of the following conditions on or before the Effective Date, each of which may be waived by the Canadian Debtors:

(a)     The Classes of Affected Secured Creditors approve the CCAA Plan by the Required Majority;

(b)      The CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class;

(c)      Execution and delivery of all such agreements, resolutions, indentures, documents and other instruments which are necessary to be executed and delivered by the Canadian Debtors to implement the CCAA Plan and perform their obligations hereunder;

(d)      In respect of the CCAA Sanction Orders described above, the expiry of the applicable appeal periods and, in the event of an appeal or application for leave to appeal, final determination by the applicable appellate tribunal;

(e)      The Plan shall have become effective in the Chapter 11 Cases in accordance with the terms of Section 9.2 of the Plan.

## **6.** ~~7.~~ CCAA Creditors' Meeting.

The CCAA Creditors' Meeting shall be held in accordance with the CCAA Plan, the CCAA Creditors' Meeting Order, and any further order which the Canadian Bankruptcy Court may enter from time to time for the purposes of considering and voting on the CCAA Resolution or any other matters to be considered at the CCAA Creditors' Meeting.

(a)      Severance.

The CCAA Plan shall be severable such that it may be voted upon and approved by each Class of Affected Creditors separately.

(b)      Voting by Creditors.

The Canadian Debtors are seeking approval of the CCAA Plan by the affirmative vote of the Required Majorities of each of the Classes of Affected Creditors.  Except for the CCAA Resolution, which shall be decided by the Required Majorities on a vote by ballot, any other matter submitted for a vote at the CCAA Creditors' Meeting shall be decided by a majority of votes cast on a vote by a show of hands, unless the CCAA Meeting Chair decides, in his or her sole discretion, to hold such vote by way of ballot.

The result of any vote at the CCAA Creditors' Meeting shall be binding on all Affected Claims of the applicable Class, regardless of whether or not the Holder of such Affected Claim was present and voting (in person or by proxy) at the CCAA Creditors' Meeting.

(c)      Claims for Voting Purposes.

Each Holder of a Voting Claim shall be entitled to one (1) vote and the weight attributed to such vote (for the purposes of determining the Required Majorities) shall be equal to the aggregate United States dollar amount of such Voting Claim.  Voting Claims shall not include fractional numbers and shall be rounded to the nearest whole United States dollar amount.

For the purposes of determining the value of Affected Claims denominated in currencies other than United States dollars for voting and distribution purposes under the CCAA Plan, such

Affected Claims shall be converted to United States dollars at the conversion rate set forth in the CCAA Bar Date Order.

If the amount of any Affected Claim is not resolved for voting purposes at least five (5) Business Days prior to the CCAA Creditors' Meeting in accordance with the CCAA Claims Determination Order and the CCAA Creditors' Meeting Order, the Affected Creditor shall be entitled to vote at the CCAA Creditors' Meeting based on that portion of its Affected Claim that has been accepted for voting purposes by the Canadian Debtors and the CCAA Monitor, without prejudice to any rights of such Affected Creditor or the Canadian Debtors with respect to the final determination of such Affected Claim for distribution purposes in accordance with the terms of the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(d)     Claims Bar Date.

If any Person required by the CCAA Bar Date Order and the CCAA Claims Determination Order to file a Proof of Claim by the Claims Bar Date has failed to do so (and is not deemed to have filed a Proof of Claim by the Claims Bar Date pursuant to the CCAA Bar Date Order or the CCAA Claims Determination Order), that Person shall not be permitted to vote at the CCAA Creditors' Meeting and shall not be entitled to receive any distribution under the Plan.

(e)     CCAA Creditors' Meeting Chair.

The CCAA Creditors' Meeting Chair shall decide all matters relating to procedure at the CCAA Creditors' Meeting that are not otherwise set out in the CCAA Creditors' Meeting Order.

(f)     Application for CCAA Sanction Order(s).

If the Classes of Affected Secured Claims approve the CCAA Plan, the Canadian Debtors shall apply for a Sanction Order in respect of each Class that has approved the CCAA Plan, providing, inter alia, that:

(i)     the compromises and arrangements effected by the CCAA Plan are approved, binding and effective on all Classes of Affected Claims that approved the CCAA Plan;

(ii)     consent is given to the assignment of the Canadian Assets to Canadian Newco; and

(iii)     no Person who is a party to an obligation or agreement with the Canadian Debtors shall, following the Effective Date, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of such obligation or agreement, by reason:

(1)     of any event(s) which occurred on or prior to the Effective Date that would have entitled any other Person thereto to enforce

those rights or remedies (including defaults or events of default arising as a result of the insolvency of the Canadian Debtors);

(2) of the fact that the Canadian Debtors have sought or obtained relief under the CCAA or that the reorganization has been implemented by the Canadian Debtors;

(3) of the effect on the Canadian Debtors of the completion of any of the transactions contemplated by the CCAA Plan; or

(4) of any compromises or arrangements effected pursuant to the CCAA Plan.

(g) Further Stay.

The Canadian Debtors may apply for an interim order extending the CCAA stay period so that the application for the CCAA Sanction Orders may be made before the stay period expires and the stay period shall not expire until the Effective Date.

**7.** **8. General.**

(a) CCAA Releases.

On the Effective Date, all Affected Creditors subject to the CCAA Plan as sanctioned by the Canadian Bankruptcy Court, any other Persons asserting such Claims, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally the applicable Canadian Debtors, the CCAA Monitor, and each of their respective Related Persons (collectively, the "CCAA Released Parties") from any and all demands, Claims, actions (including any class actions or proceedings before an administrative tribunal), causes of action, grievances, obligations, counterclaims, suits, debts, sums of money, accounts, covenants, damages, remedies, judgments, expenses, executions, liens and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any such Person may be entitled to assert, including, without limitation, any and all claims for accounting, reconciliation, contribution or indemnity, restitution or otherwise, as well as any Claims in respect of potential statutory liabilities of the former and present directors and officers of the Canadian Debtors, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, dealing, termination, disclaimer, rescission or repudiation of any contract, lease or other agreement, whether written or oral, or other occurrence existing or taking place on or prior to the Effective Date relating to, arising out of or in connection with any Claim, trust, constructive trust or deemed trust, the business and affairs of the Canadian Debtors, the CCAA Plan, the Canadian Asset Sale, or the CCAA Proceedings, provided that nothing in the Plan shall release or discharge (i) any CCAA Released Party if such CCAA Released Party is adjudged by the express terms of a judgment rendered on a final determination on the merits to have committed fraud or (ii) any director of a Canadian Debtor for a Claim excluded by Section 5.1(2) of the CCAA.

(b) Amendments to the CCAA Plan.

(i)     The Canadian Debtors reserve the right, at any time and from time to time, to (in consultation with the Committee and the CCAA Monitor) amend, modify and/or supplement the CCAA Plan, or to waive in whole or in part any condition, provided that any such amendment, modification or supplement must be in a written document which is: (i) filed with the Canadian Bankruptcy Court; and (ii) communicated to the Affected Creditors in such manner, if any, as may be required by the Canadian Bankruptcy Court.  Any supplement or amendment to the CCAA Plan so filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.

(ii)    Any amendment, modification, supplement or waiver may be made following the entry of the CCAA Sanction Order unilaterally by the Canadian Debtors, provided that it concerns a matter that, in the opinion of the Canadian Debtors, acting reasonably, is of an administrative nature required to better give effect to the implementation of the CCAA Plan and the CCAA Sanction Order and is not adverse to the financial or economic interest of any Class of Affected Creditors.

(iii)   Any supplementary plan or plans of compromise or arrangement filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.

(c)     Further Assurances.

Notwithstanding that the transactions and events set out in the CCAA Plan shall be deemed to occur without any additional act or formality other than as set out in the CCAA Plan, each of the Persons affected hereby shall make, do and execute or cause to be made, done or executed all such further acts, deeds, agreements, transfers, assurances, instruments, documents or discharges as may be reasonably required by the Canadian Debtors in order to better implement the CCAA Plan.

(d)     Paramountcy.

From and after the Effective Date, any conflict between the CCAA Plan and the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, credit document, agreement for sale, by-laws of the Canadian Debtors subject to the CCAA Plan, lease or other agreement, written or oral, and any and all amendments or supplements thereto, existing between one or more of the Affected  Creditors and the Canadian Debtors subject to the CCAA Plan as of the Effective Date, shall be deemed to be governed by the terms, conditions and provisions of this CCAA Plan and any applicable CCAA Sanction Order, which shall take precedence and priority.  From and after the Effective Date, any conflict between the terms of Article III of the Plan and the CCAA Plan shall be resolved by the Bankruptcy Court and the Canadian Bankruptcy Court in accordance with the terms of the Cross-Border Insolvency Protocol.

(e)     Termination.

At any time until the Effective Date, the Canadian Debtors may determine not to proceed with the CCAA Plan, notwithstanding any prior approval given at the CCAA Creditors' Meeting.

(f)     Successors and Assigns.

The CCAA Plan and any compromise effected by the CCAA Plan shall be binding upon and shall inure to the benefit of the heirs, administrators, executors, representatives, successors and assigns of any Person named or referred to in, or affected by, the Plan for all purposes, as of the Effective Date.

(g)     Deeming Provisions.

In the CCAA Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

## E.     **The Canadian Asset Sale.**

### 1.     **Sale of the Canadian Assets to Canadian Newco.**

(a)     Formation of Canadian Newco.

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA Monitor) shall establish Canadian Newco (including, ~~in the Debtors' sole discretion~~without limitation, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in Canadian Newco) as a wholly-owned, direct or indirect, subsidiary of SSCE. On the Effective Date, the Canadian Newco Certificate of Incorporation and the Canadian Newco By-Laws, in substantially the forms of Exhibit 7 and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively, shall become effective. From and after the Effective Date, Canadian Newco shall be a wholly-owned subsidiary of Reorganized SSCC.

(b)     Offer to Purchase the Canadian Assets.

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, in consideration for (i) the payment of cash ~~or the distribution of Debt Instruments~~ in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada,

Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash ~~and/or shares of New SSCC Common Stock~~ in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with Article IV of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash ~~Debt Instruments, and/or shares of New SSCC Common Stock~~ necessary to consummate the Canadian Asset Sale.

      (c)      Assumption of Certain Liabilities by Canadian Newco.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company to their current employees, but excluding any obligations with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations are deemed to be Allowed Claims and are not satisfied or discharged pursuant to the Plan. For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

      (d)      Assignment of Executory Contracts and Unexpired Leases to Canadian Newco.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in <u>Exhibit 9</u> to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases ~~as~~ set forth in <u>Exhibit 10</u> to the Plan (to be filed with the Plan Supplement). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases. Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings. Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

(e) Consensual Transfer of the Canadian Assets to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order. The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

(f) Sale of the Canadian Assets if Affected Unsecured Creditors of SSC Canada and Smurfit-MBI Do Not Approve the CCAA Plan.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan. If the CCAA Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should the Plan fail to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, (i) the Debtors~~,~~ shall be permitted (in consultation with the Committee ~~shall be permitted (~~and with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the Canadian Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall ~~conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Competing Bid(s).~~ determine whether any such Competing Bid constitutes a Superior Competing Bid. Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of (i) cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default, and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities

149

thereunder), and the Canadian Employee Benefit Plans.  Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI ~~under the Plan.  Canadian Newco shall be entitled to participate in the bidding and auction process.At the conclusion of the auction, the Canadian Bankruptcy Court shall determine whether any Competing Bid constitutes a Superior Competing Bid~~.  If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order~~; provided, however, that the consideration Canadian Newco provides~~.  If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets ~~at the conclusion of the auction~~, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s).  Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not be required to, revise its bid to include ~~any~~ cash ~~and/or shares of New SSCC Common Stock in the amounts necessary to fund the SSC Canada Distribution Pool~~or other consideration that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and ~~the~~/or Smurfit-MBI ~~Distribution Pool~~.

F.  **Means For Implementation of the Plan.**

1.  **Procedural Consolidation.**

The Plan is a joint plan that does not provide for substantive consolidation of the Estates, and on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan.  Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the other Debtors.  Except as specifically set forth in the Plan and Disclosure Statement, nothing in the Plan or ~~the~~this Disclosure Statement shall constitute, or be deemed to constitute, an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors shall be treated as a separate Claim against each Debtor for all purposes (including, but not limited to, voting and distributions); provided, however, that there shall only be a single recovery on account of any such Claim, any distributions from a Debtor on account of such a Claim shall take into account the Distributions to be made by the other Debtors on account of such Claim pursuant to the Plan, and such Claims shall be administered and treated in the manner provided in the Plan and described in ~~the~~this Disclosure Statement.

2.  **Corporate Governance and Corporate Actions.**

(a)  Amended and Restated Certificate of Incorporation and By-Laws.

(i)  On the Effective Date, the Amended and Restated ~~Certificate of Incorporation~~By-Laws and the Amended and Restated ~~By-Laws~~Certificate

150

of Incorporation, in substantially the forms of Exhibit 2 and Exhibit 1 to the Plan (to be filed with the Plan Supplement), respectively, and in a form reasonably acceptable to the Committee, shall become effective.  The Amended and Restated Certificate of Incorporation and the Amended and Restated By-Laws shall include, among other things, (i) provisions authorizing the issuance of [_____]150,000,000 shares of New SSCC Common Stock, of which up to [_____]100,000,000 shares shall initially be issued and outstanding as of the Effective Date; provided, however, that shares representing not less than [_____]eight percent ([____])8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____]8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the applicable Management Incentive Plan(s) asat, and as of, such times as are set forth in Exhibit 3 to the Plan on, and effective as of, the Effective Date; (ii) provisions authorizing the issuance of [_____]10,000,000 shares of New SSCC Preferred Stock; provided, however, that no shares of the New SSCC Preferred Stock shall be issued on the Effective Date; and (iii) provisions to the extent necessary or appropriate, giving effect to the terms of the Plan.  Consistent with Sectionsection 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities in contravention of the Bankruptcy Code.

(ii)     The certificates or articles of incorporation, by-laws, limited liability company agreements, and partnership agreements, as applicable, of each of theReorganized Debtor other than Reorganized DebtorsSSCC shall be amended as necessary to (a) include director and officer liability exculpation and indemnity provisions (including advancement of expenses) for those individuals who are or were directors or officers of the Debtors or the Reorganized Debtors on or after the Petition Date in accordance with, and to the fullest extent permittedauthorized by, the law of the applicablesuch Reorganized Debtor's state of organization, and (b) satisfy the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, in accordance with applicable law.

(b)     Directors and Officers of Reorganized SSCC.

As of the Effective Date, the initial directors of Reorganized SSCC shall be the persons identified in Exhibit 4 to the Plan (to be filed with  the Plan Supplement).  The term of any current members of the board of directors of SSCC or SSCE not identified as members of the initial

board~~Board~~ of ~~directors~~Directors of Reorganized SSCC shall expire on the Effective Date. The initial ~~board~~Board of ~~directors~~Directors of Reorganized SSCC shall consist of ____ (__) directors, including (a) Patrick J. Moore, the Chief Executive Officer of Reorganized SSCC and (b) Steven J. Klinger, the President and Chief Operating Officer of Reorganized SSCC. On or promptly after the Effective Date, the initial ~~board~~Board of ~~directors~~Directors of Reorganized SSCC shall select a non-executive Chairman of the ~~board of directors of Reorganized SSCC~~Board of Directors of Reorganized SSCC, who shall not be an officer of Reorganized SSCC; provided, however, that nothing in the Plan or in the Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC after the Effective Date.

In accordance with ~~Section~~section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 4 to the Plan (to be filed with the Plan Supplement) the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized SSCC, and to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. Each director of Reorganized SSCC shall serve from and after the Effective Date pursuant to the terms of the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, and applicable law. As set forth in Exhibit 4 to the Plan, all existing executive officers of ~~Reorganized~~ SSCC are currently expected to ~~continue to~~ serve as officers of Reorganized SSCC in their existing capacities from and after the Effective Date and, where applicable, pursuant to the terms and conditions of the Employment and Retirement Benefit Agreements to which such executive officers are party on the Effective Date, as set forth in Exhibit 12 to the Plan.

(c)     Management of Reorganized Debtors Other Than Reorganized SSCC.

The board of directors of each Reorganized Debtor other than Reorganized SSCC shall consist of such officers or employees of Reorganized SSCC or the other Reorganized Debtors as shall be designated by the Chief Executive Officer of Reorganized SSCC. All existing executive officers of Reorganized Debtors other than Reorganized SSCC are currently expected to continue to serve in their existing capacities from and after the Effective Date.

(d)     Corporate Action.

On the Effective Date, the adoption of the Amended and Restated Certificate of Incorporation or similar constituent documents, the adoption of the Amended and Restated By-Laws, the selection of directors and officers for Reorganized SSCC and the other Reorganized Debtors, and all other corporate actions contemplated by the Plan, including the formation of Canadian Newco pursuant to Section 5.1.1 of the Plan, shall be deemed to have been authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the entity structure of the Debtors or the Reorganized Debtors, and any entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, partners or shareholders of SSCC, Reorganized SSCC, or any of the other Debtors or Reorganized Debtors. On the Effective Date, the appropriate directors and officers of Reorganized SSCC and/or of the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the

agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of Reorganized SSCC and/or the other Reorganized Debtors.

### 3. Issuance and Distribution of New Securities and Related Matters.

(a)     Issuance of New SSCC Common Stock.

On the Effective Date, Reorganized SSCC shall issue up to [~~         ~~]100,000,000 shares of New SSCC Common Stock and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule; provided, however, that shares representing ~~not less than [      ]~~eight percent ([~~         ~~]8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [~~         ~~]8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the pertinent Management Incentive Plan(s) ~~as~~at, and as of, such times as are set forth in Exhibit 3 to the Plan~~on, and effective as of, the Effective Date~~.

The issuance and distribution of the New SSCC Common Stock under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy law and under the Bankruptcy Code, including, without limitation, ~~Section~~section 1145(a) of the Bankruptcy Code.  Without limiting the effect of ~~Section~~section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.  In addition, all of the shares of New SSCC Common Stock issued pursuant to the Plan shall be deemed to be fully paid, non-assessable and freely ~~tradeable~~tradable to the fullest extent permissible under ~~Section~~section 1145 of the Bankruptcy Code.

(b)     Distribution of New SSCC Common Stock.

On or as soon as reasonably practicable after the Effective Date, all of the shares of the New SSCC Common Stock to which any Holder of a Claim shall become entitled pursuant to the Plan shall be made by delivery of one or more certificates representing such shares ~~or notes~~ as described in the Plan or issued in the name of such Holder or DTC or its nominee or nominees, in accordance with DTC's book-entry exchange procedures, as contemplated by Section 8.7.2 of the Plan, subject to the terms and conditions of the Plan.  In the period pending distribution of the New SSCC Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and shall be entitled to receive dividends or other distributions payable in respect of such Holder's New SSCC Common Stock (including, without limitation, receiving any proceeds of any permitted transfer of such New SSCC Common Stock), and to exercise all other rights in respect of the New SSCC Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of any shares of the New SSCC Common Stock issued in the name of such Holder pursuant to the Plan).

(c)    Issuance of New Calpine Corrugated Interests.

On the Effective Date, Reorganized Calpine Corrugated shall issue 100% of the New Calpine Corrugated Interests to Reorganized SSCC (as the successor in interest to SSCE) without the necessity of any further act or action under applicable law, regulation, order or rule.

**4.    Listing on the New York Stock Exchange or the NASDAQ Stock Market.**

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market ("NASDAQ") but will incur no liability if it is unable to do so.  Persons receiving distributions of New SSCC Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with Reorganized SSCC's reasonable requests to assist Reorganized SSCC in its efforts to list the New SSCC Common Stock on the NYSE or NASDAQ, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized SSCC who satisfy the independence and other requirements of the NYSE or NASDAQ and establishing committees of the board of directors of Reorganized SSCC and cooperating with any other requirements of listing on the NYSE or NASDAQ.

**5.    Exit Facilities.**

On or prior to the Effective Date, certain of the Debtors shall enter into the Exit Facility Documentation and execute all other necessary and appropriate documentation in connection with the Exit Facilities.  The proceeds of the Exit Facilities shall be used, among other things, to make cash payments required under the Plan and to provide working capital for the business operations and general corporate purposes of the Reorganized Debtors.

**6.    5.  Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.**

On and after the Effective Date, after giving effect to each of the Restructuring Transactions contemplated under the Plan, each of the Reorganized Debtors and Canadian Newco shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation and by-laws, limited liability company agreements or partnership agreements in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, subject to the effect of the Restructuring Transactions contemplated under this the Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Claims, rights and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors and Canadian Newco free and clear of all Claims, Liens, charges, remedies and other encumbrances.  On and after the Effective Date, the Reorganized

Debtors and Canadian Newco may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, with the sole exception of any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors shall be authorized to pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without the need for any application to the Bankruptcy Court or the Canadian Bankruptcy Court.

### 7. ~~6.~~ Dissolution of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II.

If the CCAA Plan is approved by each Class of Affected Creditors, then from and after the Confirmation Date and through the Effective Date, SSC Canada, Smurfit-MBI and Stone FinCo II shall continue in existence and each then current officer and director of such Debtors shall continue to serve in his or her respective capacity through the earlier of the date such Debtors are dissolved pursuant to the Plan and the date such officer or director resigns, is replaced, or is terminated. On the Effective Date, to the extent that the Canadian Assets are transferred to Canadian Newco and the SSC Canada Distribution Reserve and the Smurfit-MBI Distribution Reserve are established, SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II shall be deemed dissolved for all purposes without the necessity for any other or further action by or on behalf of Debtors or any payments to be made in connection therewith; provided, however, that the Debtors or the Reorganized Debtors shall file with the appropriate public office certificates of dissolution for SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II. From and after the Effective Date, neither the Debtors nor the Reorganized Debtors shall be required to file any document, or take any other action, to withdraw the business operations of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II from any state or province in which such Debtors previously conducted their business operations.

### 8. ~~7.~~ Vesting of the Canadian Assets in Canadian Newco.

To the extent that the Canadian Assets are transferred to Canadian Newco on the Effective Date, they shall be transferred to and vest in Canadian Newco free and clear of all Liens, Claims, interests and encumbrances of any kind (except as otherwise set forth in the CCAA Vesting Order or in the Plan). From and after the Effective Date, Canadian Newco shall operate and may use, acquire and dispose of any Canadian Assets free of any restrictions of the Bankruptcy Code, the CCAA, the Bankruptcy Court, or the Canadian Bankruptcy Court.

The transfer of the Canadian Assets to Canadian Newco on the Effective Date and the assignment of any executory contracts, unexpired leases, licenses or permits to Canadian Newco in connection with the Canadian Asset Sale, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under the ~~Section~~section 1146(a) of the Bankruptcy Code.

### 9. ~~8.~~ Cancellation of Credit Documents, Debt Instruments, and Interests.

On the Effective Date, after giving effect to the distributions to be made on the Effective Date pursuant to the Plan and except as otherwise provided in the Plan, all (a) Prepetition Credit Documents, Calpine Corrugated Credit Agreements, Prepetition Notes, Prepetition Notes Indentures, Industrial Revenue Bonds, Industrial Revenue Bond Indentures, SSCC Interests, all other Interests that are Impaired under the Plan, and any other notes, bonds, indentures, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan, shall be cancelled, and (b) the obligations of the Debtors under any agreements, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements and repurchase arrangements, or indentures (including the Prepetition Notes Indentures and the Industrial Revenue Bond Indentures) governing the Prepetition Notes, the Industrial Revenue Bonds, the SSCC Interests, and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be discharged.  Notwithstanding the foregoing and anything contained in the Plan, (x) the Prepetition Notes Indentures shall continue in effect solely to the extent necessary to (i)  allow the ~~Reorganized Debtors or the relevant Prepetition Notes Indenture Trustees~~applicable Disbursing Agent(s) to make distributions pursuant to the Plan ~~on or about the Effective Date~~ on account of the Prepetition Noteholder Claims under the respective Prepetition Notes Indentures, (ii) permit the relevant Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, (iii) permit the Prepetition Notes Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Prepetition Notes Indenture Trustee is a party, and (iv) permit the applicable Prepetition Notes Indenture Trustee to perform any  functions that are necessary in connection with the foregoing clauses (i) through (iii); and (y) the Industrial Revenue Bond Indentures shall continue in effect solely to the extent necessary to (i) allow the applicable Disbursing Agent(s) to make distributions pursuant to the Plan on account of the Industrial Revenue Bond Claims under the respective Industrial Revenue Bond Indentures, (ii) permit the relevant Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, (iii) permit the Industrial Revenue Bond Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Industrial Revenue Bond Indenture Trustee is a party, and (iv) permit the applicable Industrial Revenue Bond Indenture Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (iii).  As of the Effective Date, any SSCC Interest that has been authorized to be issued but that has not been issued shall be deemed cancelled and extinguished without any further action of any party.

**10.** ~~9.~~ **Cancellation of Liens.**

Except as otherwise provided in the Plan, on the Effective Date, (i) all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Documents and the Calpine Corrugated Credit Agreements, shall be terminated, null and void and of no effect, and (ii) any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan)

shall be deemed released and the Holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

### **11.** ~~10.~~ **Employee Compensation and Benefit Programs.**

Except and to the extent previously assumed pursuant to an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee Benefit Plans and Employment and Retirement Benefit Agreements (as set forth in Exhibit 12 to the Plan), as amended or modified pursuant to the Plan or otherwise, including programs subject to ~~Sections~~sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date, except for (i) any executory contracts or plans specifically rejected pursuant to the Plan, and (ii) any executory contracts or plans that have previously been rejected or are the subject of a motion to reject as of the Confirmation Date; provided, however, that (x) the Debtors and the Reorganized Debtors shall pay all "retiree benefits" (as defined in ~~Section~~section 1114(a) of the Bankruptcy Code) and (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements (as set forth in Exhibit 12 to the Plan) shall be amended prior to (or upon) the assumption thereof by the Debtors (and assignment thereof to the Reorganized Debtors) to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" or "Good Cause" (or provide any other similar basis) for any employee of the Debtors or the Reorganized Debtors to terminate his or her employment nor constitute a "Change in Control" that would result in any obligation of the Debtors or Reorganized Debtors to provide any payments or other benefits to any employee.

With respect to the Employment and Retirement Benefit Agreements that the Debtors have not entered into prior to the Confirmation Date, as identified in Exhibit 12 to the Plan, the pertinent Debtor shall be deemed to have entered into each such Employment and Retirement Benefit Agreement with the applicable employee(s) on the Confirmation Date pursuant to the Plan. Such Employment and Retirement Benefit Agreements shall become binding in all respects on the Debtors and the applicable employee(s) on the Effective Date and shall be assigned by the Debtors to the Reorganized Debtors on the Effective Date.

On the Effective Date, Reorganized SSCC and any other Reorganized Debtor, whose employees are covered by any of the U.S. Pension Plans shall assume and continue the U.S. Pension Plans, satisfy the minimum funding standards under the U.S. Pension Plans pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the U.S. Pension Plans in accordance with their terms and the provisions of ERISA; and nothing in the Plan shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the U.S. Pension Plans.

On and after the Effective Date, Reorganized SSCC and any other Reorganized Debtor whose employees are covered by any Multi-Employer Pension Plan shall continue to perform their respective obligations under such Multi-Employer Pension Plan as such obligations may exist as of the Effective Date; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' rights or obligations with respect to such Multi-Employer Pension Plan.

### **12.** ~~11.~~ Canadian Pension Plans.

To the extent that the Canadian Assets are transferred to Canadian Newco, then, on the Effective Date, the Canadian Pension Plans shall be assigned to Canadian Newco pursuant to the terms of the CCAA Vesting Order, the Plan, the Confirmation Order, and the CCAA Sanction Order. From and after the Effective Date, Canadian Newco shall assume and continue the Canadian Pension Plans, satisfy the minimum funding standards thereunder pursuant to applicable Canadian law, and administer the Canadian Pension Plans in accordance with their terms and the provisions of applicable Canadian law. Nothing in the Plan shall be construed in any way as discharging, releasing or relieving Canadian Newco from liability imposed under any law or regulatory provision with respect to the Canadian Pension Plans.

### **13.** ~~12.~~ Management Incentive Plans.

On the Effective Date, Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the ~~forms of the stock option and restricted stock~~ form award agreements) substantially in the form as set forth in Exhibit 3 to the Plan.

~~Not less than [    ]~~ Eight percent (~~[    ]~~8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., ~~[    ]~~8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans. Reorganized SSCC shall deliver (a) the stock option, restricted stock, and/or other equity-based awards to certain officers and other employees ~~on,~~ in such allocations, at and effective as of ~~the Effective Date, in~~ such ~~amounts~~ times as set forth in Exhibit 3 to the Plan and in such forms as set forth in Exhibit 3 to the Plan, pursuant to the Management Incentive Plans and (b) such additional stock options, restricted stock unit grants and/or other equity-based awards pursuant to the Management Incentive Plans, from time to time on or after the Effective Date, as determined by the compensation committee of the board of directors of Reorganized SSCC in such committee's discretion. On and after the Effective Date, eligible officers and other employees who earn or receive incentive bonus, equity-based awards, and/or other benefits under such Management Incentive Plans shall be entitled to ~~the~~ such payments, awards, and other benefits ~~thereof~~ as provided in Exhibit 3 to the Plan, on the terms and conditions provided for therein, including the applicable award agreements provided pursuant to such Management Incentive Plans and in Section IV.C of the "Summary of Management Incentive Plans for Smurfit-Stone

158

Container Corporation and its Subsidiaries" as set forth in Exhibit 3 to the Plan. As of the Effective Date, all equity-based awards granted by a Debtor prior to the Petition Date shall terminate and cease to be binding on such Debtor.

The Debtors' 2009 Long-Term Incentive Plan and 2010 Management Incentive Plan, which were previously approved by the Bankruptcy Court, shall have the financial performance goals and (as applicable) restructuring goals, and shall provide for such payments to participants, as set forth in Exhibit 3 to the Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

In the event the Plan is modified to embody a sale of all or substantially all assets or equity of SSCC and/or SSCE: (i) on the Confirmation Date, the Debtors shall adopt the Management Sale Incentive Plan in substantially the form set forth in Exhibit 3 to the Plan; and (ii) on the Effective Date, the Debtors shall be deemed to have assumed the Management Sale Incentive Plan and shall assign it to the Reorganized Debtors pursuant to the terms of the Plan.

### 14. 13. Restructuring Transactions.

On, prior to, or after the Effective Date, any Debtor or Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. Such Restructuring Transactions will include the merger of SSCC into SSCE (the "SSCC/SSCE Merger"), which will survive the merger and become Reorganized SSCC under the Plan. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms in the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms in the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. TheIn addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors. In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Exhibit 13 to the Plan, to be filed with the Plan

Supplement, shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 6.13 of the Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, ~~Sections~~sections 1123 and 1141 of the Bankruptcy Code without any further notice, action, or process of any kind.

**15.** ~~14.~~ **Additional Transactions Authorized Under the Plan.**

In accordance with the provisions of the Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take such actions as may be necessary or appropriate to Reinstate certain Claims or Interests or to render certain Claims or Interests not Impaired in accordance with the terms of the Plan.

**16.** **Cash-Out Auction for Eligible Cash-Out Participants.**

    **(a)** **General.**

Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction by making the Cash-Out Election on its timely-submitted Ballot. Each Eligible Cash-Out Participant shall be entitled to make the Cash-Out Election regardless of whether such Eligible Cash-Out Participant has voted in favor of the Plan. All Eligible Cash-Out Participants that choose not to make the Cash-Out Election shall receive shares of the New SSCC Common Stock on account of their Allowed Claims and shall not be subject to the terms and conditions set forth in Section 6.16 of the Plan. Any Eligible Cash-Out Participant holding a Disputed Claim as of the Voting Deadline shall be entitled, but not required, to participate in the Cash-Out Auction, provided that all Eligible Cash-Out Participants must hold Allowed General Unsecured Claims against SSCE on or before the Initial Distribution Date in order to receive a Cash-Out Payment. Any Eligible Cash-Out Participant that holds a Disputed Claim as of the Initial Distribution Date that is deemed to be an Allowed Claim after the Initial Distribution Date shall receive shares of the New SSCC Common Stock on account of its Allowed Claims and shall not be entitled to receive a Cash-Out Payment. THE DEBTORS, IN CONSULTATION WITH THE COMMITTEE, RESERVE THE RIGHT TO CANCEL THE CASH-OUT AUCTION AT ANY TIME PRIOR TO THE EFFECTIVE DATE BY FILING A WRITTEN NOTICE OF SUCH CANCELLATION WITH THE BANKRUPTCY COURT. If the Cash-Out Auction is cancelled by the Debtors, all Eligible Cash-Out Participants that made the Cash-Out Election on their timely-submitted Ballots shall receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims.

    **(b)** **Cash-Out Auction.**

Pursuant to the Cash-Out Election, each Eligible Cash-Out Participant may elect to forego its Pro Rata Share of the New SSCC Common Stock Pool, which it otherwise would have received under the Plan on account of its Allowed General Unsecured Claims against SSCE, in exchange for receiving a payment in cash equal to the Cash-Out Percentage of such Allowed Claim (the "Cash-Out Payment") on the Initial Distribution Date, in full and complete satisfaction,

settlement, release and discharge of such Allowed Claim. Each Eligible Cash-Out Participant that receives a Cash-Out Payment shall be deemed to have irrevocably waived its right to receive any shares of the New SSCC Common Stock under the Plan. The process for determining which Eligible Cash-Out Participants may be entitled to receive Cash-Out Payments on account of their Allowed Claims in accordance with the procedures set forth in Section 6.16.3 of the Plan and described below is referred to in the Plan as the "Cash-Out Auction."

(c) Cash-Out Auction Procedures.

The Debtors will administer the Cash-Out Auction in accordance with the following procedures:

(i) Participation: In order to participate in the Cash-Out Auction, the Eligible Cash-Out Participant must specify on its timely-submitted Ballot the percentage of its Claim (if and when it is deemed to be an Allowed Claim) that such Eligible Cash-Out Participant is willing to receive in cash (the "Cash-Out Percentage") in lieu of its Pro Rata Share of the New SSCC Common Stock Pool. The Cash-Out Percentage must be set forth in whole numbers and clearly marked on a timely-submitted Ballot. Eligible Cash-Out Participants who fail to comply with the foregoing requirements shall not be eligible to receive a Cash-Out Payment.

(ii) Successful Cash-Out Participants: Following the Voting Deadline, the Debtors will examine all timely-submitted Ballots and will identify the Eligible Cash-Out Participants who made the Cash-Out Election. All Eligible Cash-Out Participants who specified the same Cash-Out Percentage (in whole numbers) on their timely-submitted Ballots shall be grouped together (each such group, a "Cash-Out Percentage Group") by the Debtors for purposes of the Cash-Out Auction. The Cash-Out Percentage Groups will be ranked by the Debtors from the lowest Cash-Out Percentage to the highest Cash-Out Percentage.

(iii) Cash-Out Distribution Pool: If the Cash-Out Auction is not cancelled by the Debtors prior to the Effective Date, the Cash-Out Distribution Pool will be distributed as follows: (i) the Eligible Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage will be entitled to receive a Cash-Out Payment on the Initial Distribution Date if sufficient cash is available in the Cash-Out Distribution Pool to make a Cash-Out Payment to all Eligible Cash-Out Participants in such Cash-Out Percentage Group; (ii) if insufficient cash is available in the Cash-Out Distribution Pool to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the Cash-Out Percentage Group with the lowest Cash-Out Percentage, such Eligible Cash-Out Participants shall not be entitled to receive any portion of the Cash-Out Distribution Pool and will instead receive their Pro Rata Share of the New SSCC Common Stock Pool on the Initial Distribution Date in full and complete satisfaction, settlement, release and discharge of their Allowed Claims; (iii) once the Eligible

161

Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage have received their Cash-Out Payments, the Debtors will move to the Cash-Out Percentage Group with the second-lowest Cash-Out Percentage and will repeat the procedures set forth in subclauses (i) and (ii) hereof until insufficient funds remain in the Cash-Out Distribution Pool to allow the Debtors to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the applicable Cash-Out Percentage Group, at which point any remaining funds in the Cash-Out Distribution Pool will be returned to the Reorganized Debtors (and all Eligible Cash-Out Participants who did not receive a Cash-Out Payment will receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims).

(iv) Additional Procedures: The Debtors or the Reorganized Debtors (in consultation with the Committee) shall be authorized to adopt any additional procedures for administering the Cash-Out Auction that are not inconsistent with the procedures set forth in Section 6.16 of the Plan and are reasonably necessary to efficiently administer the Cash-Out Auction in accordance with the terms of the Plan.  The Reorganized Debtors shall send a written notice prior to the Initial Distribution Date to each Eligible Cash-Out Participant that the Reorganized Debtors reasonably believe will be entitled to receive a Cash-Out Payment under the Plan.

G.    **Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases and the CCAA Proceedings.**

1.    **Assumption/Ratification of Executory Contracts and Unexpired Leases.**

Upon the occurrence of the Effective Date, all executory contracts or unexpired leases of the Debtors shall (i) be deemed assumed in accordance with, and subject to, the provisions and requirements of ~~Sections~~sections 365 and 1123 of the Bankruptcy Code and (ii) be deemed ratified by the Canadian Debtor that is a party to such executory contract or unexpired lease, unless such executory contract or unexpired lease (a) was previously assumed or rejected by the Debtors in the Chapter 11 Cases or repudiated by the Canadian Debtors in the CCAA Proceedings, (b) previously expired or terminated in accordance with its terms, or (c) is subject to the Assumption/Rejection Motion in the Chapter 11 Cases.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of each such assumption pursuant to ~~Sections~~sections 365(a) and 1123 of the Bankruptcy Code in the Chapter 11 Cases.  Entry of the CCAA Sanction Order by the Canadian Bankruptcy Court shall constitute approval of each such ratification in the CCAA Proceedings. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except

162

as modified by the provisions of the Plan, the terms of the Confirmation Order or the CCAA Sanction Order, as applicable, or applicable law. Except as otherwise set forth in the Plan, (x) all Employee Benefit Plans shall be deemed to have been assumed by the Debtors on the Effective Date and (y) all Non-Qualified Employee Benefit Plans shall be deemed to have been rejected by the Debtors, and to have been terminated with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code, on the Effective Date.

**2. Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.**

Any monetary amounts by which each executory contract and unexpired lease to be assumed or ratified pursuant to the Plan is in default shall be satisfied by payment of the default amount in cash on the Effective Date or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of ~~Section~~section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption or ratification of such contract or lease , the cure payments required shall be made following the entry of a Final Order resolving the dispute and approving the assumption or ratification, as applicable. Pending the entry of such Final Order, the executory contract or unexpired lease at issue shall be deemed assumed or ratified by the Debtors, as applicable, unless otherwise ordered by the Bankruptcy Court or the Canadian Bankruptcy Court.

**3. Assumption of Collective Bargaining Agreements.**

All Collective Bargaining Agreements shall be deemed to have been assumed or ratified by the Debtors party thereto upon the occurrence of the Effective Date, provided that the Canadian Collective Bargaining Agreements shall be assigned to Canadian Newco on the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the pertinent Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

**4. Insurance Policies and Agreements.**

Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, (i) the entry of the Confirmation Order shall constitute approval of such assumption pursuant to ~~Section~~section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate and (ii) the entry of the CCAA Sanction Order shall constitute approval of such ratification. Unless otherwise determined by the Bankruptcy Court or the Canadian

Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement.  To the extent that the Bankruptcy Court or the Canadian Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

5.      **Rejection Damages Bar Date.**

If the rejection by a Debtor (or repudiation by a Canadian Debtor) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor unless a Proof of Claim with respect to such Claim is filed with the Claims and Noticing Agent and served upon counsel to the Debtors or the Reorganized Debtors (as the case may be) by the earlier of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting such executory contract or unexpired lease.

6.      **Post-Petition Contracts and Leases.**

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date (including, without limitation, all Employment and Retirement Benefit Agreements entered into by any Debtor after the Petition Date and on or before the Confirmation Date, as set forth in <u>Exhibit 12</u> of the Plan) shall be deemed to have been assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date.

H.      <u>**Provisions Governing the Distributions Under the Plan.**</u>

1.      **General Provisions on Distributions under the Plan.**

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court or to the extent that any Holder of an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings agrees to different treatment, distributions to be made on account of Claims that are Allowed Claims or Proven Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.  Notwithstanding anything in the Plan to the contrary, distributions on account of (i) Administrative Expense Claims that are Allowed Claims as of the Effective Date and (ii) CCAA Charges shall be made on, or as soon as practicable after, the Effective Date, with no action to enforce a right to such payment until at least thirty (30) days after the Effective Date.  Distributions on account of any Claim that first becomes an Allowed Claim or a Proven Claim after the Effective Date shall be made on the first Distribution Date after such Claim becomes an Allowed Claim or a Proven Claim, as applicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

Notwithstanding any other provision of the Plan to the contrary, no distributions shall be made on account of any Disputed Claims unless and until such Claim has become an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings.  Prior to the Effective Date, Disputed Claims in the CCAA Proceedings shall be dealt with in accordance with the terms of the CCAA Claims Determination Order.  Following the Effective Date, the resolution of

Disputed Claims in the CCAA Proceedings shall continue to be dealt with in accordance with the terms of the CCAA Claims Determination Order.

**2.    No Interest on Claims Unless Otherwise Provided in the Plan.**

Except as otherwise specifically provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the DIP Financing Order), or as otherwise required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to the payment of interest accruing on or after the Petition Date on any Claim.

**3.    Distributions by Disbursing Agents.**

Except as specifically provided in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to assist in or make the distributions required by the Plan.  The Prepetition Agent shall be the Disbursing Agent for all distributions to the Holders of Prepetition Lender Claims and Prepetition Canadian Lender Claims.  The Prepetition Notes Indenture Trustees shall be the Disbursing Agents for all distributions to the Holders of Prepetition Noteholder Claims.  The ~~Industrial Revenue Bond Indenture~~ ~~Trustees shall be the~~ Disbursing Agents for all distributions to the ~~Holders of Industrial Revenue Bond Claims~~Industrial Revenue Bondholders shall be either the applicable Industrial Revenue Bond Indenture Trustee, the Reorganized Debtors, or any Person or Entity retained by the Reorganized Debtors for the purpose of making distributions under the Plan to the Industrial Revenue Bondholders.  Other than as specifically set forth in the Plan, distributions to be made on account of Prepetition Noteholder Claims or Industrial Revenue Bond Claims shall be made in accordance with the terms of the applicable Prepetition Notes Indenture or Industrial Revenue Bond Indenture, or in accordance with the Plan if such Prepetition Notes Indenture or Industrial Revenue Bond Indenture is silent.

**4.    Delivery of Distributions – Chapter 11 Cases**.

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Allowed Claims in the Chapter 11 Cases.

(a)    Delivery of Distributions in General.

Distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Allowed Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Allowed Claim; (iii) at the address set forth in any written notice of address change delivered to the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)    Distributions to Holders of Prepetition Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Lender Claims, any distributions that the Debtors are required to make to such Holders pursuant to Article III of the Plan.

(c)     Distributions to Holders of Union Bank Claims and CIT Group Claims.

On the Effective Date, the Reorganized Debtors shall deliver to Union Bank and CIT Group, for distribution on behalf of Calpine Corrugated, the cash distributions that Calpine Corrugated is required to make to such Holders pursuant to Article III of the Plan.

(d)     Distributions to Holders of General Unsecured Claims Against SSCE.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver shares of the New SSCC Common Stock to the applicable Disbursing Agent for distribution to the Holders of Allowed General Unsecured Claims against SSCE in accordance with the procedures set forth in Sections —and—8.4 and 8.7 of the Plan.  If the Cash-Out Auction has not been cancelled by the Debtors prior to the Effective Date, the Reorganized Debtors shall deliver the Cash-Out Payments to the applicable Eligible Cash-Out Participants in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.

(e)     Distributions to Holders of Convenience Claims.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute cash to the Holders of Allowed Convenience Claims against SSCE in accordance with the procedures set forth in Sections —8.4 and —8.7 of the Plan.

(f)     Distributions to Holders of General Unsecured Claims Against Cameo Container and Calpine Corrugated.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver to the Holders of Allowed General Unsecured Claims against Cameo Container and Calpine Corrugated the cash distributions that Cameo Container and Calpine Corrugated are required to make to such Holders pursuant to Article III of the Plan.

**5.     Delivery of Distributions – CCAA Proceedings.**

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Proven Claims in the CCAA Proceedings.

(a)     Delivery of Distributions in General.

Distributions to Holders of Proven Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Proven Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Proven Claim; (iii) at the address set forth in any written notice of address change delivered to the CCAA Monitor or the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set

CH1 504999855118439v.974

forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)     Distributions to Holders of Prepetition Canadian Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Canadian Lender Claims, any distributions that the Debtors are required to make to such Holders pursuant to Article III and Article IV of the Plan.

(c)     Distributions to Holders of General Unsecured Claims Against SSC Canada and Smurfit-MBI.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver cash and/or shares of New SSCC Common Stock to the Holders of Allowed General Unsecured Claims against SSC Canada and Smurfit-MBI in accordance with the procedures set forth in Sections —8.5 and —8.7 of the Plan.

**6.     Undeliverable and Unclaimed Distributions.**

(a)     Holding and Investment of Undeliverable and Unclaimed Distributions.

If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address, at which time all previously-missed distributions shall be made to such Holder without interest.

(b)     Failure to Claim Undeliverable Distributions.

Amounts in respect of undeliverable distributions made in cash shall be retained by the Reorganized Debtors until such distributions are claimed. Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed distribution within six (6) months after the Effective Date shall be deemed to have forfeited its rights to such undeliverable or unclaimed distribution and shall be forever barred and enjoined from seeking the payment of any such undeliverable or unclaimed distribution from the Debtors or the Reorganized Debtors. In such cases, any cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any shares of New SSCC Common Stock returned to the Debtors and not claimed within one (1) year of return shall irrevocably revert to the Reorganized Debtors and shall be cancelled, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which the check was originally issued. Any Claim in respect of a

167

voided check shall be made on or before the six (6) month anniversary of the date of issuance of such check. After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred and the Reorganized Debtors shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

**7.      Record Date for Distributions.**

The Reorganized Debtors and the other Disbursing Agents shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Proven Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes hereof to recognize and make distributions only to those Holders of Allowed Claims or Proven Claims that actually held such Claims as of the close of business on the Distribution Record Date. The Reorganized Debtors and the other Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as stated on the official claims register in the Chapter 11 Cases, or as reflected in the CCAA Monitor's records, as of the close of business on the Distribution Record Date.

Distributions to Holders of Allowed Prepetition Noteholder Claims administered by each Prepetition Notes Indenture Trustee shall be made to the account of, or at the direction of, the respective Prepetition Notes Indenture Trustee and subject to the rights of each respective Prepetition Notes Indenture ~~Trustees~~Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. In connection with such book-entry exchange, each Prepetition Notes Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Prepetition Noteholder Claims.

Distributions to Holders of Allowed Industrial Revenue Bond Claims administered by any Industrial Revenue Bond Indenture Trustee or any other Disbursing Agent shall be made to the account of, or at the direction of, the respective Industrial Revenue Bond Indenture Trustee and subject to the rights of each respective Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. In connection with such book-entry exchange, each Industrial Revenue Bond Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Industrial Revenue Bond Claims.

**8.      Assignment of Claims.**

For purposes of determining entitlement to  receive any distribution pursuant to the Plan, the Debtors, the Reorganized Debtors and the applicable Disbursing Agent, and each of their respective agents, successors and assigns, shall have no obligation to recognize any transfer of a Claim unless and until notice of the transfer or assignment from either the transferor, assignor, transferee or assignee, together with evidence showing ownership, in whole or in part, of such Claim and that such transfer or assignment was valid under applicable law, has been received by

CH1 ~~5049998~~5118439v.~~7~~4

the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent, as the case may be, at least ten (10) Business Days prior to the applicable Distribution Date.

9. **Means of Cash Payment.**

Unless otherwise set forth in the Plan, all payments of cash made pursuant to the Plan shall be in United States dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the Reorganized Debtors; provided that cash payments made to the Prepetition Agent, Union Bank and CIT Group shall be made in immediately available funds by wire transfer. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

10. **Withholding and Reporting Requirements.**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Holders of Allowed Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, each Person or Entity that has received any distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

11. **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest thereon.

12. **Setoff and Recoupment.**

The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan in respect of such Allowed Claim, Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may assert against the Holder of such Allowed Claim; provided, however, that neither the failure to assert such rights of setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any Claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

13. **Fractional Shares.**

No fractional shares of New SSCC Common Stock shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New SSCC Common Stock or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New SSCC Common Stock. The total number of shares of New SSCC Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding in the Plan.

**14.** **Compromises and Settlements.**

Up to and including the Effective Date, the Debtors may compromise and settle, in accordance with Bankruptcy Rule 9019(a), any and all Claims against them. On the Effective Date, such right to compromise and settle Claims shall pass to the Reorganized Debtors as contemplated in Section 8.15 of the Plan, and the Reorganized Debtors shall thereafter be authorized (subject to the Creditor Representative's approval when necessary under Section 12.11 of the Plan) to compromise and settle any Disputed Claim and execute all necessary documents, including a stipulation of settlement or release, in their sole discretion, without notice to any party, and without the need for further approval of the Bankruptcy Court.

**15.** **Claims Administration Responsibility – Chapter 11 Cases.**

(a)  Sole Responsibility of the Reorganized Debtors.

From and after the Effective Date, the Reorganized Debtors shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making distributions (if any) with respect to all Claims, including all Administrative Expense Claims; provided, however, that the Reorganized Debtors shall not be authorized to compromise, settle, or resolve any Claim, including any Administrative Expense Claim, if the Allowed amount of such Claim would exceed the Creditor Representative Threshold Amount, without the consent of the Creditor Representative in accordance with Section 12.11 of the Plan.

(b)  Objections to Claims.

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Debtors or the Reorganized Debtors effect service of such objection in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable Proof of Claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

(c)  Determination of Allowed Claims.

Except as otherwise agreed to by the Debtors in writing or as set forth in the Plan, the Allowed amount of any Claim as to which a Proof of Claim was timely filed in the Chapter 11

Cases, and which Claim is subject to an objection filed by the Debtors or the Reorganized Debtors before the Claims Objection Deadline, will be determined and liquidated pursuant to a Final Order of the Bankruptcy Court. Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with the Plan. Any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be deemed Allowed for purposes of the Plan unless otherwise ordered by the Bankruptcy Court.

### 16. Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.

(a) No Distributions Pending Allowance.

~~No~~Except as otherwise set forth in the Plan, no distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim; provided, however, that where (i) any portion of a Claim is listed in the Schedules as neither contingent, unliquidated or disputed or (ii) the Debtors, in good faith, reasonably dispute the allowance of no more than 50% of any Claim, the Reorganized Debtors shall make a distribution on the Initial Distribution Date on account of the higher of (a) any portion of such Claim that is listed in the Schedules as neither contingent, unliquidated or disputed and (b) any portion of such Claims that is not a Disputed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b) SSCE Distribution Reserve.

On the Effective Date, the Reorganized Debtors shall issue and hold in the SSCE Distribution Reserve shares of the New SSCC Common Stock in such amount as the Reorganized Debtors reasonably determine is necessary to enable them to make the distributions required to be made to the Holders of Allowed General Unsecured Claims against SSCE once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Damages Claims, is ultimately determined. To the extent that the SSCE Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors shall file a list of such affected Disputed Claims with the Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. To the extent that the SSCE Distribution Reserve incorporates Rejection Damages Claim arising from the rejection of any executory contracts or unexpired leases under the Plan, the Debtors shall, at such time as they file the Assumption/Rejection Motion, identify the amount of the SSCE Distribution Reserve allocated for the putative Rejection Damages Claims arising from the rejection of such executory contracts or unexpired leases. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court sustaining such objection, the Debtors' estimation of each Disputed Claim for purposes of the SSCE Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim, once Allowed, than the pro rata distribution it would have received based on the Debtors' estimation. Shares of the New SSCC Common Stock held in the SSCE Distribution Reserve pending the resolution of all Disputed Claims shall be deemed to have been voted in the same proportion as the shares of New SSCC Common Stock issued on the

Initial Distribution Date.  Any transfer or surrender of shares out of the SSCE Distribution Reserve shall be accompanied by any distributions or proceeds received in respect of such shares while in the SSCE Distribution Reserve.

        (c)      Distributions After Allowance.

Except as otherwise set forth in the Plan with respect to General Unsecured Claims against SSCE, promptly after a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors or the Disbursing Agent, as applicable, will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims had such Claim been an Allowed Claim on such dates.  After a Final Order has been entered, or other resolution has been reached, with respect to any Disputed Claim that is a General Unsecured Claim against SSCE for less than the amount of the SSCE Distribution Reserve for such Disputed Claim, the excess remaining shares of New SSCC Common Stock in the SSCE Distribution Reserve shall either be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE on the Final Distribution Date or irrevocably surrendered to Reorganized SSCC (together with any dividends, distributions or proceeds received in respect thereof); provided, however, that if more than [_____] shares of the New SSCC Common Stock remain in the SSCE Distribution Reserve after the Final Distribution Date, such remaining shares shall be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE who had previously received distributions of the New SSCC Common Stock under the Plan.  All Distributions under the Plan on account of Allowed Claims will be made together with any dividends, payments, or other distributions made on account of the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims in such Class.

        (d)      No Recourse.

No Holder of a Disputed Claim shall have any recourse against the Debtors, the Estates, the Reorganized Debtors, the Committee, the Prepetition Agent, the Prepetition Lenders, the Prepetition Notes Indenture Trustees, or the Industrial Revenue Bond Indenture Trustees, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors, in the event that the SSCE Distribution Reserve is insufficient to provide a sufficient distribution on account of any Disputed Claim that becomes an Allowed Claim.

        (e)      Unliquidated and Contingent Claims.

Any Claim that is filed or scheduled as an unliquidated or contingent Claim shall be disallowed as of the Confirmation Date unless the Holder thereof files a motion seeking the allowance or estimation of such Claim at least twenty (20) days prior to the Confirmation Hearing. In addition, the Debtors may, at any time prior to the Confirmation Hearing, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to ~~Section~~section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to the allowance of such Claim.

## 17. Distribution Reserve– CCAA Proceedings.

(a) SSC Canada Distribution Reserve.

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the SSC Canada Distribution Pool. The CCAA Monitor shall hold the SSC Canada Distribution Pool in one or more segregated accounts and shall disburse funds ~~and/or shares of New SSCC Common Stock~~ from the SSC Canada Distribution Pool in accordance with the terms of the Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the SSC Canada Distribution Reserve for the purpose of holding cash ~~and/or shares of New SSCC Common Stock~~ from the SSC Canada Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against SSC Canada the amount of cash ~~and/or shares of New SSCC Common Stock~~ that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against SSC Canada as of the Initial Distribution Date. To the extent that the SSC Canada Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the SSC Canada Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation. Any funds ~~and/or shares of New SSCC Common Stock~~ remaining in the SSC Canada Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the SSC Canada Distribution Reserve to Reorganized SSCC.

(b) Smurfit-MBI Distribution Reserve.

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the Smurfit-MBI Distribution Pool. The CCAA Monitor shall hold the Smurfit-MBI Distribution Pool in one or more segregated accounts and shall disburse funds ~~and/or shares of New SSCC Common Stock~~ from the Smurfit-MBI Distribution Pool in accordance with the terms of the Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the Smurfit-MBI Distribution Reserve for the purpose of holding cash ~~and/or shares of New SSCC Common Stock~~ from the Smurfit-MBI Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against Smurfit-MBI the amount of cash ~~and/or shares of New SSCC Common Stock~~ that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against Smurfit-MBI as of the Initial Distribution Date. To the extent that the Smurfit-MBI Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed

173

with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the Smurfit-MBI Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation. Any funds and/or shares of New SSCC Common Stock remaining in the Smurfit-MBI Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the Smurfit-MBI Distribution Reserve to Reorganized SSCC.

## I.  **Confirmation and Consummation of the Plan.**

### 1.  **Conditions to Confirmation.**

The following are conditions precedent to the occurrence of the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Section 9.3 of the Plan:

(a)  The Bankruptcy Court shall have entered a Final Order, in a form reasonably acceptable to the Debtors and the Committee, approving the adequacy of the this Disclosure Statement.

(b)  The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) have been entered and (ii) be in form and substance reasonably acceptable to the Debtors and the Committee.

(c)  The conditions precedent for implementation of the CCAA Plan, as set forth in Section 4.6 of the Plan, shall have been satisfied.

### 2.  **Conditions to Occurrence of the Effective Date.**

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)  All conditions to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived in accordance with Section 9.3 of the Plan.

(b)  The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

(c) Each CCAA Sanction Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

(d) Each document, instrument, or agreement to be executed in connection with the Plan shall be reasonably acceptable to the Debtors.

(e) The transactions contemplated by Article V of the Plan shall have occurred or shall have been waived by the Debtors in accordance with the terms of the Plan.

**3.** **Waiver of Conditions.**

Notwithstanding anything to the contrary in Section 9.1 or Section 9.2 of the Plan, the Debtors (in consultation with the Committee and the CCAA Monitor) may waive in writing the occurrence of any of the foregoing conditions precedent to the Confirmation of the Plan and/or occurrence of the Effective Date or modify any such conditions precedent, other than the conditions set forth in Sections 9.2.2 and 9.2.3 of the Plan. Any such written waiver or modification of a condition precedent may be effected at any time without notice, without leave or order of the Bankruptcy Court or the Canadian Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in the manner set forth above, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

**4.** **Consequences of Non-Occurrence of Effective Date.**

If the Effective Date has not occurred within one hundred and twenty (120) days of the Confirmation Date (as such date may be extended by the Debtors in consultation with the Committee and the CCAA Monitor), upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors will request that the Bankruptcy Court enter an order vacating the Confirmation Order. If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume, assign or reject executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated.

**5.** **Notice of Effective Date.**

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

**J.      Injunctions, Releases And Discharge.**

**1.      Discharge.**

(a)      Discharge of Claims and Termination of Interests.

(i)      As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors, the Reorganized Debtors, Canadian Newco, or any of their respective assets, property and Estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a Holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under ~~Section~~ section 1141(d)(1)(A) of the Bankruptcy Code and applicable provisions of the CCAA and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in ~~Sections~~ sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under ~~Section~~ section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is deemed to be an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security Holder in any of the Debtors and all Interests, including, without limitation, the SSCC Interests.

(ii)      As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all Persons and Entities shall be precluded from asserting against the Debtors and their respective assets, property and Estates, the Reorganized Debtors, Canadian Newco, and each of their respective Related Persons, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all

Interests or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, the Confirmation Order and the CCAA Sanction Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest and termination of all rights of any equity security Holder in any of the Debtors and all Interests, including the SSCC Interests, pursuant to ~~Sections~~sections 524 and 1141 of the Bankruptcy Code and applicable provisions of the CCAA, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or Canadian Newco, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any equity security Holder in any of the Debtors or terminated Interest, including, without limitation, an SSCC Interest.

(iii)     Pursuant to ~~Section~~section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge SSC Canada, Smurfit-MBI or Stone FinCo II from any Claims and other debts or obligations that arose prior to the Petition Date.

(b)     Discharge Injunction.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or any of their respective assets, property and Estates, the Reorganized Debtors, or Canadian Newco that is discharged pursuant to Section 10.1.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, Canadian Newco, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions

177

from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation ~~owed to any Person~~that is discharged under Section 10.1.1 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order or the CCAA Sanction Order.

(c)     Integral to Plan.

Each of the discharges and injunctions provided in Section 10.1 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Debtors, the Reorganized Debtors, and Canadian Newco shall have the right to independently seek the enforcement of the discharge and injunction set forth in Section 10.1 of the Plan.

**2.     Releases.**

(a)     Releases by Debtors and Estates.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, Canadian Newco, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, ~~the~~this Disclosure Statement, the Canadian Asset Sale, or the Restructuring Transactions that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates.

(b)     Releases by Holders of Claims and Interests.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature

CH1 ~~5049998~~5118439v.~~7~~4

whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, ~~the~~this Disclosure Statement, the Restructuring Transactions, or the Canadian Asset Sale; <u>provided</u>, <u>however</u>, that each Person that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 10.2.2 of the Plan with respect to those Released Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and their respective predecessors, successors and assigns (whether by operation of law or otherwise).

(c)    Injunction Related to Releases.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation ~~owed to any Person~~<u>that is</u> discharged under Section 10.2 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

(d)    Integral to Plan.

Each of the releases and injunctions provided in Section 10.2 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the releases and injunctions set forth in Section 10.2 of the Plan shall have the right to independently seek the enforcement of such releases and injunctions.

179

(e)     Deemed Consent.

By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 10.2.2 of the Plan by marking the appropriate box on the Ballot, each ~~holder~~Holder of a Claim or Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 10.2.2 of the Plan.

(f)     No Waiver.

Notwithstanding anything to the contrary contained in Section 10.2 of the Plan, the releases and injunctions set forth in Section 10.2 of the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors or Canadian Newco to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors or Canadian Newco pursuant to the Plan.

**3.     Supplemental Injunction.**

In order to supplement the injunctive effect of the Discharge Injunction, the Confirmation Order and the CCAA Sanction Order shall provide for the following injunctions to take effect as of the Effective Date.

(a)     Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in ~~Sections~~sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the United States, Canada, or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(i)     commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations,

suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;

(ii)     enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iii)    creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iv)    except as otherwise expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and

(v)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Related Documents, the Confirmation Order, or the CCAA Sanction Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.

(b)     Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(c)     Integral to Plan.

Each of the injunctions provided in Section 10.3 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the injunctions set forth in Section 10.3 of the Plan shall have the right to independently seek the enforcement of such injunctions.

**4.     Disallowed Claims.**

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any Order disallowing any Claim or Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to ~~Section~~section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) disallowing all Claims to the extent such Claims are not allowable under any provision of ~~Section~~section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

5. **Exculpation.**

(a) No Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, ~~the~~this Disclosure Statement, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence, and each Released Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

(b) Notwithstanding any other provision in the Plan, (i) no Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) no other party in interest, (iii) no Person claiming by or through any of the foregoing entities, and (iv) none of the Related Persons of any of the foregoing entities, shall, or shall be deemed to, have any Claim or right of action whatsoever against any Released Party for, or on account of or relating to (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken or omitted to be taken in

connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, ~~the~~this Disclosure Statement, the Confirmation Order, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence.

6.   **Revesting of Assets.**

Pursuant to ~~Section~~section 1141(b) of the Bankruptcy Code and any applicable provisions of the CCAA, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date (subject to the effects of the Restructuring Transactions). Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Interests, except as specifically provided in the Plan, the Confirmation Order, or the CCAA Sanction Order. Without limiting the generality of the foregoing, each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional services and expenses.

7.   **Preservation of Litigation Claims.**

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with ~~Section~~section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims. The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

8.   **Survival of Indemnification Obligations.**

(a)   Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, all respective obligations of SSCC and the other Debtors to indemnify and reimburse persons who are or were directors, officers, managers or employees and agents of the Debtors on the Petition Date or at any time thereafter, whether pursuant to certificates

or articles of incorporation, codes of regulation, by-laws, limited liability company agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall be treated as if they are executory contracts that are assumed pursuant to ~~Section~~section 365 of the Bankruptcy Code under the Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and the Debtors' assumption, of each of the Debtors' director and officer liability insurance policies.  Additionally, the Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be described in greater detail in the Plan Supplement.

      (b)      Integral Part of Plan.

Each of the provisions set forth in Section 10.8 of the Plan is an integral part of the Plan and is essential to its implementation.  Each Person entitled to indemnification and insurance pursuant to Section 10.8 of the Plan shall have the right to independently seek the enforcement of each of the terms of Section 10.8 of the Plan.

## K.  **Retention of Jurisdiction.**

### 1.  **Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court.**

Subject to the Cross-Border Insolvency Protocol, the Bankruptcy Court and the Canadian Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the CCAA Proceedings, and the Plan, pursuant to ~~Sections~~sections 105(c) and 1142 of the Bankruptcy Code and applicable provisions of the CCAA, to the fullest extent permitted by law, including, among other things, jurisdiction to:

      (a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses for periods ending on or before the Effective Date;

(c)     resolve any matters related to the assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)     ensure that distributions to Holders of Allowed Claims or Proven Claims are accomplished pursuant to the provisions of the Plan;

(e)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the CCAA Sanction Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, ~~the~~this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order;

(g)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)     reconcile any inconsistency between the terms of the Confirmation Order and the terms of the CCAA Sanction Order;

(i)     approve any modification of the Plan before or after the Effective Date pursuant to ~~Section~~section 1127 of the Bankruptcy Code and applicable provisions of the CCAA or approve any modification of ~~the~~this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, ~~the~~this Disclosure Statement, the Confirmation Order, ~~,~~the CCAA Sanction Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, ~~the~~this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, ~~the~~this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order, in such manner as may be necessary or appropriate to consummate the Plan;

(j)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under ~~Sections~~ sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, that (i) the fees and expenses of Professionals retained by the Reorganized Debtors, including counsel fees, that are incurred after the Effective Date, (ii) the fees and expenses of Professionals retained by the Committee, including counsel fees, that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, and (iii) the fees and expenses of agents for or external counsel to any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(k)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(l)      hear and determine any Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

(m)      hear and determine matters concerning state, local and federal taxes in accordance with ~~Sections~~ sections 346, 505 and 1146 of the Bankruptcy Code;

(n)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan are enjoined or stayed;

(o)      determine any other matters that may arise in connection with or relate to the Plan, ~~the~~ this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, ~~the~~ this Disclosure Statement, the Confirmation Order or the CCAA Sanction Order;

(p)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases and the CCAA Proceedings;

(q)      hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

CH1 ~~5049998~~5118439v.~~7~~4

(r)    hear and determine all claims, rights or disputes arising under or in connection with the Asset Purchase Agreement and related agreements;

(s)    hear and determine any disputes with respect to requests for the allowance of compensation and reimbursement of expenses incurred by any Professional;

(t)    hear and determine such other matters as may be provided in the Confirmation Order or the CCAA Sanction Order, or as may be authorized under the Bankruptcy Code or the CCAA;

(u)    resolve and finally determine all disputes that may relate to, have an impact on, or arise in connection with the Plan;

(v)    hear any other matter consistent with the provisions of the Bankruptcy Code or the CCAA, as the case may be;

(w)    enter an order closing the Chapter 11 Cases; and

(x)    enter an order winding up the CCAA Proceedings.

## L.    **Miscellaneous.**

### 1.    **Surrender of Instruments.**

As a condition to participation under the Plan, the Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall surrender such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the beneficial holder of such a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall be deemed to have surrendered such Holder's Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness upon the surrender of such global security by DTC or such other securities depository or custodian thereof, or in the event the DTC or such other securities depository or custodian does not surrender such global security on the Effective Date or as soon as practicable thereafter, then the Debtors may waive any requirement of surrender of such Prepetition Note, Industrial Revenue Bond, or

other evidence of indebtedness.  Except as otherwise provided in Section 12.1.1 of the Plan, if no surrender of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness.  The Debtors or the Reorganized Debtors (as the case may be) shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees) and the record Holders of such securities shall be those Holders of record as of the Effective Date.

### 2. Dissolution of the Committee.

The Committee shall continue in existence until the Effective Date.  On the Effective Date, the appointment of the Committee shall terminate, and the Committee shall be dissolved, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to ~~Section~~section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; (iii) any adversary proceedings or contested matter as of the Effective Date to which the Committee is a party; and (iv) responding to creditor inquiries for one hundred and twenty (120) days following the Effective Date.  All reasonable fees and expenses incurred by the Professionals retained by the Committee in connection therewith shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court.  Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, the Committee shall be dissolved and the members of the Committee shall be released and discharged of and from all duties, responsibilities and obligations related to or arising from or in connection with the Chapter 11 Cases.

### 3. Pre-Effective Date Injunctions or Stays.

All injunctions or stays that are in effect in the Chapter 11 Cases or the CCAA Proceedings on the Confirmation Date, whether by operation of law (including, without limitation, ~~Section~~section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court or the Canadian Bankruptcy Court (including, without limitation, the CCAA Initial Order), shall continue and remain in full force and effect through and including the Effective Date.

### 4. Post-Confirmation Date Retention of Professionals.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with ~~Sections~~sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

### 5. Payment of the Fee Auditor's Fees and Expenses.

CH1 ~~5049998~~5118439v.~~7~~4

Following the Effective Date, the Reorganized Debtors shall pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from the Fee Auditor, all reasonable fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court. In the event that the Reorganized Debtors object to payment of such invoice from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

### 6. 5. Bar Date for Certain Administrative Expense Claims.

All applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to Sectionsection 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases (but expressly excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.16 of the Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim. The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

### 7. 6. Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

### 8. 7. Exemption from Transfer Taxes.

Pursuant to Sectionsection 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan; (c) the making or assignment of any lease or sublease pursuant to the Plan; or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan, the Confirmation Order or the CCAA Sanction Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee or similar tax, charge or expense to the fullest extent provided for under the Bankruptcy Code.

### 9. 8. Payment of Statutory Fees.

All fees payable pursuant to ~~Section~~section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### **10.** ~~9.~~ **Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees.**

Notwithstanding anything to the contrary in the Plan, the Prepetition Notes Indenture Trustee Fees and the Industrial Revenue Bond Indenture Trustee Fees that are incurred prior to the Effective Date shall be paid in full, in cash, on the Effective Date. The Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees that are incurred after the Effective Date shall be paid in full, in cash, by the Reorganized Debtors in the ordinary course of business after the Effective Date.

### **11.** ~~10.~~ **Proofs of Claim Filed by Prepetition Notes Indenture Trustees.**

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Prepetition Notes Indenture Trustees with respect to the Prepetition Noteholder Claims. If any Prepetition Notes Indenture Trustee files a Proof of Claim in respect of the Prepetition Noteholder Claims and a Prepetition Noteholder also files a Proof of Claim with respect to any Prepetition Noteholder Claim included in the Proof of Claim filed by the Prepetition Notes Indenture Trustee, only the Proof of Claim of the Prepetition Notes Indenture Trustee shall be Allowed.

### **12.** **Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.**

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Industrial Revenue Bond Indenture Trustees with respect to the Industrial Revenue Bond Claims. If any Industrial Revenue Bond Indenture Trustee files a Proof of Claim in respect of the Industrial Revenue Bond Claims and an Industrial Revenue Bond Bondholder also files a Proof of Claim with respect to any Industrial Revenue Bond Claim included in the Proof of Claim filed by the Industrial Revenue Bond Indenture Trustee, only the Proof of Claim of the Industrial Revenue Bond Indenture Trustee shall be Allowed.

### **13.** ~~11.~~ **Creditor Representative Duties and Payment of Fees**

The Committee, in consultation with the Debtors, shall select the Creditor Representative, whose identity shall be disclosed in the Plan Supplement. From and after the Effective Date, the Creditor Representative, with the assistance of counsel, shall be responsible for (i) approving the settlement or allowance of any Claim where the Allowed amount would exceed the Creditor Representative Threshold Amount and (ii) enforcing the terms of the Plan. The reasonable fees and expenses of the Creditor Representative (including the reasonable fees and expenses of counsel retained by the Creditor Representative) shall be paid by the Reorganized Debtors after the Effective Date without the need for approval by the Bankruptcy Court, provided that such fees and expenses shall not exceed $[_____] in the aggregate.

### 14. 12. Amendment or Modification of the Plan.

Subject to Sectionsection 1127 of the Bankruptcy Code and applicable provisions of the CCAA, the Debtors may alter, amend, modify or supplement the Plan, Plan Supplement or the Plan Exhibits at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### 15. 13. Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 16. 14. Binding Effect; Successors and Assigns.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and all other parties in interests in these Chapter 11 Cases and the respective successors and assigns of each of the foregoing, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 17. 15. Revocation, Withdrawal or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

**18.** ~~16.~~ **Notice.**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Smurfit-Stone Container Corporation
222 North LaSalle Street
Chicago, IL 60601
Attention:  General Counsel
Telephone:
Facsimile:

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Attention: James F. Conlan
          Matthew A. Clemente
          Dennis M. Twomey
          Bojan Guzina
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

**19.** ~~17.~~ **Governing Law.**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law of the United States is applicable to the Plan in the Chapter 11 Cases, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the Plan in the Chapter 11 Cases shall be governed by, and construed and enforced in accordance with, the laws of the United States and the State of Delaware, without giving effect to the principles of conflicts of laws thereof.  Except to the extent that the CCAA or other federal law of Canada is applicable to the CCAA Plan, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the CCAA Plan shall be governed by, and construed and enforced in accordance with, the laws of Canada and the Province of Ontario, without giving effect to the principles of conflicts of laws thereof.

**20.** ~~18.~~ **Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan shall have no force and effect unless (i) the Bankruptcy Court has entered the Confirmation Order and (ii) the Canadian Bankruptcy Court has entered the CCAA Sanction Order.  The filing of the Plan, ~~the~~this Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors with

respect to the Plan, shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to any Holders of Claims against or Interests in the Debtors.

## VI. VOTING PROCEDURES AND REQUIREMENTS

**A.**   **Voting Procedures/Solicitation in the Chapter 11 Proceedings.**

If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims.  If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call the Voting Agent at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

**1.**   **Voting Deadline.**

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **ACTUALLY RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. PREVAILING EASTERN TIME ON [_____ ___], ~~2009~~2010 (THE "VOTING DEADLINE").  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.  ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:


**FOR FIRST CLASS MAIL:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
FDR STATION, P.O. BOX 5014
NEW YORK, NEW YORK
10150-5014

**FOR OVERNIGHT MAIL AND HAND DELIVERY:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK 10017

Votes cannot be transmitted orally, by facsimile or by electronic mail.  Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASES UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

## 2. Vote Required for Acceptance by a Class of Claims.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

## 3. Voting Procedures.

### (a) Ballots.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly competed and executed form of Ballot designated for such Class. Holders of Impaired Claims ~~and Interests~~ voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

Ballots must be delivered to the Voting Agent, at its address set forth above, and <u>actually received</u> by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan.

In addition, each Holder of a Claim entitled to vote on the Plan may elect, by checking the appropriate box on the Ballot, not to grant the releases contained in ~~section~~Section 10.2 of the Plan and the related injunction. All Holders of Claims who submit a Ballot without such box checked will be deemed to consent to the releases set forth in ~~section~~Section 10.2 of the Plan and the related injunction to the fullest extent permitted by applicable law.

If you are a beneficial holder of a Prepetition Note who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is actually received no later than the Voting Deadline. If you are the ~~holder~~Holder of any other type of Claim, in order for your vote to be counted, your ~~ballot~~Ballot must be properly completed in accordance with the

voting instructions on the Ballot and returned to the Voting Agent so that it is received no later than the Voting Deadline. Any ~~ballot~~Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to ~~Section~~section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

(b) Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the voting deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim ~~or Interest~~, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

## B. **Canadian Voting Procedures.**

### 1. **Voting and Acceptance of Plan in CCAA Proceedings.**

As noted above, in addition to confirmation of the Plan by the Bankruptcy Court, the CCAA Plan will need to be sanctioned by the Canadian Bankruptcy Court as the CCAA Plan pertains to the Canadian Debtors. The voting procedures for approval of the CCAA Plan in the CCAA Proceedings are described in the CCAA Creditors' Meeting Order.

A class of creditors shall have agreed to the CCAA Plan in the CCAA Proceedings if it is accepted by a majority in number representing two-thirds (⅔) in value of the creditors present and voting in person or by proxy on a class-by-class basis. The CCAA Plan is binding only against creditors of those classes which vote to accept the proposal. Classes that reject the CCAA Plan are not bound thereunder.

### 2. **Solicitation in CCAA Proceedings.**

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan. Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be bound by the CCAA Plan for purposes of the CCAA Proceedings. The votes of Affected Creditors

to accept or reject the Plan will be counted once for the purposes of both the CCAA Proceedings and the Chapter 11 Cases.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes: (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable, against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company) and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA Plan. The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order"). The CCAA Creditors' Meeting Order provides, among other things, that:

- CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct a meeting of Affected Creditors for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve CCAA Plan;

- For purposes of voting on CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

  (a)     The CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; and

  (b)     The Disclosure Statement, Plan, and Voting Procedures Order, including the form of proxy (Ballot) for use at the Creditors' Meeting, attached as Exhibit [__] to the Voting Procedures Order.

CH1 5049998 5118439v.7 4

- If the CCAA Plan is accepted by the Required Majority of a Class of Affected Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## VII. CONFIRMATION OF THE PLAN

### A. Confirmation in Chapter 11 Cases.

#### 1. Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [_____, __] 20__ at [__ _.m.], prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [_____] at 4:00 p.m., prevailing Eastern Time** by the following parties:

Counsel to the Debtors:

| | |
|---|---|
| Sidley Austin LLP | Young Conaway Stargatt & Taylor, LLP |
| One South Dearborn Street | The Brandywine Building |
| Chicago, Illinois 60603 | 1000 West Street, 17th Floor |
| Facsimile: (312) 853-7036 | P.O. Box 391 |
| Attn: James F. Conlan | Wilmington, Delaware 19899-0391 |
| Matthew A. Clemente | Facsimile: (302) 571-1253 |
| Dennis M. Twomey | Attn: Robert S. Brady |
| Bojan Guzina | Edmon L. Morton |

The United States Trustee:

U.S. Trustee
Office of the United States Trustee

197

J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

Counsel to the Official Committee of
Unsecured Creditors:

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 2. Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all Classes of Claims and Interests or, if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (ii) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

(a) Acceptance.

Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19C, 20B, 20C, 20D, 21B and 21C are impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, impaired Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have noted to accept or reject the Plan.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are unimpaired under the Plan, and the Holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 17F, 18E, 20F, 21D, and 22C through 25C are impaired and the Holders of such Claims and Interests will not receive or retain any property under the Plan. Accordingly, these classes are deemed not to have accepted the Plan and confirmation of the Plan will require application of the "fair and equitable test," described below.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; provided, however, if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(b)     Fair and Equitable Test.

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(i)     Secured Creditors. Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(ii)     Unsecured Creditors. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal

to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii)     Interest Holders.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).  ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

(c)     Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the financial advisors of the Debtors have analyzed the Debtors' ability to meet their obligations under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the years ending December 31, 2009 through and including 2014.  These financial projections, and the assumptions on which they are based, are annexed hereto as Exhibit C (the "Projections"). Based upon the Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Debtors also believe that they will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or prior to the maturity of such indebtedness.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the current circumstances.  Those assumptions the Debtors considered to be significant are described in the notes which are part of the Projections.  The Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.  Therefore the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the Plan.

(d)     Best Interests Test.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a Chapter 7 liquidation.  As indicated above, the Debtors believe that under the Plan, Holders of Impaired Claims and Impaired Interests will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.  The Chapter 7 liquidation analysis set forth below demonstrates that the Plan satisfies the requirements of the "best interests" test.

To estimate potential returns to Holders of Claims and Interests in a Chapter 7 liquidation, the Debtors determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.  The Debtors considered many factors and data and have assumed that the liquidation of all assets would be conducted in an orderly manner and, as such, the bids received for the Debtors' significant assets would be, at most, materially no different from the bids that the Debtors have received from sales and inquiries in recent months.  The liquidation proceeds available for distribution to Holders of Claims against and Interests in the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other cash that the Debtors held and generated during the assumed holding period stated in the Plan and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;

- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;

- third, to the unpaid Administrative Expense Claims;

- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;

- fifth, to Unsecured Claims;  and

- sixth, to Interests.

The Debtors' liquidation costs in a Chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the Chapter 7 cases and all unpaid Administrative

Expense Claims that are allowed in the Chapter 7 case. The liquidation itself might trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. These Priority Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, Chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The following Chapter 7 liquidation analysis is provided solely to discuss the effects of a hypothetical Chapter 7 liquidation of the Debtors and is subject to the assumptions set forth below. The Debtors cannot assure you that these assumptions would be accepted by a Bankruptcy Court. The Chapter 7 liquidation analysis has not been independently audited or verified.

(e)     Liquidation Analysis.

A liquidation analysis is attached to this Disclosure Statement as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"). This analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors assure you that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

**ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN <u>EXHIBIT D</u>. NO REPRESENTATION OR WARRANTY CAN OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS. THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF THE ESTATE AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THESE VALUATIONS IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION OF THE DEBTORS FOR ANY OTHER PURPOSE.**

The Liquidation Analysis is based upon the Debtors' balance sheets as of September 30, 2009, and assumes that the actual September 30, 2009 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to Cash and close the estate as expeditiously as is compatible with the best interests of the parties-in-interest. Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of nine (9) months, during which time all of the Debtors' major assets

would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors. Although the liquidation of some assets might not require nine months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than nine (9) months.

As set forth in detail on the Liquidation Analysis attached hereto as Exhibit D, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims and Interests than would be achieved in a Chapter 7 liquidation.  Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the Holders of Claims and Interests than would a Chapter 7 liquidation.

## B.  **Canadian Requirements for Sanction of CCAA Plan.**

Section 6 of the CCAA provides that the Canadian Bankruptcy Court may section a plan that has received the requisite creditor vote.  However, the Canadian Bankruptcy Court does not have to sanction the plan even if approved by the requisite majority of creditors.  While there is no statutory test for the exercise of the Canadian Bankruptcy Court's discretion, courts have held that the person applying to have the plan sanctioned must meet three tests:  (1) there has been compliance with all statutory requirements and adherence to previous orders of the Canadian Bankruptcy Court; (2) nothing has been done or purported to be done that is not authorized by the CCAA; and (3) the plan is fair and reasonable.  In determining whether a plan is fair and reasonable, the Canadian Bankruptcy Court has discretion to consider whatever factors it determines are relevant.  Common considerations may include (a) the proper classification of claims, (b) anticipated receipts in liquidation or bankruptcy, and (c) the public interest.

## VIII. PROJECTED FINANCIAL INFORMATION

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached to this Disclosure Statement as Exhibit C, in connection with the development of the Plan.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in thethis Disclosure Statement and in the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in SSCC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, SSCC's Quarterly Report on Form 10-Q for the third quarter ending September  30, 2009, and other reports filed by SSCC with the SEC filed prior to the Bankruptcy Court's approval of this Disclosure Statement. These filings are available by visiting the SEC's website at http://www.sec.gov or the Debtors' website at http://www.smurfit.com.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of Reorganized Debtors.  The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition.  Accordingly, the Debtors and the Reorganized Debtors do not intend to update or otherwise revise the Projections, or to include such information

in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X, "CERTAIN RISK FACTORS TO BE CONSIDERED."

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

# IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of [_____]150,000,000 shares, and will issue approximately [_____]100,000,000 shares, of New SSCC Common Stock for distribution to creditors as set forth herein, with no less than [_____]eight percent ([___]8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., [_____]8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans. The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will authorize the issuance of [_____]10,000,000 shares New SSCC Preferred Stock.

The Amended and Restated Certificate of Incorporation of Reorganized SSCC, to be filed as Exhibit 2 to the Plan, provides that Reorganized SSCC will have authorized shares of New SSCC Common Stock in the numbers set forth therein, $.001 par value per share and authorized shares of New SSCC Preferred Stock in the numbers set forth therein, $.001 par value per share. Each share of New SSCC Common Stock will have one vote upon all matters to be voted on by the holders of New SSCC Common Stock, and shall be entitled to participate equally in all dividends payable with respect to the New SSCC Common Stock. The Board of Directors of Reorganized SSCC will be elected by the affirmative vote of a majority of the New SSCC Common Stock present and entitled to vote on such matter. Each share of New SSCC Common Stock will share equally, in all assets of Reorganized SSCC, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of Reorganized SSCC, or upon any distribution of the assets of the Reorganized SSCC. Holders of the New SSCC Common Stock will not have preemptive rights. Voting of the New SSCC Common Stock will not be cumulative. The New SSCC Preferred Stock may be issued in one or more classes or series, with each such class or series having such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions, as may be fixed by the Board of Directors in accordance with the by-laws of Reorganized SSCC. Consistent with, but only to the extent required by, Sectionsection 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall prohibit the issuance of non-voting equity securities. To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, the terms of the Certificate of Incorporation shall control.

# X.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), INCLUDING THE DISCLAIMERS SET FORTH ABOVE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

A.    **Certain Bankruptcy Considerations.**

    1.    **Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code and sanction under the CCAA, there can be no assurance that the Bankruptcy Court and the Canadian Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or sanction or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C. In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section ~~12.12~~12.14 thereof. While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

Similarly, under the CCAA, the Canadian Bankruptcy Court is not required to sanction the CCAA Plan even if it has been approved by the requisite creditor vote. While the Debtors believe that the CCAA Plan is "fair and reasonable", there can be no assurance that the Canadian Bankruptcy Court will reach the same conclusion.

In addition, confirmation of the Plan is subject to certain conditions as described in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being confirmed.

If the Plan is not confirmed there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. Likewise, in Canada, if the CCAA Plan is not sanctioned, there can be no assurance that the CCAA Proceedings will continue or that any alternative plan would provide terms as favorable as the CCAA Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

    2.    **Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.**

Although the Plan is designed to minimize the length of the Proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed. The continuation of the Chapter 11 Cases or the CCAA Proceedings, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could materially adversely affect operations and relationships with customers, vendors, service providers, employees, regulators and partners. For example, negative events or publicity associated with the Proceedings could adversely affect the Debtors' sales and relationships with their customers, particularly if the Proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court and/or the Canadian Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, if confirmation, sanction and consummation of the Plan do not occur expeditiously, the Proceedings could result in, among other things, increased costs for professional fees and similar expenses.

3. **Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.**

Although the Debtors believe that the Effective Date may occur as soon as ten (10) Business Days after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Effective Date is subject to certain conditions precedent as described in Articles IV and IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Proceedings will continue rather than be converted into liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

B. **Risks Relating to the Reorganized Debtors' Financial Results and Condition.**

1. **The Reorganized Debtors' Failure to Achieve Their Projected Financial Results May Affect Their Ability to Pay Obligations.**

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached as Exhibit C to this Disclosure Statement, in connection with the development of the Plan. The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections.

The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial condition of the Reorganized Debtors for the periods indicated. The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which will be beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations. Accordingly, the Reorganized Debtors' actual operating results may vary materially from the operating results shown in the Projections.

Failure of the Reorganized Debtors to achieve projected revenue or cash flow levels may materially adversely affect the ability of the Reorganized Debtors to continue operating their businesses consistent with the Projections after the Effective Date and to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

## 2. The Debtors' Financial Projections Are Based on Assumptions and Subject to Uncertainty.

The Projections are based on a variety of assumptions that are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Moreover, the Debtors believe that the industries in which the Reorganized Debtors will be operating are volatile due to numerous factors, all of which make accurate forecasting very difficult. Accordingly, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, the Reorganized Debtors or any other person that the Projections will be achieved.

In addition, the Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the Proceedings contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results. There can be no assurance that these assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' results of operations and financial condition.

## 3. Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date. This determination will be based on an independent valuation. Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

## 4. Historical Financial Information May Not Be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the results of operations and financial condition of the Reorganized Debtors from and after the Effective Date may not be comparable to results of operations and financial condition reflected in the Debtors' historical financial statements.

## C.    Risks Relating to the Reorganized Debtors' Business.

### 1.    Global Economic Conditions and Credit Tightening Materially and Adversely Affect the Reorganized Debtors' Business.

The Debtors' business has been materially and adversely affected by changes in regional, national and global economic conditions. Such changes have included or may include reduced consumer spending, reduced availability of capital, inflation, deflation, adverse changes in interest rates, reduced energy availability and increased energy costs and government initiatives to manage economic conditions.  Continuing instability in financial markets and the deterioration of other national and global economic conditions may have further materially adverse effects on the Reorganized Debtors' operations, financial results or liquidity. For example, the financial stability of the Reorganized Debtors' customers or suppliers may be compromised, which could result in additional bad debts for the Reorganized Debtors or non-performance by suppliers, and one or more of the financial institutions that make available the exit financing credit facility may become unable to fulfill their funding obligations, which could materially and adversely affect the Reorganized Debtors' liquidity.

Uncertainty about current economic conditions may cause consumers of the Reorganized Debtors' products to postpone or refrain from spending in response to tighter credit, negative financial news, declines in income or asset values, or other adverse economic events or conditions, which could materially reduce demand for the Reorganized Debtors' products and materially and adversely affect the Reorganized Debtors' results of operations and financial condition.  Further deterioration of economic conditions would likely exacerbate these adverse effects, result in wide-ranging, adverse and prolonged effects on general business conditions, and materially and adversely affect the Reorganized Debtors' operations, financial results and liquidity.

### 2.    The Reorganized Debtors May Be Required to Record Impairment On Their Long-Lived Assets.

If the Reorganized Debtors are unable to generate sufficient cash flows from operations, they may be required to record impairment on tangible assets such as facilities and equipment, which would have a negative impact on their financial results.

### 3.    The Reorganized Debtors' Capital Structure.

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness that could have significant consequences. For example, a substantial portion of the Reorganized Debtors' cash flow from operations may be needed to meet the payment of principal and interest on their indebtedness and other obligations and may not be available for their working capital, capital expenditures and other general corporate purposes.  In addition, the Reorganized Debtors' level of debt may make them more

vulnerable to economic downturns and may reduce their operational and business flexibility in responding to changing business and economic conditions and opportunities, including obtaining additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes important to their growth and productivity improvement programs. To the extent that the Reorganized Debtors are more highly leveraged than their competitors, this may place them at a competitive disadvantage.

4.     **The Reorganized Debtors' Exit Financing Credit Facility May Limit Their Ability to Plan For or Respond to Changes in Their Business.**

The Reorganized Debtors' exit financing credit facility may include [financial and other] covenants that impose restrictions on their financial and business operations. These covenants may have a material adverse impact on the Reorganized Debtors' operations. The Reorganized Debtors' failure to comply with any of these covenants could result in an event of default that, if not cured or waived, could result in the Reorganized Debtors being required to repay the borrowings under the exit financing credit facility before their due date. The exit financing credit facility may also contain other events of default customary for similar financings[, including cross defaults to certain other material indebtedness and certain change of control events]. If the Reorganized Debtors were unable to repay or otherwise refinance their borrowings when due (as a result of acceleration or otherwise), the lenders could foreclose on the Reorganized Debtors' assets. If the Reorganized Debtors were unable to refinance these borrowings on favorable terms, their costs of borrowing could increase significantly.

There can be no assurance that Reorganized Debtors will have sufficient liquidity to repay or refinance borrowings under the exit financing credit facility if such borrowings were accelerated upon an event of default. In addition, an event of default or declaration of acceleration under the exit financing credit facility could also result in an event of default under other indebtedness agreements.

5.     **The Debtors' Industry is Cyclical and May Experience Periods of Overcapacity.**

The Debtors' operating results reflect general cyclical pattern of the industry in which the Debtors operate. The Debtors' industry is also capital intensive, which leads to high fixed costs. These conditions have contributed to substantial price competition and volatility in the industry. The majority of the Debtors' products can be subject to extreme price competition. Future decreases in prices would adversely affect the Reorganized Debtors' financial results. In addition, some segments of the Debtors' industry also experience production overcapacity, which may require the Reorganized Debtors to take downtime periodically to reduce inventory levels during periods of weak demand. Decreases in prices for the Reorganized Debtors' products, coupled with their highly leveraged financial position, may adversely impact their ability to respond to competition and to other market conditions or to otherwise take advantage of business opportunities.

6.     **The Debtors' Industry is Highly Competitive.**

The paperboard and packaging products industries are highly competitive and are particularly sensitive to price fluctuations as well as other factors including innovation, design, quality and service, with varying emphasis on these factors depending on the product line. To the extent that one or more of the Reorganized Debtors' competitors become more successful with respect to any key competitive factor, the Reorganized Debtors' ability to attract and retain customers could be materially adversely affected. Many of the Debtors' competitors are less leveraged, have financial and other resources greater than those which the Reorganized Debtors will have and are more capable to withstand the adverse nature of the business cycle. In addition, the Debtors' filing the Chapter 11 Cases and the CCAA Proceedings and the associated risks and uncertainties may be used by competitors in an attempt to divert the Debtors' existing customers or may discourage future customers from purchasing the Reorganized Debtors' products under long-term arrangements. If the Reorganized Debtors facilities are not as cost efficient as those of their competitors, the Reorganized Debtors may need to temporarily or permanently close such facilities and suffer a consequent reduction in their revenues.

7.    **The Debtors' Pension Plans Are Underfunded and Will Require Additional Cash Contributions.**

The Debtors have made substantial contributions to their pension plans in the past five years and may be required to make substantial contributions in the coming years in order to ensure that their funding levels remain adequate in light of projected liabilities and to meet the requirements of the Pension Protection Act of 2006. Future contributions to the Reorganized Debtors' pension and other postretirement plans will be dependent on future regulatory changes, future changes in discount rates, the earnings performance of the Reorganized Debtors' plan assets, and the impact of the Proceedings. These contributions reduce the amount of cash available for the Reorganized Debtors to repay indebtedness or make capital investments.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the ~~Company~~Debtors were under funded by approximately $900 million. The ~~Company estimates~~Debtors estimate that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans. These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. The ~~Company~~Debtors currently ~~estimates~~estimate that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan. The ~~Company~~Debtors currently ~~estimates~~estimate that these contributions will potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and

returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

8. **Fluctuations in Energy, Transportation and Raw Materials Prices Could Adversely Affect Reorganized Debtors' Manufacturing Costs.**

The cost of producing and transporting the Debtors' products is highly sensitive to the price of energy. Energy prices, in particular oil and natural gas, have experienced significant volatility in recent years, with a corresponding effect on the Debtors' production and transportation costs. Energy prices may continue to fluctuate and may rise to higher levels in future years. This could materially adversely affect the Reorganized Debtors' production costs and results of operations.

Wood fiber and reclaimed fiber, the principal raw materials used in the manufacture of the Debtors' paper products, are purchased in highly competitive, price-sensitive markets, which have historically exhibited price and demand cyclicality. Adverse weather, conservation regulations and the shutdown of a number of sawmills have caused, and will likely continue to cause, a decrease in the supply of wood fiber and higher wood fiber costs in some of the regions in which the Debtors procure wood fiber. Fluctuations in supply and demand for reclaimed fiber, particularly export demand from Asian producers, have occasionally caused supplies of reclaimed fiber to be limited. At such times, the Reorganized Debtors may experience an increase in the cost of fiber or may temporarily have difficulty obtaining adequate supplies of fiber. If the Reorganized Debtors are not able to obtain wood fiber at favorable prices or at all, their results of operations may be materially adversely affected.

9. **Factors Beyond the Reorganized Debtors' Control Could Hinder Their Ability to Service Debt and Meet Operating Requirements.**

The ability of the Reorganized Debtors to meet their obligations and to comply with the financial covenants contained in their ~~Debt Instruments~~debt instruments will largely depend on their future performance. The Reorganized Debtors' performance will be subject to financial, business and other factors. Many of these factors will be beyond Reorganized Debtors' control, such as: the state of the economy; the financial markets; demand for, and selling prices of, the Reorganized Debtors' products; performance of the Reorganized Debtors' major customers; costs of raw materials and energy; hurricanes and other major weather-related disruptions; and legislation and other factors relating to the paperboard and packaging products industries generally or to specific competitors.

If operating cash flows, net proceeds from borrowings, divestitures or other financing sources do not provide the Reorganized Debtors with sufficient liquidity to meet the Reorganized Debtors' operating and debt service requirements, they will be required to pursue other alternatives to repay debt and improve liquidity. Such alternatives may include: sales of assets; cost reductions; deferral of certain discretionary capital expenditures and benefit payments; and amendments or waivers to ~~Debt Instruments~~debt instruments.

The Reorganized Debtors might not successfully complete any of these measures or such measures may not generate the liquidity that the Reorganized Debtors require to operate their business and service their obligations.

### 10. Cost of Compliance with Government Regulation May Adversely Affect the Reorganized Debtors' Financial Results.

The Debtors are subject to various federal, state, provincial, foreign, and local laws and regulations that affect the conduct of their operations. For example, environmental requirements, particularly those relating to air and water quality, are a significant factor in the Debtors' business. There can be no assurance that compliance with these laws and regulations or the adoption of modified or additional laws and regulations will not require large expenditures by the Reorganized Debtors or otherwise have a significant effect on the Reorganized Debtors' results of operations or financial condition. In particular, compliance with existing environmental laws, as well as complying with requirements imposed by new or changed environmental laws, such as proposed legislation intended to mitigate the impacts of industrial activity on climate change, may require capital expenditures for compliance. In addition, ongoing remediation costs and future remediation liability at sites where the Reorganized Debtors may be a potentially responsible party (PRP) for cleanup activity under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and analogous state and other laws may materially adversely affect the Reorganized Debtors' results of operations and financial condition. Among other laws, a change in the tax laws of the United States could materially affect the consequences of the Plan as described herein to the Reorganized Debtors and the holders of Claims and Interests. See Article XI, "Certain Tax Consequences of the Plan."

### 11. Failure to Maintain Customer Relationships May Adversely Affect Financial Results.

The loss of one or more major customers, or a material reduction in sales to these customers as a result of competition from other packaging manufacturers, would have a material adverse effect on the Reorganized Debtors' results of operations and financial condition.

### 12. Failure to Attract and Retain Employees May Adversely Affect Financial Results.

Among the Debtors' most valuable assets are their highly skilled professionals who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Proceedings, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from chapter 11 and CCAA. Further attrition may hinder the Reorganized Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

### 13. Foreign Currency Risks and Exchange Rate Fluctuations Could Hinder the Results of the Reorganized Debtors' Canadian Operations.

The Debtors' assets and liabilities outside the United States are primarily located in Canada. Their principal foreign exchange exposure is the Canadian dollar. The functional currency for their Canadian operations is the U.S. dollar. The Reorganized Debtors' net income could be reduced to the extent they have un-hedged positions, their hedging procedures do not perform as planned or the Canadian dollar strengthens. The financial performance of the Reorganized Debtors will be directly affected by exchange rates because certain of their products will be manufactured in Canada, but sold in U.S. dollars, and the monetary assets and liabilities of their Canadian operations are translated into U.S. dollars for financial reporting purposes.

### 14. Work Stoppages and Other Labor Relations Matters May Have an Adverse Effect on the Reorganized Debtors' Financial Results.

A significant number of the Debtors' employees in North America are governed by collective bargaining agreements that have either already expired or will do so before 2013. Expired North American contracts are in the process of renegotiation. The Reorganized Debtors may not be able to successfully negotiate new union contracts covering their employees at various sites without work stoppages or labor difficulties. If the Reorganized Debtors are unable to successfully renegotiate the terms of any of their agreements or an industry association is unable to successfully negotiate a national agreement when they expire, or if the Reorganized Debtors experience any extended interruption of operations at any of their facilities as a result of strikes or other work stoppages, the Reorganized Debtors' results of operations and financial condition could be materially adversely affected.

### D. Risks Relating to the New SSCC Common Stock.

### 1. A Liquid Trading Market for the New SSCC Common Stock May Not Develop.

There can be no assurance that an active market for the New SSCC Common Stock will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although the Company has agreed that as soon as practicable after the Effective Date Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of New SSCC Common Stock for trading on the NYSE or the NASDAQ Stock Market, there can be no assurance that Reorganized SSCC will be able to obtain this listing or, even if such listing is obtained, that an active or liquid trading market will develop for such securities.

### 2. Certain Holders May be Restricted Under Applicable Securities Laws in Their Ability to Sell or Transfer New SSCC Common Stock.

The New SSCC Common Stock to be issued under the Plan has not been registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or "blue sky" laws or the laws of any other jurisdiction. Absent such registration, the New SSCC Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Article XII of the this Disclosure Statement ("Certain U.S. Federal and State, Canadian and Foreign Securities Law Considerations"), in general, recipients of the New SSCC Common Stock will be able to

resell the New SSCC Common Stock without registration under the Securities Act pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of ~~Section~~section 1145(b) of the Bankruptcy Code. Holders of New SSCC Common Stock who are deemed to be "underwriters" within the meaning of ~~Section~~section 1145(b) of the Bankruptcy Code will be restricted in their ability to resell their shares of New SSCC Common Stock.

The New SSCC Common Stock to be issued under the Plan to any Canadian residents is being issued under an exemption from the prospectus requirements under applicable Canadian securities laws. Any resale of such New SSCC Common Stock may be subject to resale restrictions under applicable Canadian securities laws.

### 3. The Market Price of Shares of New SSCC Common Stock May Fluctuate Significantly.

There can be no assurance as to the prices at which shares of New SSCC Common Stock might be traded. The market price at which New SSCC Common Stock trades may fluctuate significantly, depending on many factors, some of which may be beyond Reorganized SSCC's control and may not be directly related to its operating performance. These factors include: price and volume fluctuations in the overall stock market from time to time; changes in earnings or variations in operating results; Reorganized SSCC's capital structure, including the amount of its indebtedness; the depth and liquidity of the market for Reorganized SSCC's common stock; Reorganized SSCC's dividend policy; investor perception of Reorganized SSCC and its business; operating performance of companies comparable to Reorganized SSCC; general economic trends and other external factors; and the impact of the factors referred to elsewhere in this Disclosure Statement.

In addition, the stock market regularly experiences significant price and volume fluctuations. This volatility has had a significant impact on the market price of securities issued by many companies, including SSCC and other companies in SSCC's industry. The changes frequently appear to occur without regard to the operating performance of the affected companies. Hence, the price of the New SSCC Common Stock may fluctuate based upon factors that have little or nothing to do with Reorganized SSCC, and these fluctuations could materially reduce Reorganized SSCC's share price.

### 4. Sales of a Substantial Number of Shares of New SSCC Common Stock Could Depress Stock Prices.

Shares of New SSCC Common Stock distributed by Reorganized SSCC pursuant to the Plan, other than shares distributed to "underwriters" within the meaning of ~~Section~~section 1145(b) of the Bankruptcy Code and shares that may be subject to resale restrictions under applicable Canadian securities laws, will generally be eligible for resale in the public market. It is likely that some stockholders will sell shares of New SSCC Common Stock for various reasons, including the fact that Reorganized SSCC's business profile or market capitalization does not fit their investment objectives. Any sales of substantial amounts of New SSCC Common Stock in the public market, or the perception that such sales might occur, could cause declines in the market price of New SSCC Common Stock. SSCC is unable to predict whether significant amounts of

New SSCC Common Stock will be sold in the open market following its issuance pursuant to the Plan or whether a sufficient number of buyers will be in the market at that time.

5. **Value of New SSCC Common Stock May be Diluted.**

The Certificate of Incorporation of Reorganized SSCC will authorize the issuance of up to a total of [———]150,000,000 shares of New SSCC Common Stock. The issuance of additional shares of New SSCC Common Stock, or any security convertible into or exchangeable for shares of New SSCC Common Stock, in the future would dilute the ownership percentage represented by the shares of New SSCC Common Stock to be issued pursuant to the Plan. In addition, the New SSCC Common Stock will be subject to dilution with respect to shares that ~~may~~will be issued under the Management Incentive Plan.

6. **Lack of Dividends on New SSCC Common Stock May Adversely Affect Liquidity.**

SSCC does not anticipate that cash dividends or other distributions will be made by Reorganized SSCC with respect to the New SSCC Common Stock in the foreseeable future. ~~In addition, covenants in certain Debt Instruments to which Reorganized SSCC or the Reorganized Debtors will be a party may restrict the ability of Reorganized SSCC or the Reorganized Debtors to pay dividends and make certain other payments.~~ Further, such restrictions on dividends may have an adverse impact on the market demand for New SSCC Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

## XI. CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax and Canadian federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion of U.S. federal income tax is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

The discussion of Canadian federal income tax is based on the current provisions of the Income Tax Act (Canada), as amended (the "ITA"), the regulations promulgated thereunder, and the published administrative practices and assessing policies of the Canada Revenue Agency (the "CRA") publicly released prior to the date hereof. This discussion also takes into account all specific proposals to amend the ITA and the regulations promulgated thereunder publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof. This discussion is not exhaustive of all possible Canadian federal income tax considerations, and except

for the forgoing, this discussion of Canadian federal income tax consequences does not take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it address any provincial, territorial or foreign tax considerations.

No ruling has been requested or obtained from the U.S. Internal Revenue Service (the "IRS") or the CRA with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax or Canadian federal income tax consequences described herein.

*     *     *     *

Any discussion of U.S. or Canadian federal income tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. or Canadian federal income tax penalties that may be imposed on such person. Each Holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*     *     *     *

## A.    <u>U.S. Federal Income Tax Consequences to the Debtors.</u>

### <u>Cancellation of Indebtedness Income</u>

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of COD Income, generally in the following order: any net operating loss for the taxable year and carryovers to such year ("NOLs"), general business and minimum tax credit carryforwards, capital losses for the taxable year and carryovers to such year, the tax basis of the debtor's assets and foreign tax credit carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule"). A debtor may elect to first apply any portion of the reduction to the tax basis of the debtor's depreciable assets, with any remaining balance applied to the debtor's other Tax Attributes in the order stated above. The Floor Rule does not apply to any reduction in tax basis by reason of this election.

Generally, debtors that realize COD Income in 2009 or 2010 may, in lieu of the rules described above, elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each

debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated U.S. federal income tax return (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the tax basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the tax basis of property of other members) must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be applied against by Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that the debtor member is required to reduce its tax basis in the stock of another group member, that lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required Tax Attribute reduction takes place after the consolidated group has determined its taxable income, and any U.S. federal income tax liability, for the taxable year in which the COD Income is realized

The Company expects to realize substantial COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New SSCC Common Stock, which cannot be known with certainty until after the Effective Date. Assuming, however, that the New SSCC Common Stock is valued consistently with the valuation assumption ~~utilized~~mentioned in Article ~~VIII~~IV of this Disclosure Statement, the Company estimates that it will realize COD Income in the United States between approximately $[__] billion and $[__] billion for U.S. federal income tax purposes. Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Debtor that realizes the COD Income will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge. The Company does not expect to make the elections described above to reduce the tax basis of depreciable property first or to defer COD Income to 2014-2018.

<u>Net Operating Losses and Other Tax Attributes</u>.

As of December 31, 2008, the U.S. consolidated group of which SSCC is the common parent (the "SSCC U.S. Group") had approximately $[___] million of NOLs. In addition, the SSCC U.S. Group expects that it will generate approximately $[__] million in additional NOLs in 2009 due primarily to the worthlessness of its equity interest in Smurfit-Stone Container Canada Inc. and approximately $[__] in capital losses in 2010 due to the worthlessness of its equity interests in certain other Canadian subsidiaries. These NOLs and capital losses have not been examined or approved by the IRS and remain subject to adjustment or disallowance.

As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years (five

preceding taxable years in the case of qualifying NOLs generated in 2008 and 2009) and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.  Capital losses of corporations can only be used to offset capital gains and generally can be carried back three years or forward five years for such purposes.

The Company expects that the COD Income realized by the SSCC U.S. Group will exceed its NOLs and general business credits and minimum tax credits (which credits are reduced 33⅓ cents for each dollar of COD Income) and thus that these Tax Attributes will be eliminated. However, the Company expects that it will have sufficient capital losses to absorb any remaining COD Income and thus that no reduction in the basis of assets (including the stock of subsidiaries) will be necessary.  This result depends upon a number of assumptions, including the amount of COD Income and the available NOLs and capital losses, which, as noted above, have not been examined or approved by the IRS.  If these assumptions are incorrect, the SSCC U.S. Group might have to reduce its basis in assets.

**B.       U.S. Federal Income Tax Consequences to the Holders of Claims.**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States; (2) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof; (3) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (4) that is a trust (a) over the administration of which a United States Person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control, or (b) that has validly elected to continue to be treated as a United States Person for U.S. federal income tax purposes.  In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  United States Persons who are partners in a partnership should consult their tax advisors.  A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person.  For purposes of the following discussion and unless otherwise noted below, the term "Holder" means a beneficial owner of a Claim or Interest that is a United States Person.  The general U.S. federal income tax consequences to holders of Allowed Claims or Interests that are Non-United States Persons are discussed below under Section XI.B of this Disclosure Statement.

The U.S. federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes.  Certain holders of Claims or Interests (such as Non-United States Persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to

special rules not addressed in this summary. There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN

General.

A Holder who receives cash or other consideration (including, without limitation, New SSCC Common Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent consistent with the Plan, to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

If not otherwise so required, a Holder who receives New SSCC Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New SSCC Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

<u>Market Discount</u>.

The market discount provisions of the IRC may apply to Holders of certain Claims.  In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain.  Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

<u>Holders of Prepetition Lender Claims</u>.

A Holder of a Prepetition Lender Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) ~~(depending on whether the Holder receives Debt Instruments or cash), either (A) the "issue price" of the Debt Instruments it receives, or (B)~~ the amount of cash it receives.  The ~~"issue price" of the Debt Instruments is generally expected to equal the principal amount thereof if neither the Debt Instruments nor the Prepetition Lender Claim is treated as "publicly traded."  If the Debt Instruments are treated as publicly traded, then the issue price of the Debt Instruments will be the fair market value of the Debt Instruments on the Effective Date.  If the Debt Instruments are not treated as publicly traded but the Prepetition Lender Claim is treated as publicly traded, then the issue price of the Debt Instruments will be determined by reference to the fair market value of the Prepetition Lender Claim.  For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60-day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) in certain circumstances, price quotations are readily available from dealers, brokers or traders~~

~~If a Holder of a Prepetition Lender Claim receives a Debt Instrument in exchange for its Claim and both the Prepetition Lender Claim and Debt Instrument are considered a "security" for U.S. federal income tax purposes (see "Definition of 'Security'" below), then the exchange of the Prepetition Lender Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, the Holder will not recognize any gain or loss on the exchange, its tax basis in the Debt Instrument will be the same as its basis in the Prepetition Claim surrendered, and its  holding period in the Debt Instruments will include the holding period in the Prepetition Lender Claim surrenderedIf a Holder of a Prepetition Lender Claim receives a Debt Instrument in exchange for~~

its Claim and either the Prepetition Lender Claim or Debt Instrument does not constitute a "security" for U.S. federal income tax purposes or if a Holder of a Prepetition Lender Claim receives cash in exchange for its Claim, then the exchange will be a taxable transaction, and the Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange. In such a case, the Holder's initial tax basis in a Debt Instrument it receives in exchange for its Prepetition Lender Claim will equal the issue price of such Debt Instrument and its holding period would commence on the day after the Effective Date

A Holder who receives a Debt Instrument generally will be required to include interest on the Debt Instrument in income in accordance with such Holder's regular method of tax accounting. If, however, the stated principal amount of the Debt Instrument exceeds its issue price (determined as described above) by more than a specified de minimis amount (generally, 25 basis points times the weighted average maturity), such excess will be treated as original issue discount for U.S. federal income tax purposes. In such a case, a Holder of a Debt Instrument will be required to include in income the amount of such original issue discount over the term of the Debt Instrument based on the constant yield method and will be required to include amounts in income before they are received. A Holder's tax basis in a Debt Instrument will be increased by the amount of original issue discount included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the Debt Instrument.

Holder of General Unsecured Claims Against SSCE.

A Holder of a General Unsecured Claim against SSCE who exchanges it for New SSCC Common Stock will realize gain or loss for U.S. federal income tax purposes on the exchange of its Claim for New SSCC Common Stock equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New SSCC Common Stock it receives in the exchange.

The tax consequences to a Holder of a General Unsecured Claim against SSCE depend on whether its Claim is a "security" for U.S. federal income tax purposes. See "Definition of 'Security'" below. If the Claim does not constitute a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New SSCC Common Stock it receives in the exchange will equal the fair market value of such New SSCC Common Stock on the Effective Date, and its holding period in its New SSCC Common Stock would commence on the day after the Effective Date.

If a Holder's General Unsecured Claim against SSCE constitutes a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be treated as a tax-free transaction for U.S. federal income tax purposes. In such a case, the Holder should not recognize any gain or loss realized for U.S. federal income tax purposes with respect to the exchange, the Holder's initial tax basis in the New SSCC Common Stock it receives in exchange for its Claim should equal its adjusted tax basis in such Claim, and the Holder's holding period in the New SSCC Common Stock it receives in the exchange will include its holding period in the Claim surrendered.

A Holder of a General Unsecured Claim against SSCE who exchanges it for a Cash-Out Payment will realize gain or loss for U.S. federal income tax purposes as a result of the confirmation of the Plan equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of the Cash-Out Payment.  The Holder of such Claim will be required to recognize the full amount of it gain or loss realized on the exchange.

Holder of Claims Against Calpine Corrugated, Cameo Container, and SSPRI.

A Holder of a Union Bank Claim, CIT Group Claim or General Unsecured Claim against Calpine Corrugated, Cameo Container, or SSPRI will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives.  The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

Holder of General Unsecured Claims Against SSCC and General Unsecured Claims Against Non-Operating Debtors.

Pursuant to the Plan, all General Unsecured Claims against SSCC and General Unsecured Claims Against Non-Operating Debtors, will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Claims will receive nothing in exchange for such Claims.  As a result, each Holder of such Claims generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Claims extinguished under the Plan unless the Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

Holders of Convenience Claims.

A Holder of a Convenience Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives.  The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

Holders of SSCC Interests and Calpine Corrugated Interests.

Pursuant to the Plan, all SSCC  Interests and Calpine Corrugated Interests will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Interests will receive nothing in exchange for such Interests.  As a result, each Holder of such Interests generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

Definition of "Security".

The term "security" is not defined in the IRC or in the United States Treasury regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined

based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

## C. **Certain Canadian Federal Income Tax Consequences of the Plan.**

The following discussion identifies certain Canadian federal income tax considerations that are relevant to Holders of Claims under the Plan. This discussion also describes certain Canadian federal income tax considerations relevant to the Debtors arising in connection with the CCAA Plan.

For the purposes of the following discussion, the term "Canadian Holder" means a Holder that, for purposes of the ITA, (i) is resident or deemed resident in Canada and (ii) deals at arm's length with and is not affiliated with any Debtors for the purposes of the ITA. This discussion is not applicable to a Canadian Holder that is a "financial institution" (as defined in the ITA for purposes of the mark-to-market rules).

All amounts, including the cost of, interest or dividends received and accrued on, and proceeds of disposition from, any Claim, Interest or any New SSCC Common Stock must be determined in Canadian dollars at applicable exchange rates for the purposes of the ITA.

<u>Canadian Debt Forgiveness Rules.</u>

The ITA contains rules (the "debt forgiveness rules") which may affect certain Debtors as a result of the implementation of the CCAA Plan. These rules generally apply where a "commercial debt obligation" (as defined for these purposes in the ITA) is settled or extinguished without any payment or by the payment of an amount less than the principal amount of the debt.

In general, the debt forgiveness rules provide that the amount by which the principal amount of a debt (including, generally, accrued and unpaid interest thereon) exceeds the amount paid in satisfaction of such principal amount (such excess being referred to in this discussion as the "forgiven amount") is to be applied to reduce, in the following order, the debtor's (i) non-capital losses of prior taxation years, (ii) net capital losses of prior taxation years, (iii) capital cost and undepreciated capital cost of depreciable property, (iv) cumulative eligible capital and (v) adjusted cost base of certain other capital property. Generally, one-half of any remaining unapplied portion of the forgiven amount is included in computing the income of the debtor in the year the debt is settled. Although the debt forgiveness rules are applied on a legal entity basis, in certain circumstances a debtor may elect to transfer any unapplied forgiven amount to another entity within a corporate group. In addition, corporations resident in Canada are allowed a deduction (the "insolvency deduction") which effectively offsets any income inclusion under the debt forgiveness rules to the extent that such inclusion exceeds twice the fair market value of the corporation's net assets at the end of the taxation year (as determined under the applicable provisions of the ITA) in which the settlement or extinguishment occurs.

Where pursuant to the CCAA Plan a Claim that is a commercial debt obligation is settled or extinguished without any payment or by the payment of an amount less than the principal amount of such Claim, the debt forgiveness rules will generally apply to the relevant Debtor. Depending on the circumstances of the Debtor, the insolvency deduction may be available to fully or partially offset any income inclusion arising pursuant to the debt forgiveness rules. Different rules may apply to the settlement of debts accrued to suppliers of inventory and certain other trade debts.

<u>Certain Canadian Tax Consequences of Canadian Asset Sale.</u>

The sale of the Canadian Assets to Canadian Newco by SSC Canada, Smurfit-MBI and Francobec Company <s>will</s>may give rise to taxable capital gains <s>and</s>or losses <s>and</s>or ordinary income or loss to SSC Canada <s>and</s>, Smurfit-MBI and Francobec Company. For Canadian tax purposes, Canadian Newco should generally acquire the Canadian Assets at a cost equal to the price at which such assets are acquired from SSC Canada, Smurfit-MBI and Francobec Company, subject to certain adjustments under the ITA applicable in respect of transfers of assets between affiliated corporations (including any adjustments pursuant to section 69 of the ITA, which deems certain transfers of property between persons not dealing at arm's length to occur at fair market value for purposes of the ITA).

<u>Amounts Received by a Canadian Holder on Account of Interest.</u>

The Debtors reserve the right, to the extent consistent with the Plan, to allocate the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such

Claim and then to accrued but unpaid interest, if any, with respect to such Claim. However, such allocation will not be binding on the CRA and the CRA may assert an alternative allocation.

A Canadian Holder who receives cash or other consideration (including New SSCC Common Stock) in satisfaction of a Claim may realize ordinary income or loss to the extent that any portion of such consideration is characterized as interest.

The income tax consequences arising as a result of the non-payment of interest owing to a Canadian Holder will be dependent on the particular circumstances of the Canadian Holder, including the method followed in computing its income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such interest.

Canadian Trade Creditors.

The following portion of this summary is applicable to a Canadian Holder whose Claim arose in the course of a business carried on by it, and who has included an amount in income for the year or a previous year in respect of such Claim (a "Canadian Trade Creditor").

The Canadian income tax consequences to a Canadian Trade Creditor of receiving cash or other property (including New SSCC Common Stock) in satisfaction of a Claim will depend on its particular circumstances, including the method regularly followed in computing income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such Claim.

Where a Canadian Trade Creditor has previously claimed a bad or doubtful debt deduction in respect of a Claim and receives cash, New SSCC Common Stock or other property in satisfaction of such Claim, the Canadian Trade Creditor may be required to include in computing its income (in the taxation year in which such property is received) an amount equal to the aggregate fair market value of such property.

It is the published administrative position of the CRA that where property (including a security such as the New SSCC Common Stock) is accepted by a Canadian Trade Creditor in settlement of a trade debt of a kind that would qualify for a deduction under paragraph 20(1)(p) of the ITA, and the fair market value of the property at the time it is acquired by the Canadian Trade Creditor is less than the amount of the trade debt, the difference will be deductible by the Canadian Trade Creditor as a bad debt.

It is the published administrative position of the CRA that where a trade debt of a taxpayer is satisfied by the issuance of property (including a security such as the New SSCC Common Stock), if the property is retained by the taxpayer for a period of time which, in the circumstances, indicates that it was held as an investment, any subsequent disposition will be considered to be the disposition of a capital property and will be subject to the rules relating to capital gains and capital losses (see "Taxation of Capital Gains and Capital Losses", below). However, if the property is disposed of in circumstances indicating that the taxpayer did not have the intention of retaining it as an investment, then the profit or loss arising on the disposition will constitute income or loss from business.

Canadian Holders Disposing of Claims Held as Capital Property.

The following portion of this summary is applicable to a Canadian Holder whose Claim is held as capital property for the purposes of the ITA.

A Canadian Holder who receives cash or other property in satisfaction of the principal amount of a Claim held as capital property will be considered to have disposed of such Claim for proceeds of disposition equal to the amount of cash plus the fair market value of any other property received. Generally, such Canadian Holder will realize a capital gain (or capital loss) for Canadian federal income tax purposes equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the Claim, determined immediately prior to the Effective Date.

A Canadian Holder of a Claim held as capital property that is extinguished without payment should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Claim extinguished under the Plan.

<u>Canadian Holders Disposing of SSCC Interests Held as Capital Property.</u>

The following portion of this summary is applicable to a Canadian Holder whose SSCC Interests are held as capital property for the purposes of the ITA.

Pursuant to the Plan, all SSCC Interests will be cancelled, annulled and extinguished as of the Effective Date, and all Holders of SSCC Interests will receive nothing in exchange for such Interests. As a result, a Canadian Holder should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Interest extinguished under the Plan. The general tax consequences to a Canadian Holder of an SSCC Interest held as capital property realizing a capital loss are described below under "Taxation of Capital Gains and Capital Losses".

<u>Tax Consequences of Holding and Disposing of New SSCC Common Stock.</u>

Dividends, if any, received by a Canadian Holder on New SSCC Common Stock acquired pursuant to the Plan will be required to be included in computing the Canadian Holder's income for the purposes of the ITA. Such dividends received by a Canadian Holder who is an individual will not be subject to the gross-up and dividend tax credit rules in the ITA. A Canadian Holder that is a corporation will not be entitled to deduct the amount of such dividends in computing its taxable income. A Canadian Holder that is throughout the relevant taxation year a Canadian-controlled private corporation may be liable to pay Additional Refundable Tax (defined below) on such dividends. Subject to the detailed rules in the ITA, a Canadian Holder may be entitled to a foreign tax credit or deduction for any foreign withholding tax paid with respect to dividends received on account of New SSCC Common Stock acquired pursuant to the Plan.

A Canadian Holder will be considered to have acquired any New SSCC Common Stock received under the Plan at a cost equal to its fair market value on the Effective Date. A Canadian Holder who holds New SSCC Common Stock as capital property will generally realize a capital gain (or capital loss) on the disposition or deemed disposition of such New SSCC Common Stock equal to the amount, if any, by which the Canadian Holder's proceeds of disposition of such New SSCC Common Stock, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the New SSCC Common Stock to the Canadian Holder immediately before

the disposition. The general tax consequences to a Canadian Holder of realizing a capital gain or capital loss are described below under "Taxation of Capital Gains and Capital Losses". The Canadian Holder may be entitled to claim a foreign tax credit or deduction in respect of any foreign tax payable by the Canadian Holder on any capital gain realized on such disposition or deemed disposition.

<u>Taxation of Capital Gains and Capital Losses.</u>

In general, under the current provisions of the ITA, one-half of any capital gain (a "taxable capital gain") realized in a taxation year will be included in a Canadian Holder's income for the year, and one-half of the amount of any capital loss (an "allowable capital loss") realized in a taxation year is deducted from income for the year to the extent of any taxable capital gains realized in the year. Allowable capital losses in excess of taxable capital gains for the taxation year of disposition may generally be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years, to the extent and under the circumstances specified in the ITA.

A Canadian Holder that throughout the taxation year is a "Canadian-controlled private corporation" (as defined in the ITA) may be liable to pay an additional refundable tax of 6 $^2/_3$ % ("Additional Refundable Tax") on certain investment income, including an amount in respect of taxable capital gains.

<u>Non-Canadian Holders.</u>

The following is a summary of certain Canadian federal income tax considerations generally applicable to a Holder who, at all relevant times, for purposes of the ITA (a) is not and is not deemed to be resident in Canada, (b) holds any relevant Claim as capital property, (c) deals at arm's length and is not affiliated with any Debtor, and (d) does not use or hold and is not deemed to use or hold the Claim in the course of carrying on a business in Canada (a "Non-Canadian Holder"). This summary does not address the considerations relevant to a Non-Canadian Holder (a) that is an insurer carrying on business in Canada and elsewhere, or (b) to whom the relevant Claim constitutes "taxable Canadian property" (as defined in the ITA). This summary also assumes that no amounts are paid or payable to a non-Canadian Holder on account of "participating debt interest" (as defined in the ITA).

A Non-Canadian Holder will not realize any Canadian federal income tax consequences as a result of the settlement of a Claim pursuant to the Plan.

**D.**  **Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. AND CANADIAN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR

CIRCUMSTANCES.  ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND CANADIAN FEDERAL, PROVINCIAL, TERRITORIAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## E.  Reservation of Rights.

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XI and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XII.  CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN SECURITIES LAW CONSIDERATIONS

## A.  Exemption From Registration Requirements.

Upon consummation of the Plan, the Debtors will rely on ~~Section~~section 1145 of the Bankruptcy Code to exempt the issuance of the New SSCC Common Stock from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan.  The Debtors believe that Reorganized SSCC is a successor to SSCC under the Plan for purposes of ~~Section~~section 1145 of the Bankruptcy Code and that the offer and sale of the New SSCC Common Stock under the Plan satisfies the requirements of ~~Section~~section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

## B.  Subsequent Transfers of Securities.

In general, recipients of the New SSCC Common Stock will be able to resell the New SSCC Common Stock without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of ~~Section~~section 1145(b) of the Bankruptcy Code.  In addition, the New SSCC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of the New SSCC Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made

CH1 ~~5049998~~5118439v.~~7~~1

with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(a)(11) of the Securities Act. Under Section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New SSCC Common Stock under the Plan are deemed to be "underwriters," the resale of the New SSCC Common Stock by such persons would not be exempted by ~~Section~~section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws except for certain trading transactions. The Debtors believe that sales by any persons deemed to be underwriters of such New SSCC Common Stock or other securities without registration pursuant to certain provisions of Rule 144 under the Securities Act would constitute such exempt trading transactions. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

Certain persons may have rights to require Reorganized SSCC to register shares of New SSCC Common Stock held by such person for resale pursuant to a registration statement filed and effective under the Securities Act in accordance with the terms and conditions of the Registration Rights Agreement.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW SSCC COMMON STOCK OF REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF COMMON STOCK OF REORGANIZED DEBTORS ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## C.     **Canadian Securities Law Considerations.**

Canadian securities laws provide for a specific statutory exemption from the prospectus requirements when securities are issued or distributed in connection with a reorganization or arrangement that is under a statutory procedure. The Canadian securities regulatory authorities interpret the phrase "statutory procedure" broadly; it includes any statute of a jurisdiction or foreign jurisdiction under which the entities involved have been incorporated or created and exist or under which the transaction is taking place. The Debtors believe that the issuance and distribution of the New SSCC Common Stock under the Plan to any Canadian-resident holders of Claims would constitute trades made in connection with a reorganization or arrangement that is under a statutory procedure and would therefore be exempt from the prospectus requirements under applicable Canadian securities laws.

Any resale of the New SSCC Common Stock ~~aquired~~acquired under an exemption from the prospectus requirements must be made in accordance with applicable Canadian securities laws, which may require resales to be made in accordance with prospectus requirements or exemptions from the prospectus requirements. These resale restrictions may in some circumstances apply to resales of the New SSCC Common Stock outside of Canada. Canadian-resident holders of New

SSCC Common Stock are advised to seek legal advice prior to any resale of the New SSCC Common Stock. Such holders should also seek legal advice concerning any dealer registration requirements under applicable Canadian securities laws.

## XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND CCAA PLAN

If the Plan is not confirmed, the alternatives for the Chapter 11 Cases include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A. Continuation of the Chapter 11 Cases.

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted chapter 11 cases. The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11. If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11. Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### B. Liquidation Under Chapter 7 or Chapter 11.

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.

CH1 ~~5049998~~5118439v.~~73~~4

Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the Holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially.

## C. Alternatives in CCAA Proceedings.

As in the Chapter 11 Cases, in the CCAA Proceedings if CCAA Plan is not approved by creditors in the CCAA Proceedings or is not sanctioned by the Canadian Bankruptcy Court, the Canadian Debtors would not automatically lose control of the CCAA Proceedings (i.e., have a trustee appointed to oversee its assets). It is possible for the Canadian Debtors to submit a new or amended plan and, during the intervening period, continue to operate under the CCAA. In the event that CCAA Plan is not accepted, however, the Canadian Debtors' significant creditors may seek to lift the CCAA Stay to exercise their remedies against the debtor that are otherwise available.

## XV. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan in the Chapter 11 Cases and sanction of CCAA Plan in the CCAA Proceedings is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan in the Chapter 11 Cases and/or sanction of CCAA Plan in the CCAA Proceedings could result in extensive delays and increased administrative expenses, or the ultimate liquidation of certain or all of the Debtors.

Accordingly, the Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan in the Chapter 11 Cases and/or approve CCAA Plan in the CCAA Proceedings.

Dated: December 1,22, 2009

                                     Respectfully submitted,

                                     SMURFIT-STONE CONTAINER CORPORATION
                                     (for itself and on behalf of each of the other Debtors)

                                     By: /s/ Craig A. Hunt_____.
                                     Name: Craig A. Hunt
                                     Title: Senior Vice President, Secretary and General
                                     Counsel

SIDLEY AUSTIN LLP

James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone:  (416) 869-5261
Facsimile:  (416) 947-0866

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Counsel to the Debtors and Debtors in Possession

CH1 5049998 5118439v.7 1

Document comparison by Workshare Professional on Tuesday, December 22, 2009
5:40:29 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://CHLDMS/CH1/5121745/1 |
| Description | #5121745v1<CH1> - December 1 DS - AS FILED |
| Document 2 ID | interwovenSite://CHLDMS/CH1/5118439/4 |
| Description | #5118439v4<CH1> - SMURFIT DISCLOSURE STATEMENT 12.22 FOR FILING |
| Rendering set | standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 955 |
| Deletions | 858 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1835 |