# **EXHIBIT 1**

Term Sheet

# SMURFIT-STONE CONTAINER ENTERPRISES, INC.

## Outline of Terms and Conditions for
## Senior Secured Term Loan Exit Facility

Set forth below are the terms and conditions for the Term Facility (as such term is defined below) which shall be funded on the effective date of the Joint Plan of Reorganization and Plan of Compromise and Arrangement (as amended from time to time, the "Plan") expected to be confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the pending voluntary cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq (the "Bankruptcy Code"), of Smurfit-Stone Container Corporation and certain of its subsidiaries (the "Chapter 11 Cases") and sanctioned by the Ontario Superior Court of Justice (Commercial List) in the pending cases under the Companies' Creditors Arrangement Act (Canada) of certain of such subsidiaries.

| | |
|---|---|
| Borrower: | Smurfit-Stone Container Enterprises, Inc., a Delaware corporation (the "Borrower"). Smurfit-Stone Container Corporation, a Delaware corporation ("SSCC"), will merge with and into the Borrower on the Funding Date (as defined below), with the Borrower surviving such merger and changing its name to Smurfit-Stone Container Corporation. |
| Guarantors: | The obligations of the Borrower shall be guaranteed by each existing and future direct and indirect domestic Material Subsidiary (as defined under "Security" below) of the Borrower (other than JSC Timber Finance Inc., Timber Capital Holdings LLC and Timber Note Holdings LLC) and each other Domestic Subsidiary of Borrower that guarantees the obligations under the Revolving Facility (as defined under "Security" below), whether or not a Material Subsidiary (collectively, the "Guarantors" and, together with the Borrower, the "Loan Parties"). |
| Co-Lead Arrangers and Bookrunners: | J.P. Morgan Securities Inc., Deutsche Bank Securities Inc. and Banc of America Securities LLC (in such capacity, the "Arrangers"). |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("JPMCB" and, in such capacity, the "Administrative Agent"). |
| Syndication Agent: | Deutsche Bank Securities Inc. ("DBSI" and, in such capacity, the "Syndication Agent"). |
| Documentation Agent: | Banc of America Securities LLC ("BAS" and, in such capacity, the "Documentation Agent"). |
| Other Agents and Titles: | To be mutually agreed upon by the Arrangers and the Borrower. |
| Lenders: | A syndicate of banks, financial institutions and other entities arranged by the Arrangers and acceptable to the Borrower (collectively, the "Lenders"). |
| Term Facility: | A senior secured term loan facility (the "Term Facility") in an aggregate principal amount of $1,200,000,000. The term loans made under the |

|  |  |
|---|---|
|  | Term Facility (the "<u>Term Loans</u>") shall be repayable in equal quarterly installments for five years and nine months in an aggregate annual amount equal to 1.0% of its original principal amount, with the balance payable at maturity. The commitments under the Term Facility are referred to herein as the "<u>Term Loan Commitments</u>". Notwithstanding anything to the contrary herein, the Term Loan Commitments will terminate if the Funding Date has not occurred on or prior to the date that is five months after the Closing Date (as defined below). |
| <u>Maturity Date</u>: | Six years from the Funding Date. |
| <u>Incremental Facility</u>: | The Borrower shall be permitted, without the consent of any Lenders other than the Lenders providing the incremental facility, to add one or more incremental term loan facilities to the Term Facility, and, in the event the Revolving Facility is terminated and its liens released, one or more revolving facilities (each an "<u>Incremental Facility</u>") in an aggregate amount of up to $400,000,000. Any such Incremental Facility shall be made and documented under the Credit Agreement (as defined below) and the other loan documents, and shall be guaranteed and secured on a *pari passu* basis with the Term Facility. No such Incremental Facility may be incurred unless (a) at the time thereof and after giving effect thereto, no default or event of default shall exist, (b) in the case of incremental term loans, such loans have a final maturity no earlier than, and a weighted average life no shorter than, the Term Facility and (c) after giving effect thereto, the Consolidated Senior Secured Leverage Ratio (as defined in the Prepetition Credit Agreement) shall be less 3.00:1. If the interest rate spread applicable to any Incremental Facility (which, for this purpose shall be deemed to include all upfront or similar fees or original issue discount (collectively, "<u>Upfront Payments</u>"), in each case, paid to the lenders in respect of such Incremental Facility) exceeds the interest rate spread applicable to the Term Facility (taking into account the Upfront Payments paid to the Lenders in respect of the establishment of the Term Facility) by more than 0.25%, then the interest rate spread applicable to the Term Facility shall be increased so that it equals (after taking into account Upfront Payments made in respect of the establishment of the Term Facility) the interest rate spread applicable to the Incremental Facility. |
| <u>Purpose</u>: | The proceeds of the Term Loans shall be used, together with cash on hand of the Borrower and its subsidiaries, to satisfy claims against the Borrower and its subsidiaries pursuant to the Plan, and for general corporate purposes and working capital needs. |
| <u>Availability</u>: | The Term Loans will be available in a single drawing on the effective date of the Plan (the "<u>Funding Date</u>"). Amounts in respect of the Term Loans that are repaid or prepaid may not be reborrowed. |
| <u>Interest Rates</u>: | As set forth on <u>Annex I</u> hereto. |
| <u>Security</u>: | The obligations of each Loan Party in respect of the Term Facility and any interest rate protection or other hedging arrangements provided by |

any Lender, any lender under the Revolving Facility (or any affiliate of either of the foregoing) designated by the Borrower as being secured hereunder (it being understood that any such designated hedging arrangement cannot also be secured on a first lien basis by the Revolving Facility Collateral (as defined below)) and any cash management arrangements provided by any Lender (or any affiliate of a Lender) (collectively, the "Obligations") will be secured by (a) a perfected first priority pledge of (i) all of the capital stock of each Guarantor and (ii) 65% of the voting stock of (x) Smurfit-Stone Container Canada Inc. (or the successor newco(s) which acquires the assets of Smurfit-Stone Container Canada Inc. pursuant to the Plan) ("SSCCI") and (y) each other first tier foreign subsidiary of the Borrower that is a Material Subsidiary, (b) perfected first priority security interests in, and mortgages on, (i) all existing domestic real properties owned by the Loan Parties (other than certain scheduled properties to be determined, including properties that have been identified by the Borrower as having been closed or as being held for sale) having a fair market value in excess of an amount to be agreed and (ii) certain material after-acquired domestic real properties of the Loan Parties (owned real property with a fair market value equal to or greater than $5,000,000, provided that no action shall be required unless and until the aggregate fair market value of such real properties exceeds $50,000,000), but excluding any individual parcel of real property acquired by a Loan Party that is subject to an existing mortgage (or any extension or refinancing thereof) so long as such parcel is subject to such existing mortgage (or any extension or refinancing thereof), and (c) perfected first priority security interests in all tangible and intangible personal property (whether now owned or hereafter acquired) of each Loan Party (but excluding all Revolving Facility Collateral (as defined below)), in each case subject to permitted liens and exceptions existing in the existing Loan Documents (as defined in the Prepetition Credit Agreement), but excluding (A) assets as to which the Administrative Agent reasonably determines that the burden or cost of obtaining a security interest therein or perfection thereof is excessive in relation to the value of the security to be afforded thereby and (B) any assets where the granting of security interests is prohibited by law, regulation or contract, or would result in material and adverse tax consequences (collectively, the "First Lien Collateral").

The Obligations will also be secured by a perfected second priority security interest in all accounts receivable, inventory, deposit and investment accounts and all contracts, contract rights, payment intangibles, commercial tort claims, chattel paper, documents, instruments, supporting obligations and books and records and related data processing software directly relating to, or arising from, any of the foregoing, in each case, whether now owned or hereafter acquired, and all products and proceeds of the foregoing (subject to permitted liens and exceptions existing in the existing Loan Documents, but excluding (A) assets as to which the Administrative Agent reasonably determines that the burden or cost of obtaining a security interest therein or perfection thereof is excessive in relation to the value of the security to be afforded thereby and (B) any assets where the granting of security interests is

prohibited by law, regulation or contract (except to the extent any such contractual prohibition is ineffective under applicable law), or would result in material and adverse income tax consequences) (collectively, the "Revolving Facility Collateral").

A separate stand-alone revolving facility (the "Revolving Facility") in an aggregate principal amount of up to $650,000,000 will be secured by a perfected first priority security interest in the Revolving Facility Collateral and a perfected second priority security interest in the First Lien Collateral.  The Revolving Facility Collateral shall not include any patents, copyrights or trademarks or any other intellectual property; provided that the agent under the revolving facility shall be granted limited, non-exclusive licenses in the Loan Parties' intellectual property as and to the extent necessary for such agent to realize upon the Revolving Facility Collateral.

Notwithstanding the foregoing, the Revolving Facility Collateral securing the Obligations on a second priority basis will only include Revolving Facility Collateral owned by the Loan Parties and shall exclude Revolving Facility Collateral owned by SSCCI or any other foreign subsidiary that has granted collateral securing the Revolving Facility on a first priority basis.

It is understood that the security interests in the First Lien Collateral and the Revolving Facility Collateral securing the Obligations will not be perfected until the Funding Date.

A "Material Subsidiary" will be defined as a subsidiary of the Borrower that accounted for more than 5% of the Borrower's consolidated revenues for, or more than 5% of the Borrower's consolidated assets at the close of, the most recent period of four consecutive fiscal quarters for which financial statements have been delivered, as well as any other subsidiaries irrevocably designated from time to time by the Borrower to the Administrative Agent as "Material Subsidiaries".

| | |
|---|---|
| Intercreditor Agreement: | The lien priority, relative rights and other creditors' rights issues in respect of the Term Facility and the Revolving Facility will be set forth in an intercreditor agreement, the form of which will be attached as an exhibit to the Credit Agreement, which may be subject to such subsequent modifications as the Administrative Agent may agree, in its reasonable discretion. |
| Voluntary Reductions: | The Borrower may voluntarily permanently reduce the commitments on or prior to the Funding Date in whole or in part, in a minimum amount of $5,000,000 and multiples thereof, upon one business day's notice to the Administrative Agent, subject to the payment of OID and/or participation fees required to be paid pursuant to the provisions of Annex I hereto as a result of the termination of such commitments prior to the Funding Date. |
| Voluntary Prepayments: | Voluntary prepayments of loans will be permitted in whole or in part, at the option of the Borrower, without premium or penalty (except as |

provided below and except for any breakage costs associated with Eurodollar Loans), with partial prepayments in integral multiples of $1,000,000 for ABR Loans and $5,000,000 for Eurodollar Loans, upon (i) same day notice (by 11:00 a.m., New York City time) for ABR Loans and (ii) three business days' notice for Eurodollar Loans.

Any voluntary prepayment of Term Loans effected through a refinancing of such Term Loans on or prior to the second anniversary of the Funding Date (other than in connection with a Change in Control (as defined in the Prepetition Credit Agreement)) shall be accompanied by a prepayment fee equal to 1.00% of the aggregate principal amount of such prepayment if paid on or prior to the second anniversary of the Funding Date; provided, however, that no such prepayment fee shall be payable (A) with respect to Term Loans up to an aggregate principal amount of $500,000,000 that are prepaid on or prior to the date three months after the Funding Date with proceeds from the issuance of Permitted Notes (as defined below) consisting of unsecured senior and/or subordinated indebtedness (such unsecured Permitted Notes, "Unsecured Notes"), or (B) if all outstanding Term Loans are prepaid in their entirety on or prior to the three-month anniversary of the Funding Date with proceeds from a senior secured note offering.

In addition to voluntary prepayments provided above, the Credit Agreement shall contain Dutch auction repurchase provisions, pursuant to which the Borrower shall be permitted to repurchase outstanding loans of one or more tranches from time to time at its option, subject to each offer being made to all Lenders of the relevant tranche and subject to other customary terms and conditions.

| | |
|---|---|
| Mandatory Prepayments: | The following amounts will be applied to prepay the Term Loans: |

(a) 50% of Excess Cash Flow (to be defined consistent with the Prepetition Credit Agreement, with appropriate modifications for upcoming pension payments) for each fiscal year, commencing with the partial period commencing on the first day following the Funding Date and ending December 31, 2010, and for each fiscal year thereafter and paid on an annual basis within 90 days after the end of each fiscal year; provided, however, that the foregoing percentage shall be reduced to (i) 25% if the Consolidated Senior Secured Leverage Ratio (as defined in the Prepetition Credit Agreement) is equal to or less than 2.25:1 and (ii) 0% if the Consolidated Senior Secured Leverage Ratio is equal to or less than 1.75:1.

(b) 100% of the net after-tax cash proceeds of any sale or other disposition (including as a result of casualty or condemnation) of any asset of the Borrower and its subsidiaries, except for Revolving Facility Collateral, subject to a 365-day reinvestment right in an aggregate amount of up to $250,000,000, and otherwise in each case consistent with the exceptions and reinvestment rights set forth in the Prepetition Credit Agreement

- 5 -

(including, without limitation, the definitions of "Asset Sale" and "Net Cash Proceeds" set forth in the Prepetition Credit Agreement).

(c) 100% of the net cash proceeds of any incurrence of debt after the Funding Date by the Borrower or any of its subsidiaries, subject to the exceptions set forth in the Prepetition Credit Agreement.

The above-described mandatory prepayments (a) shall be allocated pro rata between the Term Facility and any incremental term facility and (b) within each such term facility, shall be applied pro rata to reduce the remaining amortization payments under such facility; provided, however, that (i) prepayments from Excess Cash Flow may be applied first to the installments of principal coming due within 24 months of prepayment and (ii) up to $100,000,000 of any mandatory prepayment resulting from Excess Cash Flow may be allocated among such term facilities in the manner directed by the Borrower.

In the event that the Borrower, prior to the Funding Date, issues Unsecured Notes (including for proceeds that are deposited into an escrow account pending the Funding Date), then the Term Loan Commitments will automatically be reduced at the time of such issuances, on a pro rata basis, by an amount equal to the proceeds of such issuances, and the Borrower will pay to the Lenders the OID and/or participation fees required to be paid pursuant to the provisions of Annex I hereto as a result of the termination of such commitments prior to the Funding Date.

Permitted Debt Exchange: The Credit Agreement shall contain permitted debt exchange provisions, pursuant to which the Borrower shall be permitted to consummate one or more exchanges ("Permitted Debt Exchanges") of outstanding loans of one or more tranches for Permitted Notes (as defined below) from time to time at its option, subject to each exchange offer being made to all Lenders of the relevant tranche and other customary terms and conditions.

"Permitted Notes" means any notes or bonds issued by the Borrower pursuant to one or more indentures so long as (a) each issue of Permitted Notes shall constitute (i) indebtedness that is secured by a lien on the Collateral that is junior in priority to the Term Facility but may be senior to the Revolving Facility with respect to the Collateral ("Second Lien Debt"), (ii) senior unsecured indebtedness or (iii) unsecured subordinated indebtedness, provided that any Second Lien Debt shall be subject to the terms of an intercreditor agreement and such other documentation setting forth the relative priorities to the Collateral, which shall be in form and substance reasonably satisfactory to the Administrative Agent, (b) such indebtedness has a final maturity more than 90 days after the maturity of the Term Facility and requires no scheduled payment of principal in cash prior to 90 days after the maturity of the Term Facility, (c) such indebtedness includes covenants, events of default and other terms and conditions that are no more restrictive, when taken as a whole, to the

| | Loan Parties than the Term Facility. |
|---|---|
| Conditions Precedent: | The effectiveness of the Term Facility on the Closing Date and the funding of the Term Loans on the Funding Date will be conditioned upon the satisfaction of the conditions set forth on Annex II hereto. |
| Effectiveness of Documentation: | The Credit Agreement and related loan documentation will become effective and become binding and enforceable against all parties thereto (including any permitted successors and assigns) on the Closing Date (as defined in Annex II hereto). |
| Representations and Warranties: | Substantially the same as set forth in the Prepetition Credit Agreement. |
| Affirmative Covenants: | Substantially the same as set forth in the Prepetition Credit Agreement, but including, without limitation, using commercially reasonable efforts to obtain as promptly as practicable and thereafter maintain a public corporate rating from S&P, a public corporate family rating from Moody's and a public rating of the Term Facility from each of S&P and Moody's. Subject to the last paragraph under "Negative Covenants" below, the affirmative covenants will become effective on, and shall apply from and after, the Funding Date. |
| Negative Covenants: | Negative covenants to consist of the following: |

a) *Indebtedness.* The Borrower and its subsidiaries shall not incur any indebtedness or attributable debt in respect of sale/leaseback transactions, provided that the Borrower and its subsidiaries may incur indebtedness if, after giving effect thereto and application of proceeds therefrom, the pro forma Interest Coverage Ratio (as defined in the existing senior note indentures of the Borrower) would be greater than 2.00:1. Notwithstanding the foregoing, the Borrower and its subsidiaries may incur indebtedness under the following exceptions: (i) indebtedness created under the Credit Agreement from time to time; (ii) indebtedness in existence on the Funding Date after giving effect to the consummation of the Plan and which is contemplated by the Plan on such date, (iii) Unsecured Notes issued on or prior to the Funding Date, provided that the Term Loan Commitments are reduced and the related OID and participation fee payments are made to the Lenders as set forth under "Mandatory Prepayments" above; (iv) intercompany indebtedness which, if owed to a Loan Party, is pledged as Collateral; (v) indebtedness of foreign subsidiaries and guarantees thereof (other than guarantees by any Loan Party unless otherwise permitted as investments) not to exceed an aggregate principal amount of $35,000,000; (vi) indebtedness under the Revolving Facility (together with refinancings and replacements thereof) and guarantees thereof in an aggregate principal amount not to exceed $800,000,000, with any incremental financing being on substantially the same terms (other than fees), including availability, as on the Funding Date; (vii) indebtedness incurred to refinance outstanding indebtedness

and any refinancings thereof (such indebtedness, "<u>Permitted Refinancing Indebtedness</u>" (to be further defined)) in an amount not to exceed the amount so refinanced plus premiums, accrued interest, fees and expenses (it being understood that refinancings of indebtedness otherwise subject to a basket must be effected under such basket or pursuant to a separate provision permitting such refinancing indebtedness); (viii) indebtedness in respect of (A) performance, surety, appeal or similar bonds, completion guarantees or similar instruments, letters of credit and bankers acceptances provided in the ordinary course of business, (B) currency, commodity and interest rate hedging agreements in the ordinary course of business, and (C) agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligations pursuant to such agreement, incurred in connection with the disposition of any business, assets or subsidiary; (ix) (A) Capital Lease Obligations and Attributable Indebtedness (as such terms are defined in the Prepetition Credit Agreement), (B) indebtedness incurred to finance the acquisition, construction, repair or improvement of property and (C) indebtedness consisting of industrial revenue, environmental control and other similar bonds and guarantees and letters of credit in support thereof, in an aggregate amount for preceding clauses (A)-(C) not to exceed $150,000,000; (x) indebtedness consisting of the financing of insurance premiums in the ordinary course of business not to exceed $75,000,000; (xi) indebtedness of any person acquired in a Permitted Acquisition and assumed pursuant to such acquisition (including any refinancing, renewal or replacement, in whole or in part, thereof at the time of assumption or from time to time thereafter) in an aggregate amount not to exceed $50,000,000, provided that immediately after the incurrence thereof and giving pro forma effect thereto, the Interest Coverage Ratio shall not be less than the Interest Coverage Ratio immediately prior to such incurrence; (xii) guarantees with respect to bonds issued to support workers' compensation and other similar obligations in the ordinary course of business; (xiii) indebtedness in the form of any earnout or other similar contingent payment obligation incurred in connection with any permitted acquisition; (xiv) indebtedness evidenced by Permitted Notes so long as (A) the net proceeds thereof are applied promptly after the incurrence thereof to refinance in whole or in part the Term Loans, (B) such Permitted Notes are exchanged for outstanding loans of one or more tranches under the Credit Agreement pursuant to a Permitted Debt Exchange, and/or (C) to the extent all net cash proceeds from the issuance of such Permitted Notes are not used as described in preceding clause (A) and such Permitted Notes are not exchanged as described in preceding clause (B), then the aggregate principal amount of such Permitted Notes issued under this clause (C) shall not exceed the available Incremental Facility amount at such time (with the amount specified under this clause

- 8 -

(C) reducing the available Incremental Facility amount); (xv) indebtedness of Smurfit-Stone Puerto Rico, Inc. in an aggregate amount not to exceed $10,000,000 and the guarantee thereof by the Borrower; and (xvi) indebtedness not to exceed $75,000,000.

(b) *Liens.* Substantially the same as set forth in the Prepetition Credit Agreement, except that (i) the carve-out for Liens on Program Receivables will be replaced with a carve-out for Liens on the Revolving Facility Collateral, (ii) the carve-out for Liens deemed to exist in connection with any Permitted Investment will be omitted, (iii) the general basket in clause (xii) of the Prepetition Credit Agreement will be reduced to $30,000,000, (iv) Liens securing Permitted Timber Financing will be capped at $10,000,000, (v) the carve-out for Permitted Equipment Financing will be omitted and (vi) the catch-all basket in clause (xvi) of the Prepetition Credit Agreement will be reduced to $20,000,000.

(c) *Investments, Loans and Advances.* Substantially the same as set forth in the Prepetition Credit Agreement, except that (i) appropriate modifications shall be made to exclude references to FinSubs, (ii) the basket for loans, advances or other investments made to or in any Subsidiary will be reduced to $75,000,000, (iii) the general basket in clause (l) of the Prepetition Credit Agreement will be reduced to $100,000,000 and (iv) the requirement that no more than 15% of consolidated revenues or consolidated assets in any fiscal quarter may be generated or held by Domestic Subsidiaries and Canadian Subsidiaries that are not Loan Parties will be eliminated (and replaced with clause (n) entitled "Material Subsidiaries" below).

(d) *Mergers, Consolidations, Sales of Assets and Acquisitions.* Substantially the same as set forth in the Prepetition Credit Agreement, except that (i) appropriate modifications shall be made to exclude references to FinSubs and (ii) Permitted Acquisitions shall be subject to the following additional requirements: (A) after giving pro forma effect to such acquisition, the Borrower could incur at least $1.00 of additional indebtedness under the incurrence test above (Interest Coverage Ratio greater than 2.00:1), provided that if a Permitted Acquisition is made for stock consideration and does not involve the acquisition, assumption or issuance of debt, such acquisition may be effected if, at the time of such acquisition and after giving pro forma effect thereto, the Interest Coverage Ratio shall not be less than the Interest Coverage Ratio immediately prior to the consummation of such acquisition, (B) at the time of such acquisition and after giving effect thereto, the Consolidated Senior Secured Leverage Ratio shall be less than or equal to 3.00:1 and (C) upon consummation of such acquisition, the acquired entity (subject to exceptions for foreign acquisitions to be agreed) shall become a Loan Party under the Credit

- 9 -

Agreement if such acquired entity would be a Material Subsidiary based on a pro forma calculation for the most recent period of four consecutive fiscal quarters in respect of which financial statements have been delivered.

(e) *Restricted Payments.* SSCC will be permitted to make (i) repurchases and redemptions of any of its equity interests not exceeding $5,000,000 in the aggregate for any fiscal year, pursuant to and in accordance with stock option plans or other benefit plans or agreements for directors, officers or employees of SSCC or its subsidiaries and (ii) Restricted Payments (as defined in the Prepetition Credit Agreement) in an aggregate amount not to exceed in any fiscal year the Borrower's portion of Excess Cash Flow not used to repay the Term Loan, but, unless the Additional RP Conditions (as defined below) are met, not in excess of US$50,000,000 in such year; provided, in each case, that no default or event of default exists at the time of and immediately after giving effect to any Restricted Payment.

The Additional RP Conditions will be satisfied if, at the time of a proposed Restricted Payment and immediately after giving effect thereto, (A) no loans are outstanding under the Revolving Facility (other than issued and outstanding letters of credit (other than letters of credit backing Indebtedness for borrowed money)), (B) the Borrower could incur at least $1.00 of additional indebtedness under the Incurrence Test above (Interest Coverage Ratio greater than 2.00:1) and (C) in such fiscal year the Borrower has made prepayments of the Term Loans in the amount of 50% of Excess Cash Flow for the immediately preceding fiscal year (other than mandatory prepayments from the proceeds of asset sales and debt issuances) notwithstanding any reductions to the required mandatory prepayments applicable to Excess Cash Flow set forth under "Mandatory Prepayments" above (provided, however, that any voluntary prepayments used to satisfy such condition will not be deemed to reduce Excess Cash Flow for the fiscal year in which such Restricted Payment is made).

(f) *Transactions with Affiliates.* Substantially the same as set forth in the Prepetition Credit Agreement.

(g) *Limitation on Debt Prepayments.* Substantially the same as set forth in the Prepetition Credit Agreement, except that the carve-outs for debt that will not longer exist after giving effect to the Plan will be omitted.

(h) *Amendment of Certain Documents.* Substantially the same as set forth in the Prepetition Credit Agreement.

(i) *Restrictions on Ability of Subsidiaries to Pay Dividends.* Substantially the same as set forth in the Prepetition Credit

- 10 -

Agreement.

(j) *Limitation on Disposition of Stock of Subsidiaries.* Substantially the same as set forth in the Prepetition Credit Agreement.

(k) *Business.* Substantially the same as set forth in the Prepetition Credit Agreement.

(l) *Disposition of Collateral and Other Assets.* Substantially the same as set forth in the Prepetition Credit Agreement.

(m) *Fiscal Year.* The same as set forth in the Prepetition Credit Agreement.

(n) *Material Subsidiaries.* The Borrower will ensure that as of the end of each fiscal quarter the sum of (i) the individual revenues and assets of the Borrower and of each domestic Material Subsidiary that is a Loan Party and (ii) the revenues and assets of each first-tier foreign subsidiary at least 65% of the voting stock of which has been pledged as First Lien Collateral to secure the Obligations and of such foreign subsidiary's subsidiaries, calculated on a consolidated basis, in each case for or as of the end of the most recent period of four consecutive fiscal quarters in respect of which financial statements have been delivered, when taken together, account for at least 90% of the Borrower's consolidated revenues for, and at least 90% of the Borrower's consolidated assets at the close of, such period of four consecutive fiscal quarters.

The negative covenants will become effective on, and shall apply from and after, the Funding Date. Notwithstanding the foregoing, it shall be a condition to the Funding Date that following consummation of the transactions expected to occur substantially simultaneously with the Funding, no event, circumstance or condition will exist that would constitute a default or event of default under the Credit Agreement had the affirmative and negative covenants and Events of Default been applicable at all times after the Closing Date, other than any such event, condition or circumstance directly attributable to consummation of the Plan as reflected in the Disclosure Statement on the Closing Date or to changes therein that do not require the consent of a supermajority of Lenders pursuant to paragraph II(a) of Annex II hereto (it being understood that any such non-compliance with covenants or Event of Default prior to the Funding Date that has been cured or otherwise is not continuing as of the Funding Date will not be deemed to result in a failure of this condition).

Financial Covenants: None.

Events of Default: Substantially the same as set forth in the Prepetition Credit Agreement. The events of default will become effective on, and shall apply from and

|                                             | after, the Funding Date.                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                            |
|---------------------------------------------|---|
| Yield Protection and<br>Increased Costs; Taxes: | Customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR Loan on a day other than the last day of an interest period with respect thereto. |
| Costs and Expenses;<br>Indemnification: | The Borrower shall pay or reimburse (a) all reasonable out-of-pocket expenses of the Administrative Agent and the Arrangers incurred in connection with the preparation, negotiation, execution and delivery of the Credit Agreement and related documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of one counsel to the Administrative Agent and the Arrangers taken as a whole and, if necessary, of bankruptcy counsel and one local counsel and one regulatory counsel in any jurisdiction) and (b) all out-of-pocket expenses of the Administrative Agent and the Lenders in connection with the enforcement of the Credit Agreement and related documentation (including the fees, disbursement and other charges of a single lead counsel to the Administrative Agent and the Lenders and such local and regulatory counsel as may reasonably be deemed necessary by the Administrative Agent in each relevant jurisdiction and, in the case of a conflict of interest, one additional counsel per affected party) .<br><br>The Administrative Agent, the Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable fees, disbursements and other charges of counsel to the indemnified persons) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are determined by the final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such indemnified person (or its related parties). |
| Assignments and<br>Participations : | The Lenders will be permitted to assign loans to persons (including to the Borrower in connection with Permitted Debt Exchanges and Dutch auction repurchases) with the consent of the Borrower (unless a bankruptcy or payment event of default has occurred and is continuing or such assignment is to a Lender, an affiliate of a Lender, an Approved Fund (as defined in the Prepetition Credit Agreement) or the Borrower), not to be unreasonably withheld; <u>provided</u> that Borrower shall cause any loans assigned to it to be canceled to the extent permitted by applicable law and not giving rise to adverse tax consequences. Each assignment (except to other Lenders or their affiliates) will be in a minimum amount of $1,000,000. The Administrative Agent will receive a processing and recordation fee of $3,500 from each assignee with each assignment. |

|  |  |
|---|---|
| | Each assignment will be by novation. |
| | Notwithstanding the foregoing, (i) the Borrower and its affiliates shall not have voting or informational rights under the Credit Agreement and (ii) any loans under the Term Facility held by the Borrower and its affiliates shall not be included in the calculation of the required voting percentages described below. |
| | Each Lender shall have the right to sell participations in its loans, subject to customary voting limitations. Participants shall be entitled to the benefit of the yield protection and increased cost provisions referred to above, subject to customary limitations. |
| Voting: | Amendments and waivers of the Credit Agreement will require the approval of Required Lenders (defined to mean Lenders holding more than 50% of the aggregate principal amount of outstanding loans or commitments), with customary exceptions, including (i) the consent of each affected Lender is required to reduce the principal amount of any loan or rate of interest thereon (other than default rate interest), to extend any date for the scheduled payment of interest or to extend the final maturity and (ii) the consent of all of the Lenders is required to release all or substantially all of the collateral or the guarantees (other than in connection with any sale of collateral or release of a guarantee permitted by the Credit Agreement or the other loan documents). |
| | Notwithstanding the foregoing, the Credit Agreement shall contain "amend and extend" provisions pursuant to which the Borrower may extend commitments and/or Term Loans of one or more tranches with only the consent of the respective extending lenders, it being understood that each lender under the applicable tranche(s) that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other lender in such tranche(s), <u>provided</u> that it is understood that no existing lender will have any obligation to commit to any such extension. |
| Defaulting Lenders: | Usual provisions for facilities and transactions of this type to be applicable to Defaulting Lenders (to be defined) providing for, among other things, the termination of such Defaulting Lender's rights to OID and participation fee payments, the loss of voting rights and the ability of the Borrower to require an assignment of the Defaulting Lender's commitments. |
| Replacement of Lenders: | The same as set forth in the Prepetition Credit Agreement. |
| Governing Law: | New York. |

- 13 -

**ANNEX I**

INTEREST RATES

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Term Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate plus the Applicable Margin. |
| | As used herein: |
| | "ABR" means the highest of (i) the rate of interest per annum publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus 0.5% and (iii) the Eurodollar Rate for a one month interest period plus 1.00%. Notwithstanding the foregoing, the minimum ABR shall be 3.00%. |
| | "Applicable Margin" means, (a) 4.00% in the case of ABR Loans and (b) 5.00% in the case of Eurodollar Loans. |
| | "Eurodollar Rate" means the rate (adjusted for any statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to 1, 2, 3 or 6 months (or, if consented to by all affected Lenders, 9 or 12 months thereafter) (as selected by the Borrower) appearing on Reuters Screen LIBOR01 (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to U.S. dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such interest period, as the rate for U.S. dollar deposits with a maturity comparable to such interest period. In the event that such rate is not available at such time for any reason, then the "Eurodollar Rate" for such interest period shall be the rate per annum at which U.S. dollar deposits of $5,000,000 and for a maturity comparable to such interest period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 3:00 p.m., London time, two Business Days prior to the commencement of such interest period. Notwithstanding the foregoing, the minimum Eurodollar Rate shall be 2.00%. |
| Interest Payment Dates: | In the case of Term Loans bearing interest based upon the ABR ("ABR Loans"), quarterly in arrears. |

|  |  |
|---|---|
|  | In the case of Term Loans bearing interest based upon the Eurodollar Rate ("Eurodollar Loans") on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| OID/Participation Fees: | Any OID or Participation Fees necessary to successfully arrange the Term Loan will be earned and payable as follows: |
|  | (a) Each Lender will earn a fee on the Closing Date in the amount of the product of (i) a percentage equal to the lesser of (x) 0.50% and (y) 1/2 of any OID or Participation Fee, expressed as a percentage, and (ii) such Lender's Term Loan Commitments in effect on the Closing Date. This fee will be payable, in whole or in part, upon the earlier of (1) the Funding Date, and (2) the date upon which any such Term Loan Commitments are terminated or otherwise expire, but are only payable on the amount of any such expired or terminated Term Loan Commitments (including as a result of the termination of a portion of the Term Loan Commitments on or prior to the Funding Date as a result of the issuance of any Unsecured Notes). |
|  | (b) Each Lender will earn a fee on the Funding Date in the amount of the product of (i) a percentage equal to the total amount of the OID or Participation Fees, expressed as a percentage, and (ii) the amount of such Lender's Term Loan Commitment that is funded on the Funding Date, minus any fee paid pursuant to paragraph (a) with regard to such funded amount. This fee will be payable on the Funding Date, either as a fee or as an original issue discount, at the option of the Lender. |
| Default Interest: | Upon the occurrence and during the continuance of any default in the payment of principal, interest or other amounts due under the Credit Agreement or related loan documents, by acceleration or otherwise, at the discretion of the Required Lenders, interest on such defaulted amount shall be payable on demand at 2% above the then applicable rate. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR loans based on the Prime Rate) for actual days elapsed. |

CONDITIONS PRECEDENT

I. Conditions Precedent to the Closing Date.

The Credit Agreement and related loan documents shall become effective and binding and enforceable against the Borrower, the Lenders and the Administrative Agent on the date (the "Closing Date") on which the following conditions are satisfied or waived.

(a) The Administrative Agent, the Lenders and each Loan Party shall have executed and delivered loan documents to which they are a party (including the Credit Agreement) for the Term Facility.

(b) The Administrative Agent shall have received an unaudited pro forma consolidated balance sheet of SSCC and its subsidiaries as of a date to be determined, adjusted to give effect to the implementation of the Plan and the financing contemplated hereby as if such transactions had occurred on such date.

(c) The Administrative Agent shall have received such legal opinions, certificates, documents and instruments reasonably satisfactory to the Administrative Agent and its counsel as are customary for transactions of this type.

(d) The Administrative Agent shall have received projections through 2014, including but not limited to quarterly projections for the first year after the Closing Date.

(e) The Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the Administrative Agent approving the Borrower's execution, delivery and performance of the Credit Agreement, including the payment of fees, expenses, indemnities and other amounts contemplated thereby, and approving as an administrative expense claim against SSCC the indemnification, cost reimbursement obligations and fee obligations accruing or payable in respect of periods or events occurring prior to the Funding Date.

II. Conditions Precedent to the Funding Date.

The Funding Date and funding of the Term Loans shall be subject to the satisfaction or waiver of the following conditions.

(a) The Bankruptcy Court shall have entered an order confirming the Plan, which order (the "Confirmation Order") (i) shall be in form and substance reasonably satisfactory to the Administrative Agent, (ii) shall authorize the Term Facility and the Revolving Facility and (iii) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed. The effective date of the Plan shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied (or shall be concurrently satisfied) or waived pursuant to the terms of the Plan). Since the Closing Date, there shall have been no amendment or modification of the Plan that could reasonably be expected to adversely affect the interests of the Lenders in any significant respect that has not been approved by the Lenders having Term Loan Commitments representing more than 66-2/3% of the aggregate Term Loan Commitments of all Lenders.

(b)  The Administrative Agent shall have received a completed Perfection Certificate (to be defined) dated the Funding Date and signed by a Responsible Officer of Borrower, together with all attachments contemplated thereby, including the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by the Credit Agreement or have been, or substantially contemporaneously with the Funding Date will be, released.

(c)  All actions necessary to establish that the Administrative Agent will have perfected first priority security interests in the First Lien Collateral and perfected second priority security interests in the Revolving Facility Collateral shall have been taken, and, in connection with real estate collateral, the Borrower shall deliver to the Administrative Agent on or prior to the Funding Date (or such later date as the Administrative Agent reasonably determines with respect to certain Real Estate Documents (as defined below) that, despite the use of commercially reasonable efforts by the Borrower to complete, may require additional time for delivery thereof) mortgages, deeds of trust, title insurance policies and local counsel opinions (the "Real Estate Documents"), in each case in form and substance reasonably satisfactory to the Administrative Agent.

(d)  The Administrative Agent shall have received such legal opinions, certificates, documents and instruments reasonably satisfactory to the Administrative Agent and its counsel as are customary for transactions of this type.

(e)  The representations and warranties of the Borrower and its subsidiaries set forth in the Credit Agreement and related loan documents are true and correct in all material respects as of the Funding Date.

(f)  No Event of Default shall have occurred and be continuing as of the Funding Date.

(g)  The Administrative Agent shall have received an unaudited pro forma consolidated balance sheet of SSCC and its subsidiaries as of the last day of the most recent fiscal quarter for which financial statements are publicly available, adjusted to give pro forma effect to the implementation of the Plan and the financing contemplated hereby and by the Revolving Facility as if such transactions had occurred on such date.  As of the Funding Date, the Borrower and its subsidiaries will not have incurred any material liabilities not reflected in such pro forma consolidated balance sheet, other than liabilities incurred in the ordinary course of business.

(h)  The Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that following consummation of the transactions expected to occur substantially simultaneously with the Funding, no event, circumstance or condition will exist that would constitute a default or event of default under the Credit Agreement had the affirmative and negative covenants and Events of Default been applicable at all times after the Closing Date, other than any such event, condition or circumstance directly attributable to the Plan as reflected in the Disclosure Statement on the Closing Date or to changes therein not requiring approval of the Lenders pursuant to paragraph II(a) above (it being understood that any such non-compliance with covenants or Event of Default prior to the Funding Date that has been cured or otherwise is not continuing as of the Funding Date will not be deemed to result in a failure of this condition).

(i)  After giving pro forma effect to the implementation of the Plan and the transactions contemplated thereunder, the funding of the Term Loans and any borrowings on the Funding Date under the Revolving Facility, the Borrower's ratio of total consolidated indebtedness to LTM EBITDA (to be

defined) for the most recent twelve-month period ending at least 30 days prior to the Funding Date shall not exceed 3.5:1 if the Funding Date occurs on or prior to April 30, 2010 and otherwise, 3.85:1.

(j)  The documentation for the Revolving Facility (the "Revolving Facility Documents") shall contain terms that conform to the term sheet disclosed to the Administrative Agent and provided to the Lenders prior to the Closing Date and are otherwise reasonably satisfactory to the Borrower and the Administrative Agent, and the Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Revolving Facility Documents shall have been satisfied or waived in accordance with their terms and that the availability under the Revolving Facility plus the Borrower's cash and cash equivalents on the Funding Date is greater than $500,000,000 if the Funding Date occurs on or prior to April 30, 2010 and otherwise, $450,000,000.

(k)  The Administrative Agent and the agent under the Revolving Facility shall have executed and delivered an intercreditor agreement in the form attached as an exhibit to the Credit Agreement, with such modifications to which the Administrative Agent may agree, in its reasonable discretion.

(l)  The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Funding Date, including to the extent invoiced, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Credit Agreement and related loan documents or in respect of the execution and delivery of the Credit Agreement.

[[NYCORP:3188217v14:3132D:01/12/10--11:49 a]]