## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, *et al.*,[1] | Case No. 09-10235 (BLS) |
| | Jointly Administered |
| Debtors. | |

## MOTION OF AURELIUS CAPITAL MANAGEMENT, LP
## AND COLUMBUS HILL CAPITAL MANAGEMENT, L.P. TO CONVERT
## THE CHAPTER 11 CASE OF STONE CONTAINER FINANCE COMPANY
## OF CANADA II TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

Aurelius Capital Management, LP, as manager of certain funds that are beneficial holders of the Notes (defined below) ("Aurelius") and Columbus Hill Capital Management, L.P., as manager of certain funds that are beneficial holders of the Notes ("CHCM" and, together with Aurelius, the "Moving Parties"), by and through their undersigned counsel, hereby submit this motion (the "Motion") pursuant to sections 105(a) and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1530 (the "Bankruptcy Code") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an Order converting the chapter 11 case of Stone Container Finance Company of Canada II ("Finance II"), one of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), to a case under chapter 7 of the Bankruptcy Code. The Moving Parties are managers of funds that hold approximately 62% of the outstanding principal amount of the 7 3/8% Senior Notes due July 15, 2014 (the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 150 North Michigan Avenue, Chicago, Illinois 60601.

"Notes") issued by Finance II on July 20, 2004.[2]  In support of the Motion, the Moving Parties respectfully state as follows:

## PRELIMINARY STATEMENT

By this Motion, the Moving Parties request entry of an Order converting the Finance II chapter 11 case to a case under chapter 7 of the Bankruptcy Code.  The Moving Parties are requesting this relief because it has become abundantly clear that the interests of Finance II are being sacrificed for the benefit of the other Debtors and that the recovery of Finance II's creditors is unfairly being subverted in the process.  Specifically:

- Creditors of Finance II will receive a significantly greater recovery in a chapter 7 case than they will if Finance II remains in a chapter 11 case.

- Finance II has no on-going operations, no employees, no reasonable likelihood of rehabilitation and no reorganizational purpose.  The Debtors themselves intend to dissolve Finance II upon consummation of the Amended Plan.

- Finance II's officers and directors are grossly mismanaging the Finance II estate by failing to pursue (and, worse, actively impeding) recovery on Finance II's only known material assets, which are claims against other Debtors and Finance II's officers and directors in these chapter 11 cases.

- Finance II's officers and directors (together with their counsel) suffer from disabling conflicts that make it impossible for them to act in Finance II's best interest.

- The only possible justification for Finance II remaining in chapter 11 is to benefit the other Debtors, which is not a legally permissible reason to maintain Finance II's chapter 11 case.

Only conversion of this case to a case under chapter 7 of the Bankruptcy Code will allow maximization of the recoveries for *Finance II* and its creditors.  For all these reasons, "cause" exists for the conversion of this case, and conversion is clearly in the best interests of Finance II's estate and creditors.

---

[2]     The Notes were originally issued in the principal amount of $200,000,000.

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The legal predicates for the relief sought herein are sections 105(a) and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017.

**FACTUAL BACKGROUND[3]**

**A.      Procedural Background**

4.      On January 26, 2009 (the "Petition Date"), Finance II, Smurfit-Stone Container Canada Inc. ("SSC Canada"), Smurfit-Stone Container Enterprises, Inc. ("SSCE") and certain of their affiliates, including Finance II (the "Consolidated U.S. Debtors") filed petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Consolidated U.S. Debtors are operating their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On the same day, after the commencement of the chapter 11 cases, Finance II, SSC Canada and certain of their affiliates (not including Smurfit-Stone Container Corporation ("SSCC") or SSCE) (collectively, the "Canadian Debtors") filed for protection from their creditors in Canada under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA"), in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court"). The Consolidated U.S. Debtors' chapter 11 cases in the Bankruptcy Court

---

[3]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Disclosure Statement (as defined below) or the Amended Plan (as defined below).

have been recognized by the Canadian Bankruptcy Court as a "foreign proceeding" as defined in section 267 of the *Bankruptcy and Insolvency Act (Canada)* ("BIA").

6.     On December 1, 2009, the Consolidated U.S. Debtors filed their Joint Plan of Reorganization [Docket No. 2914] (the "Plan") and related Disclosure Statement [Docket No. 2915] (the "Disclosure Statement") with the Bankruptcy Court.  Thereafter, on December 22, 2009, the Consolidated U.S. Debtors amended the Plan [Docket No. 3372] (the "Amended Plan") and the Disclosure Statement [Docket No. 3374] (the "Amended Disclosure Statement"). The Canadian Debtors also filed the Plan as part of their draft Plan of Arrangement (the "CCAA Plan") in the CCAA proceedings.  The Amended Plan and CCAA Plan generally provide for a restructuring of the Consolidated U.S. Debtors and the Canadian Debtors in both the Bankruptcy Court and the Canadian Bankruptcy Court.  Finance II is purportedly a proponent of the Amended Plan.  The hearing on the adequacy of the Disclosure Statement has been set for January 29, 2010.

7.     The Amended Plan provides for the dissolution of Finance II upon consummation of the Amended Plan.  *See* Amended Plan § 6.7.  The Amended Plan also contemplates a management Equity Incentive Plan (the "EIP") which includes a reservation of not less than 8% on a fully diluted basis of the New SSCC Common Stock (as defined in the Amended Plan) for post-reorganization management.  Moreover, the Amended Plan provides that certain of the Debtors' key executives and managers will receive grants of equity in Reorganized SSCC totaling 4.1% on a fully diluted basis (the "Equity Grants").

8.     On December 28, 2009, the Consolidated U.S. Debtors filed a motion [Docket No. 3475] pursuant to section 1121(d) of the Bankruptcy Code requesting a further extension of (i) their exclusive filing period by one hundred twenty (120) days, through May 21, 2010, and

(ii) their exclusive solicitation period by one hundred twenty (120) days, through July 21, 2010. On January 7, 2010, the Moving Parties filed an objection to a further extension of the exclusive periods as to Finance II [Docket No. 4003].

## B. Finance II

### (i) FINANCE II'S CORPORATE STRUCTURE

9. Finance II is an unlimited liability company incorporated under the *Companies Act (Nova Scotia)* and is a wholly-owned subsidiary of Debtor SSCE, which is a Delaware corporation.[4] Finance II has no operations, no employees and no on-going business activities; accordingly, it has no operations to restructure.

10. Finance II's corporate structure is typical of many Canada-U.S. cross-border financing structures which make use of an unlimited liability company formed under the laws of Nova Scotia (a "ULC") because a ULC is treated as a corporation for Canadian tax purposes but as a "disregarded entity" for U.S. federal income tax purposes. As a result of this tax-advantaged structure, SSCE (as the U.S. parent of Finance II) had the ability to deduct the interest payable by Finance II on the Notes for U.S. federal income tax purposes without having to recognize income with respect to any interest Finance II derived from the loan made pursuant to the Intercompany Note (as defined below) (the "Intercompany Loan"). At the same time, however, the interest payable on the Notes, as well as the Intercompany Loan, was also deductible for Canadian income tax purposes. In order for the Smurfit group to obtain the intended benefits of the ULC structure, it was necessary, among other things, that the Intercompany Loan be treated as debt for Canadian tax purposes. The ULC structure benefits creditors of Finance II as well, because, among other benefits, SSCE (as a Nova Scotia unlimited liability company and the parent of

---

[4] SSCE is the wholly-owned United States operating subsidiary of Debtor SSCC, which is a Delaware corporation.

Finance II) is obligated to contribute funds to Finance II to satisfy all of the debt obligations of Finance II and SSC Canada has a debt obligation to Finance II under the Intercompany Claim (as defined below). The Amended Plan, however, goes to elaborate lengths to eliminate these benefits for Finance II's creditors.

11.     The Notes were issued in the public debt market by Finance II, as issuer, and pursuant to an Indenture between Finance II as borrower, SSCE as guarantor, and BNY Midwest Trust Company as trustee (the "Indenture"). The Notes were guaranteed by SSCE (the "Guarantee"). The Guarantee provides that SSCE "unconditionally guarantees to each Holder and the Trustee on behalf of the Holders . . . punctual payment of the principal . . . [and] interest" in connection with such Notes. Guarantee, § 10.01. Pursuant to the Indenture and to the offering memorandum, dated as of July 15, 2004 (the "Offering Memorandum"), with respect to the Notes, the Guarantee was issued on a senior and unsecured basis.

**(ii)     FINANCE II'S COMMON OFFICERS AND DIRECTORS**

12.     Finance II's only directors are Patrick J. Moore, Steven Klinger and John R. Murphy, all of whom are also executives of SSCC or its affiliates (the "SSCC Executives"). Patrick J. Moore is the Chairman of the Board and the Chief Executive Officer of SSCC, as well as a director and an officer of Finance II, and an employee of SSCC or one of its affiliates that is dominated and controlled by SSCC. Mr. Moore is subject to an employment agreement and SSCC's management incentive plan under which his compensation is tied in part to the success of SSCC. Mr. Moore also owns shares of stock in SSCC, is a participant in the EIP and will be entitled to Equity Grants if the Amended Plan is confirmed.

13.     Steven Klinger is the President and Chief Operating Officer of SSCC and is a member of its Board, as well as a director and an officer of Finance II, and an employee of SSCC

or one of its affiliates that is dominated and controlled by SSCC. Mr. Klinger is subject to an executive retirement agreement, an employment agreement and SSCC's management incentive plan under which his compensation is tied in part to the success of SSCC. Mr. Klinger also owns shares of stock in SSCC, is a participant in the EIP and will be entitled to Equity Grants if the Amended Plan is confirmed.

14.     John R. Murphy is a Senior Vice President and the Chief Financial Officer of SSCC, as well as a director and an officer of Finance II, and an employee of SSCC or one of its affiliates that is dominated and controlled by SSCC. Mr. Murphy is subject to SSCC's management incentive plan under which his compensation is tied in part to the success of SSCC. He, too, owns shares of stock in SSCC, is a participant in the EIP and will be entitled to Equity Grants if the Amended Plan is confirmed.

15.     Craig A. Hunt is a Senior Vice President, Secretary and General Counsel of SSCC, as well as an officer of Finance II. Upon information and belief, Mr. Hunt signed the Intercompany Loan Agreement (as defined below) on behalf of *both* Finance II and SSC Canada. Mr. Hunt is also an employee of SSCC or one of its affiliates that is dominated and controlled by SSCC, and is subject to SSCC's management incentive plan under which his compensation is tied in part to the success of SSCC. Mr. Hunt also owns shares of stock in SSCC, is a participant in the EIP and will be entitled to Equity Grants if the Amended Plan is confirmed.

**C.     Finance II's Assets**

16.     Although Finance II has no operations to restructure, it does have significant assets including the Wind-up Claim (as defined below) against its parent company SSCE, the Intercompany Claim (as defined below) against SSC Canada, and breach of fiduciary duty and other related party claims against the SSCC Executives and other fiduciaries (the "Related Party

Claims"). Upon information and belief, all of Finance II's known assets are comprised of claims against other Debtors or Finance II's own officers and directors.

**(i)  THE WIND-UP CLAIM AGAINST SSCE**

17.     In addition to its obligations as the guarantor of the Notes, SSCE is separately and independently liable for all obligations of Finance II (including, but not limited to, the obligations under the Notes) due to the corporate structure of  Finance II.  As stated, Finance II is an unlimited liability company organized under the *Companies Act (Nova Scotia)*.  As the member (*i.e.*, owner) of Finance II, SSCE is required under section 135 of the *Companies Act* to make contributions to Finance II in an amount sufficient to satisfy all of Finance II's debts and obligations to Finance II's creditors (the "Wind-up Claim").  The Wind-up Claim is a separate and independent claim held by Finance II against SSCE, and in particular is a separate and independent obligation of SSCE in addition to its other debt obligations (including its obligations under the Guarantee held by holders of the Notes issued by Finance II).  SSCE should not be permitted to derive significant tax benefits from the ULC structure and then, when it is convenient, deprive Finance II's creditors of the benefit to which *they* are entitled by virtue of Finance II's corporate structure.  SSCE is obligated to make them whole by paying the Wind-up Claim.

**(ii)  THE INTERCOMPANY CLAIM AGAINST SSC CANADA**

18.     Pursuant to that certain Loan Agreement, dated July 20, 2004 (the "Intercompany Loan Agreement"), by and between Finance II and SSC Canada, Finance II loaned $200 million to SSC Canada.  The terms of the Intercompany Loan Agreement were not disclosed under the Indenture or the Offering Memorandum.  Upon information and belief, the Intercompany Loan Agreement was signed by Mr. Hunt on behalf of both Finance II and SSC Canada.   Pursuant to

the Intercompany Loan Agreement, SSC Canada owes Finance II over $200 million (the "Intercompany Claim").

### (iii) THE RELATED PARTY CLAIMS AGAINST THE SSCC EXECUTIVES

19. As described above, Finance II's directors and officers are all beholden to SSCC and the Smurfit corporate group. Instead of trying to maximize the value of Finance II, the SSCC Executives have engaged in gross mismanagement and self-dealing with respect to Finance II (which is driven by their desire to increase the financial success of Finance II's ultimate parent SSCC) and have violated their fiduciary duties of loyalty and care to Finance II's creditors by refusing to take actions that are manifestly in the best interests of Finance II's creditors. Because of their conflicted loyalties to the other Debtors, the SSCC Executives have subordinated their duties to Finance II by affirmatively misusing their control of and neglecting their duties to Finance II to benefit Finance II's affiliated Debtors and the SSCC Executives, all to the harm and prejudice of Finance II and its creditors.

20. As a result of the abdication of their fiduciary duties by the SSCC Executives, Finance II has meritorious Related Party Claims against those parties which should be pursued for the benefit of Finance II's creditors. The Amended Plan purports to release and enjoin those claims.

### D. Finance II's Liabilities

21. The Notes are Finance II's only significant prepetition obligation. Other than the Notes, Finance II's prepetition liabilities consist of (A) a purported claim by SSCE against Finance II which, if valid, would constitute the basis for an additional claim by Finance II against SSCE due to the unlimited liability company structure, (B) an unidentified tax claim and (C)

Finance II's guaranty of the Consolidated U.S. Debtors' DIP financing obligations, which have already been satisfied.

## E.    The Treatment of Claims Under the Amended Plan[5]

22.    Notwithstanding the clear conflicts of interest between Finance II and the other Consolidated U.S. Debtors, and the clear self-dealing by the SSCC Executives in violation of their fiduciary duties of loyalty and care to Finance II and its creditors, Finance II was and continues to be "represented" by Sidley Austin LLP and Stikeman Elliott LLP in connection with the development and prosecution of the Amended Plan.  Both Sidley Austin LLP and Stikeman Elliott LLP have debilitating conflicts that should disqualify them from continuing to represent Finance II while also representing the other Debtors.  The lack of representation of Finance II is apparent in the treatment of Finance II's Claims against each of the Consolidated U.S. Debtors and Canadian Debtors in the Amended Plan.[6]

### (i)    THE TREATMENT OF THE WIND-UP CLAIM AGAINST SSCE

23.    The Amended Plan fails to treat the Wind-up Claim as an Allowed Claim.  The Debtors' failure to Allow the Wind-up Claim is particularly disturbing because there can be no dispute that, under applicable law, such Wind-up Claim exists upon the winding up of Finance II. Finance II actively opposed the request of the Moving Parties to cause Finance II's directors and officers to make an assignment in bankruptcy in Canada, which is a proceeding (but not the only proceeding) that plainly constitutes a winding up proceeding.  The Amended Plan effectively

---

[5]    The Moving Parties' objections to the treatment of Claims under the Amended Plan will be the subject of a pleading filed at the appropriate time.  The discussion herein is intended to illustrate that the interests of Finance II are being sacrificed for the benefit of the other Debtors and that the recovery of Finance II's creditors is drastically impacted as a result.

[6]    The Amended Plan also seeks to disenfranchise the creditors of Finance II in the treatment of the direct claims of Finance II's creditors in respect of the Notes, which treatment will be addressed in the Moving Parties' forthcoming objection to the Amended Disclosure Statement (and the Amended Plan, should it proceed to confirmation).

proposes to wind up Finance II, but only after structuring it to deprive the holders of the benefit of the Wind-up Claim by treating it inappropriately through the Amended Plan.

24.     If treated as an Allowed Claim, the Wind-up Claim is classified as an intercompany claim against SSCE. There is no principled basis for classifying the Wind-up Claim separate from general unsecured claims against SSCE. Such classification serves only to permit the Debtors to avoid paying the Wind-up Claim the same recovery general unsecured creditors of SSCE would receive and to disenfranchise Finance II.

25.     In addition, the treatment of the Wind-up Claim sets up significant barriers to recovery on that Claim. As the Amended Plan is structured, the Wind-up Claim (together with all other intercompany claims against SSCE) will not receive a distribution under the Amended Plan if the general unsecured creditors of SSC Canada and Smurfit-MBI—two entities totally unrelated to Finance II—accept the Amended Plan. However, if the same unrelated creditors reject the Amended Plan, the intercompany claims against SSCE (including the Wind-up Claim, if Allowed) would receive a pro rata share of the equity in reorganized SSCE. Thus, the Amended Plan improperly treats the Wind-up Claim by tying its fate to the vote of two classes of unrelated creditors. In essence, the Debtors are using the threat of an Allowed Wind-up Claim to force the unsecured creditors of SSC Canada and Smurft-MBI to vote in favor of the Amended Plan; the Debtors are sacrificing Finance II's claims in order to buy the votes of these creditors.

26.     Clearly the Amended Plan is designed to make recovery on the Wind-up Claim as difficult as possible for Finance II.

**(ii)     THE TREATMENT OF THE INTERCOMPANY CLAIM AGAINST SSC CANADA**

27.     The Intercompany Claim is classified in its own class against SSC Canada. This classification scheme is designed to permit the Debtors to avoid providing the Intercompany

Claim the same recovery (and voting rights) as the other general unsecured claims or intercompany claims (if any) against SSC Canada. The current classification scheme is a transparent attempt to create an impaired accepting class at SSC Canada.

28.    In addition, the treatment of the Intercompany Claim sets up significant barriers to recovery on that Claim. As the Amended Plan is structured, the only way for the Intercompany Claim to receive any distribution under the Amended Plan is through a settlement effectuated by the holders of direct claims against Finance II in respect of the Notes. Otherwise, the Intercompany Claim is treated (improperly) as a subordinated claim and deemed settled and extinguished. Through this treatment of the Intercompany Claim, the Consolidated U.S. Debtors are really achieving the same result as if they had substantively consolidated Finance II and SSC Canada. This, despite the fact that the legal standards for an actual substantive consolidation could not be met as to those two entities.

###    (iii)    THE TREATMENT OF THE RELATED PARTY CLAIMS AGAINST THE SSCC EXECUTIVES

29.    The Amended Plan does not provide for any recovery on the various Related Party Claims against the SSCC Executives. As a result of the self-dealing by the SSCC Executives in violation of their fiduciary duties of loyalty and care to Finance II and its creditors, those claims are to be released and enjoined as part of the Amended Plan without consideration. Given that the Amended Plan predictably includes exculpation and releases of the SSCC Executives, the SSCC Executives have no incentive to pursue the Related Party Claims and every incentive to get the Amended Plan approved. The Amended Plan's failure to provide recovery on – or even to preserve – the Related Party Claims is further evidence of the clear, absolute and irreconcilable conflicts of interests facing the SSCC Executives and the counsel which is common to all of the Consolidated U.S. Debtors and the Canadian Debtors.

**F.    The Irreconcilable Conflicts that Have Disabled Finance II in These Proceedings**

30.    In an effort to preserve the Wind-up Claim and to free Finance II from the chokehold exercised by its shared officers and directors, including the SSCC Executives, on October 7, 2009, the Moving Parties filed a motion in the Canadian Bankruptcy Court seeking an order directing Finance II's directors and officers, including the SSCC Executives, to make an assignment of Finance II into a proceeding under the BIA (the "<u>BIA Motion</u>").  Despite the fact that the proceedings under the BIA would have advanced the Wind-up Claim, the common counsel of Finance II and the other Canadian Debtors *actively opposed* the BIA Motion, arguing such motion was premature and citing speculative prejudice to the other Debtors.  The filing of the BIA Motion would have resulted in the appointment of a trustee who would retain independent counsel, thereby resolving these irreconcilable conflicts.

31.    Compounding the injury, the Canadian Debtors' common counsel (Stikeman Elliott LLP) argued *for the first time* in response to the BIA Motion that the $200 million loan that Finance II extended to SSC Canada under the Intercompany Loan Agreement should be recharacterized as equity, contrary to Finance II's tax filings and the Statement of Financial Affairs filed with this Court.  Again, Finance II's purported counsel was clearly acting contrary to the interests of Finance II.

32.    On October 20, 2009, the Canadian Bankruptcy Court issued an Endorsement (an order), denying the relief sought under the BIA Motion on the basis that it was premature, and noting that "there is a real issue as to whether Finance II's claims constitute debt or equity," *Order*, at ¶ 29, and directed the parties to "turn their minds to an appropriate process to address that issue."  *Id*.    The Endorsement denied the BIA Motion without prejudice to a later application.

33.     At the request of counsel to the Canadian Debtors (purportedly including Finance II, which, for all intents and purposes, has been unrepresented throughout the Canadian proceedings) and over the strenuous objections of the Moving Parties, the Canadian Bankruptcy Court then held a hearing on December 11, 2009 to resolve the issue of whether the Intercompany Claim could be characterized as equity, notwithstanding that at that hearing, Finance II was effectively unrepresented.  In that hearing, the Canadian Bankruptcy Court (i) forced the *Moving Parties*' counsel to advance the position of Finance II without granting it all of the rights that counsel to Finance II would have and at the Moving Parties' own expense, and (ii) permitted counsel to the Debtors to interfere with – and indeed, block – the Moving Parties' counsel's access to Finance II's officers, directors, documents and information, which it needed in order to properly advance Finance II's interests.  The Moving Parties were allowed only one cross-examination and one interview and were denied access to critical evidence as to the basis of the Finance II structure.  Remarkably, the overlapping directors and officers of Finance II and SSC Canada stayed silent while Finance II's own counsel argued vigorously on behalf of SSC Canada, but did not advocate on behalf of Finance II.[7]  The Canadian Bankruptcy Court has taken the matter under advisement and is expected to rule shortly.

34.     The Moving Parties requested that the Canadian Bankruptcy Court conduct a joint hearing with the Bankruptcy Court with respect to the characterization of the Intercompany Claim as equity because both the process and substantive issues involve interpretation of U.S. law.  The Canadian Bankruptcy Court denied the request.  In denying the request, the Canadian Bankruptcy Court orally stated that it would deal only with Canadian law issues.

---

[7]     In what could be fairly characterized as blind loyalty to the SSCC Executives, on December 11, 2009, lead Canadian counsel for the Debtors represented to the Canadian Bankruptcy Court that there was no conflict because it "represents all of the Debtors."

35.     The efforts of the SSCC Executives (through their common counsel) to actively undermine Finance II's recovery with respect to two of its primary assets—the Wind-up Claim and the Intercompany Claim—is evidence of the gross mismanagement and continuing breaches of fiduciary duties that are rampant in the Finance II chapter 11 case.  The SSCC Executives have sacrificed the needs of Finance II at every turn and refused to take actions that are manifestly in the best interests of Finance II's creditors.

## G.     Best Interests of Finance II Creditors

36.     Creditors of Finance II would receive a greater recovery on their claims if its primary assets – the Wind-up Claim, the Intercompany Claim and the Related Party Claims – were maximized.  It is beyond dispute that a chapter 7 trustee who investigates and pursues the Wind-up Claim, Intercompany Claim and Related Party Claims would achieve greater recoveries for Finance II's creditors than what is proposed under the Plan simply by virtue of the fact that Finance II's claims against the other Debtors and its officers and directors will not even be investigated, let alone pursued, under the chapter 11 plan.

37.     Creditors of Finance II are entitled to recovery on each of their direct claims in respect of the Notes, and their claims in respect of the Guarantee and the Related Party Claims. The value of creditors' direct claims in respect of the Notes is linked to Finance II's recovery on the Intercompany Claim and its Wind-up Claim, as well as the disallowance or subordination of SSCE's claims against Finance II.  In a chapter 7 case, the trustee would assert and/or pursue all of those claims on behalf of Finance II.  Under the current chapter 11 plan, all of these claims except the claims in respect of the Guarantee are rendered worthless.

38.     The Debtors have set up multiple barriers to recovery under the Amended Plan. The Amended Plan releases and enjoins the Related Party Claims, which necessarily results in

less value for Finance II's creditors. Further, creditors' direct claims against Finance II on account of the Notes effectively have zero value as a result of the treatment of the Intercompany Claim and the Wind-up Claim under the Amended Plan. This combination of factors reduces the recovery for Finance II's creditors under the Amended Plan to just their claim under the Guarantee. Clearly, therefore, the Amended Plan is not in the best interests of Finance II or its creditors.

## RELIEF REQUESTED

39. "Cause" exists under section 1112(b) of the Bankruptcy Code for the entry of an order converting the Finance II chapter 11 case to a case under chapter 7 of the Bankruptcy Code. As set forth herein, conversion to a chapter 7 case is clearly in the best interests of Finance II's creditors.

40. Because Finance II has no operations, no employees and no on-going business activities, it has no reasonable likelihood of rehabilitation and no reorganizational purpose. The Debtors acknowledge this in Section 6.7 of their Amended Plan, which provides that Finance II will be dissolved upon consummation of the Amended Plan. The Debtors are using the chapter 11 process to limit recoveries to Finance II and its creditors in order to benefit the other Debtors. Moreover, gross mismanagement by the SSCC Executives has stymied, at every step, efforts to realize on Finance II's assets, making it clear that the only reason Finance II is part of this chapter 11 proceeding is to benefit the other Debtors at the expense of Finance II and its creditors.

41. The only way to cure the actual and irreconcilable conflicts of the SSCC Executives and their counsel is by the conversion of the chapter 11 case of Finance II to chapter 7 so that an independent fiduciary can retain independent counsel and act in the best interests of

Finance II's estate, unburdened by the conflicts of interest held by Finance II's directors and officers and its bankruptcy attorneys. Clearly, conversion is in the best interests of Finance II's estate and its creditors, and the Motion should be granted.

## ARGUMENT

42. The Moving Parties have demonstrated "cause" sufficient to convert this case to a case proceeding under chapter 7. Section 1112(b)(1) of the Bankruptcy Code permits conversion "for cause." 11 U.S.C. § 1112(b) ("the court shall convert a case under this chapter to a case under chapter 7 . . . if the movant establishes cause."). Although the statute does not define "cause," it enumerates sixteen examples, any of which would justify conversion of the case including:

> (A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B)     gross mismanagement of the estate. . . .

11 U.S.C. § 1112(b).

43. These examples are not exclusive and a Court may convert a case in other situations so long as the Court decides that "cause" has been established. *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("The 'list' contained in § 1112(b) 'is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.'") (quoting H.R. Rep. No. 595 at 405, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362); *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991) (the examples enumerated in § 1112(b) are illustrative, not exhaustive). Finally, courts will consider the "totality of the circumstances" when determining whether to convert a case. *See In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991); *In re Ravick Corp.*, 106 B.R. 834, 843 (D.N.J. 1989).

44. Pursuant to section 1112(b) of the Bankruptcy Code, conversion must be in the best interests of a debtor's creditors. Here, conversion is manifestly in the best interests of Finance II's creditors. First, conversion will eliminate the aforementioned conflict issues by replacing the SSCC Executives with a chapter 7 trustee who will act as an independent fiduciary. Second, conversion with an independent chapter 7 trustee overseeing the estate will allow Finance II to maximize value for its creditors by, among other things, (i) investigating and vigorously pursuing the Wind-up Claim, Intercompany Claim and Related Party Claims; (ii) assuring that Finance II's interests are treated appropriately in both the U.S. and Canada; and (iii) seeking to subordinate alleged intercompany claims asserted by SSCE against Finance II.

A.     **Finance II Has No Reorganizational Purpose**

45. Rehabilitation, for the purposes of section 1112(b), means "to put back in good condition; re-establish on a firm, sound basis." *In re The Ledges Apartments*, 58 B.R. 84, 87 (Bankr. D. Vt. 1986) (citation omitted). The absence of a reasonable likelihood of rehabilitation, on the other hand, exists when, "the state of the debtor's financial affairs are such that it is unable to re-establish itself on a firm or sound base." *In re Schriock Const., Inc.*, 167 B.R. 569, 576 (Bankr. D.N.D. 1994).

46. Notably, the Amended Plan contemplates the dissolution of Finance II upon consummation, *see* Amended Plan § 6.7, and the *only significant assets Finance II has*—its claims against the other Debtors and its own officers and directors—will be discharged upon consummation and will never be pursued for the benefit of its estate and creditors. It is clear why the SSCC Executives are not pursuing the Wind-up Claim, Intercompany Claim and Related Party Claims: *their self-interest is clearly advanced by acting to advance the interests of the other Debtors (and to benefit from releases for doing so) rather than to advance the*

*interests of Finance II notwithstanding their clear fiduciary duty obligating them to do so.* There is an actual conflict between Finance II and the other Debtors, in that Finance II's material assets are claims against the other Debtors and related parties. Yet no one is acting for Finance II in these cases. Finance II needs an independent fiduciary with independent counsel to ensure that its assets are maximized and its interests are treated appropriately in the reorganization processes in the U.S. and Canada. As a proponent of the Amended Plan, however, this is effectively impossible.

47. Languishing in chapter 11 provides no benefit to Finance II and its creditors. Finance II has no operations to restructure. Instead, it appears that Finance II's only material assets are its claims against other parties in these proceedings: (i) the Wind-up Claim against its parent company; (ii) the Intercompany Claim against one of its affiliates; and (iii) the Related Party Claims against its own directors and officers. Given that the Wind-up Claim, Intercompany Claim and Related Party Claims will be discharged under the Amended Plan and Finance II will be dissolved upon consummation of the Amended Plan, it is clear that the only reason Finance II remains in chapter 11 is to benefit its affiliated Debtors by ensuring that the Wind-up Claim, Intercompany Claim and Related Party Claims are not pursued and Finance II's creditors are disenfranchised, which are not valid reorganizational purposes.

48. The conversion of Finance II's chapter 11 case will have little effect on the other Debtors, except to foil their attempts to better their circumstances under the Amended Plan by mistreating Finance II's and its creditors' claims. The Debtors have admitted Finance II is not an integral component of the proposed reorganization, as the Amended Plan actually provides for the dissolution of Finance II on the Effective Date. Moreover, the DIP has been satisfied, so Finance II's guaranty obligations have been discharged.

49. Accordingly, Finance II has *no reorganizational purpose* and there are no circumstances necessitating that Finance II remain a part of these chapter 11 proceedings.

**B.    The SSCC Executives Are Grossly Mismanaging Finance II's Estate in Willful Disregard of Their Duty of Loyalty to Finance II**

### (I)    GROSS MISMANAGEMENT IS GROUNDS FOR CONVERSION

50. Gross mismanagement is also sufficient grounds, standing alone, for conversion from chapter 11 to chapter 7. *In re Gateway Access Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007). It is absolutely clear that no one is acting for the benefit of Finance II in these cases. As a result, gross mismanagement of the Finance II Estate has occurred, and thus, this case should be converted from chapter 11 to chapter 7 if, for no other reason, than to allow an independent fiduciary who will ensure that Finance II's interests are protected.

51. A debtor-in-possession owes a fiduciary duty to its creditors, *In re G-I Holdings.*, Inc., 385 F.3d 313, 319 (3d Cir. 2004), which includes the duty to maximize the value of the bankruptcy estate. *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).[8]  Management of a debtor-in-possession owes the same fiduciary obligations to a debtor-in-possession's creditors as does a trustee, *Wolf v. Weinstein*, 372 U.S. 633, 651, *reh'g denied,* 373 U.S. 928 (1963) ("[W]illingness to leave the debtor in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."), and has a "'duty to protect and conserve property in its possession for the benefit of creditors.'" *In re*

---

[8]    *See also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 200 n.3 (1983) (the debtor-in-possession occupies the shoes of a trustee in every major way); *In re Coastal Group, Inc.*, 13 F.3d 81, 84 (3d Cir. 1994) (the debtor-in-possession, like a trustee, owes creditors fiduciary duties); *In re DN Associates*, 3 F.3d 512, 514 (1st Cir. 1993) (debtor-in-possession is fiduciary of bankrupt estate under 11 U.S.C. §§ 323(a), 1107(a)); *In re Intermagnetics America, Inc.*, 926 F.2d 912, 917 (9th Cir. 1991) ("Officers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties.").

*Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (*quoting In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

52.     In order to avoid a finding of gross mismanagement, the SSCC Executives must pursue the Wind-up Claim, Intercompany Claim and Related Party Claims, or provide a compelling reason why they are not pursuing such actions.  *See, e.g., In re 210 West Liberty Holdings, LLC*, Case No. 08-677, 2009 WL 1522047, at *6 (Bankr. N.D. W.Va. May 29, 2009) ("The Debtor's refusal to pursue collection of an asset of the estate (or to provide a compelling reason why such an asset is not being pursued) constitutes gross mismanagement of the estate."). The SSCC Executives have not pursued such claims.  SSCC, through the SSCC Executives, has total control over Finance II and is using that control to the detriment of Finance II's creditors. Thus, while the SSCC Executives are obligated to act without self-dealing and in the best interests of Finance II and its creditors, they repeatedly have failed to do so.  Given their conflicted loyalties, the SSCC Executives have failed to pursue the Wind-up Claim, Intercompany Claim and Related Party Claims, failed to ensure that Finance II's interests are treated appropriately in the reorganization process, failed to place Finance II into a winding up proceeding and, tellingly, failed to provide a compelling reason for all of these failures, even though Finance II's assets represent hundreds of millions of dollars of value to its creditors. Absent conversion of the Finance II chapter 11 case and the appointment of an independent fiduciary for Finance II, Finance II's officers and directors, together with the Debtors, will continue down the path of attempting the discharge of Finance II's primary assets—the Wind-up Claim, the Intercompany Claim and the Related Party Claims.

(II)    **DEBTOR IN POSSESSION OWES FIDUCIARY DUTIES TO ITS ESTATE AND STAKEHOLDERS**

53.    A trustee of a debtor's estate or debtor-in-possession owes a duty of care to the corporation's creditors, requiring it to conduct the affairs of the corporation with the degree of care a person of ordinary intelligence and prudence would exercise in similar circumstances. *U.S. v. Aldrich (In re Rigden)*, 795 F.2d 727, 730 (9th Cir. 1986); *George Benz & Sons v. (Lovett In re Schwen's, Inc.)*, 20 B.R. 638, 641 (D. Minn. 1982), *aff'd*, 693 F.2d 48 (8th Cir. 1982); *Barrows v. Bezanson (In re Barrows)*, 171 B.R. 455, 457 (Bankr. D.N.H. 1994); *In re Haugen Constr. Service, Inc.*, 104 B.R. 233, 240 (Bankr. D.N.D. 1989).

54.    Similarly, directors of an insolvent corporation have a duty of loyalty to the corporation's creditors which requires them to maximize the value of the estate. *CFTC v. Weintraub*, 471 U.S. 343, 352 (1985). The duty of loyalty, both with respect to the duties of directors of a solvent corporation to shareholders and the duties of directors of an insolvent corporation to creditors, requires directors to avoid self-dealing, usurpation of corporate opportunities and conflicts of interest. *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 634-35 (3d Cir. 2007) ("[W]hen the corporation becomes insolvent the creditors' investment is at risk, and the directors should manage the corporation in their interests"); *In re The Brown Schools*, 386 B.R. 37, 46-47 (Bankr. D. Del. 2008); *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939).

55.    In the insolvency context, the scrutiny given to self-dealing is substantially heightened. *See Citicorp. Venture Capital Ltd. v. Committee of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) (where shareholder with substantial equity interest in debtor and a representative on the debtor's board purchased securities of the debtor at a substantial discount without disclosing its identity to the debtor when making such purchases was "subjected to rigorous scrutiny and when challenged, the burden is

on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the view point of the corporation and those with interests therein"); *see also In re Bidermann Indus., U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) (debtor's directors and officers (A) breached their duties by approving a transaction whereby the debtor's turnaround firm, whose principal was retained as debtor's chief executive officer, participated as a minority investor in a leveraged buyout of the debtor, and (B) were not entitled to the presumption of the business judgment rule because five factors were not present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith and (v) no abuse of discretion or waste of corporate assets).

56.     Further, directors of an insolvent corporation "breach their fiduciary obligations when they authorize a transaction which prejudices creditors." *Brandt v. Hicks, Muse & Co., Inc., (In re Healthco Intern., Inc.*, 208 B.R. 288, 301 (Bankr. Mass. 1997). Indeed, "[r]equiring directors to look out for the interests of creditors as well as stockholders involves no irreconcilable conflict." *Id.* Rather, "[i]t is merely an incident of the fiduciary obligations owed by directors to their corporation." *Id.*

57.     These SSCC Executives have absolutely no incentive to act on behalf of Finance II and, in fact, have a *disincentive* to act in Finance II's best interest in order to benefit the other Debtors who are their primary employers. Moreover, the SSCC Executives are apparently fully protected in doing so since they are being released under the Amended Plan. Finance II's directors and officers have subordinated the best interests of Finance II's estate and creditors to those of Finance II's affiliated Debtors and/or their own self-interest.

58.     With respect to the Wind-up Claim, SSCC, its subsidiaries and their common counsel actually *opposed* the Moving Parties' request for an assignment in bankruptcy in

Canada, which is one of the proceedings that would constitute a winding up under applicable law. In light of the pervasive conflicts, it is unsurprising that the other Debtors and common counsel opposed this request, despite the fact that no valid business reason exists for not winding up Finance II and allowing for the maximization of its assets. Further, Finance II's shared counsel has actively opposed the best interests of Finance II (which is still its client) and its creditors by arguing that the Intercompany Claim is equity, not debt. While conflicted counsel to Finance II and SSC Canada argued on behalf of SSC Canada during the Canadian proceedings, Finance II's *own officers* (and SSCC Executives) stood silent and watched. Conflicted counsel did not advocate on behalf of Finance II, clearly and impermissibly placing the interests of SSC Canada—and its own interests—ahead of Finance II's interests. *See Interwest Bus. Equip., Inc.*, 23 F.3d 311, 316, 318-19 (10th Cir. 1994) (affirming decision requiring separate counsel for jointly administered debtors in the presence of interdebtor issues and noting "[t]he jaundiced eye and scowling mien that counsel for the debtor is required to cast upon everyone in sight will not likely fall upon the party with whom he has a potential conflict") (internal quotations and citation omitted).

59.     Because Finance II has no employees, recovery on the Notes is dependent on the skill, honesty and expertise of the SSCC Executives in maximizing the value of Finance II. The SSCC Executives, however, have controlled, dominated and manipulated the management of Finance II to the detriment of Finance II and its creditors, in violation of their duties of loyalty and care. To be sure, the SSCC Executives engaged in self-dealing by placing the financial interests of SSCE before their obligation to maximize the value of Finance II. Examples of such self-dealing include: (i) appearing on both sides of the transactions and business activities of Finance II; (ii) affirmatively failing to disclose the substance of the Intercompany Loan

Agreement (until compelled to do so); (iii) disregarding the benefits of the ULC structure by treating the Intercompany Loan as equity instead of debt, after having reaped the tax advantages of not having to recognize interest on the Intercompany Loan for purposes of U.S. tax laws; (iv) failing to diligently investigate and pursue the Wind-up Claim, Intercompany Claim and Related Party Claims; and (v) failing to protect Finance II and ensure that its interests are treated appropriately in the reorganization process both in the U.S. and in Canada.[9]  As a result of these breaches, the SSCC Executives have committed gross mismanagement.  *See, e.g., In re Emergystat of Sulligent, Inc.*, Case No. 07-51394, 2008 WL 597618, at *9 (Bankr. E.D. Tenn. Feb. 29, 2008) (holding that gross mismanagement had been established when the president and CEO of both the debtor and parent company placed the interests of the parent company over the debtor).

60.     The totality of circumstances in this case points to the fact that the SSCC Executives are engaged in self-dealing and have committed gross mismanagement.  The SSCC Executives not only favored the interests of SSCC above those of Finance II, they also breached their duties of good faith and fair dealing.  In sum, because of the SSCC Executives' actual and irreconcilable conflicts with respect to negotiation and prosecution of the Amended Plan, and because the Amended Plan blatantly favors SSCC and affiliates of Finance II but is grossly unfair to Finance II, the SSCC Executives violated their duties to act in the best interests of Finance II and to maximize the value of its estate.

---

[9]     The Debtors' attempts during the Canadian proceedings (purportedly on behalf of Finance II) to recharacterize the Intercompany Claim as equity are particularly troubling because Finance II did not have counsel defending itself in connection with the proceedings before the Canadian Bankruptcy Court.  Rather, Finance II's only lawyers of record in the Canadian proceedings argued vigorously that the Intercompany Loan was *equity*, apparently on behalf of SSC Canada and contrary to the interests of Finance II.

### C.     Counsel to Finance II Is Hopelessly Conflicted

61.     It is fundamental that attorneys may not represent conflicting interests without full disclosure and consent by all parties.  *ABA Model Code of Professional Responsibility* DR 5-105; *ABA Model Rules of Professional Conduct Rule* 1.7.  Further, section 327(a) of the Bankruptcy Code allows the trustee, with the approval of the court, to "employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that ***do not hold or represent an interest adverse to the estate***, and that are disinterested."  11 U.S.C. § 327(a) (emphasis added).  Although courts generally examine the factual circumstances surrounding the representation to determine whether a multi-debtor representation in the presence of intercompany disputes amongst each of the debtor entities is appropriate, 3 *Collier on Bankruptcy* ¶ 327.04[5][a] (15th ed. rev.), the Bankruptcy Code imposes *per se* mandatory disqualification of a professional that has an actual conflict of interest.  *See, e.g., In re Marvel Entertainment Group, Inc.,* 140 F.3d 463 (3d Cir. 1998); *In re Woodworkers Warehouse, Inc.,* 303 B.R. 740 (Bankr. D. Del. 2004); *In re Zenith Electronics Corp.,* 241 B.R. 92 (Bankr. D. Del. 1999); *In re Pittsburgh Corning Corp.*, 308 B.R. 716 (Bankr. W.D. Pa. 2004); *In re Campbell-Erskine Apothecary, Inc.,* 302 B.R. 169 (Bankr. W.D. Pa. 2003).

62.     An actual conflict of interest has been defined as "an active competition between two interests, in which one interest can only be served at the expense of the other."  *In re B H & P, Inc*., 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *rev'd in part*, 119 B.R. 35 (D.N.J. 1990).  In contrast, a potential conflict of interest has been defined as "one in which the competition is presently dormant, but may become active if certain contingencies occur."  *Id.* at 563.

63.     As noted above, Finance II and SSC Canada engaged the same attorneys in connection with these cases and the prosecution of the Amended Plan and CCAA Plan.  While

the same counsel often represents multiple debtors in large, multi-debtor cases, where there are interdebtor conflicts and counsel has not remained neutral, courts will take corrective action. *See, e.g., In re PSINet Consulting Solutions Holdings, Inc.*, Case No. 01-14916 (REG) (Bankr. S.D.N.Y. Nov. 30, 2001) (given the serious interdebtor disputes and the fact that PSINet's management and counsel were conflicted, the court appointed a trustee). Here, counsel have shown themselves to be hopelessly conflicted in representing all the Consolidated U.S. Debtors and all Canadian Debtors (including Finance II), and these conflicts are fatal particularly as they relate to Finance II: (i) Finance II was not represented by separate counsel in connection with the proceedings before this Court, including the negotiation and prosecution of the Amended Plan; and (ii) Finance II was not represented by separate counsel in connection with the proceedings before the Canadian Bankruptcy Court, including the negotiation and prosecution of the CCAA Plan and certain litigation related to the Wind-up Claim and the Intercompany Claim before the Canadian Bankruptcy Court. Moreover, this conflict is pervasive and historical, as evidenced by the fact that Finance II was not represented prepetition by separate counsel in negotiating and executing the Intercompany Loan Agreement between it and SSC Canada. Indeed, the Senior Vice President, Secretary and General Counsel of SSCC executed the Intercompany Loan Agreement for both Finance II and SSC Canada, and Finance II was without the benefit of independent counsel when it executed the Intercompany Loan Agreement. Counsel to Finance II simply cannot effectively represent the best interests of Finance II *because counsel technically is beholden to Finance II, SSC Canada, SSCE and other Debtors, and, as demonstrated by the Plan it filed and the positions it has taken, actually is beholden solely to SSC Canada, SSCE and other Debtors (other than Finance II).* As such, each of the Debtors' bankruptcy counsel has actual conflicts of interest with respect to Finance II and its creditors.

Despite the fact that Finance II and the other Debtors' interests are diametrically opposed, the Debtors all share the same U.S. and Canadian counsel, and this defect can only be remedied by the conversion of Finance II's chapter 11 case to a case under chapter 7 with the appointment of a chapter 7 trustee.

## CONCLUSION

64.     Finance II has no employees and no ongoing business operations, has no reasonable expectation for rehabilitation and has no reorganizational purpose. There is no justifiable reason for Finance II to remain a part of these chapter 11 proceedings. Indeed, it is apparent that Finance II is a proponent of the Amended Plan solely to benefit the other Debtors, at the expense of Finance II and its creditors.

65.     There has been, and continues to be, gross mismanagement of the Finance II estate. The SSCC Executives who dominate Finance II's management have engaged in self-dealing in violation of their fiduciary duties of loyalty and care to Finance II and its creditors by placing the financial interests of SSCC ahead of their obligations to Finance II. They have supported the Debtors' attempts to impede (with a view to discharging, without any recovery on behalf of Finance II) the Wind-up Claim, the Intercompany Claim and the Related Party Claims in the Amended Plan.

66.     Moreover, common counsel simply is unable to represent the best interests of Finance II due to the actual conflicts between Finance II, on the one hand, and the other Debtors, especially SSCC, SSCE and SSC Canada, on the other. As a result of these conflicts, Finance II effectively has been unrepresented in connection with the proceedings before this Court, including in the negotiation and prosecution of the Amended Plan, and in connection with the

proceedings before the Canadian Bankruptcy Court, including in the negotiation and prosecution of the CCAA Plan and the litigation related to the Wind-up Claim and Intercompany Claim.

67.     The only way that the deterioration of Finance II's estate and the actual and the irreconcilable conflicts of the SSCC Executives and common counsel may be remedied is by the conversion of Finance II's chapter 11 case to a case under chapter 7.  An independent fiduciary will act in the best interests of Finance II to maximize the value of Finance II's estate for the benefit of its stakeholders.  Among other things, a trustee would (i) investigate and vigorously pursue the Wind-up Claim, the Intercompany Claim and the Related Party Claims, (ii) ensure that Finance II's interests are treated appropriately in both the U.S. and Canada and (iii) seek to subordinate alleged intercompany claims asserted by SSCE against Finance II.

68.     To date, the Debtors have taken the opposite approach by sacrificing Finance II for the benefit of the other Debtors and to the detriment of Finance II's estate and creditors. Unless its case is converted, Finance II's creditors will not realize the value to which they are entitled through these chapter 11 cases.

WHEREFORE the Moving Parties respectfully request entry of an order substantially in the form attached hereto converting Finance II's chapter 11 case to a case under chapter 7, and granting such other and further relief as is just and appropriate.

Dated:     January 12, 2010
           Wilmington, Delaware

GREENBERG TRAURIG, LLP

/s/ T. Max Riffin
Scott D. Cousins (DE Bar No. 3079)
Sandra G. M. Selzer (DE Bar No. 4283)
T. Max Riffin (DE Bar No. 5225)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
cousinss@gtlaw.com
selzers@gtlaw.com
riffinm@gtlaw.com

-and-

Bruce R. Zirinsky
Nancy A. Mitchell
MetLife Building
200 Park Avenue
New York, New York 10281
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
zirinskyb@gtlaw.com
mitchelln@gtlaw.com

*Attorneys for Aurelius Capital Management, LP
And Columbus Hill Capital Management, LP*