IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SMURFIT-STONE CONTAINER | ) | Case No. 09-10235 (BLS) |
| CORPORATION, et al. | ) | (Jointly Administered) |
| | ) | |
| Debtors | ) | Related to Docket Nos.: 830, |
| _____ | ) | 924, 2736, 2855, 3034 and 3180 |

| | |
|---|---|
| Robert S. Brady | Donald J. Detweiler |
| Edward L. Morton | Dennis A. Meloro |
| YOUNG CONAWAY STARGATT & | GREENBURG TRAURIG, LLP |
| TAYLOR, LLP | 1007 North Orange Street, |
| 1000 West Street, 17th Floor | Suite 1200 |
| Wilmington, DE 19899-0391 | Wilmington, DE 19801 |
| | |
|    -and- |    -and- |
| | |
| James F. Conlan | Daniel S. Bleck |
| Matthew A. Clemente | Ian A. Hammel |
| Dannis M. Twomey | Charles Azano |
| Bojan Guzina | MINTZ, LEVIN, COHN, FERRIS, |
| SIDLEY AUSTIN LLP | GLOVSKY & POPEO, P.C. |
| One South Dearborn Street | One Financial Center |
| Chicago, IL 60603 | Boston, MA 02111 |
| | |
| *Attorneys for Smurfit-Stone* | *Attorneys for U.S. Bank N.A.* |
| *Container Corp.* | |

## OPINION[1]

Before the Court are the following matters: the motion of
U.S. Bank, N.A. ("U.S. Bank") to compel immediate payment of
administrative expenses [Docket No. 830]; the motion for summary
judgment filed by Smurfit-Stone Container Corp. ("SSCC") [Docket
No. 2736]; and the cross-motion for summary judgment filed by

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

U.S. Bank [Docket No. 2855].  U.S. Bank, as indenture trustee for certain municipal bonds issued in 2003, seeks an order compelling the Debtors to pay as an administrative expense the amounts owed under a certain trust indenture and utility contract.  The Debtors argue that the payments owed to U.S. Bank cannot qualify for administrative expense priority because they represent interest on a prepetition, unsecured debt and are not actual, necessary costs of preserving the estate.

The Court must determine whether, pending their decision to assume or reject a contract, the Debtors may withhold payment on those portions of a prepetition contract representing the non-debtor counterparty's financing costs, and deduct this amount from the contract rate to arrive at a reasonable value for postpetition services.  The Court concludes that the Debtors must timely pay for the reasonable value of the services received, and finds that a genuine issue of material fact exists with regard to the value of the utility services provided to the Debtors.  Summary judgement is therefore inappropriate at this stage of the proceedings.  Accordingly, the Court will direct that the parties meet and confer regarding scheduling an evidentiary hearing on the market value of the services received.

## I.    BACKGROUND

A.    General Background

SSCC, through its wholly-owned subsidiary, Smurfit-Stone
Container Enterprises ("SSCE," and collectively with SSCC,
hereinafer referred to as "Smurfit" or "the Company"), is one of
the leading integrated manufacturers of paperboard and paper-
based packaging in North America and one of the world's largest
paper recyclers.  The Company was created through the 1998 merger
of Jefferson Smurfit Corporation and Stone Container Corporation.
It sells a broad range of paper-based packaging products,
including containerboard, corrugated containers, kraft paper and
point of purchase displays, to a broad range of manufacturers of
industrial and consumer products.

The recent recession dramatically reduced demand for
Smurfit's products at the same time as increased competition
forced Smurfit to accept lower prices from purchasers of its
products.  The Company's deteriorating financial condition led
it, along with 25 affiliated debtors (collectively with Smurfit,
"the Debtors"), to commence voluntary proceedings for relief
under Chapter 11 of the Bankruptcy Code before this Court on
January 26, 2009 (the "Petition Date").

B.    <u>The Hodge Mill</u>

As of Petition Date, the Debtors operated 162 manufacturing facilities, primarily in the United States and Canada.  Among those facilities is a paper manufacturing facility located in Hodge, Louisiana (the "Hodge Mill" or the "Mill"), which employs more than 500 people.  Attached to and integrated with the Hodge Mill is a utility plant (the "Utility Plant" or the "Plant"), which is staffed and operated by the Debtors' employees.  The Utility Plant generates steam, electricity, water, and compressed air that is used in the Debtors' manufacturing processes.  It also provides electricity to other residents of the Village of Hodge, which has only approximately 500 residents.  The Utility Plant is essential to the operation of the Mill because the Mill cannot purchase the steam it needs to operate from another source.  The Mill also cannot purchase from an outside source all of the electricity required for its operation because the existing electricity line into the Mill cannot carry the large megawatt load of electricity needed to run the manufacturing processes.

The Mill differs in some important respects from Smurfit's other mills.  Most importantly, the Utility Plant connected to the Mill is owned not by Smurfit, but by the Village of Hodge.  In 1972, when the Mill was owned by Continental Can Company, the Village of Hodge issued municipal revenue bonds to finance an

upgrade of the Utility Plant.[2]

At the same time, Continental Can and the Village of Hodge entered into a utility operating agreement [Docket No. 2739, Ex. 3] (including all supplements, the "Utility Contract") memorializing their responsibilities to one another. An entity called the Hodge Utility Operating Company ("HUOC") was formed to operate the Utility Plant. HUOC has no employees. Its board of directors now consists of six Smurfit employees and two representatives of the Village of Hodge. As a practical matter, though HUOC owns the Utility Plant, it is run by Smurfit employees. Based on a 1972 IRS letter ruling, Smurfit captures the burdens and benefits of ownership of the Utility Plant, including tax deductions and depreciation of assets normally allowed to an owner.

A second and third set of bonds were issued in 1990 and 2003, with the bonds issued in 2003 (the "2003 Bonds") being used to refinance and retire the 1972 and 1990 bonds. In connection with each of these bond issuances, the Village of Hodge and Smurfit (as successor to Continental Can) supplemented the Utility Contract. In connection with the issuance of the 2003

---

[2] Revenue bonds are payable only from the revenues of a specific project or government-related activity. General obligation bonds, in contrast, are backed by the full faith and credit of the issuing municipality and can be paid by tax revenue or any other form of revenue available to the issuer. See generally Greenberg, Municipal Securities: Some Basic Principles and Practices, 9 Urb. Law. 340-341 (1977).

Bonds, the Village of Hodge and U.S. Bank entered into a trust indenture [Docket No. 2739, Ex. 6] (the "Trust Indenture") memorializing their respective rights and responsibilities.  U.S. Bank, pursuant to § 18 of the Utility Contract, has the right to enforce the rights of the Village in the event of default under the Trust Indenture.  That is what it seeks to do here.

C.    Payment Under the Utility Contract

The Utility Contract provides that "[Smurfit] shall, . . . pay to [U.S. Bank] for the account of the Village . . . all of the Village's costs in connection with the ownership, operation, and maintenance of, and renewal and replacements to, the Project."  (Utility Contract § 6).  In addition to all operating costs of the Utility Plant, Smurfit is required under the Utility Contract to pay to U.S. Bank the "Series 2003 Payments", which consist of the "principal, redemption price of and interest on the 2003 Bonds as the same shall become due and payable" (hereinafter referred to as the "Bond Payments").  (Utility Contract § 1).   Pursuant to these requirements, Smurfit historically has made payment to U.S. Bank, which then transferred back to Smurfit the funds necessary to pay operating expenses to HUOC and various vendors.

The mechanics of the payment process are spelled out in the Trust Indenture.  It requires that the Village "as promptly as practicable" pay all revenues into the "Revenue Fund" at U.S.

6

Bank. (Trust Indenture § 6.1). U.S. Bank is then required to transfer an amount into an "Operating Fund" sufficient to cover operating and maintenance expenses for the next calendar month. (Trust Indenture § 6.3). This amount is calculated from Smurfit's monthly budgets. After funding the "Operating Fund", U.S. Bank is next required to allocate sufficient amounts to the "Bond Fund" to pay the principal, interest, and any premium on the 2003 Bonds as they come due. (Trust Indenture § 6.4). Finally, remaining amounts are allocated to the "Reserve and Contingency Fund" to cover any potential deficiencies in the Bond Fund or to pay for any necessary extraordinary improvements or replacements to the Utility Plant. (Trust Indenture § 6.4).

The parties' actual practice deviated from the scheme contemplated in the documents. In reality, the "Revenue Fund" was not used. The Village, through Smurfit employees, would wire money to U.S. Bank, which would allocate it directly to the "Operating Fund". The money required to cover budgeted operating and maintenance expenses would then be wired back to Smurfit, which would then write checks to the various vendors and suppliers of services. Every six months, Smurfit would wire to U.S. Bank the amount necessary for the Bond Payments. U.S. Bank would then make the required semiannual payments to the bondholders. Thus, in contrast to the waterfall scheme laid out in the documents, Smurfit directly funded the various accounts as

7

needed.  (J. Murphy Dep. 79-81, Docket No. 2739, Ex. 8).

Since the Petition Date, Smurfit has not made any payments to U.S. Bank.  Instead, Smurfit has paid directly to HUOC and various vendors the amounts attributable to expenses other than the Bond Payments.  In other words, Smurfit has withheld the amounts attributable to the Bond Payments, and assumed control of the functions U.S. Bank once carried out in administering the Operating Fund.  As a result, U.S. Bank has been cut out of the process and bondholders have not been paid.

## II.  JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A),(B) and (O).

## III.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. R. 56(c).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).

8

To defeat a motion for summary judgment, the non-movant must
"designate specific facts showing that there is a genuine issue
for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
Summary judgment is inappropriate if the dispute about a material
fact is genuine or if "a reasonable jury could return a verdict
for the non-moving party." Whaling v. Atlas Van Lines, Inc., 919
F. Supp. 168, 169 (E.D. Pa. 1996) (citing Anderson, 477 U.S. at
248).

## IV.   DISCUSSION

A.   The Parties' Positions

1.   U.S. Bank's Position

U.S. Bank seeks an order compelling immediate payment of
approximately $4.3 million as an administrative expense under §
503(b)(1)(A) of the Bankruptcy Code.  This is the total of the
Bond Payments owing as of October 31, 2009.  U.S. Bank also seeks
immediate payment of any amounts accruing since then.

Section 503(b)(1)(A) allows as an administrative expense the
"actual, necessary costs and expenses of preserving the estate .
. . ." U.S. Bank analogizes the Utility Contract to an ordinary
utility agreement deserving of administrative expense priority.
See 3 Norton Bankr. Law & Practice 3d § 49.22 (noting that courts
routinely award administrative expense priority for utilities
provided post-petition).  Under this view of the Utility
Contract, the payments Smurfit has failed to make represent the

9

capital costs of the Utility Plant, and Smurfit refuses to recognize the fixed capital costs typically embedded in monthly utility payments.  U.S. Bank argues that if the Court does not compel immediate payment of the full amount it is owed as an administrative expense, the Court will thereby create an "ill-advised new rule" that "a debtor should be permitted to 'cherry-pick' the consideration it owes under a contract and avoid paying any consideration (regardless of how reasonable it might be) relating to the other party's capital costs", even while the debtor continues to enjoy the other party's services.  (U.S. Bank's Cross-Mot. Summ. J., Docket No. 2855, ¶ 43-44).

U.S. Bank has submitted the affidavit of a utilities industry expert who opined that the total charges under the Utilities Contract are consistent with normal market rates and thus commercially reasonable for the service provided.  <u>See</u> Expert Report of Richard W. Cuthbert, U.S. Bank's Cross-Mot. Summ. J., Docket No. 2855, Ex. 1 (the "Cuthbert Affidavit").

In sum, U.S. Bank argues that the costs for the services rendered by the Utility Plant are "necessary" because Hodge Mill could not operate without them, and that the payments called for under the Utility Contract, including the Bond Payments, reflect the reasonable value of the services provided to the estate. Therefore, U.S. Bank claims, Smurfit must pay the contract rate as agreed.

2.    Smurfit's Position

Smurfit views the Utility Contract differently, arguing that U.S. Bank's position is based on a "fundamentally flawed attempt to analogize the bond interest payments here to a normal capital cost." (Smurfit Opp. Br., Docket No. 3034, p. 2). Smurfit argues that the unique facts of this case render inapt any simple analogy to a typical utility contract. Among the ways Smurfit's situation differs from a typical utility customer/provider relationships are the following: (i) the Utility Plant and Hodge Mill are inseparably interconnected, (ii) the Utility Plant cannot run without the Mill, (iii) Smurfit employees run the Utility Plant, and (iv) the bond payments (which U.S. Bank characterizes as capital costs) are paid in separate semi-annual payments, not included in a monthly bill.

Based on these facts, Smurfit argues that both as a practical and a legal matter, the Bond Payments cannot possibly be actual and necessary costs of preserving the estate. First, as a practical matter, experience has shown the payments not to be necessary: Smurfit has failed to pay any amount directly to U.S. Bank since the Petition Date, and the Utility Plant has continued to supply power. This is because residents of the Village depend on the Utility Plant for electricity and because Smurfit exercises some control over the Utility Plant.

Second, as a legal matter, the bond payments are not actual

11

and necessary costs of preserving the estate, Smurfit claims.

Administrative priorities must be construed narrowly, and §

503(b) requires some kind of quid pro quo or additional

postpetition consideration.  That is, administrative expenses are

intended to be an "incentive to creditors who otherwise would not

continue to provide services to a failing business."

Commonwealth of Pennsylvania Dept. of Envtl. Res. v. Tri-State

Clinical Labs. Inc., 178 F.3d 685, 690 (3d Cir. 1999).  Smurfit

argues that the bondholders (for whom U.S. Bank is trustee) have

provided no new consideration.  The payments owed to them,

according to Smurfit, are simply payments on a prepetition debt.

To the extent HUOC has provided new consideration to Smurfit,

Smurfit contends that it has paid the reasonable value of those

services.

Smurfit does not dispute that it continues to receive the

benefit of the Utility Plant's operation.  It also does not

dispute that the bondholders have a valid claim for payment.

Smurfit contends, though, that U.S. Bank has no valid claim for

administrative priority, and must instead share in the pro rata

distribution with similarly situated unsecured creditors upon

confirmation of a plan.  To award U.S. Bank administrative

priority would unfairly allow the bondholders to jump ahead of

other unsecured creditors.

Resorting to an analogy of its own, Smurfit notes that "if

12

Smurfit, rather than the Village of Hodge, had been the issuer of the Series 2003 Bonds, there would be no question that the interest payments to the bondholders would not be treated as an administrative expense . . . ."  (Smurfit's Mot. Summ. J. 10). The inclusion of the Bond Payments in the Utility Contract was a mere "fortuity," Smurfit claims, that should not entitle U.S. Bank to administrative priority for what are really payments on a prepetition debt.

B.   Analysis

    1.   Debtors' Obligations Pending Assumption or Rejection of Contract

The parties agree that the Utility Contract is an executory contract.  See Smurfit's Opp. Mot., Docket No. 924, p. 5, n.2 ("The Utility Contract is an executory contract.").  The parties also agree on the extent of a debtor's obligations pending assumption or rejection of a contract: a debtor must pay the reasonable value of the services received.  N.L.R.B. v. Bildisco, 465 U.S. 513, 531 (1984).  See also  In re Continental Airlines, Inc., 146 B.R. 520, 526-27 (Bankr. D. Del. 1992)(citing Bildisco and finding that aircraft lessor was entitled to immediate payment of administrative expenses because debtor retained the aircraft and used it in its business without paying rent postpetition).

    Courts in this District have consistently held that

administrative expense priority is available to contract parties
when the debtor enjoys the benefits of the contract pending
assumption or rejection. See id.; see also In re Goody's Family
Clothing, Inc., 392 B.R. 604, 607 (Bankr. D. Del. 2008).  Smurfit
attempts to distinguish Continental and Goody's on the ground
that they involve payments under standard lease arrangements, in
contrast to the more unusual arrangement between Smurfit, the
Village and U.S. Bank.  But, as discussed more fully below,
Smurfit fails to demonstrate why the distinction should matter.

This Court will apply Bildisco's "reasonable value of
services" standard.  Under this standard, there is a presumption
that the contract rate is reasonable.  See, e.g., In re Bethlehem
Steel Corp., 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003)("There is
an initial assumption that, where a contract exists, the
contractual rate is the reasonable value of the goods or services
provided to the estate.").  This "presumption is viable unless
the debtor introduces convincing evidence to the contrary."  In
re Washington-St. Tammany Electric Cooperative, Inc., 111 B.R.
555, 559 (Bankr. E.D. La. 1989).

Here, the Debtor has produced no evidence that the pre-
petition contract rate is unreasonable, relying instead on a
legal argument relating to the distinction in the Utility
Contract and Trust Indenture between operating costs and bond
payments.  U.S. Bank, on the other hand, has submitted the

14

Cuthbert Affidavit to establish that the contract rate is reasonable. Mr. Cuthbert, an expert in rates and costs of service in the utilities industry, reaches three conclusions about the rates charged under the Utility Contract: (i) utilities are highly leveraged and recover their capital costs as part of the rates they charge; (ii) as a percentage of overall costs, the capital costs reflected in the Utility Contract are very low compared to other utilities; and (iii) the total charges owed by Smurfit under the Utility Contract are reasonable. (Cuthbert Aff. 6).

Smurfit suggests that the unique facts of this case make any market comparison impossible, but Mr. Cuthbert's report adjusts for these factors (such as the costs for necessary upgrades which would be necessary for the Plant to actually buy utilities on the open market). The Debtors' simple contention that there is no market does not suffice to rebut the presumption that the contract rate is reasonable.

The Court acknowledges that the unusual circumstances of this case may make it difficult to determine a reasonable market rate. The Plant is connected to the Mill. The Bond Payment is identified separately from other charges in the Utility Contract and is paid directly to U.S. Bank semiannually. Smurfit employees operate the Plant. A broad universe of similar utility

arrangements may not be available.[3]  But that does not mean that the Debtors can simply excise portions of the payment due under the Utility Contract, nor does it mean that Debtors are absolved of the burden of demonstrating the reasonable value of the services received.

A hypothetical example may be illustrative.  Suppose Customer is looking for a certain product.  After soliciting bids from numerous potential producers, Customer contracts with Manufacturer to provide the product for $50,000 per month.  For parties' convenience, Manufacturer purchases a parcel of property and opens up shop next door to Customer.  Also for the parties' convenience, Manufacturer insists, and the contract requires, that Customer directly pay Manufacturer's monthly mortgage cost, which is $10,000 per month.  The total contract rate is $50,000: $40,000 paid monthly to Manufacturer, and $10,000 paid directly to Manufacturer's mortgagee.  If Customer files for bankruptcy protection, it cannot necessarily assert that the $10,000 mortgage payment is not part of the reasonable value of the product or services provided.  Manufacturer negotiated for its entire package of compensation ($50,000), and Customer must rebut the presumption that the contract rate is the reasonable value of the services provided.

---

[3] The Court makes no finding regarding the existence or depth of such a market, and leaves it to the parties to put forth additional evidence on this point.

16

Similarly, in this case, the Village of Hodge negotiated a package of compensation that included a semi-annual amount paid directly to U.S. Bank.  The Debtors must refute the presumption that the contract rate is the reasonable value of the services provided.  As the Court has acknowledged above, the Debtors failed to put forth any such evidence, while U.S. Bank introduced the Cuthbert Affidavit.  The Court does not believe the parties have fully joined the issue, and is not presently satisfied with the evidentiary record relating to the market value of the services provided by the Village of Hodge.

## V.   CONCLUSION

Each of the cross-motions for summary judgment will be denied.  The Court directs the parties to meet and confer regarding scheduling an evidentiary hearing concerning the market value of the services received.

An appropriate order follows.

BY THE COURT:

Dated: March 8, 2010

Brendan Linehan Shannon
United States Bankruptcy Judge