# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SMURFIT-STONE CONTAINER<br>CORPORATION, et al.,[1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 09-10235 (BLS)<br><br>Jointly Administered<br><br>Hearing Date: April 14, 2010 at 10:00 a.m. (ET)<br>Objection Deadline: April 7, 2010 at 4:00 p.m. (ET) |

**MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 364(b) OF THE BANKRUPTCY CODE (I) GRANTING AUTHORITY TO (A) ENTER INTO EXIT ABL REVOLVING LOAN CREDIT FACILITY AND (B) EXECUTE, DELIVER AND PERFORM ALL OBLIGATIONS UNDER THE RELATED CREDIT FACILITY DOCUMENTS AND (II) APPROVING CERTAIN INDEMNIFICATION, COST REIMBURSEMENT AND FEE OBLIGATIONS AS ADMINISTRATIVE EXPENSE CLAIMS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order, pursuant to sections 105(a), 363(b) and 364(b) of title 11 of the United Stated Code (the "Bankruptcy Code"), (i) granting authority to (a) enter into the Senior Secured ABL Revolving Exit Facility (the "ABL Facility") and (b) execute, deliver, and perform all obligations, including the payment of fees, expenses and indemnities, under that certain credit agreement, and any related credit facility agreement, by and among the Debtors, certain subsidiaries of the Debtors, Deutsche Bank AG New York Branch ("DBNY"), Deutsche Bank Securities Inc. ("DBSI" and, together with DBNY, "DB"), JPMorgan Chase Bank, N.A. ("JPMCB"), J.P. Morgan Securities Inc. ("J.P.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, LLC (8169), SLP Finance II, LLC (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

Morgan" and, together with JPMCB, "JPM"), General Electric Capital Corporation ("GECC"), GE Capital Markets, Inc. ("GECM" and, together with GECC, "GE"), Bank of America, N.A. ("BOA"), Banc of America Securities, LLC ("BAS" and, together with BOA, "Bank of America"), Wells Fargo Capital Financing, LLC ("Wells Fargo", and together with DBSI, J.P. Morgan, GECM and BAS, the "Lead Arrangers"), The Bank of Nova Scotia ("Scotia"), Regions Bank ("Regions" and, together with DB, JPM, GE, Bank of America, Wells Fargo and Scotia, the "Agents") and certain other financial institutions that from time to time become lenders under the ABL Facility (the "Lenders") (as amended, restated, supplemented, and/or otherwise modified, and with all exhibits and schedules attached thereto, the "Credit Agreement") and (ii) approving as an administrative expense claim against Smurfit-Stone Container Corporation ("SSCC"), Smurfit-Stone Container Enterprises, Inc. ("SSCE"), and the other borrowers under the ABL Facility any indemnification, cost reimbursement and fee obligations accruing or payable on or prior to the Funding Date (as defined below). In support of this Motion, the Debtors respectfully state as follows:

**STATUS OF THE CASE AND JURISDICTION**

1. On January 26, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[2] On January 27, 2009, the Court entered an order consolidating the Debtors' chapter 11 cases for procedural purposes only.

---

[2] On the Petition Date, following the commencement of these chapter 11 proceedings, certain of the Debtors – including Smurfit-Stone Container Canada Inc., a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Cross-Border Debtors") – applied for protection from their creditors in Canada pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA") or other insolvency laws in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"). On the Petition Date, the Canadian Court issued an order that, *inter alia*, imposed a stay of all proceedings (the "CCAA Stay") against the Cross-Border Debtors and their property in Canada. The Cross-Border Debtors are Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. Smurfit-MBI and SLP Finance General Partnership did not apply for protection under the CCAA but did receive certain relief under the CCAA Initial Order, including all

2.  The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.  On February 5, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee of Unsecured Creditors (the "Committee").  No request has been made for the appointment of a trustee or examiner.

4.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363(b) and 364(b) of the Bankruptcy Code.

## THE ABL FACILITY

5.  On January 27, 2010, the Debtors filed revised versions of their Joint Plan of Reorganization (the "Plan") and Disclosure Statement for the Joint Plan of Reorganization (the "Disclosure Statement").  The Court held a hearing to consider the Disclosure Statement on January 29, 2010 and entered an order approving the Disclosure Statement.  A hearing regarding confirmation of the Plan is scheduled to begin on April 15, 2010.

6.  A key element of the restructuring contemplated by the Plan is the availability of exit financing that provides sufficient funding for the Debtors to meet their cash obligations under the Plan and for the reorganized Debtors to have sufficient working capital for their business operations and general corporate purposes.  Section 6.5 of the Plan specifically provides that certain of the Debtors shall enter into definitive documentation for their exit financing on or prior to the effective date of the Plan.  In that regard, certain Debtors already have executed the

---

protections of the CCAA Stay.  In addition, Smurfit-MBI, SLP Finance General Partnership and the other Cross-Border Debtors sought and received recognition of their respective Chapter 11 Cases in the Canadian Court under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.

credit agreement for their $1.2 billion exit Term Loan Facility, previously authorized by this Court.[3]

7.  On February 3, 2010, the Debtors filed a motion[4] (the "ABL Facility Commitment Motion") seeking authority to enter into the ABL Facility Commitment Documents (as defined in the ABL Facility Commitment Motion), which constituted the first step in arranging the Debtors' contemplated US $650,000,000 ABL Facility. Additionally, the Debtors sought authority to pay the fees and expenses associated with the arrangement of the ABL Facility and in consideration for the commitments provided for in the Commitment Letter, and to furnish indemnities related to such arrangement. The Debtors also filed, as an exhibit to the ABL Facility Commitment Motion, the Commitment Letter by and among the Debtors and the Agents and a Summary of Terms and Conditions (the "Term Sheet") which set forth the proposed terms and conditions of the ABL Facility.[5] The Court entered an order (the "ABL Facility Commitment Order") granting the relief requested in the ABL Facility Commitment Motion on February 16, 2010 [Docket No. 5056].

8.  Upon execution of the ABL Facility Commitment Documents, DBNY, JPMCB, GECC, BOA, Wells Fargo, Scotia and Regions committed to financing the US $650,000,000 ABL Facility, subject to the terms and conditions set forth therein, including the execution of definitive documentation. The Debtors stated in the ABL Facility Commitment Motion that they

---

[3] On February 1, 2010, the Debtors filed a Motion for an Order Pursuant to Section 105(a), 363(b) and 364(b) of the Bankruptcy Code (i) Granting Authority to (a) Enter Into Exit Term Loan Credit Facility and (b) Executed, Deliver, and Perform All Obligations Under the Related Credit Facility Documents and (ii) Approving Certain Indemnification, Cost Reimbursement and Fee Obligations as Administrative Expense Claims (the "Exit Term Loan Motion") [Docket No. 4577]. The Court entered an order (the "Exit Term Loan Order") granting the relief requested in the Exit Term Loan Motion on February 16, 2010 [Docket No. 5055].

[4] See Motion for an Order Pursuant to Sections 105(a), 107(b), 363(b) and 364(b) of the Bankruptcy Code for Authority to (A) Enter Into ABL Exit Facility Commitment Letter and Fee Letters, (B) Pay Associated Fees and Expenses, (C) Furnish Related Indemnities and (D) File Under Seal the Fee Letters [Docket No. 4668].

[5] The Commitment Letter and Term Sheet were filed with the ABL Facility Commitment Motion and a revised copy of the Commitment Letter and Term Sheet were filed on February 15, 2010. [Docket No. 5020].

would separately seek the Court's authority to enter into definitive documentation for the ABL Facility. See ABL Facility Commitment Motion, ¶ 10. The Debtors and the Agents have negotiated a comprehensive credit agreement in good faith based on the terms and conditions provided for in the Term Sheet. The Credit Agreement is in substantially final form and is attached to this Motion as Exhibit A. The Credit Agreement provides for the US $650,000,000 ABL Facility, consisting of a $550 million U.S. Facility and a $100 million Canadian Facility, that the Debtors will use, together with cash on hand, (i) to satisfy certain obligations under the Plan and (ii) for general corporate purposes and working capital needs.

**Summary of the Terms and Conditions of the Term Loan Facility**

9. The Credit Agreement provides that the Credit Agreement and the rights and obligations of the parties thereunder will become effective following the Court's approval thereof, the execution of such agreement by the relevant parties, and satisfaction (or waiver in accordance with section 13.12 of the Credit Agreement) of all of the conditions specified in section 6.01 of the Credit Agreement (the "Closing Date"). However, the obligations of the Lenders to actually make loans and issue letters of credit under the Credit Agreement will not be effective until the "Funding Date", which is the date upon which all of the conditions specified in section 6.02 and section 7 of the Credit Agreement are satisfied (or waived in accordance with section 13.12 of the Credit Agreement) and is anticipated to be the effective date of the Plan.

10. The Credit Agreement provides that the Debtors will pay the fees payable to the Agents set forth in the Commitment Letter, Joint Fee Letter and the Agent Fee Letter, as described in the ABL Facility Commitment Motion and approved in the ABL Facility Commitment Order (the "Arrangement and Commitment Fees"). While the Joint Fee Letter and the Agent Fee Letter were filed under seal pursuant to the ABL Facility Commitment Order, the

Debtors agreed in the ABL Facility Commitment Motion to disclose an aggregate amount of the fees, costs and expenses related to the ABL Facility upon seeking authority to enter into a definitive credit agreement. The estimated aggregate amount of fees and expenses payable by the Debtors in connection with the ABL Facility is approximately $25 million, which includes fees and expenses in respect of (i) the Arrangement and Commitment Fees, (ii) counsel for the Agents and for the Debtors, (iii) financial advisors for the Debtors, (iv) out-of-pocket costs for the Agents, (v) Intra-Links and (vi) other miscellaneous expenses. The Credit Agreement provides that any fees, expenses, indemnities or other amounts set forth in the Credit Agreement accruing or payable on or prior to the Funding Date shall be treated as administrative expense claims against SSCC, SSCE and the other borrowers under the ABL Facility.

11. Various other key terms and provisions of the ABL Facility as set forth in the Credit Agreement are summarized below:[6]

- Borrower: SSCE, a Delaware corporation, and each of SSCE's wholly-owned domestic subsidiaries that is a Material Subsidiary (the "U.S. Borrowers"); provided that each of SSCE's wholly-owned Canadian subsidiaries that is a Material Subsidiary shall be designated as borrowers with respect to a separate tranche under the ABL Facility (the "Canadian Borrowers", and with the U.S. Borrowers, the "Borrowers") available to both U.S. Borrowers and Canadian Borrowers. SSCC will merge with and into SSCE on the Funding Date, with SSCE surviving such merger and changing its name to Smurfit-Stone Container Corporation.

- Guaranties: SSCE and each existing and future direct and indirect domestic subsidiary of SSCE which is a Material Subsidiary and that is not itself a U.S. Borrower (each, a "U.S. Guarantor" and collectively, the "U.S. Guarantors", and together with the U.S. Borrowers, the "U.S. Loan Parties") and the U.S. Borrowers shall be required to provide an unconditional guaranty of all amounts owing by the Borrowers under the ABL Facility and all amounts owing by the Loan Parties (if applicable) under the Secured Hedging Agreements and the Secured Cash Management Agreements (the "U.S. Guaranty"); provided that,

---

[6] The descriptions of the terms and provisions of the ABL Facility and the Credit Agreement contained herein are summary in nature, and are qualified in their entirety by the Credit Agreement. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Credit Agreement.

notwithstanding the foregoing, any subsidiary of SSCE that guaranties the term loans under the Term Facility (other than the U.S. Borrowers) shall be a U.S. Guarantor.  Each existing and future direct and indirect Canadian subsidiary of SSCE which is a Material Subsidiary and that is not itself a Canadian Borrower (each, a "<u>Canadian Guarantor</u>" and collectively, the "<u>Canadian Guarantors</u>" and together with the U.S. Guarantors, collectively, the "<u>Guarantors</u>," and the Canadian Guarantors together with the Canadian Borrowers, the "<u>Canadian Loan Parties</u>", and together with the U.S. Loan Parties, collectively, the "<u>Loan Parties</u>") shall be required to provide an unconditional guaranty of all amounts owning by the Canadian Borrowers under the ABL Facility and all amounts owing by the Canadian Loan Parties (if applicable) under the Secured Hedging Agreements and the Secured Cash Management Agreements (the "<u>Canadian Guaranty</u>" and, together with the U.S. Guaranty, the "<u>Guaranties</u>"), subject to certain exceptions to be mutually agreed upon; <u>provided</u> that the Canadian Guaranty shall in no event support any obligations of any U.S. Borrower, any U.S. Guarantor or any other direct or indirect domestic subsidiary of SSCE.  Notwithstanding the foregoing, only Material Subsidiaries shall be required to provide the Guaranties. Furthermore, each of the Borrowers and the Guarantors shall also guarantee (i) SSCE's and the other Loan Parties' obligations under interest rates, foreign currency and commodity hedging agreements with a Lender or Term Loan Lender (or an affiliate of a Lender or Term Loan Lender) designated by SSCE as being secured by the Collateral securing the ABL Facility (the "<u>Secured Hedging Agreements</u>") and (ii) SSCE's and the other Loan Parties' obligations under cash management agreements with a Lender or Term Loan Lender (or an affiliate of a Lender or Term Loan Lender) designated by SSCE as being secured by the Collateral securing the ABL Facility (the "<u>Secured Cash Management Agreements</u>"); provided that the Canadian Guaranty shall in no event support (and no Canadian Guarantor or Canadian Borrower shall guaranty) any obligations of any U.S. Borrower, any U.S. Guarantor or any other direct or indirect domestic subsidiary of SSCE.

- <u>Commitment</u>:  Commitments in the amount of $650.0 million, effective as of 2/16/2010 and expiring if (1) Closing Date has not occurred prior to 4/30/2010 or (2) Funding Date has not occurred prior to 7/16/2010.  The ABL Facility will be comprised of a $550 million U.S. Facility and a $100 million Canadian Facility.

- <u>Currencies</u>:  The available currencies will be U.S. dollars and Canadian dollars.

- <u>Maturity</u>:  The final maturity date of the ABL Facility shall be 4 years from the Funding Date (the "<u>Maturity Date</u>").

- <u>Interest Rates</u>: (1) Eurodollar Loans- Eurodollar Rate plus 3.5%  for first 90 days after Funding Date with the Applicable Margin after the first 90 days  tied to grid based on Historical Excess Availability ranging from 3.25% to 3.75%.

    (2) Base Rate Loans- Base Rate plus 2.5% for first 90 days after Funding Date with the Applicable Margin after the first 90 days tied to grid based on Historical Excess Availability ranging from 2.25% to 2.75%.

7

(3) Canadian Prime Rate Loans– Canadian Prime Rate plus 2.5% for first 90 days after Funding Date with the Applicable Margin after the first 90 days tied to grid based on Historical Excess Availability ranging from 2.25% to 2.75%.

- Commitment Fees: If Historical Unutilized Commitment is in excess of 50% of the Total Commitment, a rate of 0.75%, and a rate of 0.50% if Historical Unutilized Commitment is less than or equal to 50%.

- Letters of Credit: $150 million capacity with $112.5 million allocated to US Facility and $37.5 million allocated to the Canadian Facility.

- Swingline Loans: A portion of the ABL Facility shall be available from and after the Funding Date and prior to the Maturity Date for swingline loans on same-day notice. Any Swingline Loans will reduce availability under the ABL Facility on a dollar-for-dollar basis. Each Lender under the ABL Facility shall acquire an irrevocable and unconditional pro rata participation in each Swingline Loan.

- Availability: Availability under the ABL Facility (for Loans and Letters of Credit) shall be subject to U.S. and Canadian borrowing bases consisting of (a) 85.0% of Eligible Accounts plus (b) the lesser of (I) 65.0% of Eligible Inventory and (II) 85.0% of the Net Orderly Liquidation Value of Eligible Inventory minus (c) the sum of (A) the Qualified Secured Hedging Agreements, (B) the Qualified Secured Cash Management Agreement Reserves plus (C) customary and appropriate reserves.

- Borrowing Base: The Borrowing Base shall be computed, and a borrowing base certificate delivered, on a monthly basis (or weekly at all times when (i) an event of default exists or (ii) Excess Availability is less than the greater of (x) 20.0% of the aggregate commitments and (y) $110.0 million, and continuing until such time as Excess Availability has been greater than the greater of (x) 20.0% of the aggregate commitments and (y) $110.0 million for 45 consecutive days).

- Mandatory Repayments: If at any time the outstandings under the ABL Facility (including Letters of Credit outstanding and Swingline Loans) exceed the applicable Borrowing Base, prepayments of Loans (and/or the cash collateralization of Letters of Credit) shall be required in an amount equal to such excess.

- Cash Collections: If an event of default has occurred and is continuing or Excess Availability is less than the greater of (a) 17.5% of the aggregate commitments and (b) $96.25 million for a period of three (3) consecutive Business Days, and continuing thereafter, and, during all such times, cash dominion shall be in effect until such event of default has been cured or waived or Excess Availability is re-established for 45 consecutive days.

- Financial Covenants: At all times when Excess Availability is less than the greater of (a) 15.0% of the aggregate commitments and (b) $82.5 million and continuing until such time as Excess Availability has been equal to or greater than the greater of 15.0% of the aggregate commitments and $82.5 million for 45 consecutive

days, compliance by the Company and its subsidiaries with a springing minimum consolidated fixed charge coverage ratio of 1.00:1.00.

- <u>Incremental Commitments</u>: Up to an additional $150 million subject to receipt of commitments and certain other conditions set forth in the Credit Agreement. In the event interest rate on the Incremental Commitments is greater than the rate on the existing ABL facility, then the entire ABL Facility would be re-priced at the greater rate.

- <u>Security</u>: A perfected first priority security interest in all accounts receivable, inventory, cash, deposit and investment accounts of the Loan Parties, a perfected second priority pledge of all of the capital stock of each Canadian Loan Party owned by a Canadian Loan Party, a perfected second priority pledge of (a) all of the capital stock of each U.S. Loan Party (other than the Company) and (b) 65% of the voting stock of (x) Smurfit-Stone Container Canada Inc. (or the successor newco(s)) ("<u>SSCCI</u>") (or, if applicable, each first tier foreign subsidiary that owns, directly or indirectly, any capital stock of SSCCI) and each other first tier foreign subsidiary of a U.S. Loan Party that is a Material Subsidiary, perfected second priority security interests in, and mortgages on, all existing domestic real properties owned by the U.S. Loan Parties (other than certain scheduled properties), and perfected second priority security interests in all tangible and intangible personal property (whether now owned or hereafter acquired) of the U.S. Loan Parties (other than assets subject to a first priority security interest as set forth above), in each case subject to permitted liens and exceptions.

- <u>Conditions Precedent</u>: The effectiveness of the ABL Facility on the Closing Date and the availability of the ABL Facility from and after the Funding Date will be conditioned upon certain conditions.

- <u>Events of Default</u>: The events of default shall be the events of default which are usual and customary for this type of facility, with materiality thresholds, exceptions and grace periods to be mutually agreed upon.

**RELIEF REQUESTED**

12. By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b) and 364(b) of the Bankruptcy Code, (i) authority to (a) enter into the ABL Facility and (b) execute, deliver and perform all obligations under the Credit Agreement and any related credit facility documents, including the payment of fees, expenses, and indemnities and other amounts provided for in the Credit Agreement and (ii) approval as an administrative expense claim against SSCC, SSCE and the other Borrowers the indemnification, cost reimbursement and fee obligations accruing or payable on or prior to the Funding Date. The Debtors have negotiated

9

the terms of the Credit Agreement in good faith and at arm's-length with the Agents after considering several potential options for exit financing and after receiving authority to enter into the ABL Facility Commitment Documents in the ABL Facility Commitment Order. The Debtors believe that the terms of the Credit Agreement are fair and reasonable, and represent standard terms for the ABL Facility.

## BASIS FOR RELIEF REQUESTED

13. Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts in this circuit interpreting section 363(b) of the Bankruptcy Code have generally approved the use, sale, or lease of estate property out of the ordinary course of business where there exists a sound business justification for the proposed transaction. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); In re Montgomery Ward Holding Corp., 242 B.R. 142, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business judgment" test for the use of property under section 363). Moreover, pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

14. A debtor has the burden of establishing that a valid business purpose exists for the use of estate property in a manner that is not ordinary course of business. See In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983); In re Montgomery Ward Holding, Corp., 242 B.R. at 154. However, once a debtor articulates a valid business justification, a presumption arises that the debtor's decision is made "on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second guessing, and mandates that a court approve a debtor's business decision unless that decision is the product of bad faith or gross abuse of discretion. See id; see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

15. The Debtors respectfully submit that, in their business judgment, there are substantial business justifications for allowing the Debtors to enter into ABL Facility and to execute, deliver, and perform all obligations under the Credit Agreement and any related credit facility documents, including the payment of fees expenses and indemnities and other amounts provided for in such documents. As discussed above, exit financing is necessary to finance the Debtors' obligations under the Plan and to provide the Debtors with essential funding for their emergence from chapter 11. Furthermore, the Plan states that the Debtors must enter into definitive documentation for their exit financing on or prior to the effective date of the Plan. Rather than bear the risk of an adverse change in the financial markets or the occurrence of other circumstances that might create obstacles to the Debtors' emergence from chapter 11, the Debtors sought to secure the necessary exit financing commitments as promptly as possible, and therefore seek to enter into the ABL Facility and Credit Agreement at this time.

16. Additionally, section 364(b) of the Bankruptcy Code states that a court may authorize a debtor to obtain unsecured credit or incur unsecured debt outside the ordinary

11

course of business, and may allow such obligations as administrative expenses. 11 U.S.C. § 364(b). Pursuant to the terms of the Credit Agreement, the Debtors are incurring obligations to pay certain fees and expenses related to the ABL Facility as of the Closing Date, but will not pay all of such fees and expenses until the Funding Date.[7] The Debtors believe that it is reasonable to incur these fees and expenses as administrative expenses because such obligations are reasonable given the circumstances of the transaction and because the ABL Facility will provide a considerable benefit to the Debtors and their estates in that it provides necessary financing to enable the Debtors to consummate the Plan.

17. As noted above, the Debtors and their professional advisors engaged in the substantial, arm's-length bargaining with the Agents and their advisors over the core terms and conditions of the ABL Facility and the Credit Agreement. The Debtors believe, and have been advised by their financial advisors, that the terms of the Credit Agreement and the ABL Facility, including any fees payable thereunder, are fair and reasonable under the circumstances for the type of financing commitments required by the Plan. Additionally, given the magnitude and duration of the Lenders' financial commitment to the Debtors, the fees payable under the Credit Agreement are reasonable and appropriate compensation under the circumstances to the Agents for securing the financing and to the Lenders for providing the financing.

18. The ABL Facility provides critical assurance that the Debtors will have access to funds to consummate the Plan upon emergence from bankruptcy. Accordingly, the Debtors believe that the significant benefits to the Debtors, their estates, and their creditors in permitting the Debtors' entry into the ABL Facility and Credit Agreement far outweigh the

---

[7]Certain fees and expenses incurred as of the Closing Date will be due and payable as of the Funding Date, while other fees and expenses incurred as of the Closing Date will be due and payable as follows: (i) one-half on the Closing Date and (ii) one-half on the earliest of (x) the Funding Date, (y) the date of the Debtors' emergence from bankruptcy and (z) the date on which the commitments under the ABL Facility expire or are terminated.

reasonable costs to the estates and represent an important step in obtaining the committed exit financing necessary to consummate the Plan. In the ABL Facility Commitment Order, the Court authorized the Debtors to enter into the ABL Facility Commitment Documents, pay associated fees and expenses, and furnish indemnities to the Agents. The relief requested in the Motion follows the relief granted in the ABL Facility Commitment Order in that such relief allows the Debtors to enter into and perform obligations under the ABL Facility as contemplated by the ABL Facility Commitment Order. For the reasons stated above, the Court should (i) authorize the Debtors to (a) enter into the ABL Facility and (b) execute, deliver and perform all obligations under the Credit Agreement and any related credit facility documents, including the payment of fees, expenses, indemnities and other amounts set forth in the Credit Agreement and (ii) approve as an administrative expense claim any indemnification, cost reimbursement and fee obligations accruing or payable on or prior to the Funding Date.

## **NOTICE**

19.     Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the Committee; (vi) counsel to the agents for the Debtors' prepetition loan facilities; (vii) counsel to the agents for the Debtors' post-petition lenders; (viii) the indenture trustees for each series of the Debtors' pre-petition notes; and (ix) those parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b). In light of the nature of the relief requested in this Motion, the Debtors submit that no other or further notice is required.

13

DB02:9433674.1                                                                                                                                         068063.1001

## NO PRIOR REQUEST

20. No prior request for the relief sought in this Motion has been made to this or any other court.

*Remainder of page intentionally left blank*

## CONCLUSION

WHEREFORE, pursuant to sections 105(a), 363(b) and 364(b) of the Bankruptcy Code, the Debtors respectfully request entry of the Proposed Order, in substantially the form attached hereto as <u>Exhibit B</u>, (i) authorizing the Debtors to (a) enter into the ABL Facility and (b) execute, deliver, and perform all obligations under the Credit Agreement and any related credit facility documents, (ii) approving as an administrative expense claim any indemnification, cost reimbursement and fee obligations accruing or payable on or prior to the Funding Date, and (iii) granting such other relief as is just and proper.

Dated: Wilmington, Delaware
March 29, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____/s/ Robert F. Poppiti, Jr._____
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION

15

DB02:9433674.1　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　068063.1001