# EXHIBIT A

**Credit Agreement**

ABL CREDIT AGREEMENT

among

SMURFIT-STONE CONTAINER CORPORATION,

SMURFIT-STONE CONTAINER ENTERPRISES, INC.,

CERTAIN OF ITS SUBSIDIARIES FROM TIME TO TIME PARTY HERETO,

THE LENDERS PARTY HERETO,

DEUTSCHE BANK AG NEW YORK BRANCH,

as ADMINISTRATIVE AGENT and SECURITY AGENT,

and

DEUTSCHE BANK AG NEW YORK BRANCH,

JPMORGAN CHASE BANK, N.A.

and

GENERAL ELECTRIC CAPITAL CORPORATION,

as CO-COLLATERAL AGENTS

_____

Dated as of [            ], 2010

_____

DEUTSCHE BANK SECURITIES INC.,

J.P. MORGAN SECURITIES INC.,

GE CAPITAL MARKETS, INC.

BANC OF AMERICA SECURITIES, LLC,

and

WELLS FARGO CAPITAL FINANCE, LLC

as JOINT LEAD ARRANGERS and JOINT BOOK-RUNNERS,

J.P. MORGAN SECURITIES INC. as SYNDICATION AGENT,

GENERAL ELECTRIC CAPITAL CORPORATION,

BANC OF AMERICA SECURITIES, LLC,

and

WELLS FARGO CAPITAL FINANCE, LLC

as DOCUMENTATION AGENTS

and

THE BANK OF NOVA SCOTIA

and

REGIONS BANK

as SENIOR MANAGING AGENTS

ABL CREDIT AGREEMENT, dated as of [   ], 2010, among Smurfit-Stone Container Corporation, a Delaware corporation ("SSCC"), Smurfit-Stone Container Enterprises, Inc., a Delaware corporation ("SSCE"), each Domestic Subsidiary of Holdings set forth on the signature pages hereto (together with Holdings and each other Domestic Subsidiary of Holdings that becomes a U.S. Borrower pursuant to Section 9.09(b), collectively, the "U.S. Borrowers"), each Canadian Subsidiary of Holdings set forth on the signature pages hereto (together with each other Canadian Subsidiary of Holdings that becomes a Canadian Borrower pursuant to Section 9.09(b), collectively, the "Canadian Borrowers", and the Canadian Borrowers together with the U.S. Borrowers, collectively, the "Borrowers"), the Lenders party hereto from time to time, Deutsche Bank AG New York Branch, as Administrative Agent and Security Agent, and Deutsche Bank AG New York Branch, JPMorgan Chase Bank, N.A., and General Electric Capital Corporation, as Co-Collateral Agents. All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

<h1 style="text-align:center">W I T N E S S E T H :</h1>

WHEREAS, SSCC and certain of its Subsidiaries are currently debtors in reorganization proceedings (the "U.S. Proceedings") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (SSCC and such Subsidiaries, the "U.S. Debtor Entities"), and SSC Canada and certain of its Subsidiaries (SSC Canada and such Subsidiaries, the "Canadian Debtor Entities" and, together with the U.S. Debtor Entities, the "Debtors") are currently debtors subject to reorganization proceedings in Canada (the "Canadian Proceedings" and, together with the U.S. Proceedings, the "Bankruptcy Proceedings") under the Companies' Creditors Arrangement Act ("CCAA") in the Ontario Superior Court of Justice (the "Canadian Bankruptcy Court" and, together with the U.S. Bankruptcy Court, the "Bankruptcy Court");

WHEREAS, the U.S. Debtor Entities are continuing to operate their businesses and manage their properties as debtors and debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors have filed a Joint Plan of Reorganization (the "Plan of Reorganization") with the U.S. Bankruptcy Court pursuant to which certain U.S. Debtor Entities expect to be reorganized and emerge from the Bankruptcy Proceedings. The assets of SSC Canada and Smurfit-MBI shall be transferred to certain newly organized Canadian Subsidiary or Canadian Subsidiaries of Holdings that will be Canadian Borrowers on the Funding Date, which transfer shall be approved by the Canadian Bankruptcy Court pursuant to a vesting order, sanction order or other order issued by the Canadian Bankruptcy Court. The Plan of Reorganization is described in, and included as an exhibit to, the Debtors' Disclosure Statement (the "Disclosure Statement") approved by the U.S. Bankruptcy Court on January 29, 2010 and is expected to be confirmed by the U.S. Bankruptcy Court and sanctioned by the Canadian Bankruptcy Court on or prior to the Funding Date. Pursuant to the Plan of Reorganization, on the Funding Date, SSCC will merge with and into SSCE (the "Funding Date Merger"), with SSCE continuing as the surviving corporation and changing its name to "Smurfit-Stone Container Corporation";

WHEREAS, SSCC and the Borrowers have requested (i) the U.S. Facility Lenders to make to SSCE and the other U.S. Borrowers from time to time U.S. Facility Revolving Loans in either U.S. Dollars or Canadian Dollars in an initial aggregate principal amount not in excess of U.S. $550,000,000 under a revolving credit facility initially maturing four years from the Funding Date, and (ii) the Canadian Facility Lenders to make to the U.S. Borrowers and the Canadian Borrowers from time to time Canadian Facility Revolving Loans in either U.S. Dollars or Canadian Dollars in an initial aggregate principal amount not in excess of U.S. $100,000,000 under a revolving credit facility initially maturing four years from the Funding Date;

WHEREAS, SSCC and the Borrowers have also requested (i) the Issuing Lenders to issue U.S. Facility Letters of Credit denominated in either U.S. Dollars or Canadian Dollars in an aggregate face amount at any time outstanding not in excess of U.S. $112,500,000, and (ii) the Issuing Lenders to issue Canadian Facility Letters of Credit denominated in either U.S. Dollars or Canadian Dollars in an aggregate face amount at any time outstanding not in excess of U.S. $37,500,000;

WHEREAS, SSCC and SSCE have entered into the Term Loan Facility, which will be secured by a perfected first priority security interest in the Term Priority Collateral and a perfected second priority security interest in the ABL Priority Collateral of the U.S. Loan Parties. The Obligations hereunder will be secured by, among other items, a perfected first priority security interest in the ABL Priority Collateral and a perfected second priority security interest in the Term Priority Collateral; and

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrowers the senior secured revolving credit facilities provided for herein;

NOW, THEREFORE, IT IS AGREED:

SECTION 1. <u>Definitions and Accounting Terms</u>.

1.01. <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>ABL Priority Collateral</u>" shall, prior to the Funding Date, have the meaning assigned to the term "ABL Collateral" in the form of Intercreditor Agreement attached as <u>Exhibit E</u> hereto, and from and after the Funding Date, have the meaning assigned to the term "ABL Collateral" in the Intercreditor Agreement, in each case for the purposes hereof as if the term "ABL Collateral" is amended by deleting the word "Grantors" in each case in such definition and inserting "Loan Parties" in each case in lieu thereof.

"<u>Account</u>" shall mean (i) any "Account" as such term is defined in Article 9 of the UCC or the PPSA, as applicable, and (ii) any other right to payment for the sale, lease, license, assignment or other disposal of any Inventory or the performance of services (whether performed or to be performed), in each case existing on the date of this Agreement or hereafter arising, whether or not earned by performance.

"Account Debtor" shall mean, with respect to any Account, the obligor with respect to such Account.

"Acquired Entity" shall have the meaning provided in Section 10.05(f).

"Acquisition Indebtedness" shall have the meaning provided in Section 10.01(j).

"Additional Commitment Fee" shall have the meaning provided in Section 2.14(a).

"Additional Margin" shall have the meaning provided in Section 2.14(a).

"Adjustable Applicable Commitment Fee Percentage" shall have the meaning provided in the definition of Applicable Commitment Fee Percentage.

"Adjustable Applicable Margins" shall have the meaning provided in the definition of Applicable Margin.

"Administrative Agent" shall mean Deutsche Bank AG New York Branch, in its capacity as Administrative Agent for the Lenders hereunder and under the other Loan Documents, and shall include any successor to or replacement of the Administrative Agent appointed pursuant to Section 12.09.

"Affiliate" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For purposes of this definition, neither any Lender nor any Affiliate of a Lender (other than any such Affiliate that is Holdings or a Subsidiary of Holdings) shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries solely by reason of its ownership of or right to vote any Indebtedness or equity securities of Holdings or any of its Subsidiaries.

"After-Acquired Mortgage Property" shall mean a parcel (or adjoining parcels) of real property (including any improvements thereon) acquired in fee ownership by any U.S. Loan Party after the Funding Date.

"Agent Advance" shall have the meaning provided in Section 2.01(e).

"Agent Advance Amount" shall have the meaning provided in Section 2.01(e).

"Agent Advance Period" shall have the meaning provided in Section 2.01(e).

"Agents" shall mean, collectively, the Administrative Agent, the Security Agent and the Co-Collateral Agents, and individually shall mean any one of the Administrative Agent, the Security Agent or a Co-Collateral Agent.

"Aggregate Canadian Borrower Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of all Canadian Borrower Revolving Loans (including the Face Amount of all Bankers' Acceptance Loans incurred by a Canadian Borrower) outstanding

at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) the aggregate amount of all Letter of Credit Outstandings (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) at such time in respect of Letters of Credit issued for the account of any Canadian Borrower (exclusive of such Letter of Credit Outstandings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Canadian Borrower Revolving Loans or Canadian Borrower Swingline Loans) (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) and (c) the aggregate principal amount of all Canadian Borrower Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time (exclusive of Canadian Borrower Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Canadian Borrower Revolving Loans).

"Aggregate Canadian Facility Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of all Canadian Facility Revolving Loans (including the Face Amount of all Canadian Facility Bankers' Acceptance Loans) outstanding at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) the aggregate amount of all Canadian Facility Letter of Credit Outstandings (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) at such time in respect of Canadian Facility Letters of Credit issued for the account of any Borrower (exclusive of such Canadian Facility Letter of Credit Outstandings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Canadian Facility Revolving Loans or Canadian Facility Swingline Loans) and (c) the aggregate principal amount of all Canadian Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time (exclusive of Canadian Facility Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Canadian Facility Revolving Loans).

"Aggregate Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of all Revolving Loans (including the Face Amount of all Bankers' Acceptance Loans) then outstanding (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) the aggregate amount of all Letter of Credit Outstandings (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) at such time (exclusive of Letter of Credit Outstandings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Loans) and (c) the aggregate principal amount of all Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) then outstanding (exclusive of Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Revolving Loans).

"Aggregate U.S. Borrower Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of all U.S. Borrower Revolving Loans (including the Face Amount of all Bankers' Acceptance Loans incurred by a U.S. Borrower) outstanding at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) the aggregate amount of all Letter of Credit Outstandings (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) at such time in respect of Letters of Credit issued for the account of any U.S. Borrower (exclusive of such Letter of Credit

Outstandings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of U.S. Borrower Revolving Loans or U.S. Borrower Swingline Loans) and (c) the aggregate principal amount of all U.S. Borrower Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time (exclusive of U.S. Borrower Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of U.S. Borrower Revolving Loans).

"<u>Aggregate U.S. Facility Exposure</u>" shall mean, at any time, the sum of (a) the aggregate principal amount of all U.S. Facility Revolving Loans (including the Face Amount of all U.S. Facility Bankers' Acceptance Loans) outstanding at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) the aggregate amount of all U.S. Facility Letter of Credit Outstandings (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) at such time in respect of U.S. Facility Letters of Credit issued for the account of any U.S. Borrower (exclusive of such U.S. Facility Letter of Credit Outstandings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of U.S. Facility Revolving Loans or U.S. Facility Swingline Loans) and (c) the aggregate principal amount of all U.S. Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time (exclusive of U.S. Facility Swingline Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of U.S. Facility Revolving Loans).

"<u>Agreement</u>" shall mean this ABL Credit Agreement.

"<u>Anti-Terrorism Laws</u>" shall have the meaning provided in <u>Section 8.24(a)</u>.

"<u>Applicable Commitment Fee Percentage</u>" initially shall mean a percentage per annum equal to 0.75%. From and after each Start Date to and including the applicable End Date, the Applicable Commitment Fee Percentage (hereinafter, the "<u>Adjustable Applicable Commitment Fee Percentage</u>") shall be that commitment percentage set forth below opposite the Historical Unutilized Commitment for such Start Date, as determined by the Administrative Agent:

| Level | Historical Unutilized Commitment | Commitment Percentage |
|---|---|---|
| I | Greater than 50% of Total Commitments as then in effect | 0.75% |
| II | Less than or equal to 50% of Total Commitments as then in effect | 0.50% |

The Adjustable Applicable Commitment Fee Percentage so determined, shall apply, except as set forth in the immediately succeeding sentence, from the relevant Start Date to

the applicable End Date.  Notwithstanding anything to the contrary contained above in this definition, (i) at all times prior to the first Start Date occurring after the Funding Date, the Adjustable Applicable Commitment Fee Percentage shall be maintained at Level I above (ii) from and after the most recent Incremental Commitment Date for any Incremental Commitment Agreement pursuant to which the Applicable Commitment Fee Percentages and Adjustable Applicable Commitment Fee Percentages have been increased above the Applicable Commitment Fee Percentages and the Adjustable Applicable Commitment Fee Percentages in effect immediately prior to such Incremental Commitment Date, each of the Applicable Commitment Fee Percentages and the Adjustable Applicable Commitment Fee Percentages shall be increased to those respective percentages per annum set forth in the applicable Incremental Commitment Agreement and (iii) from and after the Extension Date, with respect to any Extended U.S. Facility Loans and Canadian Facility Loans, the Applicable Commitment Fee Percentage and Adjustable Applicable Commitment Fee Percentage specified for such Extended U.S. Facility Loans and Canadian Facility Loans in the applicable definitive documentation thereof.

"<u>Applicable Eligible Jurisdiction</u>" shall mean (i) in the case of Eligible U.S. Accounts, the United States or Canada, (ii) in the case of Eligible U.S. Inventory, the United States, and (iii) in the case of Eligible Canadian Accounts or Eligible Canadian Inventory, Canada.

"<u>Applicable Margin</u>" initially shall mean a percentage per annum equal to (i) in the case of Revolving Loans maintained as (A) Base Rate Loans or Canadian Prime Rate Loans, 2.50% and (B) Eurodollar Loans or Bankers' Acceptance Loans, 3.50%; and (ii) in the case of Swingline Loans, 2.50%.  From and after each Start Date to and including the applicable End Date, the Applicable Margins for such Loans (hereinafter, the "<u>Adjustable Applicable Margins</u>") shall be those set forth below opposite the Historical Excess Availability for such Start Date, as determined by the Administrative Agent:

| Level | Historical Excess Availability | Revolving Loans Maintained as Eurodollar Loans or Bankers' Acceptance Loans | Revolving Loans and Swingline Loans Maintained as Base Rate Loans or Canadian Prime Rate Loans |
|---|---|---|---|
| I | Greater than or equal to 67% of Total Commitments as then in effect | 3.25% | 2.25% |
| II | Less than 67% of Total Commitments but greater than or equal to 34% of Total Commitments as then in effect | 3.50% | 2.50% |

| Level | Historical Excess Availability | Revolving Loans Maintained as Eurodollar Loans or Bankers' Acceptance Loans | Revolving Loans and Swingline Loans Maintained as Base Rate Loans or Canadian Prime Rate Loans |
|---|---|---|---|
| III | Less than 34% of Total Commitments as then in effect | 3.75% | 2.75% |

The Historical Excess Availability used in a determination of Adjustable Applicable Margins shall be determined upon receipt by the Administrative Agent of the Borrowing Base Certificate pursuant to Section 9.04(i), in the case of each Start Date occurring after the initial Start Date, for the last month of any fiscal quarter of Holdings (i.e., by the 20th day following each of March 31, June 30, September 30 and December 31 of each fiscal year). The Adjustable Applicable Margins so determined shall apply, except as set forth in the immediately succeeding sentence, from the relevant Start Date to the applicable End Date, at which time, if no Borrowing Base Certificate has been delivered to the Administrative Agent, the Adjustable Applicable Margins shall be those that correspond to a Historical Excess Availability at Level III (such Adjustable Applicable Margins as so determined, the "Highest Adjustable Applicable Margins") until such time when a Borrowing Base Certificate is delivered, at which time the Adjusted Applicable Margins shall be re-determined as set forth above. Notwithstanding anything to the contrary contained above in this definition, (i) subject to clause (ii) below, to and including the date that occurs 90 days following the Funding Date, the Adjustable Applicable Margins shall be maintained at Level II above, (ii) at all times during which there shall exist any Event of Default the Adjustable Applicable Margins shall be maintained at the Highest Adjustable Applicable Margins, (iii) from and after the most recent Incremental Commitment Date for any Incremental Commitment Agreement pursuant to which the Applicable Margins and Adjustable Applicable Margins have been increased above the Applicable Margins and the Adjustable Applicable Margins in effect immediately prior to such Incremental Commitment Date, each of the Applicable Margins and the Adjustable Applicable Margins shall be increased to those respective percentages per annum set forth in the applicable Incremental Commitment Agreement and (iv) from and after the Extension Date, with respect to any Extended U.S. Facility Loans and Canadian Facility Loans, the Applicable Margins and Adjustable Applicable Margins specified for such Extended U.S. Facility Loans and Canadian Facility Loans in the applicable definitive documentation thereof.

"Asset Exchange" shall mean any transfer of operating properties or assets by Holdings or any of its Subsidiaries to any Person in which at least 75% of the consideration received by the transferor consists of operating properties or assets of comparable use.

"Asset Sale" shall mean the sale, transfer or other disposition (including any casualty or condemnation) by Holdings or any Subsidiary of Holdings to any Person other than a Loan Party or, other than for the purposes of the definition of Significant Asset Sale, a Wholly-Owned Subsidiary of Holdings of (a) any capital stock in any Person, (b) substantially all the assets of any geographic or other division or line of business of Holdings or any of its Subsidiaries or (c) any real property or a portion of any real property or any other asset or assets

(excluding any assets manufactured, constructed or otherwise produced or purchased for sale to others in the ordinary course of business and any Permitted Investments) of Holdings or any Subsidiary of Holdings; provided that none of the following shall constitute an "Asset Sale" for purposes of this Agreement: (i) the sale of inventory in the ordinary course of business, (ii) any sale, transfer or other disposition having a value not in excess of $5,000,000, (iii) any sale of assets in connection with any Permitted Timber Financing, (iv) the sale of assets (other than Collateral) securing any Indebtedness permitted hereunder (other than the Loans), if and to the extent such Indebtedness shall be repaid, redeemed or repurchased in full with the proceeds of such asset sale (or any other payment made contemporaneously therewith) and (v) any issuance of capital stock by Holdings.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit H.

"Attributable Indebtedness" shall mean, with respect to any Sale/Leaseback Transaction that does not result in a Capital Lease, at any date of determination, the product of (a) the net proceeds from such Sale/Leaseback Transaction and (b) a fraction, the numerator of which is the number of full years of the term of the lease relating to the property involved in such Sale/Leaseback Transaction (without regard to any options to renew or extend such term) remaining at the date of the making of such computation and the denominator of which is the number of full years of the term of such lease (without regard to any options to renew or extend such term) measured from the first day of such term.

"Authorized Officer" shall mean, with respect to (a) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the respective Borrower to deliver such notices pursuant to this Agreement and that has appropriate evidence of incumbency and signatures on file with the Administrative Agent, the Swingline Lender or the respective Issuing Lender, (b) delivering financial information and officer's certificates pursuant to this Agreement, a Financial Officer of Holdings, and (c) any other matter in connection with this Agreement or any other Loan Document, any Responsible Officer of Holdings or the respective Loan Party.

"Availability Condition" shall mean (a) in the case of determining whether a Dominion Period is in effect, the greater of (i) $96,250,000 and (ii) 17.5% of the Total Commitment as then in effect, and (b) in the case of determining whether a Compliance Period is in effect, the greater of (i) $82,500,000 and (ii) 15% of the Total Commitment as then in effect.

"Available Currency" shall mean U.S. Dollars and Canadian Dollars.

"B/A Discount Proceeds" shall mean, in respect of any Bankers' Acceptance or Draft to be purchased by a Lender on any date pursuant to Section 2.01(a) and Schedule 1.01(b), the difference between (i) the result (rounded to the nearest whole Canadian cent, and with one-half of one Canadian cent being rounded up) calculated on such day by dividing the aggregate Face Amount of such Bankers' Acceptance or Draft by the sum of one plus the product of (x) the Reference Discount Rate (expressed as a decimal) applicable to such Bankers' Acceptance or Draft multiplied by (y) a fraction, the numerator of which is the number of days in the term of such Bankers' Acceptance or Draft and the denominator of which is 365 (with such

product being rounded up or down to the fifth decimal place and with .000005 being rounded up), and (ii) the applicable Drawing Fee.

"B/A Equivalent Note" shall have the meaning provided in Schedule 1.01(b).

"B/A Instruments" shall mean, collectively, Bankers' Acceptances, Drafts and B/A Equivalent Notes, and, in the singular, any one of them.

"B/A Lender" shall mean any Lender that is a bank listed in Schedule I or II to the Bank Act (Canada) as amended and that is not a Non-B/A Lender.

"Bankers' Acceptance" shall mean each U.S. Facility Bankers' Acceptance and each Canadian Facility Bankers' Acceptance.

"Bankers' Acceptance Loans" shall mean each U.S. Facility Bankers' Acceptance Loan and each Canadian Facility Bankers' Acceptance Loan.

"Bankruptcy Code" shall have the meaning provided in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning provided in the recitals to this Agreement.

"Bankruptcy Proceedings" shall have the meaning provided in the recitals to this Agreement.

"Base Rate" shall mean, at any time, the highest of (i) the Prime Lending Rate at such time, (ii) 1/2 of 1% in excess of the overnight Federal Funds Rate at such time and (iii) the sum of (x) the Eurodollar Rate with a one-month Interest Period commencing on such day (calculated without giving effect to the rounding requirement set forth in the definition of Eurodollar Rate) plus (y) 1%.

"Base Rate Loan" shall mean (a) each U.S. Dollar Denominated Swingline Loan and (b) each U.S. Dollar Denominated Revolving Loan designated or deemed designated as such by the relevant Borrower of such U.S. Dollar Denominated Revolving Loan at the time of the incurrence thereof or conversion thereto.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Borrower" and "Borrowers" shall have the meaning provided in the preamble of this Agreement.

"Borrower Obligations" shall mean (i) all U.S. Facility Obligations owing by any U.S. Borrower, (ii) all Canadian Facility Obligations owing by any U.S. Borrower, and/or (iii) all Canadian Facility Obligations owing by any Canadian Borrower, as applicable.

"Borrowing" shall mean the borrowing of one Type of Loan of a single Tranche denominated in a single Available Currency by a Borrower from all the Lenders having Commitments of the respective Tranche (or from the Swingline Lender in the case of Swingline Loans) on a given date (or resulting from a conversion or conversions on such date) having in the case of Eurodollar Loans the same Interest Period, provided that Base Rate Loans of a single Tranche incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans of the respective Tranche.

"Borrowing Base" shall mean the Canadian Borrowing Base, the U.S. Borrowing Base and/or the Total Borrowing Base, as applicable.

"Borrowing Base Certificate" shall mean (x) with respect to borrowing base certificates delivered prior to the delivery of the Funding Date Borrowing Base Certificate, a certificate substantially in the form (with adjustments to exclude any real property or equipment) of the most recent borrowing base certificate delivered prior to the date hereof pursuant to the requirements set forth in the Prior Credit Agreement (or such other form as agreed between the Co-Collateral Agents and Holdings) and (y) with respect to the Funding Date Borrowing Base Certificate and each borrowing base certificate delivered (or required to be delivered) thereafter, a certificate substantially in the form of Exhibit J hereto (with supporting calculations in reasonable detail) executed and certified as accurate and complete by a Financial Officer of Holdings on behalf of Holdings.

"Business Day" shall mean (a) for all purposes other than as covered by clauses (b) and (c) below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close, (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (a) above and which is also a day for trading by and between banks in U.S. dollar deposits in the London interbank eurodollar market and (c) with respect to all notices and determinations in connection with, and payments of principal (or, Face Amount, as applicable) and interest on, Canadian Dollar Denominated Loans, any day which is a Business Day described in clause (a) above and which is also a day which is not a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in Toronto, Ontario.

"CAM" shall have the meaning provided in Section 16.01(a).

"CAM Exchange" shall have the meaning provided in Section 16.01(b).

"CAM Exchange Date" shall have the meaning provided in Section 16.01(c).

"CAM Percentage" shall have the meaning provided in Section 16.01(d).

"Canadian Bankruptcy Court" shall have the meaning provided in the recitals to this Agreement.

"<u>Canadian Benefit Plans</u>" shall mean all employee benefit plans of any nature or kind whatsoever (other than the Canadian Pension Plans) that are maintained or contributed to by SSC Canada or any other Canadian Subsidiary of Holdings.

"<u>Canadian Borrower</u>" and "<u>Canadian Borrowers</u>" shall have the meaning provided in the preamble of this Agreement.

"<u>Canadian Borrower Canadian Facility Revolving Loan</u>" shall have the meaning provided in <u>Section 2.01(a)</u>.

"<u>Canadian Borrower Canadian Facility Revolving Note</u>" shall have the meaning provided in <u>Section 2.05(a)</u>.

"<u>Canadian Borrower Canadian Facility Swingline Loan</u>" shall have the meaning provided in <u>Section 2.01(b)</u>.

"<u>Canadian Borrower Canadian Facility Swingline Note</u>" shall have the meaning provided in <u>Section 2.05(a)</u>.

"<u>Canadian Borrower Loans</u>" shall mean each Canadian Borrower Revolving Loan and each Canadian Borrower Swingline Loan.

"<u>Canadian Borrower Obligations</u>" shall mean all Obligations owing to the Administrative Agent, the Security Agent, any Co-Collateral Agent, any Issuing Lender or any Lender by any Canadian Borrower.

"<u>Canadian Borrower Revolving Loan</u>" shall mean each Revolving Loan borrowed by a Canadian Borrower.

"<u>Canadian Borrower Swingline Loan</u>" shall mean each Swingline Loan borrowed by a Canadian Borrower.

"<u>Canadian Borrowing Base</u>" shall mean, at the time of any determination, an amount equal to the sum of the U.S. Dollar amount (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), without duplication, of (a) 85% of Eligible Canadian Accounts at such time plus (b) the lesser of (i) 65% of Eligible Canadian Inventory at such time and (ii) 85% of the Net Orderly Liquidation Value of Eligible Canadian Inventory at such time (in each case with respect to clauses (i) and (ii) with any Eligible Canadian Inventory to be valued at the lower of cost (determined on a first-in, first-out basis in accordance with GAAP) or market value thereof (net of any intercompany profit)), <u>minus</u> (c) the sum (without duplication) of (i) the Canadian Qualified Secured Hedging Agreement Reserve, (ii) the Canadian Qualified Secured Cash Management Agreement Reserve, (iii) the Canadian Priority Payables Reserve and (iv) the amount of the Reserves in such amounts and with respect to such matters, as the Co-Collateral Agents in their Permitted Discretion may establish from time to time. The Canadian Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to <u>Section 9.04(i)</u> of this Agreement. The Co-Collateral Agents shall have the right (but no obligation) to review such computations and if, in their Permitted Discretion, such computations

have not been calculated in accordance with the terms of this Agreement, the Co-Collateral Agents shall have the right, to correct any such errors in such manner as they shall determine in their Permitted Discretion and the Co-Collateral Agents will notify Holdings promptly after making any such correction.

"Canadian Collection Account" shall mean each account established at a Canadian Collection Bank subject to a Control Agreement into which funds shall be transferred as provided in Section 5.03(c).

"Canadian Collection Banks" shall have the meaning provided in Section 5.03(c).

"Canadian Debtor Entities" shall have the meaning provided in the recitals to this Agreement.

"Canadian Dilution Reserve" shall mean, at any date, (i) the amount by which the Dilution Ratio of Eligible Canadian Accounts exceeds five percent (5%) multiplied by (ii) the Eligible Canadian Accounts on such date.

"Canadian Dollar Denominated Loans" shall mean each Loan denominated in Canadian Dollars at the time of the incurrence thereof.

"Canadian Dollar Denominated Revolving Loans" shall mean each Revolving Loan denominated in Canadian Dollars at the time of the incurrence thereof.

"Canadian Dollar Denominated Swingline Loans" shall mean each Swingline Loan denominated in Canadian Dollars at the time of the incurrence thereof.

"Canadian Dollars" and "Cdn.$" shall mean freely transferable lawful money of Canada (expressed in Canadian dollars).

"Canadian Facility Bankers' Acceptance" shall mean a Canadian Facility Draft drawn by a Borrower and accepted by a Canadian Facility Lender pursuant to Section 2.01(a) and Schedule 1.01(b).

"Canadian Facility Bankers' Acceptance Loans" shall mean (i) the creation of Canadian Facility Bankers' Acceptances or (ii) the creation and purchase of completed Canadian Facility Drafts and, if requested by a Non-B/A Lender, the exchange of such Canadian Facility Drafts for B/A Equivalent Notes, in each case as contemplated in Section 2.01(a) and Schedule 1.01(b).

"Canadian Facility Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 1.01(a) directly below the column entitled "Canadian Facility Revolving Commitment", as same may be (x) reduced from time to time or terminated pursuant to Sections 4.02, 4.03 and/or 11, as applicable, (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 2.13 or 13.04(b), or (z) increased from time to time pursuant to Section 2.14. In addition, the Canadian Facility Commitment of each Lender shall include each of its Initial Canadian Facility Commitment, and, subject to the consent of such Lender, any Extended Canadian Facility Commitment of such

Lender. As of the Closing Date, the aggregate amount of Canadian Facility Commitments of the Canadian Facility Lenders is U.S. $100,000,000.

"Canadian Facility Draft" shall mean, at any time, either a depository bill within the meaning of the Depository Bills and Notes Act (Canada) as amended, or a bill of exchange, within the meaning of the Bills of Exchange Act (Canada) as amended, drawn by a Borrower in Canadian Dollars on a Canadian Facility Lender and bearing such distinguishing letters and numbers as such Canadian Facility Lender may determine, but which at such time has not been completed or accepted by such Canadian Facility Lender.

"Canadian Facility Lenders" shall mean the Lenders having Canadian Facility Commitments (or, after the termination of all Canadian Facility Commitments, outstanding Individual Canadian Facility Exposure).

"Canadian Facility Letter of Credit" shall have the meaning provided in Section 3.01(a).

"Canadian Facility Letter of Credit Exposure" shall mean, at any time, the aggregate amount of all Canadian Facility Letter of Credit Outstandings at such time in respect of Canadian Facility Letters of Credit issued for the account of any Borrower. The Canadian Facility Letter of Credit Exposure of any Lender at any time shall be its Canadian Facility RL Percentage of the total Canadian Facility Letter of Credit Exposure at such time.

"Canadian Facility Letter of Credit Outstandings" shall mean, at any time, the sum of (a) the Stated Amount of all outstanding Canadian Facility Letters of Credit at such time and (b) the aggregate amount of all Unpaid Drawings in respect of all Canadian Facility Letters of Credit at such time.

"Canadian Facility Obligations" shall mean all Loan Document Obligations owing to any Lender Creditor to repay principal of, interest on, and all other amounts with respect to, all Canadian Facility Revolving Loans, Canadian Facility Swingline Loans, Canadian Facility Letters of Credit, and all other Loan Document Obligations (including, without limitation, all fees, indemnities, taxes and other obligations) pursuant to this Agreement and each other Loan Document in connection with the Canadian Facility Commitments.

"Canadian Facility Revolving Loan" shall have the meaning provided in Section 2.01(a).

"Canadian Facility Revolving Note" shall have the meaning provided in Section 2.05(a).

"Canadian Facility RL Percentage" of any Canadian Facility Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the Canadian Facility Commitment of such Canadian Facility Lender at such time and the denominator of which is the Total Canadian Facility Commitment at such time, provided that if the Canadian Facility RL Percentage of any Canadian Facility Lender is to be determined after the Total Canadian Facility Commitment has been terminated, then the Canadian Facility RL Percentages of such Canadian Facility Lender shall mean a fraction (expressed as a percentage) the numerator of which is such

Lender's Individual Canadian Facility Exposure at such time and the denominator of which is the Aggregate Canadian Facility Exposure at such time, provided that in the case of Section 2.18 when a Defaulting Lender shall exist, "Canadian Facility RL Percentage" shall mean the percentage of the Total Canadian Facility Commitments (disregarding any Defaulting Lender's Canadian Facility Commitment) represented by such Lender's Canadian Facility Commitment.

"Canadian Facility Swingline Exposure" shall mean, at any time, the aggregate principal amount of all Canadian Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time. The Canadian Facility Swingline Exposure of any Lender at any time shall be its Canadian Facility RL Percentage of the total Canadian Facility Swingline Exposure at such time.

"Canadian Facility Swingline Loan" shall have the meaning provided in Section 2.01(b).

"Canadian Facility Swingline Note" shall have the meaning provided in Section 2.05(a).

"Canadian GAAP" shall mean generally accepted accounting principles in Canada, as recommended from time to time by the Canadian Institute of Chartered Accountants, applied on a consistent basis.

"Canadian Guarantee and Collateral Agreement" shall mean the Canadian Guarantee and Collateral Agreement, among the Canadian Borrowers, the Canadian Subsidiaries of Holdings party thereto and the Security Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit N hereto with such modifications thereto as the Security Agent may agree.

"Canadian Guarantors" shall mean and include each Canadian Borrower (in its capacity as a guarantor under the Canadian Guarantee and Collateral Agreement) and each Canadian Subsidiary Guarantor.

"Canadian Loan Parties" shall mean each Canadian Borrower and each Canadian Subsidiary Guarantor.

"Canadian Loan Party Obligations" shall mean (i) all Canadian Borrower Obligations, (ii) all Hedging Obligations owing to Hedging Creditors by any Canadian Loan Party, (iii) all Cash Management Services Obligations owing to Cash Management Creditors by any Canadian Loan Party, and (iv) any guarantees of the obligations described in clause (i), (ii) or (iii) hereof by the Loan Parties (including the U.S. Loan Parties) pursuant to the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement or pursuant to any other Loan Document.

"Canadian Pension Plans" shall mean each plan that is considered to be a pension plan for the purposes of the ITA or any applicable pension benefits standards statute and/or regulation in Canada and that is established, maintained or contributed to by SSC Canada or any other Canadian Subsidiary of Holdings for its current or former employees.

"**Canadian Perfection Certificate**" shall mean the Canadian Perfection Certificate in the form thereof included in Exhibit D-2 or any other form approved by the Administrative Agent, as the same may be supplemented from time to time pursuant to Section 9.10(c) or otherwise.

"**Canadian Prime Rate**" shall mean, for any day, the rate of interest per annum expressed on the basis of a 365-day year equal to the greater of (i) the per annum rate of interest quoted or established as the "prime rate" of DB Canada (or similar entity of a successor Administrative Agent hereunder) which it quotes or establishes for such day as its reference rate of interest in order to determine interest rates for commercial loans made in Canadian Dollars in Canada to its Canadian borrowers and (ii) the average rate for Canadian Dollar bankers' acceptances having a term of 30 days that appears on Reuters Screen CDOR Page (or such other page as may be selected by DB Canada (or similar entity of a successor Administrative Agent hereunder) as a replacement page for such bankers' acceptances if such screen is not available) at approximately 10:00 A.M. (Toronto time) on such day plus 1%, in each instance, as of such day, adjusted automatically with each quoted or established change in such rate, all without the necessity of any notice to any Borrower or any other Person. Any change in the Canadian Prime Rate due to a change in the "prime rate" or the average rate for Canadian Dollar bankers' acceptances shall be effective as of the opening of business on the effective day of such change in the "prime rate" or the average rate for Canadian Dollar bankers' acceptances, respectively.

"**Canadian Prime Rate Loans**" shall mean (a) each Canadian Dollar Denominated Swingline Loan and (b) each Canadian Dollar Denominated Revolving Loan during the period which it bears interest at a rate determined by reference to the Canadian Prime Rate.

"**Canadian Priority Payables**" shall mean, at any time, with respect to the Canadian Borrowing Base:

(a)     the amount past due and owing by any Canadian Loan Party (or any other Person for which any Canadian Loan Party has joint and several liability), or the accrued amount for which each Canadian Loan Party has an obligation whether to remit to a Governmental Authority or other Person pursuant to any applicable law, rule or regulation, in respect of (i) pension fund obligations, (ii) employment insurance, (iii) goods and services taxes, sales taxes, employee income taxes and other taxes payable or to be remitted or withheld, (iv) workers' compensation, (v) wages, salaries, commission or compensation, including vacation pay, and (vi) other like charges and demands; in each case in respect of which any Governmental Authority or other Person may claim a security interest, hypothecation, prior claim, trust or other claim or Lien ranking or capable of ranking in priority to or pari passu with one or more of the Liens granted pursuant to the Security Documents; and

(b)     the aggregate amount of any other liabilities of the Canadian Loan Parties (or any other Person for which the Canadian Loan Parties have joint and several liability) (i) in respect of which a trust has been or may be imposed on Collateral of any Canadian Loan Party to provide for payment or (ii) which are secured by a security interest, hypothecation, prior claim, pledge, charge, right, or claim or other Lien on any Collateral of any Canadian Loan Party, in each case pursuant to any applicable law, rule or regulation and which trust, security interest, hypothecation, prior claim, pledge, charge, right, claim or other Lien ranks or is capable of

ranking in priority to or _pari passu_ with one or more of the Liens granted in the Security Documents.

"Canadian Priority Payables Reserve" shall mean, on any date of determination for the Canadian Borrowing Base, a reserve established from time to time by the Co-Collateral Agents in their Permitted Discretion in such amount as the Co-Collateral Agents may reasonably determine in respect of Canadian Priority Payables of the Canadian Loan Parties.

"Canadian Proceedings" shall have the meaning provided in the recitals to this Agreement.

"Canadian Qualified Secured Cash Management Agreement Reserve" shall mean a reserve established by the Co-Collateral Agents from time to time in respect of the Canadian Qualified Secured Cash Management Agreements, which reserve shall be in an amount equal to the aggregate amount of all reserves agreed upon from time to time by the applicable Cash Management Creditor and Holdings and notified to, and so long as Excess Availability (after giving effect to such reserve) is less than 35% of the Total Commitment then in effect at the time any such reserve is created or increased shall be agreed upon by, the Co-Collateral Agents in writing with respect to such Canadian Qualified Secured Cash Management Agreements in accordance with Section 13.21 (it being understood and agreed that a reserve with respect to a Canadian Qualified Secured Cash Management Agreement (i) may only be decreased with the consent of the Cash Management Creditor party to such Canadian Qualified Secured Cash Management Agreement and (ii) may only be created or increased with the consent of Holdings and, so long as Excess Availability is less than 35% of the Total Commitment then in effect at the time any such reserve is created or increased, the Co-Collateral Agents (in each case in clauses (i) and (ii) following written notice to the Co-Collateral Agents)).

"Canadian Qualified Secured Cash Management Agreements" shall mean each Qualified Secured Cash Management Agreement between a Cash Management Creditor (as determined at the time such Secured Cash Management Agreement is designated as a Qualified Secured Cash Management Agreement without regard to whether such Person is currently a Lender or an affiliate thereof) and a Canadian Loan Party.

"Canadian Qualified Secured Hedging Agreement" shall mean any Qualified Secured Hedging Agreement between a Hedging Creditor (as determined at the time such Secured Hedging Agreement is designated as a Qualified Secured Hedging Agreement without regard to whether such Person is currently a Lender or an affiliate thereof) and a Canadian Loan Party.

"Canadian Qualified Secured Hedging Agreement Reserve" shall mean a reserve established by the Co-Collateral Agents from time to time in respect of the Canadian Qualified Secured Hedging Agreements, which reserve shall be in the amount of the aggregate U.S. Dollar Equivalent marked to market exposure thereunder as calculated from time to time by the Hedging Creditor party to such Canadian Qualified Secured Hedging Agreement (which calculation may be disputed by Holdings) in accordance with GAAP (based on the valuation methodology agreed between Holdings and the Hedging Creditor party to such Canadian Qualified Secured Hedging Agreements) and notified to the Co-Collateral Agents at the time

such Secured Hedging Agreement is designated as a Qualified Secured Hedging Agreement and from time to time thereafter, in each case, in accordance with Section 13.21 (it being understood and agreed that such reserve may be increased or reduced by the Co-Collateral Agents in their Permitted Discretion).  The determination as to whether any such reserve shall be established with respect to any such Canadian Qualified Secured Hedging Agreement shall be subject to the agreement between the applicable Hedging Creditor party to such agreement (as modified by the Co-Collateral Agents in their Permitted Discretion) and Holdings, but the absence of any such reserve shall not impact the designation thereof as a Canadian Qualified Secured Hedging Agreement.

"Canadian Secured Obligations" shall mean and include (a) all Loan Document Obligations owing by any Canadian Loan Party, (b) all Hedging Obligations owing by any Canadian Loan Party, (c) all Cash Management Services Obligations owing by any Canadian Loan Party, and (d) all amounts paid (or incurred) by any Indemnified Party as to which such Indemnified Party has the right to reimbursement by a Canadian Loan Party under Section 13.01 or any indemnity contained in any Security Document; it being acknowledged and agreed that the "Canadian Secured Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or any Security Document or extended from time to time after the date of this Agreement or any Security Document.

"Canadian Security Documents" shall mean the Canadian Guarantee and Collateral Agreement, the Quebec Security Documents and the other similar security agreements, instruments and documents executed and delivered pursuant to Section 9.09 governed by Canadian law (or the laws of any province of Canada).

"Canadian Subsidiary" of any Person shall mean any Subsidiary of such Person incorporated or organized in Canada or any province or territory thereof.

"Canadian Subsidiary Guarantors" shall mean each Canadian Subsidiary of Holdings that is a Material Subsidiary (other than any Canadian Borrowers), whether existing on the Closing Date or established, created or acquired after the Closing Date, in each case unless and until such time as the respective Canadian Subsidiary is released from all of its obligations under the Security Documents to which it is a party in accordance with the terms and provisions thereof.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of the principal portion of all Capitalized Lease Obligations incurred by such Person.

"Capital Lease" shall have the meaning provided in the definition of the term "Capital Lease Obligations".

"Capital Lease Obligations" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof (each, a "Capital Lease"), which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP.  For the purposes of this Agreement, the amount of such obligations at

any time shall be the capitalized amount thereof at such time, determined in accordance with GAAP.

"Cash Management Agreement" shall mean any arrangement for the provision of Cash Management Services.

"Cash Management Creditors" shall mean, collectively, each Lender, each Term Loan Lender and/or any affiliate thereof that has entered into one or more Secured Cash Management Agreements, even if (i) in the case of a Lender, the respective Lender subsequently ceases to be a Lender under this Agreement for any reason and (ii) in the case of a Term Loan Lender, the respective Term Loan Lender subsequently ceases to be a Term Loan Lender under the Term Loan Facility for any reason, together with such Lender's, Term Loan Lender's or such affiliate's successors and assigns, if any.

"Cash Management Services" shall mean (i) cash management services, including treasury, depository, overdraft, electronic funds transfer and other cash management arrangements and (ii) commercial credit card and merchant card services.

"Cash Management Services Obligations" shall mean and include, as to any Loan Party, any and all obligations of the Loan Parties to the Cash Management Creditors, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with any Secured Cash Management Agreements, whether such Secured Cash Management Agreement is now in existence or hereinafter arising (including, without limitation, all obligations, liabilities and indebtedness of each Loan Party in its capacity as a Guarantor under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement, to which it is a party, in respect of the Secured Cash Management Agreements), provided that the obligations of the Loan Parties with respect to commercial credit card and merchant card services shall not exceed an aggregate principal amount of $10,000,000.

"Cash Proceeds" shall mean, with respect to any Asset Sale, cash, cash equivalents or marketable securities received from such Asset Sale, including any insurance or condemnation proceeds and proceeds received by way of deferred payment pursuant to a note receivable or otherwise (other than the portion of such deferred payment constituting interest, which shall be deemed not to constitute Cash Proceeds).

"CERCLA" shall have the meaning provided in Section 8.15(a)(iv).

"Change in Control" shall mean, and be deemed to have occurred, if (a) (x) on or prior to the Funding Date, a majority of the seats (other than vacant seats) on the board of directors of SSCC or SSCE shall at any time be occupied by persons who were neither (i) nominated by the board of directors of SSCC or SSCE, as the case may be, nor (ii) appointed by directors so nominated; other than seats filled either on or shortly after the Funding Date and specifically contemplated by the Plan of Reorganization or (y) after the Funding Date, a majority of the seats (other than vacant seats) on the board of directors of Holdings shall at any time be occupied by persons who were not (i) members of the board of directors of Holdings on the Funding Date (or appointed shortly thereafter as specifically contemplated by the Plan of

Reorganization), (ii) nominated by the board of directors of Holdings after the Funding Date or (iii) appointed by the directors referred to in clause (y)(i) or (ii) after the Funding Date, (b) on or at any time after the Funding Date, any person or group (within the meaning of Rule 13d-5 of the Securities and Exchange Act of 1934, as in effect on the date hereof) shall own, directly or indirectly, beneficially or of record, shares representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings; or (c) at any time prior to the Funding Date, SSCC shall cease to own, directly or indirectly, beneficially and of record, 100% of the issued and outstanding capital stock of SSCE.

"Closing Date" shall mean [_____], 2010.

"Co-Collateral Agent" and "Co-Collateral Agents" shall mean Deutsche Bank AG New York Branch, JP Morgan Chase Bank, N.A. and General Electric Capital Corporation in their capacity as co-collateral agents pursuant to this Agreement.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended from time to time, and any final or temporary regulations promulgated and in effect thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean any and all assets and properties of the Loan Parties that are required to be subject to Liens (whether Term Priority Collateral or ABL Priority Collateral) securing any of the Obligations, including all "Collateral" (as defined in (a) prior to the Funding Date, the Guarantee and Collateral Agreement attached hereto as Exhibit M and the Canadian Guarantee and Collateral Agreement attached hereto as Exhibit N and (b) on and after the Funding Date, the Guarantee and Collateral Agreement and Canadian Guarantee and Collateral Agreement), and the Mortgaged Properties.

"Collateral Access Agreement" shall mean any landlord waiver or other agreement, in form and substance satisfactory to the Co-Collateral Agents, between the Security Agent and any third party (including any bailee, consignee, customs broker or other similar Person) in possession of any Collateral or any landlord mortgagee of any Loan Party for any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated or otherwise modified from time to time.

"Collateral and Guarantee Requirement" shall mean, at any time, the requirement that:

(a) the Administrative Agent shall have received from each U.S. Borrower, each U.S. Subsidiary Guarantor, each of other Persons required to become a U.S. Loan Party and the other parties thereto either (i) counterparts of each of the Guarantee and Collateral Agreement, the Intercreditor Agreement and the other Security Documents (other than the Canadian Security Documents), duly executed and delivered on behalf of such parties or (ii) in the case of any Person that is required to become a U.S. Loan Party after the Funding Date, joinder instruments in the form or forms specified in the Guarantee and Collateral Agreement, the Intercreditor Agreement or the other Security Documents (other than the Canadian Security Documents), as

applicable, under which such Loan Party becomes a party to the applicable Guarantee and Collateral Agreement, the Intercreditor Agreement or the other Security Documents (other than the Canadian Security Documents), as applicable, duly executed and delivered on behalf of such Loan Party;

(b) the Administrative Agent shall have received from each Canadian Borrower, each Canadian Subsidiary Guarantor, each of the other Persons required to become a Canadian Loan Party and the other parties thereto either (i) counterparts of each of the Canadian Guarantee and Collateral Agreement and the other Canadian Security Documents, duly executed and delivered on behalf of such parties or (ii) in the case of any Person that is required to become a Canadian Loan Party after the Funding Date, joinder instruments in the form or forms specified in the Canadian Guarantee and Collateral Agreement or the other Canadian Security Documents, as applicable, under which such Canadian Loan Party becomes a party to the applicable Canadian Guarantee and Collateral Agreement or the other Canadian Security Documents, as applicable, duly executed and delivered on behalf of such Canadian Loan Party;

(c) all Equity Interests in (x) each Domestic Subsidiary of Holdings that is a Material Subsidiary, (y) SSC Canada (or, if applicable, each Foreign Subsidiary of Holdings that owns, directly or indirectly, any Equity Interests of SSC Canada and the Equity Interests of which are owned directly by one or more U.S. Loan Parties) and (z) each other Foreign Subsidiary of Holdings that is a Material Subsidiary and Equity Interests of which are owned directly by one or more U.S. Loan Parties shall have been pledged pursuant to, and to the extent required by, the Guarantee and Collateral Agreement and, in the case of Equity Interests in any Foreign Subsidiary of Holdings, if requested by the Administrative Agent, a Foreign Pledge Agreement (provided that the U.S. Loan Parties shall not be required to pledge more than 65% of the issued and outstanding voting Equity Interests of SSC Canada or any other Foreign Subsidiary of Holdings), and the Prior Agent or the Security Agent shall have received certificates or other instruments (to the extent issuable, including by amending any applicable governing documents, in certificate form) representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(d) all Equity Interests in each Canadian Loan Party which are owned directly by a Canadian Loan Party shall have been pledged pursuant to, and to the extent required by, the Canadian Guarantee and Collateral Agreement, and the Security Agent shall have received certificates or other instruments (to the extent issuable, including by amending any applicable governing documents, in certificate form) representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(e) (i) all Indebtedness (including amounts owed in connection with the intercompany settlements with respect to collections from accounts receivable and inventory of U.S. Loan Parties deposited into accounts of Canadian Loan Parties and other intercompany receivables) of Holdings and each other Subsidiary of Holdings that is owing to any U.S. Loan Party shall be evidenced by a promissory note and shall have been pledged pursuant to the Guarantee and Collateral Agreement and (ii) all Indebtedness of any other Person that is owing to any U.S. Loan Party and is evidenced by a promissory note (other than Indebtedness in a principal amount of less than $5,000,000, so long as the aggregate principal amount of Indebtedness not pledged under this exclusion does not exceed $10,000,000) shall have been

pledged pursuant to the Guarantee and Collateral Agreement, and in each case, the Prior Agent or the Security Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(f)  the Administrative Agent shall have received a lender's title insurance policy insuring that each Mortgage relating to any Mortgaged Property constitutes a first lien on such Mortgaged Property (subject to any Lien expressly permitted by Section 10.02 or otherwise agreed to by the Administrative Agent and other than as provided in the Intercreditor Agreement), and the Administrative Agent shall have received such other documents relating to Mortgaged Properties as reasonably requested in writing by the Administrative Agent (including adequate flood insurance coverage);

(g)  all documents and instruments, including UCC and PPSA financing statements, required by applicable law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registering or recording and all filing, registration, stamping or recording duty or other fee shall have been paid (at the expense of the Borrowers); and

(h)  with respect to each deposit account of any Loan Party (other than Excluded Accounts) and each securities account and commodities account maintained by any Loan Party with any depositary bank, securities intermediary or commodity intermediary, the Administrative Agent shall have received a counterpart, duly executed and delivered by the applicable Loan Party and such depositary bank, securities intermediary or commodity intermediary, as the case may be, of a Control Agreement (which Control Agreements may also be for the benefit of the Term Loan Agent or Permitted Notes Agent (as defined in the Intercreditor Agreement)); provided that so long as no Dominion Period then exists no such Control Agreement shall be required to be entered into pursuant to this clause (h) until the later of (A) the date that is 60 days after the Funding Date (or such later date as agreed in writing by the Administrative Agent in its sole discretion, or, with respect to any extension of the period for compliance with this paragraph beyond 90 days from the date that is 60 days after the Funding Date, as agreed in writing by the Co-Collateral Agents in their sole discretion) and (B) in the case of deposit accounts, securities accounts and commodities accounts opened after the Funding Date, at the time of the establishment of the respective deposit account, securities account or commodities account, as the case may be (or such later date as agreed to in writing by the Administrative Agent in its sole discretion).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any Loan Document to the contrary, (a) the foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, if, and for so long as the Administrative Agent, in consultation with Holdings, determines that the burden or cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of withholding or other material taxes)), shall be excessive in relation to the value of

the security to be afforded thereby, (b) if the Administrative Agent reasonably determines that Holdings shall have used commercially reasonable efforts to procure and deliver, but shall nevertheless be unable to deliver, any Mortgage (or any Mortgage related documents) that is required to be delivered in order to satisfy the foregoing requirements, such delivery shall not be a condition precedent to the Funding Date, but shall be required to be accomplished by such later date as the Administrative Agent shall reasonably determine, (c) in no event shall the Collateral include any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations is prohibited by any applicable law, regulation or contract (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable law) or would result in material and adverse tax consequences.

"Collection Accounts" shall mean, collectively, the U.S. Collection Accounts and the Canadian Collection Accounts.

"Commingled Inventory" shall mean Inventory of any Loan Party that is commingled (whether pursuant to a consignment (as defined in Section 9-102 of the UCC), a toll manufacturing agreement or otherwise) with Inventory of another Person (other than another Loan Party) at a location owned or leased by a Loan Party to the extent that such Inventory of such Loan Party is not readily identifiable.

"Commitment" shall mean any of the commitments of any Lender, i.e., a U.S. Facility Commitment, a Canadian Facility Commitment, an Extended U.S. Facility Commitment or an Extended Canadian Facility Commitment.

"Commitment Fees" shall have the meaning provided in Section 4.01(a).

"Compliance Period" shall mean any period (x) commencing on the date on which the Excess Availability is less than the Availability Condition and (y) ending on the first date thereafter on which the Excess Availability has been equal to or greater than the Availability Condition for 45 consecutive days.

"Confidential Information" shall mean all information and data, including, without limitation, technical, business, marketing and financial information, disclosed to the Agents (or any of them), any Issuing Lender or any Lender by Holdings or any of its Subsidiaries in connection with this Agreement, any other Loan Document or any of the Transactions, whether tangible, intangible, electronic, verbal or written form or by observation and all memoranda, summaries, samples, notes, analyses, compilations, studies, or other documents prepared by the Agents (or any of them), any Issuing Lender or any Lender which contain, reflect or are derived from such information and/or data; provided however, the term "Confidential Information" shall not include information or data which (a) is, or becomes, generally available other than as a result of a disclosure by the respective Agent, Issuing Lender or Lender in violation of any Loan Document, (b) is, or becomes, available to an Agent, any Issuing Lender or Lender on a non-confidential basis from a source other than Holdings or any of its Subsidiaries or its representatives, provided that such source is not, and was not, actually known by such Agent, Issuing Lender or Lender, as the case may be, to be prohibited from transmitting such information or data by any contractual, fiduciary or other legal obligation of confidentiality to Holdings or any of its Subsidiaries, or (c) was available to an Agent, an Issuing

Lender or a Lender on a non-confidential basis prior to disclosure by Holdings or any of its Subsidiaries or their respective representatives.

"Confidential Information Memorandum" shall mean the Confidential Information Memorandum of SSCC dated February 2010.

"Confirmation Order" shall have the meaning provided in Section 6.02(j).

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period, plus:

(a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of:

(i) Consolidated Interest Expense for such period;

(ii) provision for taxes based on income, profits or losses (determined on a consolidated basis) during such period;

(iii) all amounts attributable to depreciation, depletion and amortization of intangibles for such period;

(iv) any extraordinary charges or extraordinary losses for such period;

(v) any Non-Cash Charges for such period;

(vi) restructuring charges for such period relating to current or anticipated future cash expenditures, including restructuring costs related to closure or consolidation of facilities, in an aggregate amount not to exceed in any fiscal year $25,000,000; provided that commencing in the fiscal year beginning on January 1, 2011, such maximum aggregate amount of restructuring charges shall be increased by the amount, if positive, by which $25,000,000 exceeds the amount of such restructuring charges in the immediately preceding fiscal year, but not to exceed $18,750,000;

(vii) cash fees, costs, expenses, commissions or other cash charges incurred during such period in connection with this Agreement, the Term Loan Facility Documents, the Bankruptcy Proceedings, the Plan of Reorganization and the transactions contemplated by the foregoing, including in connection with the termination or settlement of executory contracts, professional and accounting fees, costs and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the U.S. Bankruptcy Court), and litigation and settlements (but excluding interest and fees accruing after the Funding Date hereunder or under the Term Loan Facility) in an aggregate amount for all periods after December 31, 2009, not in excess of $65,000,000; and

(viii) deferred financing fees (and any write-offs thereof);

provided that, to the extent not reflected in Consolidated Net Income for the period in which such cash payment is made, any cash payment made with respect to any Non-Cash Charges added back in computing Consolidated EBITDA for any prior period pursuant to clause (v) above (or that would have been added back had this Agreement been in effect during such prior period) shall be subtracted in computing Consolidated EBITDA for the period in which such cash payment is made; and minus

(b) without duplication and to the extent included in determining such Consolidated Net Income:

(i) any extraordinary gains for such period; and

(ii) any non-cash gains for such period (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period);

in each case of clauses (a) and (b), determined on a consolidated basis in accordance with GAAP; provided further, that Consolidated EBITDA for any period shall be calculated so as to exclude (without duplication of any adjustment referred to above) the effect of:

(A) the cumulative effect of any changes in GAAP or accounting principles applied by management;

(B) any gain or loss for such period that represents after-tax gains or losses attributable to any sale, transfer or other disposition or abandonment of assets by SSCC, the Borrower or any of the Subsidiaries, other than dispositions or sales of inventory and other dispositions in the ordinary course of business;

(C) any income or loss for such period attributable to the early extinguishment of Indebtedness or accounts payable;

(D) any non-cash gains or losses on foreign currency derivatives and any foreign currency transaction non-cash gains or losses and any foreign currency exchange translation gains or losses that arise on consolidation of integrated operations;

(E) any re-evaluation of inventory or other assets or any liabilities due to "fresh-start" accounting adjustments upon the Borrower's emergence from the Bankruptcy Proceedings; and

(F) mark-to-market adjustments in the valuation of derivative obligations resulting from the application of Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*.

Notwithstanding the foregoing, for purposes hereof, Consolidated EBITDA for each of the fiscal quarters ended March 31, 2009, June 30, 2009, September 30, 2009 and December 31, 2009, shall be $131,268,000, $144,331,000, $121,329,000 and $97,932,000, respectively.

"Consolidated Fixed Charge Coverage Ratio" shall mean, for any period, the ratio of (a) (i) the Consolidated EBITDA of Holdings and its Subsidiaries for such period plus (ii) to the extent not included in clause (a)(i) above cash interest income for such period minus (iii) the sum of (A) the aggregate amount of all Capital Expenditures made by Holdings and its Subsidiaries during such period (other than Capital Expenditures to the extent financed with equity net cash proceeds, asset sale net cash proceeds, condemnation net cash proceeds, insurance net cash proceeds or Indebtedness but including Capital Expenditures to the extent financed with proceeds of Loans) plus (B) the amount of all cash payments during such period made by Holdings and its Subsidiaries in respect of income taxes (net of cash income tax refunds during such period) (excluding such cash payments related to asset sales not in the ordinary course of business) plus (C) without duplication of any amounts included in clause (B) above, the aggregate amount of all cash Restricted Payments paid by Holdings during such period, to (b) Consolidated Fixed Charges for such period. The Consolidated Fixed Charge Coverage Ratio shall be determined on a pro forma basis as and to the extent provided in Section 1.04.

"Consolidated Fixed Charges" shall mean, for any period, the sum of (a) cash Consolidated Interest Expense of Holdings and its Subsidiaries for such period plus (b) the scheduled principal payments made during such period on all Indebtedness for borrowed money and Capital Leases of Holdings and its Subsidiaries for such period net of the cash proceeds of (i) any other Indebtedness permitted by Section 10.01 (other than the proceeds of Loans), (ii) any issuance of Equity Interests by Holdings and (iii) any asset sale permitted by Section 10.13, in each case, to the extent such proceeds are used to make such payment, plus (c) (i) actual cash pension funding payments made with respect to pension funding obligations for such period, minus (ii) the profit and loss statement charge (or benefit) with respect to such pension funding obligations for such period.

"Consolidated Interest Expense" shall mean, for any period, the interest expense (other than for the purposes of Consolidated Fixed Charges, net of interest income on Permitted Investments) of Holdings and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding any fees and expenses payable or amortized during such period by Holdings and its Subsidiaries in connection with the amortization of deferred debt issuance costs. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by Holdings and its Subsidiaries with respect to Hedging Agreements, but excluding any gain or loss recognized under GAAP that results from the mark-to-market valuation of any Hedging Agreement.

"Consolidated Leverage Ratio" shall mean, on any date of determination, the ratio obtained by dividing (a) Indebtedness of Holdings and its Subsidiaries on such date by (b) Consolidated EBITDA for the period of twelve consecutive months most recently ended prior to such date.

"Consolidated Net Income" shall mean, for any period, the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, provided that there shall be excluded from such calculation (a) the net gains (or losses) associated with the sale of any asset not in the ordinary course of business, (b) any income or gains associated with or resulting from the purchase or acquisition of Term Loans by Holdings or any Subsidiary of Holdings, (c) the income (or loss) of

any Subsidiary of Holdings that is not wholly owned by Holdings to the extent such income (or loss) is attributable to the noncontrolling interest in such Subsidiary, (d) the income (or loss) of any Person accrued prior to the date it becomes (or, for pro forma purposes, is deemed to have become) a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or the date that Person's assets are acquired by Holdings or any of its Subsidiaries and (e) the effect of any re-evaluation of inventory or other assets or any liabilities due to "fresh-start" accounting adjustments upon Holdings' emergence from the Bankruptcy Proceedings.

"Control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" and "Controlled" shall have meanings correlative thereto.

"Control Agreement" shall mean, with respect to any deposit account, securities account or commodities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank, the securities intermediary or commodity intermediary, as the case may be, with which such account is maintained.

"Core Canadian Concentration Account" shall have the meaning provided in Section 5.03(d).

"Core Concentration Accounts" shall mean, collectively, the Core U.S. Concentration Accounts and the Core Canadian Concentration Accounts.

"Core U.S. Concentration Account" shall have the meaning provided in Section 5.03(d).

"Credit Account" shall have the meaning provided in Section 5.03(g).

"Credit Event" shall mean the making of any Loan or the issuance, amendment, extension or renewal of any Letter of Credit (other than any amendment, extension or renewal that does not increase the maximum Stated Amount of such Letter of Credit).

"DB Canada" shall mean Deutsche Bank AG, Canada Branch, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise acting in respect of its Canadian banking business.

"DB Canadian Account" shall have the meaning provided in Section 5.03(f).

"DB U.S. Account" shall have the meaning provided in Section 5.03(e).

"DBNY" shall mean Deutsche Bank AG New York Branch, in its individual capacity, and any successor corporation by merger, consolidation or otherwise.

"Debtor Relief Law" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or

other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean, at any time of determination thereof, any Lender that (i) has failed to fund any portion of the Revolving Loans, participations in Letter of Credit Outstandings or participations in Swingline Loans required to be funded by it hereunder (including its obligations under Section 2.01(a) or (c), Section 2.04 or Section 3), (ii) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, (iii) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or a takeover (in receivership or similar proceeding) by a Governmental Authority, (iv) does not meet a capital adequacy or liquidity requirement applicable to such Lender as determined by the relevant Governmental Authority or (v) has notified Holdings, any Issuing Lender, the Swingline Lender and/or the Administrative Agent of any of the foregoing (including any notification of its intent not to comply with its funding obligations described in preceding clause (i)); provided that for purposes of Section 2.01 with respect to Swingline Loans, Section 3 and any documentation entered into pursuant to the Letter of Credit Back-Stop Arrangements only, the term "Defaulting Lender" shall also include (a) any Lender with an affiliate that (x) either (A) Controls such Lender or (B) is under common Control with such Lender and (y) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or a takeover by a Governmental Authority or does not meet a capital adequacy or liquidity requirement applicable to such affiliate as determined by the relevant Governmental Authority, (b) any Lender that previously constituted a "Defaulting Lender" under this Agreement, unless such Lender has ceased to constitute a "Defaulting Lender" for a period of at least 90 consecutive days, and (c) any Lender that (x) one of the Swingline Lender, any Issuing Lender, the Fronting Lender or the Administrative Agent and (y) at least one other Lender, believes in good faith has defaulted, and has notified Holdings and the Administrative Agent of such belief (although no such notice shall be required following an Event of Default), has defaulted (which default is continuing) in its obligations under any other credit facility to which such Lender is a party.

"Deposit Account" shall mean a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization.

"Designated Obligations" shall have the meaning provided in Section 16.01(e).

"Dilution Factors" shall mean, without duplication, with respect to any period, the aggregate amount of all bad debt write-downs, discounts, credits, returns, rebates, and other dilutive items.

"Dilution Ratio" shall mean, at any date, as to the Accounts owned by any Person, the amount (expressed as a percentage) that is the result of dividing the U.S. Dollar aggregate amount (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) of (a) the applicable Dilution Factors for the twelve (12) most recently ended fiscal

months with respect to such Person's Accounts, by (b) such Person's total gross sales with respect to their Accounts for the twelve (12) most recently ended fiscal months.

"Dilution Reserve" shall mean, in the case of the Canadian Borrowing Base, the Canadian Dilution Reserve, and in the case of the U.S. Borrowing Base, the U.S. Dilution Reserve.

"Discharge" shall, prior to the Funding Date, have the meaning assigned to such term in the form of Intercreditor Agreement attached as Exhibit F hereto, and after the Funding Date, have the meaning assigned to such term in the Intercreditor Agreement.

"Disclosure Statement" shall have the meaning provided in the recitals to this Agreement.

"Documentation Agents" shall mean General Electric Capital Corporation, Banc of America Securities, LLC and Wells Fargo Capital Finance, LLC, in their capacities as Documentation Agents in respect of the credit facilities hereunder, and any successors thereto.

"Domestic" when used in reference to any item, shall mean that such item is within the United States or any State thereof (including the District of Columbia).

"Domestic Subsidiary" of any Person shall mean any Subsidiary of such Person organized under the laws of the United States or any State thereof (including the District of Columbia).

"Dominion Period" shall mean any period (i) commencing on the date on which (x) an Event of Default has occurred and is continuing or (y) the Excess Availability is less than the Availability Condition for three (3) consecutive Business Days and (ii) ending on the first date thereafter on which (x) no Event of Default exists and (y) the Excess Availability has been equal to or greater than the Availability Condition for forty-five (45) consecutive days; provided that, notwithstanding paragraph (ii) above, at any time more than two Dominion Periods have existed during the immediately preceding twelve (12) month period, a Dominion Period shall be deemed to exist at such time.

"Draft" shall mean each U.S. Facility Draft and each Canadian Facility Draft.

"Drawing" shall have the meaning provided in Section 3.05(b).

"Drawing Date" shall mean the date on which a Draft is drawn.

"Drawing Fee" shall mean, in respect of a Draft drawn by a Borrower hereunder and accepted by a B/A Lender or a Draft (or B/A Equivalent Note exchanged therefor) purchased by a Non-B/A Lender, a fee calculated on the Face Amount of such Draft (or B/A Equivalent Note exchanged therefor) at a rate per annum equal to the Applicable Margin for Bankers' Acceptance Loans on the Drawing Date of such Draft (or B/A Equivalent Note exchanged therefor). Drawing Fees shall be calculated on the basis of the term to maturity of the Draft (or B/A Equivalent Note exchanged therefor) and a year of 365 days.

"Eligible Accounts" shall mean, at any time, the Accounts created by a Loan Party in the ordinary course of its business, that arise out of its sale of goods (other than promotional products not held for sale) or rendition of services, but excluding any Account:

(a)     which is not subject to a first priority perfected Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents, (ii) a Lien (if any) permitted by Section 10.02 which is junior in priority to the Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents, and (iii) an unregistered Lien in respect of Canadian Priority Payables that are not yet due and payable;

(c)     which (i) is unpaid more than 90 days after the date of the original invoice therefor, other than Accounts unpaid more than 90 days, but not more than 120 days, after the original invoice date up to an aggregate amount for all Borrowing Bases not exceeding $20,000,000, or (ii) has been written off on the books of the Loan Party or otherwise designated as uncollectible (in determining the aggregate unpaid amount owing from each Account Debtor with respect to Accounts that are unpaid more than 90 days after the original invoice therefore, such aggregate amount shall be reduced to give effect to any credits extended by, or amounts owing from, the Loan Parties to such Account Debtor);

(d)     which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates to the Loan Parties are ineligible pursuant to clause (c) of this definition;

(e)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Loan Parties exceeds 15% of the aggregate amount of Eligible Accounts of the Loan Parties;

(f)     with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Documents has been breached or is not true in any material respect;

(g)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation reasonably satisfactory to the Co-Collateral Agents which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon any Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest (but only that portion of the Account relating thereto);

(h)     for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by a Loan Party or if such Account was invoiced more than once;

(i)    which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state, provincial or federal bankruptcy laws (other than post-petition accounts payable by an Account Debtor that is a debtor-in-possession under the Bankruptcy Code or is subject to a proceeding under the CCAA or other applicable Insolvency Law and is acceptable to the Co-Collateral Agents in their Permitted Discretion), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j)    which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(k)    which is owed by an Account Debtor which (i) does not maintain its chief executive office or have material business operations in the U.S. or Canada or (ii) is not organized and existing under applicable law of the U.S. or Canada or, in either case any political subdivision thereof, unless, in either case, such Account is backed by an irrevocable letter of credit acceptable to the Co-Collateral Agents in their Permitted Discretion which is in the possession of, has been assigned to and is directly drawable by, the Security Agent;

(l)    which is owed in any currency other than Dollars or Canadian Dollars;

(m)    (A) with respect to the U.S. Borrowing Base, which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by an irrevocable letter of credit acceptable to the Co-Collateral Agents in their Permitted Discretion which is in the possession of the Security Agent, or (ii) the federal government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Security Agent for the benefit of the Secured Parties in such Account, have been complied with to the Co-Collateral Agents' reasonable satisfaction; and (B) with respect to the Canadian Borrowing Base, which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than Canada unless such Account is backed by an irrevocable letter of credit acceptable to the Co-Collateral Agents in their Permitted Discretion which is in the possession of the Security Agent, or (ii) the government of Canada, or any department, agency, public corporation, or instrumentality thereof, unless the Financial Administration Act (Canada) or similar provincial or territorial legislation or municipal ordinance of similar purpose, in each case as amended, and any other steps necessary to perfect the Lien of the Security Agent for the benefit of the Secured Parties in such Account have been complied with to the Co-Collateral Agents' reasonable satisfaction;

(n)    which is owed by any Affiliate of any Loan Party or any employee, officer, director or agent of any Loan Party or Affiliate of any Loan Party thereof;

(o)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent such Account Debtor or Affiliate has or has asserted a right of setoff, or has disputed its obligation to pay all or any portion of the Account, or such Account is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(p)     which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(q)     which is evidenced by any promissory note, chattel paper, or instrument or subject to a payment plan so long as such payment plan could result in such Accounts being ineligible pursuant to clause (c) of this definition;

(r)     (x) with respect to which such Loan Party has made any agreement with the Account Debtor (i) for any reduction thereof (but only to the extent of such reductions from time to time that are not already reflected in the calculation of the face value of each respective invoice related thereto), or (ii) for any adjustment, extension, compromise or settlement thereof (but only to the extent of such adjustment, extension, compromise or settlement, as the case may be, from time to time that are not already reflected in the calculation of the face value of each respective invoice related thereto), except for adjustments, extensions, compromises and settlements made in the ordinary course of business for prompt payment (and not related to the creditworthiness of the Account Debtor), or (y) any Account which was partially paid and any newly created Account related to the unpaid portion of such partially paid Account;

(s)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state, provincial or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(t)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Loan Party has or has had an ownership interest in such goods, or which indicates any party other than such Loan Party as payee or remittance party;

(u)     Accounts with respect to which any return, rejection or repossession of any of the merchandise giving rise to such Account has occurred, but only to the extent of the value of the goods returned, rejected or repossessed;

(v)     Accounts that are not payable to a Loan Party;

(w)     Accounts with respect to which the agreements evidencing such Accounts are not governed by the laws of a jurisdiction which is an Applicable Eligible Jurisdiction for the Accounts of a Loan Party, or the laws of such other jurisdiction acceptable to the Co-Collateral Agents in their Permitted Discretion;

(x)     Accounts to the extent representing goods and services tax, value added tax and provincial sales tax, in each case that has not yet been paid to the applicable Government Authority or has not been Reserved for; or

(y)     Accounts that are otherwise unacceptable to the Co-Collateral Agents in their Permitted Discretion.

Except as otherwise set forth above, the amount of an Eligible Account shall be determined based on the face amount of such Account; provided that the face amount of an Account may, in the Co-Collateral Agents' Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all discounts (which may at the Co-Collateral Agents' option, be calculated on shortest terms), claims, credits or credits pending, promotional program allowances, price adjustments, finance charges, other allowances or sales or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time (including any amount that such Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Loan Party to reduce the amount of such Account.

"Eligible Canadian Accounts" shall mean the Eligible Accounts owned by the Canadian Loan Parties.

"Eligible Canadian Inventory" shall mean the Eligible Inventory owned by the Canadian Loan Parties.

"Eligible Inventory" means, at any time, the Inventory of the Loan Parties, but excluding any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents, (ii) a Lien (if any) permitted by Section 10.02 which is junior in priority to the Lien in favor of the Security Agent for the benefit of the Secured Parties pursuant to the relevant Security Documents, and (iii) an unregistered Lien in respect of Canadian Priority Payables that are not yet due and payable;

(c)     which is determined, based on the Loan Parties' historical practices and procedures, in each case, which are reasonably acceptable to the Co-Collateral Agents, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Documents has been breached or is not true in any material

respect and which does not conform in any material respect to all standards imposed by any Governmental Authority;

(e)    in which any Person other than such Loan Party shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)    which constitutes spare or replacement parts, subassemblies, packaging supplies and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business, including, but not limited to, chemicals, starches, ink and adhesives (other than fuels in the Co-Collateral Agents' Permitted Discretion);

(g)    which is not located in an Applicable Eligible Jurisdiction, or the laws of such other jurisdiction acceptable to the Co-Collateral Agents in their Permitted Discretion, or is in transit (other than (i) between locations in an Applicable Eligible Jurisdiction controlled by Loan Parties, to the extent included in current perpetual inventory reports of any Loan Party or (ii) from an Account Debtor of a Loan Party to a location in an Applicable Eligible Jurisdiction controlled by such Loan Party so long as a Reserve has been established by the Co-Collateral Agents in their Permitted Discretion (or a contra account is established to reduce the amount owed by such Account Debtor) for the accounts payable of such Loan Party with respect to such inventory in transit);

(h)    which (i) is located in any location leased by a Loan Party unless (A) the lessor has delivered to the Security Agent a Collateral Access Agreement or (B) a Rent Reserve with respect to such facility has been established by the Co-Collateral Agents in their Permitted Discretion or (ii) which is located at an owned location subject to a mortgage or other security interest in favor of a creditor other than the Security Agent, the Permitted Notes Agent or the Term Loan Agent or is located in any third party warehouse or other storage facility or is in the possession of a bailee unless (A) such mortgagee, warehouseman or bailee has delivered to the Security Agent a Collateral Access Agreement and such other documentation as the Co-Collateral Agents may require in their Permitted Discretion or (B) a Rent Reserve or other Reserve has been established by the Co-Collateral Agents in their Permitted Discretion;

(i)    which is being processed offsite at a third party location or outside processor, or is in-transit to or from said third party location or outside processor;

(j)    which is a discontinued product or component thereof;

(k)    which is the subject of a consignment by such Loan Party as consignor;

(l)    which contains or bears any intellectual property rights licensed to such Loan Party unless the Co-Collateral Agents are satisfied that the Security Agent may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(m)     which is not reflected in a current inventory report of such Loan Party (unless such Inventory is reflected in a report to the Co-Collateral Agents as "in transit" Inventory);

(n)     for which reclamation rights have been asserted by the seller;

(o)     consists of goods that have been returned or rejected by the buyer and are not in salable condition;

(p)     is Commingled Inventory;

(q)     is not covered by casualty insurance as required by the terms of this Agreement;

(r)     consists of Hazardous Materials or goods (other than fuels) that can be transported or sold only with licenses that are not readily available;

(s)     any portion of the cost of such Inventory is attributable to intercompany profit between any Loan Party and any of its Affiliates (but only to the extent of such portion); or

(t)     is otherwise unacceptable to the Co-Collateral Agents in their Permitted Discretion.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act); provided that an Eligible Transferee shall exclude individuals and Holdings and its Subsidiaries and Affiliates.

"Eligible U.S. Accounts" shall mean the Eligible Accounts owned by the U.S. Loan Parties.

"Eligible U.S. Inventory" shall mean the Eligible Inventory owned by the U.S. Loan Parties.

"End Date" shall mean, in respect of any Start Date, (a) for purpose of the definition of Applicable Commitment Fee Percentage, the last day of the fiscal quarter of Holdings in which such Start Date occurred and (b) for purposes of the definition of Applicable Margin, the last day of a fiscal month of Holdings during which the Administrative Agent received a Borrowing Base Certificate pursuant to Section 9.04(i) with respect to the last month of a fiscal quarter of Holdings during which such Start Date occurred.

"Environmental Laws" shall mean all current and future federal, state, provincial, local and foreign laws, rules or regulations, codes, ordinances, orders, decrees, judgments or injunctions issued, promulgated, approved or entered thereunder or other requirements of Governmental Authorities or the common law, relating to health, safety, or pollution or protection of the environment, natural resources, the climate or threatened or endangered species, including laws relating to emissions, discharges, Releases or threatened releases of, or exposure to, pollutants, contaminants, chemicals or industrial, toxic or hazardous substances, or wastes

into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances, or wastes, or underground storage tanks and emissions or releases therefrom.

"Equity Interests" shall mean the shares of capital stock, partnership interests, membership interests, beneficial interests or other ownership interests, whether voting or nonvoting, in, or interests in the income or profits of, a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, or any successor statute, as the same may be amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Holdings, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) a failure by any Plan to satisfy the minimum funding standard within the meaning of Section 412 of the Code or Section 302 of ERISA, applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(c) of ERISA or Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by Holdings, any Loan Party or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by Holdings, any Loan Party or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (g) the incurrence by Holdings, any Loan Party or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by Holdings, any Loan Party or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Holdings, any Loan Party or any their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which Holdings, any Loan Party or any of their respective ERISA Affiliates is a "disqualified person" (as defined in Section 4975 of the Code) or a "party in interest" (as defined in Section 406 of ERISA) or could otherwise be liable; or (j) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of Holdings, any Loan Party or any of their respective ERISA Affiliates.

"Eurodollar Loan" shall mean each U.S. Dollar Denominated Loan designated as such by the Borrower of such U.S. Dollar Denominated Loan at the time of the incurrence thereof or conversion thereto bearing interest at a rate determined by reference to the Eurodollar Rate.

"Eurodollar Rate" shall mean (a) the rate appearing on Reuters Screen Libor 01 (or on any successor or substitute page of such screen, or any successor to or substitute for such screen, providing rate quotations comparable to those currently provided on such page of such screen, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the applicable Interest Determination Date, as the rate for dollar deposits with a maturity comparable to such Interest Period, divided by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D).

"Event of Default" shall have the meaning provided in Section 11.01.

"Excess Availability" shall mean, as of any date of determination, an amount equal to (a) the lesser of (i) the Total Commitment at such time and (ii) the Total Borrowing Base at such time minus (b) the Aggregate Exposure at such time.

"Exchange Act" shall mean the Securities and Exchange Act of 1934, as amended.

"Excluded Accounts" shall mean (i) any disbursement deposit account the funds in which are used solely for the payment of salaries and wages, employee benefits, workers' compensation and similar expenses or that has an ending daily balance of zero, (ii) trust accounts for the benefit of directors, officers or employees and (iii) deposit accounts, the daily balance in which does not at any time exceed $3,500,000 for all such accounts, provided, however, that, notwithstanding the above, an account shall not be an Excluded Account if (x) a Control Agreement over such account is entered into for the benefit of the Term Loan Agent or (y) such account is a Core Concentration Account or a Collection Account.

"Excluded Subsidiaries" shall mean, collectively, Timber Capital Holdings LLC, a Delaware limited liability company, and Timber Note Holdings LLC, a Delaware limited liability company.

"Executive Order" shall have the meaning provided in Section 8.24(a).

"Existing Letters of Credit" shall have the meaning provided in Section 3.01(a)(B).

"Expenses" shall mean all present and future reasonable out-of-pocket expenses incurred by or on behalf of the Administrative Agent, the Security Agent or the Co-Collateral Agents in connection with this Agreement, any other Loan Document or otherwise in its capacity

as the Administrative Agent under this Agreement, a Co-Collateral Agent under the Loan Documents or the Security Agent under any Security Document under this Agreement, whether incurred heretofore or hereafter, which expenses shall include, without limitation, the expenses set forth in <u>Section 13.01</u>.

"<u>Extended Canadian Facility Commitment</u>" shall have the meaning provided in <u>Section 2.19(c)</u>.

"<u>Extended Loan</u>" shall mean each Revolving Loan and each Swingline Loan pursuant to an Extended U.S. Facility Commitment or Extended Canadian Facility Commitment.

"<u>Extended Revolving Loan Maturity Date</u>" shall mean, with respect to any Extended Loan, or Extended U.S. Facility Commitment or Extended Canadian Facility Commitment, the date occurring on the first anniversary of the Initial Revolving Loan Maturity Date.

"<u>Extended U.S. Facility Commitment</u>" shall have the meaning provided in <u>Section 2.19(c)</u>.

"<u>Extension</u>" shall have the meaning provided in <u>Section 2.19(a)</u>.

"<u>Extension Offer</u>" shall have the meaning provided in <u>Section 2.19(a)</u>.

"<u>Face Amount</u>" shall mean, in respect of a Draft, Bankers' Acceptance or B/A Equivalent Note, as the case may be, the amount payable to the holder thereof on its maturity. The Face Amount of any Bankers' Acceptance Loan shall be equal to the aggregate Face Amounts of the underlying Bankers' Acceptances, B/A Equivalent Notes or Drafts, as the case may be.

"<u>Facing Fee</u>" shall have the meaning provided in <u>Section 4.01(c)</u>.

"<u>Fair Market Value</u>" shall have the meaning provided in <u>Section 9.09(d)</u>.

"<u>Federal Funds Rate</u>" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"<u>Fees</u>" shall mean all amounts payable pursuant to or referred to in <u>Section 4.01</u>.

"<u>Financial Officer</u>" of any Person shall mean the chief executive officer, the chief operating officer, the chief financial officer, principal accounting officer, treasurer, controller or assistant treasurer of such Person.

"<u>Foreign</u>" when used in reference to any item, shall mean that such item is not Domestic.

"<u>Foreign Lender</u>" shall mean any Lender that is organized under the laws of a jurisdiction other than in which the applicable Borrower is resident for tax purposes.

"<u>Foreign Pledge Agreement</u>" shall mean a pledge or charge agreement granting a Lien on Equity Interests in a Foreign Subsidiary of Holdings to secure any Secured Obligations, governed by the law of the jurisdiction of organization of such Foreign Subsidiary and in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Foreign Subsidiary</u>" shall mean Smurfit-Stone Puerto Rico and, as to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"<u>Fronting Lender</u>" shall mean DBNY, in its individual capacity or any Person serving as a successor Administrative Agent hereunder, in its individual capacity as a Fronting Lender.

"<u>Funding Date</u>" shall have the meaning provided in <u>Section 13.10(b)</u>.

"<u>Funding Date Borrowing Base Certificate</u>" shall have the meaning provided in <u>Section 6.02(n)</u>.

"<u>Funding Date Merger</u>" shall have the meaning provided in the recitals to this Agreement.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States, applied on a consistent basis.

"<u>Governmental Authority</u>" shall mean any Federal, state, provincial, regional, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"<u>Guarantee</u>" of or by any Person shall mean any obligation, contingent or otherwise (whether or not denominated as a guarantee), of such Person guaranteeing any Indebtedness of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness, (b) to purchase property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment of such Indebtedness or (c) to maintain working capital, equity capital or other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness; <u>provided</u>, <u>however</u>, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guarantee (or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof).

"Guarantee and Collateral Agreement" shall mean the Guarantee and Collateral Agreement, among Holdings, the Borrowers, the Domestic Subsidiaries of Holdings party thereto and the Security Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit M hereto with such modifications thereto as the Security Agent may agree.

"Guarantors" shall mean and include each U.S. Guarantor and each Canadian Guarantor.

"Hazardous Materials" shall have the meaning provided in Section 8.15(a)(iv).

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings or its Subsidiaries shall be a Hedging Agreement.

"Hedging Creditors" shall mean, collectively, each Lender, each Term Loan Lender and/or any affiliate thereof that has entered into one or more Secured Hedging Agreements, even if (i) in the case of a Lender, the respective Lender subsequently ceases to be a Lender under this Agreement for any reason and (ii) in the case of a Term Loan Lender, the respective Term Loan Lender subsequently ceases to be a Term Loan Lender under the Term Loan Facility for any reason, together with such Lender's, such Term Loan Lender's or such affiliate's successors and assigns, if any.

"Hedging Obligations" shall mean and include, as to any Loan Party, all obligations, liabilities and indebtedness owing by such Loan Party to the Hedging Creditors, whether now existing or hereafter incurred under, arising out of or in connection with any Secured Hedging Agreement, whether such Secured Hedging Agreement is now in existence or hereinafter arising (including, without limitation, all obligations, liabilities and indebtedness of each Loan Party in its capacity as a Guarantor under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement, as the case may be, to which it is a party, in respect of the Secured Hedging Agreements).

"Highest Adjustable Applicable Margins" shall have the meaning provided in the definition of Applicable Margin.

"Historical Excess Availability" shall mean (a) for the purposes of the definition of Applicable Margin (i) in the case of the first Start Date occurring after the Funding Date, an amount equal to (x) the sum of each day's Excess Availability during the period commencing on the Funding Date and ending on the last day of the fiscal month of Holdings for which the Administrative Agent was required prior to such first Start Date to receive a Borrowing Base Certificate pursuant to Section 9.04(i) divided by (y) the number of days in the period commencing on the Funding Date and ending on the last day of the fiscal month of Holdings for which the Administrative Agent was required prior to such first Start Date to receive a

Borrowing Base Certificate pursuant to Section 9.04(i) and (ii) in the case of each Start Date thereafter, an amount equal to (x) the sum of each day's Excess Availability during the most recently ended fiscal quarter of Holdings divided by (y) the number of days in such fiscal quarter of Holdings, and (b) in the case of the definition of Payment Conditions, with respect to any action or proposed action, an amount equal to (i) the sum of each day's Excess Availability during the one hundred and eighty (180) consecutive day period immediately preceding such action or proposed action divided by (ii) one hundred and eighty (180). In the case of clause (b) only, Excess Availability shall be determined on a pro forma basis as if such action or proposed action and any Loans incurred (or to be incurred), Letters of Credit issued (or to be issued) or Indebtedness repaid (or to be repaid) in connection with such action or proposed action had occurred or been incurred, issued or repaid, as the case may be, on the first day of the one hundred and eighty (180) day period immediately preceding such action or proposed action.

"Historical Unutilized Commitment" shall mean, on any date of determination, an amount equal to (a) in the case of the first Start Date occurring after the Funding Date, (i) the sum of each day's Total Unutilized Commitment during the period commencing on the Funding Date and ending on the day immediately preceding such first Start Date divided by (ii) the number of days in the period commencing on the Funding Date and ending on the day immediately preceding such first Start Date and (b) in the case of each Start Date thereafter, (i) the sum of each day's Total Unutilized Commitment during the most recently ended fiscal quarter of Holdings divided by (ii) the number of days in such fiscal quarter of Holdings.

"Holdings" shall mean, prior to the Funding Date Merger, SSCC, and, from and after the effectiveness of the Funding Date Merger, shall mean SSCE which shall change its name to "Smurfit-Stone Container Corporation" upon the effectiveness of such merger.

"Incremental Commitment" shall mean, for any Lender, any Commitment provided by such Lender after the Funding Date in an Incremental Commitment Agreement delivered pursuant to Section 2.14; it being understood, however, that on each date upon which an Incremental Commitment of any Lender becomes effective, such Incremental Commitment of such Lender shall be added to (and thereafter become a part of) the applicable Commitment of such Lender for all purposes of this Agreement as contemplated by Section 2.14.

"Incremental Commitment Agreement" shall mean each Incremental Commitment Agreement in substantially the form of Exhibit K (appropriately completed, and with such modifications as may be reasonably satisfactory to the Administrative Agent) executed and delivered in accordance with Section 2.14.

"Incremental Commitment Date" shall mean each date upon which an Incremental Commitment under an Incremental Commitment Agreement becomes effective as provided in Section 2.14(b).

"Incremental Commitment Requirements" shall mean, with respect to any provision of an Incremental Commitment on a given Incremental Commitment Date, the satisfaction of each of the following conditions on the Incremental Commitment Date of the respective Incremental Commitment Agreement: (i) no Default or Event of Default exists or would exist after giving effect thereto; (ii) all of the representations and warranties contained in

the Loan Documents shall be true and correct in all material respects at such time (unless stated to relate to a specific earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date); (iii) the delivery by Holdings to the Administrative Agent of an acknowledgment, in form and substance reasonably satisfactory to the Administrative Agent and executed by each Loan Party, acknowledging that such Incremental Commitment and all Revolving Loans subsequently incurred, and Letters of Credit issued, as applicable, pursuant to such Incremental Commitment shall constitute Obligations under the Loan Documents and secured on a pari passu basis with the Obligations under the Security Documents; (iv) the delivery by Holdings to the Administrative Agent of an opinion, in form and substance reasonably satisfactory to the Administrative Agent, from counsel to Holdings reasonably satisfactory to the Administrative Agent and dated such date, covering such customary matters incident to the transactions contemplated thereby as the Administrative Agent may reasonably request; (v) the delivery by each Loan Party to the Administrative Agent of such other officers' certificates, board of director (or equivalent governing body) resolutions and evidence of good standing (to the extent available under applicable law) as the Administrative Agent shall reasonably request; (vi) the incurrence of Revolving Loans in an aggregate principal amount equal to the Total Commitment (including such Incremental Commitment then being obtained) shall be permitted at such time under the Intercreditor Agreement, the Term Loan Facility Documents and any other indenture, loan agreement or other agreement with respect to Material Indebtedness; and (vii) Holdings shall have delivered a certificate executed by an Authorized Officer of Holdings, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i), (ii) and (vi) and containing the calculations (in reasonable detail) required by preceding clause (vi).

"Incremental Lender" shall have the meaning provided in Section 2.14(b).

"Incremental Security Documents" shall have the meaning provided in Section 2.14(b).

"Incurrence Test" shall have the meaning provided in Section 10.01.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding (i) trade accounts payable and accrued expenses arising in the ordinary course of business and (ii) any contingent earnout or other contingent payment obligation incurred in connection with an acquisition permitted hereunder (but only to the extent that such obligation has not become fixed)), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed by such Person (and in the event such Person has not assumed or otherwise become liable for payment of such obligation, the amount of Indebtedness under this clause (e) shall be the lesser of the amount of such obligation and the fair market value of such property), (f) all Guarantees by such Person, (g) all Capital Lease Obligations of such Person, (h) all net obligations of such Person in respect of Hedging Agreements (such net obligations to be equal at

any time to the termination value of such Hedging Agreements or other arrangements that would be payable by or to such Person at such time) and (i) all obligations of such Person as an account party to reimburse any bank or any other Person in respect of letters of credit. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, except to the extent such Indebtedness is expressly non-recourse to such Person.

"Indemnified Person" shall have the meaning provided in Section 13.01(a).

"Individual Canadian Facility Exposure" of any Lender shall mean, at any time, the sum of (a) the aggregate principal amount of all Canadian Facility Revolving Loans made by such Lender (and the aggregate principal amount of all Specified Foreign Currency Loans with respect to Canadian Facility Revolving Loans in which participations have been acquired by such Lender pursuant to Section 15) and then outstanding (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) such Lender's Canadian Facility RL Percentage in the aggregate principal amount of all Canadian Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) then outstanding and (c) such Lender's Canadian Facility RL Percentage in the aggregate amount of all Canadian Facility Letter of Credit Outstandings at such time. For purposes of this definition, the amount of Canadian Facility Revolving Loans made by the Fronting Lender shall be reduced by the aggregate amount of Specified Foreign Currency Participations therein purchased by the other Lenders in such Canadian Facility Revolving Loans pursuant to Section 15.

"Individual Exposure" of any Lender shall mean, at any time, the sum of (a) such Lender's Individual U.S. Facility Exposure at such time and (b) such Lender's Individual Canadian Facility Exposure at such time.

"Individual U.S. Facility Exposure" of any Lender shall mean, at any time, the sum of (a) the aggregate principal amount of all U.S. Facility Revolving Loans made by such Lender (and the aggregate principal amount of all Specified Foreign Currency Loans with respect to U.S. Facility Revolving Loans in which participations have been acquired by such Lender pursuant to Section 15) and then outstanding (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), (b) such Lender's U.S. Facility RL Percentage in the aggregate principal amount of all U.S. Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) then outstanding and (c) such Lender's U.S. Facility RL Percentage in the aggregate amount of all U.S. Facility Letter of Credit Outstandings at such time. For purposes of this definition, the amount of U.S. Facility Revolving Loans made by the Fronting Lender shall be reduced by the aggregate amount of Specified Foreign Currency Participations therein purchased by the other Lenders in such U.S. Facility Revolving Loans pursuant to Section 15.

"Initial Canadian Facility Commitment" shall mean, with respect to each Lender, the Canadian Facility Commitments of such Lender (excluding such Lender's Extended Canadian Facility Commitment).

"Initial Revolving Loan Maturity Date" shall mean the date occurring on the fourth anniversary of the Funding Date.

"Initial U.S. Facility Commitment" shall mean, with respect to each Lender, the U.S. Facility Commitments of such Lender (excluding such Lender's Extended U.S. Facility Commitment).

"Insolvency Law" shall mean, to the extent applicable, (a) Title 11 of the United States Code, (b) the Bankruptcy and Insolvency Act (Canada), (c) the Companies' Creditors Arrangement Act (Canada), and (d) any similar Federal, provincial, state, local or foreign bankruptcy or insolvency law, in each case as now constituted or hereafter amended or enacted.

"Intercreditor Agreement" shall mean an Intercreditor Agreement among Holdings, the other U.S. Loan Parties, the Administrative Agent, the Term Loan Agent and, if applicable, one or more Senior Representatives for holders of Permitted Second Lien Notes, substantially in the form of Exhibit E hereto with such modifications thereto that are not materially adverse to the Lenders as the Administrative Agent may agree.

"Interest Coverage Ratio" shall mean, on the date of any incurrence of Indebtedness or any other event, including any change in interest rates applicable to existing Indebtedness resulting from a modification or amendment to the documents governing such Indebtedness, in respect of which the Incurrence Test is to be satisfied (the "Test Date"), the ratio of (a) aggregate amount of Consolidated EBITDA for the then most recent four fiscal quarters for which financial statements have been delivered immediately prior to such date (the "Four Quarter Period") to (b) the aggregate Consolidated Interest Expense for such Four Quarter Period. In making the foregoing calculation, (A) pro forma effect shall be given to any Indebtedness incurred or repaid (including any Indebtedness irrevocably called for redemption) during the period (the "Reference Period") commencing on the first day of the Four Quarter Period and ending on the Test Date (other than Indebtedness incurred or repaid hereunder or under any similar arrangement except to the extent commitments hereunder or thereunder, as the case may be, (or under any predecessor or successor revolving credit or similar arrangement in effect on the last day of such Four Quarter Period) are permanently reduced), in each case as if such Indebtedness had been incurred or repaid on the first day of such Reference Period; (B) Consolidated Interest Expense attributable to interest on any Indebtedness (whether existing or being incurred) computed on a pro forma basis and bearing a floating interest rate shall be computed as if the rate in effect on the Test Date (taking into account any Hedging Agreement applicable to such Indebtedness if such Hedging Agreement has a remaining term in excess of 12 months or, if shorter, at least equal to the remaining term of such Indebtedness) had been the applicable rate for the entire period; (C) pro forma effect shall be given to Asset Sales and Permitted Acquisitions (including giving pro forma effect to the application of proceeds of any Asset Sale) that occur during such Reference Period as if they had occurred and such proceeds had been applied on the first day of such Reference Period; and (D) pro forma effect shall be given to asset sales and permitted acquisitions (including giving pro forma effect to the application of proceeds of any asset sale) that have been made by any Person that has become a U.S. Loan Party or has been merged with or into Holdings or any U.S. Loan Party during such Reference Period and that would have constituted Asset Sales or Permitted Acquisitions had such transactions occurred when such Person was a U.S. Loan Party as if such asset sales or permitted acquisitions were Asset Sales or Permitted Acquisitions that occurred on the first day of such Reference Period; provided that to the extent that clause (C) or (D) of this sentence requires that pro forma effect be given to an Asset Sale or Permitted Acquisition, such pro forma

calculation shall be based upon the four full fiscal quarters immediately preceding the Test Date of the Person, or division or line of business of the Person, that is acquired or disposed for which financial information is available.

"Interest Determination Date" shall mean, with respect to any Eurodollar Loan, the second Business Day prior to the commencement of any Interest Period relating to such Eurodollar Loan.

"Interest Period" shall have the meaning provided in Section 2.09.

"Inventory" shall mean "inventory" as such term is defined in Article 9 of the UCC or the PPSA, as applicable.

"Inventory Reserves" shall mean reserves against Inventory equal to the sum of the following:

(a)     a reserve for shrink, or discrepancies that arise pertaining to inventory quantities on hand between the Loan Parties' perpetual accounting system and physical counts of the inventory in accordance with the Loan Parties' historical accounting procedures and is acceptable to the Co-Collateral Agents in their Permitted Discretion;

(b)     a revaluation reserve whereby capitalized favorable variances shall be deducted from Eligible Inventory and unfavorable variances shall not be added to Eligible Inventory;

(c)     a lower of the cost or market reserve for any differences between a Loan Party's actual cost to produce any Inventory versus the selling price of such Inventory to third parties, determined on a product line basis; and

(d)     any other reserve established by the Co-Collateral Agents in their Permitted Discretion, from time to time.

"Investment" shall mean, as applied to any Person (the "investor"), any direct or indirect purchase or other acquisition by the investor of, or a beneficial interest in, stock or other securities of any other Person, including any exchange of equity securities for Indebtedness, or any direct or indirect loan, advance (other than advances to employees for moving and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by the investor to any other Person, including all Indebtedness and accounts receivable owing to the investor from such other Person that did not arise from sales or services rendered to such other Person in the ordinary course of the investor's business.  Except for any Investment described in the immediately succeeding sentence, the amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment minus any amounts (a) realized upon the disposition of assets comprising an Investment (including the value of any liabilities assumed by any Person other than Holdings, any Borrower or any Subsidiary of Holdings in connection with such disposition), (b) constituting repayments of Investments that are loans or advances or (c) constituting cash returns of principal or capital thereon (including any dividend, redemption or repurchase of

equity that is accounted for, in accordance with GAAP, as a return of principal or capital).  For purposes of this Agreement, the redemption, purchase or other acquisition for value by any Subsidiary of Holdings of any shares of its capital stock from a Person other than Holdings, any Borrower or any other Subsidiary of Holdings shall be deemed to be an "Investment" by such Subsidiary in its shares of capital stock.

"IP Security Agreements" shall have the meaning set forth in (a) prior to the Funding Date, the Guarantee and Collateral Agreement attached hereto as Exhibit M and (b) on and after the Funding Date, the Guarantee and Collateral Agreement.

"IRS" shall mean the U.S. Internal Revenue Service.

"Issuing Lender" shall mean each of DBNY (except as otherwise provided in Section 12.09), JPMCB and any other Lender reasonably acceptable to the Administrative Agent and Holdings which agrees to issue Letters of Credit hereunder.  Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by one or more Affiliates of such Issuing Lender (and such Affiliate shall be deemed to be an "Issuing Lender" for all purposes of the Loan Documents); provided that, if the Extension is effected in accordance with Section 2.19, then on the occurrence of the Initial Revolving Maturity Date, each Issuing Lender shall have the right to resign as such on, or on any date within twenty (20) Business Days after, the Initial Revolving Maturity Date, upon not less than ten (10) days' prior written notice thereof to Holdings and the Administrative Agent and, in the event of any such resignation and upon the effectiveness thereof, the resigning Issuing Lender shall retain all of its rights hereunder and under the other Loan Documents as Issuing Lender with respect to all Letters of Credit theretofore issued by it (which Letters of Credit shall remain outstanding in accordance with the terms hereof until their respective expirations) but shall not be required to issue any further Letters of Credit hereunder.  If at any time and for any reason (including as a result of resignations as contemplated by the last proviso to the preceding sentence), an Issuing Lender has resigned in such capacity in accordance with the preceding sentence and no Issuing Lenders exist at such time, then no Person shall be an Issuing Lender hereunder obligated to issue Letters of Credit unless and until (and only for so long as) a Lender (or Affiliate of a Lender) reasonably satisfactory to the Administrative Agent and Holdings agrees to act as Issuing Lender hereunder.

"ITA" shall mean the Income Tax Act (Canada), as amended, and any successor thereto, and any regulations promulgated thereunder.

"Joinder Agreement" shall mean a Joinder Agreement substantially in the form of Exhibit I (appropriately completed).

"JPMCB" shall mean JPMorgan Chase Bank, N.A., in its individual capacity, and any successor corporation by merger, consolidation or otherwise.

"Judgment Currency" shall have the meaning provided in Section 13.20.

"Judgment Currency Conversion Date" shall have the meaning provided in Section 13.20.

"**L/C Supportable Obligations**" shall mean (i) obligations of Holdings or any of its Subsidiaries with respect to workers compensation, surety bonds and other similar statutory obligations and (ii) such other obligations of Holdings or any of its Subsidiaries as are permitted to exist pursuant to the terms of this Agreement (other than obligations in respect of (x) the Term Loan Facility, (y) any Indebtedness that is subordinated in right of payment to the Obligations or (z) any Equity Interests issued by Holdings).

"**Lead Arrangers**" shall mean Deutsche Bank Securities Inc. J.P. Morgan Securities Inc., GE Capital Markets, Inc., Banc of America Securities LLC and Wells Fargo Capital Finance, LLC, in their capacities as Joint Lead Arrangers in respect of the credit facilities hereunder, and any successors thereto.

"**Lender**" shall mean each financial institution listed on Schedule 1.01(a), as well as any Person that becomes a "Lender" hereunder pursuant to Section 2.13, Section 2.14 or Section 13.04(b).

"**Lender Creditors**" shall mean, collectively, the Lenders, each Issuing Lender, the Swingline Lender, the Fronting Lender, the Administrative Agent, the Co-Collateral Agents and the Security Agent.

"**Letter of Credit**" shall mean each U.S. Facility Letter of Credit and each Canadian Facility Letter of Credit.

"**Letter of Credit Back-Stop Arrangements**" shall have the meaning provided in Section 2.18.

"**Letter of Credit Exposure**" shall mean the sum of (i) the U.S. Facility Letter of Credit Exposure plus (ii) the Canadian Facility Letter of Credit Exposure.

"**Letter of Credit Fee**" shall have the meaning provided in Section 4.01(b).

"**Letter of Credit Outstandings**" shall mean, at any time, the sum of all U.S. Facility Letter of Credit Outstandings and Canadian Facility Letter of Credit Outstandings.

"**Letter of Credit Request**" shall have the meaning provided in Section 3.03(a).

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, assignment for security, hypothecation, prior claim (within the meaning of the Civil Code of Quebec) encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, Capital Lease or title retention agreement relating to such asset.

"**Loan**" shall mean each Revolving Loan, each Swingline Loan and each Extended Loan.

"**Loan Document Obligations**" shall mean and include, as to any Loan Party, all Obligations of such Loan Party to the Lender Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, each Loan Document to which such Loan

Party is a party (including, without limitation, in the event such Loan Party is a Guarantor, all such obligations, liabilities and indebtedness of such Loan Party in its capacity as a Guarantor under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement to which it is a party) (except to the extent consisting of Hedging Obligations or Cash Management Services Obligations).

"<u>Loan Documents</u>" shall mean this Agreement, the Guarantee and Collateral Agreement, each Canadian Security Agreement, each Foreign Pledge Agreement, each Mortgage, the Intercreditor Agreement, and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Incremental Commitment Agreement, each Note, each Joinder Agreement and each other Security Document.

"<u>Loan Party</u>" shall mean each U.S. Loan Party and each Canadian Loan Party.

"<u>Majority Lenders</u>" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"<u>Mandatory Borrowing</u>" shall have the meaning provided in <u>Section 2.01(c)</u>.

"<u>Margin Stock</u>" shall have the meaning given such term under Regulation U.

"<u>Material Adverse Effect</u>" shall mean (a) a materially adverse effect on the business, operations, properties or financial condition of Holdings and its Subsidiaries, taken as a whole, or (b) material impairment of the rights of or benefits available to the Lenders under any Loan Document.

"<u>Material Contract</u>" shall mean any contract to which Holdings, any other Borrower or any of the Subsidiaries of Holdings is or becomes a party that provides for payments by or to Holdings, any other Borrower or any of their respective Subsidiaries in excess of $50,000,000 per year and that has a term in excess of twelve months.

"<u>Material Indebtedness</u>" shall mean Indebtedness (other than the Loan Document Obligations), or obligations in respect of one or more Hedging Agreements, of any one or more of Holdings, any other Borrower and their respective Subsidiaries in an aggregate principal amount exceeding $30,000,000.

"<u>Material Subsidiary</u>" shall mean each Subsidiary of Holdings now existing or hereafter acquired or formed and each successor thereto that (a) for the most recent period of four consecutive fiscal quarters of Holdings accounted (on a consolidated basis with its Subsidiaries) for more than 5% of the consolidated revenues of Holdings, (b) as at the end of such fiscal quarter, was (on a consolidated basis with its Subsidiaries) the owner of more than 5% of the consolidated assets of Holdings, as shown on the consolidated financial statements of Holdings for such fiscal quarter or (c) is irrevocably designated as a Material Subsidiary in a writing by a Loan Party to the Administrative Agent; <u>provided</u> that no Excluded Subsidiary shall be deemed to be a Material Subsidiary.  <u>Schedule 1.01(c)</u> sets forth each Subsidiary that is a Material Subsidiary on and as of the Closing Date.

"<u>Maturity Date</u>" shall mean the Revolving Loan Maturity Date or the Swingline Expiry Date, as the case may be.

"<u>Maximum Canadian Facility Letter of Credit Amount</u>" shall mean $37,500,000.

"<u>Maximum Canadian Facility Swingline Amount</u>" shall mean $20,000,000.

"<u>Maximum U.S. Facility Letter of Credit Amount</u>" shall mean $112,500,000.

"<u>Maximum U.S. Facility Swingline Amount</u>" shall mean $45,000,000.

"<u>Minimum Borrowing Amount</u>" shall mean (a) for Base Rate Loans and Canadian Prime Rate Loans (in each case, other than Swingline Loans), U.S.$500,000, (b) for Eurodollar Loans, U.S.$500,000, (c) for Bankers' Acceptance Loans, U.S.$500,000 and (d) for Swingline Loans, U.S.$100,000; <u>provided</u> that during a Dominion Period there shall be no Minimum Borrowing Amount with respect to (a) and (d) above.

"<u>Minimum Extension Condition</u>" shall have the meaning provided in <u>Section 2.19(d)</u>.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Mortgaged Properties</u>" shall mean (i) each parcel (or adjoining parcels) of real property (including any real property fixtures thereon) owned by a U.S. Loan Party on the Closing Date and specified on <u>Schedule 1.01(d)</u>, and (ii) each After-Acquired Mortgage Property with respect to which a Mortgage is granted pursuant to <u>Section 9.09</u>.

"<u>Mortgages</u>" shall mean (a) the mortgages, deeds of trust, assignments of leases and rents, modifications and other security documents with respect to Mortgaged Properties or delivered pursuant to <u>Section 9.09</u>. Each Mortgage shall be substantially in the form of <u>Exhibit O</u>, or otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA that has been maintained, sponsored or contributed to by (or to which there is or may be an obligation to contribute to by) Holdings or an ERISA Affiliate within the preceding five plan years.

"<u>NAIC</u>" shall mean the National Association of Insurance Commissioners.

"<u>Net Cash Proceeds</u>" shall mean (a) with respect to any Asset Sale, the Cash Proceeds therefrom, net of (i) costs of sale (including payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than Loans and borrowings under the Term Loan Facility) required to be repaid under the terms thereof as a result of such Asset Sale), (ii) if such Asset Sale includes the sale or transfer of assets included in the ABL Priority Collateral and pledged to secure the Obligations, any Cash Proceeds therefrom equal to the book value of the inventory, receivables or other ABL Priority Collateral included in such sale or transfer, (iii) taxes paid or reasonably estimated to be payable in the year such Asset

Sale occurs or in the following year as a result thereof and (iv) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations and any purchase price adjustments associated with such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); and (b) with respect to any issuance of debt or equity securities, the cash proceeds thereof, net of underwriting commissions or placement fees and expenses directly incurred in connection therewith.

"Net Orderly Liquidation Value" shall mean the "net orderly liquidation value" determined by an unaffiliated valuation company reasonably acceptable to the Co-Collateral Agents after performance of an inventory valuation to be done at the Co-Collateral Agents' request and the Borrowers' expense, less the amount estimated by such valuation company for marshalling, reconditioning, carrying, and sales expenses designated to maximize the resale value of such Inventory and assuming that the time required to dispose of such Inventory is customary with respect to such Inventory and expressed as a percentage of the net book value of such Inventory.

"Non-B/A Lender" shall mean any Lender which is unwilling or unable to create Bankers' Acceptances by accepting Drafts and which has identified itself as a "Non-B/A Lender" by written notice to the Administrative Agent and Holdings.

"Non-Cash Charges" shall mean any non-cash charges or losses, including (a) any impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets and investments in debt and equity securities pursuant to GAAP, (b) long-term incentive plan accruals and any non-cash expenses resulting from the grant of stock options or other equity-based incentives to any director, officer or employee of Holdings, any other Borrower or any Subsidiary of Holdings and (c) any non-cash charges or losses resulting from the application of purchase accounting; provided that Non-Cash Charges shall not include additions to bad debt reserves or bad debt expense.

"Non-Defaulting Lender" shall mean each Lender other than a Defaulting Lender; provided, however, solely for purposes of Section 4.01(a), a Lender that is a Defaulting Lender solely under clause (iii), (iv) or (v) (but, in the case of such clause (v), only to the extent relating to either clause (iii) or (iv)) of the definition thereof shall be treated as a Non-Defaulting Lender and not as a Defaulting Lender.

"Non-Wholly-Owned Subsidiary" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"Note" shall mean each U.S. Facility Revolving Note, each U.S. Borrower Canadian Facility Revolving Note, each Canadian Borrower Canadian Facility Revolving Note, the U.S. Facility Swingline Note, the U.S. Borrower Canadian Facility Swingline Note and the Canadian Borrower Canadian Facility Swingline Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean (i) for credit notices, the office of the Administrative Agent located at 60 Wall Street, NYC60-0208, 2nd Floor, New York, New York 10005-2858, Attention: Erin Morrissey, Telephone No.: (212) 250-1765, Telecopier No.: (212) 797-5690, and email: erin.morrissey@db.com and (ii) for operational notices, the office of the Administrative Agent located at 5022 Gate Parkway, Suite 100, Jacksonville, Florida 32256, Attention: [ ], Telephone No.: (904) 527-[ ], Telecopier No.: (732) [ ], and e-mail: [ ]@db.com; provided that in the case of all Borrowings of Canadian Borrower Revolving Loans denominated in Canadian Dollars, a copy of such notice also shall be delivered simultaneously to DB Canada located at [199 Bay Street, Suite 4700, Commerce Court West, P.O. Box 263, Toronto, Ontario, Canada M5L 1E9, Attention: Marcellus Leung, Telephone No.: (416) 682-8252, and Telecopier No.: (416) 682-8484][1]; or (in either case) such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligation Currency" shall have the meaning provided in Section 13.20.

"Obligations" shall mean all amounts owing to the Administrative Agent, the Security Agent, the Co-Collateral Agents, any Issuing Lender, the Swingline Lender or any Lender pursuant to the terms of this Agreement or any other Loan Document (other than the Intercreditor Agreement), including, without limitation, all amounts in respect of any principal (or Face Amount, as applicable), premium (if any), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim under any such proceeding or under applicable state, federal or foreign law), penalties, fees, expenses (including Expenses), indemnifications, reimbursements (including Unpaid Drawings with respect to Letters of Credit), damages and other liabilities, and guarantees in each case of the foregoing amounts.

"Participant" shall have the meaning provided in Section 3.04(a).

"Participating Specified Foreign Currency Lender" shall have the meaning provided in Section 15.01.

"Patriot Act" shall have the meaning provided in Section 13.17.

"Payment Conditions" shall mean that at the time of each action or proposed action and after giving effect thereto:

(i)     each of the following conditions are satisfied: (a) no Default or an Event of Default shall have occurred and be continuing, (b) Excess Availability (on the date of such action or proposed action after giving effect to any Loans incurred (or to be incurred) or Letters of Credit issued (or to be issued) on such date in connection with such action or proposed action) and Historical Excess Availability, calculated on a pro forma basis in accordance with the definition thereof, shall exceed the greater of (A) $137,500,000 and (B) 25% of the Total Commitment as then in effect, (c) Holdings shall have a Consolidated Fixed Charge Coverage Ratio of not less than 1.10:1.00 for the Test

---

[1] DB to confirm.

Period then most recently ended for which financial statements are available calculated on a pro forma basis in accordance with Section 1.04 as if such action or proposed action had occurred on the first day of such Test Period, and (d) Holdings shall have delivered to the Administrative Agent a certificate of an Authorized Officer of Holdings certifying as to compliance with preceding clauses (a) through (c) and demonstrating (in reasonable detail) the calculations required by preceding clauses (b) and (c); or

(ii)    each of the following conditions are satisfied:  (a) no Default or an Event of Default shall have occurred and be continuing, (b) Excess Availability (on the date of such action or proposed action after giving effect to any Loans incurred (or to be incurred) or Letters of Credit issued (or to be issued) on such date in connection with such action or proposed action) and Historical Excess Availability, in each case, calculated on a pro forma basis in accordance with the definition thereof, shall exceed the greater of (A) $275,000,000 and (B) 50% of the Total Commitment as then in effect, and (c) Holdings shall have delivered to the Administrative Agent a certificate of an Authorized Officer of Holdings certifying as to compliance with preceding clauses (a) and (b) and demonstrating (in reasonable detail) the calculations required by preceding clause (b).

"Payment Office"[2] shall mean (i) except as provided in clause (ii) below, the office of the Administrative Agent located at 60 Wall Street, New York, New York 10005 and (ii) in the case of all payments with respect to Canadian Dollar Denominated Revolving Loans, the office of DB Canada located at 199 Bay Street, Suite 4700, Commerce Court West, P.O. Box 263, Toronto, Ontario, Canada M5L 1E9, or (in either case) such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor thereto.

"Perfection Certificate" shall mean each of the U.S. Perfection Certificate and the Canadian Perfection Certificate.

"Permitted Acquisition" shall have the meaning provided in Section 10.05(f).

"Permitted Discretion" shall mean a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment, following either (x) consultation with the Borrowers or (y) two (2) Business Days' advance notice to the Borrowers.

"Permitted Investments" shall mean any of the following:

(a)    any evidence of Indebtedness, maturing not more than one year after the acquisition thereof, issued by the United States of America or Canada, or any instrumentality or agency thereof and guaranteed fully as to principal, interest and premium, if any, by the United States of America or Canada;

---

[2] DB to confirm.

(b)     any certificate of deposit, banker's acceptance or time deposit (including Eurodollar time deposits), maturing not more than one year after the date of purchase, issued or guaranteed by or placed with (i) the Administrative Agent or any bank providing Cash Management Services to Holdings or any of its Subsidiaries or (ii) a commercial banking institution that has long-term debt rated "A2" or higher by Moody's Investors Service, Inc. ("Moody's") or "A" or higher by Standard & Poor's Ratings Services ("S&P") and which has a combined capital and surplus of not less than $500,000,000;

(c)     commercial paper (i) maturing not more than 270 days after the date of purchase and (ii) issued by a corporation (other than a Loan Party or any Affiliate of a Loan Party) with a rating, at the time as of which any determination thereof is to be made, of "P-1" or higher by Moody's or "A-1" or higher by S&P (or equivalent rating in the case of a Permitted Investment made by a Foreign Subsidiary of Holdings);

(d)     investments in fully collateralized repurchase agreements with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank or trust company meeting the qualifications specified in clause (b) above;

(e)     demand deposits with any bank or trust company;

(f)     money market funds substantially all the assets of which are comprised of securities of the types described in clauses (a) through (e) above; and

(g)     in the case of the Foreign Subsidiaries of Holdings, short-term investments comparable to the foregoing.

"Permitted Liens" shall mean, with respect to any Person, any of the following:

(a) Liens for taxes, assessments or other governmental charges or levies not yet due and payable or which are being contested in good faith by appropriate proceedings diligently pursued, provided that (i) any proceedings commenced for the enforcement of such Liens shall have been duly suspended and (ii) full provision for the payment of all such taxes known to such Person has been made on the books of such Person if and to the extent required by GAAP;

(b) mechanics', materialmen's, carriers', warehousemen's, landlord's and similar Liens arising by operation of law and in the ordinary course of business and securing obligations of such Person that are not overdue for a period of more than 60 days or are being contested in good faith by appropriate proceedings diligently pursued, provided that in the case of any such contest (i) any proceedings commenced for the enforcement of such Liens shall have been duly suspended and (ii) full provision for the payment of such Liens has been made on the books of such Person if and to the extent required by GAAP;

(c) Liens arising in connection with workers' compensation, unemployment insurance, old age pensions and social security benefits that are not overdue or are being contested in good faith by appropriate proceedings diligently pursued, provided that in the case of any such contest (i) any proceedings commenced for the enforcement of such Liens shall have

been duly suspended and (ii) full provision for the payment of such Liens has been made on the books of such Person if and to the extent required by GAAP;

(d) (i) Liens incurred or deposits made in the ordinary course of business to secure the performance of bids, tenders, statutory obligations, fee and expense arrangements with trustees and fiscal agents (exclusive of obligations incurred in connection with the borrowing of money or the payment of the deferred purchase price of property) and (ii) Liens securing surety, indemnity, performance, appeal and release bonds, in the case of either clause (i) or (ii), securing such obligations in an amount outstanding at any time not to exceed individually or in the aggregate $100,000,000, provided that full provision for the payment of all such obligations has been made on the books of such Person if and to the extent required by GAAP;

(e) imperfections of title, restrictive covenants, rights of way, easements, servitudes, mineral interest reservations, reservations made in the grant from the Crown, municipal and zoning ordinances, general real estate taxes and assessments not yet delinquent and other encumbrances on real property that (i) do not arise out of the incurrence of any Indebtedness for money borrowed and (ii) do not interfere with or impair in any material respect the utility, operation, value or marketability of the real property on which such Lien is imposed;

(f) the rights of collecting banks or other financial institutions having a right of setoff, revocation, refund or chargeback with respect to money or instruments on deposit with or in the possession of such financial institution;

(g) leases or subleases granted to others not interfering in any material respect with the business of Holdings or any Subsidiary of Holdings and any interest or title of a lessor under any lease (whether a Capital Lease or an operating lease) permitted by this Agreement or the Security Documents;

(h) Liens on accounts receivable for which attempts at collection have been undertaken by a third party authorized by the Person owning such accounts receivable;

(i) Liens arising from the granting of a license to enter into or use any asset of Holdings or any Subsidiary of Holdings to any Person in the ordinary course of business of Holdings or any Subsidiary of Holdings that does not interfere in any material respect with the use or application by Holdings or any Subsidiary of Holdings of the asset subject to such license;

(j) Liens attaching solely to cash earnest money deposits made by Holdings or any Subsidiary of Holdings in connection with any letter of intent or purchase agreement entered into it in connection with an acquisition permitted hereunder;

(k) Liens arising from precautionary UCC financing statements (or analogous personal property security filings or registrations in other jurisdictions) regarding operating leases;

(l) Liens on insurance policies and proceeds thereof to secure premiums thereunder; and

(m) Liens arising out of judgments or awards in respect of which an appeal or proceeding for review is being diligently prosecuted, provided that (i) a stay of execution pending such appeal or proceeding for review has been obtained and (ii) full provision for the payment of such Liens has been made on the books of such Person if and to the extent required by GAAP.

For the purposes of the Security Documents and Section 8.17, "Permitted Liens" shall also be deemed to include the Liens permitted by Sections 10.02(a)(ii), (iii), (iv), (v), (vi), (vii), (ix), (x), (xii), (xiii), (xiv) and (xv). Any reference in any of the Loan Documents (other than the Intercreditor Agreement) to a Permitted Lien is not intended to and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by any of the Loan Documents to any Permitted Lien.

"Permitted Notes" shall mean Permitted Second Lien Notes or Permitted Unsecured Notes.

"Permitted Refinancing Indebtedness" shall mean, with respect to Holdings, any Borrower or any Subsidiary of Holdings, any refinancing, refunding, renewal or extension of any Indebtedness, in whole or in part, of such Person from time to time; provided that (a) the principal amount (or accreted value, if applicable) or, in the case of any revolving facility, the commitments thereunder, thereof does not exceed the principal amount (or accreted value, if applicable) or in the case of any revolving facility, the commitments thereunder, (except as otherwise permitted under Section 10.01(f)) of the Indebtedness so modified, refinanced, refunded, renewed or extended (the "Refinanced Debt") except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) the Indebtedness resulting from such refinancing, refunding, renewal or extension (the "Refinancing Debt") has a final maturity date the same as or later than the final maturity date of, and, other than in the case of a revolving facility, has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Refinanced Debt, (c) at the time thereof, no Event of Default shall have occurred and be continuing, (d) to the extent such Refinanced Debt is subordinated in right of payment to the Obligations, such Refinancing Debt is subordinated in right of payment to the Obligations on terms, when taken as a whole, at least as favorable to the Lenders as those contained in the documentation governing the Refinanced Debt, (e) if the Refinanced Debt is secured, the Refinancing Debt shall be unsecured or secured only by assets that secured such Refinanced Debt; provided that if the Refinanced Debt is the Term Loan Facility, such Refinancing Debt may be secured by any assets or properties of Holdings or any Domestic Subsidiary or Canadian Subsidiary of Holdings which also secures the Obligations, (f) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate, redemption premium and other pricing provisions) of any such Refinancing Debt, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Refinanced Debt; provided that, in respect of any Refinancing Debt in an aggregate principal amount of $75,000,000 or greater, a certificate of a Responsible Officer of Holdings delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Refinancing Debt or drafts of the

documentation relating thereto, stating that Holdings or the Subsidiary of Holdings incurring such Indebtedness has determined in good faith that such terms and conditions satisfy the foregoing requirement of this clause (f) shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies Holdings within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (g) unless each Domestic Subsidiary and Canadian Subsidiary of Holdings that is a primary obligor or guarantor in respect of such Refinancing Debt was also a primary obligor or guarantor in respect of the Refinanced Debt, all the Domestic Subsidiaries and Canadian Subsidiaries of Holdings that are primary obligors or guarantors of such Refinancing Debt shall be Loan Parties; provided further, that (A) if the proceeds of revolving loans are used to repurchase or redeem any Indebtedness, within 90 days of such repurchase or redemption, Holdings or any Subsidiary of Holdings may incur Indebtedness otherwise meeting the requirements of this definition (as if such new Indebtedness were used to refinance such repurchased or redeemed Indebtedness) to repay such revolving loans and (B) if the proceeds of Indebtedness meeting the requirements of this definition cannot be immediately applied to refinance existing Indebtedness, then, unless such proceeds are held by Holdings or a Subsidiary of Holdings pending such refinancing, they may be used to temporarily prepay revolving loans or other revolving debt, which then may be redrawn to refinance such Indebtedness within 90 days of such prepayment, provided that the Co-Collateral Agents in their Permitted Discretion may establish a Reserve in an amount equal to the amount the Loans are prepaid pursuant to this sub-paragraph (B). Notwithstanding anything to the contrary in clause (f) above, with respect to Refinanced Debt that is the Term Loan Facility, the terms and conditions as to collateral of the Refinancing Debt shall be deemed to be not materially less favorable to the Loan Parties or the Lenders than the terms as to collateral of the Refinanced Debt if the Refinancing Debt (i) is secured by collateral meeting the requirements of clause (e) above and (ii) is subject to substantially the same intercreditor arrangements as set forth in and contemplated by the Intercreditor Agreement (for the avoidance of doubt with the Secured Parties benefiting from a first priority security interest in the ABL Priority Collateral, provided that any differing terms or terms with respect to assets or property of Canadian Subsidiaries of Holdings (if any) are agreed to by the Administrative Agent.

"Permitted Second Lien Notes" shall mean secured Indebtedness incurred by Holdings and issued under an indenture or similar governing instrument in a registered public offering or a Rule 144A or other private placement transaction in the form of one or more series of second lien secured notes; provided that (i) such Indebtedness is secured by (A) the Term Priority Collateral on a second lien, subordinated basis to the obligations in respect of the Term Facility and on a senior basis to the Obligations and (B) the ABL Priority Collateral of the U.S. Loan Parties on a third lien, subordinated basis to the Obligations, and is not secured by any property or assets of Holdings, any Borrower or any Subsidiary of Holdings (including any Foreign Subsidiary of Holdings) other than the Collateral; (ii) such Indebtedness does not mature or have scheduled amortization or other required payments of principal prior to the date that is ninety-one (91) days after the later of (A) the Latest Maturity Date (as defined in the Term Loan Credit Agreement) at the time such Indebtedness is incurred and (B) the Extended Revolving Loan Maturity Date, (iii) the security agreements relating to such Indebtedness are substantially the same as the Security Documents (other than the Canadian Security Documents) (with such differences as are reasonably satisfactory to the Administrative Agent), (iv) such Indebtedness is not guaranteed by any Subsidiaries other than the U.S. Guarantors, (v) such Indebtedness and the

indenture or other governing instrument applicable thereto does not contain covenants, events of default, or other terms and conditions that, when taken as a whole, are more restrictive to the Loan Parties than the terms of this Agreement, and (vi) a Senior Representative acting on behalf of the holders of such Indebtedness pursuant to the indenture or other instrument governing such Indebtedness shall have become party to the Intercreditor Agreement (or a successor intercreditor agreement having the same terms as the Intercreditor Agreement or such other terms reasonably acceptable to the Administrative Agent). Permitted Second Lien Notes will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Timber Financing" shall mean any financing transaction by Holdings or any Subsidiary of Holdings secured by timber or timberland, or a Sale/Leaseback Transaction in which the subject property consists of timber or timberland, in each case owned by such Person for more than 90 days immediately prior to such financing transaction or Sale/Leaseback Transaction, so long as such financing transaction or Sale/Leaseback Transaction (a) does not have a final maturity or final payment date in respect thereof on or prior to the later of (A) the Latest Maturity Date (as defined in the Term Loan Credit Agreement) then in effect or a Weighted Average Life to Maturity shorter than the number of days to the maturity of the Term Loan Facility and (B) the Extended Revolving Loan Maturity Date, (b) results in the Net Cash Proceeds to any Loan Party in excess of 60% of the fair market value (determined, as of the date of such financing transaction or Sale/Leaseback Transaction, on the basis of an assumed arms-length sale of such property, by a nationally recognized appraisal or valuation firm experienced in valuing timber or timberland) of the timber or timberland that is the subject property of such financing transaction or Sale/Leaseback Transaction and (c) contains covenants no more restrictive than those contained in this Agreement (except that covenants that relate solely to the subject property may be more restrictive).

"Permitted Unsecured Notes" shall mean unsecured Indebtedness incurred by Holdings and issued under an indenture or similar governing instrument in a registered public offering or a Rule 144A or other private placement transaction in the form of one or more series of senior unsecured or unsecured subordinated notes; provided that (i) such Indebtedness does not mature or have scheduled amortization or other required payments of principal prior to the date that is ninety-one (91) days after the later of (A) the Latest Maturity Date (as defined in the Term Loan Credit Agreement) at the time such Indebtedness is incurred and (B) the Extended Revolving Loan Maturity Date, (ii) such Indebtedness is not guaranteed by any Subsidiary of Holdings other than the Guarantors, (iii) if such Indebtedness is subordinated, it and any Guarantees thereof shall be subordinated to the Obligations and the obligations under the Term Loan Facility, in the case of capital markets subordinated debt, on customary market terms then applying to similar capital markets offerings or placement of subordinated debt, or otherwise, on a basis reasonably satisfactory to the Administrative Agent, (iv) such Indebtedness and the indenture or other governing instrument applicable thereto does not contain covenants, events of default, or other terms and conditions that, when taken as a whole, are more restrictive to the Loan Parties than the terms of this Agreement, and (v) such Indebtedness is not secured by any Lien on any property or assets of Holdings, any Borrower or any Subsidiary of Holdings (including any Foreign Subsidiary of Holdings). Permitted Unsecured Notes will include any Registered Equivalent Notes issued in exchange therefor.

"Person" shall mean an individual, partnership, corporation (including a business trust), joint stock company, estate, trust, limited liability company, unlimited liability company, unincorporated association, joint venture or other entity or Governmental Authority.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained, sponsored or contributed to by (or to which there is or may be an obligation to contribute to by) Holdings or an ERISA Affiliate within the preceding five plan years.

"Plan of Reorganization" shall have the meaning provided in the recitals to this Agreement.

"PPSA" shall mean the Personal Property Security Act (Ontario); provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or the Civil Code of Quebec, "PPSA" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Quebec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"Primary Obligations" shall have the meaning specified in Section 11.02(a).

"Primary U.S. Loan Party Obligations" shall have the meaning specified in Section 11.02(a).

"Prime Lending Rate" shall mean the rate which the Administrative Agent announces from time to time as its prime lending rate, the Prime Lending Rate to change when and as such prime lending rate changes. The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administrative Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"Prior Agent" shall have the meaning provided in the Intercreditor Agreement.

"Prior Credit Agreement" shall mean that certain Amended and Restated Credit Agreement, dated as of February 25, 2009, among Holdings, certain subsidiaries of Holdings party thereto, the lenders party thereto, JPMorgan Chase Bank, N.A. as administrative agent and collateral agent and JPMorgan Chase Bank, N.A., Toronto Branch as Canadian administrative agent and Canadian collateral agent (as amended through and including the Closing Date).

"Pro Rata Share" shall have the meaning specified in Section 11.02(a).

"Projections" shall mean the projections that were prepared by or on behalf of Holdings in connection with this Agreement and provided to the Administrative Agent on March 23, 2010 (and delivered by the Administrative Agent to the Lenders).

"Qualified Secured Cash Management Agreement Reserve" shall mean the Canadian Qualified Secured Cash Management Agreement Reserves and the U.S. Qualified Secured Cash Management Agreement Reserves.

"Qualified Secured Cash Management Agreements" shall have the meaning provided in Section 13.21.

"Qualified Secured Cash Management Services Obligations" shall mean Cash Management Services Obligations under each Secured Cash Management Agreement that is a Qualified Secured Cash Management Agreement; provided that, at any time, the aggregate amount of the Qualified Secured Cash Management Services Obligations shall not exceed the aggregate amount of the Qualified Secured Cash Management Agreement Reserve at such time (as such amount is reduced by the aggregate amount of payments in respect of Qualified Secured Cash Management Services Obligations pursuant to Section 11.02); provided further that if the aggregate amount of Qualified Secured Cash Management Services Obligations (determined without giving effect to the immediately preceding proviso) at any time exceeds the aggregate amount of the Qualified Secured Cash Management Agreement Reserve at such time (as such amount is reduced by the aggregate amount of payments in respect of the Qualified Secured Cash Management Services Obligations pursuant to Section 11.02), then such excess amount shall constitute other Cash Management Services Obligations (and, accordingly, Tertiary Obligations) hereunder.

"Qualified Secured Hedging Agreement Reserve" shall mean the Canadian Qualified Secured Hedging Agreement Reserves and the U.S. Qualified Secured Hedging Agreement Reserves.

"Qualified Secured Hedging Agreements" shall have the meaning provided in Section 13.21.

"Qualified Secured Hedging Obligations" shall mean Hedging Obligations under each Secured Hedging Agreement that is a Qualified Secured Hedging Agreement; provided that, at any time, the aggregate amount of the Qualified Secured Hedging Obligations shall not exceed $100,000,000 (as such amount is reduced by the aggregate amount of payments in respect of Qualified Secured Hedging Obligations pursuant to Section 11.02); provided further that if the aggregate amount of the Qualified Secured Hedging Obligations (determined without giving effect to the immediately preceding proviso) at any time exceeds $100,000,000 (as such amount is reduced by the aggregate amount of payments in respect of Qualified Secured Hedging Obligations pursuant to Section 11.02), then such excess amount (divided pro rata among such Hedging Obligations) shall constitute other Hedging Obligations (and, accordingly, Tertiary Obligations) hereunder.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December occurring after the Funding Date.

"Quebec Secured Obligations" shall have the meaning provided in Section 12.12.

"Quebec Security Documents" shall mean each hypothecation, bond and other security document executed and delivered by the Canadian Loan Parties, in form and substance

reasonably acceptable to the Administrative Agent, as may be necessary for the purpose of creating and preserving in the Province of Quebec the Liens on ABL Priority Collateral located in Quebec.

"Real Properties" shall mean each parcel of real property identified on Schedule 8.19, together with all fixtures thereon, and each other parcel of real property acquired and owned by Holdings or any Domestic Subsidiary of Holdings after the Closing Date, together with all fixtures thereon.

"Reference Discount Rate" shall mean, in respect of any Bankers' Acceptances or completed Drafts to be purchased by a Lender pursuant to Section 2.01(a) and Schedule 1.01(b), (i) by a Schedule I chartered bank, the arithmetic average of the discount rates (calculated on an annual basis and rounded to the nearest one-hundredth of 1%, with five-thousandths of 1% being rounded up) for the appropriate term as quoted on Reuters Screen CDOR Page (or such other page as may be selected by DB Canada as a replacement page for such Bankers' Acceptances if such screen is not available) at 10:00 A.M. (Toronto time); and (ii) by any other Lender, the lesser of (A) the rate specified in (i) plus 0.10% and (B) the discount rate (calculated on an annual basis and rounded to the nearest one-hundredth of 1%, with five-thousandths of 1% being rounded up) quoted by DB Canada at 10:00 A.M. (Toronto time) as the discount rate at which DB Canada would purchase, on the relevant Drawing Date, its own bankers' acceptances or Drafts having an aggregate Face Amount equal to, and with a term to maturity the same as, the Bankers' Acceptances or Drafts, as the case may be, to be acquired by such Lender on such Drawing Date.

"Register" shall have the meaning provided in Section 13.15.

"Registered Equivalent Notes" shall mean, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees, if any) issued in a dollar for dollar exchange therefor pursuant to an exchange offer registered with the Securities and Exchange Commission.

"Regulation H" shall mean Regulation H of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Release" shall mean any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within any building, structure, facility or fixture.

"Rent Reserve" shall mean with respect to any facility, warehouse, distribution center or depot where any Inventory subject to Liens arising by operation of law is located and with respect to which no Collateral Access Agreement is in effect, a reserve equal to (a) in the case of any leased location, three (3) months' (or such longer period as the Co-Collateral Agents determine in their Permitted Discretion as it will take to liquidate ABL Priority Collateral at such location) gross rent at such facility, warehouse, distribution center or depot, and (b) in the case of any other such location, an amount determined by the Co-Collateral Agents in their Permitted Discretion in respect of the liabilities owed to the applicable bailee or warehouseman.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Required Lenders" shall mean, at any time, Non-Defaulting Lenders the sum of whose Commitments (or, after the termination of all Commitments, outstanding Individual Exposures) at such time represents at least a majority of the Total Commitment in effect at such time less the Commitments of all Defaulting Lenders (or, after the termination of all Commitments, the sum of then total outstanding Individual Exposures of all Non-Defaulting Lenders, at such time).

"Reserves" shall mean Dilution Reserves, Inventory Reserves, Rent Reserves and any other reserves established by the Co-Collateral Agents in their Permitted Discretion, in all cases without duplication and reserving for such items that have not already been taken into account in the calculation of the applicable Borrowing Base (including through the categories of ineligible items set forth in the definitions of "Eligible Accounts" and "Eligible Inventory") (including, without limitation, reserves for accrued and unpaid interest on the Secured Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, un-indemnified or under-indemnified liabilities or potential liabilities with respect to any litigation, reserves for freight costs related to Eligible Inventory in transit, and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party (other than any Qualified Secured Cash Management Agreement Reserve and any Qualified Secured Hedging Agreement Reserve).

"Responsible Officer" of any Person shall mean the chief executive officer, chief operating officer, president, any Financial Officer or any vice president of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" shall mean (a) any dividend or other distribution, direct or indirect, on account of any Equity Interests of Holdings or any of its Subsidiaries, now or hereafter outstanding, except (i) any dividend payable solely in shares or other Equity Interests of such class of Equity Interests to the holders of such Equity Interests, (ii) any dividend or distribution made by any Subsidiary of Holdings ratably to the holders of the capital stock of such Subsidiary and (iii) any dividend or distribution made or paid to Holdings or any Subsidiary of Holdings, and (b) any redemption, retirement, sinking fund or similar payment, purchase, exchange or other acquisition for value, direct or indirect, of any Equity Interests of Holdings or any of its Subsidiaries, now or hereafter outstanding, except for any such redemption, retirement,

sinking fund or similar payment, purchase, exchange or other acquisition for value (i) payable only to a Loan Party or payable from a Foreign Subsidiary of Holdings to another Foreign Subsidiary of Holdings or (ii) of any minority Equity Interests of a Subsidiary of Holdings that is not wholly owned which are held by Persons that are not Affiliates of Holdings.

"Returns" shall have the meaning provided in Section 8.12.

"Revolver Facilities" shall have the meaning provided in Section 16.01(f).

"Revolving Credit Obligations" shall, prior to the Funding Date, have the meaning assigned to such term in the form of Intercreditor Agreement attached as Exhibit F hereto, and after the Funding Date, have the meaning assigned to such term in the Intercreditor Agreement.

"Revolving Loan" shall have the meaning provided in Section 2.01(a).

"Revolving Loan Maturity Date" shall mean (a) with respect to any Loans, Initial U.S. Facility Commitments or Initial Canadian Facility Commitments (or any portions thereof) that have not been extended pursuant to Section 2.19, the Initial Revolving Loan Maturity Date and (b) with respect to any Extended Loans, Extended U.S. Facility Commitment or Extended Canadian Facility Commitment, the Extended Revolving Loan Maturity Date.

"Revolving Note" shall have the meaning provided in Section 2.05(a).

"RL Percentage" of any Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the Commitments of such Lender at such time and the denominator of which is the Total Commitment at such time, provided that if the RL Percentage of any Lender is to be determined after the Total Commitment has been terminated, then the RL Percentages of such Lender shall mean a fraction (expressed as a percentage) the numerator of which is such Lender's Individual Exposure at such time and the denominator of which is the Aggregate Exposure at such time, provided that in the case of Section 2.18 when a Defaulting Lender shall exist, "RL Percentage" shall mean the percentage of the total Commitments (disregarding any Defaulting Lender's Commitment) represented by such Lender's Commitment.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"Sale/Leaseback Transaction" shall mean an arrangement, direct or indirect, whereby Holdings or any of its Subsidiaries shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

"Secondary Obligations" shall have the meaning specified in Section 11.02(a).

"Secondary U.S. Loan Party Obligations" shall have the meaning specified in Section 11.02(a).

"<u>Section 5.04(b)(ii) Certificate</u>" shall have the meaning provided in <u>Section 5.04(b)(ii)</u>.

"<u>Secured Cash Management Agreements</u>" shall mean each Cash Management Agreement entered into by a Loan Party with any Lender, any Term Loan Lender or any affiliate thereof (even if (i) in the case of a Lender, the respective Lender subsequently ceases to be a Lender under this Agreement for any reason and (ii) in the case of a Term Loan Lender, the respective Term Loan Lender subsequently ceases to be a Term Loan Lender under the Term Loan Facility for any reason) the obligations of which have been designated pursuant to <u>Section 13.21</u> as being treated as "Cash Management Services Obligations" so long as such Lender, such Term Loan Lender or such affiliate participates in such Secured Cash Management Agreement.

"<u>Secured Hedging Agreements</u>" shall mean each Hedging Agreement entered into by a Loan Party with any Lender, any Term Loan Lender or any affiliate thereof (even if (i) in the case of a Lender, the respective Lender subsequently ceases to be a Lender under this Agreement for any reason and (ii) in the case of a Term Loan Lender, the respective Term Loan Lender subsequently ceases to be a Term Loan Lender under the Term Loan Facility for any reason) the obligations of which have been designated pursuant to <u>Section 13.21</u> as being treated as "Hedging Obligations" so long as such Lender, such Term Loan Lender or such affiliate participates in such Hedging Agreement.

"<u>Secured Obligations</u>" shall mean the Canadian Secured Obligations or the U.S. Secured Obligations, as the context requires.

"<u>Secured Parties</u>" shall mean, collectively, (i) the Lender Creditors, (ii) the Hedging Creditors, (iii) the Cash Management Creditors, (iv) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (v) the successors and assigns of each of the foregoing.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Security Agent</u>" shall mean Deutsche Bank AG New York Branch in its capacity as security agent for the Secured Parties pursuant to the Security Documents, and shall include any successor to the Security Agent as provided in <u>Section 12.09</u>.

"<u>Security Documents</u>" shall mean the Mortgages, the Guarantee and Collateral Agreement, the Canadian Security Documents, the IP Security Agreements and each of the security agreements and other instruments and documents executed and delivered pursuant to <u>Section 9.09</u> or the Letter of Credit Back-Stop Arrangements; provided, that any cash collateral or other agreements entered into pursuant to the Letter of Credit Back-Stop Arrangements shall constitute "Security Documents" solely for purposes of (x) <u>Sections 8.02</u> and (y) the term "Loan Documents" as used in <u>Sections 10.01(a)</u>, <u>10.02(a)(ii)</u>, <u>10.12</u> and <u>13.01</u>.

"<u>Senior Managing Agents</u>" shall mean The Bank of Nova Scotia and Regions Bank, in their capacities as Senior Managing Agents in respect of the credit facilities hereunder, and any successors thereto.

-62-

"Senior Representative" shall mean, with respect to any series of Permitted Second Lien Notes, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Settlement Date" shall have the meaning provided in Section 2.04(b)(i).

"Significant Asset Sale" shall mean each Asset Sale (without giving effect to clauses (ii) and (iii) of the provisio of such definition) which includes ABL Priority Collateral with a value in excess of $35,000,000.

"Smurfit-Stone Puerto Rico" shall mean Smurfit-Stone Puerto Rico, Inc., a Delaware corporation that is qualified to do business in the Commonwealth of Puerto Rico. For purposes of this Agreement, Smurfit-Stone Puerto Rico shall be deemed to be a Foreign Subsidiary.

"Specified Foreign Currency Funding Capacity" at any date of determination, for any Lender, shall mean the ability of such Lender to fund Revolving Loans denominated in Canadian Dollars, as set forth in the records of the Administrative Agent pursuant to the receipt by the Administrative Agent of a notification in writing by such Lender to the Administrative Agent within three (3) Business Days prior to such Lender becoming a Lender hereunder.

"Specified Foreign Currency Loan" shall have the meaning provided in Section 15.01.

"Specified Foreign Currency Participation" shall have the meaning provided in Section 15.01.

"Specified Foreign Currency Participation Fee" shall have the meaning provided in Section 15.06.

"Specified Foreign Currency Participation Settlement" shall have the meaning provided in Section 15.02(a).

"Specified Foreign Currency Participation Settlement Amount" shall have the meaning provided in Section 15.02(b).

"Specified Foreign Currency Participation Settlement Date" shall have the meaning provided in Section 15.02(a).

"Specified Foreign Currency Participation Settlement Period" shall have the meaning provided in Section 15.02(a).

"SSC Canada" shall mean Smurfit-Stone Container Canada Inc., a corporation continued under the Companies Act (Nova Scotia) (or the newly organized Subsidiary or Subsidiaries that acquire the assets of Smurfit-Stone Container Canada Inc. pursuant to the Plan of Reorganization).

"<u>SSCC</u>" shall have the meaning provided in the preamble of this Agreement. Each reference herein to SSCC shall, on and after the Funding Date and the Funding Date Merger, be deemed a reference to Holdings as the corporation surviving the Funding Date Merger.

"<u>SSCE</u>" shall have the meaning provided in the preamble of this Agreement.

"<u>Start Date</u>" shall mean (a) for purposes of the definition of Applicable Commitment Fee Percentage, the first day of each fiscal quarter of Holdings (commencing with the first fiscal quarter of Holdings ending after the Funding Date) and (b) for purposes of the definition of Applicable Margin, (i) the date that occurs 91 days following the Funding Date and (ii) thereafter, the first day of each fiscal month of Holdings immediately after the receipt by the Administrative Agent of a Borrowing Base Certificate with respect to the last month of a fiscal quarter of Holdings (commencing with the first full fiscal quarter of Holdings ending after the Funding Date) pursuant to <u>Section 9.04(i)</u>.

"<u>Stated Amount</u>" of each Letter of Credit shall mean, at any time, the maximum amount available to be drawn thereunder (in each case determined without regard to whether any conditions to drawing could then be met); <u>provided</u> that the "Stated Amount" of each Letter of Credit denominated in Canadian Dollars shall be, on any date of calculation, the U.S. Dollar Equivalent of the maximum amount available to be drawn in the respective currency thereunder (determined without regard to whether any conditions to drawing could then be met).

"<u>Subsidiary</u>" shall mean, with respect to any Person, any corporation, partnership, association or other business entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership or membership interests are, at the time any determination is being made, owned, controlled or held by, or otherwise Controlled by, such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Holdings.

"<u>Subsidiary Guarantor</u>" shall mean each U.S. Subsidiary Guarantor and each Canadian Subsidiary Guarantor.

"<u>Supermajority Lenders</u>" shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement, if the reference to "a majority" contained therein were changed to "80.0%".

"<u>Swingline Expiry Date</u>" shall mean that date which is five Business Days prior to the Revolving Loan Maturity Date.

"<u>Swingline Exposure</u>" shall mean the sum of (i) the U.S. Facility Swingline Exposure <u>plus</u> (ii) the Canadian Facility Swingline Exposure.

"<u>Swingline Lender</u>" shall mean the Administrative Agent, in its capacity as Swingline Lender hereunder; <u>provided</u> that, if the Extension is effected in accordance with <u>Section 2.19,</u> then on the occurrence of the Initial Revolving Maturity Date, the Swingline Lender

at such time shall have the right to resign as Swingline Lender on, or on any date within twenty (20) Business Days after, the Initial Revolving Maturity Date, upon not less than ten (10) days' prior written notice thereof to Holdings and the Administrative Agent and, in the event of any such resignation and upon the effectiveness thereof, the applicable Borrowers shall repay any outstanding Swingline Loans made by the respective entity so resigning and such entity shall not be required to make any further Swingline Loans hereunder. If at any time and for any reason (including as a result of resignations as contemplated by the proviso to the preceding sentence), the Swingline Lender has resigned in such capacity in accordance with the preceding sentence, then no Person shall be the Swingline Lender hereunder obligated to make Swingline Loans unless and until (and only for so long as) a Lender (or Affiliate of a Lender) reasonably satisfactory to the Administrative Agent or Holdings agrees to act as the Swingline Lender hereunder.

"Swingline Loan" shall have the meaning provided in Section 2.01(b).

"Swingline Note" shall have the meaning provided in Section 2.05(a).

"Syndication Agent" shall mean J.P. Morgan Securities Inc., in its capacity as Syndication Agent in respect of the credit facilities hereunder, and any successors thereto.

"Tax Benefit" shall have the meaning provided in Section 5.04(d).

"Taxes" shall have the meaning provided in Section 5.04(a).

"Term Loan Agent" shall mean JPMorgan Chase Bank, N.A., as administrative agent under the Term Loan Facility, or any successor or replacement administrative agent.

"Term Loan Credit Agreement" shall mean the Credit Agreement, dated as of February 22, 2010, among SSCC, SSCE, the lenders party thereto and JPMorgan Chase Bank, N.A., as the administrative agent, or any successor administrative agent appointed thereunder, in an initial aggregate principal amount of up to $1,200,000,000, as the same may be increased pursuant to incremental commitments thereunder in compliance with Section 10.01(f).

"Term Loan Credit Obligations" shall prior to the Funding Date, have the meaning assigned to such term in the form of Intercreditor Agreement attached as Exhibit F hereto, and after the Funding Date, have the meaning assigned to such term in the Intercreditor Agreement.

"Term Loan Facility" shall mean (a) the Term Loan Credit Agreement or (b) any credit facility constituting Permitted Refinancing Indebtedness of the facility in clause (a), including any subsequent incremental financing thereunder in compliance with Section 10.01(f).

"Term Loan Facility Documents" shall mean all agreements and other documents evidencing or governing the Term Loan Facility or any Permitted Refinancing Indebtedness of the Term Loan Facility (other than, for the avoidance of doubt, this Agreement or the Intercreditor Agreement) or providing for any guarantee, security interests or other right in respect thereof.

"Term Loan Lender" shall mean, at any time, each "Lender" under (and as defined in) the Term Loan Facility.

"Term Loans" shall mean, at any time, each "Loan" under (and as defined in) the Term Loan Facility.

"Term Priority Collateral" shall, prior to the Funding Date, have the meaning assigned to the term "Non-ABL Collateral" in the form of Intercreditor Agreement attached as Exhibit E hereto, and after the Funding Date, have the meaning assigned to the term "Non-ABL Collateral" in the Intercreditor Agreement.

"Term Sweep Account" shall, prior to the Funding Date, have the meaning assigned to the term "Non-ABL Sweep Account" in the form of Intercreditor Agreement attached as Exhibit E hereto, and after the Funding Date, have the meaning assigned to the term "Non-ABL Sweep Collateral Account" in the Intercreditor Agreement.

"Tertiary Obligations" shall have the meaning specified in Section 11.02(a).

"Test Period" shall mean, on any date of determination, (i) other than during a Compliance Period, the period of four consecutive fiscal quarters of Holdings then last ended and (ii) during a Compliance Period, each period of 12 consecutive fiscal months of Holdings then last ended, in each case taken as one accounting period.

"Total Borrowing Base" shall mean, as of any date of determination, the sum of the Canadian Borrowing Base and the U.S. Borrowing Base, in each case, at such date.

"Total Canadian Facility Commitment" shall mean, at any time, the sum of the Canadian Facility Commitments of each of the Lenders at such time.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total Unutilized Canadian Facility Commitment" shall mean, at any time, an amount equal to (a) the Total Canadian Facility Commitment in effect at such time minus (b) the Aggregate Canadian Facility Exposure at such time.

"Total Unutilized Commitment" shall mean, at any time, an amount equal to (a) the Total Commitment in effect at such time minus (b) the Aggregate Exposure at such time.

"Total Unutilized U.S. Facility Commitment" shall mean, at any time, an amount equal to (a) the Total U.S. Facility Commitment in effect at such time minus (b) the Aggregate U.S. Facility Exposure at such time.

"Total U.S. Facility Commitment" shall mean, at any time, the sum of the U.S. Facility Commitments of each of the Lenders at such time.

"Tranche" shall mean the respective facility and commitments utilized in making Loans hereunder, (a) with there initially being four separate Tranches, i.e., U.S. Facility

Revolving Loans, U.S. Facility Swingline Loans, Canadian Facility Revolving Loans and Canadian Facility Swingline Loans (collectively, the "Initial Tranches" and, each an "Initial Tranche") and (b) after giving effect to the Extension pursuant to Section 2.19, any group of Extended Loans pursuant to Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as the case may be, extended, directly or indirectly, from the same Initial Tranche and having the same Revolving Loan Maturity Date, interest rate and fees; provided that for purposes of Sections 2.13, 13.04(b), 13.12(a) and (b) and the definition of "Majority Lenders", (i) U.S. Facility Revolving Loans and U.S. Facility Swingline Loans shall be deemed to constitute part of a single "Tranche" and (ii) Canadian Facility Revolving Loans and Canadian Facility Swingline Loans shall be deemed to constitute part of a single "Tranche".

"Transactions" shall have the meaning provided in Section 8.02.

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan, a Eurodollar Loan, a Canadian Prime Rate Loan or a Bankers' Acceptance Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"United States" and "U.S." shall each mean the United States of America.

"Unpaid Drawing" shall have the meaning provided in Section 3.05(a).

"Unutilized Commitment" shall mean, with respect to any Lender at any time, the sum of (i) to the extent such Lender is a U.S. Facility Lender, such Lender's U.S. Facility Commitment at such time minus the sum of (a) the aggregate outstanding principal amount of all U.S. Facility Revolving Loans (taking the U.S. Dollar Equivalent of any such U.S. Facility Revolving Loans denominated in a currency other than U.S. Dollars) made by such Lender at such time plus (b) such Lender's U.S. Facility RL Percentage of the U.S. Facility Letter of Credit Outstandings at such time (taking the U.S. Dollar Equivalent of any U.S. Facility Letter of Credit denominated in a currency other than U.S. Dollars), and (ii) to the extent such Lender is a Canadian Facility Lender, such Lender's Canadian Facility Commitment at such time minus the sum of (a) the aggregate outstanding principal amount of all Canadian Facility Revolving Loans (taking the U.S. Dollar Equivalent of any such Canadian Facility Revolving Loans denominated in a currency other than U.S. Dollars) made by such Lender at such time plus (b) such Lender's Canadian Facility RL Percentage of the Canadian Facility Letter of Credit Outstandings at such time (taking the U.S. Dollar Equivalent of any Canadian Facility Letter of Credit denominated in a currency other than U.S. Dollars).

"U.S. Bankruptcy Court" shall have the meaning provided in the recitals to this Agreement.

"U.S. Borrower" and "U.S. Borrowers" shall have the meaning provided in the preamble of this Agreement.

"U.S. Borrower Canadian Facility Revolving Loan" shall have the meaning provided in Section 2.01(a).

"<u>U.S. Borrower Canadian Facility Revolving Note</u>" shall have the meaning provided in <u>Section 2.05(a)</u>.

"<u>U.S. Borrower Canadian Facility Swingline Loan</u>" shall have the meaning provided in <u>Section 2.01(b)</u>.

"<u>U.S. Borrower Canadian Facility Swingline Note</u>" shall have the meaning provided in <u>Section 2.05(a)</u>.

"<u>U.S. Borrower Loans</u>" shall mean each U.S. Borrower Revolving Loan and each U.S. Borrower Swingline Loan.

"<u>U.S. Borrower Obligations</u>" shall mean all Obligations owing to the Administrative Agent, the Security Agent, any Co-Collateral Agent, any Issuing Lender or any Lender by any U.S. Borrower.

"<u>U.S. Borrower Revolving Loan</u>" shall mean each Revolving Loan borrowed by a U.S. Borrower.

"<u>U.S. Borrower Swingline Loan</u>" shall mean each Swingline Loan borrowed by a U.S. Borrower.

"<u>U.S. Borrowing Base</u>" shall mean, at the time of any determination, an amount equal to the sum of the U.S. Dollar amount (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), without duplication, of (a) 85% of Eligible U.S. Accounts at such time plus (b) the lesser of (i) 65% of Eligible U.S. Inventory at such time and (ii) 85% of the Net Orderly Liquidation Value of Eligible U.S. Inventory at such time (in each case with respect to clauses (i) and (ii) with any Eligible U.S. Inventory to be valued at the lower of cost (determined on a first-in, first-out basis in accordance with GAAP) or market value thereof (net of any intercompany profit)), <u>minus</u> (c) the sum (without duplication) of (i) the U.S. Qualified Secured Hedging Agreement Reserve, (ii) the U.S. Qualified Secured Cash Management Agreement Reserve and (iii) the amount of the Reserves, in such amounts and with respect to such matters, as the Co-Collateral Agents in their Permitted Discretion may establish from time to time with respect to the U.S. Borrowing Base. The U.S. Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to <u>Section 5.04(i)</u> of this Agreement. The Co-Collateral Agents shall have the right (but no obligation) to review such computations and if, in their Permitted Discretion, such computations have not been calculated in accordance with the terms of this Agreement, the Co-Collateral Agents shall have the right, to correct any such errors in such manner as they shall determine in their Permitted Discretion and the Co-Collateral Agents will notify Holdings promptly after making any such correction.

"<u>U.S. Collection Account</u>" shall mean each account established at a U.S. Collection Bank subject to a Control Agreement into which funds shall be transferred as provided in <u>Section 5.03(b)</u>.

"<u>U.S. Collection Banks</u>" shall have the meaning provided in <u>Section 5.03(b)</u>.

"U.S. Debtor Entities" shall have the meaning provided in the recitals to this Agreement.

"U.S. Dilution Reserve" shall mean, at any date, (i) the amount by which the Dilution Ratio of U.S. Eligible Accounts exceeds five percent (5%) multiplied by (ii) the Eligible U.S. Accounts on such date.

"U.S. Dollar Denominated Loans" shall mean each Loan denominated in U.S. Dollars at the time of the incurrence thereof.

"U.S. Dollar Denominated Revolving Loans" shall mean each Revolving Loan denominated in U.S. Dollars at the time of the incurrence thereof.

"U.S. Dollar Denominated Swingline Loans" shall mean each Swingline Loan denominated in U.S. Dollars at the time of the incurrence thereof.

"U.S. Dollar Equivalent" of an amount denominated in a currency other than U.S. Dollars shall mean, at any time for the determination thereof, the amount of U.S. Dollars which could be purchased with the amount of such currency involved in such computation at the spot exchange rate therefor as quoted by the Administrative Agent as of 11:00 A.M. (New York time) on the date two Business Days prior to the date of any determination thereof, for purchase on such date (or on the date of the respective unreimbursed payment under a Letter of Credit denominated in a currency other than U.S. Dollars as provided in Sections 3.04(c) and 3.05(a), as the case may be); provided that for purposes of (x) determining compliance with Sections 2.01(c), 2.01(d), 3.02, 5.02(a), 7.01 and 7.03 and (y) calculating Fees pursuant to Section 4.01 (except Fees which are expressly required to be paid in a currency other than U.S. Dollars pursuant to Section 4.01), the U.S. Dollar Equivalent of any amounts denominated in a currency other than U.S. Dollars shall be revalued on each Credit Event or loan repricing date using the spot exchange rates therefor as quoted on Bloomberg (or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) on the immediately preceding Business Day, provided, however, that at any time, if the Aggregate Exposure (for the purposes of the determination thereof, using the U.S. Dollar Equivalent as recalculated based on the spot exchange rate therefor as quoted on Bloomberg (or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) on the respective date of determination pursuant to this exception) would exceed 85% of the Total Commitment or the Total Borrowing Base, then in the sole discretion of the Administrative Agent or at the request of the Required Lenders, the U.S. Dollar Equivalent shall be reset based upon the spot exchange rates on such date as quoted on Bloomberg (or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent), which rates shall remain in effect until the date of a Credit Event or loan repricing or such earlier date, if any, as the rate is reset pursuant to this proviso. Notwithstanding anything to the contrary contained in this definition, at any time that a Default or an Event of Default then exists, the Administrative Agent may revalue the U.S. Dollar Equivalent of any amounts outstanding under the Loan Documents in a currency other than U.S. Dollars on any date in its sole discretion in accordance with the foregoing methodology.

"U.S. Dollars" or "$" shall mean lawful currency of the United States.

"U.S. Facility Bankers' Acceptance" shall mean a U.S. Facility Draft drawn by a U.S. Borrower and accepted by a U.S. Facility Lender pursuant to Section 2.01(a) and Schedule 1.01(b).

"U.S. Facility Bankers' Acceptance Loans" shall mean (i) the creation of U.S. Facility Bankers' Acceptances or (ii) the creation and purchase of completed U.S. Facility Drafts and, if requested by a Non-B/A Lender, the exchange of such U.S. Facility Drafts for B/A Equivalent Notes, in each case as contemplated in Section 2.01(a) and Schedule 1.01(b).

"U.S. Facility Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 1.01(a) directly below the column entitled "U.S. Facility Revolving Commitment", as same may be (x) reduced from time to time or terminated pursuant to Sections 4.02, 4.03 and/or 11, as applicable, (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 2.13 or 13.04(b), or (z) increased from time to time pursuant to Section 2.14.  In addition, the U.S. Facility Commitment of each Lender shall include each of its Initial U.S. Facility Commitment, and, subject to the consent of such Lender, any Extended U.S. Facility Commitment of such Lender.  As of the Closing Date, the aggregate amount of U.S. Facility Commitments of the U.S. Facility Lenders is U.S. $550,000,000.

"U.S. Facility Draft" shall mean, at any time, either a depository bill within the meaning of the Depository Bills and Notes Act (Canada) as amended, or a bill of exchange, within the meaning of the Bills of Exchange Act (Canada) as amended, drawn by a U.S. Borrower in Canadian Dollars on a U.S. Facility Lender and bearing such distinguishing letters and numbers as such U.S. Facility Lender may determine, but which at such time has not been completed or accepted by such U.S. Facility Lender.

"U.S. Facility Lenders" shall mean the Lenders having U.S. Facility Commitments (or, after the termination of all U.S. Facility Commitments, outstanding Individual U.S. Facility Exposure).

"U.S. Facility Letter of Credit" shall have the meaning provided in Section 3.01(a).

"U.S. Facility Letter of Credit Exposure" shall mean, at any time, the aggregate amount of all U.S. Facility Letter of Credit Outstandings at such time in respect of U.S. Facility Letters of Credit issued for the account of any U.S. Borrower. The U.S. Facility Letter of Credit Exposure of any Lender at any time shall be its U.S. Facility RL Percentage of the total U.S. Facility Letter of Credit Exposure at such time.

"U.S. Facility Letter of Credit Outstandings" shall mean, at any time, the sum of (a) the Stated Amount of all outstanding U.S. Facility Letters of Credit at such time and (b) the aggregate amount of all Unpaid Drawings in respect of all U.S. Facility Letters of Credit at such time.

"<u>U.S. Facility Obligations</u>" shall mean all Loan Document Obligations owing to any Lender Creditor to repay principal of, interest on, and all other amounts with respect to, all U.S. Facility Revolving Loans, U.S. Facility Swingline Loans, U.S. Facility Letters of Credit, and all other Loan Document Obligations (including, without limitation, all fees, indemnities, taxes and other obligations) pursuant to this Agreement and each other Loan Document in connection with the U.S. Facility Commitments.

"<u>U.S. Facility Revolving Loan</u>" shall have the meaning provided in Section 2.01(a).

"<u>U.S. Facility Revolving Note</u>" shall have the meaning provided in Section 2.05(a).

"<u>U.S. Facility RL Percentage</u>" of any U.S. Facility Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the U.S. Facility Commitment of such Lender at such time and the denominator of which is the Total U.S. Facility Commitment at such time, provided that if the U.S. Facility RL Percentage of any U.S. Facility Lender is to be determined after the Total U.S. Facility Commitment has been terminated, then the U.S. Facility RL Percentages of such U.S. Facility Lender shall mean a fraction (expressed as a percentage) the numerator of which is such U.S. Facility Lender's Individual U.S. Facility Exposure at such time and the denominator of which is the Aggregate U.S. Facility Exposure at such time, <u>provided</u> that in the case of <u>Section 2.18</u> when a Defaulting Lender shall exist, "U.S. Facility RL Percentage" shall mean the percentage of the Total U.S. Facility Commitments (disregarding any Defaulting Lender's U.S. Facility Commitment) represented by such Lender's U.S. Facility Commitment.

"<u>U.S. Facility Swingline Exposure</u>" shall mean, at any time, the aggregate principal amount of all U.S. Facility Swingline Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars) outstanding at such time. The U.S. Facility Swingline Exposure of any Lender at any time shall be its U.S. Facility RL Percentage of the total U.S. Facility Swingline Exposure at such time.

"<u>U.S. Facility Swingline Loan</u>" shall have the meaning provided in Section 2.01(b).

"<u>U.S. Facility Swingline Note</u>" shall have the meaning provided in Section 2.05(a).

"<u>U.S. Guarantors</u>" shall mean and include each U.S. Borrower (in its capacity as a guarantor under the Guarantee and Collateral Agreement) and each U.S. Subsidiary Guarantor.

"<u>U.S. Loan Parties</u>" shall mean Holdings, each other U.S. Borrower and each U.S. Guarantor.

"<u>U.S. Loan Party Obligations</u>" shall mean (i) all U.S. Borrower Obligations, (ii) all Hedging Obligations owing to Hedging Creditors by any U.S. Loan Party, (iii) all Cash Management Services Obligations owing to Cash Management Creditors by any U.S. Loan Party, and (iv) any guarantees of the obligations described in clause (i), (ii) or (iii) hereof by the

U.S. Loan Parties pursuant to the Guarantee and Collateral Agreement or pursuant to any other Loan Document.

"U.S. Perfection Certificate" shall mean the U.S. Perfection Certificate in the form thereof included in Exhibit D-1 or any other form approved by the Administrative Agent, as the same may be supplemented from time to time pursuant to Section 9.10(c) or otherwise.

"U.S. Proceedings" shall have the meaning provided in the recitals to this Agreement.

"U.S. Qualified Secured Cash Management Agreement Reserve" shall mean a reserve established by the Co-Collateral Agents from time to time in respect of the U.S. Qualified Secured Cash Management Agreements, which reserve shall be in an amount equal to the aggregate amount of all reserves agreed upon from time to time by the applicable Cash Management Creditor, Holdings and notified to, and so long as Excess Availability (after giving effect to such reserve) is less than 35% of the Total Commitment then in effect at the time any such reserve is created or increased shall be agreed upon by, the Co-Collateral Agents in writing with respect to such U.S. Qualified Secured Cash Management Agreements in accordance with Section 13.21 (it being understood and agreed that a reserve with respect to a U.S. Qualified Secured Cash Management Agreement (i) may be only be decreased with the consent of the Cash Management Creditor party to such U.S. Qualified Secured Cash Management Agreement and (ii) may be only be created or increased with the consent of Holdings and, so long as Excess Availability (after giving effect to such reserve) is less than 35% of the Total Commitment then in effect at the time any such reserve is created or increased, the Co-Collateral Agents (in each case in clauses (i) and (ii) following written notice to the Co-Collateral Agents)).

"U.S. Qualified Secured Cash Management Agreements" shall mean each Qualified Secured Cash Management Agreement between a Cash Management Creditor (as determined at the time such Secured Cash Management Agreement is designated as a Qualified Secured Cash Management Agreement without regard to whether such Person is currently a Lender or an affiliate thereof) and any Loan Party.

"U.S. Qualified Secured Hedging Agreement" shall mean any Qualified Secured Hedging Agreement between a Hedging Creditor (as determined at the time such Hedging Agreement is designated as a Qualified Secured Hedging Agreement without regard to whether such Person is currently a Hedging Creditor) and any Loan Party.

"U.S. Qualified Secured Hedging Agreement Reserve" shall mean a reserve established by the Co-Collateral Agents from time to time in respect of the U.S. Qualified Secured Hedging Agreements, which reserve shall be in the amount of the aggregate U.S. Dollar Equivalent marked to market exposure thereunder as calculated from time to time by the Hedging Creditor party to such U.S. Qualified Secured Hedging Agreement (which calculation may be disputed by Holdings) in accordance with GAAP (based on the valuation methodology agreed between Holdings and the Hedging Creditor party to such U.S. Qualified Secured Hedging Agreements) and notified to the Co-Collateral Agents at the time such Secured Hedging Agreement is designated as a Qualified Secured Hedging Agreement and from time to time thereafter, in each case, in accordance with Section 13.21 (it being understood and agreed that

such reserve may be increased or reduced by the Co-Collateral Agents in their Permitted Discretion). The determination as to whether any such reserve shall be established with respect to any such U.S. Qualified Secured Hedging Agreement shall be subject to the agreement between Holdings and the applicable Hedging Creditor party to such agreement (as modified by the Co-Collateral Agents in their Permitted Discretion), but the absence of any such reserve shall not impact the designation thereof as a U.S. Qualified Secured Hedging Agreement.

"U.S. Secured Obligations" shall mean and include (a) all Loan Document Obligations owing by any Loan Party, (b) all Hedging Obligations owing by any Loan Party, (c) all Cash Management Services Obligations owing by any Loan Party, and (d) all amounts paid (or incurred) by any Indemnified Party as to which such Indemnified Party has the right to reimbursement under Section 13.01 or any indemnity contained in any Security Document; it being acknowledged and agreed that the "U.S. Secured Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or any Security Document or extended from time to time after the date of this Agreement or any Security Document.

"U.S. Subsidiary Guarantors" shall mean (a) each Domestic Subsidiary of Holdings that is a Material Subsidiary (other than any U.S. Borrowers), whether existing on the Closing Date or established, created or acquired after the Closing Date, and (b) each Subsidiary of Holdings (other than any U.S. Borrowers), which guarantees obligations under the Term Loan Facility Documents, whether existing on the Closing Date or established, created or acquired after the Closing Date, in each case unless and until such time as the respective Domestic Subsidiary is released from all of its obligations under the Security Documents to which it is a party in accordance with the terms and provisions thereof.

"Weekly Borrowing Base Period" shall mean any period (i) during the occurrence and continuance of an Event of Default or (ii) (x) commencing on the date on which the Excess Availability is less than the greater of (A) $110,000,000 and (B) 20% of the Total Commitment as then in effect and (y) ending on the first date thereafter on which the Excess Availability has been equal to or greater than the greater of (A) $110,000,000 and (B) 20% of the Total Commitment as then in effect for 45 consecutive days.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Canadian Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Canadian Subsidiary of such Person.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary of such Person.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, unlimited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of Holdings with respect to the preceding clauses (i) and (ii), directors' qualifying shares and/or other nominal amounts of shares required to be held by Persons other than Holdings and its Subsidiaries under applicable law).

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.02. References to "UCC". Where the context so requires, (i) any term defined herein by reference to the "UCC" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the Personal Property Security Act of each province or territory of Canada, the Securities Transfer Act of each province of Canada, the Civil Code of Quebec, the Bills of Exchange Act (Canada) and the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Administrative Agent, and (ii) all references herein to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws.

1.03. Terms Generally. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context shall otherwise require, all references herein to Sections, Exhibits and Schedules shall be deemed to be references to Sections of, and Exhibits and Schedules to, this Agreement , and the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof. Other than as specifically set forth in this Agreement, each reference to any Loan Document or any other document or agreement shall be deemed to be a reference to such Loan Document, document or agreement as amended, restated (including any amendment and restatement thereof), waived, supplemented, modified, extended or renewed from time to time in accordance with the provisions hereof and thereof.

1.04. Pro Forma Calculations. For the purposes of (i) the Interest Coverage Ratio and the Consolidated Fixed Charge Coverage Ratio, upon the occurrence of any Permitted Acquisition, and (ii) the Consolidated Fixed Charge Coverage Ratio, upon the occurrence of any Significant Asset Sale or any action or proposed action pursuant to Payment Conditions, in each case, the applicable calculation shall be made with respect to the applicable period (and, to the

extent applicable, subsequent periods) on a pro forma basis after giving effect to such Permitted Acquisition, Significant Asset Sale or action or proposed action pursuant to Payment Conditions, as the case may be (including, without duplication, in respect of any Permitted Acquisition (a) all pro forma adjustments permitted or required by Article 11 of Regulation S-X under the Securities Act of 1933, as amended, and (b) pro forma adjustments for cost savings (net of continuing associated expenses) to the extent such cost savings are factually supportable and have been realized or are reasonably expected to be realized within 12 months following such Permitted Acquisition, provided that such cost savings shall be set forth in a reasonably detailed certificate of an Authorized Officer of Holdings), using, for purposes of making such calculations, the historical financial statements of all entities or assets so acquired or to be acquired and the consolidated financial statements of Holdings and its Subsidiaries, which shall be reformulated as if such Permitted Acquisition or Significant Asset Sale, and any other Permitted Acquisitions or Significant Asset Sales that have been consummated during the period, had been consummated at the beginning of such period.  In addition, solely for purposes of determining the Consolidated Fixed Charge Coverage Ratio, any Indebtedness incurred or repaid in connection with any Permitted Acquisition or Significant Asset Sale and any other Permitted Acquisitions or Significant Asset Sales that have been consummated during the period shall be assumed to have been incurred or repaid at the beginning of such period.

1.05. Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if Holdings notifies the Administrative Agent that it requests an amendment to any provision hereof to eliminate the effect of any change occurring in GAAP or policies used to prepare the audited financial statements of Holdings referred to in Section 8.05(a) for the fiscal year ended December 31, 2009 or in the application thereof on the operation of such provision (or if the Administrative Agent notifies Holdings that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, the Borrowers or any of their respective Subsidiaries at "fair value", as defined therein.  Any references herein to consolidated or other financial information of Holdings and its Subsidiaries shall be deemed, on and after the Funding Date and the consummation of the Funding Date Merger, to refer to Holdings and its Subsidiaries.

1.06. Interpretation Québec.  For purposes of any assets of any Canadian Loan Party located in the Province of Québec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable

property", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest", "mortgage" and "lien" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the Uniform Commercial Code or the PPSA shall be deemed to include publication under the *Civil Code of Québec*, (vii) all references to "perfection" of or "perfected" liens or security interest shall be deemed to include a reference to an "opposable" or "set up" lien or hypothec as against third parties, (viii) any "right of offset", "right of set-off" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents or title, instruments, money and securities, and (x) an "agent" shall be deemed to include a "mandatary".

SECTION 2.  Amount and Terms of Credit.

2.01.  The Commitments.  (a)  Subject to and upon the terms and conditions set forth herein (including, without limitation, the conditions set forth in Sections 6 and 7), (A) each U.S. Facility Lender with a U.S. Facility Commitment severally agrees to make, at any time and from time to time on or after the Funding Date and prior to the Revolving Loan Maturity Date, a revolving loan or revolving loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers) (each, a "U.S. Facility Revolving Loan" and, collectively, the "U.S. Facility Revolving Loans") and (B) each Canadian Facility Lender with a Canadian Facility Commitment severally agrees to make, at any time and from time to time on or after the Funding Date and prior to the Revolving Loan Maturity Date, (x) a revolving loan or revolving loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers) (each, a "U.S. Borrower Canadian Facility Revolving Loan" and, collectively, the "U.S. Borrower Canadian Facility Revolving Loans") and (y) a revolving loan or revolving loans to any Canadian Borrower (on a joint and several basis with the other Canadian Borrowers) (each, a "Canadian Borrower Canadian Facility Revolving Loan" and, collectively, the "Canadian Borrower Canadian Facility Revolving Loans" and, together with the U.S. Borrower Canadian Facility Revolving Loans, each, a "Canadian Facility Revolving Loan" and, collectively, the "Canadian Facility Revolving Loans" and, together with the U.S. Facility Revolving Loans, each, a "Revolving Loan" and, collectively, the "Revolving Loans"), which Revolving Loans:

(i)  shall be made and maintained in an Available Currency;

(ii)  except as hereafter provided, shall, at the option of the applicable Borrowers, be incurred and maintained as, and/or converted into, one or more Borrowings of (x) Base Rate Loans, Canadian Prime Rate Loans or Eurodollar Loans, or (y) (A) in the case of a B/A Lender, Bankers' Acceptances in Canadian Dollars by acceptance and purchase thereof on the terms and conditions provided for herein and in Schedule 1.01(b) or (B) in the case of a Non-B/A Lender, completed Drafts in Canadian Dollars purchased and, at the request of the Non-B/A Lender, exchanged for B/A Equivalent Notes, in each case on the terms and conditions provided for herein and in Schedule 1.01(b); provided that, except as otherwise specifically provided in Section 2.10(b), all Revolving Loans made as part of the same Borrowing shall at all times consist of Revolving Loans of the same Type;

(iii)  may be repaid and reborrowed in accordance with the provisions hereof;

(iv)      shall not be made (and shall not be required to be made) by any such Lender in any instance where the incurrence thereof (after giving effect to the use of the proceeds thereof on the date of the incurrence thereof to repay any amounts theretofore outstanding pursuant to this Agreement) would cause (x) in the case of U.S. Facility Revolving Loans, (A) the Individual U.S. Facility Exposure of such U.S. Facility Lender to exceed the amount of its U.S. Facility Commitment at such time or (B) the Aggregate U.S. Facility Exposure to exceed the Total U.S. Facility Commitment at such time or (y) in the case of Canadian Facility Revolving Loans, (A) the Individual Canadian Facility Exposure of such Canadian Facility Lender to exceed the amount of its Canadian Facility Commitment at such time or (B) the Aggregate Canadian Facility Exposure to exceed the Total Canadian Facility Commitment at such time; and

(v)      to the extent denominated in Canadian Dollars and required to be made by a Participating Specified Foreign Currency Lender, shall, subject to Section 15, be made by the Fronting Lender.

(b)      Subject to and upon the terms and conditions set forth herein (including, without limitation, the conditions set forth in Sections 6 and 7), the Swingline Lender agrees to make, at any time and from time to time on or after the Funding Date and prior to the Swingline Expiry Date (A) in respect of the U.S. Facility Commitments, a revolving loan or revolving loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers) (each, a "U.S. Facility Swingline Loan" and, collectively, the "U.S. Facility Swingline Loans") and (B) in respect of the Canadian Facility Commitments, (x) a revolving loan or revolving loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers) (each, a "U.S. Borrower Canadian Facility Swingline Loan" and, collectively, the "U.S. Borrower Canadian Facility Swingline Loans") and (y) a revolving loan or revolving loans to any Canadian Borrower (on a joint and several basis with the other Canadian Borrowers) (each, a "Canadian Borrower Canadian Facility Swingline Loan" and, collectively, the "Canadian Borrower Canadian Facility Swingline Loans" and, together with the U.S. Borrower Canadian Facility Swingline Loans, each, a "Canadian Facility Swingline Loan" and, collectively, the "Canadian Facility Swingline Loans" and, together with the U.S. Facility Swingline Loans, each, a "Swingline Loan" and, collectively, the "Swingline Loans"), which Swingline Loans:

(i)      shall be made and maintained in an Available Currency;

(ii)      shall be made and maintained as Base Rate Loans or Canadian Prime Rate Loans;

(iii)      may be repaid and reborrowed in accordance with the provisions hereof;

(iv)      shall not be made (and shall not be required to be made) by the Swingline Lender in any instance where the incurrence thereof (after giving effect to the use of the proceeds thereof on the date of the incurrence thereof to repay any amounts theretofore outstanding pursuant to this Agreement) would cause (x) in the case of U.S. Facility Swingline Loans, the Aggregate U.S. Facility Exposure to exceed the Total U.S. Facility Commitment at such time or (y) in the case of Canadian Facility Swingline Loans, the

Aggregate Canadian Facility Exposure to exceed the Total Canadian Facility Commitment at such time; and

(v)     shall not exceed in aggregate principal amount at any time outstanding (x) in the case of U.S. Facility Swingline Loans, the Maximum U.S. Facility Swingline Amount or (y) in the case of Canadian Facility Swingline Loans, the Maximum Canadian Facility Swingline Amount.

(c)     The Swingline Lender (x) may, in its sole discretion, on any Business Day, and (y) shall, on the penultimate Business Day of each week, give notice to the Lenders under a Tranche that the Swingline Lender's outstanding Swingline Loans under such Tranche shall be funded with one or more Borrowings of Revolving Loans under such Tranche to be made to, and maintained by, the Borrower of the outstanding Swingline Loan under such Tranche being funded by such Revolving Loan (or any other Borrower jointly and severally liable with such Borrower under such Tranche) in the same currency as the outstanding Swingline Loan under such Tranche being funded by such Revolving Loan (provided that such notice shall be deemed to have been automatically given upon the occurrence of a Default or an Event of Default under Section 11.01(g) or (h) or upon the exercise of any of the remedies provided in the last paragraph of Section 11.01), in which case one or more Borrowings of Revolving Loans under a Tranche constituting Base Rate Loans (in the case of Swingline Loans under such Tranche denominated in U.S. Dollars) or Revolving Loans under a Tranche constituting Canadian Prime Rate Loans (in the case of Swingline Loans under such Tranche denominated in Canadian Dollars), in each case, to be made to, and maintained by, the Borrower of the outstanding Swingline Loan under such Tranche being funded by such Revolving Loan (or any other Borrower jointly and severally liable with such Borrower under such Tranche) in the same currency as the outstanding Swingline Loan under such Tranche being funded by such Revolving Loan (each such Borrowing, a "Mandatory Borrowing"), shall be made on the immediately succeeding Business Day by all Lenders under such Tranche pro rata based on each such Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be (determined before giving effect to any termination of the Commitments under such Tranche pursuant to the last paragraph of Section 11.01) and the proceeds thereof shall be applied directly by the Swingline Lender to repay the Swingline Lender for such outstanding Swingline Loans under such Tranche; provided that such Revolving Loans which are denominated in Canadian Dollars and are required to be made by a Participating Specified Foreign Currency Lender shall, subject to Section 15, be made by the Fronting Lender. Each Lender under a Tranche hereby irrevocably agrees to make Revolving Loans under such Tranche to the applicable Borrower upon one Business Day's notice pursuant to each Mandatory Borrowing in the amount and currency and in the manner specified in the preceding sentence and on the date specified in writing by the Swingline Lender notwithstanding (i) the amount of the Mandatory Borrowing may not comply with the Minimum Borrowing Amount otherwise required hereunder, (ii) whether any conditions specified in Section 7 are then satisfied, (iii) whether a Default or an Event of Default then exists, (iv) the date of such Mandatory Borrowing, and (v) the amount of any Borrowing Base or the Total U.S. Facility Commitment or Total Canadian Facility Commitment, as applicable, at such time. In the event that any Mandatory Borrowing cannot for any reason be made on the date otherwise required above (including, without limitation, as a result of the commencement of a proceeding, corporate action or other step taken under any Insolvency Law with respect to any Borrower, then each Lender under a Tranche hereby agrees

that it shall forthwith purchase (as of the date the Mandatory Borrowing would otherwise have occurred, but adjusted for any payments received from any Borrower under such Tranche on or after such date and prior to such purchase) from the Swingline Lender such participations in the outstanding Swingline Loans under such Tranche as shall be necessary to cause such Lenders to share in such Swingline Loans ratably based upon their respective U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be (determined before giving effect to any termination of the Commitments under such Tranche pursuant to the last paragraph of <u>Section 11.01</u>), <u>provided</u> that (x) all interest payable on the Swingline Loans under such Tranche shall be for the account of the Swingline Lender until the date as of which the respective participation is required to be purchased and, to the extent attributable to the purchased participation, shall be payable to the participant from and after such date and (y) at the time any purchase of participations pursuant to this sentence is actually made, the purchasing Lender shall be required to pay the Swingline Lender interest on the principal amount of the participation purchased for each day from and including the day upon which the Mandatory Borrowing would otherwise have occurred to but excluding the date of payment for such participation, (A) in the case of a Mandatory Borrowing constituting Revolving Loans denominated in U.S. Dollars, at the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Revolving Loans denominated in U.S. Dollars, in each case maintained as Base Rate Loans hereunder for each day thereafter, and (B) in the case of a Mandatory Borrowing constituting Revolving Loans denominated in Canadian Dollars, at the cost to the Administrative Agent of acquiring the overnight funds in Canadian Dollars for the first three days and at the interest rate otherwise applicable to such Revolving Loans denominated in Canadian Dollars, in each case maintained as Canadian Prime Rate Loans hereunder for each day thereafter.

(d)　　Notwithstanding anything to the contrary in <u>Section 2.01(a)</u> or <u>(b)</u>, <u>Section 7.03</u> or elsewhere in this Agreement, the Co-Collateral Agents shall have the right to establish Reserves in such amounts, and with respect to such matters, as the Co-Collateral Agents in their Permitted Discretion shall deem necessary or appropriate, against any Borrowing Base (with any establishment of or increase in Reserves to reduce such then existing Borrowing Base, as applicable, in an amount equal to such Reserves and any elimination of or reduction in any Reserves to increase such then existing Borrowing Base, as applicable, in an amount equal to such Reserves). The Co-Collateral Agents shall promptly notify Holdings of the establishment of any new Reserve or any increase or decrease to an existing Reserve.

(e)　　In the event that the Borrowers are unable to comply with the conditions precedent to the making of Revolving Loans set forth in <u>Section 7</u> (including, without limitation, the Borrowing Base limitations set forth in <u>Section 7.03</u>), the Lenders under any Tranche, subject to the immediately succeeding proviso, hereby authorize the Administrative Agent, for the account of the Lenders under a Tranche, to make U.S. Facility Revolving Loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers), U.S. Borrower Canadian Facility Revolving Loans to any U.S. Borrower (on a joint and several basis with the other U.S. Borrowers) and/or Canadian Borrower Canadian Facility Revolving Loans to any Canadian Borrower (on a joint and several basis with the other Canadian Borrowers) solely in the event that the Administrative Agent in its Permitted Discretion deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of repayment of the Obligations, or (C) to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement, including, without limitation, documented Expenses and

Fees which are invoiced in reasonable detail; _provided_ that such Revolving Loans may only be made as Base Rate Loans or Canadian Prime Rate Loans, respectively, as determined by the Administrative Agent (each, an "Agent Advance"), for a period commencing on the date the Administrative Agent first receives a Notice of Borrowing requesting an Agent Advance until the earliest of (x) the twentieth Business Day after such date, (y) the date the respective Borrowers are again able to comply with the applicable Borrowing Base limitations and the conditions precedent to the making of Revolving Loans, or obtain an amendment or waiver with respect thereto and (z) the date the Required Lenders instruct the Administrative Agent to cease making Agent Advances (in each case, the "Agent Advance Period"); _provided_ further that the Administrative Agent shall not make any Agent Advance to the extent that at the time of the making of such Agent Advance, (I) the amount of such Agent Advance when added to the aggregate outstanding amount of all other Agent Advances (w) made to, if such Agent Advance is a U.S. Borrower Revolving Loan, the U.S. Borrowers at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), would exceed 5% of the U.S. Borrowing Base at such time, (x) made to, if such Agent Advance is a Canadian Borrower Revolving Loan, the Canadian Borrowers at such time (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), would exceed 5% of the Canadian Borrowing Base at such time, (y) if such Agent Advance is a U.S. Facility Revolving Loan, that are U.S. Facility Revolving Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), would exceed 5% of the Total U.S. Facility Commitment at such time or (z) if such Agent Advance is a Canadian Facility Revolving Loan, that are Canadian Facility Revolving Loans (for this purpose, using the U.S. Dollar Equivalent of amounts not denominated in U.S. Dollars), would exceed 5% of the Total Canadian Facility Commitment at such time (each, an "Agent Advance Amount") or (II) the amount of such Agent Advance (after giving effect to thereto) would cause (x) if such Agent Advance is a U.S. Facility Revolving Loan, (A) the Individual U.S. Facility Exposure of any U.S. Facility Lender to exceed the amount of such U.S. Facility Lender's U.S. Facility Commitment at such time or (B) the Aggregate U.S. Facility Exposure to exceed the Total U.S. Facility Commitment at such time or (y) if such Agent Advance is a Canadian Facility Revolving Loan, (A) the Individual Canadian Facility Exposure of any Canadian Facility Lender to exceed the amount of such Canadian Facility Lender's Canadian Facility Commitment at such time or (B) the Aggregate Canadian Facility Exposure to exceed the Total Canadian Facility Commitment at such time. Agent Advances may be made by the Administrative Agent in its sole discretion and no Borrower shall have any right whatsoever to require that any Agent Advances be made, provided that the Administrative Agent shall promptly notify Holdings following the occurrence of an Agent Advance. Agent Advances will be subject to periodic settlement with the applicable Lenders pursuant to Section 2.04(b).

(f)     If the Initial Revolving Loan Maturity Date shall have occurred at a time when Extended U.S. Facility Commitments or Extended Canadian Facility Commitments are in effect, then on the Initial Revolving Loan Maturity Date all then outstanding Swingline Loans shall be repaid in full on such date (and there shall be no adjustment to the participations in such Swingline Loans as a result of the occurrence of such Initial Revolving Loan Maturity Date); _provided_ that, if on the occurrence of the Initial Revolving Loan Maturity Date (after giving effect to any repayments of Revolving Loans and any reallocation of Letter of Credit participations as contemplated in Section 3.07), there shall exist sufficient unutilized Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as the case may be, so

that the respective outstanding Swingline Loans could be incurred pursuant the Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as the case may be, which will remain in effect after the occurrence of the Initial Revolving Loan Maturity Date, then there shall be an automatic adjustment on such date of the participations in such Swingline Loans and same shall be deemed to have been incurred solely pursuant to the Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as the case may be, and such Swingline Loans shall not be so required to be repaid in full on the Initial Revolving Loan Maturity Date.

2.02. <u>Minimum Amount of Each Borrowing</u>. The aggregate principal amount of each Borrowing of Loans of a specific Type shall not be less than the Minimum Borrowing Amount applicable to such Type of Loans. More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than (x) ten (10) Borrowings of Eurodollar Loans (or such greater number of Borrowings of Eurodollar Loans as may be agreed to from time to time by the Administrative Agent) in the aggregate for all Loans or (y) five (5) different maturity dates in the aggregate for all outstanding Bankers' Acceptance Loans (or such greater number of maturity dates as may be agreed to from time to time by the Administrative Agent).

2.03. <u>Notice of Borrowing</u>. (a) Whenever a Borrower desires to incur (i) Eurodollar Loans or Bankers' Acceptance Loans hereunder, such Borrower shall give the Administrative Agent at the Notice Office at least three Business Days' prior notice of each Eurodollar Loan or Bankers' Acceptance Loan to be incurred hereunder and (ii) Base Rate Loans (including Agent Advances, but excluding Swingline Loans and Revolving Loans made pursuant to a Mandatory Borrowing) or Canadian Prime Rate Loans (including Agent Advances, but excluding Swingline Loans and Revolving Loans made pursuant to a Mandatory Borrowing or to the extent resulting from automatic conversions of Bankers' Acceptance Loans as provided in <u>Schedule 1.01(b)</u>) hereunder, such Borrower shall give the Administrative Agent at the Notice Office at least one Business Day's prior notice (or such shorter period as agreed to by the Administrative Agent in its sole discretion) of each Base Rate Loan or Canadian Prime Rate Loan to be incurred hereunder; <u>provided</u> that any such notice shall be deemed to have been given on a certain day only if given before 12:00 Noon (New York City time) on such day, in the case of Revolving Loans. Each such notice (each, a "<u>Notice of Borrowing</u>"), except as otherwise expressly provided in <u>Section 2.10</u>, shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, in the form of <u>Exhibit A-1</u>, appropriately completed to specify: (i) the aggregate principal amount or Face Amount, as the case may be, of the Loans to be incurred pursuant to such Borrowing (stated in the Available Currency), (ii) the date of such Borrowing (which shall be a Business Day), (iii) in the case of a Borrowing of Revolving Loans, whether the Revolving Loans made pursuant to such Borrowing constitute Agent Advances (it being understood that the Administrative Agent shall be under no obligation to make such Agent Advance), (iv) in the case of U.S. Dollar Denominated Revolving Loans, whether the Revolving Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Eurodollar Loans and if, Eurodollar Loans, the initial Interest Period to be applicable thereto, (v) in the case of Canadian Dollar Denominated Revolving Loans, whether the Revolving Loans being incurred pursuant to such Borrowing shall consist of Canadian Prime Rate Loans or Bankers' Acceptance Loans and, if Bankers' Acceptance Loans, the term thereof (which shall comply with the requirements of <u>Schedule 1.01(b)</u>) and (vi) whether the Loans being incurred pursuant to such Borrowing shall

constitute U.S. Facility Revolving Loans or Canadian Facility Revolving Loans. Except in the case of Agent Advances, the Administrative Agent shall promptly give each Lender under a Tranche notice of such proposed Borrowing under such Tranche, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)     Whenever a Borrower desires to incur Swingline Loans hereunder, such Borrower shall give the Swingline Lender no later than 1:00 P.M. (New York City time) on the date that a Swingline Loan is to be incurred, written notice or telephonic notice promptly confirmed in writing of each Swingline Loan to be incurred hereunder. Each such notice shall be irrevocable and specify in each case (A) the date of Borrowing (which shall be a Business Day), (B) the aggregate principal amount of the Swingline Loans to be incurred pursuant to such Borrowing (stated in the Available Currency) and (C) whether the Swingline Loans being incurred pursuant to such Borrowing shall constitute U.S. Facility Swingline Loans or Canadian Facility Swingline Loans.

(c)     Mandatory Borrowings shall be made upon the notice specified in Section 2.01(c), with each Borrower irrevocably agreeing, by its incurrence of any Swingline Loan, to the making of the Mandatory Borrowings as set forth in Section 2.01(a).

(d)     Without in any way limiting the obligation of any Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Loans, the Administrative Agent or the Swingline Lender, as the case may be, may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent or the Swingline Lender, as the case may be, in good faith to be from an Authorized Officer of such Borrower, prior to receipt of written confirmation. In each such case, such Borrower hereby waives the right to dispute the Administrative Agent's or the Swingline Lender's record of the terms of such telephonic notice of such Borrowing or prepayment of Loans, as the case may be, absent manifest error.

2.04.    Disbursement of Funds. (a)  No later than 1:00 P.M. (New York City time) on the date specified in each Notice of Borrowing (or (x) in the case of Swingline Loans, no later than 4:00 P.M. (New York City time) on the date specified pursuant to Section 2.03(b) or (y) in the case of Mandatory Borrowings, no later than 1:00 P.M. (New York City time) on the date specified in  Section 2.01(a)), each Lender under the respective Tranche, subject to Section 15, will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing under such Tranche requested to be made on such date. All such amounts will be made available in U.S. Dollars (in the case of U.S. Dollar Denominated Loans) or in Canadian Dollars (in the case of Canadian Dollar Denominated Loans), as the case may be, and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the relevant Borrower or Borrowers at the Payment Office the aggregate of the amounts so made available by the Lenders under the respective Tranche (or in the case of Swingline Loans, the Swingline Lender will make available the full amount thereof). Unless the Administrative Agent shall have been notified by any Lender under the respective Tranche prior to the date of Borrowing under such Tranche that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing under such Tranche to be made on such date, the Administrative Agent may assume that such Lender has made such

amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the relevant Borrower or Borrowers a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the relevant Borrower or Borrowers, and the relevant Borrower or Borrowers shall promptly (but no later than one Business Day following such notice) pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the relevant Borrower or Borrowers, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the relevant Borrower or Borrowers until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate (or, in the case of Canadian Dollar Denominated Loans, the cost to the Administrative Agent of acquiring overnight funds in Canadian Dollars) for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the relevant Borrower or Borrowers, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08.  Nothing in this Section 2.04(a) shall be deemed to relieve any Lender under a Tranche from its obligation to make Loans hereunder under such Tranche or to prejudice any rights which any Borrower may have against any Lender under a Tranche as a result of any failure by such Lender to make Loans hereunder under such Tranche.  Notwithstanding this Section 2.04(a) and subject to the provisions of Section 15, (x) the Fronting Lender shall be obligated to make each Participating Specified Foreign Currency Lender's pro rata portion of a Specified Foreign Currency Loan and (y) each Participating Specified Foreign Currency Lender shall not be obligated to make its pro rata portion of a Specified Foreign Currency Loan.

(b)    Agent Advances made pursuant to Section 2.01(c) shall be subject to periodic settlement as follows:

(i)    The amount of each Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of Revolving Loans shall be computed weekly (or more frequently in the Administrative Agent's sole discretion) and shall be adjusted upward or downward on the basis of the amount of outstanding Revolving Loans under such Tranche as of 5:00 P.M. (New York City time) on the last Business Day of each week, or such other period specified by the Administrative Agent (each such date, a "Settlement Date").  The applicable Lenders under a Tranche shall transfer to the Administrative Agent, or the Administrative Agent shall transfer to the applicable Lenders under a Tranche, such amounts as are necessary so that (after giving effect to all such transfers) the amount of Revolving Loans under a Tranche made by each Lender under such Tranche shall be equal to such Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of the aggregate amount of Revolving Loans under such Tranche outstanding as of such Settlement Date.  If a notice from the Administrative Agent of any such necessary transfer is received by a Lender on or prior to 12:00 Noon (New York City time) on any Business Day, then such Lender shall make transfers described above in immediately available funds no later than 3:00

P.M. (New York City time) on the day such notice was received; and if such notice is received by a Lender after 12:00 Noon (New York City time) on any Business Day, such Lender shall make such transfers no later than 1:00 P.M. (New York City time) on the next succeeding Business Day. The obligation of each of the Lenders to transfer such funds shall be irrevocable and unconditional and without recourse to, or without representation or warranty by, the Administrative Agent. Each of the Administrative Agent and each Lender agrees and the Lenders agree to mark their respective books and records on each Settlement Date to show at all times the dollar amount of their respective U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of the outstanding Revolving Loans under such Tranche on such date. The provisions of this Section 2.04(b) with respect to Specified Foreign Currency Loans of a Participating Specified Foreign Currency Lender shall be subject to the terms of Section 15.

(ii)     To the extent that the settlement described in preceding clause (i) shall not yet have occurred with respect to any particular Settlement Date, upon any repayment of Revolving Loans under a Tranche by any Borrower prior to such settlement, the Administrative Agent may apply such amounts repaid directly to the amounts that would otherwise be made available by the Administrative Agent pursuant to this Section 2.04(b) under such Tranche.

(iii)     Because the Administrative Agent on behalf of the Lenders under a Tranche may be advancing and/or may be repaid Revolving Loans under such Tranche prior to the time when such Lenders will actually advance and/or be repaid such Revolving Loans, interest with respect to such Revolving Loans shall be allocated by the Administrative Agent to each such Lender and the Administrative Agent in accordance with the amount of such Revolving Loans actually advanced by and repaid to each such Lender and the Administrative Agent and shall accrue from and including the date such Revolving Loans are so advanced to but excluding the date such Revolving Loans are either repaid by the U.S. Borrowers or the Canadian Borrowers, as the case may be, in accordance with the terms of this Agreement or actually settled by the Administrative Agent or the applicable Lender as described in this Section 2.04(b).

2.05. Notes.  (a)  Each U.S. Borrower's joint and several obligation under a Tranche and each Canadian Borrower's joint and several obligation under a Tranche, as the case may be, to pay the principal of, and interest on, the Loans under such Tranche made by each Lender under such Tranche shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.15 and shall, if requested by such Lender, also be evidenced (i) in the case of U.S. Facility Revolving Loans, by a promissory note duly executed and delivered by each U.S. Borrower substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity herewith (each, a "U.S. Facility Revolving Note" and, collectively, the "U.S. Facility Revolving Notes"), (ii) in the case of U.S. Borrower Canadian Facility Revolving Loans, by a promissory note duly executed and delivered by each U.S. Borrower substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity herewith (each, a "U.S. Borrower Canadian Facility Revolving Note" and, collectively, the "U.S. Borrower Canadian Facility Revolving Notes"), (iii) in the case of Canadian Borrower Canadian Facility Revolving Loans, by a promissory note duly executed and delivered by each Canadian Borrower substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity

herewith (each, a "Canadian Borrower Canadian Facility Revolving Note" and, collectively, the "Canadian Borrower Canadian Facility Revolving Notes" and, together with the U.S. Borrower Canadian Facility Revolving Notes, the "Canadian Facility Revolving Notes" and, together with the U.S. Facility Revolving Notes, the "Revolving Notes"), (iv) in the case of U.S. Facility Swingline Loans, by a promissory note duly executed and delivered by each U.S. Borrower substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith (each, a "U.S. Facility Swingline Note" and, collectively, the "U.S. Facility Swingline Notes"), (v) in the case of U.S. Borrower Canadian Facility Swingline Loans, by a promissory note duly executed and delivered by each U.S. Borrower substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith (each, a "U.S. Borrower Canadian Facility Swingline Note" and, collectively, the "U.S. Borrower Canadian Facility Swingline Notes"), and (vi) in the case of Canadian Borrower Canadian Facility Swingline Loans, by a promissory note duly executed and delivered by each Canadian Borrower substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith (each, a "Canadian Borrower Canadian Facility Swingline Note" and, collectively, the "Canadian Borrower Canadian Facility Swingline Notes" and, together with the U.S. Borrower Canadian Facility Revolving Notes, the "Canadian Facility Swingline Notes" and, together with the U.S. Facility Swingline Notes, the "Swingline Notes").

(b)     Each Lender under a Tranche will note on its internal records the amount of each Loan under such Tranche made by it and each payment in respect thereof and prior to any transfer of any of its Notes under such Tranche will endorse on the reverse side thereof the outstanding principal amount of Loans under such Tranche evidenced thereby. Failure to make any such notation or any error in such notation shall not affect any Borrower's obligations in respect of such Loans.

(c)     Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes in respect of a Tranche shall only be delivered to Lenders under such Tranche which at any time specifically request the delivery of such Notes. No failure of any Lender to request, obtain, maintain or produce a Note evidencing its Loans to any Borrower shall affect, or in any manner impair, the obligations of any Borrower to pay the Loans (and all related Obligations) incurred by such Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to any Loan Document. Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (b). At any time when any Lender under a Tranche requests the delivery of a Note under such Tranche to evidence any of its Loans under such Tranche, each of the respective Borrowers shall promptly execute and deliver to the respective Lender, at such Borrowers' expense, the requested Note in the appropriate amount or amounts to evidence such Loans.

(d)     If requested by a Lender following an Extension, the applicable Borrowers shall promptly provide such Lender with the applicable Notes (substantially in the form set forth in Section 2.05(a) with such amendments thereto to reflect the Extension).

2.06.  Conversions. (a) Each Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the

outstanding principal amount of U.S. Dollar Denominated Loans made to it pursuant to one or more Borrowings (so long as of the same Tranche) of one or more Types of U.S. Dollar Denominated Revolving Loans into a Borrowing (of the same Tranche) of another Type of U.S. Dollar Denominated Revolving Loan; provided that, (i) except as otherwise provided in Section 2.10(b), Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Eurodollar Loans being converted and no such partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of such Eurodollar Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) following notice by the Administrative Agent or the Required Lenders to Holdings during the continuation of any Default or Event of Default (although no such notice shall be required following an Event of Default under Section 11.01(g) or (h)), Base Rate Loans may not be converted into Eurodollar Loans, and (iii) no conversion pursuant to this Section 2.06 shall result in a greater number of Borrowings of Eurodollar Loans than is permitted under Section 2.02. Each such conversion shall be effected by the relevant Borrower (of U.S. Dollar Denominated Revolving Loan being converted) by giving the Administrative Agent at the Notice Office prior to 12:00 Noon (New York City time) at least (i) in the case of conversions of Base Rate Loans into Eurodollar Loans, three Business Days' prior notice and (ii) in the case of conversions of Eurodollar Loans into Base Rate Loans, one Business Day's prior notice (each, a "Notice of Conversion/Continuation"), in each case in the form of Exhibit A-2, appropriately completed to specify the U.S. Dollar Denominated Revolving Loans to be so converted, the Borrowing or Borrowings pursuant to which such U.S. Dollar Denominated Loans were incurred and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its U.S. Dollar Denominated Revolving Loans.

(b)     Conversions of Bankers' Acceptance Loans (so long as of the same Tranche) into Canadian Prime Rate Loans (of the same Tranche) shall be made in the circumstances, and to the extent, provided in Schedule 1.01(b). Except as provided in Schedule 1.01(b), Bankers' Acceptance Loans shall not be permitted to be converted into Canadian Prime Rate Loans prior to the maturity date of the respective Bankers' Acceptance or B/A Equivalent Note, as the case may be.

(c)     Each Borrower shall have the option to convert on any Business Day occurring on or after the Funding Date, all or a portion at least equal to the Minimum Borrowing Amount of the outstanding principal amount of Canadian Prime Rate Loans made to such Borrower pursuant to one or more Borrowings (so long as of the same Tranche) of Canadian Dollar Denominated Revolving Loans into a Borrowing or Borrowings (of the same Tranche) of Bankers' Acceptance Loans; provided that (i) following notice by the Administrative Agent or the Required Lenders to Holdings during the continuation of any Default or Event of Default (although no such notice shall be required following an Event of Default under Section 11.01(g) or (h)), Canadian Prime Rate Loans may not be converted into Bankers' Acceptance Loans and (ii) Borrowings of Bankers' Acceptance Loans resulting from this Section 2.06 shall be limited in number as provided in Section 2.02. Each such conversion shall be effected by the relevant Borrower (of Canadian Dollar Denominated Revolving Loan being converted), by giving the Administrative Agent at the Notice Office, prior to 12:00 Noon (New York City time), at least three Business Days prior to the date of the proposed conversion, a Notice of Conversion/Continuation specifying the Canadian Dollar Denominated Revolving Loans

maintained as Canadian Prime Rate Loans to be so converted into Bankers' Acceptance Loans, the Borrowing or Borrowings pursuant to which such Canadian Dollar Denominated Revolving Loans were made and the term of the proposed Borrowing of Bankers' Acceptance Loans (which, in each case, shall comply with the requirements of <u>Schedule 1.01(b)</u>). The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Canadian Dollar Denominated Revolving Loans maintained as Canadian Prime Rate Loans.

2.07. <u>Pro Rata Borrowings</u>. Except as provided in <u>Section 15</u>, all Borrowings of U.S. Facility Revolving Loans and Canadian Facility Revolving Loans (including U.S. Borrower Revolving Loans and Canadian Borrower Revolving Loans) under this Agreement shall be incurred from the Lenders under such Tranche <u>pro rata</u> on the basis of their U.S. Facility Commitments and Canadian Facility Commitments, as the case may be, <u>provided</u> that all Mandatory Borrowings under a Tranche shall be incurred from the Lenders under such Tranche <u>pro rata</u> on the basis of their U.S. Facility RL Percentage or Canadian Facility RL Percentages, as the case may be. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender under such Tranche shall be obligated to make the Loans under such Tranche provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08. <u>Interest</u>. (a) (x) The U.S. Borrowers jointly and severally agree to pay interest in respect of the unpaid principal amount of each U.S. Facility Loan, (y) the U.S. Borrowers jointly and severally agree to pay interest in respect of the unpaid principal amount of each U.S. Borrower Canadian Facility Revolving Loan and U.S. Borrower Canadian Facility Swingline Loan and (y) the Canadian Borrowers jointly and severally agree to pay interest in respect of the unpaid principal amount of each Canadian Borrower Canadian Facility Revolving Loan and Canadian Borrower Canadian Facility Swingline Loan, in each case:

(A)     Maintained as a Base Rate Loan, in each case, from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to <u>Section 2.06</u> or <u>2.09</u>, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin <u>plus</u> the Base Rate, each as in effect from time to time.

(B)     Maintained as a Eurodollar Loan, in each case, from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin as in effect from time to time during such Interest Period <u>plus</u> the Eurodollar Rate for such Interest Period.

(C)     Maintained as a Canadian Prime Rate Loan (including with respect to any Bankers' Acceptance Loan converted into a Canadian Prime Rate Loan pursuant to <u>Schedule 1.01(b)</u>), in each case, from the date of Borrowing thereof (or, in the circumstances described in the immediately preceding parenthetical, from the date of conversion of such respective Bankers' Acceptance Loan into a Canadian Prime Rate Loan) until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such

Canadian Prime Rate Loan to a Bankers' Acceptance Loan pursuant to <u>Schedule 1.01(b)</u>, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin <u>plus</u> the Canadian Prime Rate, each as in effect from time to time.

(b)  Overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan and any other overdue amount payable hereunder and under any other Loan Document, by acceleration or otherwise, shall, in each case, bear interest at a rate per annum equal to the rate which is two percent (2.0%) in excess of the otherwise applicable rate of interest then borne by the applicable borrowing (or, if any such amount does not relate to a borrowing under this Agreement, the rate which is 2% in excess of the rate otherwise applicable to Base Rate Loans from time to time).  Interest that accrues under this <u>Section 2.08(b)</u> shall be payable on demand.

(c)  Accrued (and theretofore unpaid) interest shall be payable (i) in respect of each Base Rate Loan, quarterly in arrears on each Quarterly Payment Date, (ii) in respect of each Canadian Prime Rate Loan, quarterly in arrears on each Quarterly Payment Date, (iii) in respect of each Eurodollar Rate Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period and (iv) in respect of each Loan (other than Bankers' Acceptance Loans), (x) on the date of any repayment or prepayment thereof (on the amount prepaid or repaid) (except that repayments and prepayments of Base Rate Loans or Canadian Prime Rate Loans, in each case, under a Tranche shall not be required to be accompanied by a payment of accrued, and theretofore unpaid, interest thereon, unless either all outstanding Loans of such Type under such Tranche are being repaid or prepaid or the Total Commitment under such Tranche has terminated or will be terminated concurrently with such repayment or prepayment), (y) at maturity (whether by acceleration or otherwise) and (z) after such maturity, on demand.

(d)  Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Eurodollar Loans and shall promptly notify the respective Borrowers and the Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09.  <u>Interest Periods</u>.  At the time any Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Eurodollar Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 Noon (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loan (in the case of any subsequent Interest Period), such Borrower shall have the right to elect the interest period (each, an "<u>Interest Period</u>") applicable to such Eurodollar Loan, which Interest Period shall, at the option of such Borrower, be (i) a one or two week period to the extent agreed to by all Lenders with Loans and/or Commitments under the relevant Tranche, (ii) a one, two, three or six month period or (iii) a nine or twelve month period to the extent agreed to by all Lenders with Loans and/or Commitments under the relevant Tranche, <u>provided</u> that (in each case):

(a)     all Eurodollar Loans comprising a Borrowing shall at all times have the same Interest Period;

(b)     the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (including, the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(c)     if any Interest Period for a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(d)     if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)     unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when a Default or an Event of Default is then in existence; and

(f)     no Interest Period in respect of any Borrowing of any Tranche of Loans shall be selected which extends beyond the Maturity Date for such Tranche of Loans.

With respect to any Loans under a Tranche maintained as Eurodollar Loans, at the end of any Interest Period applicable to a Borrowing thereof, the relevant Borrower may elect to split the respective Borrowing into two or more Borrowings (of the same Tranche) of the same Type or combine two or more Borrowings (of the same Tranche) of the same Type into a single Borrowing (of the same tranche), in each case, by having the relevant Borrower give notice thereof together with its election of one or more Interest Periods, in each case so long as each resulting Borrowing (x) has an Interest Period which complies with the foregoing requirements of this Section 2.09 and (y) does not cause a violation of the requirements of Section 2.02.  If by 12:00 Noon (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Eurodollar Loans, any Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Eurodollar Loans as provided above, such Borrower shall be deemed to have elected to convert such Eurodollar Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

2.10.   Increased Costs, Illegality, etc.  (a)  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clauses (i) and (iv) below, may be made only by the Administrative Agent):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the applicable interbank market, adequate and

fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of the respective Eurodollar Rate; or

(ii) at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder (and deemed by such Lender to be material) with respect to any Eurodollar Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request (other than with respect to any Tax, which shall be governed solely by Section 5.04), such as, but not limited to, a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate, and/or (y) other circumstances arising since the Closing Date affecting such Lender, the interbank eurodollar market or the position of such Lender in such market; or

(iii) at any time, that the making or continuance of any Eurodollar Loan has been made unlawful by any law or governmental rule, regulation or order adopted or changed after the Closing Date which materially and adversely affects the applicable eurodollar; or

(iv) at any time that there is no market for Bankers' Acceptances by reason of circumstances affecting the Canadian money market generally or the relevant Available Currency (other than U.S. Dollars) is not available in sufficient amounts, in either case as determined in good faith by the Administrative Agent, acting reasonably;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clauses (i) and (iv) above) shall promptly give notice (by telephone promptly confirmed in writing) to the affected Borrowers and, except in the case of clauses (i) and (iv) above, to the Administrative Agent, of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders or in the case of clauses (ii) and (iii) each other affected Lender). Thereafter (w) in the case of clause (i) above, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies Holdings and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by any Borrower with respect to Eurodollar Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by such Borrower, (x) in the case of clause (ii) above, the U.S. Borrowers (jointly and severally) and/or the Canadian Borrowers (jointly and severally) agree to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the respective Borrowers by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto), (y) in the case of clause (iii) above, the respective Borrower or Borrowers shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law and (z)

in the case of clause (iv) above, and as provided in Schedule 1.01(b), Bankers' Acceptance Loans or other Revolving Loans in the relevant Available Currency (exclusive of any such Revolving Loans which have theretofore been funded) shall no longer be available until such time as the Administrative Agent notifies the affected Borrowers and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation with respect to Bankers' Acceptance Loans or such other Revolving Loans given by the respective Borrowers which have not been incurred (including by way of conversion) shall be deemed rescinded by such Borrowers.

(b)  At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(ii), the affected Borrower may, and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.10(a)(iii), the affected Borrower shall, either (i) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that such Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii), or (ii) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Borrower to convert such Eurodollar Loan into a Base Rate Loan (which conversion, in the case of the circumstance described in Section 2.10(a)(iii), shall occur no later than the last day of the Interest Period then applicable to such Eurodollar Loan or such earlier day as shall be required by applicable law); provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)  If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitment hereunder or its obligations hereunder, by an amount deemed by such Lender to be material, then Holdings agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation on an after-tax basis for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable; provided that such Lender's determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to Holdings, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish Holdings' obligations to pay additional amounts pursuant to this Section 2.10(c) upon the subsequent receipt of such notice.

2.11. <u>Compensation</u>.  The applicable Loan Parties (grouped by Borrowing Base), jointly and severally agree to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans or Bankers' Acceptance Loans but excluding loss of anticipated profits) which such Lender may sustain:  (a) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Eurodollar Loans or Bankers' Acceptance Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the respective Borrower or Borrowers or deemed withdrawn pursuant to <u>Section 2.10(a)</u>); (b) if any prepayment or repayment (including any prepayment or repayment made pursuant to <u>Section 5.01</u>, <u>Section 5.02</u> or as a result of an acceleration of the Loans pursuant to <u>Section 11.01</u>) or conversion of any of its Eurodollar Loans or Bankers' Acceptance Loans occurs on a date which is not the last day of an Interest Period or maturity date, as applicable, with respect thereto; (c) if any prepayment of any of its Eurodollar Loans is not made on any date specified in a notice of prepayment given by the respective Borrowers; or (d) as a consequence of (i) any other default by the respective Borrowers to repay Eurodollar Loans or Bankers' Acceptance Loans when required by the terms of this Agreement or any Note held by such Lender or (ii) any election made pursuant to <u>Section 2.10(b)</u>.

2.12. <u>Lending Offices and Affiliate Lenders for Loans in Available Currency</u>. (a)  Each Lender may at any time or from time to time designate, by written notice to the Administrative Agent to the extent not already reflected on <u>Schedule 13.03</u>, one or more lending offices (which, for this purpose, may include Affiliates of the respective Lender) for the various Loans in the Available Currency made, and Letters of Credit participated in, by such Lender (including, without limitation, by designating a separate lending office (or Affiliate) to act as such with respect to such Loans and Letter of Credit Outstandings); <u>provided</u> that, for designations made after the Closing Date, to the extent such designation shall result in increased costs under <u>Section 2.10</u>, <u>3.06</u> or <u>5.04</u> in excess of those which would be charged in the absence of the designation of a different lending office (including a different Affiliate of the respective Lender), then the Borrowers shall not be obligated to pay such excess increased costs (although if such designation results in increased costs, the Borrowers shall be obligated to pay the costs which would have applied in the absence of such designation and any subsequent increased costs of the type described above resulting from changes after the date of the respective designation). Except as provided in the immediately preceding sentence, each lending office and Affiliate of any Lender designated as provided above shall, for all purposes of this Agreement and the other Loan Documents, be treated in the same manner as the respective designating Lender (and shall be entitled to all indemnities and similar provisions in respect of its acting as such hereunder).

(b)      Each Lender agrees that on the occurrence of any event giving rise to the operation of <u>Section 2.10(a)(ii)</u> or <u>(iii)</u>, <u>Section 2.10(c)</u>, <u>Section 3.06</u> or <u>Section 5.04</u> with respect to such Lender, it will, if requested by Holdings, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans or Letters of Credit affected by such event; <u>provided</u> that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.

Nothing in this Section 2.12(b) shall affect or postpone any of the obligations of any Borrower or the right of any Lender provided in Sections 2.10, 3.06 and 5.04.

2.13. Replacement of Lenders. (a) If any Lender becomes a Defaulting Lender, (b) upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c), Section 3.06 or Section 5.04 with respect to any Lender which results in such Lender charging to any Borrower increased costs in excess of those being generally charged by the other Lenders, (c) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b) or (d) in the case of the rejection (or deemed rejection) by a Lender of the Extension under Section 2.19(a) which Extension has been accepted under Section 2.19(a) by the Required Lenders, Holdings shall have the right, in accordance with Section 13.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, to replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") and each of which shall be reasonably acceptable to the Administrative Agent, Swingline Lender, Fronting Lending (unless such Person will not be a Participating Specified Foreign Currency Lender) and any Issuing Lender; provided that:

(i) at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Borrowers or, if otherwise agreed, the Replacement Lender) pursuant to which the Replacement Lender shall acquire the entire Commitment and all outstanding Revolving Loans (other than Bankers' Acceptance Loans) and all participations in Letters of Credit by, the Replaced Lender and, in connection therewith, shall pay to (i) the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans (other than Bankers' Acceptances and B/A Equivalent Notes) of the respective Replaced Lender with respect to which such Replaced Lender is being replaced, (B) an amount equal to the Face Amount of any outstanding B/A Instrument of the respective Replaced Lender in satisfaction of the obligations of the Borrower to repay the B/A Instrument on the maturity thereof, (C) an amount equal to all Unpaid Drawings (if any) that have been funded by (and not reimbursed to) such Replaced Lender, together with all then unpaid interest with respect thereto at such time and (D) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 4.01, (ii) each Issuing Lender an amount equal to such Replaced Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of any Unpaid Drawing relating to Letters of Credit issued by such Issuing Lender under such Tranche (which at such time remains an Unpaid Drawing) to the extent such amount was not theretofore funded by such Replaced Lender and (iii) the Swingline Lender an amount equal to such Replaced Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of any Mandatory Borrowing under such Tranche to the extent such amount was not theretofore funded by such Replaced Lender to the Swingline Lender; and

(ii)     all obligations of the Borrowers then owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11 shall be paid in full to such Replaced Lender concurrently with such replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

(b)     Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 13.04.  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the relevant Borrowers, (x) the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such Replaced Lender and (y) the U.S. Facility RL Percentage or Canadian Facility RL Percentage shall be automatically adjusted at such time to give effect to such replacement.

2.14.  Incremental Commitments.   (a)     Holdings shall have the right, in consultation and coordination with the Administrative Agent as to all of the matters set forth below in this Section 2.14, but without requiring the consent of the Administrative Agent (except as otherwise provided in this Section 2.14) or the Lenders, to request at any time and from time to time after the Funding Date and prior to the Revolving Loan Maturity Date that one or more Lenders (and/or one or more other Persons which are Eligible Transferees and which will become Lenders) provide Incremental Commitments and, subject to the applicable terms and conditions contained in this Agreement and the relevant Incremental Commitment Agreement, make Revolving Loans and participate in Letters of Credit and Swingline Loans pursuant thereto; provided that (i) no Lender shall be obligated to provide an Incremental Commitment, and until such time, if any, as such Lender has agreed in its sole discretion to provide an Incremental Commitment and executed and delivered to the Administrative Agent, Holdings and the other Borrowers an Incremental Commitment Agreement as provided in clause (b) of this Section 2.14, such Lender shall not be obligated to fund any Revolving Loans in excess of its U.S. Facility Commitment or Canadian Facility Commitment, as applicable, (if any) or participate in any Letters of Credit or Swingline Loans in excess of its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as applicable, in each case, as in effect prior to giving effect to such Incremental Commitment provided pursuant to this Section 2.14, (ii) any Lender (including any Person which is an Eligible Transferee who will become a Lender) may so provide an Incremental Commitment without the consent of the Administrative Agent or any other Lender; provided that any Person that is not a Lender prior to the effectiveness of its Incremental Commitment shall require the consent of the Administrative Agent, each Issuing Lender, the Swingline Lender and the Fronting Lender (unless such Person will not be a Participating Specified Foreign Currency Lender) (which consents shall not be unreasonably

withheld or delayed) to provide an Incremental Commitment pursuant to this <u>Section 2.14</u>, (iii) the aggregate amount of each request (and provision therefor) for Incremental Commitments shall be in a minimum aggregate amount for all Lenders which provide an Incremental Commitment pursuant to a given Incremental Commitment Agreement pursuant to this <u>Section 2.14</u> (including Persons who are Eligible Transferees and will become Lenders) of at least $25,000,000 (or such lesser amount that is acceptable to the Administrative Agent), (iv) the aggregate amount of all Incremental Commitments permitted to be provided pursuant to this <u>Section 2.14</u> shall not exceed in the aggregate $150,000,000, (v) Holdings shall not increase the Commitments pursuant to this <u>Section 2.14</u> more than 3 times in the aggregate, (vi) if the Applicable Commitment Fee Percentage and/or Applicable Margins with respect to Commitments to be provided or Loans to be incurred pursuant to an Incremental Commitment shall be higher in any respect than those applicable to any other Commitments or Loans, the Applicable Commitment Fee Percentage and/or Applicable Margins, as the case may be, for the other Commitments and Loans and extension of credit hereunder shall be automatically increased as and to the extent needed to eliminate any deficiencies in accordance with the definition of "Applicable Commitment Fee Percentage" or "Applicable Margin" contained herein (such increase, the "<u>Additional Commitment Fee</u>" or "<u>Additional Margin</u>", as the case may be), (vii) each Incremental Commitment Agreement shall specifically designate the Tranche of the Incremental Commitments being provided thereunder, (viii) all Revolving Loans of a Borrower incurred pursuant to an Incremental Commitment (and all interest, fees and other amounts payable thereon) shall be Obligations under this Agreement and the other applicable Loan Documents and shall be secured by the relevant Security Documents, and guaranteed under the Guarantee and Collateral Agreement and/or Canadian Guarantee and Collateral Agreement, on a <u>pari passu</u> basis with all other Loans of such Borrower secured by each relevant Security Document and guaranteed under the Guarantee and Collateral Agreement and/or Canadian Guarantee and Collateral Agreement, and (ix) each Lender (including any Person which is an Eligible Transferee who will become a Lender) agreeing to provide an Incremental Commitment pursuant to an Incremental Commitment Agreement shall, subject to the satisfaction of the relevant conditions set forth in this Agreement, participate in Swingline Loans and Letters of Credit pursuant to <u>Sections 2.01(b)</u> and <u>3.04</u>, respectively, and make Revolving Loans as provided in <u>Section 2.01(a)</u>, in each case, under the U.S. Facility Commitment or Canadian Facility Commitment, as applicable, and such Revolving Loans shall constitute U.S. Facility Revolving Loans or Canadian Facility Revolving Loans, as the case may be, for all purposes of this Agreement and the other applicable Loan Documents.

(b)     At the time of the provision of Incremental Commitments pursuant to this <u>Section 2.14</u>, (I) Holdings, each other Borrower, each Guarantor, the Administrative Agent and each such Lender or other Eligible Transferee which agrees to provide an Incremental Commitment (each, an "<u>Incremental Lender</u>") shall execute and deliver to Holdings and the Administrative Agent an Incremental Commitment Agreement, appropriately completed (with the effectiveness of the Incremental Commitment provided therein to occur on the date set forth in such Incremental Commitment Agreement, which date in any event shall be no earlier than the date on which (i) all fees required to be paid in connection therewith at the time of such effectiveness shall have been paid, (ii) all Incremental Commitment Requirements have been satisfied, (iii) all conditions set forth in this <u>Section 2.14</u> shall have been satisfied and (iv) all other conditions precedent that may be set forth in such Incremental Commitment Agreement shall have been satisfied) and (II) Holdings, each other Borrower, each Guarantor, the Security

Agent and each Incremental Lender (as applicable) shall execute and deliver to the Administrative Agent and the Security Agent such additional Security Documents and/or amendments to the Security Documents as the Administrative Agent may reasonably request which are necessary to ensure that all Loans incurred pursuant to the Incremental Commitments and any Additional Commitment Fee and/or Additional Margin are secured by each relevant Security Document (the "Incremental Security Documents"). The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Commitment Agreement and, at such time, Schedule 1.01(a) shall be deemed modified to reflect the Incremental Commitments of such Incremental Lenders.

(c)        It is understood and agreed that the Incremental Commitments provided by an Incremental Lender or Incremental Lenders, as the case may be, pursuant to each Incremental Commitment Agreement shall constitute part of, and be added to, the U.S. Facility Commitment and/or the Canadian Facility Commitment, as the case may be, and each Incremental Lender shall constitute a U.S. Facility Lender and/or Canadian Facility Lender, as applicable, for all purposes of this Agreement and each other applicable Loan Document.

(d)        At the time of any provision of Incremental Commitments pursuant to this Section 2.14, each Borrower shall, in coordination with the Administrative Agent, repay outstanding Revolving Loans of certain of the Lenders, and incur additional Revolving Loans from certain other Lenders (including the Incremental Lenders), in each case to the extent necessary so that all of the U.S. Facility Lenders and/or Canadian Lenders, as applicable, participate in each outstanding Borrowing of each Tranche of Revolving Loans pro rata on the basis of their respective Commitments (after giving effect to any increase in the Total Commitment pursuant to this Section 2.14) and with the Borrowers being obligated to pay to the respective Lenders any costs of the type referred to in Section 2.11 in connection with any such repayment and/or Borrowing.

2.15.   Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest. (a) Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, solely to the extent that a court of competent jurisdiction finally determines that the calculation or determination of interest or any fee payable by the Canadian Borrowers in respect of the Canadian Borrower Obligations pursuant to this Agreement and the other Loan Documents shall be governed by or subject to the laws of any province of Canada or the federal laws of Canada, in no event shall the aggregate "interest" (as defined in Section 347 of the Criminal Code, R.S.C. 1985, c. C-46, as the same shall be amended, replaced or re-enacted from time to time) payable by the Canadian Borrowers to the Administrative Agent or any Lender Creditor under this Agreement or any other Loan Document exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement or such other Loan Document lawfully permitted under that section and, if any payment, collection or demand pursuant to this Agreement or any other Loan Document in respect of "interest" (as defined in that section) is determined to be contrary to the provisions of that section, such payment, collection or demand shall be deemed to have been made by mutual mistake of the Administrative Agent, the Lenders and the Canadian Borrowers and the amount of such payment or collection shall be refunded by the Administrative Agent and the Lenders to the Canadian Borrowers. For the purposes of this Agreement and each other Loan Document to which any Canadian Borrowers are a party, the effective annual rate of interest payable by the Canadian

Borrowers shall be determined in accordance with generally accepted actuarial practices and principles over the term of the loans on the basis of annual compounding for the lawfully permitted rate of interest and, in the event of dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by and for the account of the Canadian Borrowers will be conclusive for the purpose of such determination in the absence of evidence to the contrary.

(b)     For the purposes of the Interest Act (Canada) and with respect to Canadian Borrowers only:

(i)     whenever any interest or fee payable by the Canadian Borrowers is calculated using a rate based on a year of 360 days or 365 days, as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days, as the case may be, (y) multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and (z) divided by 360 or 365, as the case may be; and

(ii)     all calculations of interest payable by the Canadian Borrowers under this Agreement or any other Loan Document are to be made on the basis of the nominal interest rate described herein and therein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest. The parties hereto acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

(c)     The parties hereto acknowledge and agree that clauses (a) and (b) of this Section 2.15 only apply to the Canadian Borrowers and shall not otherwise reduce or effect the obligations of the U.S. Borrowers under this Agreement to pay the full amount of the Obligations of such U.S. Borrowers in accordance with the terms of this Agreement (including to reimburse the Administrative Agent and the applicable Lenders for any amounts refunded by the Administrative Agent or any Lender to the Canadian Borrowers pursuant to clause (a) of this Section 2.15).

2.16.  Provisions Regarding Bankers' Acceptances, Drafts, etc.  The parties hereto agree that the provisions of Schedule 1.01(b) shall apply to all Bankers' Acceptances, Bankers' Acceptance Loans, Drafts and B/A Equivalent Notes created hereunder, and that the provisions of Schedule 1.01(b) shall be deemed incorporated by reference into this Agreement as if such provisions were set forth in their entirety herein.

2.17.  Holdings as Agent for Borrowers.  Each Borrower hereby irrevocably appoints Holdings as its agent and attorney-in-fact for all purposes under this Agreement and each other Loan Document, which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by the respective appointing Borrower that such appointment has been revoked.  Each Borrower hereby irrevocably appoints and authorizes Holdings (i) to provide the Administrative Agent with all notices with respect to Loans and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement or any other Loan Document and (ii) to take such action as Holdings deems appropriate on its behalf to exercise such other powers as are

reasonably incidental thereto to carry out the purposes of this Agreement and the other Loan Documents. It is understood that the handling of the Credit Account and the Collateral of the respective Borrowers in a combined fashion (i.e., the U.S. Borrowers in a combined fashion and the Canadian Borrowers in a combined fashion), as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that the Lenders shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Credit Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the consolidated group. To induce the Agents and the Lenders to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each Agent and each Lender and hold each Agent and each Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against any Agent or any Lender by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Credit Account and Collateral of the Borrowers as provided in this Agreement or (b) the Agents' and the Lenders' relying on any instructions of Holdings, or (c) any other action taken by the Agents or the Lenders hereunder or under the other Loan Documents, except that the Borrowers will have no liability to any Lender or any Agent with respect to any such liability, expense, loss or claim of damage or injury to the extent the same has been finally determined by a court of competent jurisdiction to have resulted from the gross negligence, or willful misconduct of such Lender or such Agent, as the case may be.

2.18. <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) if any U.S. Facility Swingline Exposure or U.S. Facility Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender then:

(i) all or any part of such U.S. Facility Swingline Exposure and U.S. Facility Letter of Credit Exposure shall be reallocated among the U.S. Facility Lenders that are Non-Defaulting Lenders in accordance with their respective U.S. Facility RL Percentages but only to the extent (x) the sum of all U.S. Facility Lenders' that are Non-Defaulting Lenders Individual U.S. Facility Exposures plus such Defaulting Lender's U.S. Facility Swingline Exposure and U.S. Facility Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' U.S. Facility Commitments, (y) immediately following the reallocation to a U.S. Facility Lender that is a Non-Defaulting Lender, the Individual U.S. Facility Exposure of such U.S. Facility Lender does not exceed its U.S. Facility Commitment at such time and (z) the conditions set forth in <u>Section 7</u> are satisfied at such time;

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the applicable Borrowers shall within one (1) Business Day following notice by the Administrative Agent (x) first, prepay such U.S. Facility Swingline Exposure and (y) second, cash collateralize in a manner reasonably satisfactory to the applicable Issuing Lender such Defaulting Lender's U.S. Facility Letter of

Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in aggregate amount equal to 100% of such Defaulting Lender's U.S. Facility Letter of Credit Exposure for so long as such U.S. Facility Letter of Credit Exposure is outstanding (such arrangements, together with the arrangements set forth in Section 2.18(c)(ii) (the "Letter of Credit Back-Stop Arrangements");

(iii)    the applicable Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.01(b) with respect to such Defaulting Lender's U.S. Facility Letter of Credit Exposure;

(iv)    if the U.S. Facility Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.18(a), then the fees payable to the Lenders pursuant to Section 4.01(b) shall be adjusted in accordance with such Non-Defaulting Lenders' U.S. Facility RL Percentages; and

(v)    if any Defaulting Lender's U.S. Facility Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.18(a), then, without prejudice to any rights or remedies of any Issuing Lender or any Lender hereunder, all letter of credit fees payable under Section 4.01(b) with respect to such Defaulting Lender's U.S. Facility Letter of Credit Exposure shall be payable to each Issuing Lender until such U.S. Facility Letter of Credit Exposure is cash collateralized and/or reallocated;

(b)    if any Canadian Facility Swingline Exposure or Canadian Facility Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender then:

(i)    all or any part of such Canadian Facility Swingline Exposure and Canadian Facility Letter of Credit Exposure shall be reallocated among the Canadian Facility Lenders that are Non-Defaulting Lenders in accordance with their respective Canadian Facility RL Percentages but only to the extent (x) the sum of all Canadian Facility Lenders' that are Non-Defaulting Lenders Individual Canadian Facility Exposures plus such Defaulting Lender's Canadian Facility Swingline Exposure and Canadian Facility Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Canadian Facility Commitments, (y) immediately following the reallocation to a Canadian Facility Lender that is a Non-Defaulting Lender, the Individual Canadian Facility Exposure of such Canadian Facility Lender does not exceed its Canadian Facility Commitment at such time and (z) the conditions set forth in Section 7 are satisfied at such time;

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the applicable Borrowers shall within one (1) Business Day following notice by the Administrative Agent (x) first, prepay such Canadian Facility Swingline Exposure and (y) second, cash collateralize in a manner reasonably satisfactory to the applicable Issuing Lender such Defaulting Lender's Canadian Facility Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in aggregate amount equal to 100% of such

Defaulting Lender's Canadian Facility Letter of Credit Exposure for so long as such Canadian Facility Letter of Credit Exposure is outstanding (such arrangements, the "Letter of Credit Back-Stop Arrangements");

(iii)    the applicable Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.01(b) with respect to such Defaulting Lender's Canadian Facility Letter of Credit Exposure;

(iv)    if the Canadian Facility Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.18(b), then the fees payable to the Lenders pursuant to Section 4.01(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Canadian Facility RL Percentages; and

(v)    if any Defaulting Lender's Canadian Facility Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.18(b), then, without prejudice to any rights or remedies of any Issuing Lender or any Lender hereunder, all letter of credit fees payable under Section 4.01(b) with respect to such Defaulting Lender's Canadian Facility Letter of Credit Exposure shall be payable to each Issuing Lender until such Canadian Facility Letter of Credit Exposure is cash collateralized and/or reallocated;

(c)    so long as any U.S. Facility Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any U.S. Facility Swingline Loan and no Issuing Lender shall be required to issue, amend or increase any U.S. Facility Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the U.S. Facility Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the applicable Borrowers in accordance with Section 2.18(a), and participating interests in any such newly issued or increased U.S. Facility Letter of Credit or newly made U.S. Facility Swingline Loan shall be allocated among U.S. Facility Lender that are Non-Defaulting Lenders in a manner consistent with Section 2.18(a)(i) (and Defaulting Lenders shall not participate therein); and

(d)    so long as any Canadian Facility Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Canadian Facility Swingline Loan and no Issuing Lender shall be required to issue, amend or increase any Canadian Facility Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Canadian Facility Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the applicable Borrowers in accordance with Section 2.18(b), and participating interests in any such newly issued or increased Canadian Facility Letter of Credit or newly made Canadian Facility Swingline Loan shall be allocated among Canadian Facility Lender that are Non-Defaulting Lenders in a manner consistent with Section 2.18(b)(i) (and Defaulting Lenders shall not participate therein).

In the event that the Administrative Agent, the Borrowers, each Issuing Lender and the Swingline Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and Letter of Credit Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitments and on such date such Lender shall purchase at par such of the Loans of

the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be.

2.19.   Extensions of Loans and Commitments.

(a)      Notwithstanding anything to the contrary in this Agreement, subject to the terms of this Section 2.19, the Borrowers may extend the maturity date, and otherwise modify the terms of each of the Tranches, or any portion thereof (including, without limitation, by increasing the interest rate or fees payable in respect of any Loans and/or Commitments applicable to a Tranche, or any portion thereof (and related outstandings) (the "Extension") pursuant to a written offer (the "Extension Offer") made by Holdings to all Lenders, in each case on a pro rata basis under each Tranche (based on the aggregate outstanding principal amount of the respective outstanding Loans and unfunded Commitments of such Tranche) and on the same terms to each such Lender.   In connection with the Extension, Holdings will provide notification to the Administrative Agent (for distribution to the Lenders), not earlier than 18 months and not later than 6 months prior to the Initial Revolving Loan Maturity Date of the requested Extension and new Extended Revolving Loan Maturity Date.  In connection with the Extension, each Lender of the applicable Tranche, acting in its sole and individual discretion, wishing to participate in the Extension shall, prior to the date (the "Notice Date") that is 30 days after delivery of notice by the Administrative Agent to such Lender, provide the Administrative Agent with a written notice thereof in a form reasonably satisfactory to the Administrative Agent.  Any Lender that does not respond to the Extension Offer by the Notice Date shall be deemed to have rejected such Extension. The Administrative Agent shall promptly notify Holdings of each Lender's determination under this Section 2.19(a). The election of any Lender to agree to the Extension shall not obligate any other Lender to so agree. After giving effect to the Extension, the U.S. Facility Commitments and Canadian Facility Commitments so extended shall cease to be a part of the Tranche they were a part of immediately prior to the Extension and shall be a new Tranche hereunder.

(b)      Holdings shall have the right to replace each Lender that shall have rejected (or be deemed to have rejected) the Extension under Section 2.19(a) with, and add as "Lenders" under this Agreement in place thereof, one or more Replacement Lenders as provided in Section 2.13; provided that each of such Replacement Lenders shall enter into an Assignment and Assumption Agreement pursuant to which such Replacement Lender shall, effective as of a closing date selected by the Administrative Agent in consultation with Holdings (which shall occur no later than 30 days following the Notice Date and shall occur on the same date as the effectiveness of the Extension as to the Lenders which have consented thereto pursuant to Section 2.19(a)), undertake the U.S. Facility Commitment and Canadian Facility Commitment of such Replaced Lender (and, if any such Replacement Lender is already a Lender, its U.S. Facility Commitment and Canadian Facility Commitment shall be in addition to such Lender's U.S. Facility Commitment and Canadian Facility Commitment hereunder on such date).

(c)      The Extension shall be subject to the following:

(i)      no Default or Event of Default shall have occurred and be continuing at the time any offering document in respect of the Extension Offer is delivered to the Lenders and at the time of the Extension;

(ii)    (A) except as to interest rates, utilization fees, unused fees and final maturity, the U.S. Facility Commitment of any U.S. Facility Lender extended pursuant to the Extension (the "Extended U.S. Facility Commitment"), and the related outstandings, shall be a U.S. Facility Commitment (or related outstandings, as the case may be) with the same terms as the original U.S. Facility Commitments (and related outstandings); provided that, subject to the provisions of Sections 3.07 and 2.01(f) to the extent dealing with Swingline Loans and Letters of Credit which mature or expire after the Initial Revolving Loan Maturity Date, all U.S. Facility Swingline Loans and U.S. Facility Letters of Credit shall be participated in on a pro rata basis by all U.S. Facility Lenders with U.S. Facility Commitments and/or Extended U.S. Facility Commitments in accordance with their U.S. Facility RL Percentages (and except as provided in Sections 3.07 and 2.01(f), without giving effect to changes thereto on the Initial Revolving Loan Maturity Date with respect to U.S. Facility Swingline Loans and U.S. Facility Letters of Credit theretofore incurred or issued) and all borrowings under U.S. Facility Commitments and repayments thereunder shall be made on a pro rata basis (except for (x) payments of interest and fees at different rates on Extended U.S. Facility Commitments (and related outstandings) and (y) repayments required upon any Revolving Loan Maturity Date of any Tranche of U.S. Facility Commitments or Extended U.S. Facility Commitments); and

(B) except as to interest rates, utilization fees, unused fees and final maturity, the Canadian Facility Commitment of any Canadian Facility Lender extended pursuant to the Extension (the "Extended Canadian Facility Commitment"), and the related outstandings, shall be a Canadian Facility Commitment (or related outstandings, as the case may be) with the same terms as the original Canadian Facility Commitments (and related outstandings); provided that, subject to the provisions of Sections 3.07 and 2.01(f) to the extent dealing with Canadian Facility Swingline Loans and Canadian Facility Letters of Credit which mature or expire after the Initial Revolving Loan Maturity Date, all Swingline Loans and Letters of Credit shall be participated in on a pro rata basis by all Canadian Facility Lenders with Canadian Facility Commitments and/or Extended Canadian Facility Commitments in accordance with their Canadian Facility RL Percentages (and except as provided in Sections 3.07 and 2.01(f), without giving effect to changes thereto on the Initial Revolving Loan Maturity Date with respect to Canadian Facility Swingline Loans and Canadian Facility Letters of Credit theretofore incurred or issued) and all borrowings under Canadian Facility Commitments and repayments thereunder shall be made on a pro rata basis (except for (x) payments of interest and fees at different rates on Extended Canadian Facility Commitments (and related outstandings) and (y) repayments required upon any Revolving Loan Maturity Date of any Tranche of Canadian Facility Commitments or Extended Canadian Facility Commitments);

(iii)    (A) if the aggregate principal amount of U.S. Facility Commitments in respect of which U.S. Facility Lenders shall have accepted the Extension Offer shall exceed the maximum aggregate principal amount of U.S. Facility Commitments offered to be extended by Holdings pursuant to the Extension Offer, then the U.S. Facility Commitments of such U.S. Facility Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual

holdings of record) with respect to which such U.S. Facility Lenders have accepted the Extension Offer; and

(B) if the aggregate principal amount of Canadian Facility Commitments in respect of which Canadian Facility Lenders shall have accepted the Extension Offer shall exceed the maximum aggregate principal amount of Canadian Facility Commitments offered to be extended by Holdings pursuant to the Extension Offer, then the Canadian Facility Commitments of such Canadian Facility Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Canadian Facility Lenders have accepted the Extension Offer;

(iv)    all documentation in respect of the Extension shall be consistent with the foregoing, and all written communications by the Borrowers under the applicable Tranche generally directed to the Lenders under such Tranche in connection therewith shall be in form and substance consistent with the foregoing and otherwise reasonably satisfactory to the Administrative Agent;

(v)    the Minimum Extension Condition shall be satisfied; and

(vi)    the Extension shall not become effective unless, on the proposed effective date of the Extension, (x) the Borrowers shall deliver to the Administrative Agent a certificate of an Authorized Officer of each Loan Party dated the applicable date of the Extension and executed by an Authorized Officer of such Loan Party certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such extension and (y) the conditions set forth in Section 7 shall be satisfied (with all references in such Section to any Credit Event being deemed to be references to the Extension on the applicable date of the Extension) and the Administrative Agent shall have received a certificate to that effect dated the applicable date of the Extension and executed by a Financial Officer of each Borrower.

(d)    With respect to the Extension consummated by the Borrowers pursuant to this Section 2.19, (i) the Extension shall not constitute voluntary or mandatory payments or prepayments for purposes of Sections 5.01, 5.02, 5.03, 13.02 or 13.06, (ii) the Extension Offer shall contain a condition (a "Minimum Extension Condition") to consummating the Extension that (x) at least 60% of the aggregate amount of the U.S. Facility Commitments in effect immediately prior to the Initial Revolving Loan Maturity Date (unless another amount is agreed to by the Administrative Agent) and (y) at least 60% of the aggregate amount of the Canadian Facility Commitments in effect immediately prior to the Initial Revolving Loan Maturity Date (unless another amount is agreed to by the Administrative Agent), shall, in each case, be in effect immediately following the Initial Revolving Loan Maturity Date, (iii) if the amount extended is less than the Maximum U.S. Facility Letter of Credit Amount, the Maximum U.S. Facility Letter of Credit Amount shall be reduced upon the date that is five (5) Business Days prior to the Initial Revolving Loan Maturity Date (to the extent needed so that the Maximum U.S. Facility Letter of Credit Amount does not exceed the aggregate U.S. Facility Commitment which would be in effect after the Initial Revolving Loan Maturity Date), and, if applicable, the Borrowers under such Tranche shall cash collateralize obligations under any issued U.S. Facility Letters of Credit in

an amount equal to 100% of the Stated Amount of such U.S. Facility Letters of Credit, (iv) if the amount extended is less than the Maximum Canadian Facility Letter of Credit Amount, the Maximum Canadian Facility Letter of Credit Amount shall be reduced upon the date that is five (5) Business Days prior to the Initial Revolving Loan Maturity Date (to the extent needed so that the Maximum Canadian Facility Letter of Credit Amount does not exceed the aggregate Canadian Facility Commitment which would be in effect after the Initial Revolving Loan Maturity Date), and, if applicable, the Borrowers under such Tranche shall cash collateralize obligations under any issued Canadian Facility Letters of Credit in an amount equal to 100% of the Stated Amount of such Canadian Facility Letters of Credit, (v) if the amount extended is less than the Maximum U.S. Facility Swingline Amount, the Maximum U.S. Facility Swingline Amount shall be reduced upon the date that is five (5) Business Days prior to the Initial Revolving Loan Maturity Date (to the extent needed so that the Maximum U.S. Facility Swingline Amount does not exceed the aggregate U.S. Facility Commitment which would be in effect after the Initial Revolving Loan Maturity Date), and, if applicable, the Borrowers under such Tranche shall prepay any outstanding U.S. Swingline Loans, and (vi) if the amount extended is less than the Maximum Canadian Facility Swingline Amount, the Maximum Canadian Facility Swingline Amount shall be reduced upon the date that is five (5) Business Days prior to the Initial Revolving Loan Maturity Date (to the extent needed so that the Maximum Canadian Facility Swingline Amount does not exceed the aggregate Canadian Facility Commitment which would be in effect after the Initial Revolving Loan Maturity Date), and, if applicable, the Borrowers under such Tranche shall prepay any outstanding Canadian Swingline Loans.  The Administrative Agent and the Lenders hereby consent to the Extension and the other transactions contemplated by this Section 2.19 (including, for the avoidance of doubt, payment of any interest or fees in respect of any Extended U.S. Facility Commitments and Extended Canadian Facility Commitments on the such terms as may be set forth in the Extension Offer) and hereby waive the requirements of any provision of this Credit Agreement (including, without limitation, Sections 5.01, 5.02, 5.03, 13.02 or 13.06) or any other Loan Document that may otherwise prohibit the Extension or any other transaction contemplated by this Section 2.19, provided that such consent shall not be deemed to be an acceptance of the Extension Offer.

(e)     The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Credit Agreement and the other Loan Documents with the Borrowers as may be necessary in order establish new Tranches or sub-Tranches in respect of U.S. Facility Commitments and Canadian Facility Commitments so extended and such technical amendments as may be necessary in connection with the establishment of such new Tranches or sub-Tranches, in each case on terms consistent with this Section 2.19.  Notwithstanding the foregoing, the Administrative Agent shall have the right (but not the obligation) to seek the advice or concurrence of the Required Lenders with respect to any matter contemplated by this Section 2.19 and, if the Administrative Agent seeks such advice or concurrence, the Administrative Agent shall be permitted to enter into such amendments with the Borrowers in accordance with any instructions actually received by such Required Lenders and shall also be entitled to refrain from entering into such amendments with the Borrowers unless and until it shall have received such advice or concurrence; provided, however, that whether or not there has been a request by the Administrative Agent for any such advice or concurrence, all such amendments entered into with the Borrowers by the Administrative Agent hereunder shall be binding and conclusive on the Lenders.  Without limiting the foregoing, in connection with the Extension, the respective Loan Parties shall (at their expense) amend (and the Administrative

Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the Extended Revolving Loan Maturity Date so that such maturity date is extended to the Extended Revolving Loan Maturity Date (or such later date as may be advised by local counsel to the Administrative Agent).

(f)     In connection with the Extension, Holdings shall provide the Administrative Agent at least ten (10) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures, if any, as may be reasonably established by, or reasonably acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.19.

SECTION 3.  Letters of Credit.

3.01.  Letters of Credit.  (a)  (A) Subject to and upon the terms and conditions set forth herein (including, without limitation, the conditions set forth in Section 7), a Borrower may request that an Issuing Lender issue, at any time and from time to time on and after the Funding Date and prior to the 30th day prior to the Revolving Loan Maturity Date, (i) in the case of a request for a Letter of Credit in respect of the U.S. Facility Commitments, for the joint and several account of the U.S. Borrowers (each such letter of credit, a "U.S. Facility Letter of Credit" and, collectively, the "U.S. Facility Letters of Credit"), (ii) in the case of a request for a Letter of Credit by a U.S. Borrower in respect of the Canadian Facility Commitments, for the joint and several account of the U.S. Borrowers (each such letter of credit, a "U.S. Borrower Canadian Facility Letter of Credit" and, collectively, the "U.S. Borrower Canadian Facility Letters of Credit") and (iii) in the case of a request for a Letter of Credit by a Canadian Borrower in respect of the Canadian Facility Commitments, for the joint and several account of the Canadian Borrowers (each such letter of credit, a "Canadian Borrower Canadian Facility Letter of Credit" and, collectively, the "Canadian Borrower Canadian Facility Letters of Credit" and, together with the U.S. Borrower Canadian Facility Letters of Credit, the "Canadian Facility Letters of Credit" and, together with the U.S. Facility Letters of Credit, the "Letters of Credit"), and, in each case, for the benefit of (x) any holder (or any trustee, agent or other similar representative for any such holders) of L/C Supportable Obligations, an irrevocable standby letter of credit, in a form customarily used by such Issuing Lender or in such other form as is reasonably acceptable to such Issuing Lender, and (y) sellers of goods to Holdings or any of its Subsidiaries, an irrevocable trade letter of credit, in a form customarily used by such Issuing Lender or in such other form as has been approved by such Issuing Lender (although without limiting the joint and several nature of the U.S. Borrowers' or the Canadian Borrowers' obligations, as the case may be, in respect of the Letters of Credit, any particular Letter of Credit may name only one or more of the U.S. Borrowers or the Canadian Borrowers, as the case may be, as the applicant or obligor therein and, at the direction of such respective Borrower(s), may be issued for the benefit of one or more Subsidiaries of Holdings).  Unless agreed to by an Issuing Lender in respect of a Letter of Credit issued by such Issuing Lender, each Letters of Credit shall only provide for payment at sight.

(B)     Schedule 3.01(a) contains a description of letters of credit that were originally issued pursuant to the Prior Credit Agreement and which remain outstanding on the Closing Date (and setting forth, with respect to each such letter of credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account

parties, (iv) the stated amount, (v) the currency in which the letter of credit is denominated, (vi) the name of the beneficiary, (vii) the expiry date and (viii) whether such letter of credit constitutes a standby letter of credit or a trade letter of credit). Each such letter of credit which remains outstanding on the Funding Date, including any extension or renewal thereof in accordance with the terms thereof and hereof (each, as amended from time to time in accordance with the terms thereof and hereof, an "Existing Letter of Credit") shall constitute a "U.S. Facility Letter of Credit" or "Canadian Facility Letter of Credit" as specified on Schedule 3.01(a) for all purposes of this Agreement and shall be deemed issued on the Funding Date. Each Existing Letter of Credit shall be deemed to have been issued for the account of the respective Borrowers as specified on Schedule 3.01(a).

(b)     Subject to and upon the terms and conditions set forth herein (including, without limitation, the conditions set forth in Section 7), each Issuing Lender agrees that it will, at any time and from time to time on and after the Funding Date and prior to the 30th day prior to the Revolving Loan Maturity Date, following its receipt of the respective Letter of Credit Request, issue for (i) in the case of a request for a U.S. Facility Letter of Credit, for the joint and several account of the U.S. Borrowers, (ii) in the case of a request for a Canadian Facility Letter of Credit by a U.S. Borrower, for the joint and several account of the U.S. Borrowers and (iii) in the case of a request for a Canadian Facility Letter of Credit by a Canadian Borrower, for the joint and several account of the Canadian Borrowers, and one or more Letters of Credit, in each case as are permitted to remain outstanding hereunder without giving rise to a Default or an Event of Default; provided that no Issuing Lender shall be under any obligation to issue any Letter of Credit of the types described above if at the time of such issuance:

(i)     any order, judgment or decree of any Governmental Authority or arbitrator shall purport by its terms to enjoin or restrain such Issuing Lender from issuing such Letter of Credit or any requirement of law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect with respect to such Issuing Lender on the date hereof, or any unreimbursed loss, cost or expense which was not applicable or in effect with respect to such Issuing Lender as of the date hereof and which such Issuing Lender reasonably and in good faith deems material to it and for which such Issuing Lender is not otherwise entitled to reimbursement or indemnification hereunder and has not received assurances satisfactory to such Issuing Lender that it will be paid; or

(ii)     such Issuing Lender shall have received from any Borrower, any other Loan Party or the Required Lenders prior to the issuance of such Letter of Credit notice of the type described in the second sentence of Section 3.03(b).

3.02.  Maximum Letter of Credit Outstandings; Currencies Final Maturities. Notwithstanding anything to the contrary contained in this Agreement, (a) no U.S. Facility Letter of Credit shall be issued (or required to be issued) if the Stated Amount of such U.S. Facility Letter of Credit, when added to the U.S. Facility Letter of Credit Outstandings (exclusive of

Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective U.S. Facility Letter of Credit) at such time would exceed the Maximum U.S. Facility Letter of Credit Amount, (b) no Canadian Facility Letter of Credit shall be issued (or required to be issued) if the Stated Amount of such Canadian Facility Letter of Credit, when added to the Canadian Facility Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective Canadian Facility Letter of Credit) at such time would exceed the Maximum Canadian Facility Letter of Credit Amount, (c) no U.S. Facility Letter of Credit shall be issued (or required to be issued) at any time when the Aggregate U.S. Facility Exposure exceeds (or would after giving effect to such issuance exceed) the Total U.S. Facility Commitment at such time, (d) no Canadian Facility Letter of Credit shall be issued (or required to be issued) at any time when the Aggregate Canadian Facility Exposure exceeds (or would after giving effect to such issuance exceed) the Total Canadian Facility Commitment at such time, (e) the issuance of any Letter of Credit shall be subject to the conditions set forth in this Agreement (including, without limitation, the conditions set forth in <u>Section 7</u>), (f) each Letter of Credit shall be denominated in either U.S. Dollars or Canadian Dollars, (g) each standby Letter of Credit shall by its terms terminate on or before the earlier of (i) the date which occurs 12 months after the date of the issuance thereof (although any such standby Letter of Credit shall be extendible for successive periods of up to 12 months, but, in each case, not beyond the fifth Business Day prior to the Revolving Loan Maturity Date) and (ii) five Business Days prior to the Revolving Loan Maturity Date and (h) each trade Letter of Credit shall by its terms terminate on or before the earlier of (i) the date which occurs 180 days after the date of issuance thereof and (ii) five Business Days prior to the Revolving Loan Maturity Date.

3.03. <u>Letter of Credit Requests; Minimum Stated Amount</u>. (a) Whenever a Borrower desires that a Letter of Credit be issued (i) in the case of a request for a U.S. Facility Letter of Credit, for the joint and several account of the U.S. Borrowers, (ii) in the case of a request for a Canadian Facility Letter of Credit by a U.S. Borrower, for the joint and several account of the U.S. Borrowers and (iii) in the case of a request for a Canadian Facility Letter of Credit by a Canadian Borrower, for the joint and several account of the Canadian Borrowers, and shall give the Administrative Agent and the respective Issuing Lender at least five Business Days' (or such shorter period as is acceptable to such Issuing Lender) written notice thereof (including by way of facsimile). Each notice shall be in the form of <u>Exhibit C</u>, appropriately completed (each, a "<u>Letter of Credit Request</u>") and shall specify whether the Letter of Credit being issued shall constitute a U.S. Facility Letter of Credit or Canadian Facility Letter of Credit.

(b) The making of each Letter of Credit Request shall be deemed to be a representation and warranty by such requesting Borrower to the Lenders of the respective Tranche that such Letter of Credit may be issued in accordance with, and will not violate the requirements of, <u>Section 3.02</u>. Unless the respective Issuing Lender has received notice from any Borrower, any other Loan Party or the Required Lenders before it issues a Letter of Credit that one or more of the conditions specified in <u>Section 6</u> or <u>7</u> are not then satisfied, or that the issuance of such Letter of Credit would violate <u>Section 3.02</u>, then such Issuing Lender shall, subject to the terms and conditions of this Agreement, issue the requested Letter of Credit for the account of such Borrower (and the U.S. Borrowers in a combined fashion, or the Canadian Borrowers in a combined fashion, as the case may be) in accordance with such Issuing Lender's usual and customary practices. Upon the issuance of or modification or amendment to any standby Letter of Credit, each Issuing Lender shall promptly notify the Borrower to be named as

account party therein and the Administrative Agent, in writing of such issuance, modification or amendment and such notice shall be accompanied by a copy of such Letter of Credit or the respective modification or amendment thereto, as the case may be. Promptly after receipt of such notice the Administrative Agent shall notify the Participants, in writing, of such issuance, modification or amendment. On the first Business Day of each week, each Issuing Lender shall furnish the Administrative Agent with a written (including via facsimile) report of the daily aggregate outstandings of Letters of Credit issued by such Issuing Lender for the immediately preceding week.

(c)     The initial Stated Amount of each Letter of Credit shall not be less than $10,000 (or, in the case of a Letter of Credit issued in a currency other than U.S. Dollars, the U.S. Dollar Equivalent thereof) or such lesser amount as is acceptable to the respective Issuing Lender.

3.04.     <u>Letter of Credit Participations</u>.  (a)  Immediately upon the issuance by an Issuing Lender of any Letter of Credit under a Tranche, such Issuing Lender shall be deemed to have sold and transferred to each Lender under such Tranche, and each such Lender (in its capacity under this <u>Section 3.04</u>, a "<u>Participant</u>") shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of such Participant's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, in such Letter of Credit, each drawing or payment made thereunder and the obligations of the U.S. Borrowers under a Tranche, or the Canadian Borrowers, as the case may be, under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.  Upon any change in the Commitments under a Tranche or U.S. Facility RL Percentages or Canadian Facility RL Percentages of the Lenders pursuant to <u>Section 2.13</u>, <u>Section 2.14</u> or <u>Section 13.04(b)</u>, it is hereby agreed that, with respect to all outstanding Letters of Credit and Unpaid Drawings under such Tranche relating thereto, there shall be an automatic adjustment to the participations pursuant to this <u>Section 3.04</u> to reflect the new U.S. Facility RL Percentages or Canadian Facility RL Percentages of the assignor and assignee Lender under such Tranche, as the case may be.

(b)     In determining whether to pay under any Letter of Credit under a Tranche, no Issuing Lender shall have any obligation relative to the other Lenders under such Tranche other than to confirm that any documents required to be delivered under such Letter of Credit appear to have been delivered and that they appear to substantially comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by an Issuing Lender under or in connection with any Letter of Credit issued by it shall not create for such Issuing Lender any resulting liability to any Borrower, any other Loan Party, any Lender or any other Person unless such action is taken or omitted to be taken with gross negligence or willful misconduct on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)     In the event that an Issuing Lender makes any payment under any Letter of Credit under a Tranche issued by it and the U.S. Borrowers or the Canadian Borrowers, as applicable, shall not have reimbursed such amount in full to such Issuing Lender pursuant to <u>Section 3.05(a)</u>, such Issuing Lender shall promptly notify the Administrative Agent, which shall promptly notify each Participant under such Tranche of such failure, and each such Participant

shall promptly and unconditionally pay to such Issuing Lender the amount of such Participant's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of such unreimbursed payment in U.S. Dollars (or, in the case of any unreimbursed payment made in a currency other than U.S. Dollars, the U.S. Dollar Equivalent of such unreimbursed payment, as determined by the Issuing Lender on the date on which such unreimbursed payment was made by such Issuing Lender) in immediately available funds. If the Administrative Agent so notifies, prior to 12:00 Noon (New York City time) on any Business Day, any Participant under a Tranche required to fund a payment under a Letter of Credit under such Tranche, such Participant shall make available to the respective Issuing Lender in U.S. Dollars (or, in the case of any unreimbursed payment made in a currency other than U.S. Dollars, the U.S. Dollar Equivalent thereof) such Participant's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of the amount of such payment on such Business Day in immediately available funds. If and to the extent such Participant shall not have so made its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of the amount of such payment available to the respective Issuing Lender, such Participant agrees to pay to such Issuing Lender, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to such Issuing Lender at the overnight Federal Funds Rate (or, in the case of any unreimbursed payment made in a currency other than U.S. Dollars, at the respective Issuing Lender's customary rate for interbank advances) for the first three days and at the interest rate applicable to U.S. Dollar Denominated Revolving Loans that are maintained as Base Rate Loans for each day thereafter. The failure of any Participant under a Tranche to make available to an Issuing Lender its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of any payment under any Letter of Credit under such Tranche issued by such Issuing Lender shall not relieve any other Participant under such Tranche of its obligation hereunder to make available to such Issuing Lender its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of any payment under any Letter of Credit under such Tranche on the date required, as specified above, but no Participant under such Tranche shall be responsible for the failure of any other Participant under such Tranche to make available to such Issuing Lender such other Participant's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of any such payment.

(d)     Whenever an Issuing Lender receives a payment of a reimbursement obligation as to which it has received any payments from the Participants pursuant to clause (c) above, such Issuing Lender shall pay to each such Participant which has paid its applicable U.S. Facility RL Percentage or Canadian Facility RL Percentage thereof, in U.S. Dollars (or, in the case of any unreimbursed payment made in a currency other than U.S. Dollars, the U.S. Dollar Equivalent thereof) and in same day funds, an amount equal to such Participant's share (based upon the proportionate aggregate amount originally funded by such Participant to the aggregate amount funded by all Participants in respect of such participation) of the principal amount of such reimbursement obligation and interest thereon accruing after the purchase of the respective participations.

(e)     Upon the request of any Participant under a Tranche, each Issuing Lender shall furnish to such Participant copies of any standby Letter of Credit under such Tranche issued by it and such other documentation as may reasonably be requested by such Participant.

(f)     The obligations of the Participants under a Tranche to make payments to each Issuing Lender with respect to Letters of Credit under such Tranche shall be irrevocable and not subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Loan Documents;

(ii)     the existence of any claim, setoff, defense or other right which Holdings or any of its Subsidiaries may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Participant, or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between Holdings or any Subsidiary of Holdings and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of any of the Loan Documents; or

(v)     the occurrence of any Default or Event of Default.

3.05.  <u>Agreement to Repay Letter of Credit Drawings</u>.  (a)  (i) Each U.S. Borrower, in the case of a U.S. Facility Letter of Credit, hereby jointly and severally agrees, (ii) each U.S. Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a U.S. Borrower, hereby jointly and severally agrees and (iii) each Canadian Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a Canadian Borrower, hereby jointly and severally agrees, in each case, to reimburse each Issuing Lender, by making payment to the Administrative Agent in U.S. Dollars (or, in the case of any unreimbursed payment made in a currency other than U.S. Dollars, the U.S. Dollar Equivalent of such payment or disbursement as determined by the respective Issuing Lender on the date of such payment or disbursement) in immediately available funds at the Payment Office, for any payment or disbursement made by such Issuing Lender under any Letter of Credit issued by it for the account of such U.S. Borrower or Canadian Borrower, as applicable (each such amount (or the U.S. Dollar Equivalent thereof, as the case may be), so paid until reimbursed by such U.S. Borrower, or such Canadian Borrower, as applicable, an "<u>Unpaid Drawing</u>"), not later than one Business Day following receipt by any such U.S. Borrower or any such Canadian Borrower, as the case may be, of notice of such payment or disbursement (<u>provided</u> that no such notice shall be required to be given if a Default or an Event of Default under <u>Section 11.01(g)</u> or <u>(h)</u> shall have occurred and be continuing, in which case the Unpaid Drawing shall be due and payable immediately without presentment, demand, protest or notice of any kind (all of which are hereby waived by the Borrowers)), with interest on the amount so paid or disbursed by such Issuing

Lender, to the extent not reimbursed prior to 12:00 Noon (New York City time) on the date of such payment or disbursement, from and including the date paid or disbursed to but excluding the date such Issuing Lender was reimbursed by such U.S. Borrower or such Canadian Borrower, as applicable, at a rate per annum equal to the Base Rate as in effect from time to time plus the Applicable Margin as in effect from time to time for U.S. Dollar Denominated Revolving Loans that are maintained as Base Rate Loans; provided, however, to the extent such amounts are not reimbursed prior to 12:00 Noon (New York City time) on the third Business Day following the receipt by any such U.S. Borrower or any such Canadian Borrower, as applicable, of notice of such payment or disbursement or following the occurrence of a Default or an Event of Default under Section 11.01(g) or (h), interest shall thereafter accrue on the amounts so paid or disbursed by such Issuing Lender (and until reimbursed by such U.S. Borrower or such Canadian Borrower, as applicable, at a rate per annum equal to the Base Rate as in effect from time to time plus the Applicable Margin for U.S. Dollar Denominated Revolving Loans that are maintained as Base Rate Loans as in effect from time to time plus 2%, with such interest to be payable on demand. Each Issuing Lender shall give the U.S. Borrower or the Canadian Borrowers, or as the case may be, prompt written notice of each Drawing under any Letter of Credit issued by it for the account of such U.S. Borrower or such Canadian Borrower, as the case may be; provided that the failure to give any such notice shall in no way affect, impair or diminish the obligations of any such Borrower hereunder.

(b)     The joint and several obligations of such U.S. Borrowers or such Canadian Borrowers, as the case may be, under this Section 3.05 to reimburse each Issuing Lender with respect to drafts, demands and other presentations for payment under Letters of Credit issued by it (each, a "Drawing") (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which Holdings, any Borrower or any other Subsidiary of Holdings may have or have had against any Lender under the respective Tranche (including in its capacity as an Issuing Lender or as a Participant under such Tranche), including, without limitation, any defense based upon the failure of any drawing under a Letter of Credit to conform to the terms of the Letter of Credit or any nonapplication or misapplication by the beneficiary of the proceeds of such Drawing; provided, however, that no Borrower shall be obligated to reimburse any Issuing Lender for any wrongful payment made by such Issuing Lender under a Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

3.06.  Increased Costs.  If at any time after the Closing Date, the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by the NAIC or any Governmental Authority charged with the interpretation or administration thereof, or compliance by any Issuing Lender or any Participant with any request or directive by the NAIC or by any such Governmental Authority (whether or not having the force of law), shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against letters of credit issued by any Issuing Lender or participated in by any Participant, or (b) impose on any Issuing Lender or any Participant any other conditions relating, directly or indirectly, to this Agreement or any Letter of Credit; and the result of any of the foregoing is to increase the cost to any Issuing Lender or any Participant of issuing, maintaining or participating in any Letter of Credit, or reduce the amount

of any sum received or receivable by any Issuing Lender or any Participant hereunder or reduce the rate of return on its capital with respect to Letters of Credit (except with respect to any Tax, which shall be governed solely by Section 5.04), then, upon the delivery of the certificate referred to below to the Borrowers by any Issuing Lender or any Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), the applicable Loan Parties whose Revolving Loans are subject to such increased costs jointly and severally agree to pay to such Issuing Lender or such Participant such additional amount or amounts as will compensate such Issuing Lender or such Participant for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital. Any Issuing Lender or any Participant, upon determining that any additional amounts will be payable to it pursuant to this Section 3.06, will give prompt written notice thereof to the Borrowers, which notice shall include a certificate submitted to the Borrowers by such Issuing Lender or such Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), setting forth in reasonable detail the basis for the calculation of such additional amount or amounts necessary to compensate such Issuing Lender or such Participant. The certificate required to be delivered pursuant to this Section 3.06 shall, absent manifest error, be final and conclusive and binding on the Borrowers.

Section 3.07 Extended Commitments. If the Initial Revolving Loan Maturity Date shall have occurred at a time when Extended U.S. Facility Commitments or Extended Canadian Facility Commitments are in effect, then such Letters of Credit shall automatically be deemed to have been issued (including for purposes of the obligations of the Lenders under the applicable Tranche to purchase participations therein and to make U.S. Facility Revolving Loans or Canadian Facility Revolving Loans, as the case may be, and payments in respect thereof pursuant to Sections 3.04 and 3.05) under (and ratably participated in by Lenders under the applicable Tranche pursuant to) the Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as applicable, up to an aggregate amount not to exceed the aggregate principal amount of the unutilized Extended U.S. Facility Commitments or Extended Canadian Facility Commitments, as the case may be, thereunder at such time (it being understood that no partial face amount of any Letter of Credit may be so reallocated). Except to the extent of reallocations of participations pursuant to the prior sentence, the occurrence of the Initial Revolving Loan Maturity Date with respect to a given Tranche of Commitments shall have no effect upon (and shall not diminish) the percentage participations of the Lenders under a Tranche in any Letter of Credit under such Tranche issued before the Initial Revolving Loan Maturity Date.

SECTION 4. Commitment Fees; Reductions of Commitment.

4.01. Fees. (a) Holdings agrees to pay to the Administrative Agent for distribution to each Non-Defaulting Lender a commitment fee (the "Commitment Fees") for the period from and including the Closing Date to and including the Revolving Loan Maturity Date (or such earlier date on which the Total Commitment has been terminated) computed at a rate per annum equal to the Applicable Commitment Fee Percentage of the Unutilized Commitment of such Non-Defaulting Lender as in effect from time to time. Accrued Commitment Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the date upon which the Total Commitment is terminated.

(b)      (i) Each U.S. Borrower, in the case of a U.S. Facility Letter of Credit, hereby jointly and severally agrees, (ii) each U.S. Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a U.S. Borrower, hereby jointly and severally agrees and (iii) each Canadian Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a Canadian Borrower, hereby jointly and severally agrees, in each case, to pay to the Administrative Agent for distribution to each Non-Defaulting Lender under the respective Tranche (based on each such Lender's respective U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be) a fee in respect of each Letter of Credit issued for the account of such U.S. Borrower or such Canadian Borrower, as applicable (the "Letter of Credit Fee") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to the Applicable Margin as in effect from time to time during such period with respect to Revolving Loans that are maintained as Eurodollar Loans on the daily Stated Amount of each such Letter of Credit. Accrued Letter of Credit Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the first day on or after the termination of the Total U.S. Facility Commitment or Total Canadian Facility Commitment, as the case may be, upon which no Letters of Credit under the respective Tranche remain outstanding.

(c)      (i) Each U.S. Borrower, in the case of a U.S. Facility Letter of Credit, hereby jointly and severally agrees, (ii) each U.S. Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a U.S. Borrower, hereby jointly and severally agrees and (iii) each Canadian Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a Canadian Borrower, hereby jointly and severally agrees, in each case, to pay to each Issuing Lender, for its own account, a facing fee in respect of each Letter of Credit issued by it for the account of such U.S. Borrower or such Canadian Borrower, as applicable (the "Facing Fee") as may have been, or are hereafter, agreed to in writing from time to time by Holdings and such Issuing Lender.

(d)      (i) Each U.S. Borrower, in the case of a U.S. Facility Letter of Credit, hereby jointly and severally agrees, (ii) each U.S. Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a U.S. Borrower, hereby jointly and severally agrees and (iii) each Canadian Borrower, in the case of a Canadian Facility Letter of Credit issued for the account of a Canadian Borrower, hereby jointly and severally agrees, in each case, to pay to each Issuing Lender, for its own account, upon each payment under, issuance of, or amendment to, any Letter of Credit issued by it for the account of such U.S. Borrower or such Canadian Borrower, as applicable, such amount as shall at the time of such event be the administrative charge and the reasonable expenses which such Issuing Lender is generally imposing in connection with such occurrence with respect to letters of credit.

(e)      (i) Each U.S. Borrower, in the case of U.S. Facility Bankers' Acceptance Loans, hereby jointly and severally agrees, (ii) each U.S. Borrower, in the case of Canadian Facility Bankers' Acceptance Loans made to them, hereby jointly and severally agrees and (iii) each Canadian Borrower, in the case of Canadian Facility Bankers' Acceptance Loans made to them, hereby jointly and severally agrees, in each case, to pay Drawing Fees at the time of the incurrence (by way of acceptance, purchase or otherwise) of each such respective Bankers' Acceptance Loan.

(f)    The applicable Borrowers agree to pay to each Agent such fees as may have been, or are hereafter, agreed to in writing from time to time by Holdings or any of its Subsidiaries and such Agent on the basis and to the extent set forth therein.

4.02.  <u>Voluntary Termination of Unutilized Commitments</u>.  Upon at least three Business Day's prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders under the applicable Tranche), the Borrowers shall have the right, at any time or from time to time, without premium or penalty to terminate Total Unutilized U.S. Facility Commitment or Total Unutilized Canadian Facility Commitment, in each case, in whole, or reduce it in part, pursuant to this <u>Section 4.02</u>, in an integral multiple of $500,000 in the case of partial reductions to the Total Unutilized U.S. Facility Commitment or Total Unutilized Canadian Facility Commitment, as the case may be, <u>provided</u> that each such reduction shall apply proportionately to permanently reduce the Commitments under the applicable Tranche of each Lender under such Tranche; <u>provided</u> <u>further</u>, that a notice of termination of the Total Unutilized Commitment in whole delivered by a Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by such Borrower (by notice to the Administrative Agent on or prior to the specified effective date).

4.03.  <u>Mandatory Reduction of Commitments</u>.  (a)  The Total Commitment (and the Commitments of each Lender) shall terminate in its entirety on July 16, 2010, unless the Funding Date has occurred on or prior to such date.

(b)    In addition to any other mandatory commitment reductions pursuant to this <u>Section 4.03(b)</u>, the Total Commitment (and the Commitments of each Lender) shall terminate in its entirety upon the earlier of (i) the Revolving Loan Maturity Date and (ii) unless the Required Lenders otherwise agree in writing, the date on which a Change of Control occurs.

SECTION 5.  <u>Prepayments; Payments; Taxes</u>.

5.01.  <u>Voluntary Prepayments</u>.  Each Borrower shall have the right to prepay the Loans made to such Borrower, without premium or penalty, in whole or in part at any time and from time to time on the following terms and conditions:  (i) such Borrower shall give the Administrative Agent prior to 12:00 Noon (New York City time) at the Notice Office (A) at least one Business Day's (or such shorter period as agreed to by the Administrative Agent in its sole discretion) prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans (or same day notice in the case of a prepayment of U.S. Dollar Denominated Swingline Loans) or Canadian Prime Rate Loans (or same day notice in the case of a prepayment of Canadian Dollar Denominated Swingline Loans) and (B) at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Eurodollars Loans, which notice (in each case) shall specify whether U.S. Facility Revolving Loans, U.S. Facility Swingline Loans, Canadian Facility Revolving Loans or Canadian Facility Swingline Loans shall be prepaid, the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made, and which notice the Administrative Agent shall, except in the case of Swingline Loans, promptly transmit to each of the Lenders under the applicable Tranche, <u>provided</u> that if a notice of optional prepayment is

given in connection with a conditional notice of termination of the Total Unutilized Commitment in whole as contemplated by Section 4.02, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 4.02; (ii) (x) each partial prepayment of Revolving Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of at least $500,000 (or such lesser amount as is acceptable to the Administrative Agent) and (y) each partial prepayment of Swingline Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of at least $100,000 (or such lesser amount as is acceptable to the Administrative Agent in any given case); provided that if any partial prepayment of Eurodollar Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Eurodollar Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by such Borrower shall have no force or effect; (iii) each prepayment pursuant to this Section 5.01 in respect of any Revolving Loans or Swingline Loans made pursuant to a Borrowing shall be applied pro rata among such Revolving Loans or Swingline Loans, as the case may be, provided that at the applicable Borrower's election in connection with any prepayment of Revolving Loans pursuant to this Section 5.01, such prepayment shall not, so long as no Default or Event of Default then exists, be applied to any Revolving Loan of a Defaulting Lender, and (iv) prepayments of Bankers' Acceptance Loans may not be made prior to the maturity date of the underlying Bankers' Acceptances or B/A Equivalent Notes, as the case may be.

5.02. Mandatory Repayments; Cash Collateralization. (a) (i) On any day on which any one or more of the following conditions shall exist, the Borrowers shall repay the Loans (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured) and/or cash collateralize outstanding Letters of Credit (in U.S. Dollars or, to the extent any Letter of Credit is denominated in a currency other than U.S. Dollars, in the U.S. Dollar Equivalent thereof) and Bankers' Acceptance Loans pursuant to clause (iii) below in such amount as may be required to cause such conditions to cease to exist on such day:

(u)     the Aggregate U.S. Borrower Exposure at such time exceeds 100% (or, during an Agent Advance Period, 105%) of the U.S. Borrowing Base at such time;

(v)     the Aggregate Canadian Borrower Exposure at such time exceeds 100% (or, during an Agent Advance Period, 105%) of the Canadian Borrowing Base at such time;

(w)     the Aggregate U.S. Facility Exposure at such time exceeds the Total U.S. Facility Commitment at such time;

(x)     the Aggregate Canadian Facility Exposure at such time exceeds the Total Canadian Facility Commitment at such time;

(y)     the aggregate U.S. Facility Letter of Credit Outstandings at such time exceeds the Maximum U.S. Facility Letter of Credit Amount; and/or

(z)      the aggregate Canadian Facility Letter of Credit Outstandings at such time exceeds the Maximum Canadian Facility Letter of Credit Amount.

(ii)      In connection with any repayment and/or cash collateralization required pursuant to Section 5.02(a)(i) on any day, the Borrowers shall prepay the Loans in the following order:

(A)      in the case of a repayment and/or cash collateralization required pursuant to Section 5.02(a)(i)(u) on any day, the U.S. Borrowers shall repay on such day the principal of outstanding U.S. Borrower Swingline Loans and, after all U.S. Borrower Swingline Loans have been repaid in full or if no U.S. Borrower Swingline Loans are outstanding, U.S. Borrower Revolving Loans (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured) (each such repayment shall be applied to the U.S. Facility Revolving Loans and the U.S. Borrower Canadian Facility Revolving Loans on a pro rata basis), in each case in such amount as may be required to cause the conditions giving rise to such mandatory repayment requirement to cease to exist on such day,

(B)      in the case of a repayment and/or cash collateralization required pursuant to Section 5.02(a)(i)(v) on any day, the Canadian Borrowers shall repay on such day the principal of outstanding Canadian Borrower Swingline Loans and, after all Canadian Borrower Swingline Loans have been repaid in full or if no Canadian Borrower Swingline Loans are outstanding, Canadian Borrower Revolving Loans (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured), in each case in such amount as may be required to cause the conditions giving rise to such mandatory repayment requirement to cease to exist on such day,

(C) in the case of a repayment and/or cash collateralization required pursuant to Section 5.02(a)(i)(w) on any day, the U.S. Borrowers shall repay on such day the principal of outstanding U.S. Facility Swingline Loans and, after all U.S. Facility Swingline Loans have been repaid in full or if no U.S. Facility Swingline Loans are outstanding, U.S. Facility Revolving Loans (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured), in each case in such amount as may be required to cause the conditions giving rise to such mandatory repayment requirement to cease to exist on such day, and

(D) in the case of a repayment and/or cash collateralization required pursuant to Section 5.02(a)(i)(x) on any day, the Borrowers shall repay on such day the principal of their respective outstanding Canadian Facility Swingline Loans and, after all Canadian Facility Swingline Loans have been repaid in full or if no Canadian Facility Swingline Loans are outstanding, Canadian Facility Revolving Loans (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured), in each case in such amount as may be required

to cause the conditions giving rise to such mandatory repayment requirement to cease to exist on such day.

(iii)     If the conditions set forth in Section 5.02(a)(i)(x) or (y) exist or, after giving effect to the prepayment of all Loans under a Tranche (other than Bankers' Acceptance Loans where the underlying B/A Instrument has not matured), the conditions set forth in <u>Section 5.02(a)(i)</u> continue to exist, the respective Borrowers shall pay to the Administrative Agent at the Payment Office on such day an amount of cash and/or Permitted Investments equal to 105% of the amount of such excess, such cash and/or Permitted Investments to be held as security for all Obligations of the Borrowers to the Issuing Lenders and the Lenders, in each case, under such Tranche hereunder in a cash collateral account to be established by, and under the sole dominion and control of, the Administrative Agent (and which cash and/or Permitted Investments may, without limiting the Borrowers' obligations in respect thereof, be paid to and applied by such Issuing Lenders in satisfaction of the Obligations of the Borrowers to such Issuing Lenders and/or Lenders in respect of any Drawings made under any Letter of Credit under such Tranche issued for the account of a Borrower or such Bankers' Acceptance Loans under such Tranche on the respective maturity dates thereof).

(b)     In addition to any other mandatory repayments pursuant to this <u>Section 5.02</u>, all then outstanding Loans shall be repaid in full and the respective Borrowers shall pay to the Administrative Agent at the Payment Office on such day an amount of cash and/or Permitted Investments equal to 105% of the amount of such excess, such cash and/or Permitted Investments to be held as security for all Obligations of the applicable Borrower to the applicable Issuing Lenders and Lenders hereunder in a cash collateral account to be established by, and under the sole dominion and control of, the Administrative Agent (and which cash and/or Permitted Investments may, without limiting the Borrowers' obligations in respect thereof, be paid to and applied by such Issuing Lenders and/or Lenders in satisfaction of the Obligations of the Borrowers to such Issuing Lenders and/or Lenders in respect of any Drawings made under any Letter of Credit issued for the account of a Borrower or such Bankers' Acceptance Loan on the respective maturity dates thereof), in each case on the Initial Revolving Loan Maturity Date (or, in the case of any Extended U.S. Facility Commitments and Extended Canadian Facility Commitments, the Extended Revolving Loan Maturity Date).

(c)     In addition to any other mandatory repayments pursuant to this <u>Section 5.02</u>, each Swingline Loan under a Tranche will be repaid (for the avoidance of doubt, such repayment may be made with proceeds from Revolving Loans under such Tranche incurred by the same Borrower), no later than the seventh day following the incurrence thereof; <u>provided</u> that, if the seventh day is not a Business Day, such repayment shall be made on the next succeeding Business Day.

5.03.  <u>Method and Place of Payment; Deposits and Accounts</u>.  (a)  Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 1:00 p.m. (New York City time) on the date when due and shall be made in (x) U.S. Dollars (or, in the case of any Unpaid Drawings denominated in a currency other than U.S. Dollars, in an amount equal to the U.S. Dollar Equivalent thereof) in immediately available

funds at the Payment Office in respect of any obligation of the Borrowers under this Agreement except as otherwise provided in the immediately following clause (y) or (y) Canadian Dollars in immediately available funds at the Payment Office, if such payment is made in respect of (i) principal of, or Face Amount of, or interest on Canadian Dollar Denominated Loans or (ii) any increased costs, indemnities or other amounts owing with respect to Canadian Dollar Denominated Loans (including, without limitation, pursuant to Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06). Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

(b) Each U.S. Loan Party shall, along with the Security Agent, certain financial institutions selected by Holdings and reasonably acceptable to the Administrative Agent (the "U.S. Collection Banks"), and each of those banks in which each Core U.S. Concentration Account, U.S. Collection Account and Deposit Account (other than Excluded Accounts) are maintained by each such U.S. Loan Party, enter into, and thereafter maintain, separate Control Agreements in respect of each such Core U.S. Concentration Account, U.S. Collection Account and Deposit Account (other than Excluded Accounts) in compliance with the Collateral and Guarantee Requirements. Each U.S. Loan Party shall instruct all Account Debtors of the U.S. Loan Parties to remit all payments to the applicable "P.O. Boxes" or "Lockbox Addresses" of the applicable U.S. Collection Bank (or to remit such payments to the applicable U.S. Collection Bank by electronic settlement) with respect to all Accounts of such Account Debtor, which remittances shall be collected by the applicable U.S. Collection Bank and deposited in the applicable U.S. Collection Account. All amounts received by any U.S. Loan Party and any U.S. Collection Bank in respect of any Account of an Account Debtor of any U.S. Loan Party, in addition to all other cash received by any U.S. Loan Party from any other source, shall upon receipt be deposited into a U.S. Collection Account or a Core U.S. Concentration Account or, to the extent permitted hereunder in the case of amounts not constituting payments in respect of Accounts of any U.S. Loan Party, an Excluded Account or Term Sweep Account; provided that so long as no Dominion Period then exists collections with regard to such Accounts and with respect to inventory in an aggregate amount not to exceed $15,000,000 during any calendar month may be deposited in Canadian depository accounts of a Canadian Borrower so long as no later than 30 days following the end of each such month, such collections are settled through the intercompany accounting procedures of Holdings and its Subsidiaries.

(c) Each Canadian Loan Party shall, along with the Security Agent, certain financial institutions selected by Holdings and reasonably acceptable to the Administrative Agent (the "Canadian Collection Banks"), and each of those banks in which each Core Canadian Concentration Account, Canadian Collection Account and Deposit Account (other than Excluded Accounts) are maintained by each such Canadian Loan Party, enter into, and thereafter maintain, separate Control Agreements in respect of each such Core Canadian Concentration Account, Canadian Collection Account and Deposit Account (other than Excluded Accounts) in compliance with the Collateral and Guarantee Requirements. Each Canadian Loan Party shall instruct all Account Debtors of the Canadian Loan Parties to remit all payments to the applicable "P.O. Boxes" or "Lockbox Addresses" of the applicable Canadian Collection Bank (or to remit such payments to the applicable Canadian Collection Bank by electronic settlement) with respect to all Accounts of such Account Debtor, which remittances shall be collected by the applicable

Canadian Collection Bank and deposited in the applicable Canadian Collection Account. All amounts received by any Canadian Loan Party and any Canadian Collection Bank in respect of any Account of an Account Debtor of any Canadian Loan Party, in addition to all other cash received by any Canadian Loan Party from any other source, shall upon receipt be deposited into a Canadian Collection Account, a Core Canadian Concentration Account or, to the extent permitted hereunder in the case of amounts not constituting payments in respect of Accounts of any Canadian Loan Party, an Excluded Account or Term Sweep Account.

(d)     (i) All amounts deposited or held in all of the U.S. Collection Accounts with respect to each U.S. Loan Party and available for transfer shall be transferred by the close of business on each Business Day into one or more accounts with the Administrative Agent or a financial institution reasonably acceptable to the Administrative Agent (each a "<u>Core U.S. Concentration Account</u>" and collectively, the "<u>Core U.S. Concentration Accounts</u>") unless such amounts are otherwise (A) required or permitted to be applied pursuant to <u>Section 5.02</u> or (B) so long as no Dominion Period then exists, required to be retained in any U.S. Collection Account, in each case to satisfy the payment of outstanding obligations owing in respect of checks or similar obligations issued by any U.S. Loan Party, provided that the aggregate amount retained in all such U.S. Collection Accounts pursuant to this clause (B) shall not exceed that amount (as reasonably determined by Holdings) to cover all of the aggregate amount of all such outstanding obligations and (ii) all amounts deposited or held in all of the Canadian Collection Accounts with respect to each Canadian Loan Party and available for transfer shall be transferred by the close of business on each Business Day into one or more accounts with the Administrative Agent or a financial institution reasonably acceptable to the Administrative Agent (each, a "<u>Core Canadian Concentration Account</u>" and, collectively, the "<u>Core Canadian Concentration Accounts</u>") unless such amounts are otherwise (A) required or permitted to be applied pursuant to <u>Section 5.02</u> or (B) so long as no Dominion Period then exists, required to be retained in any Canadian Collection Account, in each case to satisfy the payment of outstanding obligations owing in respect of checks or similar obligations issued by any Canadian Loan Party, provided that the aggregate amount retained in all such Canadian Collection Accounts pursuant to this clause (B) shall not exceed that amount (as reasonably determined by Holdings) to cover all of the aggregate amount of all such outstanding obligations. Except as, and to the extent, permitted by this <u>Section 5.03(d)</u>, and <u>Section 10</u> each Collection Account shall have a zero balance immediately following the transfer of funds on each Business Day pursuant to the immediately preceding sentences. So long as no Dominion Period then exists, the Borrowers and the other Loan Parties shall be permitted to transfer cash from the Core Concentration Accounts to other Deposit Accounts to be used for working capital and general corporate purposes all subject to the requirements of this Agreement (including this <u>Section 5.03(d)</u>). If a Dominion Period exists, all collected amounts held in the Core Concentration Accounts shall be applied as provided in <u>Section 5.03(e)</u> or <u>(f)</u>, as applicable.

(e)     Each Control Agreement relating to a Core U.S. Concentration Account shall (unless otherwise agreed by the Administrative Agent in its sole discretion) include provisions that allow, during any Dominion Period, for all collected amounts held in such Core U.S. Concentration Account from and after the date requested by the Administrative Agent, to be sent by ACH or wire transfer or similar electronic transfer no less frequently than once per Business Day to one or more accounts maintained by the Administrative Agent at DBNY (or if DBNY is not the Administrative Agent, at the institution designated by such successor

Administrative Agent) or an affiliate thereof (each a "DB U.S. Account").  Subject to the terms of the respective Security Document, all amounts received in a DB U.S. Account during the existence of a Dominion Period shall be applied (and allocated) by the Administrative Agent on a daily basis in the following order (in each case to the extent the Administrative Agent has actual knowledge of the amounts owing or outstanding as described below, and after giving effect to the application of any such amounts constituting proceeds from any Collateral otherwise required to be applied pursuant to the terms of the respective Security Document during the existence of an Event of Default), subject to the provisions of the immediately succeeding sentence (to the extent applicable):   (1) first, to the payment (on a ratable basis) of any outstanding Expenses actually due and payable by any U.S. Borrower to the Administrative Agent, the Co-Collateral Agents and the Security Agent under any of the Loan Documents; (2) second, to the extent all amounts referred to in preceding clause (1) have been paid in full, to pay (on a ratable basis) all outstanding Expenses actually due and payable by any U.S. Borrower to each Issuing Lender under any of the Loan Documents; (3) third, to the extent all amounts referred to in preceding clauses (1) and (2) have been paid in full, to pay (on a ratable basis) all accrued and unpaid interest actually due and payable on the U.S. Borrower Loans and then all accrued and unpaid Fees actually due and payable by any U.S. Borrower to the Administrative Agent, the Issuing Lenders and the Lenders under any of the Loan Documents; (4) fourth, to the extent all amounts referred to in preceding clauses (1) through (3), inclusive, have been paid in full, to pay (on a ratable basis) any and all unpaid principal of U.S. Borrower Loans and Unpaid Drawings in respect of Letters of Credit issued for the account of a U.S. Borrower in each case which are then actually due and payable; (5) fifth, to the extent all amounts referred to in preceding clauses (1) through (4), inclusive, have been paid in full, to repay or prepay outstanding U.S. Borrower Swingline Loans and to repay or prepay all outstanding U.S. Borrower Revolving Loans advanced by the Administrative Agent on behalf of the Lenders pursuant to Section 2.01(e); (6) sixth, to the extent all amounts referred to in preceding clauses (1) through (5), inclusive, have been paid in full, to repay (on a ratable basis) the outstanding principal of U.S. Borrower Revolving Loans (whether or not then due and payable, but excluding any outstanding Bankers' Acceptance Loans where the underlying B/A Instrument has not matured), provided that, with respect to each repayment of U.S. Borrower Revolving Loans required by this Section 5.03(e)(6), so long as no Default or Event of Default then exists and less than all outstanding U.S. Borrower Revolving Loans would otherwise be required to be repaid pursuant hereto, the U.S. Borrowers may designate the Types of U.S. Borrower Revolving Loans which are to be repaid and, in the case of Eurodollar Loans which are U.S. Borrower Revolving Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made; (7) seventh, to the extent all amounts referred to in preceding clauses (1) through (6), inclusive, have been paid in full, but only if an Event of Default has occurred and is continuing, to cash collateralize (on a ratable basis) all outstanding Letters of Credit issued for the account of a U.S. Borrower and Bankers' Acceptance Loans which are U.S. Borrower Revolving Loans where the underlying B/A Instrument has not matured (such cash collateral to be held by the Administrative Agent while an Event of Default exists in a cash collateral account to be established by, and under the sole dominion and control of, the Administrative Agent and applied to the Obligations of the U.S. Borrowers to the Issuing Lenders and/or Lenders in respect of any Drawings made under any such Letters of Credit or any such Bankers' Acceptance Loans); (8) eighth, to the extent all amounts referred to in preceding clauses (1) through (7), inclusive, have been paid in full, to pay (on a ratable basis) all other outstanding Obligations of any U.S.

Borrower then due and payable to the Administrative Agent, the Co-Collateral Agents, the Security Agent and the Lenders under any of the Loan Documents; and (9) ninth, to the U.S. Borrowers; provided that, with respect to any payments or cash collateralization required to be applied (or allocated) pursuant to preceding clauses (1) through (8), in each case, to the extent the outstanding Obligations under any such clause constitutes outstanding Obligations under more than one Tranche, any such payments or cash collateralization shall be applied (or allocated) under such clause to the outstanding Obligations under each Tranche on a pro rata basis based upon the outstanding Obligations with respect to such Tranches under such clause. Each U.S. Loan Party agrees that it will not cause any proceeds of any Core Concentration Account to be otherwise redirected.

(f)     Each Control Agreement relating to a Core Canadian Concentration Account shall (unless otherwise agreed by the Administrative Agent in its sole discretion) include provisions that allow, during any Dominion Period, for all collected amounts held in such Core Canadian Concentration Account from and after the date requested by the Administrative Agent, to be sent by ACH or wire transfer or similar electronic transfer no less frequently than once per Business Day to one or more accounts maintained by the Administrative Agent at DBNY (or if DBNY is not the Administrative Agent, at the institution designated by such successor Administrative Agent) or an affiliate thereof (each a "DB Canadian Account"). Subject to the terms of the respective Security Document, all amounts received in a DB Canadian Account during the existence of a Dominion Period shall be applied (and allocated) by the Administrative Agent on a daily basis in the following order (in each case to the extent the Administrative Agent has actual knowledge of the amounts owing or outstanding as described below, and after giving effect to the application of any such amounts constituting proceeds from any Collateral otherwise required to be applied pursuant to the terms of the respective Security Document during the existence of an Event of Default), subject to the provisions of the immediately succeeding sentence (to the extent applicable):  (1) first, to the payment (on a ratable basis) of any outstanding Expenses actually due and payable by any Canadian Borrower to the Administrative Agent, the Co-Collateral Agents and the Security Agent under any of the Loan Documents; (2) second, to the extent all amounts referred to in preceding clause (1) have been paid in full, to pay (on a ratable basis) all outstanding Expenses actually due and payable by any Canadian Borrower to each Issuing Lender under any of the Loan Documents; (3) third, to the extent all amounts referred to in preceding clauses (1) and (2) have been paid in full, to pay (on a ratable basis) all accrued and unpaid interest actually due and payable on the Canadian Borrower Loans and then all accrued and unpaid Fees actually due and payable by any Canadian Borrower to the Administrative Agent, the Issuing Lenders and the Lenders under any of the Loan Documents; (4) fourth, to the extent all amounts referred to in preceding clauses (1) through (3), inclusive, have been paid in full, to pay (on a ratable basis) any and all unpaid principal of Canadian Borrower Loans and Unpaid Drawings in respect of Letters of Credit issued for the account of a Canadian Borrower in each case which are then actually due and payable; (5) fifth, to the extent all amounts referred to in preceding clauses (1) through (4), inclusive, have been paid in full, to repay or prepay outstanding Canadian Borrower Swingline Loans and to repay or prepay all outstanding Canadian Borrower Revolving Loans advanced by the Administrative Agent on behalf of the Lenders pursuant to Section 2.01(e); (6) sixth, to the extent all amounts referred to in preceding clauses (1) through (5), inclusive, have been paid in full, to repay (on a ratable basis) the outstanding principal of Canadian Borrower Revolving Loans (whether or not then due and payable, but excluding any outstanding Bankers' Acceptance

Loans where the underlying B/A Instrument has not matured), provided that, with respect to each repayment of Canadian Borrower Revolving Loans required by this Section 5.03(f)(6), so long as no Default or Event of Default then exists and less than all outstanding Canadian Borrower Revolving Loans would otherwise be required to be repaid pursuant hereto, the Canadian Borrowers may designate the Types of Canadian Borrower Revolving Loans which are to be repaid and, in the case of Eurodollar Loans which are Canadian Borrower Revolving Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made; (7) seventh, to the extent all amounts referred to in preceding clauses (1) through (6), inclusive, have been paid in full, but only if an Event of Default has occurred and is continuing, to cash collateralize (on a ratable basis) all outstanding Letters of Credit issued for the account of a Canadian Borrower and Bankers' Acceptance Loans which are Canadian Borrower Revolving Loans where the underlying B/A Instrument has not matured (such cash collateral to be held by the Administrative Agent while an Event of Default exists in a cash collateral account to be established by, and under the sole dominion and control of, the Administrative Agent and applied to the Obligations of the Canadian Borrowers to the Issuing Lenders and/or Lenders in respect of any Drawings made under any such Letters of Credit or Bankers' Acceptance Loans); (8) eighth, to the extent all amounts referred to in preceding clauses (1) through (7), inclusive, have been paid in full, to pay (on a ratable basis) all other outstanding Obligations of any Canadian Borrower then due and payable to the Administrative Agent, the Co-Collateral Agents, the Security Agent and the Lenders under any of the Loan Documents; and (9) ninth, to the Canadian Loan Parties. Each Canadian Loan Party agrees that it will not cause any proceeds of any Core Canadian Concentration Account to be otherwise redirected.

(g)     Without limiting the provisions set forth in Section 13.15, the Administrative Agent shall maintain accounts on its books in the name of each Borrower (collectively, the "Credit Account") in which each Borrower will be charged with all loans and advances under each Tranche made by the Lenders to the respective Borrower for the respective Borrower's account, including the Loans, the Letter of Credit Outstandings, and the Fees, Expenses and any other Obligations relating thereto.  Each Borrower will be credited, in accordance with this Section 5.03, with all amounts received by the Lenders from such Borrower or from others for its account, including, as set forth above, all amounts received by the Administrative Agent and applied to the Obligations.  In no event shall prior recourse to any Accounts or other Collateral be a prerequisite to the Administrative Agent's right to demand payment of any Obligation upon its maturity.  Further, the Administrative Agent shall have no obligation whatsoever to perform in any respect any of the Borrowers' or other Loan Parties' contracts or obligations relating to the Accounts.

5.04.  Net Payments; Taxes.  (a) (i)  All payments made by the Borrowers and the other Loan Parties hereunder and under any other Loan Document will be made without setoff, counterclaim or other defense.

(ii)     Except as provided in Section 5.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding those certain taxes described in Section 13.01(a)(ii), which shall be governed solely by the provisions of such Section, and, except as provided in the

second succeeding sentence, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder, (w) taxes imposed on or measured by its net income (however denominated) and franchise taxes imposed on or measured by its gross or net income or receipts, in each case by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or is otherwise doing business or has a permanent establishment for purposes of an applicable tax treaty or in which its principal office is located, (x) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Borrower is located, (y) in the case of a Foreign Lender (other than an assignee pursuant to a request by a Borrower under Section 2.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Borrower with respect to such withholding pursuant to Section 5.04(a) and (z) any withholding tax that is attributable to a Foreign Lender's failure to comply with Section 5.04(b) or (c) or providing incorrect, false or misleading statements with respect thereto) and all interest, penalties or similar liabilities with respect thereto (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").  If any Taxes are so levied or imposed, the respective Borrower and any other Loan Party making the respective payment or which has guaranteed the obligations of the relevant Borrower jointly or severally agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any other Loan Document, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such other Loan Documents.  If, pursuant to the preceding sentence, any additional amounts are payable in respect of Taxes, the respective Borrower and any other Loan Party making the respective payment or which has guaranteed the obligations of the relevant Borrower jointly and severally agree to reimburse each affected Lender, upon the written request of such Lender, for any taxes imposed on such Lender as a result of the payment of such additional amounts and which are measured by the net income of such Lender pursuant to the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located and for any withholding of taxes as such Lender shall determine are payable by, or withheld from, such Lender, in respect of such amounts so paid to or on behalf of such Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of such Lender pursuant to this sentence.  The respective Borrower (or other Loan Party) will furnish to the Administrative Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Borrower (or other Loan Party) or other evidence of such payment reasonably acceptable to the Administrative Agent.  Subject to Section 14.07, (i) the U.S. Borrowers (jointly and severally) agree (and the applicable U.S. Subsidiary Guarantors agree), to indemnify and hold harmless each U.S. Facility Lender and (ii) the U.S. Borrowers (jointly and severally) or the Canadian Borrowers (jointly and severally), as applicable, agree (and the applicable Subsidiary Guarantors agree) to indemnify and hold harmless each Canadian Facility Lender, and, in each case, reimburse such Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender.

(b)     Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes agrees to deliver to Holdings and the Administrative Agent on or prior to the Closing Date (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8IMY, Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made by the U.S. Borrowers under this Agreement and under any Note, or (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8IMY, Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) pursuant to clause (i) above, (x) a certificate substantially in the form of <u>Exhibit L</u> (any such certificate, a "<u>Section 5.04(b)(ii) Certificate</u>") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made by the U.S. Borrowers under this Agreement and under any Note.  In addition, each Lender agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Lender will deliver to Holdings and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8IMY, Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN (with respect to the portfolio interest exemption) and a <u>Section 5.04(b)(ii)</u> Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments by the U.S. Borrowers under this Agreement and any Note, or such Lender shall immediately notify Holdings and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this <u>Section 5.04(b)</u>.  Notwithstanding anything to the contrary contained in <u>Section 5.04(a)(ii)</u>, but subject to <u>Section 13.04(b)</u> and the immediately succeeding sentence, (x) each U.S. Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political subdivision or taxing authority thereof or therein) from interest, Fees or other amounts payable hereunder for the account of any Lender which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes to the extent that such Lender has not provided to Holdings U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) each U.S. Borrower shall not be obligated pursuant to <u>Section 5.04(a)</u> to gross-up payments to be made to a Lender in respect of income or similar taxes imposed by the United States if (I) such Lender has not provided to Holdings the Internal Revenue Service Forms required to be provided to Holdings pursuant to this <u>Section 5.04(b)</u> or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from withholding of such taxes.  Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this <u>Section 5.04</u> and except as set forth in <u>Section 13.04(b)</u> and subject to <u>Section 14.07</u>, (i) the U.S. Borrowers (jointly and severally) agree (and the applicable U.S. Subsidiary Guarantors agree), to indemnify and hold harmless each U.S. Facility Lender and (ii) the U.S. Borrowers (jointly and severally) or the Canadian Borrowers

(jointly and severally), as applicable, agree (and the applicable Subsidiary Guarantors agree) to pay any additional amounts and to indemnify such Lender in the manner set forth in <u>Section 5.04(a)</u> (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of income or similar taxes.

(c)       Each Canadian Facility Lender agrees to use reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Canadian Facility Lender) to file any certificate or document or to furnish to the relevant Canadian Borrower any information, in each case, as reasonably requested by such Canadian Borrower that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 5.04(c)</u> shall require a Canadian Facility Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).

(d)       If any Borrower or Loan Party pays any amount under this <u>Section 5.04</u> to a Lender or any other Person and such Lender determines in its sole discretion that it (or any of its Affiliates) has actually received or realized in connection therewith any refund or any reduction of its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "<u>Tax Benefit</u>"), such Lender shall pay to such Borrower an amount that the Lender shall, in its sole discretion, determine is equal to the net benefit, after tax, which was obtained by the Lender (or its Affiliates) as a consequence of such Tax Benefit; <u>provided</u>, <u>however</u>, that (i) any Lender may determine, in its sole discretion consistent with the policies of such Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction of any Tax Benefit with respect to which such Lender has made a payment to the Borrower pursuant to this <u>Section 5.04(d)</u> shall be treated as a Tax for which the Borrower is obligated to indemnify such Lender pursuant to this <u>Section 5.04</u> without any exclusions or defenses; (iii) nothing in this <u>Section 5.04(d)</u> shall require the Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns); and (iv) no Lender shall be required to pay any amounts pursuant to this <u>Section 5.04(d)</u> at any time which a Default or Event of Default exists.

(e)       Each Agent and each Lender that is a U.S. person within the meaning of Section 7701(a)(30) of the Code (other than any such person that is treated as a corporation for United States federal income tax purposes) shall deliver to Holdings and the Administrative Agent on or before the date such Person becomes a party to this Agreement a duly completed United States Internal Revenue Service form W-9 (or successor form) establishing that such Person is not subject to U.S. federal backup withholding.

SECTION 6.  <u>Conditions Precedent to the Closing Date and to the Funding Date</u>.

6.01.  <u>Conditions Precedent to the Closing Date</u>.  This Agreement and the rights and obligations of the parties hereunder will become effective on the date on which each of the following conditions has been satisfied (or waived in accordance with <u>Section 13.12</u>):

(a)     The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement as provided in <u>Section 13.10</u>.

(b)     The Administrative Agent shall have received a favorable written opinion of each of Winston & Strawn LLP, U.S. counsel for the Loan Parties, substantially to the effect set forth in <u>Exhibit P-1</u>, Craig A. Hunt, Senior Vice President, Secretary and General Counsel for SSCC and SSCE, substantially to the effect set forth in <u>Exhibit P-2</u>, and Osler, Hoskin & Harcourt LLP, Canadian counsel for the Loan Parties, substantially to the effect set forth in <u>Exhibit P-3</u>, in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent, the Security Agent and the Lenders, and (C) covering such customary legal matters relating to this Agreement as the Administrative Agent shall reasonably request and with such changes as are reasonably acceptable to the Administrative Agent.  SSCC, SSCE and the other Borrowers hereby instruct their counsel to deliver such opinions.

(c)     All legal matters incident to this Agreement, the Borrowings and other extensions of credit hereunder and the other Loan Documents shall be reasonably satisfactory to the Administrative Agent and the Lenders.

(d)     The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation (or equivalent organizational documents), including all amendments thereto, of each of SSCC, SSCE and the other Borrowers, certified as of a recent date by the Secretary of State or other relevant Governmental Authority of the jurisdiction of its organization, and a certificate as to the good standing (or the equivalent thereof) of each of SSCC, SSCE and the other Borrowers as of a recent date from such Secretary of State or other Governmental Authority; (ii) a certificate of the Secretary or Assistant Secretary of each of SSCC, SSCE and the other Borrowers dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or equivalent organizational documents) of SSCC, SSCE or each other Borrower, as applicable, as in effect on the Closing Date, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of SSCC, SSCE or each other Borrower, as applicable, authorizing the Transactions, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation (or equivalent organizational documents) of SSCC, SSCE or each other Borrower, as applicable, have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above and (D) as to the incumbency and specimen signature of each officer executing this Agreement on behalf of SSCC, SSCE or each other Borrower, as applicable (and each of the foregoing in sub-clauses (i) and (ii) shall be in form and substance reasonably acceptable to the Administrative Agent); (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; (iv) a certificate of the Secretary or Assistant Secretary of Holdings dated the Closing Date and certifying that attached thereto is a true and complete copy of the Term Loan Credit Agreement (including all exhibits, annexes and schedules thereto) which shall contain terms that conform to the Plan of Reorganization and are otherwise in form and

substance reasonably satisfactory to the Administrative Agent;[3] and (v) such other documents as the Administrative Agent may reasonably request.

(e)     The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of and on behalf of Holdings, confirming compliance as of the Closing Date with the condition precedent set forth in Section 7.01(ii) with the same effect as if each reference to the date of a Credit Event therein were a reference to the Closing Date.

(f)     The Administrative Agent shall have received (i) management's financial projections for SSCC and the Subsidiaries through 2014, including but not limited to monthly projections for 2010 (including projected monthly borrowing base levels for such year), reflecting the Transactions and the Plan of Reorganization as disclosed in the Disclosure Statement as of the Closing Date and including the material assumptions on which such projections were based, in each case in form and substance reasonably satisfactory to the Administrative Agent, and (ii) an unaudited pro forma consolidated balance sheet of SSCC and its Subsidiaries as of the last day of the most recent fiscal quarter for which financial statements are publicly available, adjusted to give pro forma effect to implementation of the Plan of Reorganization and the Transactions as if such transactions had occurred on such date, which, in each case, shall be prepared in good faith and based upon reasonable assumptions.

(g)     The U.S. Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to DBNY and JPMCB approving Holdings and the other Borrowers' execution, delivery and performance of this Agreement, including the payment of fees, expenses, indemnities and other amounts contemplated hereby, and approving as an administrative expense claim against Holdings and the other Borrowers the indemnification, cost reimbursement obligations and fee obligations accruing or payable in respect of periods or events occurring on or prior to the Funding Date.

(h)     The Plan of Reorganization as reflected in the Disclosure Statement shall be in form and substance reasonably acceptable to the Lead Arrangers.

(i)     On or prior to the Closing Date, Holdings shall have provided to the Administrative Agent and the Co-Collateral Agents (i) an appraisal of the Inventory of each Borrower and their respective Subsidiaries from Great American Advisory & Valuation Services, LLC  and (ii) a collateral examination of the Accounts and Inventory and related assets and liabilities of each Borrower and their respective Subsidiaries from JPMCB and, in each case, the results of such appraisal and collateral examination shall be in form and substance reasonably satisfactory to the Co-Collateral Agents.

(j)     On the Closing Date, the Administrative Agent and the Co-Collateral Agents shall have received the initial Borrowing Base Certificate.

(k)     The Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, payment or reimbursement of all Fees and expenses (including the reasonable fees, charges and

---

[3] Term Loan Credit Agreement dated February 22, 2010 is satisfactory.

disbursements of counsel) required to be reimbursed or paid by Holdings or any Borrower hereunder or under any other Loan Document or in respect of the execution and delivery of this Agreement.

6.02.  Conditions Precedent to the Funding Date.  The obligations of the Lenders hereunder to make Loans, and the obligation of each Issuing Lender to issue Letters of Credit, on the Funding Date are subject to the satisfaction (or waiver in accordance with Section 13.12) of the following conditions:

(a)  The Administrative Agent shall have received a favorable written opinion of each of (i) Winston & Strawn LLP, U.S. counsel for the Loan Parties, Craig A. Hunt, Senior Vice President, Secretary and General Counsel for SSCC and SSCE, and Osler, Hoskin & Harcourt LLP, Canadian counsel for the Loan Parties, and (ii) such local counsel reasonably acceptable to the Administrative Agent, in each case (A) dated the Funding Date, (B) addressed to the Administrative Agent, the Security Agent and the Lenders, and (C) covering such customary legal matters relating to the Loan Documents as the Administrative Agent shall reasonably request and in form and substance reasonably satisfactory to the Administrative Agent.  SSCC, SSCE and the other Loan Parties hereby instruct their counsel to deliver such opinions.

(b)  The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation (or equivalent organizational documents), including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State or other relevant Governmental Authority of the jurisdiction of its organization, and a certificate as to the good standing (or the equivalent thereof) of each Loan Party as of a recent date from such Secretary of State or other Governmental Authority; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Funding Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or equivalent organizational documents) of such Loan Party as in effect on the Funding Date, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the Transactions, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation (or equivalent organizational documents) of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document on behalf of such Loan Party (and each of the foregoing in sub-clauses (i) and (ii) shall be in form and substance reasonably acceptable to the Administrative Agent); (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; (iv) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Funding Date and certifying that attached thereto is a true and complete copy of the material Term Loan Facility Documents (other than the Term Loan Credit Agreement) and any amendments to the Term Loan Credit Agreement (including all exhibits, annexes and schedules thereto) from and after the Closing Date, in each case, which shall contain terms that conform to the Plan of Reorganization and are otherwise in form and substance reasonably satisfactory to the Administrative Agent; and (v) such other documents as the Administrative Agent may reasonably request.

(c)     The Administrative Agent shall have received a certificate, dated the Funding Date and signed by a Financial Officer of and on behalf of Holdings, confirming compliance with the conditions precedent set forth in <u>Section 7.01</u>.

(d)     The Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced, payment or reimbursement of all Fees and expenses (including the reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document or in respect of the execution and delivery of this Agreement.

(e)     The Administrative Agent shall have received a notice of such Credit Event as required by <u>Section 7.02</u>.

(f)     The Collateral and Guarantee Requirement shall have been satisfied, including with respect to each Borrower and each Domestic Subsidiary and Canadian Subsidiary of Holdings that is a Material Subsidiary based on the most recently available consolidated financial statements of SSCC or that is or will be a guarantor under the Term Loan Facility, and the requirements of the covenant set forth in <u>Section 10.15</u> shall have been satisfied. The Administrative Agent shall have received a completed Perfection Certificate, dated the Funding Date and duly executed by a Authorized Officer of Holdings, together with all attachments contemplated thereby, including results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and with copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar document) are permitted under <u>Section 10.02</u> or have been, or substantially contemporaneously with the Funding Date will be, released.

(g)     None of the Mortgaged Properties shall be subject to any Lien other than those expressly permitted under <u>Section 10.02</u> and other encumbrances permitted by the relevant Mortgage.

(h)     The Administrative Agent shall have received copies of, or an insurance broker's or agent's certificate as to coverage under, the insurance policies required by <u>Section 9.02</u> and the applicable provisions of the Security Documents, each of which policies shall be endorsed or otherwise amended to include a loss payable endorsement with respect to the Collateral and to name the Security Agent as additional insured, in form and substance reasonably satisfactory to the Administrative Agent.

(i)     The Administrative Agent shall have received (i) an unaudited pro forma consolidated balance sheet of Holdings and its Subsidiaries as of the last day of the most recent fiscal quarter for which financial statements are publicly available, adjusted to give pro forma effect to the implementation of the Plan of Reorganization, the consummation of the Transactions and the funding of Term Loans under the Term Loan Facility and any incurrence of Loans or issuance of Letters of Credit hereunder on the Funding Date as if such transaction had occurred on such date, which, in each case, shall be prepared in good faith and based upon reasonable assumptions and (ii) a certificate, dated the Funding Date and signed by a Financial Officer of Holdings, certifying that as of the Funding Date, Holdings and its Subsidiaries have

not incurred any material liabilities not reflected in such pro forma consolidated balance sheet, other than liabilities incurred in the ordinary course of business.

(j)     The U.S. Bankruptcy Court shall have entered an order confirming the Plan of Reorganization, which order (the "Confirmation Order") (i) shall be in form and substance reasonably satisfactory to DBNY and JPMCB, (ii) shall authorize this Agreement and the Transactions and the Term Loan Facility and (iii) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed.  The assets of SSC Canada and Smurfit-MBI (as defined in the Plan of Reorganization) shall be transferred to the newco(s) that will be Canadian Borrowers on the Funding Date, which transfer shall be approved by the Canadian Bankruptcy Court pursuant to a vesting order, sanction or other order issued by the Canadian Bankruptcy Court, in each case, in form and substance reasonably satisfactory to DBNY and JPMCB.  The effective date of the Plan of Reorganization shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied (or shall be concurrently satisfied) or waived pursuant to the terms of the Plan of Reorganization) and the Funding Date Merger shall have been consummated.  Since the Closing Date, there shall have been no amendment or modification of the terms and conditions of the Plan of Reorganization as reflected in the Disclosure Statement on the Closing Date (including without limitation the incurrence or continuation of Indebtedness or Liens not specifically contemplated by the Disclosure Statement on the Closing Date to exist after the effective date of the Plan of Reorganization) that could reasonably be expected to adversely affect the interests of the Lenders in any significant respect that has not been approved by the Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement, if the reference to "a majority" contained therein were changed to "66-2/3%".

(k)     The Administrative Agent shall be reasonably satisfied that, and shall have received a certificate from a Financial Officer of Holdings dated the Funding Date and confirming that, following consummation of the transactions expected to occur substantially simultaneously with the funding of the Term Loans under the Term Loan Facility and any incurrence of Loans or issuance of Letters of Credit hereunder on the Funding Date, no event, circumstance or condition will exist that would constitute a Default or Event of Default hereunder had the affirmative and negative covenants contained in Sections 9 and 10 and the Events of Default been applicable at all times after the Closing Date, other than any such event, condition or circumstance directly attributable to the Plan of Reorganization as reflected in the Disclosure Statement on the Closing Date or to changes therein not requiring approval of the applicable Lenders pursuant to Section 6.02(j) above (it being understood that any such non-compliance with covenants or Event of Default prior to the Funding Date that has been cured or otherwise is not continuing as of the Funding Date (and any noncompliance with the notification requirements of Section 9.05 relating to any such noncompliance attributable to the Plan of Reorganization or otherwise cured or not continuing) will not be deemed to result in a failure of this condition).

(l)     After giving pro forma effect to the implementation of the Plan of Reorganization and the transactions contemplated thereunder, the funding of the Term Loans under the Term Loan Facility and any incurrence of Loans or issuance of Letters of Credit hereunder on the Funding Date, Holdings' Consolidated Leverage Ratio for the most recent twelve-month period for which financial statements are available, but in any event, the most

recent twelve-month period ending at least 30 days prior to the Funding Date shall not exceed (i) 3.50 to 1.00 if the Funding Date occurs on or prior to April 30, 2010 or (ii) 3.85 to 1.00 if the Funding Date occurs after April 30, 2010. The Administrative Agent shall have received a certificate, dated the Funding Date and signed by a Financial Officer of Holdings, certifying as to compliance with the foregoing condition.

(m)     The Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Term Loan Facility Documents shall have been (or will be), substantially simultaneously with the Funding Date, satisfied or waived in accordance with their terms and, on the Funding Date, Holdings shall have received cash proceeds of $1,200,000,000 (calculated before underwriting and original issue discounts, commissions, fees and expenses) from the incurrence of Term Loans under the Term Loan Facility.

(n)     Prior to the fifth day preceding the Funding Date (or such shorter period as may be agreed to by the Administrative Agent in its sole discretion), the Administrative Agent and the Co-Collateral Agents shall have received a Borrowing Base Certificate as at a date not earlier than the date occurring on the 30th day preceding the Funding Date (the "Funding Date Borrowing Base Certificate").

(o)     On the Funding Date and after giving effect to the incurrence of Loans, the issuance of Letters of Credit and occurrence of all payments and transfers to be effected on or as of the Funding Date, including all such payments and transfers contemplated by the Plan of Reorganization, the sum of (i) Excess Availability and (ii) Holdings' unrestricted cash and unrestricted cash equivalents shall be greater than (x) $500,000,000 if the Funding Date occurs on or prior to April 30, 2010 or (y) $450,000,000 if the Funding Date occurs after April 30, 2010.

(p)     The Closing Date shall have occurred.

(q)     On or prior to the Funding Date, there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same the appropriate Revolving Notes executed by the appropriate Borrowers and if requested by the Swingline Lender, the appropriate Swingline Note executed by the appropriate Borrowers, in each case, in the applicable amount, maturity and as otherwise provided herein.

(r)     Prior to the fifth Business Day preceding the Funding Date, the Agents shall have received from the Loan Parties, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(s)     The Administrative Agent shall have received a solvency certificate from a Financial Officer of Holdings in the form of Exhibit F hereto dated the Funding Date.

SECTION 7.  Conditions Precedent to All Credit Events.  The obligation of each Lender to make Loans (including Loans made on the Funding Date), and the obligation of each Issuing Lender to issue Letters of Credit (including Letters of Credit issued on the Funding

Date), is subject, at the time of the Funding Date and at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

7.01. <u>No Default; Representations and Warranties</u>.  At the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

7.02. <u>Notice of Borrowing; Letter of Credit Request</u>.  (a)  Prior to the making of each Loan (other than a Swingline Loan or a Revolving Loan made pursuant to a Mandatory Borrowing), the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.03(a)</u>.  Prior to the making of each Swingline Loan, the Swingline Lender shall have received the notice referred to in <u>Section 2.03(b)(i)</u>.

(b)     Prior to the issuance of each Letter of Credit, the Administrative Agent and the respective Issuing Lender shall have received a Letter of Credit Request meeting the requirements of <u>Section 3.03(a)</u>.

7.03. <u>Borrowing Base and Commitment Limitations</u>.  Notwithstanding anything to the contrary set forth herein (but subject to <u>Section 2.01(e)</u>), it shall be a condition precedent to each Credit Event that after giving effect thereto (and the use of the proceeds thereof):

(i)     the Aggregate U.S. Borrower Exposure would not exceed the U.S. Borrowing Base at such time;

(ii)     the Aggregate Canadian Borrower Exposure would not exceed the Canadian Borrowing Base at such time;

(iii)     the Aggregate U.S. Facility Exposure at such time would not exceed the Total U.S. Facility Commitment at such time;

(iv)     the Aggregate Canadian Facility Exposure at such time would not exceed the Total Canadian Facility Commitment at such time;

(v)     the aggregate U.S. Facility Letter of Credit Outstandings would not exceed the Maximum U.S. Facility Letter of Credit Amount; and

(vi)     the aggregate Canadian Facility Letter of Credit Outstandings would not exceed the Maximum Canadian Facility Letter of Credit Amount.

The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by Holdings and the other Borrowers to the Administrative Agent

and each of the Lenders that all the conditions specified in <u>Section 6</u> (with respect to Credit Events on the Funding Date) and in this <u>Section 7</u> (with respect to Credit Events on or after the Funding Date) and applicable to such Credit Event are satisfied as of that time.

SECTION 8.  <u>Representations and Warranties</u>.  In order to induce the Lenders to enter into this Agreement and to make the Loans, and issue (or participate in) the Letters of Credit as provided herein, each of Holdings and the other Borrowers makes the following representations and warranties, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans and the issuance of the Letters of Credit, with the occurrence of the Closing Date, the Funding Date and each Credit Event on or after the Funding Date being deemed to constitute a representation and warranty that the matters specified in this <u>Section 8</u> are true and correct in all material respects on and as of the Closing Date, the Funding Date and on the date of each such other Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

8.01.  <u>Organization; Powers</u>.  Each of the Loan Parties (a) is duly organized, validly existing and in good standing (or its equivalent, to the extent that such concept is applicable in the respective jurisdiction) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in every jurisdiction where such qualification is required by the nature of its business, the character and location of its property, business or customers, or the ownership or leasing of its properties, except for such jurisdictions in which the failure so to qualify, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (d) has the requisite power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of each Borrower, to borrow hereunder.

8.02.  <u>Authorization; Absence of Conflicts</u>.  The execution, delivery and performance by each of the Loan Parties of each of the Loan Documents to which it is a party, the Borrowings hereunder, the use of the proceeds of the Loans, the creation of the security interests contemplated by the Security Documents and the other transactions contemplated by the Loan Documents (collectively, the "<u>Transactions</u>") (a) have been duly authorized by all requisite corporate or other organizational and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, other than any law, statute, rule or regulation the violation of which could not reasonably be expected to result in a Material Adverse Effect, or of the certificate of incorporation or other constitutive documents or by-laws (or equivalent organizational documents) of any Loan Party or any of its Subsidiaries, (B) any order of any Governmental Authority or (C) any provision of any indenture or other material agreement or other material instrument to which any Loan Party or any of its Subsidiaries is a party or by which any of them or any of their property is or may be bound, (ii) constitute (alone or with notice or lapse of time or both) a default under any such indenture, agreement or other instrument or give rise to any rights thereunder to require any payment, repurchase or redemption to be made by any Loan Party, or give rise to a right of, or result in, any termination, cancellation, acceleration or right of renegotiation of any obligation thereunder, or (iii) result in the creation or imposition of any Lien (other than any Lien created hereunder or under the

Security Documents) upon or with respect to any property or assets now owned or hereafter acquired by any Loan Party or any of its Subsidiaries.

8.03. <u>Enforceability</u>.  This Agreement has been duly executed and delivered by SSCC, SSCE and each other Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of SSCC, SSCE, each other Borrower and the other Loan Parties, as applicable, enforceable against each of them in accordance with its terms (except as the enforceability thereof may be limited by bankruptcy, insolvency reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (whether enforcement is sought by proceeding in equity or at law)).

8.04. <u>Governmental Approvals</u>.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with (i) the Transactions or (ii) the execution, delivery and performance of any Loan Document, except for (a) the filing of UCC and PPSA financing statements and similar security or collateral filings and registrations under applicable laws in other jurisdictions, (b) recordation of the Mortgages, (c) filings with the United States Patent and Trademark Office and the United States Copyright Office, (d) the entry by the Bankruptcy Court of the Confirmation Order referred to in <u>Section 6.02</u> and (e) such actions, consents, approvals, registrations and filings as have been made or obtained and are in full force and effect.

8.05. <u>Financial Statements</u>.  (a)  Each of SSCC and SSCE has delivered to the Lenders its audited financial statements for the fiscal year ended December 31, 2009, together with its annual report on Form 10-K, if any, filed with the Securities and Exchange Commission with respect to such fiscal year.  All financial statements set forth or referred to in the materials specified in the preceding sentence were prepared in conformity with GAAP, except, in the case of unaudited financial statements, for the absence of footnote disclosure and for year-end audit adjustments.  All such financial statements fairly present in all material respects the consolidated financial position of such Persons and their respective subsidiaries as at the date thereof and the consolidated results of operations and cash flows of such Persons and their respective subsidiaries for each of the periods covered thereby.  Except as disclosed in such financial statements, neither SSCC nor any of its Subsidiaries had at the date of such financial statements any material contingent obligation, material contingent liability or material liability for taxes, long-term lease or unusual forward or long-term commitment or obligations to retired employees for medical or other employee benefits that is not reflected in the foregoing financial statements or the notes thereto.

(b)  As of the Closing Date, the Projections delivered to the Administrative Agent and the Lenders prior to the Closing Date have been prepared in good faith and are based on reasonable assumptions.

8.06. <u>No Material Adverse Effect</u>.  Since December 31, 2009, other than the commencement of the Bankruptcy Proceedings and those events and conditions in connection with such Bankruptcy Proceedings which customarily occur as a result of events following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the CCAA, there

has been no event or condition that has had, or could reasonably be expected to have, a Material Adverse Effect.

8.07. <u>Title to Properties; Possession Under Leases</u>.  (a)  Except as set forth on <u>Schedule 8.07</u>, each of Holdings and its Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except for minor defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted.  All such title to, or leasehold interest in, material properties and assets are free and clear of Liens, other than Liens expressly permitted by <u>Section 10.02</u> and Liens with respect to which the Administrative Agent will receive on or prior to the Funding Date duly executed releases and termination statements in connection therewith.

(b)  Each of Holdings and the Subsidiaries has complied with all obligations under all leases to which it is a party and enjoys peaceful and undisturbed possession under all such leases, except where the failure thereof could not reasonably be expected to have a Material Adverse Effect.

8.08. <u>Subsidiaries</u>.  <u>Schedule 8.08</u> sets forth as of the Closing Date a list of all the Subsidiaries of SSCC, their jurisdiction of organization and the percentage ownership interest in each Subsidiary held by SSCC or any other Subsidiary of SSCC and also identifies which Subsidiaries (i) will be U.S. Borrowers or Canadian Borrowers on the Funding Date or (ii) are Material Subsidiaries of Holdings as of the Closing Date.

8.09. <u>Litigation; Compliance with Laws</u>.  (a)  Except as set forth in <u>Schedule 8.09</u>, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of SSCC or any Borrower, threatened against or affecting SSCC, any Borrower or any of their respective Subsidiaries or any business or property of any such Person that (i) purports to affect the legality, validity or enforceability of any Loan Document or the Transactions or (ii) could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)  None of SSCC, any Borrower and any of their respective Subsidiaries nor any of their respective properties or assets is (i) in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule, regulation, statute (including any zoning, building, Environmental Laws, ordinance, code or approval or any building permits) in respect of the conduct of its business, the relationship with its employees and the ownership of its property or any restrictions of record or agreements affecting the Mortgaged Properties, where such violations could reasonably be expected to have a Material Adverse Effect or (ii) in default with respect to any judgment, writ, injunction, decree or order of, any Governmental Authority, where such defaults, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

8.10. <u>Federal Reserve Regulations</u>.  (a)  None of SSCC, any Borrower and their respective Subsidiaries is engaged or will engage, principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)     No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose or (ii) for any purpose that entails a violation of, or is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

(c)     All proceeds of the Loans will be used by the Borrowers for working capital, capital expenditures, Permitted Acquisitions and general corporate purposes of Holdings and its Subsidiaries.  All Letters of Credit will be used for the purposes described in <u>Section 3.01(a)</u>.

8.11.  <u>Investment Company Act</u>.   None of SSCC, any Borrower or their respective Subsidiaries is an "investment company" as defined in, or is subject to regulation under, the Investment Company Act of 1940.

8.12.  <u>Tax Returns</u>.    Each of SSCC, any Borrower and their respective Subsidiaries has filed or caused to be filed all Federal, foreign, state, provincial, regional and local income and other material tax returns (the "Returns") required to have been filed by it or with respect to it and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by it or with respect to it, except taxes that are being contested in good faith by appropriate proceedings and for which it has set aside on its books adequate reserves in accordance with GAAP or Canadian GAAP, as applicable.  The Returns accurately reflect in all respects all liability for taxes of Holdings and its Subsidiaries, as applicable, for the periods covered thereby, except where the failure to reflect could not reasonably be expected to have a Material Adverse Effect.

8.13.  <u>No Material Misstatements</u>.  The information provided by or on behalf of SSCC, SSCE and each other Borrower and contained in the Confidential Information Memorandum (including all attachments and exhibits thereto), as supplemented, and other information furnished in writing by or on behalf of SSCC or any Borrower to any Lead Arranger, any Agent or any Lender in connection with the transactions contemplated herein, this Agreement and the other Loan Documents, when taken as a whole, as of the date such information was so furnished, does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, when taken as a whole, not materially misleading, provided that to the extent any such information therein was based upon or constitutes a forecast or projection or pro forma financial information, each of SSCC and each Borrower represents only that it acted in good faith and utilized reasonable assumptions, due and careful consideration and the information actually known to Responsible Officers of such Person at the time in the preparation of such information.

8.14.  <u>Employee Benefit Plans</u>.  (a)  Each Plan is in compliance in all material respects  in form and operation with its terms and with the applicable provisions of ERISA and the Code and all other applicable laws and regulations.  No ERISA Event has occurred or could reasonably be expected to occur that, when taken together with all the other ERISA Events that have occurred or could reasonably be expected to occur, could reasonably be expected to have a

Material Adverse Effect. For purposes of determining whether an ERISA Event, by itself or together with other ERISA Events, could reasonably be expected to have a Material Adverse Effect, the amounts to be considered relating to a Plan's or Multiemployer Plan's funded status or with respect to withdrawal liability are changes in or resulting from the following:

(i)     a Plan's or Multiemployer Plan's funded status since the most recent valuation or other statement of financial condition prior to the Closing Date; or

(ii)     withdrawal liability with respect to a Multiemployer Plan that exceeds the most recent estimate of withdrawal liability for such Multiemployer Plan received before the Closing Date; provided, however, that Holdings and the Loan Parties will, and will cause each of their respective ERISA Affiliates to, make a request from the administrator or sponsor of such Multiemployer Plan for the notices described in Section 101(l)(1) of ERISA at least annually not later than the anniversary date of the date hereon.

(b)     The Canadian Pension Plans are duly registered under the ITA and any other applicable laws which require registration, have been administered in all material respects in accordance with the ITA and such other applicable laws, and no event has occurred which could reasonably be expected to cause the loss of such registered status. Except as set forth on Schedule 8.14(b), all material obligations of SSC Canada and the other Canadian Subsidiaries of Holdings required to be performed by SSC Canada or the other Canadian Subsidiaries of Holdings in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis. As of the Closing Date, there are no outstanding disputes concerning the assets of the Canadian Pension Plans or the Canadian Benefit Plans. Except as set forth on Schedule 8.14(b), no promises of benefit improvements under the Canadian Pension Plans or the Canadian Benefit Plans have been made, except as provided for in a collective bargaining agreement or where such improvement could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 8.14(b), all contributions or premiums required to be made or paid by SSC Canada and each Canadian Subsidiary of Holdings to the Canadian Pension Plans or the Canadian Benefit Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws. There have been no improper withdrawals or applications of the assets of the Canadian Pension Plans or the Canadian Benefit Plans. Except as set forth on Schedule 8.14(b), as of the date of the most recent actuarial valuations with Governmental Authorities, none of the Canadian Pension Plans or the Canadian Benefit Plans has any unfunded actuarial liabilities or solvency deficiencies (within the meaning of the Quebec Supplemental Pension Plans Act and other applicable laws) in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect.

8.15.   Environmental and Safety Matters.

(a)     Except as set forth on Schedule 8.15:

(i)     Each of SSCC, any Borrower and their respective Subsidiaries has obtained all permits, licenses and other authorizations that are required and material with respect to the operation of the business of SSCC and the Subsidiaries, taken as a whole, under any Environmental Law, and each such permit, license and authorization is in full

force and effect, except where the failure thereof could not reasonably be expected to have a Material Adverse Effect.

(ii)     Each of SSCC, any Borrower and their respective Subsidiaries is in compliance with all material terms and conditions of the permits, licenses and authorizations specified in paragraph (i) above, and also is in compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in or pursuant to any Environmental Law applicable to it and its business, assets, operations and properties, except for any noncompliance that could not reasonably be expected to have a Material Adverse Effect.

(iii)     There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter or request for information pending or, to the knowledge of SSCC or any Borrower, after inquiry, threatened against SSCC, any Borrower or any of their respective Subsidiaries under any Environmental Law that could reasonably be expected to result have a Material Adverse Effect.

(iv)     None of SSCC, any Borrower and their respective Subsidiaries has received notice (A) that it has been identified as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA") or any comparable state law or Canadian federal or provincial law that any hazardous substances or any pollutant or contaminant, as defined in CERCLA and its implementing regulations, or any toxic substance, hazardous waste, hazardous constituents, hazardous materials, asbestos or asbestos containing material, polychlorinated biphenyls, petroleum, including crude oil and any fractions thereof, or other wastes, chemicals, substances or materials regulated by any Environmental Laws (collectively, "Hazardous Materials") that it or any of their respective predecessors in interest has used, generated, stored, tested, handled, transported or disposed of, has been found at any site at which any Governmental Authority or private party is conducting a remedial investigation or other action pursuant to any Environmental Law or (B) otherwise alleging that it has any liability, obligation or cost pursuant to any Environmental Law, except in the cases of (A) and (B) for any such notices that could not reasonably be expected to have a Material Adverse Effect.

(v)     There have been no Releases of Hazardous Materials at, in, on, under or from any location, and neither SSCC, any Borrower nor any of their respective Subsidiaries has otherwise become subject to any liability or obligation, whether contingent or otherwise, relating to any Environmental Law, that could reasonably be expected to have a Material Adverse Effect.

(vi)     To the best knowledge of SSCC and any Borrower, there is no asbestos in, on, or at any Real Properties or any facility or equipment of SSCC, any Borrower or any of their respective Subsidiaries, except to the extent that the presence of, or exposure to, such material could not reasonably be expected to have a Material Adverse Effect.

(vii)    As of the Closing Date, to the knowledge of SSCC and any Borrower, none of the Real Properties are (i) listed or proposed for listing on the National Priorities List under CERCLA or (ii) listed in the Comprehensive Environmental Response, Compensation, Liability Information System List promulgated pursuant to CERCLA.

(viii)    To the knowledge of SSCC and any Borrower, there are no events, conditions, circumstances, activities, practices, incidents, actions or plans that could reasonably be anticipated to interfere with or prevent compliance with any Environmental Law, or which may give rise to liability under any Environmental Law, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing or notice of violation, study or investigation, based on or related to the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport, shipping or handling, the emission, discharge, release or threatened release into the environment of, or exposure to, any Hazardous Material that could reasonably be expected to have a Material Adverse Effect.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 8.15 that, individually or in the aggregate, could reasonably be expected to have, a Material Adverse Effect.

8.16.    Solvency.  Immediately after giving effect to the Transactions to occur on the Funding Date, (a) the present fair saleable value of the assets of Holdings and its Subsidiaries, on a consolidated basis, will exceed the amount that will be required to be paid on or in respect of the existing debts and other liabilities (including contingent liabilities) of Holdings and its Subsidiaries, on a consolidated basis, as they become absolute and mature, (b) Holdings and its Subsidiaries, on a consolidated basis, will not have unreasonably small capital to carry out their businesses as conducted or as proposed to be conducted, and (c) neither SSCC nor any Borrower intends to, nor does it intend to permit any of its Subsidiaries to, and does not believe that it or any such Subsidiary will, incur debts beyond its ability to pay such debts as they become absolute and mature (taking into account the timing and amounts of cash to be received by each of them or any such subsidiary and the amounts to be payable on or in respect of its obligations).

8.17.    Security Documents.  (a)  The Guarantee and Collateral Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Security Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined therein) (other than vessels) and proceeds thereof and (i) when the Pledged Collateral (as defined therein) is delivered to the Security Agent or the Prior Agent, together with instruments of transfer duly endorsed in blank, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the U.S. Loan Parties in such Pledged Collateral, in each case prior and superior in right to any other Person, other than with respect to Permitted Liens and other than as provided in the Intercreditor Agreement with respect to Term Priority Collateral, and (ii) when financing statements in appropriate form have been duly filed in the offices specified on Schedule 8.17(a), the Lien created under the Guarantee and Collateral Agreement (other than with respect to the aforesaid Pledged Collateral) will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the U.S. Loan Parties in such Collateral, and the proceeds thereof, to the

extent perfection can be obtained by filing UCC financing statements, in each case prior and superior in right to any other Person, other than with respect to Permitted Liens and other than as provided in the Intercreditor Agreement with respect to the Term Priority Collateral.

(b)     When the IP Security Agreements are duly filed with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, and when financing statements in appropriate form have been duly filed in the offices specified on Schedule 8.17(a), the security interest created thereunder shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the U.S. Loan Parties in the registered intellectual property described therein and owned by the applicable U.S. Loan Parties and in which a security interest may be perfected by filing a security agreement in the United States, in each case prior and superior in right to any other Person, other than with respect to Permitted Liens and other than as provided in the Intercreditor Agreement (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications, designs, patents, patent applications and copyrights acquired by a Loan Party after the Funding Date).

(c)     When executed and delivered, each Canadian Security Document will be effective to create in favor of the Security Agent for the ratable benefit of the Secured Parties a legal, valid and enforceable security interest (or, in the case of Quebec, hypothec) in all right, title and interest of the Canadian Loan Parties in the Collateral described in each such Canadian Security Document and (i) when the Pledged Collateral (as defined therein) is delivered to the Security Agent, together with instruments of transfer duly endorsed in blank, the Canadian Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Canadian Loan Parties in such Pledged Collateral, in each case prior and superior in right to any other Person (other than Canadian Priority Payables), and (ii) and when financing statements (or, in the case of Quebec, registration statements) in appropriate form are filed in the offices specified in Schedule 8.17(a), each such Canadian Security Document will constitute a fully perfected (or, in the case of Quebec, opposable) security interest (or, in the case of Quebec, hypothec) in all right, title and interest in all of the Collateral described in such Security Document (other than, with respect to the Canadian Guarantee and Collateral Agreement, the Pledged Collateral (as defined therein)) to the extent perfection (or, in the case of Quebec, opposability) can be obtained by filing PPSA financing statements (or, in the case of Quebec, registration statements), prior and superior to the rights of any other Person, except for rights and obligations secured by Permitted Liens (it being understood that no representation is made under this clause (c) as to (A) any such Collateral that is subject to a Canadian Security Document governed by the laws of a jurisdiction other than Canada or (B) the creation, validity, perfection (or opposability) or priority (or ranking) of any Lien to the extent that such matters are determined under the law of a jurisdiction outside Canada).

(d)     The Mortgages, upon execution and delivery thereof by the parties thereto, will create in favor of the Administrative Agent, for the ratable benefit of the beneficiaries named therein, a legal, valid and enforceable Lien on all of the U.S. Loan Parties' right, title and interest in and to the Mortgaged Properties thereunder and the proceeds thereof, and when the Mortgages are duly filed or registered in the appropriate recording offices where such Mortgaged

Properties are located or as otherwise reasonably requested by the Administrative Agent, the Mortgages will constitute a fully perfected or published Lien on, and security interest or hypothec in, all right, title and interest of the U.S. Loan Parties in such Mortgaged Properties and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to Permitted Liens or other encumbrances permitted by the relevant Mortgage.

(e)     Each Security Document, other than any Security Document referred to in the preceding paragraphs of this Section, upon execution and delivery thereof by the parties thereto and the making of the filings and taking of the other actions provided for therein, will be effective under applicable law to create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a valid and enforceable security interest in all rights, title and interest of the Loan Parties in the Collateral subject thereto, prior and superior in right to any other Person, other than with respect to Permitted Liens and other than as provided in the Intercreditor Agreement with respect to the Term Priority Collateral.

8.18.  Labor Matters.  As of the Closing Date, there are no strikes or other labor disputes against SSCC, any Borrower or any of their respective Subsidiaries pending or, to the knowledge of SSCC or any Borrower, threatened, except as set forth on Schedule 8.18.  The hours worked by and payment made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters, where such violations could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  The consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which SSCC, any Borrower or any of their respective Subsidiaries is a party or by which SSCC, any Borrower or any of their respective Subsidiaries is bound on the Closing Date.

8.19.  Location of Real Property.  Schedule 8.19 sets forth as of the Closing Date all material real property owned by SSCC, any Borrower or any of their respective Subsidiaries in the United States.  All the real property set forth on Schedule 8.19 is, as of the Closing Date, owned in fee by SSCC, any Borrower or their respective Subsidiaries.

8.20.  Patents, Trademarks, etc.  Each of SSCC, any Borrower or their respective Subsidiaries owns, or is licensed or otherwise authorized to use, all patents, designs, trademarks, trade names, copyrights, technology, know-how and processes, service marks and rights with respect to the foregoing that are used in or necessary for the conduct of its business as currently conducted, except where the lack thereof could not reasonably be expected to have a Material Adverse Effect.   The use of such patents, designs, trademarks, trade names, copyrights, technology, know-how, processes and rights with respect to the foregoing by SSCC, any Borrower or their respective Subsidiaries does not infringe on the rights of any Person, subject to such claims and infringements as do not, in the aggregate, give rise to any liability on the part of SSCC, any Borrower or their respective Subsidiaries that is material to SSCC, any Borrower or their respective Subsidiaries, taken as a whole.

8.21.  Borrowing Base Calculation.  The calculation of the Total Borrowing Base and each Borrowing Base (in each case, including the valuations thereunder) pursuant to

the most recent Borrowing Base Certificate delivered pursuant to <u>Sections 6.01(j)</u> or <u>9.04(i)</u> is complete and accurate (excluding any errors that are immaterial in nature).

8.22. <u>Accounts</u>. The Administrative Agent may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by the Loan Parties with respect thereto. Holdings and each other Borrower hereby warrant, on their own behalf and on behalf of the other Loan Parties, with respect to each Account at the time it is shown as an Eligible Account in a Borrowing Base Certificate, that such Account is an Eligible Account.

8.23. <u>Inventory</u>. The Administrative Agent may rely, in determining which Inventory is Eligible Inventory, on all statements and representations made by the Loan Parties with respect thereto. Holdings and each other Borrower hereby warrant, on their own behalf and on behalf of the other Loan Parties, with respect to any Inventory at the time it is shown as being Eligible Inventory in a Borrowing Base Certificate, that such Inventory is Eligible Inventory.

8.24. <u>Anti-Terrorism Law</u>. (a) Neither Holdings nor any of its Subsidiaries is in violation (other than immaterial, unknowing or unintentional violations) of any legal requirement relating to any laws with respect to terrorism or money laundering ("<u>Anti-Terrorism Laws</u>"), including Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "<u>Executive Order</u>"), the Patriot Act and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada). Neither Holdings nor any of its Subsidiaries and, to the knowledge of Holdings and each Borrower, no agent of Holdings or any of its Subsidiaries acting on behalf of Holdings or any of its Subsidiaries, as the case may be, is any of the following:

(i) a Person that is listed in the annex to, or it otherwise subject to the provisions of, the Executive Order;

(ii) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v) a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(b) Neither Holdings nor any of its Subsidiaries and, to the knowledge of Holdings and each Borrower, no agent of Holdings or any of its Subsidiaries acting on behalf of Holdings or any of its Subsidiaries, as the case may be, (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of a Person described in <u>Section 8.24(a)</u>, (ii) deals in, or otherwise engages in any transaction relating to, any

property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

8.25. <u>Own Enquiries</u>. The Loan Parties have relied on their own investigations and enquiries regarding the transactions contemplated by the Loan Documents and have not relied on any information, advice or opinion (including information, advice or opinions regarding interest rates, hedging arrangements or exchange rates) given or offered by or on behalf of the Administrative Agent, any other Agent or any Lender even if in answer to any enquiry by or for it.

SECTION 9. <u>Affirmative Covenants</u>. Each of SSCC and each Borrower covenants and agrees with the Administrative Agent, each other Agent and each Lender that, from and after the Funding Date (subject to the condition precedent to the Funding Date set forth in <u>Section 6.02</u>), or in the case of <u>Section 9.04(i)</u> only, from and after the Closing Date, and for so long as this Agreement shall remain in effect, or the Total Commitments or Letters of Credit remain outstanding or the principal of or interest on any Loan, Fees or any other expenses or amounts payable under any Loan Document shall remain unpaid, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of their respective Subsidiaries to:

9.01. <u>Existence; Businesses and Properties</u>. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise permitted under <u>Section 10.05</u>.

(b) Except where the failure to do so could not be reasonably expected to have a Material Adverse Effect, (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect the rights, licenses, permits, trademarks, trade names, privileges and franchises necessary or desirable in the normal conduct of its business, and (ii) at all times keep and maintain all property useful and necessary in its business in good working order and condition.

9.02. <u>Insurance</u>. Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is usually maintained in the same general area by companies engaged in the same or similar businesses, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it or the use of any products sold by it; and maintain such other insurance as may be required by law. Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (i) in the case of each liability insurance policy, name the Security Agent, on behalf of the Secured Parties, as an additional insured thereunder, (ii) in the case of each casualty insurance policy relating to Collateral, contain a loss payable clause or endorsement that names the Security Agent, on behalf of the Secured Parties, as the loss payee thereunder and (iii) provide for at least 30 days' prior written notice to the Security Agent of any cancellation of such policy. With respect to each Mortgaged Property that is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, the applicable Loan Party has obtained, and will maintain, with financially sound

and reputable insurance companies, such flood insurance as is required under applicable law, including Regulation H.

9.03. <u>Payment of Taxes</u>.    Pay and discharge promptly prior to becoming delinquent all material taxes, assessments and governmental charges or levies imposed upon it or upon or in respect of its property or assets; <u>provided</u>, <u>however</u>, that such payment and discharge shall not be required with respect to any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and it shall have set aside on its books, in accordance with GAAP, adequate reserves with respect thereto and such contest operates to suspend enforcement of a Lien and, in the case of a Mortgaged Property or other material property or asset, there is no material risk of forfeiture of such property.

9.04. <u>Financial Statements, Reports, etc.</u>  Furnish to the Administrative Agent and each Lender:

(a)    within 90 days after the end of each fiscal year, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows, showing the financial condition of Holdings and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such fiscal year, all audited by Ernst & Young LLP or other independent auditors of recognized national standing and accompanied by an opinion of such accountants (which shall not contain any material qualification or exception (other than "going concern" qualifications or exceptions relating to the Bankruptcy Proceedings in such opinion with respect to the fiscal year ended December 31, 2009) to the effect that such consolidated financial statements fairly present in all material respects the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP;

(b)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year, its unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows, showing the financial condition of Holdings and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then-elapsed portion of the fiscal year (it being understood that such information shall be in reasonable detail and certified by a Financial Officer of Holdings as fairly presenting in all material respects the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of notes);

(c)    within 30 days after the commencement of, and within 30 days after the end of each calendar month ending during, a Compliance Period, the monthly unaudited consolidated balance sheet and related consolidated statement of income of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP for such period, subject to normal year-end audit adjustments and the absence of notes, together with a summary list of Capital Expenditures and a calculation of Consolidated EBITDA for such calendar month, in each case, certified by a Financial Officer of Holdings as being prepared on a consistent basis with its accounting and bookkeeping practices;

(d)    (i) concurrently with any delivery of financial statements under paragraph (a) or (b) above, a compliance certificate in the form of Exhibit G signed by a Financial Officer of Holdings and on behalf of Holdings (A) certifying that, after reasonable inquiry, to the knowledge of such Financial Officer no Default or Event of Default has occurred or, if a Default or an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (B) demonstrating compliance with the covenants contained in Sections 10.01, 10.02, 10.03, 10.04, 10.06, 10.09 and 10.16 (setting forth, for the purposes of such certificate, calculations of the Consolidated Fixed Charge Coverage Ratio for such period irrespective of whether a Compliance Period exists at such time) and (C) certifying that no Material Subsidiary exists (other than the Loan Parties) or if a Material Subsidiary (other than a Loan Party) does exist, a description of such Material Subsidiary, in each case at the end of such fiscal quarter or year, as the case may be;

(ii)    concurrently with any delivery of financial statements under paragraph (c) above, a compliance certificate signed by a Financial Officer of Holdings in the form of Exhibit G certifying on behalf of Holdings in reasonable detail the calculations required to establish whether Holdings and its Subsidiaries were in compliance with the provisions of Section 10.16 (setting forth, for the purposes of such certificate, calculations of the Consolidated Fixed Charge Coverage Ratio for such period), at the end of such fiscal month;

(e)    concurrently with any delivery of financial statements under paragraph (a) above, a certificate of the accounting firm opining on such statements (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations) stating that during the course of their examination of such financial statements, they obtained no knowledge of any Default or Event of Default, except as specified in such certificate;

(f)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials (other than (i) the exhibits to registration statements and (ii) any registration statements on Form S-8 or its equivalent) filed by Holdings or any of its Subsidiaries with the Securities and Exchange Commission, or any Governmental Authority succeeding to any of or all the functions of such Commission, or with any national securities exchange, or distributed to any such Person's shareholders (other than to Holdings or any of its Subsidiaries), as the case may be;

(g)    in the case of Holdings, as soon as available, and in any event no later than 60 days after the end of each fiscal year, a consolidated annual plan, prepared in accordance with Holdings' normal accounting procedures applied on a consistent basis, for the next fiscal year of Holdings containing quarterly detail, including projected quarterly borrowing base levels for such fiscal year;

(h)    promptly after Holdings' or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto;

(i)    (i) not later than 5:00 P.M. (New York time) on or before the 20th day of each month from and after the Closing Date (or, from and after the Funding Date, no later than

the last Business Day of each week during any period in which a Weekly Borrowing Base Period is in effect) and (ii) within 5 Business Days following the consummation of a Significant Asset Sale or the occurrence of a material casualty event with respect to ABL Priority Collateral, a Borrowing Base Certificate setting forth each Borrowing Base (in each case with supporting calculations in reasonable detail), which shall be prepared (A) as of the last Business Day of February, 2010 in the case of the initial Borrowing Base Certificate on the Closing Date and (B) as of the last Business Day of the preceding month in the case of each subsequent Borrowing Base Certificate (or, if any such Borrowing Base Certificate is delivered weekly, as of the last Business Day of the week preceding such delivery, in which case the calculation thereunder with respect to Inventory shall be based upon good faith estimates by the  Loan Parties) and, in the case of sub-clause (ii) above, after giving effect to such event.  Each such Borrowing Base Certificate shall include such supporting information as may be reasonably requested from time to time by the Co-Collateral Agents;

(j)      at the time of delivery of any Borrowing Base Certificate, (w) a summary aged trial balance of Accounts by customer, (x) upon the request of the Co-Collateral Agents, a summary of accounts payable (including detail for the top 15 vendors) indicating which accounts payable are more than thirty (30) days past due, (y) a summary inventory listing by category (in form and scope consistent with the form reviewed by the Collateral Agent prior to the Closing Date, or otherwise satisfactory in form and scope to the Co-Collateral Agents), and (z) a reconciliation of Accounts and inventory to the general ledger and to the Borrowing Base Certificate delivered pursuant to clause (i) of this Section 9.04; provided, however, when a Compliance Period is in effect (A) the information required to be delivered pursuant to the preceding clauses (w) and (x) (other than any such delivery in respect of the last week of any month during a Weekly Borrowing Base Period) shall be based upon each such Loan Party's good faith estimate and (B) in lieu of the information required to be delivered pursuant to preceding clause (x), Holdings shall provide any alternative detail that the Co-Collateral Agents may reasonably request that such Loan Parties can produce with commercially reasonable efforts; provided further that with respect to the Borrowing Base Certificates to be delivered to the Administrative Agent and the Co-Collateral Agents prior to the Funding Date the foregoing information shall not be required;

(k)      promptly following the Administrative Agent's request therefor, all documentation and other information that the Administrative Agent reasonably requests on its behalf or on behalf of any Lender in order to comply with its on-going obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(l)      promptly from time to time, such other information regarding the operations, business affairs, collateral and financial condition of Holdings and its Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request; and

(m)      information required to be delivered pursuant to this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information (including, in the case of certifications required pursuant to clause (b) above, the certifications accompanying any such quarterly report pursuant to Section 302 of

the Sarbanes-Oxley Act of 2002), shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the Securities and Exchange Commission at http://www.sec.gov. Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

9.05. <u>Litigation and Other Notices</u>. Furnish to the Administrative Agent, each other Agent and each Lender written notice of the following promptly (and in any event within five Business Days) upon a Responsible Officer of Holdings or any of its Subsidiaries obtaining knowledge thereof:

(a) any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b) the filing or commencement of, or any notice to SSCC, any Borrower or any of their Subsidiaries of the intention of any Person to file or commence, any action, suit or proceeding (whether at law or in equity or by or before any Governmental Authority or any arbitrator) against SSCC, any Borrower or any Affiliate thereof (i) that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c) any development that has resulted in, or could reasonably be anticipated to result in, a Material Adverse Effect;

(d) the occurrence of any ERISA Event that, alone or together with other ERISA Events, could reasonably be expected to result in increased liability of Holdings, any Borrower, any Loan Party, any of their respective Subsidiaries and ERISA Affiliates in an aggregate amount more than $30,000,000 greater than the liability as of the Closing Date estimated in good faith with reference to the following:

(i) the Plans' and Multiemployer Plans' funded status as of the most recent valuation or other statement of financial condition prior to the Closing Date; or

(ii) withdrawal liability with respect to a Multiemployer Plan as of the most recent estimate of withdrawal liability for such Multiemployer Plan received before the Closing Date;

(e) any material casualty or other insured damage to any material portion of any Collateral (including Mortgaged Property) or the commencement of any action or proceeding for the taking or expropriation of any Collateral (including Mortgaged Property) or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding; and

(f) the commencement of a Dominion Period, a Compliance Period or a Weekly Borrowing Base Period.

9.06. <u>Maintaining Records; Access to Properties and Inspections</u>. (a) Maintain all financial records in accordance with GAAP and applicable law and permit any representatives

designated by the Administrative Agent or any Lender to visit and inspect the properties and financial records of SSCC, any Borrower and any of their respective Subsidiaries during normal business hours and upon reasonable notice and to make extracts from and copies of such financial records (provided that, unless an Event of Default shall have occurred and is continuing, no more than two such visits and inspections may be made in any one year and provided further that, to the extent practicable, the Administrative Agent will coordinate any such visits and inspections with visits and inspections arranged by the Term Loan Agent for the Term Loan Lenders), verify Eligible Accounts and/or Eligible Inventory and permit any representatives designated by the Administrative Agent or any Lender to discuss at such reasonable times and at such reasonable intervals as may be reasonably requested the affairs, finances and condition of SSCC, any Borrower or any of their respective Subsidiaries or any properties of SSCC, any Borrower and any of their respective Subsidiaries with any officers thereof and (in the presence of SSCC, any Borrower or a Subsidiary of Holdings, unless a Default or Event of Default shall have occurred and be continuing) independent accountants therefor; provided, however, that all such visits, inspections and inquiries shall be coordinated through the Administrative Agent.

(b)     Holdings will, and will cause each of its Subsidiaries to, permit a third-party appraiser and a third-party consultant selected by the Co-Collateral Agents (and, to the extent such third-party appraiser is not Great American Group and/or such third-party consultant is not KPMG LLP, reasonably satisfactory to Holdings) to, upon the request of the Co-Collateral Agents, conduct (at the reasonable cost of the Borrowers), (x) an appraisal of the Inventory of the Loan Parties and (y) a collateral examination of the Inventory and Accounts of the Loan Parties, in each case, in scope reasonably satisfactory to the Co-Collateral Agents; provided, however, so long as no Event of Default exists, the Co-Collateral Agents may only make up to two requests in respect of each of clause (x) and (y) above during each fiscal year (or, during any period (A) commencing on the date on which the Excess Availability is less than the greater of (i) 20.0% of the Total Commitment as then in effect and (ii) $110,000,000 for a period of five consecutive Business Days and (B) ending on the first date thereafter on which the Excess Availability has been equal to or greater than the greater of (i) 20.0% of the Total Commitment as then in effect and (ii) $110,000,000 for 45 consecutive days, up to three requests in respect of each of clause (x) and (y) above during each fiscal year), in each case at the reasonable cost of the Borrowers.

9.07.  Use of Proceeds.  The Borrowers will use the proceeds of the Loans and the issuances of Letters of Credit only as provided in Section 8.10.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

9.08.  Compliance with Law.  Comply with the requirements of all applicable laws (including Environmental Laws), rules, regulations and decrees, directives and orders of any Governmental Authority that are applicable to it or to any of its properties, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.

9.09.  Further Assurances.  (a) Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing UCC and other financing statements, registrations, mortgages and deeds of trust), that may be required under applicable law or which the Required Lenders or the Administrative Agent may

reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority or rank of the security interests created or intended to be created by the Security Documents. Holdings will provide to the Administrative Agent, from time to time upon its reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)      Cause (i) each Domestic Subsidiary and Canadian Subsidiary of Holdings that is or becomes a Material Subsidiary, (ii) each Domestic Subsidiary and Canadian Subsidiary of Holdings that is or becomes a direct parent of any such Material Subsidiary and (iii) each other Domestic Subsidiary of Holdings that guarantees the obligations under the Term Loan Facility, to, as promptly as practicable, and in any event within 30 days after the occurrence of such event or status, notify the Administrative Agent thereof and cause the Collateral and Guarantee Requirements to be satisfied with respect to such Domestic Subsidiary or Canadian Subsidiary of Holdings, as the case may be, and direct parent thereof as, subject to the proviso in this paragraph (b), a U.S. Subsidiary Guarantor or Canadian Subsidiary Guarantor, as the case may be, and with respect to any Equity Interests in or Indebtedness of such Domestic Subsidiary or Canadian Subsidiary of Holdings, as the case may be, owned by any Loan Party; provided that, to the extent requested by the Administrative Agent, such Domestic Subsidiary or Canadian Subsidiary, as the case may be, (x) shall be required to execute and deliver to the Administrative Agent a Joinder Agreement pursuant to which such Domestic Subsidiary shall become a U.S. Borrower or such Canadian Subsidiary shall become a Canadian Borrower, as the case may be, and (y) shall take all action in connection therewith as would otherwise have been required to cause the Collateral and Guarantee Requirements to be satisfied as if such Domestic Subsidiary had been a U.S. Borrower or such Canadian Subsidiary had been a Canadian Borrower, as the case may be, on the Funding Date.

(c)      Subject to the final paragraph set forth in the definition of "Collateral and Guarantee Requirement", from time to time, each Borrower will, at its cost and expense, promptly secure the applicable Secured Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to such of the assets and properties of the Loan Parties as either the Administrative Agent or the Required Lenders shall reasonably request (it being understood that, subject to the limitations set forth in this paragraph (c), it is the intent of the parties that the applicable Secured Obligations shall be secured by substantially all of the assets of the U.S. Loan Parties (including real and personal properties acquired after the Funding Date), all of the ABL Priority Collateral of the Canadian Loan Parties and all of the Equity Interests of Canadian Loan Parties directly held by any Canadian Loan Party; provided, however that notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, (i) no leasehold mortgages or deeds of trust or fixture filings shall be required with respect to any leasehold interest of any Loan Party and (ii) no security interests shall be required to be pledged or created with respect to (A) properties set forth on Schedule 9.09(c), (B) any After-Acquired Mortgage Property that is subject to an existing mortgage (or any extension or refinancing thereof) or any After-Acquired Mortgage Property with a Fair Market Value of less than $5,000,000, (C) subject to paragraph (e) below, any Real Property located in the State of New York and (D) any assets located outside of the United States and Canada. Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably

satisfactory to the Administrative Agent, and each Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including customary legal opinions, title insurance policies or title opinions and lien searches) as the Administrative Agent shall reasonably request to evidence compliance with this <u>paragraph (c)</u>.

(d)    Notwithstanding anything to the contrary in <u>paragraph (c)</u> above, no security interests shall be required to be created pursuant to <u>paragraph (c)</u> above by any U.S. Loan Party with respect to any After-Acquired Mortgage Property with a fair market value (as determined by the applicable U.S. Loan Party in its reasonable judgment, it being understood that the purchase price shall be indicative thereof) (the "<u>Fair Market Value</u>") equal to or greater than \$5,000,000, unless and until the aggregate Fair Market Value of all items of After-Acquired Mortgage Property with a Fair Market Value equal to or greater than \$5,000,000 and excluded pursuant to this <u>paragraph (d)</u> (and not granted as security for the U.S. Secured Obligations pursuant to the next sentence) is at least \$50,000,000 in the aggregate for all U.S. Loan Parties. On each occasion that the Fair Market Value of all items of After-Acquired Mortgage Property described in the immediately preceding sentence shall be at least \$50,000,000, Holdings and each other U.S. Borrower shall create, or shall cause to be created, security interests on all such property (and not merely the portion of the property in excess of \$50,000,000) to secure the U.S. Secured Obligations (and thereafter, such property shall be disregarded for purposes of the calculation under the immediately preceding sentence) other than such property located in the State of New York.

(e)    Upon the written request of the Administrative Agent, Holdings shall cause a Mortgage to be granted in favor of the Security Agent for the benefit of the Secured Parties, by the holder of any fee title in respect of any Real Property owned by a U.S. Loan Party which is located in the State of New York and, to the extent a Prior Agent exists, is subject to a Lien in favor of a Prior Agent, together with title insurance policy and such other documents relating to such Mortgage as reasonably requested by the Administrative Agent.

9.10.    <u>Information Regarding Collateral; Deposit Accounts</u>.  (a) Furnish to the Administrative Agent prompt written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party and, in the case of Canadian Loan Parties, the location of such Canadian Loan Party's principal place of business, registered office, any office in which it maintains books or records relating to Collateral (other than de-minimis portions of Collateral) owned by it or any office or facility at which Collateral (other than de-minimis portions of Collateral) owned by it is located (including the establishment of any such new office or facility) or (iv) the organizational identification number, if any, or, with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, the Federal Taxpayer Identification Number of such Loan Party.  Each Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC, the PPSA or otherwise that are required in order for the Security Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral owned by such Loan Party.

(b)     Furnish to the Administrative Agent prompt written notice of (i) the acquisition by any U.S. Loan Party of, or any real property otherwise becoming, a property that is required to become a Mortgaged Property after the Funding Date and (ii) the acquisition by any Loan Party of any other material assets after the Funding Date, other than any assets constituting Collateral under the Security Documents in which the Security Agent shall have a valid, legal and perfected security interest (with the priority contemplated by the applicable Security Document) upon the acquisition thereof.

(c)     Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to <u>Section 9.04(a)</u>, Holdings shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of Holdings setting forth the information required pursuant to the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Funding Date or the date of the most recent certificate delivered pursuant to this <u>paragraph (c)</u>.

(d)     Cause all cash owned by each Borrower and the other Loan Parties at any time (other than Excluded Accounts) to be held in deposit accounts, securities accounts or commodities accounts maintained with a Domestic or Canadian office of any depositary institution, securities intermediary or commodity intermediary, as the case may be, in the name of one or more Loan Parties and will, in each case as promptly as practicable, notify the Administrative Agent of the existence of any deposit account, securities account or commodities account maintained by a Loan Party in respect of which a Control Agreement is required to be in effect pursuant to clause (h) of the definition of the term "Collateral and Guarantee Requirement" but is not yet in effect.

9.11.  <u>Material Contracts</u>.  Maintain in full force and effect (including exercising any available renewal option), and without amendment or modification, each Material Contract, unless the failure so to maintain any such Material Contract (or any amendment or modification thereto) could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

9.12.  <u>Environmental Matters</u>.  (a) Promptly give notice to the Administrative Agent upon becoming aware of (i) any violation of any Environmental Law, (ii) any material claim, inquiry, proceeding, investigation or other action, including a request for information or a notice of potential liability under any Environmental Law, by or from any Governmental Authority or any third party claimant or (iii) the discovery of the Release of any Hazardous Material at, on, under or from any of the real properties or any facility or equipment threat in excess of reportable or allowable standards or levels under any Environmental Law, or in a manner or amount that could reasonably be expected to result in material liability under any Environmental Law, in each case that could reasonably be expected to have a Material Adverse Effect.

(b)     Upon discovery of the presence on any of the real properties of any Hazardous Material that is in material violation of, or that could reasonably be expected to result in material liability under, any Environmental Law, in each case that could reasonably be expected to have a Material Adverse Effect, take or cause to be taken all necessary steps to initiate and expeditiously complete all remedial, corrective and other responsive action to the

extent required pursuant to Environmental Law, and keep the Administrative Agent reasonably informed of such actions and the results thereof.

9.13. <u>Certain Post-Funding Collateral Obligations</u>. As promptly as practicable after the Funding Date, and in any event within the applicable time period set forth in the definition of "Collateral and Guarantee Requirement", deliver all Mortgages and Control Agreements that would have been required to be delivered on the Funding Date.

SECTION 10. <u>Negative Covenants</u>. Each Borrower covenants and agrees with the Administrative Agent, each other Agent and each Lender that, from and after the Funding Date (subject to the conditions precedent to the Funding Date set forth in <u>Section 6.02</u>) and for so long as this Agreement shall remain in effect, or the Total Commitments or Letters of Credit remain outstanding or the principal of or interest on any Loan, Fees or any other expenses or amounts payable under any Loan Document shall remain unpaid, unless the Required Lenders shall otherwise consent in writing, it will not, and will not cause or permit any of their respective Subsidiaries to:

10.01. <u>Indebtedness</u>. Create, incur, assume or permit to exist any Indebtedness or Attributable Indebtedness; provided that Holdings and its Subsidiaries may incur Indebtedness if, after giving effect to the incurrence thereof and any substantially simultaneous application of proceeds thereof, the pro forma Interest Coverage Ratio would be greater than 2:00 to 1.00 (such test, the "<u>Incurrence Test</u>"). Notwithstanding the foregoing, Holdings and its Subsidiaries may, without duplication, create, incur, assume or permit to exist:

(a) the Indebtedness created hereunder and under the other Loan Documents;

(b) the Indebtedness (other than Indebtedness under the Term Loan Facility) existing on the Funding Date after giving effect to the consummation of the Plan of Reorganization and which is contemplated by the Plan of Reorganization on such date and any Permitted Refinancing Indebtedness in respect of thereof;

(c) Indebtedness consisting of Permitted Unsecured Notes issued on or prior to the Funding Date, provided that the requirements of <u>Section 2.09(c)</u> and <u>(d)</u> of the Term Loan Credit Agreement as in effect on the date hereof are satisfied in connection therewith, and any Permitted Refinancing Indebtedness in respect of thereof;

(d) intercompany loans and advances permitted by <u>Section 10.04</u> and which, (i) if owed to a U.S. Loan Party, are evidenced by a promissory note and pledged pursuant to the Guarantee and Collateral Agreement and (ii) if owed by a Loan Party, are subordinated to the Loan Document Obligations on terms reasonably satisfactory to the Administrative Agent;

(e) Indebtedness of any Foreign Subsidiary of Holdings and any Guarantees thereof, <u>provided</u> that such Indebtedness shall not be Guaranteed by or otherwise be recourse to any Loan Party, except as permitted by <u>Section 10.04(c)</u> or <u>(k)</u>; <u>provided further</u> that the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed $35,000,000;

(f)     Indebtedness under the Term Loan Facility, together with any Permitted Refinancing Indebtedness with respect thereto, including Guarantees thereof, in an aggregate principal amount not at any time in excess of $1,600,000,000 (as reduced by the aggregate principal amount (in each case, at the time of issuance thereof) of (i) Permitted Unsecured Notes permitted by paragraph (c) above and (ii) Permitted Notes permitted by paragraph (m) below), provided that any incremental financings in excess of $1,200,000,000 (including any incremental financings in excess of $1,200,000,000 incurred through Permitted Refinancing Indebtedness) under the Term Loan Facility shall be on substantially the same terms (other than fees and other pricing terms (other than interest rates) and, subject to pro forma compliance with the Incurrence Test, interest rates and, provided that the incremental financing shall not have a Weighted Average Life to Maturity shorter than the Weighted Average Life to Maturity of the Term Loans in existence immediately prior to such incremental financing, maturity date), as in effect for the Term Loan Facility immediately prior to the effectiveness of such incremental facility or any Permitted Refinancing Indebtedness in respect of the Term Loan Facility, as the case may be;

(g)     Indebtedness in respect of (i) performance, surety, appeal or similar bonds, completion guarantees or similar instruments, including letters of credit and bankers acceptances incurred for such purposes (and not for the purpose of borrowing money), in each case provided in the ordinary course of business, (ii) Hedging Agreements entered into in the ordinary course of business and not for speculative purposes and (iii) agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligations pursuant to such agreement, incurred in connection with the disposition of any business, assets or Subsidiary of Holdings;

(h)     (i) Capital Lease Obligations and Attributable Indebtedness, (ii) Indebtedness created, incurred or assumed in respect of the purchase, improvement, repair or construction of property, provided that such Indebtedness is created, incurred or assumed within 180 days after the earlier of (x) the placement in service of such property or (y) the final payment on such property, and (iii) Indebtedness consisting of industrial revenue, environmental control and other similar bonds, and Guarantees of and letters of credit supporting such Indebtedness, provided that the aggregate amount of the Indebtedness and Attributable Indebtedness created, incurred or assumed pursuant to this paragraph (h) at any time outstanding shall not exceed $150,000,000;

(i)     Indebtedness incurred to pay annual premiums for property and casualty insurance policies maintained by Holdings or any of its Subsidiaries in the ordinary course of business not exceeding in an aggregate amount at any time outstanding $75,000,000;

(j)     Indebtedness of any Person acquired by Holdings or any of its Subsidiaries in a Permitted Acquisition ("Acquisition Indebtedness") and assumed by Holdings or such Subsidiary pursuant to such acquisition (including any Permitted Refinancing Indebtedness incurred in respect thereof at the time of assumption thereof or from time to time thereafter), provided that (i) such Indebtedness was not incurred in contemplation of such acquisition, (ii) the aggregate principal amount of such Indebtedness and Permitted Refinancing Indebtedness at any time outstanding shall not exceed $50,000,000, (iii) such Indebtedness and any Permitted Refinancing Indebtedness in respect thereof shall not be secured by any assets other than the assets securing the acquired Indebtedness prior to such acquisition and

(iv) immediately after the incurrence thereof and giving pro forma effect thereto, the Interest Coverage Ratio shall not be less than the Interest Coverage Ratio immediately prior to such incurrence;

(k)     Guarantees with respect to bonds issued to support workers' compensation, or performance, surety, statutory or appeal bonds and other similar obligations (other than Indebtedness) incurred by Holdings or any of its Subsidiaries in the ordinary course of business;

(l)     Indebtedness in the form of any earnout or other similar contingent payment obligation incurred in connection with an acquisition permitted hereunder;

(m)     Indebtedness consisting of Permitted Notes, provided that (i) the Net Cash Proceeds from the issuance and sale thereof are applied to the mandatory prepayment of the Term Loans under the Term Loan Facility, (ii) such Permitted Notes are exchanged for Term Loans under the Term Loan Facility of one or more tranches pursuant to a Permitted Debt Exchange or (iii) to the extent an amount of such Net Cash Proceeds not in excess of the available Incremental Commitment Amount (as defined in the Term Loan Credit Agreement as in effect on the date hereof) immediately prior to the time of such issuance of sale are not so applied, the available Incremental Commitment Amount (as defined in the Term Loan Credit Agreement as in effect on the date hereof) is permanently reduced by an amount equal to the amount of such Net Cash Proceeds not applied pursuant to sub-paragraph (i) or (ii) above;

(n)     Permitted Timber Financings in an aggregate principal amount at any time outstanding not in excess of $10,000,000;

(o)     Indebtedness of Smurfit-Stone Puerto Rico in an aggregate principal amount at any time outstanding not to exceed $10,000,000 and the Guarantee thereof by Holdings on an unsecured basis; and

(p)     Other Indebtedness of Holdings or any of its Subsidiaries in an aggregate principal amount at any time outstanding not in excess of $75,000,000.

10.02.     Liens.  (a) Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any Person) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(i)     Permitted Liens;

(ii)     Liens created under the Loan Documents;

(iii)     Liens created under or pursuant to the Term Loan Facility Documents securing Indebtedness permitted under Section 10.01(f), provided that any such Liens on the Collateral and rights and remedies with respect thereto are at all times subject to the Intercreditor Agreement (or a successor intercreditor agreement having the same terms as the Intercreditor Agreement or such other terms reasonably acceptable to the Administrative Agent);

(iv)     Liens existing as of the Closing Date that are not discharged on the Funding Date and that are listed on Schedule 10.02(a)(iv), provided that (A) such Liens shall apply only to the property or assets to which they apply on the Closing Date and (B) such Liens shall secure only (x) those obligations that they secured on the Closing Date and (y) refinancings of such secured obligations permitted hereunder so long as the principal amount of obligations secured under this clause (iv) does not exceed the sum of the principal amount of such secured obligations being refinanced plus the amount of any premium required to be paid thereon as a result of, and any interest, fees and costs incurred in, such refinancing;

(v)     Liens securing Indebtedness permitted by Section 10.01(h), provided that any such Lien shall apply only to the property that is the subject of such Indebtedness and, if such Indebtedness was incurred to finance the acquisition, improvement, repair or construction of such property, the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the fair market value (as determined in good faith by Holdings or a Subsidiary of Holdings, as applicable) of the such property at the time it was so acquired, improved, repaired or constructed;

(vi)     Liens securing Indebtedness permitted by Section 10.01(i), provided that such Liens attach only to insurance policies and proceeds thereof;

(vii)     Liens securing Indebtedness constituting mortgage or purchase money financings, Capital Lease Obligations, industrial revenue bonds or similar financings assumed or incurred pursuant to Section 10.01(j) in connection with any acquisition permitted hereunder, provided that (A) such Liens attach only to property or assets acquired in connection with such acquisition, (B) such Liens were not created in contemplation of such acquisition and (C) such Liens shall secure only those obligations that they secure at the time of such acquisition and Permitted Refinancing Indebtedness in respect thereof;

(viii)     Liens on property or assets owned by Foreign Subsidiaries of Holdings securing Indebtedness permitted under Section 10.01(e) and Liens on property or assets owned by Smurfit-Stone Puerto Rico and securing Indebtedness permitted under Section 10.01(o), provided that no such Liens shall apply to any assets constituting ABL Priority Collateral or any Equity Interests of a Canadian Loan Party directly held by a Canadian Loan Party;

(ix)     Liens created under any agreement relating to the sale, transfer or other disposition of assets permitted hereunder, provided that such Liens relate solely to the assets to be sold, transferred or otherwise disposed;

(x)     any Lien consisting of a lease of personal property of such Person to customers of such Person, if such lease constitutes an Investment permitted under Section 10.04(h);

(xi) Liens on assets of Holdings or any Subsidiary of Holdings securing up to $30,000,000 of Indebtedness permitted by Section 10.01(p) or the Incurrence Test, provided that no such Lien shall apply to any assets constituting Collateral;

(xii) Liens on timber properties securing Permitted Timber Financings permitted under Section 10.01(n);

(xiii) extensions, renewals or replacements of any Lien referred to in clause (v), (vi) or (vii) above, provided that such extension, renewal or replacement is limited to the Indebtedness and property originally secured and encumbered thereby;

(xiv) Liens securing Indebtedness under Permitted Second Lien Notes permitted under Section 10.01(m) and Permitted Refinancing Indebtedness in respect thereof, provided that any such Liens on the Collateral and rights and remedies with respect thereto are at all times subject to the Intercreditor Agreement (or a successor intercreditor agreement having the same terms as the Intercreditor Agreement or such other terms reasonably acceptable to the Administrative Agent); and

(xv) Liens not otherwise permitted by the foregoing clauses of this paragraph (a) securing obligations in an aggregate amount outstanding at any time not in excess of $20,000,000, provided that no such Liens shall apply to any assets constituting ABL Priority Collateral or any Equity Interests of a Canadian Loan Party directly held by a Canadian Loan Party.

(b) Enter into any agreement prohibiting the creation or assumption of any Lien upon properties or assets, whether now owned or hereafter acquired, except any such restriction that exists under (i) this Agreement, (ii) agreements governing any Indebtedness of Foreign Subsidiaries of Holdings permitted hereunder, (iii) any documents governing secured Indebtedness permitted hereunder, provided that such restrictions only relate to the assets securing such Indebtedness, (iv) any documents governing Indebtedness permitted under Section 10.01(j), (m) or (p), provided that such restrictions are customary market terms for similar credits and do not restrict the granting of Liens to secure Indebtedness incurred under this Agreement or the Term Loan Facility, (v) restrictions by reason of customary provisions contained in leases, licenses, governmental contracts and similar agreements entered into in the ordinary course of business, provided that such restrictions are limited to the property or assets subject to such leases, licenses, contracts or agreements), and (vi) any agreement with respect to a permitted sale or disposition of any assets, provided such restrictions are limited to the assets to be sold or disposed of.

10.03.   Sale/Leaseback Transactions.   Enter into any Sale/Leaseback Transaction, other than any Sale/Leaseback Transaction to the extent that (i) the Capital Lease Obligations or Attributable Indebtedness, as the case may be, would be permitted by Section 10.01(h)(i) and (ii) any Liens associated therewith would be permitted by Section 10.02(a) (provided that, if Holdings or any of its Subsidiaries enters into such Sale/Leaseback Transaction with respect to any property owned by Holdings or such Subsidiary more than 12 months prior to such transaction, such Sale/Leaseback Transaction shall be treated as an Asset Sale and shall also be subject to the restrictions of Section 10.13).

10.04.      Investments, Loans and Advances.  Have outstanding or make any loan or advance to, or have or make any Investment in, any other Person or suffer to exist any such loan, advance or Investment, or any obligation to make such loan, advance or Investment, except as set forth on Schedule 10.04 and except:

(a)      Permitted Investments;

(b)      loans, advances or other Investments made by (i) Holdings or any Subsidiary of Holdings to or in any Loan Party or any wholly owned Domestic Subsidiary or any wholly owned Canadian Subsidiary of Holdings, provided that any such Investments by a Loan Party to or in any such Subsidiary that is not a Loan Party (x) complies with the requirements of Section 10.13 and (y) are in an aggregate amount not to exceed $5,000,000 outstanding at any time and (ii) any Foreign Subsidiary of Holdings (other than a Canadian Subsidiary of Holdings) to or in any other Foreign Subsidiary of Holdings;

(c)      loans, advances or other Investments made to or in any Subsidiary of Holdings (other than a Loan Party, a Wholly-Owned Domestic Subsidiary or a Wholly-Owned Canadian Subsidiary of Holdings), and Guarantees of obligations of any such Subsidiary, in an aggregate amount not to exceed $25,000,000 outstanding at any time;

(d)      Investments consisting of non-cash consideration received in connection with a sale of assets permitted under Section 10.13;

(e)      Investments by SSCC, each Borrower and their respective Subsidiaries in existence on the Closing Date in the capital stock of their respective Subsidiaries;

(f)      Investments consisting of Equity Interests, securities or notes received in settlement of accounts receivable incurred in the ordinary course of business from a customer that Holdings or any Subsidiary of Holdings has reasonably determined is unable to make cash payments in accordance with the terms of such account receivable;

(g)      accounts receivable created or acquired, and deposits, prepayments and other credits to suppliers made, in the ordinary course of business;

(h)      any Investments consisting of (i) any contract pursuant to which Holdings or any Subsidiary of Holdings obtains the right to cut, harvest or otherwise acquire timber on property owned by any other Person, whether or not the Borrower's or such Subsidiary's obligations under such contract are evidenced by a note or other instrument, or (ii) loans or advances to customers of Holdings or any Subsidiary of Holdings, including leases of personal property of Holdings or such Subsidiary to such customers, provided that the contracts, loans and advances constituting permitted Investments pursuant to this paragraph (h) shall not exceed $20,000,000 at any time outstanding;

(i)      prepaid expenses and lease, utility, workers' compensation, performance and other similar deposits made in the ordinary course of business;

(j)      loans to officers and employees not to exceed $5,000,000 at any time outstanding;

(k)     so long as the Payment Conditions are satisfied both before and after giving effect to such Investments, Holdings and its Subsidiaries may make additional Investments not otherwise permitted under this Section 10.04;

(l)     Investments constituting Guarantees permitted under Section 10.01 and Investments permitted under Section 10.05(f); and

(m)     Investments consisting of Hedging Agreements permitted hereunder.

10.05.     Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or amalgamate or consolidate with any other Person, or permit any other Person to merge into or amalgamate or consolidate with it, or sell, transfer, assign, lease, sublease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (when taken as a whole in combination with the other assets and properties of SSCC, each Borrower and their respective Subsidiaries), or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, except:

(a)     if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing, (i) any Domestic Subsidiary of Holdings may merge into or consolidate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any U.S. Borrower in a transaction in which such U.S. Borrower is the surviving corporation, (ii) any Domestic Subsidiary of Holdings (other than any U.S. Borrower) may merge into or consolidate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any Wholly-Owned Domestic Subsidiary of Holdings (other than any U.S. Borrower) in a transaction in which the surviving corporation is a Wholly-Owned Domestic Subsidiary of Holdings and (iii) any Canadian Subsidiary of Holdings may merge into or consolidate or amalgamate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any Canadian Borrower in a transaction in which such Canadian Borrower is the surviving corporation, (iv) any Canadian Subsidiary of Holdings (other than any Canadian Borrower) may merge into or consolidate or amalgamate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any wholly owned Canadian Subsidiary of Holdings (other than any Canadian Borrower) in a transaction in which the surviving entity is a Wholly-Owned Canadian Subsidiary of Holdings; provided that, in each case, (x) if any Person other than a Wholly-Owned Domestic Subsidiary of Holdings or Wholly-Owned Canadian Subsidiary of Holdings, as the case may be, receives any consideration, such transaction is also permitted by Section 10.04 and (y) the surviving entity shall, at the time of such merger or consolidation, be in compliance with the requirements of Section 9.09(b);

(b)     if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing, (i) any Wholly-Owned Foreign Subsidiary of Holdings (other than any Canadian Subsidiary of Holdings) may merge into, amalgamate or consolidate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any Canadian Loan Party in a transaction in which the surviving entity is such Canadian Loan Party and (ii) any Wholly-

Owned Foreign Subsidiary of Holdings (other than any Canadian Subsidiary of Holdings) may merge into, amalgamate or consolidate with, liquidate or dissolve into, or sell, transfer, assign, lease, sublease or otherwise dispose of all or substantially all of its assets to, any other Wholly-Owned Foreign Subsidiary of Holdings (other than a Canadian Loan Party) in a transaction in which the surviving entity is a Wholly-Owned Foreign Subsidiary of Holdings, underlined provided that no Person other than a Loan Party or a Wholly-Owned Foreign Subsidiary of Holdings receives any consideration and the Collateral and Guarantee Requirement shall be satisfied with respect to voting Equity Interests of such surviving or acquiring Foreign Subsidiary of Holdings that are owned by a Loan Party;

(c)     the Funding Date Merger and the other transactions contemplated by the Plan of Reorganization as described in the Disclosure Statement on the Closing Date may be consummated on or prior to the Funding Date;

(d)     purchases of inventory, equipment and real property in the ordinary course of business;

(e)     Investments permitted by Section 10.04; and

(f)     any Loan Party may acquire all or substantially all the assets of a Person or line of business, unit or division of such Person, in each case primarily located in the United States or Canada, or not less than 100% of the Equity Interests of such a Person (other than directors' qualifying shares) (in each case referred to herein as the "Acquired Entity"); provided that (i) the Acquired Entity shall be in a similar line of business as that of Holdings and its Subsidiaries, (ii) the acquisition shall not be preceded by, or effected pursuant to, an unsolicited tender offer or proxy solicitation, (iii) at the time of such transaction both before and immediately after giving effect thereto, no Event of Default or Default shall have occurred and be continuing, (iv) the Payment Conditions are satisfied at the time of such acquisition and after giving pro forma effect thereto and (v) upon consummation of such acquisition, the Acquired Entity and each Domestic Subsidiary and Canadian Subsidiary of Holdings thereof shall become a Loan Party if such Acquired Entity or Subsidiary would be a Material Subsidiary based on a pro forma calculation for the most recent period of four consecutive fiscal quarters in respect of which financial statements have been delivered; and Holdings and each Borrower shall comply, and shall cause their respective Subsidiaries to comply, with the other provisions of Section 9.09 applicable to such Acquired Entity or Subsidiary, or to its Equity Interests, substantially concurrently with the consummation of such acquisition or by such later date reasonably agreed by the Administrative Agent with respect to specific compliance items (any acquisition of an Acquired Entity meeting all of the criteria set forth in this paragraph (f) being referred to herein as a "Permitted Acquisition").

10.06.     Restricted Payments.  (a) Declare or make, directly or indirectly, any Restricted Payment or set aside any amount for any such purpose.

(b)     Notwithstanding the provisions of paragraph (a) above:

(i)     the transactions contemplated by the Plan of Reorganization to occur on the Funding Date may be consummated on the Funding Date;

(ii)     Holdings may make Restricted Payments so long as the Payment Conditions are satisfied both before and after giving effect to such Restricted Payments;

(iii)     Holdings may make Restricted Payments for the repurchase, retirement or other acquisition for value of Equity Interests of Holdings held by any future, present or former employee or director of Holdings or any of its Subsidiaries pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan of Holdings or its Subsidiaries, provided that the aggregate amount of such Restricted Payments in any fiscal year shall not exceed $5,000,000, provided that at the time of any such Restricted Payment made pursuant to this clause (iii) and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing; and

(iv)     Holdings may make Restricted Payments in any fiscal year commencing on or after January 1, 2011, so long as (x) immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing and (y) the aggregate amount of such Restricted Payments made pursuant to this clause (iv) shall not exceed (A) the lesser of (1) the Borrower's Portion of Excess Cash Flow (as defined in the Term Loan Credit Agreement (as in effect on the date hereof)) and (2) $50,000,000 minus (B) the aggregate principal amount of Term Loans theretofore purchased pursuant to Section 10.09(iv).

10.07.     Transactions with Stockholders and Affiliates.  Except to the extent specifically permitted by the terms of this Agreement, directly or indirectly enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 10% or more of any class of equity securities of such Person or with any Affiliate of such Person or of any such holder, on terms that are less favorable to such Person than those that could be obtained at the time from Persons that are not such a holder or Affiliate, provided that the foregoing restriction shall not apply to (a) any transaction between or among the Loan Parties or any transaction between or among Foreign Subsidiaries of Holdings (other than Canadian Subsidiaries of Holdings) or any transaction between or among Canadian Subsidiaries (other than Loan Parties), (b) any transaction or series of transactions between Holdings and any Subsidiary of Holdings or between the Subsidiaries of Holdings on a basis that is not systematically disadvantageous to any Loan Party, (c) customary fees paid to members of the Board of Directors of Holdings or any of its Subsidiaries, (d) customary compensation (including salaries and bonuses) paid to officers and employees of Holdings or any Subsidiary of Holdings, (e) management and financial services provided by Holdings or any Subsidiary of Holdings to any other Subsidiary of Holdings or any other entity in which Holdings or such Subsidiary has Investments to the extent that such services are provided by Holdings or such Subsidiary in the ordinary course of its business and senior management of such Person has determined that the providing of such services is in the best interests of such Person and (f) the transactions effected on the Funding Date in connection with the effectiveness of, and pursuant to the terms of, the Plan of Reorganization.

10.08.     Business.  Engage at any time in any business other than the businesses engaged in by Holdings or any Subsidiary of Holdings on the Closing Date and

businesses that are reasonably similar or reasonably related thereto, or are reasonable extensions thereof.

10.09.　　　<u>Limitations on Debt Prepayments</u>.　Optionally prepay, repurchase or redeem or otherwise optionally defease or segregate funds with respect to (collectively, "<u>prepay</u>") any Term Loans, Permitted Notes or other long-term capital markets Indebtedness; <u>provided</u>, <u>however</u>, that the foregoing will not prohibit (i) any refinancing of such Indebtedness pursuant to the issuance of Permitted Refinancing Indebtedness with respect thereto that is otherwise permitted by this Agreement, (ii) the transactions effected on the Funding Date in connection with the effectiveness of, and pursuant to the terms of, the Plan of Reorganization, (iii) any other prepayment, repurchase, redemption or defeasance of Indebtedness so long as the Payment Conditions are satisfied both before and after giving effect to such prepayment, repurchase, redemption or defeasance, as the case may be, and (iv) any purchase of Term Loans pursuant to, and in compliance with the conditions set forth in, Section 2.23 of the Term Loan Credit Agreement (as in effect on the date hereof), so long as (x) at the time of such purchase and after giving effect thereto no Default or Event of Default shall have occurred and be continuing and (y) the aggregate amount of all such purchases shall not exceed $30,000,000.

10.10.　　　<u>Amendment of Certain Documents</u>.　(a) Amend, modify or grant any waiver with respect to any indenture, note or any other instrument evidencing Indebtedness of Holdings or any Subsidiary of Holdings in an aggregate principal amount in excess of $100,000,000 (other than any such Indebtedness owed to Holdings or any Subsidiary of Holdings), if such amendment, modification, or waiver has the effect of (i) increasing the amounts due in respect of any such indenture, note or other instrument or, other than with respect to the Term Loan Facility, any interest rate thereunder, unless any such increase in amount would be permitted under <u>Section 10.01</u> and except that any increase in any interest rate resulting from such amendment or modification will be permitted if, after giving pro forma effect thereto, Holdings could incur at least $1.00 of additional indebtedness under the Incurrence Test, (ii) subjecting any property of Holdings or any Subsidiary of Holdings to any Lien, other than Liens permitted under <u>Section 10.02</u>, (iii) shortening the maturity or weighted average life of any such Indebtedness or (iv) creating or changing covenants, events of default and other terms and conditions such that the covenants, events of default and other terms and conditions become materially more adverse, when taken as a whole, to the Lenders.

(b)　　　Cause or suffer to exist any amendment, restatement, supplement or other modification to the certificate of incorporation (including any certificate of designation with respect to any preferred stock) or by-laws of (or, in each case an equivalent organizational document) Holdings or any Subsidiary of Holdings without the prior written consent of the Required Lenders, unless such amendment, restatement, supplement or modification is not materially adverse to the interests of the Lenders hereunder or under the other Loan Documents (provided that the foregoing will not prohibit the consummation of the Funding Date Merger).

10.11.　　　<u>Limitation on Dispositions of Stock of Subsidiaries</u>.　Directly or indirectly sell or otherwise dispose of, or permit any Subsidiary of Holdings to issue to any other Person (other than to any other Loan Party or a Wholly-Owned Subsidiary of Holdings), any Equity Interests of any Subsidiary of Holdings, except issuances to qualified directors if and to the extent required by applicable law, <u>provided</u> that nothing in this <u>Section 10.11</u> shall prohibit

(i) any disposition or issuance permitted by Sections 10.05 and 10.13 if such disposition or issuance is structured as the disposition or issuance of stock or other Equity Interests or (ii) the issuance of Equity Interests on a pro rata basis to its equity holders by any Non-Wholly-Owned Subsidiary of Holdings.

10.12. <u>Restrictions on Ability of Subsidiaries to Pay Dividends</u>.  Permit any Subsidiary of Holdings to, directly or indirectly, voluntarily create or otherwise voluntarily cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary of Holdings to (a) pay dividends or make any other distributions on its capital stock or any other interest or (b) make or repay loans or advances to any Loan Party, except for (i) encumbrances or restrictions under this Agreement and the other Loan Documents, (ii) encumbrances or restrictions under the indentures governing the Permitted Notes (or any Permitted Refinancing Indebtedness permitted hereunder with respect thereto or any other indenture or other document governing Indebtedness permitted hereby so long as the encumbrances and restrictions thereunder are no more onerous to any Subsidiary of Holdings than those contained in the Term Loan Facility Documents as in effect on the Funding Date (and under the Term Loan  Facility Documents as amended from time to time or any Permitted Refinancing Indebtedness in respect thereof, in each case, so long as the encumbrances and restrictions thereunder are no more onerous, when taken as a whole, to any Subsidiary of Holdings than those contained in the Term Loan  Facility Documents as in effect on the Funding Date)), (iii) encumbrances or restrictions under the Term Loan Facility Documents as in effect on the Funding Date (and under the Term Loan Facility Documents as amended from time to time or any Permitted Refinancing Indebtedness in respect thereof, in each case, so long as the encumbrances and restrictions thereunder are no more onerous, when taken as a whole, to any Subsidiary of Holdings than those contained in the Term Loan Facility Documents as in effect on the Funding Date), (iv) customary encumbrances or restrictions in joint venture agreements and similar agreements that relate solely to the activities of such joint venture, (v) customary encumbrances or restrictions contained in agreements relating to the sale of all or a substantial part of the Equity Interests or assets of any Subsidiary of Holdings pending such sale, <u>provided</u> that such encumbrances and restrictions apply only to the Subsidiary of Holdings to be sold and such sale is permitted hereunder, and (vi) encumbrances or restrictions in documents governing Indebtedness assumed or incurred under <u>Section 10.01(j)</u> or existing with respect to any Person or the property or assets of such Person acquired by Holdings or any Subsidiary of Holdings in an acquisition permitted hereunder, <u>provided</u> that such encumbrances and restrictions are not applicable to any Person or the property or assets of any Person other than such acquired Person or the property or assets of such acquired Person.

10.13. <u>Disposition of Collateral and Other Assets</u>.  (a) Except for any transfer or disposition permitted by <u>paragraph (b)</u> below, sell, lease, assign, transfer or otherwise dispose of any asset or assets, in a single transaction or a series of related transactions, having a fair market value in excess of $10,000,000, unless (i) fair market value is received for such asset (such fair market value to be determined by the Board of Directors of Holdings or any applicable Subsidiary of Holdings in the exercise of its reasonable judgment in the case of any asset or assets with a fair market value in excess of $100,000,000), (ii) except in the case of any Asset Exchange, if the fair market value of such asset or assets is in excess of $50,000,000, at least 75% of the consideration received by Holdings and the Subsidiaries of Holdings for such asset or assets shall be in cash, cash equivalents and readily marketable securities and (iii) except in the

case of any Asset Exchange, any non-cash consideration shall consist of debt obligations of the purchaser, provided that the foregoing shall not restrict Holdings or any Subsidiary of Holdings from receiving debt obligations of the purchaser in an aggregate principal amount not in excess of $50,000,000 in connection with any single transaction or series of related transactions.

(b) Notwithstanding anything to the contrary in this Agreement, Holdings shall not transfer any of its assets to any Subsidiary of Holdings and none of the Subsidiaries of Holdings shall transfer any of its assets to any other Subsidiary of Holdings unless (i) in the case of any asset or assets constituting Collateral, such asset or assets is transferred to a Loan Party and the Administrative Agent is satisfied that the Liens created under the Security Documents on such asset or assets shall be in full force and effect, or (ii) in the case of any asset or assets not constituting Collateral, such transfer is permitted as an Investment under Section 10.04 or is permitted under Section 10.05.

10.14.    Fiscal Year.  Cause the fiscal year of SSCC or Holdings to end on a date other than December 31.

10.15.    Material Subsidiaries.  (a) Permit, as of the date on which financial statements with respect to the fiscal quarter of Holdings most-recently ended are delivered (or, if not delivered by such date, on the date required to have been delivered) pursuant to Section 9.04(a) or (b) hereof, the sum of (i) the individual revenues and assets of Holdings and each Domestic Subsidiary of Holdings that is a Material Subsidiary and a Loan Party and (ii) the revenues and assets of each Foreign Subsidiary of Holdings at least 65% of the voting stock and all of the non-voting Equity Interests of which has been pledged by a U.S. Loan Party as Collateral to secure the U.S. Secured Obligations and of such Foreign Subsidiary's Subsidiaries, calculated on a consolidated basis, in each case for or as of the end of the most recent period of four consecutive fiscal quarters in respect of which financial statements have been (or were required to have been) delivered, when taken together, to account for less than 90% of Holdings' consolidated revenues for, or less than 90% of Holdings' consolidated assets at the close of, such period of four consecutive fiscal quarters.

(b) Permit on any day in any fiscal quarter of Holdings, the aggregate amount of cash held by Domestic Subsidiaries of Holdings in deposit accounts (other than Excluded Deposit Accounts) that are not subject to Control Agreements to exceed $15,000,000, unless, during the 30-day period after the last day of such fiscal quarter, one or more of such Domestic Subsidiaries of Holdings are designated by Holdings as a Material Subsidiary pursuant to clause (c) of the definition thereof and enter into Control Agreements, with respect to their deposit accounts referred to above, so that, if such Control Agreement has been in effect at all times during such fiscal quarter, such $15,000,000 threshold would not have been exceeded on any day.

10.16.    Consolidated Fixed Charge Coverage Ratio.  During each Compliance Period, Holdings shall not permit (i) the Consolidated Fixed Charge Coverage Ratio for the last Test Period ended prior to the beginning of such Compliance Period for which financial statements are available to be less than 1.00:1.00 or (ii) the Consolidated Fixed Charge Coverage Ratio for any Test Period for which financial statements are required to be delivered during such Compliance Period pursuant to Section 9.04(a), (b) or (c)  to be less than 1.00:1.00.

10.17.    No Additional Deposit Accounts; etc.  Each of Holdings and each other Borrower will not, and will not permit any other Loan Party to, directly or indirectly, open, maintain or otherwise have any checking, savings, deposit, securities or other accounts at any bank or other financial institution where cash or Permitted Investments are or may be deposited or maintained with any Person, other than (a) the Core Concentration Accounts set forth on Part A of Schedule 10.17, (b) the Collection Accounts set forth on Part B of Schedule 10.17, (c) the other Deposit Accounts set forth on Part C of Schedule 10.17, (d) the Excluded Accounts (which as of the Closing Date are set forth on Part D of Schedule 10.17) and (e) the securities accounts or commodities accounts set forth in Part E of Schedule 10.17; provided that any such Loan Party may open a new Core Concentration Account, Collection Account, other Deposit Account, securities account or commodities account not set forth in such Schedule 10.17, so long as prior to opening any such account (i) Holdings has delivered an updated Schedule 10.17 to the Administrative Agent listing such new account (other than an Excluded Account) and (ii) in the case of any new Core Concentration Account, Collection Account, other Deposit Account (other than an Excluded Account), securities account or commodities account, the financial institution with which such account is opened, together with the applicable Loan Party which has opened such account and the Security Agent have executed and delivered to the Administrative Agent a Control Agreement reasonably acceptable to the Administrative Agent (or in the case of a securities account, such other control agreement as may be reasonably satisfactory to the Administrative Agent).

SECTION 11.  Events of Default.

11.01.    Events of Default.  From and after the Funding Date (and, for the avoidance of doubt, including for the purpose of determining the occurrence of the Funding Date), upon the occurrence of any of the following specified events (each, an "Event of Default"):

(a)    any representation or warranty made or deemed made in any Loan Document, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)    default shall be made in the payment of any principal of (or Face Amount of in the case of any B/A Instrument) any Loan, Note or Unpaid Drawing when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan, Note or Unpaid Drawing or any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days, in the case of payment of any such interest or Fee, or 10 Business Days in the case of payment of any such other amount;

(d)　default shall be made in the due observance or performance by Holdings or any other Borrower of any covenant, condition or agreement contained in <u>Sections 9.01</u> (with respect to Holdings or any other Borrower), <u>9.04(i)</u>, <u>9.04(j)</u>, <u>9.05(a)</u>, <u>9.05(f)</u>, <u>9.07</u>, <u>9.13</u> or in <u>Section 10</u>;

(e)　default shall be made in the due observance or performance by any Loan Party or any of their respective Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those defaults specified in <u>paragraph (b)</u>, <u>(c)</u> or <u>(d)</u> above) and such default shall continue unremedied for a period of 30 days (or 15 days solely in the case of Section 9.04(a), 9.04(b), 9.04(c) or 9.04(d)) after written notice thereof from the Administrative Agent or any Lender to Holdings;

(f)　Holdings, any other Borrower or any Subsidiary of Holdings shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period), or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness (after giving effect to any applicable grace period), if the effect of any failure referred to in this <u>clause (ii)</u> is to cause, or to permit the holder or holders of such Indebtedness or a trustee on its or their behalf to cause, such Indebtedness to become due prior to its stated maturity, <u>provided</u> that this <u>paragraph (f)</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or asset securing such Indebtedness;

(g)　at any time after the Funding Date, an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, any other Borrower, any other Loan Party or any Material Subsidiary of Holdings, or of a substantial part of the property or assets of any such Person, under any Insolvency Law, (ii) the appointment of a receiver, interim receiver, receiver and manager, trustee, custodian, sequestrator, conservator or similar official for any such Person or for a substantial part of the property or assets of any such Person or (iii) the winding-up or liquidation of any such Person; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)　Holdings, any other Borrower, any other Loan Party or any Material Subsidiary of Holdings shall (i) voluntarily commence any proceeding or file any petition seeking relief under any Insolvency Law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in <u>paragraph (g)</u> above, (iii) apply for or consent to the appointment of a receiver, interim receiver, receiver and manager, trustee, custodian, sequestrator, conservator or similar official for any such Person or for a substantial part of the property or assets of any such Person, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

NEWYORK 7496812 v21 (2K)

(i)     one or more judgments for the payment of money, individually or in the aggregate, in an amount in excess of $30,000,000 (in each case to the extent not adequately covered by insurance proceeds as to which the insurance company has acknowledged coverage pursuant to a writing reasonably satisfactory to the Administrative Agent), shall be rendered against Holdings, any other Borrower or any of their respective Subsidiaries or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, vacated, discharged or satisfied;

(j)     an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in increased liability of Holdings, any other Borrower, any other Loan Party, any of their respective Subsidiaries and ERISA Affiliates in an aggregate amount more than $30,000,000 greater than the liability as of the Closing Date reasonably estimated by the Required Lenders in good faith attributable to either of the following:

(i)     the Plans' and Multiemployer Plans' funded status as of the most recent valuation or other statement of financial condition prior to the Closing Date; or

(ii)     withdrawal liability with respect to a Multiemployer Plan as of the most recent estimate of withdrawal liability for such Multiemployer Plan received before the Closing Date;

(k)     there shall have occurred a Change in Control or Holdings, any other Borrower or any of their respective Subsidiaries shall make any mandatory prepayment, repurchase or redemption or make any offer to make any such mandatory prepayment, repurchase or redemption of any Indebtedness in an aggregate outstanding principal amount in excess of $30,000,000 on account of any "Change of Control" (however designated) referred to in the indenture, agreement or other instrument governing such Indebtedness;

(l)     any Lien purported to be created by any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid, perfected first priority (or, in the case of the Term Priority Collateral, second priority, but second in priority only in respect of the obligations under the Term Loan Facility or Permitted Notes) Lien on (i) any Collateral (except as otherwise expressly provided in this Agreement or such Security Document) with a fair market value or book value (whichever is greater) in excess, individually or in the aggregate, of $100,000,000, or (ii) any ABL Priority Collateral (except as otherwise expressly provided in this Agreement or such Security Document) with a fair market value or book value (whichever is greater) in excess, individually or in the aggregate, of $50,000,000, in each case, except to the extent that any such loss of perfection, priority or rank results from the failure of the Security Agent to maintain possession of certificates representing securities pledged under the Security Documents or otherwise take any action within its control (including the filing of UCC continuation statements or similar filings or registrations under the applicable laws of any other jurisdiction);

(m)     any Loan Document shall not be for any reason, or shall be asserted by the Loan Party (except as otherwise expressly provided in this Agreement or such Loan Document)

not to be, in full force and effect and enforceable in all material respects in accordance with its terms; or

(n)    the Loan Document Obligations shall cease to constitute, or shall be asserted by any Loan Party (except as otherwise expressly provided in this Agreement or such Loan Document) not to constitute, senior indebtedness under the subordination provisions of any subordinated Indebtedness of any Loan Party, or any such subordination provisions shall be invalidated or otherwise cease to be a legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrowers, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Loan Party (provided that, if an Event of Default specified in Section 11.01(g) or (h) shall occur with respect to any Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below, shall occur automatically without the giving of any such notice):   (i) declare the Total Commitment terminated, whereupon all the Commitments of each Lender shall forthwith terminate immediately and any Commitment Fees shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal (and Face Amounts in the case of any B/A Instrument) of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party; (iii) terminate any Letter of Credit which may be terminated in accordance with its terms; (iv) (x) direct the U.S. Borrowers to pay (and the U.S. Borrowers jointly and severally agree that upon receipt of such notice, or upon the occurrence of an Event of Default specified in Section 11.01(g) or (h) with respect to any U.S. Borrower, they will pay) to the Security Agent at the Payment Office such additional amount of cash or Permitted Investments, to be held as security by the Security Agent, as is equal to the aggregate Stated Amount of all Letters of Credit issued for the account of any U.S. Borrower and then outstanding and (y) direct the Canadian Borrowers to pay (and the Canadian Borrowers jointly and severally agree that upon receipt of such notice, or upon the occurrence of an Event of Default specified in Section 11.01(g) or (h) with respect to any Canadian Borrower, they will pay) to the Security Agent at the Payment Office such additional amount of cash or Permitted Investments, to be held as security by the Security Agent, as is equal to the aggregate Stated Amount of all Letters of Credit issued for the account of any Canadian Borrower and then outstanding; (v) enforce, as Security Agent, all of the Liens and security interests created pursuant to the Security Documents; (vi) enforce the guarantee under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement; and (vii) apply any cash collateral held by the Administrative Agent pursuant to Section 5.02 to the repayment of the Obligations.

11.02.    Application of Proceeds.    (a) Subject to the terms of the Intercreditor Agreement, upon the exercise of any of the remedies provided in the last paragraph of Section 11.01, all moneys collected by the Administrative Agent or the Security Agent (or, to the extent any Security Document executed by a Loan Party requires proceeds of collateral thereunder to be applied in accordance with the provisions of this Agreement, the pledgee,

assignee, mortgagee or other corresponding party under such Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the Administrative Agent or the Security Agent hereunder (or, to the extent any Security Document executed by a Loan Party requires proceeds of collateral thereunder to be applied in accordance with the provisions of this Agreement, the pledgee, assignee, mortgagee or other corresponding party under such Security Document) upon any exercise of remedies hereunder, shall be applied as follows:

(i)     <u>first</u>, to all amounts owing to the Security Agent pursuant to any of the Loan Documents in its capacity as such in respect of (x) the preservation of Collateral or its security interest in the Collateral or (y) the exercise of any remedies provided in the last paragraph of <u>Section 11.01</u>;

(ii)     <u>second</u>, to the extent proceeds remain after the application pursuant to preceding clause (i), to all amounts owing to any Agent pursuant to any of the Loan Documents in its capacity as such;

(iii)     <u>third</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) and (ii), to an amount equal to the outstanding Primary U.S. Loan Party Obligations shall be paid to the Secured Parties as provided in <u>Section 11.02(e)</u>, with each Secured Party receiving an amount equal to its outstanding Primary U.S. Loan Party Obligations or, if the proceeds are insufficient to pay in full all such Primary U.S. Loan Party Obligations, its Pro Rata Share of the amount remaining to be distributed;

(iv)     <u>fourth</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) through (iii), inclusive, to an amount equal to the outstanding Primary Obligations (including Primary Obligations which are also Canadian Loan Party Obligations) shall be paid to the Secured Parties as provided in <u>Section 11.02(e)</u>, with each Secured Party receiving an amount equal to its outstanding Primary Obligations (including Primary Obligations which are also Canadian Loan Party Obligations) or, if the proceeds are insufficient to pay in full all such Primary Obligations (including Primary Obligations which are also Canadian Loan Party Obligations), its Pro Rata Share of the amount remaining to be distributed;

(v)     <u>fifth</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) through (iv), inclusive, to an amount equal to the outstanding Secondary U.S. Loan Party Obligations shall be paid to the Secured Parties as provided in <u>Section 11.02(e)</u>, with each Secured Party receiving an amount equal to its outstanding Secondary U.S. Loan Party Obligations or, if the proceeds are insufficient to pay in full all such Secondary U.S. Loan Party Obligations, its Pro Rata Share of the amount remaining to be distributed;

(vi)     <u>sixth</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) through (v), inclusive, to an amount equal to the outstanding Secondary Obligations (including Secondary Obligations which are also Canadian Loan Party Obligations) shall be paid to the Secured Parties as provided in <u>Section 11.02(e)</u>, with each Secured Party receiving an amount equal to its outstanding Secondary

Obligations (including Secondary Obligations which are also Canadian Loan Party Obligations) or, if the proceeds are insufficient to pay in full all such Secondary Obligations (including Secondary Obligations which are also Canadian Loan Party Obligations), its Pro Rata Share of the amount remaining to be distributed;

(vii)  <u>seventh</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) through (vi), inclusive, to an amount equal to the outstanding Tertiary Obligations shall be paid to the Secured Parties as provided in <u>Section 11.02(e)</u>, with each Secured Party receiving an amount equal to its outstanding Tertiary Obligations or, if the proceeds are insufficient to pay in full all such Tertiary Obligations, its Pro Rata Share of the amount remaining to be distributed; and

(viii)  <u>eighth</u>, to the extent proceeds remain after the application pursuant to preceding clauses (i) through (vii), inclusive, and following the Discharge of Revolving Credit Obligations, to the extent that the Term Loan Agent shall have notified the Administrative Agent that the Discharge of Term Loan Credit Obligations (as defined in the Intercreditor Agreement) has occurred, to the relevant Loan Party, their successors or assigns, or as a court of competent jurisdiction may otherwise direct or as otherwise required by the Intercreditor Agreement.

For purposes of this Agreement:  (i) "<u>Pro Rata Share</u>" shall mean, when calculating a Secured Party's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Secured Party's Primary U.S. Loan Party Obligations, Primary Obligations (including Primary Obligations which are also Canadian Loan Party Obligations), Secondary U.S. Loan Party Obligations, Secondary Obligations (including Secondary Obligations which are also Canadian Loan Party Obligations) or Tertiary Obligations, as the case may be, and the denominator of which is the then outstanding amount of all Primary U.S. Loan Party Obligations, Primary Obligations (including Primary Obligations which are also Canadian Loan Party Obligations), Secondary U.S. Loan Party Obligations, Secondary Obligations (including Secondary Obligations which are also Canadian Loan Party Obligations) or Tertiary Obligations, as the case may be, (ii) "<u>Primary Obligations</u>" shall mean (x) all Loan Document Obligations with respect to principal (or Face Amount, as applicable) of, premium, fees and interest on, Loans, Unpaid Drawings, the Stated Amount of outstanding Letters of Credit and Fees, (y) all Qualified Secured Hedging Obligations other than obligations with respect to indemnities, fees (including, without limitation, attorneys' fees) and similar obligations and liabilities, and (z) all Qualified Secured Cash Management Services Obligations other than obligations with respect to indemnities, fees (including, without limitation, attorneys' fees) and similar obligations and liabilities, (iii) "<u>Secondary Obligations</u>" shall mean all Loan Document Obligations, all Qualified Secured Hedging Obligations and all Qualified Secured Cash Management Services Obligations, in each case other than Primary Obligations, (iv) "<u>Tertiary Obligations</u>" shall mean (x) all Hedging Obligations under Secured Hedging Agreements and (y) all Cash Management Services Obligations under Secured Cash Management Agreements, in each case other than Primary Obligations and Secondary Obligations, (v) "<u>Primary U.S. Loan Party Obligations</u>" shall mean all Primary Obligations which are also U.S. Loan Party Obligations, (vi) "<u>Secondary U.S. Loan Party Obligations</u>" shall mean all Secondary Obligations which are also U.S. Loan Party Obligations.

(b)     When payments to Secured Parties are based upon their respective Pro Rata Shares (other than in respect of Tertiary Obligations), the amounts received by such Secured Parties hereunder shall be applied (for purposes of making determinations under this Section 11.02 only) (i) first, to their Primary Obligations and (ii) second, to their Secondary Obligations.  If any payment to any Secured Party of its Pro Rata Share of any distribution would result in overpayment to such Secured Party, such excess amount shall instead be distributed in respect of the unpaid Primary Obligations or Secondary Obligations, as the case may be, of the other Secured Parties, with each Secured Party whose Primary Obligations or Secondary Obligations, as the case may be, have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of such Secured Party and the denominator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of all Secured Parties entitled to such distribution.

(c)     Each of the Secured Parties, by their acceptance of the benefits hereof and of the Security Documents executed by a Loan Party, agrees and acknowledges that if the Secured Parties receive a distribution on account of undrawn amounts with respect to Letters of Credit issued under this Agreement (which shall only occur after all Unpaid Drawings have been paid in full), such amounts shall be paid to the Administrative Agent and held by it, for the equal and ratable benefit of the Secured Parties, as cash security for the repayment of Secured Obligations owing by the Loan Parties to the Secured Parties as such.  If any amounts are held as cash security pursuant to the immediately preceding sentence, then upon the termination of all outstanding Letters of Credit under this Agreement, and after the application of all such cash security to the repayment of all other Secured Obligations owing by the Loan Parties to the Secured Parties after giving effect to the termination of all such Letters of Credit, if there remains any excess cash, such excess cash shall be returned by the Administrative Agent to the Security Agent for distribution in accordance with Section 11.02(a).

(d)     Subject to the terms of the Intercreditor Agreement, all payments required to be made hereunder shall be made (x) if to the Lender Creditors, to the Administrative Agent for the account of the Lender Creditors, (y) if to the Hedging Creditors, to the trustee, paying agent or other similar representative (each, a "Representative") for the Hedging Creditors or, in the absence of such a Representative, directly to the Hedging Creditors and (z) if to the Cash Management Creditors, directly to the Cash Management Creditors.

(e)     For purposes of applying payments received in accordance with this Section 11.02, the Security Agent shall be entitled to rely upon (i) the Administrative Agent, (ii) the Representative or, in the absence of such a Representative, upon the Hedging Creditors and (iii) the Cash Management Creditors for a determination (which the Administrative Agent and each other Secured Party agrees (or shall agree) to provide upon request of the Security Agent) of the outstanding Secured Obligations of the Loan Parties owed to the Secured Parties.  Unless it has received written notice from a Secured Party to the contrary, the Administrative Agent, in furnishing information pursuant to the preceding sentence, and the Security Agent, in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding.  Unless it has written notice from a Hedging Creditor or a Cash Management Creditor to the contrary, the Security Agent, in acting hereunder, shall be entitled to assume that no Secured Hedging Agreements or Secured Cash Management Agreements are in existence.

(f)    Subject to the other limitations (if any) set forth herein and in the other Loan Documents, it is understood that the Loan Parties shall remain liable (as and to the extent set forth in the Loan Documents) to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations of the Loan Parties.

(g)    It is understood and agreed by each Loan Party and each Secured Party that the Security Agent shall have no liability for any determinations made by it in this Section 11.02 (including, without limitation, as to whether given Collateral constitutes Term Priority Collateral or ABL Priority Collateral), in each case except to the extent resulting from the gross negligence or willful misconduct of the Security Agent (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Each Loan Party and each Secured Party also agrees that the Security Agent may (but shall not be required to), at any time and in its sole discretion, and with no liability resulting therefrom, petition a court of competent jurisdiction regarding any application of Collateral in accordance with the requirements hereof and of the Intercreditor Agreement, and the Security Agent shall be entitled to wait for, and may conclusively rely on, any such determination.

(h)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Canadian Loan Parties shall not be required to repay or prepay, or to guarantee, nor shall any proceeds in respect of Collateral of the Canadian Loan Parties and payments by the Canadian Loan Parties be applied to, direct obligations (excluding obligations as guarantor of the Canadian Loan Parties) of the U.S. Loan Parties.

SECTION 12.  The Agents.

12.01.    Appointment.    The Lenders (including in their capacity as a Swingline Lender, Issuing Lender, Agent and/or Lead Arranger, as the case may be) hereby irrevocably designate and appoint the Agents to act as specified herein and in the other Loan Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize the Agents to take such action on its behalf under the provisions of this Agreement, the other Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agents by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Agents may perform any of their respective duties hereunder by or through their officers, directors, agents, employees or affiliates.

12.02.    Nature of Duties.  (a)  The Agents shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Loan Documents.  No Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Loan Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Agents shall be mechanical and administrative in nature; the Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other

Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

(b)      Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Syndication Agent, the Documentation Agents, the Lead Arrangers and the Senior Managing Agents are named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Syndication Agent, the Documentation Agents, the Lead Arrangers and the Senior Managing Agents shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 12.06 and 13.01.  Without limitation of the foregoing, the Syndication Agent, the Documentation Agents, the Lead Arrangers and the Senior Managing Agents shall not, solely by reason of this Agreement or any other Loan Documents, have any fiduciary relationship in respect of any Lender or any other Person.

12.03.      Lack of Reliance on the Agents.  Independently and without reliance upon the Agents, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (b) its own appraisal of the creditworthiness of Holdings and its Subsidiaries and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  No Agent shall be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Loan Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

12.04.      Certain Rights of the Administrative Agent.  If the Administrative Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

12.05.    Reliance.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that such Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Loan Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent.

12.06.    Indemnification.  To the extent any Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrowers, the Lenders will reimburse and indemnify such Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent (or any affiliate thereof) in performing its respective duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such affiliates' thereof) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.07.    Agents in their Individual Capacities.  With respect to its obligation to make Loans, or issue or participate in Letters of Credit, under this Agreement, each Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender", "Required Lenders", "Majority Lenders", "Supermajority Lenders", "holders of Notes" or any similar terms shall, unless the context clearly indicates otherwise, include such Agent in its respective individual capacities.  Each Agent and its respective affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Loan Party or any Affiliate of any Loan Party (or any Person engaged in a similar business with any Loan Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party or any Affiliate of any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08.    Holders.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

12.09.    Resignation and Removal of Agents.  (a)  The Administrative Agent (for purposes of this Section 12.09(a) through (e), the term "Administrative Agent" also shall include DBNY in its capacity as Security Agent hereunder and pursuant to the Security

Documents) may resign from the performance of all its respective functions and duties hereunder and/or under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under Section 11.01(g) or (h) then exists, Holdings. Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as an Issuing Lender, the Swingline Lender and the Fronting Lender, in which case the resigning Administrative Agent (x) shall not be required to issue any further Letters of Credit or make any additional Swingline Loans or Specified Foreign Currency Loans hereunder and (y) shall maintain all of its rights as Issuing Lender, Swingline Lender or Fronting Lender, as the case may be, with respect to any Letters of Credit issued by it, or Swingline Loans or Specified Foreign Currency Loans made by it, prior to the date of such resignation. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b) Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder and under the other Loan Documents who shall be a commercial bank or trust company reasonably acceptable to Holdings, which acceptance shall not be unreasonably withheld or delayed (provided that the Holdings' approval shall not be required if a Default or an Event of Default then exists).

(c) If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of Holdings (which consent shall not be unreasonably withheld or delayed, provided that Holdings' consent shall not be required if a Default or an Event of Default then exists), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d) If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 20th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e) The Required Lenders may at any time when the Administrative Agent has become the subject of a proceeding under Debtor Relief Law, or had a receiver, conservator, trustee or custodian appointed for it, upon no less than thirty (30) days' prior notice, replace the Administrative Agent. The successor Administrative Agent shall not be the subject of a proceeding under the Debtor Relief Law, or had a receiver, conservator, trustee or custodian appointed for it and shall succeed to and become vested with all of the rights, powers, privileges and duties of the replaced Administrative Agent, and the replaced Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. The provisions of this Section 12 and Section 13.01 shall continue in effect for the benefit of such replaced Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the replaced

Administrative Agent was acting as Administrative Agent. Any such replacement of an Administrative Agent hereunder shall automatically, and with no further action required on the part of the Administrative Agent, constitute the resignation of the Administrative Agent in its capacity as an Issuing Lender, the Swingline Lender and the Fronting Lender, in which case the replaced Administrative Agent (x) shall not be required to issue any further Letters of Credit, make any additional Swingline Loans or fund any Specified Foreign Currency Loan hereunder and (y) shall maintain all of its rights as Issuing Lender, Swingline Lender or Fronting Lender, as the case may be, with respect to any Letters of Credit issued by it, Swingline Loans made by it, or Specified Foreign Currency Loans funded by it, prior to the date of such replacement.

(f) Upon a resignation, replacement or removal of the Administrative Agent pursuant to this Section 12.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Section 12 (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent hereunder and under the other Loan Documents.

(g) Any Co-Collateral Agent may resign at any time upon written notice to Holdings, the Administrative Agent and each Lender and the resignation of such Co-Collateral Agent shall become effective immediately upon the delivery of such written notice.

(h) (i) If the Commitments of General Electric Capital Corporation are less than 50% of the Commitments of the Administrative Agent or General Electric Capital Corporation is a Defaulting Lender, General Electric Capital Corporation may be removed as a Co-Collateral Agent by Holdings or the Required Lenders upon written notice to it as Co-Collateral Agent and with such removal to become effective immediately upon the delivery of such written notice, (ii) if the Commitments of JPMorgan Chase Bank, N.A. are less than 50% of the Commitments of the Administrative Agent or JPMorgan Chase Bank, N.A. is a Defaulting Lender, JPMorgan Chase Bank, N.A. may be removed as a Co-Collateral Agent by Holdings or the Required Lenders upon written notice to it as Co-Collateral Agent and with such removal to become effective immediately upon the delivery of such written notice.

(i) Upon a resignation or removal of any Co-Collateral Agent pursuant to Section 12.09(g) or (h), any Co-Collateral Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Section 12 (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of such Co-Collateral Agent for all of its actions and inactions while serving as such Co-Collateral Agent hereunder and under the other Loan Documents.

12.10. Collateral Matters. (a) Each Lender (including in their capacity as a Swingline Lender, Issuing Lender, Agent and/or Lead Arranger, as the case may be) authorizes and directs the Security Agent to enter into the Security Documents and the Intercreditor Agreement for the benefit of the Lenders and the other Secured Parties. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as

are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Security Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)     The Lenders hereby authorize and direct the Security Agent, at its option and in its discretion, to release or subordinate (as the case may be) any Lien granted to or held by the Security Agent upon any Collateral and the Guarantees under the Guarantee and Collateral Agreement and/or Canadian Guarantee and Collateral Agreement (i) upon termination of the Total Commitment (and all Letters of Credit and Bankers' Acceptances (or the obligations in an amount of 105% of outstanding stated amounts are cash collateralized), and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations and other contingent obligations not due and payable) at any time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than Holdings and its Subsidiaries) upon the sale or other disposition thereof in compliance with <u>Section 10.13</u>, or consummation of any transaction permitted hereunder as a result of which any Guarantor (other than SSCE, SSCC or any other Borrower) ceases to be a Subsidiary of Holdings, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by <u>Section 13.12</u>) or (iv) as otherwise may be expressly provided in the relevant Security Documents or in the Intercreditor Agreement. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Security Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 12.10</u>.

(c)     The Security Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Security Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Security Agent in this <u>Section 12.10</u>, in any of the Security Documents or in the Intercreditor Agreement, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Security Agent may act in any manner it may deem appropriate, in its sole discretion, given the Security Agent's own interest in the Collateral as one of the Lenders and that the Security Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(d)     The Security Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents, trustees or third parties appointed by the Security Agent. The Security Agent (and any such sub-agent, trustee or third party) may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory and indemnification provisions of this <u>Section 12</u> and <u>Section 13.01</u>

shall apply to any such sub-agent, trustee or third party and to their respective Affiliates to the same extent that such provisions apply to the Security Agent.

12.11.    <u>Delivery of Information</u>.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Loan Party, any Subsidiary thereof, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Loan Document except (a) as specifically provided in this Agreement or any other Loan Document and (b) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

12.12.    <u>Quebec Security</u>.  Without limiting the powers of the Security Agent hereunder or under any of the other Loan Documents, each Secured Party hereby acknowledges and agrees that DBNY shall, for purposes of holding any security granted by any Canadian Loan Party or by any Affiliate or Subsidiary of any Canadian Loan Party on property pursuant to the laws of the Province of Quebec to secure obligations of such Canadian Loan Party or such Affiliate or Subsidiary under any bond or debenture (the "<u>Quebec Secured Obligations</u>"), be the holder of an irrevocable power of attorney (<u>fondé de pouvoir</u>) (within the meaning of the <u>Civil Code of Quebec</u>) for all present and future Secured Parties and holders of any bond or debenture.  Each of the Secured Parties, for itself and for all present and future Affiliates that are or may become Secured Parties hereby irrevocably constitutes, to the extent necessary, DBNY as the holder of an irrevocable power of attorney (<u>fondé de pouvoir</u>) (within the meaning of Article 2692 of the <u>Civil Code of Quebec</u>) in order to hold security granted by any of the Canadian Loan Parties or by any of their Affiliates or Subsidiaries to secure the Quebec Secured Obligations.  Furthermore, each of the Secured Parties hereby appoints DBNY to act in the capacity of the holder and depositary of such bond or debenture on its own behalf as Security Agent and for and on behalf and for the benefit of all present and future Secured Parties.  Each assignee (for itself and for all present and future Affiliates) of a Secured Party shall be deemed to have confirmed and ratified the constitution of the Security Agent as the holder of such irrevocable power of attorney (<u>fondé de pouvoir</u>) by execution of the relevant Assignment and Assumption Agreement or other relevant documentation relating to such assignment.  Notwithstanding the provisions of Section 32 of the <u>An Act respecting the special powers of legal persons</u> (Quebec), DBNY may acquire and be the holder of any bond or debenture.  The Canadian Borrowers (on behalf of itself and the other Loan Parties which are Canadian Subsidiaries) hereby acknowledge that such bond or debenture constitutes a title of indebtedness, as such term is used in Article 2692 of the <u>Civil Code of Quebec</u>.

12.13.    <u>Co-Collateral Agents</u>.  If a Co-Collateral Agent proposes an adjustment or revision to Borrowing Base eligibility standards, advance rates applicable to any Borrowing Base or Reserves, or makes any other proposal regarding a determination or action which may be made by the Co-Collateral Agents pursuant to this Agreement or any Loan Document, the other Co-Collateral Agents shall respond to such proposal within three Business Days of its receipt of such written proposal.  In the event that the Co-Collateral Agents cannot agree on Borrowing Base eligibility standards, advance rates applicable to the Borrowing Base or Reserves or any other action or determination which may be made by the Co-Collateral Agents

pursuant to the Agreement or any Loan Document, the consenting vote of 2 of the 3 Co-Collateral Agents shall be required; provided that if there are only two Co-Collateral Agents at the time of such determination, the determination shall be made by the individual Co-Collateral Agent either asserting the more conservative credit judgment or declining to permit the requested action for which consent is being sought by the relevant Borrowers, as applicable; provided further in the event an issue cannot be resolved by either the more conservative credit judgment or declining to permit a requested action by the Borrowers (such as the selection or replacement of an appraisal firm), then the decision of the Security Agent shall be final.

SECTION 13. Miscellaneous.

13.01. Payment of Expenses, etc. (a) The Borrowers hereby jointly and severally agree to: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses (including Expenses) of the Agents (including, without limitation, the reasonable fees and disbursements of one counsel to the Administrative Agent and one local counsel in each relevant jurisdiction, in each case acting jointly for the Agents and the fees and expenses in connection with the appraisals and collateral examinations required pursuant to Sections 6.01(i) and 9.06(b)) in connection with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents and the documents and instruments referred to herein and therein and any actual or proposed amendment, waiver or consent relating hereto or thereto, of the Agents and their respective Affiliates in connection with their syndication efforts with respect to this Agreement and of the Agents, the Issuing Lenders in connection with the Letter of Credit Back-Stop Arrangements entered into by such Persons and, after the occurrence and during the continuance of an Event of Default, each of the Issuing Lenders, the Fronting Lender and one counsel for all of the Lenders in connection with the enforcement of this Agreement and the other Loan Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel (limited to one local counsel in each relevant jurisdiction and, if necessary one bankruptcy counsel and one regulatory counsel, in each case to the Administrative Agent (or one additional per affected party in the case of a conflict preventing only one local counsel acting), in each case acting jointly for the Lenders) and one consultant for the Administrative Agent and, after the occurrence and during the continuance of an Event of Default, counsel (limited to one local counsel in each relevant jurisdiction and, if necessary one bankruptcy counsel and one regulatory counsel, in each case to the Administrative Agent (or one additional per affected party in the case of a conflict preventing only one local counsel acting) in each case acting jointly for the Issuing Lenders, the Fronting Lender and the Lenders) for each of the Issuing Lenders, the Fronting Lender and the Lenders); (ii) pay and hold the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, each of the Issuing Lenders, each Co-Collateral Agent, and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, each of the Issuing Lenders, each Co-Collateral Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, such

Issuing Lender, such Co-Collateral Agent or such Lender) to pay such taxes; and (iii) indemnify the Administrative Agent (including without limitation in its capacity as agent for the Borrowers pursuant to Section 13.15), the Security Agent, the Swingline Lender, the Fronting Lender, each Co-Collateral Agent, each Issuing Lender and each Lender, and each of their respective officers, directors, employees, representatives, agents, Affiliates, trustees and investment advisors (each, an "Indemnified Person") from and hold each of them harmless against any and all liabilities, obligations, losses, damages, penalties, claims, actions (including removal or remedial actions), judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) (collectively, "Indemnified Costs") incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (A) any investigation, litigation or other proceeding (whether or not the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Co-Collateral Agent, any Issuing Lender or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Loan Party) related to the entering into and/or performance of this Agreement or any other Loan Document or the use of any Letter of Credit or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Loan Document or the exercise of any of their rights or remedies provided herein or in the other Loan Documents, or (B) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any real property at any time owned, leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by Holdings or any of its Subsidiaries at any location, whether or not owned, leased or operated by Holdings or any of its Subsidiaries, the non-compliance by Holdings or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any real property, or any environmental claim asserted against Holdings, any of its Subsidiaries or any real property at any time owned, leased or operated by Holdings or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultant incurred in connection with any such investigation, litigation or other proceeding (but excluding any Indemnified Costs to the extent incurred by reason of the gross negligence or willful misconduct of the Indemnified Person (or its related parties) to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  To the extent that the undertaking to indemnify, pay or hold harmless any Agent, the Swingline Lender, the Fronting Lender, any Issuing Lender or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrowers jointly and severally shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.  In addition, the Borrowers jointly and severally agree to reimburse the Administrative Agent, the Security Agent and the Co-Collateral Agents for all reasonable third party administrative, audit and monitoring expenses incurred in connection with the Borrowing Base and determinations thereunder.

(b)     To the full extent permitted by applicable law, each of Holdings and the other Borrowers shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Person shall be liable for

any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's (or its related parties') gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)     The provisions of this <u>Section 13.01</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, termination of any Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  All amounts due under this <u>Section 13.01</u> shall be payable promptly after written demand therefor.

13.02.     <u>Right of Setoff</u>.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, each Issuing Lender and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Loan Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent, such Issuing Lender or such Lender (including, without limitation, by branches and agencies of the Administrative Agent, such Issuing Lender or such Lender wherever located) to or for the credit or the account of Holdings or any of its Subsidiaries against and on account of the Obligations and liabilities of the Loan Parties to the Administrative Agent, such Issuing Lender or such Lender under this Agreement or under any of the other Loan Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to <u>Section 13.04(b)</u>, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not the Administrative Agent, such Issuing Lender or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured; <u>provided</u> that, the provisions of this <u>Section 13.02</u> shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Credit Agreement (including pursuant to the Extension in accordance with <u>Section 2.19</u>).

13.03.     <u>Notices</u>.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telecopier communication, facsimile transmission or electronic mail) and mailed, telecopied, transmitted or delivered:  if to any Lender, at its address, facsimile number or electronic mail address specified on <u>Schedule 13.03</u>; if to the Administrative Agent or DBNY as Co-Collateral Agent, at the Notice Office; if to JPMorgan Chase Bank, N.A. as Co-Collateral Agent, [383 Madison Avenue, 24th Floor, New York, NY 10017, Attention:  Peter S. Predun, Telephone:  (212) [          ], Telecopier No.:  (212) 270-5100][4]; if to General Electric Capital Corporation as Co-Collateral

---

[4]  JP to advise.

Agent, at [500 West Monroe Street, 12th Floor, Chicago, IL 60661, Attention: Smurfit-Stone Account Manager, Telephone: (312) 463-2300, Telecopier No.: (312) 463-3840][5]; or, if to any Loan Party, at Six CityPlace Drive, Creve Coeur, MO 63141, Attention of Timothy T. Griffith, Vice President and Treasurer (Fax No. (314) 787-6186), with a copy to Brian S. Hart, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, IL 60601 (Fax No. (312) 558-5700); or in each case (other than with respect to a Lender), at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address, facsimile number or electronic mail address as shall be designated by such Lender in a written notice to Holdings and the Administrative Agent. All such notices and communications shall, when mailed, telecopied, faxed, mailed electronically or sent by overnight courier, be effective when deposited in the mails or overnight courier, as the case may be, or sent by telecopier or electronic mail, except that notices and communications to the Administrative Agent, any Co-Collateral Agent, Holdings and the other Loan Parties shall not be effective until received by the Administrative Agent, such Co-Collateral Agent, Holdings or the other Loan Parties, as the case may be.

13.04.    Benefit of Agreement; Assignments; Participations.    (a)    This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that neither Holdings nor any Borrower may assign or transfer any of their rights, obligations or interest hereunder without the prior written consent of the Lenders which consent will not be given unless the assignee or transferee is a member of the same "wholly-owned group" as each of the Borrowers and, provided further, that, although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Loans hereunder except as provided in Sections 2.13 and 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, provided further, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Loan Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the Revolving Loan Maturity Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by Holdings or any other Borrower of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under any or all of the Security Documents (except as expressly provided in the Loan Documents) supporting the Loans or Letters of Credit hereunder in which

---

[5]  GE to advise.

such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Loan Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if such Lender had not sold such participation.

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments under a Tranche and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i) (A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund (which fund, together with its Affiliates, has a combined capital and surplus in excess of $500,000,000) that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)); provided that no such assignment may be made to any such Person that is, or would at such time constitute, a Defaulting Lender and/or (ii) in the case of any Lender that is a fund that invests in loans, any other fund (which fund, together with its Affiliates, has a combined capital and surplus in excess of $500,000,000) that invests in loans managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $5,000,000, in each case in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (t) at such time, Schedule 1.01(a) shall be deemed modified to reflect the Commitments and/or outstanding Revolving Loans, as the case may be, of such new Lender and of the existing Lenders, (u) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the applicable Borrowers for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrowers' joint and several expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Revolving Loans, as the case may be, (v) the consents (not to be unreasonably withheld, delayed or conditioned) of each Issuing Lender, the Swingline Lender and, unless such assignment is to a Person that will not be a Participating Specified Foreign Currency Lender, the Fronting Lender, shall be required in connection with any such assignment, (w) the consent of the Administrative Agent and, so long as no Default or Event of Default then exists, Holdings, shall be required in connection with any such assignment pursuant to clause (y) above (such consents, in any case, not to be unreasonably withheld, delayed or conditioned) provided that Holdings shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof, (x) the Administrative Agent shall receive at the time of each such

assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500, (y) each assignment by any Participating Specified Foreign Currency Lender shall require a Specified Foreign Currency Participation Settlement with respect to such Participating Specified Foreign Currency Lender unless the Fronting Lender agrees in its sole discretion that the respective assignee shall succeed such Participating Specified Foreign Currency Lender as a Participating Specified Foreign Currency Lender itself, in which case such assignee shall acquire the Specified Foreign Currency Participation of the respective assignor and (z) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Revolving Loans. At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for Federal income tax purposes, the respective assignee Lender shall, to the extent legally entitled to do so, provide to Holdings and the Administrative Agent the appropriate Internal Revenue Service Forms (and, if applicable, a Section 5.04(b)(ii) Certificate) described in Section 5.04(b). In addition, at the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so and at the reasonable request of Holdings, file any certificate or document or furnish to the relevant Borrower and the Administrative Agent, such certificate or document that may be necessary to establish any available exemption from, or reduction of, any Taxes, as described in Section 5.04(c). To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or 3.06 from those being charged by the respective assigning Lender prior to such assignment, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment). A Lender may only assign all or a portion of its Commitments hereunder if that assignment would result in at least two Lenders under this Agreement.

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or Holdings), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)    Any Lender which assigns all of its Commitments and/or Revolving Loans hereunder in accordance with Section 13.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 3.06, 5.04, 12.06, 13.01 and 13.06), which shall survive as to such assigning Lender.

13.05.     No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Co-Collateral Agent, any Issuing Lender or any Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between Holdings, any other Borrower or any other Loan Party and the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Co-Collateral Agent, any Issuing Lender or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Loan Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Co-Collateral Agent, any Issuing Lender or any Lender would otherwise have.  No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Co-Collateral Agent, any Issuing Lender or any Lender to any other or further action in any circumstances without notice or demand.

13.06.     Payments Pro Rata.  (a)  Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of any Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Loan Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, Unpaid Drawings, Commitment Fees or Letter of Credit Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Loan Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)     Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of Section 2.19 and of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07.	Computations.  All computations of interest (except as provided in Section 2.15), Commitment Fees and other Fees (other than Drawing Fees) hereunder shall be made on the basis of a year of 360 days (except for interest calculated by reference to the Prime Lending Rate or clause (i) of the definition of Canadian Prime Rate, which shall be based on a year of 365 or 366 days, as applicable) for the actual number of days (including the first day but excluding the last day; except that in the case of Letter of Credit Fees and Facing Fees, the last day shall be included) occurring in the period for which such interest, Commitment Fees or Fees are payable.

13.08.	GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a)  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF TITLE 14 OF THE NEW YORK GENERAL OBLIGATIONS LAW BUT EXCLUDING ALL OTHER CHOICE OF LAW AND CONFLICTS OF LAWS RULES THEREOF.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.  EACH OF HOLDINGS AND EACH BORROWER HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS HOLDINGS, WITH A REGISTERED ADDRESS BEING SIX CITYPLACE DRIVE, CREVE COEUR, MO 63141 (PH: [          ]; FAX NO.:  (314) 787-6186), AS ITS AUTHORIZED DESIGNEE, APPOINTEE AND AGENT TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING; PROVIDED THAT DURING THE PERIOD PRIOR TO THE EFFECTIVE DATE OF THE PLAN OF REORGANIZATION EACH OF THE PARTIES HERETO SUBMITS TO THE JURISDICTION OF THE U.S. BANKRUPTCY COURT WITH RESPECT TO MATTERS RELATING HERETO.  IF FOR ANY REASON SUCH AUTHORIZED DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, EACH OF HOLDINGS AND EACH BORROWER AGREES TO DESIGNATE A NEW AUTHORIZED DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION REASONABLY SATISFACTORY TO THE ADMINISTRATIVE AGENT UNDER THIS AGREEMENT.  EACH OF HOLDINGS AND EACH BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH LOAN PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH LOAN PARTY.  EACH OF THE PARTIES TO THIS

AGREEMENT FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH LOAN PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST HOLDINGS AND EACH BORROWER IN ANY OTHER JURISDICTION.

(b) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.09. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with Holdings and the Administrative Agent. Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of an original executed counterpart hereof.

13.10. <u>Effectiveness</u>. (a) Unless the Administrative Agent has received actual notice from any Lender that the conditions contained in <u>Section 6.01</u> have not been met to its satisfaction, upon the receipt by the Administrative Agent from Holdings, the other Borrowers, each of the Co-Collateral Agents and each of the Lenders a signed counterpart hereof (whether the same or different counterparts) at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it and upon

the Administrative Agent's good faith determination that the conditions contained in <u>Section 6.01</u> have been met, then the Closing Date shall be deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the Closing Date shall not release Holdings, any Borrower or any other Loan Party from any liability for failure to satisfy one or more of the applicable conditions contained in <u>Section 6.01</u>).

(b)       The obligation of each Lender to make Loans, and the obligation of each Issuing Lender to issue Letters of Credit shall arise on the date (the "<u>Funding Date</u>") which occurs after the Closing Date on which the conditions contained in <u>Sections 6.02</u> and <u>7</u> are met to the satisfaction of the Administrative Agent and the Required Lenders. Unless the Administrative Agent has received actual notice from any Lender that the conditions described in the preceding sentence have not been met to its satisfaction, upon the Administrative Agent's good faith determination that the conditions described in the immediately preceding sentence have been met, then the Funding Date shall be deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the Funding Date shall not release Holdings, any Borrower or any other Loan Party from any liability for failure to satisfy one or more of the applicable conditions contained in <u>Section 6.02</u>). The Administrative Agent will give Holdings, the other Borrowers and each Lender prompt written notice of the occurrence of the Funding Date.

13.11.      <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12.      <u>Amendment or Waiver; etc.</u> (a) Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Loan Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of Holdings (other than the Borrowers) may be released from, the guarantee under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement, as the case may be, and the relevant Security Documents), <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender except that, for the purposes of succeeding clauses (i), (ii) and (iii) (but, in the case of such clause (iii), only to the extent relating to such clause (i) or (ii)), a Defaulting Lender shall have a separate vote to the extent otherwise provided therein; <u>provided</u> <u>further</u> that for the purposes of succeeding clauses (ii) and (iii) (but, in the case of such clause (iii), only to the extent relating to such clause (ii)), to the extent a Defaulting Lender does not accept or reject in writing to the Administrative Agent a written amendment, waiver or modification proposal on or prior to the expiry of the period of time granted to all Lenders required to consent to such proposal such Defaulting Lender shall be deemed to have consented to the respective written amendment, waiver or modification proposal) (with Obligations being directly affected in the case of the following clauses (i), (vi) and (vii)), (i) extend the final scheduled maturity of any Loan or Note or extend the stated expiration date of any Letter of Credit beyond the Revolving Loan Maturity Date, or reduce the rate or extend the time of payment of interest or Fees thereon (except (x) in connection with the waiver of applicability of any post-default increase in interest

rates and (y) extensions expressly permitted by Section 2.19), or reduce (or forgive) the principal amount thereof (it being understood that any amendment or modification to Section 13.07 shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), (ii) release all or substantially all of the Collateral (except as expressly provided in the Loan Documents) under all Security Documents, all or substantially all of the Guarantors (except as expressly provided in the Loan Documents) under the guarantee under the Guarantee and Collateral Agreement or Canadian Guarantee and Collateral Agreement or any Borrower (except as expressly provided in the Loan Documents) from any Loan Document, as the case may be, (iii) amend, modify or waive any provision of this Section 13.12(a) or Section 13.06 (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Commitments on the Funding Date), (iv) reduce the "majority" voting threshold specified in the definition of Required Lenders, (v) consent to the assignment or transfer by Holdings or any other Borrower of any of their rights and obligations under this Agreement or any other Loan Document to which it is a party, (vi) amend the priority of payments set forth in Section 11.02 and the priority of payments in provisions in the Security Documents setting forth the application of proceeds, or (vii) amend Section 2.19 the effect of which is to extend the maturity of any Lender without its consent; provided further, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitments of any Lender, and that an increase in the available portion of the Commitments of any Lender shall not constitute an increase of the Commitments of such Lender), (2) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 3 or alter its rights or obligations with respect to Letters of Credit, (3) without the consent of the Swingline Lender, alter the Swingline Lender's rights or obligations with respect to Swingline Loans, (4) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision of this Agreement or any other Loan Document as same relates to the rights or obligations of the Administrative Agent, (5) without the consent of the Co-Collateral Agent affected thereby, amend, modify or waive any provision relating to the rights or obligations of such Co-Collateral Agent, (6) without the consent of the Fronting Lender, amend, modify or waive any provision of Section 15 or alter the Fronting Lender's rights or obligations with respect to Specified Foreign Currency Loans, or (7) without the consent of the Supermajority Lenders, (v) amend the priority of payments set forth in Section 5.03(e), (w) amend the definition of Supermajority Lenders, (x) amend or expand any of the following definitions, in each case the effect of which would be to increase the amounts available for borrowing hereunder: Canadian Borrowing Base, U.S. Borrowing Base, Borrowing Base, Eligible Accounts, Eligible Inventory (including, in each case, the defined terms used therein) (it being understood that the establishment, modification or elimination of Reserves, in each case by the Co-Collateral Agents in accordance with the terms hereof, will not be deemed to require a Supermajority Lender consent), (y) decrease the frequency of Borrowing Base Certificate deliveries required pursuant to Section 9.04(i) or (z) increase the percentage of any Borrowing Base for which Agent Advances may be made pursuant to Section 2.01(e).

(b)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i)

through (vi), inclusive, of the first proviso to Section 13.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrowers shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described below, to replace each such non-consenting Lender or Lenders with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination, provided, that the Borrowers shall not have the right to replace a Lender solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the third proviso to Section 13.12(a).

(c)     Notwithstanding anything to the contrary contained in clause (a) above of this Section 13.12, the Borrowers, the Administrative Agent, the Security Agent and each Incremental Lender may, in accordance with the provisions of Section 2.14 enter into an Incremental Commitment Agreement, provided that after the execution and delivery by the Borrowers, the Administrative Agent, the Security Agent and each such Incremental Lender of such Incremental Commitment Agreement, such Incremental Commitment Agreement may thereafter only be modified in accordance with the requirements of clause (a) above of this Section 13.12.

(d)     If a fee is to be paid by any Borrower in connection with any waiver or amendment hereunder, the agreement evidencing such amendment or waiver may (but shall not be required to), at the discretion of Administrative Agent, provide that only Lenders executing such agreement by a specified date may share in such fee (and in such case may (but shall not be required to), at the discretion of Administrative Agent, be divided among the applicable Lenders on a pro rata basis without including the interests of any Lenders which have not timely executed such agreement).

13.13.     Survival; Continuing Obligation.    (i) All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 3.06, 5.04, 12.06 and 13.01, and in each other Loan Document, are a continuing obligation of each Loan Party, separate from each of their other respective obligations, and shall survive the execution, delivery and termination of this Agreement, any other Loan Document and the Notes and the making and repayment of the Obligations and (ii) any settlement or discharge of any claim under any indemnity in a Loan Document will be conditional on no payment made under that indemnity being avoided or set aside or ordered to be refunded by virtue of any provision of any enactment relating to bankruptcy, insolvency or liquidation.

13.14.     Domicile of Loans.    Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Section 2.10, 2.11, 3.06 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers shall be jointly and severally obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15.　　　Register.　The Borrowers hereby designate the Administrative Agent to serve as their agent, solely for purposes of this Section 13.15, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of the Loans of each Lender.　Failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' obligations in respect of such Loans.　With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b) (including as contemplated by Section 2.13). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.　Any provision of Incremental Commitments pursuant to Section 2.14 shall be recorded by the Administrative Agent on the Register only upon the acceptance of the Administrative Agent of a properly executed and delivered Incremental Commitment Agreement.

13.16.　　　Confidentiality.　(a)　Subject to the provisions of clause (b) of this Section 13.16, each Agent, each Lender and each Issuing Lender agrees that it will not disclose any Confidential Information to any Person without the prior consent of Holdings; provided that nothing herein shall prevent any Agent, Issuing Lender or any Lender from disclosing any such information (a) to the extent required pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case the respective Agent, Issuing Lender or Lender, to the extent permitted by law, agrees to inform Holdings promptly thereof), (b) to the extent required upon the request or demand of any regulatory authority having jurisdiction over such Agent, Issuing Lender or Lender or any of their respective Affiliates (in which case, the respective Agent, Issuing Lender or Lender to the extent permitted, agrees to inform Holdings promptly thereof; although no such notice to Holdings shall be required in connection with ordinary course reviews by any such regulatory authority), (c) to the extent that such information becomes publicly available other than by reason of improper disclosure by the respective Agent, Issuing Lender or Lender or any of its Affiliates, (d) to the extent that such information is received by the respective Agent, Issuing Lender or Lender on a non-confidential basis from a third party that is not to its knowledge subject to confidentiality obligations to any Loan Party, (e) to the Agents', any Issuing Lender's or any Lender's respective Affiliates and their respective employees, legal counsel, independent auditors and other experts or agents who need to know such information in connection with the Transaction and are informed of the confidential nature of such information, (f) to potential Lenders, participants or assignees or any potential counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower or

any of its Affiliates or any of their respective obligations, in each case who are instructed that they shall be bound by terms no less restrictive than this paragraph (or language substantially similar to this paragraph), or (g) for purposes of establishing a "due diligence" defense, provided that the respective Agent, Issuing Lender or Lender will, to the extent permitted, promptly provide Holdings with the opportunity to seek a protective order or other measure ensuring confidential treatment of the Confidential Information used to establish such defense.

(b)     Holdings and the other Borrowers hereby acknowledge and agree that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

13.17.     Patriot Act.  Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") hereby notifies Holdings and the other Borrowers that pursuant to the requirements of the Patriot Act, they are required to obtain, verify and record information that identifies Holdings, the other Borrowers and the other Loan Parties and other information that will allow such Lender to identify Holdings, the other Borrowers and the other Loan Parties in accordance with the Patriot Act.

13.18.     OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR AGREEMENT; ETC.  (a)  THE LENDERS ACKNOWLEDGE THAT THE TERM LOAN FACILITY IS SECURED BY LIENS ON THE TERM PRIORITY COLLATERAL AND THE ABL PRIORITY COLLATERAL AND THAT THE PERMITTED SECOND LIEN NOTES WILL BE SECURED BY LIENS ON THE TERM PRIORITY COLLATERAL AND THE ABL PRIORITY COLLATERAL.  IN CONNECTION WITH HOLDINGS' ENTRY INTO THE TERM LOAN FACILITY AND/OR THE INCURRENCE OF ANY PERMITTED SECOND LIEN NOTES, THE ADMINISTRATIVE AGENT SHALL ENTER INTO THE INTERCREDITOR AGREEMENT, ESTABLISHING THE RELATIVE RIGHTS OF THE SECURED PARTIES, THE SECURED PARTIES UNDER THE TERM LOAN FACILITY AND THE SECURED PARTIES UNDER THE PERMITTED SECOND LIEN NOTES, AS THE CASE MAY BE, WITH RESPECT TO THE TERM PRIORITY COLLATERAL AND THE ABL PRIORITY COLLATERAL AND SUCH AMENDMENTS TO THE SECURITY DOCUMENTS AS SHALL BE APPROPRIATE OR NECESSARY TO CAUSE THE PERMITTED SECOND LIEN NOTES TO BE SECURED AS SET FORTH IN THE DEFINITION OF THE TERM "PERMITTED SECOND LIEN NOTES", PROVIDED THAT THE ADMINISTRATIVE AGENT HAS RECEIVED EVIDENCE REASONABLY SATISFACTORY TO THE ADMINISTRATIVE AGENT THAT THE TERMS OF THE PERMITTED SECOND LIEN NOTES AND THE DEFINITIVE DOCUMENTATION ENTERED INTO IN CONNECTION THEREWITH COMPLY WITH THE TERMS HEREOF. EACH LENDER HEREBY IRREVOCABLY (I) CONSENTS TO THE TREATMENT OF LIENS TO BE PROVIDED FOR UNDER THE INTERCREDITOR AGREEMENT OR THE AMENDED SECURITY DOCUMENTS, AS THE CASE MAY BE, (II) AUTHORIZES AND DIRECTS THE ADMINISTRATIVE AGENT AND THE SECURITY AGENT TO EXECUTE AND DELIVER THE INTERCREDITOR AGREEMENT AND ANY DOCUMENTS

RELATING THERETO, IN EACH CASE, ON BEHALF OF SUCH LENDER AND WITHOUT ANY FURTHER CONSENT, AUTHORIZATION OR OTHER ACTION BY SUCH LENDER, (III) AGREES THAT, UPON EXECUTION AND DELIVERY THEREOF, SUCH LENDER SHALL BE BOUND BY THE TERMS OF THE INTERCREDITOR AGREEMENT AS IF IT WERE A SIGNATORY THERETO AND WILL TAKE NO ACTION CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND (IV) AGREES THAT NO LENDER SHALL HAVE ANY RIGHT OF ACTION WHATSOEVER AGAINST THE ADMINISTRATIVE AGENT OR THE SECURITY AGENT AS A RESULT OF ANY ACTION TAKEN BY THE ADMINISTRATIVE AGENT OR THE SECURITY AGENT PURSUANT TO THIS SECTION OR IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT. EACH LENDER HEREBY FURTHER IRREVOCABLY AUTHORIZES AND DIRECTS THE ADMINISTRATIVE AGENT TO ENTER INTO SUCH AMENDMENTS, SUPPLEMENTS OR OTHER MODIFICATIONS TO THE INTERCREDITOR AGREEMENT IN CONNECTION WITH ANY EXTENSION, RENEWAL OR REFINANCING OF ANY TERM LOANS OR ANY PERMITTED SECOND LIEN NOTES AS ARE REASONABLY ACCEPTABLE TO THE ADMINISTRATIVE AGENT AND THE SECURITY AGENT TO GIVE EFFECT THERETO, IN EACH CASE ON BEHALF OF SUCH LENDER AND WITHOUT ANY FURTHER CONSENT, AUTHORIZATION OR OTHER ACTION BY SUCH LENDER. THE ADMINISTRATIVE AGENT AND THE SECURITY AGENT SHALL HAVE THE BENEFIT OF THE PROVISIONS OF <u>SECTION 12</u> WITH RESPECT TO ALL ACTIONS TAKEN BY IT PURSUANT TO THIS SECTION TO THE FULL EXTENT THEREOF.

(b) THE PROVISIONS OF THIS <u>SECTION 13.18</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE INTERCREDITOR AGREEMENT, THE FORM OF WHICH IS ATTACHED AS AN EXHIBIT TO THIS AGREEMENT. REFERENCE MUST BE MADE TO THE INTERCREDITOR AGREEMENTS ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENT.

13.19. <u>Waiver of Sovereign Immunity</u>. Each of the Loan Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, hereby irrevocably agrees that, to the extent that such Loan Party, its Subsidiaries or any of its properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States and Canada or elsewhere, to enforce or collect upon the Loans or any Loan Document or any other liability or obligation of such Loan Party or any of its Subsidiaries related to or arising from the transactions contemplated by any of the Loan Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, such Loan Party, for itself and on behalf of its Subsidiaries, hereby expressly waives, to the fullest extent permissible

under applicable law, any such immunity, and agrees not to assert any such right or claim in any such proceeding, whether in the United States and Canada or elsewhere. Without limiting the generality of the foregoing, each Loan Party further agrees that the waivers set forth in this Section 13.19 shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

13.20. <u>Judgment Currency</u>. (a) The Loan Parties' obligations hereunder and under the other Loan Documents to make payments in the respective Available Currency (the "<u>Obligation Currency</u>") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent, the Security Agent, the respective Issuing Lender or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent, the Security Agent, such Issuing Lender or such Lender under this Agreement or the other Loan Documents. If for the purpose of obtaining or enforcing judgment against any Loan Party in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "<u>Judgment Currency</u>") an amount due in the Obligation Currency, the conversion shall be made, at the rate of exchange (as quoted by the Administrative Agent or if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the day on which the judgment is given (such day being hereinafter referred to as the "<u>Judgment Currency Conversion Date</u>").

(b) If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, each Borrower covenants and agrees to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate or exchange prevailing on the Judgment Currency Conversion Date.

(c) For purposes of determining any rate of exchange for this Section, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

13.21. <u>Qualified Secured Hedging Agreements and Qualified Secured Cash Management Agreements</u>. (a) At any time prior to or within 15 days after any Loan Party enters into any Hedging Agreement or Cash Management Agreement, or in the case of Hedging Agreements or Cash Management Agreements in effect on the Funding Date, within 15 days of the Funding Date, if the applicable Loan Party and counterparty desire that the monetary obligations in respect of such Hedging Agreement or the monetary obligations in respect of such Cash Management Agreement be treated as a "Hedging Obligations" or "Cash Management Services Obligations", as applicable, hereunder with rights in respect of payment of proceeds of the Collateral in accordance with the waterfall provisions set forth in Section 11.02, Holdings may notify the Administrative Agent in writing (which notice the Administrative Agent shall

promptly provide to the Co-Collateral Agents) (to be acknowledged by the Administrative Agent and Co-Collateral Agents) that (x) such Hedging Agreement is to be a "Secured Hedging Agreement" and, if it wishes that the monetary obligations in respect of the respective Secured Hedging Agreement be treated as pari passu with the Loan Document Obligations with respect to the priority of payment of proceeds of the Collateral in accordance with the waterfall provisions set forth in Section 11.02, a "Qualified Secured Hedging Agreement" or (y) such Cash Management Agreement is to be a "Secured Cash Management Agreement" and, if it wishes that the monetary obligations in respect of the respective Secured Cash Management Agreement be treated as pari passu with the Loan Document Obligations with respect to the priority of payment of proceeds of the Collateral in accordance with the waterfall provisions set forth in Section 11.02, a "Qualified Secured Cash Management Agreement", so long as the following conditions are satisfied:

      (i)     in the case of a Hedging Agreement, such Hedging Agreement is either (x) in effect on the Funding Date with a counterparty that is a Hedging Creditor or (y) entered into after the Funding Date with any counterparty that is a Hedging Creditor at the time such Hedging Agreement is entered into; and

      (ii)    in the case of a Cash Management Agreement, such Cash Management Agreement is either (x) in effect on the Funding Date with a Cash Management Creditor or (y) entered into after the Funding Date with a Cash Management Creditor at the time such Cash Management Agreement is entered into;

provided that no such Secured Hedging Agreement or Secured Cash Management Agreement can be secured on a first lien basis by the Term Priority Collateral (and any request under this Section 13.21 will be deemed to be a representation by Holdings to such effect); and provided further, that no monetary obligations in respect of any Secured Hedging Agreement or Secured Cash Management Agreement shall be treated as "Hedging Obligations" or "Cash Management Services Obligations", as applicable, hereunder or receive any benefit of the designation under this Section 13.21 after the Discharge of Revolving Credit Obligations. If, in any written notification by Holdings as set forth above, Holdings shall fail to include in such written notice that a Secured Hedging Agreement or Secured Cash Management Agreement shall constitute a Qualified Secured Hedging Agreement or Qualified Secured Cash Management Agreement, as the case may be, then such Secured Hedging Agreement or Secured Cash Management Agreement shall not constitute a Qualified Secured Hedging Agreement or Qualified Secured Cash Management Agreement, as the case may be.

      (b) Until such time as Holdings delivers (and the Administrative Agent and Co-Collateral Agents acknowledge) such notice as described above, such Hedging Agreement or Cash Management Agreement shall not constitute a Secured Hedging Agreement or Secured Cash Management Agreement, as the case may be. The parties hereto understand and agree that the provisions of this Section 13.21 are made for the benefit of the Lenders and their Affiliates and the Term Loan Lenders and their Affiliates which become parties to Hedging Agreements or Cash Management Agreements, as applicable, and agree that any amendments or modifications to the provisions of this Section 13.21 shall not be effective with respect to any Secured Hedging Agreement or Secured Cash Management Agreement, as the case may be, entered into prior to the date of the respective amendment or modification of this Section 13.21 (without the written

consent of the relevant parties thereto). Notwithstanding any such designation of a Hedging Agreement as a Secured Hedging Agreement or a Cash Management Agreement as a Secured Cash Management Agreement, no provider or holder of any such Secured Hedging Agreement or Secured Cash Management Agreement shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider of such agreements or the Secured Obligations owing thereunder, nor shall their consent be required (other than in their capacities as a Lender to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including, without limitation, as to any matter relating to the Collateral or the release of Collateral or Guarantors. The Administrative Agent and Co-Collateral Agents accept no responsibility and shall have no liability for the calculation of the exposure owing by the Loan Parties under any such Secured Hedging Agreement and/or Secured Cash Management Agreement, and shall be entitled in all cases to rely on the applicable counterparty and the applicable Loan Party party to such agreement for the calculation thereof. Such counterparty and the applicable Loan Party party to any such agreement each agrees to provide the Administrative Agent and the Co-Collateral Agents with the calculations of all such exposures and reserves, if any, at such times as the Administrative Agent or the Co-Collateral Agents shall reasonably request, and in any event, not less than monthly (unless otherwise agreed to by the Administrative Agent and the Co-Collateral Agents).

SECTION 14. <u>Nature of Obligations</u>.

14.01. <u>Nature of Obligations</u>. Notwithstanding anything to the contrary contained elsewhere in this Agreement, it is understood and agreed by the various parties to this Agreement that:

(a) all U.S. Facility Obligations to repay principal of, interest on, and all other amounts with respect to, all U.S. Facility Revolving Loans, U.S. Facility Swingline Loans, U.S. Facility Letters of Credit and all other U.S. Facility Obligations pursuant to this Agreement and each other Loan Document (including, without limitation, all fees, indemnities, taxes and other U.S. Facility Obligations in connection therewith or in connection with the related Commitments) shall constitute the joint and several obligations of each of the U.S. Borrowers. In addition to the direct (and joint and several) obligations of the U.S. Borrowers with respect to U.S. Facility Obligations as described above, all such U.S. Facility Obligations shall be guaranteed pursuant to, and in accordance with the terms of, the Guarantee and Collateral Agreement, <u>provided</u> that the obligations of a U.S. Borrower with respect to the U.S. Facility Obligations as described above shall not be limited by any provision of the Guarantee and Collateral Agreement entered into by such U.S. Borrower;

(b) all Canadian Facility Obligations owing by any U.S. Borrower to repay principal of, interest on, and all other amounts with respect to, all Canadian Facility Revolving Loans and Canadian Facility Swingline Loans borrowed by any U.S. Borrower, all Canadian Facility Letters of Credit issued for the account of any U.S. Borrower and all other Canadian Facility Obligations owing by any U.S. Borrower pursuant to this Agreement and each other Loan Document (including, without limitation, all fees, indemnities, taxes and other Canadian Facility Obligations in connection therewith or in connection with the related Canadian Facility Commitments) shall

constitute the joint and several obligations of each of the U.S. Borrowers. In addition to the direct (and joint and several) obligations of the U.S. Borrowers with respect to Canadian Facility Obligations as described above, all such Canadian Facility Obligations owing by any U.S. Borrower shall be guaranteed pursuant to, and in accordance with the terms of, the Guarantee and Collateral Agreement, <u>provided</u> that the obligations of a U.S. Borrower with respect to the Canadian Facility Obligations as described above shall not be limited by any provision of the Guarantee and Collateral Agreement entered into by such U.S. Borrower; and

(c)     all Canadian Facility Obligations owing by any Canadian Borrower to repay principal of, interest on, and all other amounts with respect to, all Canadian Facility Revolving Loans and Canadian Facility Swingline Loans borrowed by any Canadian Borrower, all Canadian Facility Letters of Credit issued for the account of any Canadian Borrower and all other Canadian Facility Obligations owing by any Canadian Borrower pursuant to this Agreement and each other Loan Document (including, without limitation, all fees, indemnities, taxes and other Canadian Facility Obligations in connection therewith or in connection with the related Canadian Facility Commitments) shall constitute the joint and several obligations of each of the Canadian Borrowers. In addition to the direct (and joint and several) obligations of the Canadian Borrowers with respect to Canadian Facility Obligations as described above, all such Canadian Facility Obligations owing by any Canadian Borrower shall be guaranteed pursuant to, and in accordance with the terms of, the Guarantee and Collateral Agreement and Canadian Guarantee and Collateral Agreement, <u>provided</u> that the obligations of a Canadian Borrower with respect to the Canadian Facility Obligations as described above shall not be limited by any provision of the Canadian Guarantee and Collateral Agreement entered into by such Canadian Borrower.

14.02.     <u>Independent Obligation</u>.  The obligations of each Borrower with respect to its Borrower Obligations are independent of the Loan Document Obligations of each other Borrower or any Guarantor under its Guarantee of such Borrower Obligations, and a separate action or actions may be brought and prosecuted against each Borrower, whether or not any other Borrower or any Guarantor is joined in any such action or actions.  Each Borrower waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by any Borrower or other circumstance which operates to toll any statute of limitations as to any Borrower shall, to the fullest extent permitted by law, operate to toll the statute of limitations as to each Borrower.

14.03.     <u>Authorization</u>.  Each of the Borrowers authorizes the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, the Co-Collateral Agents, the Issuing Lenders and the Lenders without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to, to the maximum extent permitted by applicable law and the Loan Documents to:

(a)     exercise or refrain from exercising any rights against any other Borrower or any Guarantor or others or otherwise act or refrain from acting;

(b)     release or substitute any other Borrower, endorsers, Guarantors or other obligors;

(c)     settle or compromise any of the Borrower Obligations of any other Borrower or any other Loan Party, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Borrower to its creditors other than the Lenders;

(d)     apply any sums paid by any other Borrower or any other Person, howsoever realized to any liability or liabilities of such other Borrower or other Person regardless of what liability or liabilities of such other Borrower or other Person remain unpaid; and/or

(e)     consent to or waive any breach of, or act, omission or default under, this Agreement or any of the instruments or agreements referred to herein, or otherwise, by any other Borrower or any other Person.

14.04.     Reliance.  It is not necessary for the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, any Issuing Lender or any Lender to inquire into the capacity or powers of any Borrower, Holdings or any of its other Subsidiaries or the officers, directors, members, partners or agents acting or purporting to act on its behalf, and any Borrower Obligations made or created in reliance upon the professed exercise of such powers shall constitute the joint and several obligations of the respective Borrowers hereunder.

14.05.     Contribution; Subrogation.  No Borrower shall exercise any rights of contribution or subrogation with respect to any other Borrower as a result of payments made by it hereunder, in each case unless and until (i) the Total Commitment and all Letters of Credit have been terminated and (ii) all of the Loan Document Obligations have been paid in full in cash.  To the extent that any Canadian Loan Party or U.S. Loan Party shall be required to pay a portion of the Loan Document Obligations which shall exceed the amount of loans, advances or other extensions of credit received by such Loan Party and all interest, costs, fees and expenses attributable to such loans, advances or other extensions of credit, then such Loan Party shall be reimbursed by the other Loan Parties within its group (Canadian or U.S.) for the amount of such excess, subject to the restrictions of the previous sentence.  This Section 14.05 is intended only to define the relative rights of Loan Parties, and nothing set forth in this Section 14.05 is intended or shall impair the obligations of each Loan Party to pay the Loan Document Obligations as and when the same shall become due and payable in accordance with the terms hereof.

14.06.     Waiver.  Each Borrower waives any right to require the Administrative Agent, the Security Agent, the Swingline Lender, the Fronting Lender, the Co-Collateral Agents, the Issuing Lenders or the Lenders to (i) proceed against any other Borrower, any Guarantor or any other party, (ii) proceed against or exhaust any security held from any Borrower, any Guarantor or any other party or (iii) pursue any other remedy in the Administrative Agent's, the Security Agent's, the Swingline Lender's, the Fronting Lender's, any Issuing Lender's or Lenders' power whatsoever.  Each Borrower waives any defense based

on or arising out of suretyship or any impairment of security held from any Borrower, any Guarantor or any other party or on or arising out of any defense of any other Borrower, any Guarantor or any other party other than payment in full in cash of its Borrower Obligations, including, without limitation, any defense based on or arising out of the disability of any other Borrower, any Guarantor or any other party, or the unenforceability of its Borrower Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Borrower, in each case other than as a result of the payment in full in cash of its Borrower Obligations.

14.07.     Limitation on Canadian Borrower Obligations.  Notwithstanding anything to the contrary herein or in any other Loan Document (including provisions that may override any other provision), in no event shall the Canadian Borrowers or any other Canadian Loan Party guarantee or be deemed to have guaranteed or become liable or obligated on a joint and several basis or otherwise for, or to have pledged any of its assets to secure, any direct Secured Obligation owing by any U.S. Borrower or Domestic Subsidiary of Holdings under this Agreement, any of the other Loan Documents, any Secured Hedging Agreement or any Secured Cash Management Agreement.  All provisions contained in any Loan Document, any Secured Hedging Agreement or any Secured Cash Management Agreement shall be interpreted consistently with this Section 14.07 to the extent possible, and where such other provisions conflict with the provisions of this Section 14.07, the provisions of this Section 14.07 shall govern.

14.08.     Rights and Obligations.  The obligations of the Swingline Lender, the Fronting Lender, each Issuing Lender and each Lender under this Agreement bind each of them severally.  Failure by the Swingline Lender, the Fronting Lender, any Issuing Lender or any Lender, as the case may be, to perform its obligations under this Agreement does not affect the obligations of any other party under this Agreement.  The Swingline Lender, the Fronting Lender, each Issuing Lender or each Lender is not responsible for the obligations of any other Swingline Lender, Fronting Lender, Issuing Lender or Lender, as the case may be, under this Agreement.  The rights, powers and remedies of the Swingline Lender, the Fronting Lender, each Issuing Lender and each Lender in connection with this Agreement are separate and independent rights, powers and remedies and any debt arising under this Agreement to or for the account of the Swingline Lender, the Fronting Lender, any Issuing Lender or any Lender from a Loan Party is a separate and independent debt.

SECTION 15.  Revolving Loans; Intra-Lender Issues.

15.01.     Specified Foreign Currency Participations.  Notwithstanding anything to the contrary contained herein, all Revolving Loans under a Tranche which are denominated in Canadian Dollars (each, a "Specified Foreign Currency Loan"), shall be made solely by the Lenders (including the Fronting Lender) under such Tranche who are not Participating Specified Foreign Currency Lenders.  Subject to Section 15.07, each Lender acceptable to the Fronting Lender (in its sole discretion) that does not have Specified Foreign Currency Funding Capacity (a "Participating Specified Foreign Currency Lender") at the time such Lender becomes a "Lender" hereunder shall irrevocably and unconditionally purchase and acquire and shall be deemed to irrevocably and unconditionally purchase and acquire from the Fronting Lender, and the Fronting Lender shall sell and be deemed to sell to each such

Participating Specified Foreign Currency Lender, without recourse or any representation or warranty whatsoever, an undivided interest and participation (a "Specified Foreign Currency Participation") in each Revolving Loan under a Tranche which is a Specified Foreign Currency Loan funded by the Fronting Lender in an amount equal to such Participating Specified Foreign Currency Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of the Borrowing that includes such Revolving Loan (it being understood and agreed that whether or not a Person should become a Participating Specified Foreign Currency Lender shall be made by the Administrative Agent in it sole discretion, but once made, subject to Section 15.07, shall not be revoked). Such purchase and sale of a Specified Foreign Currency Participation shall be deemed to occur automatically upon the making of a Specified Foreign Currency Loan by the Fronting Lender, without any further notice to any Participating Specified Foreign Currency Lender. The purchase price payable by each Participating Specified Foreign Currency Lender to the Fronting Lender for each Specified Foreign Currency Participation purchased by it from the Fronting Lender shall be equal to 100% of the principal amount of such Specified Foreign Currency Participation (i.e., the product of (i) the amount of the Borrowing that includes the relevant Revolving Loan under a Tranche and (ii) such Participating Specified Foreign Currency Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be), and such purchase price shall be payable by each Participating Specified Foreign Currency Lender to the Fronting Lender in accordance with the settlement procedure set forth in Section 15.02. The Fronting Lender and the Administrative Agent shall record on their books the amount of the Revolving Loans made by the Fronting Lender and each Participating Specified Foreign Currency Lender's Specified Foreign Currency Participation and funded Specified Foreign Currency Participation therein, all payments in respect thereof and interest accrued thereon and all payments made by and to each Participating Specified Foreign Currency Lender pursuant to this Section 15.01. This Section 15 shall not affect the obligations of any Lender that does not have Specified Foreign Currency Funding Capacity and that is not a Participating Specified Foreign Currency Lender to make Specified Foreign Currency Loans in accordance with the terms and conditions set forth in the other Sections of this Agreement.

15.02. **Settlement Procedures for Specified Foreign Currency Participations**. Each Participating Specified Foreign Currency Lender's Specified Foreign Currency Participation in the Specified Foreign Currency Loans under a Tranche shall be in an amount equal to its U.S. Facility RL Percentage or Canadian Facility RL Percentage, as the case may be, of all such Specified Foreign Currency Loans under such Tranche. However, in order to facilitate the administration of the Specified Foreign Currency Loans made by the Fronting Lender and the Specified Foreign Currency Participations, settlement among the Fronting Lender and the Participating Specified Foreign Currency Lenders with regard to the Participating Specified Foreign Currency Lenders' Specified Foreign Currency Participations shall take place in accordance with the following provisions:

(a)     The Fronting Lender and the Participating Specified Foreign Currency Lenders shall settle (a "Specified Foreign Currency Participation Settlement") by payments in respect of the Specified Foreign Currency Participations as follows: So long as any Specified Foreign Currency Loans are outstanding, Specified Foreign Currency Participation Settlements shall be effected upon the request of the Fronting Lender through the Administrative Agent on such Business Days as requested by the Fronting Lender and as the Administrative Agent shall specify by a notice by telecopy, telephone

or similar form of notice to each Participating Specified Foreign Currency Lender requesting such Specified Foreign Currency Participation Settlement (each such date on which a Specified Foreign Currency Participation Settlement occurs herein called a "Specified Foreign Currency Participation Settlement Date"), such notice to be delivered no later than 2:00 p.m. (New York time) at least one Business Day prior to the requested Specified Foreign Currency Participation Settlement Date; provided that the Fronting Lender shall have the option but not the obligation to request a Specified Foreign Currency Participation Settlement Date and, in any event, shall not request a Specified Foreign Currency Participation Settlement Date prior to the occurrence of an Event of Default; provided further, that if (x) such Event of Default is cured or waived in writing in accordance with the terms hereof, (y) no Obligations have yet been declared due and payable under Section 11.01 and (z) the Administrative Agent has actual knowledge of such cure or waiver, all prior to the Administrative Agent's giving notice to the Participating Specified Foreign Currency Lenders of the first Specified Foreign Currency Participation Settlement Date under this Agreement, then the Administrative Agent shall not give notice to the Participating Specified Foreign Currency Lenders of a Specified Foreign Currency Participation Settlement Date based upon such cured or waived Event of Default. If on any Specified Foreign Currency Participation Settlement Date the total principal amount of the Specified Foreign Currency Loans made or deemed made by the Fronting Lender during the period ending on (but excluding) such Specified Foreign Currency Participation Settlement Date and commencing on (and including) the immediately preceding Specified Foreign Currency Participation Settlement Date (or the Funding Date in the case of the period ending on the first Specified Foreign Currency Participation Settlement Date) (each such period herein called a "Specified Foreign Currency Participation Settlement Period") is greater than the principal amount of Specified Foreign Currency Loans repaid during such Specified Foreign Currency Participation Settlement Period to the Fronting Lender, each Participating Specified Foreign Currency Lender under a Tranche shall pay to the Fronting Lender (through the Administrative Agent), no later than 11:00 a.m. (New York time) on such Specified Foreign Currency Participation Settlement Date, an amount equal to such Participating Specified Foreign Currency Lender's ratable share of the amount of such excess under such Tranche. If in any Specified Foreign Currency Participation Settlement Period the outstanding principal amount of the Specified Foreign Currency Loans repaid to the Fronting Lender in such period exceeds the total principal amount of the Specified Foreign Currency Loans made or deemed made by the Fronting Lender during such period, the Fronting Lender shall pay to each Participating Specified Foreign Currency Lender under a Tranche (through the Administrative Agent) on such Specified Foreign Currency Participation Settlement Date an amount equal to such Participating Specified Foreign Currency Lender's ratable share of such excess under such Tranche. Specified Foreign Currency Participation Settlements in respect of Specified Foreign Currency Loans shall be made in the respective Available Currency in which such Specified Foreign Currency Loan was funded on the Specified Foreign Currency Participation Settlement Date for such Specified Foreign Currency Loans; provided, however, that if a Participating Specified Foreign Currency Lender shall have previously notified the Fronting Lender that it will make such payment in U.S. Dollars, such Participating

Specified Foreign Currency Lender shall be permitted to transfer the U.S. Dollar Equivalent of its Specified Foreign Currency Participation Settlement Amount.

(b)    If any Participating Specified Foreign Currency Lender fails to pay to the Fronting Lender on any Specified Foreign Currency Participation Settlement Date the full amount required to be paid by such Participating Specified Foreign Currency Lender to the Fronting Lender on such Specified Foreign Currency Participation Settlement Date in respect of such Participating Specified Foreign Currency Lender's Specified Foreign Currency Participation (such Participating Specified Foreign Currency Lender's "Specified Foreign Currency Participation Settlement Amount") with the Fronting Lender, the Fronting Lender shall be entitled to recover such unpaid amount from such Participating Specified Foreign Currency Lender, together with interest thereon (in the same respective currency or currencies as the relevant Specified Foreign Currency Loans) at the Base Rate plus the Applicable Margin for Base Rate Loans plus, if such unpaid amount is not paid within one Business Day after such Specified Foreign Currency Participation Settlement Date, 2.00%. Without limiting the Fronting Lender's rights to recover from any Participating Specified Foreign Currency Lender any unpaid Specified Foreign Currency Participation Settlement Amount payable by such Participating Specified Foreign Currency Lender to the Fronting Lender, the Administrative Agent shall also be entitled to withhold from amounts otherwise payable to such Participating Specified Foreign Currency Lender an amount equal to such Participating Specified Foreign Currency Lender's unpaid Specified Foreign Currency Participation Settlement Amount owing to the Fronting Lender and apply such withheld amount to the payment of any unpaid Specified Foreign Currency Participation Settlement Amount owing by such Participating Specified Foreign Currency Lender to the Fronting Lender.

15.03.    Obligations Irrevocable. The obligations of each Participating Specified Foreign Currency Lender under a Tranche to purchase from the Fronting Lender a participation in each Specified Foreign Currency Loan under such Tranche made by the Fronting Lender and to make payments to the Fronting Lender with respect to such participation, in each case as provided herein, shall be irrevocable and not subject to any qualification or exception whatsoever, including any of the following circumstances:

(a)    any lack of validity or enforceability of this Agreement or any of the other Loan Documents or of any Loans, against the Borrowers or any other Loan Party;

(b)    the existence of any claim, setoff, defense or other right which the Borrowers or any other Loan Party may have at any time against the Administrative Agent, any Participating Specified Foreign Currency Lender, or any other Person, whether in connection with this Agreement, any Specified Foreign Currency Loans, the transactions contemplated herein or any unrelated transactions;

(c)    any application or misapplication of any proceeds of any Specified Foreign Currency Loans;

(d)    the surrender or impairment of any security for any Specified Foreign Currency Loans;

(e) the occurrence of any Default or Event of Default;

(f) the commencement or pendency of any events specified in Section 11.01(g) or (h), in respect of Holdings, the other Borrowers or any of their respective Subsidiaries or any other Person; or

(g) the failure to satisfy the applicable conditions precedent set forth in Section 6 or 7.

15.04. <u>Recovery or Avoidance of Payments</u>. In the event any payment by or on behalf of any Borrower or any other Loan Party received by the Administrative Agent or the Fronting Lender with respect to any Specified Foreign Currency Loan under a Tranche made by the Fronting Lender is thereafter set aside, avoided or recovered from the Administrative Agent or the Fronting Lender in connection with any insolvency proceeding or due to any mistake of law or fact, each Participating Specified Foreign Currency Lender shall, upon written demand by the Administrative Agent, pay to the Fronting Lender (through the Administrative Agent) such Participating Specified Foreign Currency Lender's U.S. Facility RL Percentage or Canadian Facility RL Percentage under such Tranche of such amount set aside, avoided or recovered, together with interest at the rate and in the currency required to be paid by the Fronting Lender or the Administrative Agent upon the amount required to be repaid by it.

15.05. <u>Indemnification by Lenders</u>. Each Participating Specified Foreign Currency Lender under a Tranche agrees to indemnify the Fronting Lender (to the extent not reimbursed by the Borrowers and without limiting the obligations of the Borrowers hereunder or under any other Loan Document) ratably for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees) or disbursements of any kind and nature whatsoever that may be imposed on, incurred by or asserted against the Fronting Lender in any way relating to or arising out of any Specified Foreign Currency Loans under such Tranche or any action taken or omitted by the Fronting Lender in connection therewith; <u>provided</u> that no Participating Specified Foreign Currency Lender under such Tranche shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the Fronting Lender (as determined by a court of competent jurisdiction in a final and non-appealable judgment). Without limiting the foregoing, each Participating Specified Foreign Currency Lender under a Tranche agrees to reimburse the Fronting Lender promptly upon demand for such Participating Specified Foreign Currency Lender's ratable share of any costs or expenses payable by the Borrowers to the Fronting Lender in respect of the Specified Foreign Currency Loans under such Tranche to the extent that the Fronting Lender is not promptly reimbursed for such costs and expenses by the Borrowers. The agreement contained in this Section 15.05 shall survive payment in full of all Specified Foreign Currency Loans.

15.06. <u>Specified Foreign Currency Loan Participation Fee</u>. In consideration for each Participating Specified Foreign Currency Lender's participation in the Specified Foreign Currency Loans made by the Fronting Lender, the Fronting Lender agrees to pay to the Administrative Agent for the account of each Participating Specified Foreign Currency Lender, as and when the Fronting Lender receives payment of interest on its Specified Foreign Currency Loans, a fee (the "<u>Specified Foreign Currency Participation Fee</u>") at a rate per annum equal to (x) to the extent the Specified Foreign Currency Participation Settlement in

respect of a Specified Foreign Currency Loan has not occurred, the Applicable Margin on such Specified Foreign Currency Loan minus 0.25% on the unfunded Specified Foreign Currency Participation of such Participating Specified Foreign Currency Lender in such Specified Foreign Currency Loan of the Fronting Lender or (y) to the extent the Specified Foreign Currency Participation Settlement in respect of a Specified Foreign Currency Loan has occurred, full amount of interest on such Specified Foreign Currency Loan payable under this Agreement. The Specified Foreign Currency Participation Fee in respect of any Specified Foreign Currency Participation in a Specified Foreign Currency Loan shall be payable to the Administrative Agent in the Available Currency in which the respective Specified Foreign Currency Loan was funded when interest on such Specified Foreign Currency Loan is received by the Fronting Lender. If the Fronting Lender does not receive payment in full of such interest, the Specified Foreign Currency Participation Fee in respect of the Specified Foreign Currency Participation in such Specified Foreign Currency Loans shall be reduced proportionately. Any amounts payable under this Section 15.06 by the Administrative Agent to the Participating Specified Foreign Currency Lenders shall be paid in the Available Currency in which the respective Specified Foreign Currency Loan was funded (or, if different, the currency in which such interest payments are actually received).

15.07. Defaulting Lenders; etc. Notwithstanding anything to the contrary contained above, (x) no Lender may become a Participating Specified Foreign Currency Lender at any time it is a Defaulting Lender, and (y) if any Participating Specified Foreign Currency Lender at any time becomes a Defaulting Lender or if the Fronting Lender reasonably determines that the credit quality of any then existing Participating Specified Foreign Currency Lender has suffered a material adverse change, the Fronting Lender shall have the right to, by notice to the affected Lender, (i) terminate such Lender's status as a Participating Specified Foreign Currency Lender for Revolving Loans and (ii) declare a Specified Foreign Currency Participation Settlement Date to occur with respect to such affected Lender.

SECTION 16. Lender Loss Sharing Agreement.

16.01. Definitions. As used in this Section 16, the following terms shall have the following meanings:

(a) CAM: the mechanism for the allocation and exchange of interests in the Loans, participations in Letters of Credit and collections thereunder established under Section 16.02.

(b) CAM Exchange: the exchange of the U.S. Facility Lenders' interests and the Canadian Facility Lenders' interests provided for in Section 16.02.

(c) CAM Exchange Date: the first date after the Closing Date on which there shall occur (i) any event described in Section 11.01(g) or (h) with respect to any Borrower, (ii) an acceleration of Loans and termination of the Total Commitment pursuant to Section 11.01 or (iii) the failure by any Borrower to repay any amounts due under any Tranche of Loans on the Revolving Loan Maturity Date.

(d)     CAM Percentage:  as to each Lender, such Lender's RL Percentage of the Total Commitment immediately prior to the CAM Exchange Date and the termination of the Total Commitment.

(e)     Designated Obligations:  all Obligations of the Borrowers with respect to (i) principal and interest under the Loans, (ii) Unpaid Drawings under Letters of Credit and interest thereon and (iii) all Fees.

(f)     Revolver Facilities:  the facility established under the U.S. Facility Commitments and the Canadian Facility Commitments, and "Revolver Facility" means any one of such Revolver Facilities.

16.02.     CAM Exchange.  (a)  On the CAM Exchange Date:

(i)     the U.S. Facility Commitments and the Canadian Facility Commitments shall have terminated in accordance with Section 11.01,

(ii)     each U.S. Facility Lender shall fund its participation in any outstanding Swingline Loans and Agent Advances in accordance with Sections 2.01(b) and (e), and each Canadian Facility Lender shall fund its participation in any outstanding Swingline Loans and Agent Advances in accordance with Section 2.01(b) and Section 2.01(e), respectively,

(iii)     each U.S. Facility Lender shall fund its participation in any Unpaid Drawings made under the applicable U.S. Facility Letters of Credit pursuant to Section 3.04, and each Canadian Facility Lender shall fund its participation in any Unpaid Drawings made under the applicable Canadian Facility Letters of Credit pursuant to Section 3.04,

(iv)     each Participating Foreign Currency Lender shall fund its Specified Foreign Currency Participation in any Specified Foreign Currency Loans pursuant to Section 15.02, and

(v)     the Lenders shall purchase, at the U.S. Dollar Equivalent of par, interests in the Designated Obligations under each Revolver Facility (and shall make payments in U.S. Dollars to the Administrative Agent for reallocation to other Lenders to the extent necessary to give effect to such purchases) and shall assume the obligations to reimburse each Issuing Lender for unreimbursed drawings under outstanding Letters of Credit under such Revolver Facility such that, in lieu of the interests of each Lender in the Designated Obligations under the U.S. Facility Commitments and the Canadian Facility Commitments in which it shall participate immediately prior to the CAM Exchange Date, such Lender shall own an interest equal to such Lender's CAM Percentage in each component of the Designated Obligations immediately following the CAM Exchange.

(b)     Each Lender and each Person acquiring a participation from any Lender as contemplated by Section 13.04 hereby consents and agrees to the CAM Exchange.  Each Borrower agrees from time to time to execute and deliver to the Lenders all such promissory notes and other instruments and documents as the Administrative Agent shall reasonably request

to evidence and confirm the respective interests and obligations of Lenders after giving effect to the CAM Exchange, and each Lender agrees to surrender any promissory notes originally received by it in connection with its Loans under this Agreement to the Administrative Agent against delivery of any promissory notes so executed and delivered; provided that the failure of any Lender to deliver or accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the CAM Exchange.

(c)    As a result of the CAM Exchange, from and after the CAM Exchange Date, each payment received by the Administrative Agent pursuant to any Loan Document in respect of any of the Designated Obligations shall be distributed to Lenders, pro rata in accordance with their respective CAM Percentages.

(d)    In the event that on or after the CAM Exchange Date, the aggregate amount of the Designated Obligations shall change as a result of the making of a disbursement under a Letter of Credit by an Issuing Lender that is not reimbursed by the applicable Borrowers, then each Lender shall promptly reimburse such Issuing Lender for its CAM Percentage of such unreimbursed payment.

16.03.    Miscellaneous.    Notwithstanding any other provision of this Section 16, the Administrative Agent and each Lender agree that if the Administrative Agent or a Lender is required under applicable law to withhold or deduct any Taxes or other amounts from payments made by it hereunder or as a result hereof to the Administrative Agent or any Lender, such Person shall be entitled to withhold or deduct such amounts and pay over such Taxes or other amounts to the applicable Governmental Authority imposing such Tax without any obligation to indemnify the Administrative Agent or any Lender with respect to such amounts and without any other obligation of gross up or offset with respect thereto and there shall be no recourse whatsoever by Agent or any Lender subject to such withholding to the Administrative Agent or any other Lender making such withholding and paying over such amounts, but without diminution of the rights of the Administrative Agent or such Lender subject to such withholding as against Borrowers and the other Loan Parties to the extent (if any) provided in this Agreement and the other Loan Documents.  Any amounts so withheld or deducted shall be treated as, for the purpose of this Section 16, having been paid to the Administrative Agent or such Lender with respect to which such withholding or deduction was made.

*    *    *

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.


Address:                                          HOLDINGS:


                                                  [  ]
Attention:                                        as a U.S. Borrower
Phone:
Fax:



                                                  By:_____
                                                      Name:
                                                      Title:



For all U.S. Borrowers                            U.S. BORROWERS:
Address:


                                                  [  ]
Attention:                                            as a U.S. Borrower
Phone:
Fax:

                                                  By:_____
                                                      Name:
                                                      Title:

Address:                                <u>CANADIAN BORROWERS</u>:

[  ],
    as a Canadian Borrower

Attention:
Phone:
Fax:

With copy to:
[  ]                              By:_____
Address:
    Name:
    Title:

Attention:                                [  ],
Phone:                                    as a Canadian Borrower
Fax:

DEUTSCHE BANK AG NEW YORK
BRANCH, Individually and as
Administrative Agent, Co-Collateral Agent
and Security Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:




JPMORGAN CHASE BANK, N.A.,
Individually and
as Co-Collateral Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:




GENERAL ELECTRIC CAPITAL
CORPORATION, Individually and as Co-
Collateral Agent


By:_____
    Name:
    Title:

Commitments

| Lender | U.S. Facility Commitment | | | Canadian Facility Commitment | | |
|---|---|---|---|---|---|---|
| Deutsche Bank AG New York Branch | $ | [ | ] | $ | [ | ] |
| JPMorgan Chase Bank, N.A. | $ | [ | ] | $ | [ | ] |
| General Electric Capital Corporation | $ | [ | ] | $ | [ | ] |
| GE Capital Financial Inc. | $ | [ | ] | $ | [ | ] |
| Banc of America | $ | [ | ] | $ | [ | ] |
| Wachovia Capital Finance New England | $ | [ | ] | $ | [ | ] |
| Regions Bank | $ | [ | ] | $ | [ | ] |
| Scotia Capital | $ | [ | ] | $ | [ | ] |
| TOTAL: | $ | 550,000,000.00 | | $ | 100,000,000.00 | |

Provisions Relating to Bankers' Acceptances,
Bankers' Acceptance Loans and B/A Discount Notes

BANKERS' ACCEPTANCES

Acceptances and Drafts.

1.      Each Lender under a Tranche severally agrees, on the terms and conditions of the Agreement and this Schedule 1.01(b) and from time to time on any Business Day prior to the Revolving Loan Maturity Date to make Bankers' Acceptance Loans under such Tranche by (i) in the case of a B/A Lender, accepting Drafts and purchasing such Bankers' Acceptances in accordance with Section 6 of this Schedule 1.01(b) and the Agreement and (ii) in the case of a Non-B/A Lender, purchasing completed Drafts (which have not and will not be accepted by such Lender) in accordance with Section 6 of this Schedule 1.01(b) and the Agreement; provided that no Loan shall be made as a Bankers' Acceptance Loan if any Default or Event of Default has occurred and is continuing.

2.      Each Bankers' Acceptance and Draft shall be in a minimum Face Amount of $500,000 and in integral multiples of $100,000, and each Bankers' Acceptance Loan under a Tranche shall consist of the acceptance and purchase of Bankers' Acceptances or the purchase of Drafts on the same day, in each case for the B/A Discount Proceeds, effected or arranged by the Lenders under such Tranche in accordance with Section 6 of this Schedule 1.01(b) and the Agreement and their respective Commitments.

3.      If the Administrative Agent determines that the Bankers' Acceptances under a Tranche to be created and purchased or Drafts to be purchased on the making of any Bankers' Acceptance Loan under a Tranche (upon a conversion or otherwise) will not be created and purchased ratably by the Lenders under such Tranche in accordance with this Schedule 1.01(b) and the Agreement, then (i) the requested Face Amount of such Bankers' Acceptances and Drafts shall be reduced to such lesser amount as the Administrative Agent determines will permit ratable sharing and (x) the amount by which the requested Face Amount shall have been so reduced shall be converted or continued, as the case may be, as a Canadian Prime Rate Loan to be made contemporaneously with the making of such Bankers' Acceptance Loan or (y) the Borrowers may cancel part of, or withdraw in its entirety, the related Notice of Borrowing, or (ii) the Administrative Agent may, acting reasonably at the request of any Borrower, deem any Notice of Borrowing delivered in such circumstances of a Bankers' Acceptance Loan to be, in its entirety, a Notice of Borrowing for Canadian Prime Rate Loans, and make a Canadian Prime Rate Loan to such Borrower in the full amount as originally requested as a Bankers' Acceptance Loan in such Notice of Borrowing.

Form of Drafts.

4.      Each Draft presented by a Borrower shall (i) be in a minimum Face Amount of $500,000 and in an integral multiple of $100,000, (ii) be dated the date of the making of such Bankers' Acceptance Loan, and (iii) mature and be payable by such Borrower (in common with all other Drafts presented in connection with such Bankers' Acceptance Loan) on

a Business Day which occurs approximately 30, 60, 90 or 180 days (or such longer period as the Administrative Agent and each Lender may agree) at the election of such Borrower after the Drawing Date and on or prior to the Revolving Loan Maturity Date.

Procedure for Drawing.

5. Each Bankers' Acceptance Loan shall be made in accordance with the notice provisions given by the relevant Borrower by way of a Notice of Borrowing to the Administrative Agent as set forth in Section 2.03 of the Agreement.

6. Not later than 2:00 p.m. (Toronto time) on an applicable Drawing Date, each Lender under the respective Tranche shall complete one or more Drafts in accordance with the Notice of Borrowing and either (i) accept the Drafts and purchase the Bankers' Acceptances so created for the B/A Discount Proceeds, or (ii) purchase the Drafts for the B/A Discount Proceeds. In each case, upon receipt of the B/A Discount Proceeds and upon fulfillment of the applicable conditions set forth in Sections 6 and 7 of the Agreement, the Administrative Agent shall apply the B/A Discount Proceeds in accordance with the applicable Notice of Borrowing or Notice of Conversion/Continuation, as the case may be, as follows: (i) remit to the relevant Borrower (in the case of the making of a Canadian Revolving Loan), (ii) prepay Canadian Prime Rate Loans (which shall constitute a conversion of the Canadian Revolving Loans from Canadian Prime Rate Loans to Bankers' Acceptance Loans) or (iii) pay B/A Instruments maturing on such date (which shall constitute a continuation of Bankers' Acceptance Loans to new Bankers' Acceptance Loans), provided that in the case of any such conversion or continuation of Loans, the relevant Borrower shall pay to the Administrative Agent for account of the Lenders under the respective Tranche such additional amounts, if any, as shall be necessary to effect the prepayment in full of the respective Canadian Prime Rate Loans being prepaid, or the B/A Instruments maturing, on such date.

7. Each Borrower shall, at the request of any Lender, issue one or more non-interest bearing promissory notes (each, a "B/A Equivalent Note") payable on the date of maturity of the unaccepted Draft referred to below in this section, in such form as such Lender may specify and in a principal amount equal to the Face Amount of, and in exchange for, any unaccepted Drafts which the Lender has purchased in accordance with Section 6 of this Schedule 1.01(b) and the Agreement.

8. Bankers' Acceptances purchased by a Lender may be held by it for its own account until the contract maturity date or sold by it at any time prior to that date in any relevant Canadian market in such Lender's sole discretion. Each Borrower hereby renounces, and shall not claim or request or require any Lender to claim, any days of grace for the payment of any Bankers' Acceptance.

Presigned Draft Forms.

9. To enable the Lenders to create Bankers' Acceptances or complete Drafts in the manner specified in this Schedule 1.01(b) and the Agreement, each Borrower shall supply each Lender with such number of Drafts as it may reasonably request, duly endorsed and executed on behalf of such Borrower. Each Lender is hereby authorized to issue such B/A

Instruments endorsed in blank in such Face Amounts as may be determined by such Lender, provided that the aggregate amount thereof is equal to the aggregate amount of B/A Instruments required to be purchased by such Lender. No Lender shall be responsible or liable for its failure to accept and/or purchase a B/A Instrument if the cause of such failure is, in whole or in part, due to the failure of the relevant Borrower to provide duly executed and endorsed B/A Instruments to such Lender on a timely basis. Each Lender will exercise such care in the custody and safekeeping of Drafts as it would exercise in the custody and safekeeping of similar property owned by it and will, upon request by any Borrower, promptly advise such Borrower of the number and designations, if any, of uncompleted Drafts held by it for such Borrower. The signature of any officer of any Borrower on a Draft may be mechanically reproduced and B/A Instruments bearing facsimile signature shall be binding upon such Borrower as if they had been manually signed. Even if the individuals whose manual or facsimile signature appears on any B/A Instrument no longer hold office on the date of signature, at the date of its acceptance by the Lender or at any time after such date, any B/A Instrument so signed shall be valid and binding upon each Borrower.

10. Upon the request of any Lender, each Borrower shall provide to such Lender a power of attorney to complete, sign, endorse and issue B/A Instruments on behalf of such Borrower in form and substance satisfactory to such Lender. Alternatively, at the request of any Lender, each Borrower shall deliver to such lender a "depository bill" which complies with the requirements of the Depository Bills and Notes Act (Canada), and hereby consents to the deposit of any Bankers' Acceptance in the form of a depository bill in the book-based debt clearance systems maintained by the Canadian Depository for Securities Limited or other recognized clearing house. In such circumstances, the delivery of Bankers' Acceptances shall be governed by the clearance procedures established thereunder.

<u>Payment, Conversion or Renewal of B/A Instruments</u>.

11. Upon the maturity of a B/A Instrument, each Borrower may (i) elect to issue a replacement B/A Instrument by giving a Notice of Borrowing in accordance with Section 2.03 of the Agreement (provided that such Borrower shall pay to the Administrative Agent for the account of the Lenders under the respective Tranche such additional amounts, if any, as shall be necessary to effect payment in full of the Face Amount of the B/A Instrument maturing on such day), (ii) elect to have all or a portion of the Face Amount of the B/A Instrument converted to a Canadian Prime Rate Loan by giving a Notice of Borrowing in accordance with Section 2.03 of the Agreement, or (iii) pay, on or before 12:00 Noon (Toronto time) on the maturity date for the B/A Instrument, an amount in Canadian Dollars equal to the Face Amount of the B/A Instrument (notwithstanding that the Lender under the respective Tranche may be the holder of it at maturity). Any such payment shall satisfy the relevant Borrower's obligations under the B/A Instrument to which it relates and the relevant Lender shall then be solely responsible for the payment of the B/A Instrument.

12. If any Borrower (i) fails to pay any B/A Instrument when due or issue a replacement for B/A Discount Proceeds which together with additional amounts then paid to the Administrative Agent for the account of the Lender under the respective Tranche in respect of such maturing B/A Instrument equals the Face Amount of such B/A Instrument pursuant to Section 11 of this Schedule 1.01(b) or (ii) fails to elect to convert all or a portion of the Face

Amount of such B/A Instrument to a Canadian Prime Rate Loan pursuant to clause (ii) of Section 11 of this Schedule 1.01(b), then the unpaid amount due and payable shall be converted to a Canadian Prime Rate Loan made by the Lenders under the respective Tranche ratably under the respective Tranche and shall bear interest calculated and payable as provided in Section 2.08 of the Agreement. This conversion shall occur as of the due date and without any necessity for such Borrower to give any notice thereof.

13.     On any date on which a Bankers' Acceptance Loan under a Tranche is created, purchased, or converted, the Administrative Agent shall be entitled to net all amounts payable on such date by the Administrative Agent to a Lender under such Tranche against all amounts payable on such date by such Lender to the Administrative Agent. Similarly, on any such date each Borrower hereby authorizes each Lender to net all amounts payable on such date by such Lender to the Administrative Agent for the account of the relevant Borrower, against all amounts payable on such date by such Borrower to such Lender in accordance with the Administrative Agent's calculations.

14.     Except for the requirement to pay immediately upon acceleration of the Revolving Loans pursuant to Section 11.01 of the Agreement, each Borrower shall pay to the Administrative Agent an amount in Canadian Dollars equal to the Face Amount of each Bankers' Acceptance Loan requested by such Borrower on the maturity date thereof (notwithstanding that the Lender may be the holder of it at maturity).

Circumstances Making Bankers' Acceptances Unavailable.

15.     If, for any reason a market for bankers' acceptances does not exist at any time or the Lenders cannot for other reasons, after reasonable efforts, readily sell bankers' acceptances or perform their other obligations under this Agreement with respect to bankers' acceptances, in each case, as determined in good faith by the Administrative Agent acting reasonably and in respect of which the Administrative Agent shall have given notice to the Borrowers of the occurrence and particulars thereof, (i) the right of each Borrower to request a Bankers' Acceptance Loan shall be suspended until the circumstances causing a suspension no longer exist, (ii) any applicable Notice of Borrowing which is outstanding shall either: (x) be cancelled and the requested Bankers' Acceptance Loan shall not be made or (y) the Administrative Agent may, acting reasonably and taking into account any circumstances then affecting the Lenders and the availability of Revolving Loans denominated in Canadian Dollars, at the direction of such Borrower, deem the aforementioned Notice of Borrowing a Notice of Borrowing for Canadian Prime Rate Loans.

16.     The Administrative Agent shall promptly notify each Borrower of the suspension of such Borrower's right to request a Bankers' Acceptance Loan and of the termination of any suspension.

Lender Addresses

| Lender | Address |
|---|---|
| Deutsche Bank AG New York Branch | 60 Wall Street<br>New York, New York 10005<br>Attention:  Erin Morrissey<br>Telephone:  (212) 250-1765<br>Telecopier No.:  (212) 797-5690<br><br>Payment Office in the case of all payments with respect to Canadian Dollar Denominated Revolving Loans, the office of DB Canada located at 199 Bay Street, Suite 4700, Commerce Court West, P.O. Box 263, Toronto, Ontario, Canada M5L 1E9 |

SECTION 1.    DEFINITIONS AND ACCOUNTING TERMS ...............................................2

    1.01.    Defined Terms ............................................................................2
    1.02.    References to "UCC"...................................................................74
    1.03.    Terms Generally........................................................................74
    1.04.    Pro Forma Calculations..............................................................74
    1.05.    Accounting Terms; GAAP...........................................................75
    1.06.    Interpretation Québec.................................................................75

SECTION 2.    AMOUNT AND TERMS OF CREDIT ...............................................76

    2.01.    The Commitments.......................................................................76
    2.02.    Minimum Amount of Each Borrowing.........................................81
    2.03.    Notice of Borrowing..................................................................81
    2.04.    Disbursement of Funds ..............................................................82
    2.05.    Notes .......................................................................................84
    2.06.    Conversions..............................................................................85
    2.07.    Pro Rata Borrowings..................................................................87
    2.08.    Interest.....................................................................................87
    2.09.    Interest Periods..........................................................................88
    2.10.    Increased Costs, Illegality, etc. ...................................................89
    2.11.    Compensation ...........................................................................92
    2.12.    Lending Offices and Affiliate Lenders for Loans in Available Currency .......92
    2.13.    Replacement of Lenders .............................................................93
    2.14.    Incremental Commitments...........................................................94
    2.15.    Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest ...96
    2.16.    Provisions Regarding Bankers' Acceptances, Drafts, etc...............97
    2.17.    Holdings as Agent for Borrowers ................................................97
    2.18.    Defaulting Lenders....................................................................98
    . Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender: ...................................98
    2.19.    Extensions of Loans and Commitments. ......................................101

SECTION 3.    LETTERS OF CREDIT...............................................................105

    3.01.    Letters of Credit......................................................................105
    3.02.    Maximum Letter of Credit Outstandings; Currencies Final Maturities.........106
    3.03.    Letter of Credit Requests; Minimum Stated Amount ...................107
    3.04.    Letter of Credit Participations....................................................108
    3.05.    Agreement to Repay Letter of Credit Drawings ...........................110
    3.06.    Increased Costs .......................................................................111

SECTION 4.    COMMITMENT FEES; REDUCTIONS OF COMMITMENT ..................112

Table of Contents
(continued)

| 4.01. | Fees | 112 |
|---|---|---|
| 4.02. | Voluntary Termination of Unutilized Commitments | 114 |
| 4.03. | Mandatory Reduction of Commitments | 114 |

**SECTION 5.** PREPAYMENTS; PAYMENTS; TAXES ................................114

| 5.01. | Voluntary Prepayments | 114 |
|---|---|---|
| 5.02. | Mandatory Repayments; Cash Collateralization | 115 |
| 5.03. | Method and Place of Payment; Deposits and Accounts | 117 |
| 5.04. | Net Payments; Taxes | 122 |

**SECTION 6.** CONDITIONS PRECEDENT TO THE CLOSING DATE AND TO THE FUNDING DATE ................................125

| 6.01. | Conditions Precedent to the Closing Date. | 125 |
|---|---|---|
| 6.02. | Conditions Precedent to the Funding Date. | 128 |

**SECTION 7.** CONDITIONS PRECEDENT TO ALL CREDIT EVENTS ................................131

| 7.01. | No Default; Representations and Warranties | 132 |
|---|---|---|
| 7.02. | Notice of Borrowing; Letter of Credit Request | 132 |
| 7.03. | Borrowing Base and Commitment Limitations | 132 |

**SECTION 8.** REPRESENTATIONS AND WARRANTIES ................................133

| 8.01. | Organization; Powers | 133 |
|---|---|---|
| 8.02. | Authorization; Absence of Conflicts | 133 |
| 8.03. | Enforceability | 134 |
| 8.04. | Governmental Approvals | 134 |
| 8.05. | Financial Statements | 134 |
| . | | 134 |
| 8.06. | No Material Adverse Effect | 134 |
| 8.07. | Title to Properties; Possession Under Leases | 135 |
| 8.08. | Subsidiaries | 135 |
| 8.09. | Litigation; Compliance with Laws | 135 |
| 8.10. | Federal Reserve Regulations | 135 |
| 8.11. | Investment Company Act | 136 |
| 8.12. | Tax Returns | 136 |
| 8.13. | No Material Misstatements | 136 |
| 8.14. | Employee Benefit Plans | 136 |
| 8.15. | Environmental and Safety Matters | 137 |
| . | | 137 |
| 8.16. | Solvency | 139 |
| 8.17. | Security Documents | 139 |
| 8.18. | Labor Matters | 141 |
| 8.19. | Location of Real Property | 141 |
| 8.20. | Patents, Trademarks, etc. | 141 |

| | | |
|---|---|---|
| 8.21. | Borrowing Base Calculation | 141 |
| 8.22. | Accounts | 142 |
| 8.23. | Inventory | 142 |
| 8.24. | Anti-Terrorism Law | 142 |
| 8.25. | Own Enquiries | 143 |

**SECTION 9. AFFIRMATIVE COVENANTS** ... 143

| | | |
|---|---|---|
| 9.01. | Existence; Businesses and Properties | 143 |
| 9.02. | Insurance | 143 |
| 9.03. | Payment of Taxes | 144 |
| 9.04. | Financial Statements, Reports, etc. | 144 |
| 9.05. | Litigation and Other Notices | 147 |
| 9.06. | Maintaining Records; Access to Properties and Inspections | 147 |
| 9.07. | Use of Proceeds | 148 |
| 9.08. | Compliance with Law | 148 |
| 9.09. | Further Assurances | 148 |
| 9.10. | Information Regarding Collateral; Deposit Accounts | 150 |
| 9.11. | Material Contracts | 151 |
| 9.12. | Environmental Matters | 151 |
| 9.13. | Certain Post-Funding Collateral Obligations | 152 |

**SECTION 10. NEGATIVE COVENANTS** ... 152

| | | |
|---|---|---|
| 10.01. | Indebtedness | 152 |
| 10.02. | Liens | 154 |
| 10.03. | Sale/Leaseback Transactions | 156 |
| 10.04. | Investments, Loans and Advances | 157 |
| 10.05. | Mergers, Consolidations, Sales of Assets and Acquisitions | 158 |
| 10.06. | Restricted Payments | 159 |
| 10.07. | Transactions with Stockholders and Affiliates | 160 |
| 10.08. | Business | 160 |
| 10.09. | Limitations on Debt Prepayments | 161 |
| 10.10. | Amendment of Certain Documents | 161 |
| 10.11. | Limitation on Dispositions of Stock of Subsidiaries | 161 |
| 10.12. | Restrictions on Ability of Subsidiaries to Pay Dividends | 162 |
| 10.13. | Disposition of Collateral and Other Assets | 162 |
| 10.14. | Fiscal Year | 163 |
| 10.15. | Material Subsidiaries | 163 |
| 10.16. | Consolidated Fixed Charge Coverage Ratio | 163 |
| 10.17. | No Additional Deposit Accounts; etc. | 164 |

**SECTION 11. EVENTS OF DEFAULT** ... 164

| | | |
|---|---|---|
| 11.01. | Events of Default | 164 |
| 11.02. | Application of Proceeds | 167 |

SECTION 12.    THE AGENTS ..................................................................................171

    12.01.    Appointment .........................................................................171
    12.02.    Nature of Duties...................................................................171
    12.03.    Lack of Reliance on the Agents ..........................................172
    12.04.    Certain Rights of the Administrative Agent ........................172
    12.05.    Reliance................................................................................173
    12.06.    Indemnification ....................................................................173
    12.07.    Agents in their Individual Capacities..................................173
    12.08.    Holders.................................................................................173
    12.09.    Resignation and Removal of Agents.....................................173
    12.10.    Collateral Matters.................................................................175
    12.11.    Delivery of Information .......................................................177
    12.12.    Quebec Security ...................................................................177
    12.13.    Co-Collateral Agents ...........................................................177

SECTION 13.    MISCELLANEOUS ........................................................................178

    13.01.    Payment of Expenses, etc. ...................................................178
    13.02.    Right of Setoff.....................................................................180
    13.03.    Notices .................................................................................180
    13.04.    Benefit of Agreement; Assignments; Participations.............181
    13.05.    No Waiver; Remedies Cumulative .......................................184
    13.06.    Payments Pro Rata ...............................................................184
    13.07.    Computations .......................................................................185
    13.08.    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
                WAIVER OF JURY TRIAL.................................................185
    13.09.    Counterparts.........................................................................186
    13.10.    Effectiveness........................................................................186
    13.11.    Headings Descriptive ...........................................................187
    13.12.    Amendment or Waiver; etc...................................................187
    13.13.    Survival; Continuing Obligation..........................................189
    13.14.    Domicile of Loans................................................................189
    13.15.    Register ................................................................................190
    13.16.    Confidentiality .....................................................................190
    13.17.    Patriot Act ...........................................................................191
    13.18.    OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR
                AGREEMENT; ETC. ...........................................................191
    13.19.    Waiver of Sovereign Immunity ...........................................192
    13.20.    Judgment Currency...............................................................193
    13.21.    Qualified Secured Hedging Agreements and Qualified Secured Cash
                Management Agreements .....................................................193

SECTION 14.    NATURE OF OBLIGATIONS ........................................................195

    14.01.    Nature of Obligations...........................................................195

| | | |
|---|---|---|
| 14.02. | Independent Obligation | 196 |
| 14.03. | Authorization | 196 |
| 14.04. | Reliance | 197 |
| 14.05. | Contribution; Subrogation | 197 |
| 14.06. | Waiver | 197 |
| 14.07. | Limitation on Canadian Borrower Obligations | 198 |
| 14.08. | Rights and Obligations | 198 |
| SECTION 15. | REVOLVING LOANS; INTRA-LENDER ISSUES | 198 |
| 15.01. | Specified Foreign Currency Participations | 198 |
| 15.02. | Settlement Procedures for Specified Foreign Currency Participations | 199 |
| 15.03. | Obligations Irrevocable | 201 |
| 15.04. | Recovery or Avoidance of Payments | 202 |
| 15.05. | Indemnification by Lenders | 202 |
| 15.06. | Specified Foreign Currency Loan Participation Fee | 202 |
| 15.07. | Defaulting Lenders; etc. | 203 |
| SECTION 16. | LENDER LOSS SHARING AGREEMENT | 203 |
| 16.01. | Definitions | 203 |
| 16.02. | CAM Exchange | 204 |
| 16.03. | Miscellaneous | 205 |

## SCHEDULES

SCHEDULE 1.01(a)        --   Commitments
SCHEDULE 1.01(b)        --   Provisions Relating to Bankers' Acceptances, Bankers'
                             Acceptance Loans and B/A Discount Notes
SCHEDULE 1.01(c)        --   Material Subsidiaries
SCHEDULE 1.01(d)        --   Mortgaged Properties
SCHEDULE 3.01(a)        --   Existing Letters of Credit
SCHEDULE 8.07           --   Certain Title Matters
SCHEDULE 8.08           --   Subsidiaries
SCHEDULE 8.09           --   Litigation and Compliance with Laws
SCHEDULE 8.14(b)        --   Canadian Pension Plan Matters
SCHEDULE 8.15           --   Environmental Matters
SCHEDULE 8.17(a)        --   UCC Lien Filing Offices
SCHEDULE 8.18           --   Labor Matters
SCHEDULE 8.19           --   Real Properties
SCHEDULE 9.09(c)        --   Certain Non-Collateral Properties
SCHEDULE 10.02(a)(iv)   --   Existing Liens
SCHEDULE 10.04          --   Certain Permitted Investments
SCHEDULE 10.17          --   Deposit Accounts
SCHEDULE 13.03          --   Lender Addresses/Lending Offices

## EXHIBITS

EXHIBIT A-1    --   Form of Notice of Borrowing
EXHIBIT A-2    --   Form of Notice of Conversion/Continuation
EXHIBIT B-1    --   Form of Revolving Note
EXHIBIT B-2    --   Form of Swingline Note
EXHIBIT C      --   Form of Letter of Credit Request
EXHIBIT D-1    --   Form of U.S. Perfection Certificate
EXHIBIT D-2    --   Form of Canadian Perfection Certificate
EXHIBIT E      --   Form of Intercreditor Agreement
EXHIBIT F      --   Form of Solvency Certificate
EXHIBIT G      --   Form of Compliance Certificate
EXHIBIT H      --   Form of Assignment and Assumption Agreement
EXHIBIT I      --   Form of Joinder Agreement
EXHIBIT J      --   Form of Borrowing Base Certificate
EXHIBIT K      --   Form of Incremental Commitment Agreement
EXHIBIT L      --   Form of Section 5.04(b)(ii) Certificate
EXHIBIT M      --   Form of Guarantee and Collateral Agreement
EXHIBIT N      --   Form of Canadian Guarantee and Collateral Agreement
EXHIBIT O      --   Form of Mortgage
EXHIBIT P-1    --   Form of Closing Date Opinion of U.S. Counsel

# Table of Contents
## (continued)

EXHIBIT P-2    --    Form of Closing Date Opinion of Craig A. Hunt
EXHIBIT P-3    --    Form of Closing Date Opinion of Canadian Counsel