IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SMURFIT-STONE CONTAINER | ) | Case No.  09-10235 (BLS) |
| CORPORATION, et al., | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## MEMORANDUM OPINION[1]

The matter presently before the Court concerns objections to these Debtors' Joint Plan of Reorganization (the "Plan")[2] filed by creditors Aurelius Capital Management, L.P. ("Aurelius"), Columbus Hill Capital Management, L.P. ("Columbus"), and Manufacturers and Traders Trust Company ("M&T", and collectively with Aurelius and Columbus, the "Objectors").  For the reasons stated below, the Court will overrule certain of the objections, and withhold ruling on the objection relating to establishment of a reserve on account of the Intercompany Claim.

### INTRODUCTION

**A.     General Background**

The Debtors are one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers.  (Hunt Aff. ¶ 5) [Docket No. 68720].

The Debtors produce a full line of containerboard, which is used primarily in the production of corrugated packaging.  Sixty-nine percent of the Debtors' containerboard production is consumed internally by the Debtors' Container Division (also referred to as the Packaging Division), and the remainder is sold to third parties.  In 2008, containerboard sales to third parties generated approximately 20% of the Debtors' net sales.  (Id. at ¶ 8).

The Debtors' Container Division produces a full range of corrugated containers.  In 2008,

---

[1]     This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2]     Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Plan.

the Container Division generated approximately 63% of the Debtors' net sales to third parties. (Id. at ¶ 7).

The Debtors currently employ approximately 20,000 active employees, of whom approximately 14,200 are hourly and 5,800 are salaried. (Id. at ¶ 16).

**B.     Procedural Background**

On January 26, 2009, Stone Container Finance Company of Canada II ("Finance II"), Smurfit-Stone Container Canada Inc. ("SSC Canada"), Smurfit-Stone Container Enterprises, Inc. ("SSCE") and certain of their affiliates (collectively, the "Debtors" or the "Consolidated U.S. Debtors") filed petitions for relief pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court.

On the same day, after the commencement of the Chapter 11 cases, Finance II, SSC Canada and certain of their affiliates (not including Smurfit-Stone Container Corporation ("SSCC") or SSCE (collectively, the "Canadian Debtors") filed for protection from their creditors in Canada (the "CCAA Proceedings") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court"). The Consolidated U.S. Debtors' Chapter 11 cases in the Bankruptcy Court have been recognized by the Canadian Bankruptcy Court as a "foreign proceeding" as defined in section 267 of the [Bankruptcy and Insolvency Act.]

On December 1, 2009, the Consolidated U.S. Debtors filed a joint plan of reorganization and related disclosure statement with the Bankruptcy Court, which they subsequently amended on several occasions. The Plan generally provides for a restructuring of the Consolidated U.S. Debtors and the Canadian Debtors in both the Chapter 11 cases and the CCAA Proceedings.

**C.     The Finance II Objections**

Finance II issued 7.375% Notes Due 2014 (the "Notes) in the public debt markets in the amount of $200 million in July, 2004. Also in July of 2004, Finance II loaned $200 million to SSC Canada.

Aurelius and Columbus (collectively, the "Finance II Fund Managers") are fund managers for funds holding a majority of the Notes. (Hunt Aff. ¶ 47). The Finance II Fund Managers have

asserted, among other things, that Finance II holds a claim against SSCE based upon Finance II's status as an unlimited liability company incorporated under the [Companies Act (Nova Scotia)] and SSCE's status as the sole member of the Finance II (the "Contribution Claim").[3] (Hunt Aff. ¶ 7). The Finance II Fund Managers have also asserted that Finance II holds an intercompany claim against SSC Canada arising under the loan agreement between Finance II and SSC Canada pursuant to which Finance II advanced $200 million to SSC Canada (the "Intercompany Claim"). (Hunt Aff. ¶ 7)

In December 2009, the Canadian Debtors, including SSC Canada, sought directions from the Canadian Bankruptcy Court (the "Characterization Motion") to determine the issue of the proper characterization of the Intercompany Claim against SSC Canada. Following discovery and an evidentiary hearing on the Characterization Motion, in which the Debtors, the Finance II Fund Managers, and M&T participated, on January 28, 2010, the Canadian Court issued its lengthy opinion disposing of the issue, styled as the "Reasons for Decision on the Characterization Motion" (hereinafter, the "Reasons").

In the Reasons (which are related in greater detail <u>infra</u>), the Canadian Bankruptcy Court ruled that the Intercompany Claim was not a debt provable in bankruptcy under applicable Canadian law and would have a value of zero in any event. The Finance II Fund Managers filed a motion for leave to appeal the decision of the Canadian Bankruptcy Court to the Ontario Court of Appeal. On March 9, 2010, the Ontario Court of Appeal denied the motion for leave to appeal. The Finance II Fund Managers subsequently filed an application for leave to appeal the denial of the motion seeking leave to appeal with the Canadian Supreme Court. As of the time of writing, that application has not yet been ruled upon.

## DISCUSSION

The Objectors contend that confirmation of the Plan should be denied on at least four separate grounds. First, they contend that the Plan improperly classifies, and treats, the Intercompany Claim separately from the claims of other general unsecured creditors. Second, and

---

[3] The "Contribution Claim" is also referred to in certain pleadings as the "Wind-Up Claim."

relatedly, the Objectors contend that a reserve must be established to provide for a distribution on account of the Intercompany Claim in the event it is ultimately allowed. Third, the Objectors submit that the Canadian Asset Sale (as defined and described more fully below) is an improper transfer for the benefit of insiders at the expense of creditors. Finally, the Objectors challenge whether the Plan has been proposed in good faith. The Court will address each of these arguments in turn.

A.     **Classification and Treatment of the Intercompany Claim**

The Finance II Fund Managers do not hold any direct claims against the estate of SSC Canada. Finance II does hold claims against SSC Canada, and Finance II determined not to object to the Plan's classification and treatment of the Intercompany Claim it holds against SSC Canada. The Finance II Fund Managers are asserting objections to the Plan's classification and treatment of the Intercompany Claim effectively on behalf of Finance II.

The Intercompany Claim arises from a seven-page Loan Agreement dated July 20, 2004, between Finance II as lender and SSC Canada as borrower. (Loan Agreement, Introduction). Pursuant to the Loan Agreement, SSC Canada borrowed $200 million from Finance II and agreed to repay Finance II on July 15, 2014 (the "Loan"). (Loan Agreement, ¶¶ 1-2). The outstanding balance of the Loan was to bear interest at a rate of 7.625% per annum, which SSC Canada was required to pay by the issuance to Finance II of Class C Shares of SSC Canada. (Loan Agreement, ¶ 3).

The terms of the Loan Agreement are to be interpreted in accordance with and governed by the laws of the Province of Quebec and the laws of Canada. (Loan Agreement, ¶ 13).

The filing of the Chapter 11 cases of SSC Canada and SSCE and the filing of the petitions under the CCAA constituted an event of default pursuant to Section 6.3 of the Loan Agreement:

> [S]hould the Borrower or, its parent, Stone Container Corporation, make an assignment for the benefit of creditors, or file or consent to the filing of a petition in bankruptcy, a proposal or a notice of intention under the Bankruptcy and Insolvency Act (Canada) or any other equivalent Law of any other jurisdiction or be adjudicated insolvent or bankrupt, or petition or apply to any tribunal for any receiver, trustee, liquidator or sequestrator of or for all or substantially all of its property or should the Borrower or Stone

> Container Corporation commence any proceedings relating to it or all or substantially all of its property under any reorganization, arrangement, readjustment, composition or liquidation Law of any jurisdiction; or should there be commenced against the Borrower or Stone Container Corporation any such proceeding and it remains undismissed for a period of sixty (60) days; or should any receiver, trustee, liquidator or sequestrator of or for the Borrower or Stone Container Corporation or all or substantially all of its property be appointed or should the Borrower or Stone Container Corporation consent to or approve or accept any such proceeding or the appointment of any receiver, trustee, liquidator or sequestrator of or for the Borrower or Stone Container Corporation or all or substantially all of its property.

(Loan Agreement, ¶ 6.3). In the Reasons, the Canadian Bankruptcy Court found it undisputed that the commencement of the CCAA Proceedings and the Chapter 11 cases constituted an event of default under Section 6.3 of the Loan Agreement. (Reasons, ¶ 14). This Court likewise finds that the commencement of the CCAA Proceedings and the Chapter 11 cases constituted an event of the default pursuant to the terms of the Loan Agreement.

Pursuant to Section 7.2 of the Loan Agreement, upon the filing of the Chapter 11 Cases of SSC Canada and SSCE and the filing of the petitions under the CCAA, the Loan became repayable in Class B Shares:

> [U]pon the occurrence of an Event of Default specified in subsection 6.3, the Borrower shall lose the benefit of the Term and the entire amount of the Loan then outstanding in principal and interest shall be immediately due and payable, all without any action by the Lender and without presentment, demand, protest, or other notice of any kind all of which are waived. Thereupon the Lender may exercise any and all of its rights and recourses under the Agreement, provided, however, that the Borrower shall perform its obligations in this regard hereunder by the issuance to the Lender of Class B Shares having a value no less than the dividend or other amount that otherwise would be received by the Lender.

(Loan Agreement, ¶ 7.2). The Canadian Bankruptcy Court further found that, upon the filing of the Chapter 11 cases of SSC Canada and SSCE and the filing of the petitions under the CCAA, the Loan was repayable only in Class B Shares:

> On an event of default defined in Section 6.3 of the Loan Agreement, there is a debt that can only be repaid by the issuance of shares. In substance, Finance II is owed funds but is only entitled to be paid with shares on an insolvency. Finance II may exercise its rights and recourses under the Loan Agreement provided that Smurfit Canada *shall* perform its obligations by the issuance of

> Class B shares. The language in the Loan Agreement is mandatory in this regard. Applying Wieler J.A.'s reasoning In Re Central Capital, Finance II would be unable to recover $200 million by legal process. It would be limited to recovery of Class B shares.

(Reasons, ¶ 49). In the event of default specified in Section 6.3 of the Loan Agreement, the Loan Agreement thus clearly provides that the Loan was to be repaid by the issuance of Class B Shares in SSC Canada. The Canadian Bankruptcy Court found that there was no ambiguity in the language of the Loan Agreement. (Reasons, ¶ 45).

The Plan provides that the Holders of General Unsecured Claims against SSC Canada will receive an estimated recovery of approximately 30% of their Allowed Claims and that Holders of Interests in SSC Canada will received no distribution on account of their equity interest in SSC Canada. (Plan, §§ 3.8.4(b), 3.8.7(b)). All interests in SSC Canada will be extinguished, cancelled and discharged on the Effective Date. (Plan, § 3.8.7)

In the Reasons, the Canadian Bankruptcy Court found that it appeared that SSC Canada and Finance II contemplated in the Loan Agreement that in an insolvency proceeding, there would be no value to the Class B shares. (Reasons, ¶ 50). Specifically, the Canadian Bankruptcy Court found that:

> There is no definition for Class B Amount in the event of insolvency. It seems to me that this must be what the parties intended. In the event of a non-insolvency event of default, the Class B Shares would have a value and would rank ahead of other classes of shares but behind unsecured creditors. In an insolvency event of default, it was contemplated by the parties that the shares would have no value. Tax benefits would be derived but on an insolvency, creditors of Finance II would look to Enterprises to fulfill the cash payment obligations.

(Reasons, ¶ 51). The Canadian Bankruptcy Court stated that "[t]he intention of the parties was that if an event of default occurred as a result of an insolvency proceeding, there was no obligation to make any cash payment to Finance II." (Reasons, ¶ 52). The Canadian Bankruptcy Court therefore concluded that, under applicable Canadian law, the Intercompany Claim is not a debt provable in bankruptcy, does not have any value, and should not rank equally with the General Unsecured Claims against SSC Canada:

> In summary, I conclude that the substance of the parties' relationship

> was debt and not equity; however, the $200 million claim was not a debt provable in bankruptcy in that payment was not recoverable by legal process. If I am wrong in that regarding, there is no prospect that Smurfit Canada will have sufficient funds to satisfy all of its creditors and the Class B shares would have a value of zero in any event. Finance II's claim should not rank pari passu with the unsecured debt claims against Smurfit Canada and their claim should be valued at zero. In passing, I also note that this is consistent with the provisions of the Offering Memorandum.

(Reasons, ¶ 53).

The Loan Agreement is a contract between two Canadian entities and is governed by Canadian law. In the Reasons, the Canadian Bankruptcy Court applied Canadian law in interpreting the Loan Agreement and determined that the Intercompany Claim should be valued at zero and should not rank <u>pari passu</u> with unsecured claims. This Court finds that, pursuant to the terms of the Loan Agreement, the Intercompany Claim does not rank equally to the General Unsecured Claims against SSC Canada and is only payable in Class B Shares, which have no value. Based on the terms of the Loan Agreement and the applicable non-bankruptcy law governing the Intercompany Claim, the Intercompany Claim is not entitled to a distribution pursuant to the Plan.

The Debtors' separate classification of the Intercompany Claim is appropriate based on the terms of the Loan Agreement, including the requirement that the Intercompany Claim be repaid in equity in the event of an insolvency, the Canadian Bankruptcy Court's ruling on the Characterization Motion and the distinct legal character of the Intercompany Claim. The Court concludes that the Debtors did not separately classify the Intercompany Claim for the purpose of gerrymandering an affirmative vote on the Plan.

The Plan properly classifies the Intercompany Claim in Class 15F in accordance with section 1122 of the Bankruptcy Code because the Intercompany Claim is not "substantially similar" to the General Unsecured Claims against SSC Canada in Class 15D.

The record reflects the Intercompany Claim does not, and was not intended to, rank <u>pari passu</u> with the unsecured debt claims against SSC Canada and should be valued at zero dollars. The Intercompany Claim does not have similar legal attributes as the General Unsecured Claims

against SSC Canada and does not have the same rights against the estate of SSC Canada. Thus, the Intercompany Claim is sufficiently different from the General Unsecured Claims against SSC Canada to justify separate classification of the Intercompany Claim pursuant to section 1122(a) of the Bankruptcy Code.

Even if the Intercompany Claim were sufficiently "substantially similar" to the General Unsecured Claims against SSC Canada to permit the Debtors to classify the Intercompany Claim in Class 15D, separate classification of substantially similar claims is permitted under section 1122(a) of the Bankruptcy Code. The classification of the Intercompany Claim is reasonable and not arbitrary, and complies with section 1122(a) of the Bankruptcy Code. See In re Jersey City Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987); see also In re Kaiser Aluminum Corp., No. 02-10429 (JKF), 7312, 2006 WL 616243 *5-6 (Bankr. D. Del. Feb. 6, 2006).

A creditor's entitlement in bankruptcy arises from the underlying substantive law creating the debtor's obligation. See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000); 11 U.S.C. § 502(b)(1). Bankruptcy courts are required to consult applicable non-bankruptcy law in determining the validity of most claims, because the determination of property rights is generally left to applicable non-bankruptcy law. Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 450-51 (2007); see also In re W.R. Grace & Co., 403 B.R. 317 (Bankr. D. Del. 2009) (disallowing and expunging claims after determining that the claims, which were governed by Canadian law, would be unenforceable under Canadian law).

As noted above, the Loan Agreement is a contract between two Canadian entities and is governed by Canadian law. (Loan Agreement, ¶ 13). As such, Finance II's rights under the Loan Agreement and its entitlement to a distribution on account of the Intercompany Claim are governed by Canadian law.

As noted above, the Loan Agreement provides that in the event of the commencement of insolvency proceedings by SSC Canada or SSCE, the Loan is payable only in Class B Shares. The Class B Shares do not have any value, and therefore, as a matter of Canadian law, Finance II is not entitled to any recovery on account of the Intercompany Claim.

After an evidentiary hearing on the merits of the Intercompany Claim in which the Debtors, the Finance II Fund Managers and M&T participated, the Canadian Bankruptcy Court determined that the Intercompany Claim has a value of zero, and thus Finance II is not entitled to a distribution on account of the Intercompany Claim. The Canadian Bankruptcy Court found that the language of the Loan Agreement was unambiguous, and required that the Loan be repaid in Class B Shares. Additionally, the Canadian Bankruptcy Court found that the Intercompany Claim did not rank equally with unsecured claims against SSC Canada. The Canadian Bankruptcy Court further found that it was the parties' intention that the Class B Shares would have no value in the event of insolvency and concluded that the Intercompany Claim is worthless.

Based upon the record established in these proceedings, this Court finds and concludes that the Plan treats the Intercompany Claim in a manner that is consistent with applicable provisions of the Loan Agreement and the parties' respective rights thereunder. The treatment of the Intercompany Claim is also consistent with the Canadian Bankruptcy Court's findings with respect to the Loan Agreement. The Plan provides that Finance II will receive only what it is entitled to pursuant to the Loan Agreement, which is no distribution on account of the Intercompany Claim. The treatment of the Intercompany Claim thus complies with the applicable provisions of the Bankruptcy Code, and the objection on grounds of classification and treatment of the Intercompany Claim is overruled.

**B.      Intercompany Claim Reserve**

Section 3.8.6 of the Plan provides that Finance II should not be entitled to receive any distributions on account of the Intercompany Claim. (Plan, § 3.8.6). The Plan further provides, however, that if the Canadian appeals court subsequently determined that the Intercompany Claim was a debt provable in bankruptcy, the Intercompany Claim would be entitled to a distribution as determined by that court. (Plan, § 3.8.6). The Canadian Bankruptcy Court entered the Reasons on January 28, 2010. The Finance II Fund Managers subsequently sought leave to appeal the ruling, and the Ontario Court of Appeal denied the motion for leave to appeal on March 9, 2010 (Debtors'

Ex. 24).  The Finance II Fund Managers are now seeking leave to appeal the Ontario Court of Appeal's denial of the motion for leave to appeal.  Currently, the Canadian Bankruptcy Court's ruling regarding the Intercompany Claim is fully enforceable and effective.

The Plan proposes to enforce the Order of the Canadian Bankruptcy Court that has been effective since January 28, 2010.  Furthermore, the Debtors contend that the treatment of the Intercompany Claim is consistent with the terms of the Loan Agreement.  The Loan Agreement provides that the Loan would not be treated equally with General Unsecured Claims in the event of SSC Canada's insolvency and would be repayable in shares of SSC Canada.  (See generally Loan Agreement).  Under the Plan, General Unsecured Claims against SSC Canada are not entitled to any distribution.  Because the Intercompany Claim has no value pursuant to the applicable non-bankruptcy law and is not entitled to receive a distribution under the Plan, the Debtors contend that they are not required to reserve any amounts on account of the Intercompany Claim in the SSC Canadian Distribution Reserve or otherwise pursuant to Section 8.17.1 of the Plan.

The record in these proceedings reflects that appellate proceedings relating to the January 28, 2010 Reasons are pending before the Supreme Court of Canada.  This Court recognizes that the lack of a reserve for the Intercompany Claim would likely mean that there would be no distribution on that claim in the event it is allowed or recognized as a result of further litigation and/or appellate proceedings in Canada.  Conversely, the Debtors have expressed legitimate concerns that distributions on other, demonstrably allowed claims will be delayed or held hostage to the Objectors' efforts on appeal.

Expressing similar concerns, the Canadian Bankruptcy Court by its "Reasons for Decision" dated May 13, 2010, sanctioned the Plan Compromise and Arrangement in the CCAA Proceedings but imposed a 31-day stay on its Order to allow the appellate process in Canada to play out further.  (See May 13, 2010 Reasons at ¶¶ 32-33).  In a similar vein, this Court will refrain from ruling on the issues relating to whether a reserve is required on account of the Intercompany Claim and direct that the parties appear for a status conference at the next omnibus hearing in these cases (June 22, 2010 at 2:00 p.m.) to discuss this matter.

**C.     Canadian Asset Sale.**

Article V of the Plan describes the procedures and implications of the Canadian Asset Sale. (Plan, Art. V). The Canadian Asset Sale is an offer by Canadian Newco, a newly formed wholly-owned subsidiary of Canadian Holdco, which, in turn, is a newly formed wholly-owned subsidiary of Reorganized SSCE, to the Canadian creditors to purchase substantially all of the assets of the Canadian Debtors. (Hunt Aff., ¶ 68; Plan, §§ 5.1.1, 5.1.2).

The consideration to be paid by Canadian Newco totals approximately $600 million, which is comprised of (a) the repayment of the Prepetition Canadian Revolving Loans (including unpaid interest thereon at non-default rates) totaling $57 million; (b) the repayment of the prepetition Canadian Term Loans totaling $366 million; (c) the payment of certain other secured claims; (d) the payment of certain administrative expense claims totaling $17.2 million; (e) the assumption by Canadian Newco of certain liability of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder, which are estimated by the Canadian Debtors' actuary to be CDN$161.4 million as of December 31, 2009), and the Canadian Employee Benefit Plans (which excludes the Non-Qualified Employee Benefit Plans); and (f) cash in the amount of $19.5 million for each of the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. (See Monitor Report, ¶ 20(ii)).

Consummation of the Canadian Asset Sale under its current terms required the Affected Unsecured Creditors at SSC Canada and Smurfit-MBI to vote to accept the Plan. (Hunt Aff. ¶ 68; Plan § 5.1.1). Without the acceptance of the Canadian Asset Sale by the Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, the Plan provided for a marketing process for the Canadian Assets. (Hunt Aff. ¶ 68; Plan § 5.1.6). Canadian Newco would have been able to fully participate in the marketing and sale process, although the initial offer by Canadian Newco in this alternative process would not have included the $19.5 million in cash to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. (Hunt Aff. ¶ 68; Plan § 5.1.6). This marketing alternative to the Canadian Asset Sale afforded the Canadian creditors the opportunity to evaluate the merits of the Canadian Newco offer and determine whether they felt the offer was sufficient and provided fair consideration for the Canadian Assets. (Hunt Aff. ¶ 68).

The record developed in this Court amply demonstrates the Debtors heavily negotiated, at arm's length and in good faith, the Canadian Asset Sale with the Committee and various other key creditor constituencies and stakeholders. (Hunt Aff. ¶ 68). Further, the Monitor evaluated the Canadian Asset Sale and recommended that the Affected Unsecured Creditors of SSC Canada and Smurfit-MBI vote to accept the Plan and thus approve the Canadian Asset Sale in its Monitor Report. (See Monitor Report, ¶¶ 63-65).[4]

The Monitor recommended that the Affected Creditors vote in favor of the Plan based on (i) the Monitor's review of the Plan and the treatment of Affected Secured Creditors and Affected Unsecured Creditors; (ii) the Monitor's review of the Company's distributable value analysis for holders of General Unsecured Claims against SSC Canada and Smurfit-MBI; (iii) the Monitor's assessment of the enterprise and liquidation value of the assets of SSC Canada and Smurfit-MBI as of December 31, 2009, and the resulting distributable value to creditors under such scenarios; and (iv) the results of the claims process and the estimated distributions to creditors of the Canadian Debtors. (Monitor Report, ¶ 64).

Attached (as Exhibit D) to the Epiq Voting Affidavit is the Monitor Voting Report. That report describes the voting procedures established by the Canadian Bankruptcy Court on February 10, 2010 and the results of such voting. (Monitor Voting Report, ¶¶ 15-28). The overwhelming majority of Affected Creditors of the Canadian Debtors, except for the Affected Unsecured Creditors of Finance II, voted to accept the Plan. (Monitor Voting Report, ¶¶ 27-28).[5] The voting results demonstrate that 98.58% in number and 98.72% in value of Affected Unsecured Creditors of SSC Canada voted to accept the Plan and 99.12% in number and 99.20% in value of Affected Unsecured Creditors of Smurfit-MBI voted to accept the Plan. (Monitor Voting Report, ¶ 27). Because the applicable Affected Creditors overwhelmingly voted to accept the Plan, the Plan

---

[4] The Monitor Report provided the Affected Creditors of the Canadian Debtors with a summary of the Plan as well as the Monitor's own assessment of the Plan and recommendation in respect of the Plan. (Monitor Report, ¶ 7).

[5] The voting results demonstrate that a majority in number representing more than two-thirds in value of each of the following voting classes voted to accept the Plan: (i) the Affected Secured Creditors of SSC Canada; (ii) the Affected Secured Creditors of Smurfit-MBI; (iii) the Affected Secured Creditors of MBI Limited/Limitee; (iv) the Affected Secured Creditors of Francobec Company; (vi) the Affected Unsecured Creditors of SSC Canada, and (vii) the Affected Unsecured Creditors of Smurfit-MBI. (Monitor Voting Report, ¶¶ 27-28).

provisions providing for the sale of the Canadian Assets will be effected and such assets will be transferred to Canadian Newco on the Effective Date.  (Hunt Aff., ¶ 69).

SSCE is not retaining the Canadian Assets on account of its equity interests in the Canadian Debtors.  Furthermore, Canadian Newco is not receiving the Canadian Assets pursuant to the Canadian Asset Sale on account of SSCE's equity interests in the Canadian Debtors.  Canadian Newco is purchasing the Canadian Assets and receiving such assets in account of the approximately $600 million in consideration provided by Canadian Newco.  (Plan, § 5.1.2).

The Canadian Asset Sale was proposed in good faith and the record reflects that the sale is fair to the Affected Creditors of the Canadian Debtors.  The Canadian Asset Sale is a critical element of the Plan, which was highly scrutinized during arm's-length negotiations with the Debtors' creditor constituencies.  (Hunt Aff., ¶ 57).  While fairness is not necessarily an element of the good faith analysis, the record reflects that the Canadian Asset Sale is fair and the Plan provisions in Article V governing the Canadian Asset Sale are likewise fair.  The fairness of the Canadian Asset Sale is evidenced by the fact that, after full notice and disclosure, the unsecured creditors of SSC Canada and Smurfit-MBI overwhelmingly voted in favor of the Plan.  (See Monitor Voting Report).  The fairness and propriety of the Canadian Asset Sale is further evidenced by the Monitor's endorsement of the sale, determination that the sale is fair and reasonable, and recommendation that all Affected Creditors in Canada vote to accept the Plan.  (See Monitor Report).

Section 1123 of the Bankruptcy Code permits a plan of reorganization to be implemented through the transfer of all or any part of the property of the debtor's estate.  A sale pursuant to a plan of reorganization frankly provides greater protections for affected parties than a sale pursuant to section 363 of the Bankruptcy Code.  See, e.g., In re ORFA Corp. of Philadelphia, 1991 Bankr. LEXIS 1952, *16 (Bankr. E.D. Pa. Oct. 30, 1991) (noting that a sale pursuant to a plan not only provides creditors with the "notice and hearing" dictated by § 363(b), but also provides creditors full exposure to the formal plan voting process, and concluding that a sale pursuant to a plan may be approved without regard or reference to the requirements of § 363(b));

11 U.S.C. § 1123(a)(5). An asset sale pursuant to a plan of reorganization provides for a heightened degree of notice and disclosure surrounding all aspects of the sale, and allows the affected creditors to vote to accept or reject the plan, including the asset sale. The Canadian Asset Sale was proposed pursuant to sections 1123 and 1129 of the Bankruptcy Code, and is thus the product of the standards of the disclosure, solicitation and confirmation processes. The Required Majority of the Affected Creditors voted to approve the Plan, indicating that fair and reasonable consideration will be paid for the Canadian Assets.

The Debtors are not required to pursue a separate, formal marketing process for the Canadian Assets to demonstrate that the consideration is fair. Section 363 of the Bankruptcy Code does not require a debtor to engage in a marketing process, but rather requires a debtor to demonstrate that the price paid for the assets is fair.[6] See In re Exaeris Inc., 380 B.R. 741, 743 (Bankr. D. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith."). Even if section 363 of the Bankruptcy Code applied to an asset sale pursuant to a plan of reorganization, the heightened degree of notice and disclosure regarding the Canadian Asset Sale and the opportunity for the affected creditors to vote to accept or reject the Canadian Asset Sale operate to satisfy the requirements of section 363. The consideration provided by Canadian Newco for the purchase of the Canadian Assets (a) is fair and reasonable and (b) constitutes "reasonably equivalent value" and "fair consideration" (as such terms are used in each of the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and section 548 of the Bankruptcy Code). The Canadian Asset Sale is authorized pursuant to section 1123 of the Bankruptcy Code and complies with all applicable provisions of the Bankruptcy Code pursuant to section 1129(a)(1) of the Bankruptcy Code.

The record reflects, and the Court finds and concludes that the Canadian Asset Sale does

---

[6] The Court freely acknowledges that the "market test," consisting of a court-approved solicitation and auction process, represents the format utilized in the overwhelming majority of asset sales seen by this Court. But it is not the only method permissible under the Bankruptcy Code and Rules.

not violate the absolute priority rule embodied in section 1129(b)(1) of the Bankruptcy Code. Canadian Newco is a newly formed, wholly-owned subsidiary of Reorganized SSCE, and will purchase the Canadian Assets for fair consideration. SSCE is not retaining its equity interests in the Canadian Debtors, nor is it receiving the Canadian Assets on account of its equity interests. Canadian Newco is not receiving nor retaining any property under the Plan "on account of" its equity interest, as it never held any equity interest in the Canadian Debtors, or "on account of" SSCE's equity interests. Canadian Newco is receiving the Canadian Assets on account of the $600 million in consideration provided by Canadian Newco. The Canadian Asset Sale therefore does not violate the absolute priority rule.

Based upon the record developed herein, the objections to confirmation predicated upon the terms of the Canadian Asset Sale are overruled.

**D.     Proposal of the Plan in Good Faith[7]**

These Debtors have spent well over a year before this Court in an effort to reorganize a very large and complex industrial concern. The record reflects that the Debtors attempted, throughout these Chapter 11 cases, to work with their creditor groups in order to reach consensus as to the terms of a plan of reorganization that could be fully supported by all key creditor constituencies and stakeholders. (Hunt Aff., ¶ 54). The Plan has been created and proposed with the stated purpose of reorganizing the Debtors and maximizing the returns available to stakeholders. (Hunt Aff., ¶ 54).

The Plan itself and the arm's length negotiations among the Debtors, the members of the Committee, the Prepetition Lenders, the Prepetition Agents and many, many other stakeholders leading to the Plan's formulation, reflect the result of these arm's length negotiations, embody the best interests of the constituencies of the Debtors' estates and provide independent evidence of the Debtors' good faith in proposing the Plan. (Hunt Aff., ¶¶ 54-58).

---

[7] The Court notes that certain holders of the consolidated U.S. Debtors' common and preferred stock objected to the Plan on grounds, inter alia, of good faith and alleged violation of certain elements of the confirmation requirements contained in Bankruptcy Code § 1129. The Court conducted a lengthy valuation trial, subsequent to which the parties reached a settlement. That settlement is currently pending for hearing before the Court in late June, 2010. The Court's ruling today does not, and is not intended to, address or dispose of any issues or arguments raised by the equity objectors.

Finance II is no longer a proponent of the Plan, and the Finance II Plan has been removed from the Plan. In any case, the Court is satisfied that Finance II at all times acted in good faith with respect to the Plan.[8] Finance II determined in good faith and in accordance with its business judgment not to pursue the Intercompany Claim after the Canadian Bankruptcy Court found that it was worthless, and decided not to pursue the Contribution Claim against SSCE after it determined that the Contribution Claim lacked merit. (Hunt Aff., ¶ 49). As described above, the Plan, however, preserves the Contribution Claim in the event the Finance II Fund Managers, M&T or a trustee appointed by the Canadian Bankruptcy Court pursuant to the BIA decides to prosecute the Contribution Claim on behalf of the estate of Finance II. (Plan, § 3.3.5). In addition, the Plan provides for a sufficient reserve of New SSCC Common Stock on account of the Contribution Claim pursuant to Section 8.16.2 of the Plan.

The Court finds, based upon the record developed herein, that the Debtors have proposed the Plan in good faith and not by any means forbidden by law. Consistent with the overriding purpose of Chapter 11 of the Bankruptcy Code, the Plan is designed to allow each of the Debtors to reorganize on a going concern basis while maximizing recoveries to their creditors and providing the Reorganized Debtors with a capital structure that will allow the Reorganized Debtors to satisfy their obligations with sufficient liquidity and capital reserves and to fund necessary capital expenditures and otherwise conduct their business in the ordinary course. Accordingly, the Plan satisfies the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code.

---

[8] The Objectors correctly note that many of the customary corporate governance formalities were not followed in the case of Finance II, which the record reflects is basically a special purpose vehicle without operations or employees. In sum, the Objectors contend that the management of Finance II – comprised of persons holding other positions of responsibility within these Debtors' consolidated corporate structure – breached their fiduciary duties to the creditors of Finance II by not vigorously pursuing the Intercompany Claim, such that the Plan (embodying transactions or treatment predicated upon such breach) is not filed in good faith. To the extent that this contention may hold some theoretical appeal, it must fail after the determination of the Canadian Bankruptcy Court that the Intercompany Claim is without value.

**CONCLUSION**

For the reasons stated above, the Court concludes and determines that the objections to confirmation of the Debtors' Plan filed by Aurelius, Columbus and M&T are hereby OVERRULED, with the exception of the issue of whether a reserve must be set for the Intercompany Claim. That matter is withheld for further consideration. An appropriate Order follows.

BY THE COURT:

Dated: Wilmington, Delaware  
       June 11, 2010

_____  
Brendan Linehan Shannon  
United States Bankruptcy Judge